**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

JUDGE LYNCH

07 CV 10368

-------------------------------------------------------X

STEVE STAEHR, Derivatively on Behalf of
MORGAN STANLEY,

               Plaintiff,

    vs.

JOHN J. MACK, ZOE CRUZ, EILEEN K.
MURRAY, GARY G. LYNCH, THOMAS R.
NIDES, THOMAS V. DAULA, COLM
KELLEHER, LAURA D. TYSON, C. ROBERT
KIDDER, ROY J. BOSTOCK, ERSKINE B.
BOWLES, SIR HOWARD J. DAVIES,
DONALD T. NICOLAISEN, CHARLES H.
NOSKI, HUTHAM S. OLAYAN, CHARLES E.
PHILLIPS, JR., O. GRIFFITH SEXTON,
KLAUS ZUMWINKEL and DAVID H.
SIDWELL,

              Defendants,

  -and-

MORGAN STANLEY, a Delaware corporation,

          Nominal Defendant.

-------------------------------------------------------X

: Case No.
:
:
:
:
:
:
:
: VERIFIED SHAREHOLDER DERIVATIVE
: COMPLAINT FOR BREACH OF
: FIDUCIARY DUTY, WASTE OF
: CORPORATE ASSETS, UNJUST
: ENRICHMENT AND VIOLATIONS OF THE
: SECURITIES EXCHANGE ACT OF 1934
:
:
:
:
:
:
:
:
:
:
:
:
:
: DEMAND FOR JURY TRIAL



RECEIVED
NOV 15 2007
U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiff, by his attorneys submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of Citigroup, Inc. ("Citigroup" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state and federal law, including breaches of fiduciary duties, waste of corporate assets, unjust enrichment and violations of the Securities Exchange Act of 1934 (the "Exchange Act"), that occurred between January 2007 and the present (the "Relevant Period") and that have caused substantial monetary losses to Citigroup and other damages, such as to its reputation and goodwill.

2.      Citigroup provides a wide range of financial services. During the Relevant Period, Citigroup, under defendants' direction, recklessly spent billions of dollars purchasing subprime loans to be warehoused for future collateralized debt obligations. These actions were reckless due to the impending subprime mortgage crisis and increasing delinquency rates among subprime borrowers.

3.      Despite these material adverse circumstances, defendants directed Citigroup to issue a series of improper statements that proclaimed record growth. In fact, defendant Charles Prince ("Prince"), Citigroup's former Chief Executive Officer ("CEO"), stated in the *Financial Times* that there was too much liquidity for turmoil in the subprime mortgage market to "stop the music." In the meantime, according to Prince: "We're still dancing."

4.      Apparently, the "music stopped" on October 1, 2007 when Citigroup announced a $1.4 billion write-down of its leveraged loan commitments. On October 15, 2007, Citigroup announced third fiscal quarter earnings that were 60% lower than the Company's prior year results. But the worst was still to come.

5.      On November 4, 2007, Citigroup revealed an additional $8 to $11 billion write-down of its subprime secured assets. Further, Citigroup revealed in a Securities and Exchange Commission ("SEC") filing that it was downward revising its earlier reported third quarter results by $166 million. Understandably, defendant Prince resigned in the face of these disclosures.

-1-

certain of the defendants sold their personally held shares while in possession of material non-public information for over $57 million in proceeds.

6.    Currently, Morgan Stanley's credibility with investors is in shambles. During the Relevant Period, the Company's value has declined from over $89 per share to less than $54 per share—a $37.1 billion market capitalization loss.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under the Exchange Act. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2) because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

8.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

9.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Morgan Stanley maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Morgan Stanley occurred in this District; and (iv) defendants have received substantial

-2 -

compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

10.     Plaintiff Steve Staehr is and was, at times relevant hereto, an owner and holder of Morgan Stanley common stock. Plaintiff is a citizen of Nevada.

11.     Nominal defendant Morgan Stanley is a Delaware corporation with its principal executive offices located at 1585 Broadway, New York, New York. Morgan Stanley provides a wide range of financial services.

12.     Defendant Mack is Morgan Stanley's Chairman of the Board of Directors ("Board") and CEO and has been since June 2005. Mack was Morgan Stanley's President, Chief Operating Officer and a director from May 1997 to March 2001. Because of his positions, defendant Mack knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Morgan Stanley. During the Relevant Period, Mack participated in the issuance of improper statements, including the preparation of the improper press releases and Securities and Exchange Commission ("SEC") filings and approval of other statements made to the press, securities analysts and Morgan Stanley shareholders. Defendant Mack received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $800,000 | $36,206,766 | $36,206,766 | 178,945 | $343,395 |
| 2005 | $337,534 | $11,584,207 | $26,235,000 | - | $423,440 |

Defendant Mack sold 207,331 shares of Morgan Stanley stock for $16,732,305.75 in proceeds while in possession of material non-public information. Defendant Mack is a citizen of New York.

13.     Defendant Zoe Cruz ("Cruz") is Morgan Stanley's Co-President and has been since February 2006. Cruz was Morgan Stanley's Acting President from July 2005 to February 2006; Co-President from March 2005 to July 2005; a director from March 2005 to June 2005; and Head of Fixed Income Division from September 2000 to March 2005. Because of her positions, defendant Cruz knew, consciously disregarded, was reckless and grossly negligent in not knowing and should

-3-

have known the adverse non-public information about the business of Morgan Stanley. During the Relevant Period, Cruz participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Morgan Stanley shareholders. Defendant Cruz received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $500,000 | $10,325,000 | $17,270,265 | 85,355 | $6,100 |
| 2005 | $300,000 | $7,245,000 | $13,581,659 | - | $6,100 |

Defendant Cruz sold 229,292 shares of Morgan Stanley stock for $17,064,955.30 in proceeds while in possession of material non-public information. Defendant Cruz is a citizen of New York.

14.      Defendant Eileen K. Murray ("Murray") is Morgan Stanley's Head of Global Operations and Technology and has been since October 2005. Murray was Morgan Stanley's Chief Administrative Officer ("CAO") of Institutional Securities from March 1999 to January 2002. Because of her positions, defendant Murray knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Morgan Stanley. During the Relevant Period, Murray participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Morgan Stanley shareholders. Defendant Murray sold 156,334 shares of Morgan Stanley stock for $12,574,572.44 in proceeds while in possession of material non-public information. Defendant Murray is a citizen of New York.

15.      Defendant Gary G. Lynch ("Lynch") is Morgan Stanley's Chief Legal Officer and has been since October 2005. Because of his position, defendant Lynch knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Morgan Stanley. During the Relevant Period, Lynch participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Morgan Stanley shareholders. Defendant Lynch sold 81,822 shares of Morgan Stanley stock for

-4 -

$6,629,378.92 in proceeds while in possession of material non-public information. Defendant Lynch is a citizen of New York.

16.     Defendant Thomas R. Nides ("Nides") is Morgan Stanley's Executive Vice President, CAO and Secretary and has been since September 2005. Because of his positions, defendant Nides knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Morgan Stanley. During the Relevant Period, Nides participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Morgan Stanley shareholders. Defendant Nides sold 29,048 shares of Morgan Stanley stock for $2,067,025.62 in proceeds while in possession of material non-public information. Defendant Nides is a citizen of the District of Columbia.

17.     Defendant Thomas V. Daula ("Daula") is Morgan Stanley's Chief Risk Officer and has been since April 2005. Daula is also Morgan Stanley's Head of Market Risk Department and has been since January 2002 and Managing Director of Morgan Stanley & Co. and has been since December 2001. Daula was Executive Director of Morgan Stanley & Co. from October 1999 to December 2001. Because of his positions, defendant Daula knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Morgan Stanley. During the Relevant Period, Daula participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Morgan Stanley shareholders. Defendant Daula sold 2,759 shares of Morgan Stanley stock for $206,030.55 in proceeds while in possession of material non-public information. Defendant Daula is a citizen of New Jersey.

18.     Defendant Colm Kelleher ("Kelleher") is Morgan Stanley's Executive Vice President and Chief Financial Officer ("CFO") and has been since October 2007. Kelleher was Morgan Stanley's Head of Global Capital Markets from February 2006 to October 2007; Co-Head of Fixed Income, Europe from May 2004 to February 2006; Head of Fixed Income Sales, Europe from

- 5 -

December 2000 to May 2004; and also served as a member of the European Management Committee and the Board of Morgan Stanley International Limited from May 2004 to February 2006. From 1989 to May 2004, Kelleher held various positions with Morgan Stanley. Because of his positions, defendant Kelleher knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Morgan Stanley. During the Relevant Period, Kelleher participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Morgan Stanley shareholders. Defendant Kelleher is a citizen of New York.

19.     Defendant Laura D. Tyson ("Tyson") is a Morgan Stanley director and has been since 1997. Because of her position, defendant Tyson knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Morgan Stanley. During the Relevant Period, Tyson participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Morgan Stanley shareholders. Defendant Tyson sold 15,000 shares of Morgan Stanley stock for $1,095,004.15 in proceeds while in possession of material non-public information. Defendant Tyson is a citizen of California.

20.     Defendant C. Robert Kidder ("Kidder") is a Morgan Stanley director and has been since 1993. Kidder is also Chairman of the Compensation, Management Development and Succession Committee and has been since March 2006. Because of his positions, defendant Kidder knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Morgan Stanley. During the Relevant Period, Kidder participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Morgan Stanley shareholders. Defendant Kidder sold 8,000 shares of Morgan Stanley stock for $645,761 in proceeds while in possession of material non-public information. Defendant Kidder is a citizen of Ohio.

-6 -

21.     Defendant Roy J. Bostock ("Bostock") is a Morgan Stanley director and has been since 2005. Because of his position, defendant Bostock knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Morgan Stanley. During the Relevant Period, Bostock participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Morgan Stanley shareholders. Defendant Bostock is a citizen of New York.

22.     Defendant Erskine B. Bowles ("Bowles") is a Morgan Stanley director and has been since 2005. Bowles is also a member of the Compensation, Management Development and Succession Committee and has been since January 2006. Because of his positions, defendant Bowles knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Morgan Stanley. During the Relevant Period, Bowles participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Morgan Stanley shareholders. Defendant Bowles is a citizen of North Carolina.

23.     Defendant Sir Howard J. Davies ("Davies") is a Morgan Stanley director and has been since 2004. Davies is also a member of the Audit Committee and has been since 2005. Because of his positions, defendant Davies knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Morgan Stanley. During the Relevant Period, Davies participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Morgan Stanley shareholders. Defendant Davies is a citizen of United Kingdom.

24.     Defendant Donald T. Nicolaisen ("Nicolaisen") is a Morgan Stanley director and has been since 2006. Nicolaisen is also a member of the Compensation, Management Development and Succession Committee and has been since June 2006 and a member of the Audit Committee and has

been since April 2006. Because of his positions, defendant Nicolaisen knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Morgan Stanley. During the Relevant Period, Nicolaisen participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Morgan Stanley shareholders. Defendant Nicolaisen is a citizen of New Jersey.

25.    Defendant Charles H. Noski ("Noski") is a Morgan Stanley director and has been since September 2005. Noski is also Chairman of the Audit Committee and has been since March 2006. Because of his positions, defendant Noski knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Morgan Stanley. During the Relevant Period, Noski participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Morgan Stanley shareholders. Defendant Noski is a citizen of California.

26.    Defendant Hutham S. Olayan ("Olayan") is a Morgan Stanley director and has been since 2006. Because of her position, defendant Olayan knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Morgan Stanley. During the Relevant Period, Olayan participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Morgan Stanley shareholders. Defendant Olayan is a citizen of New York.

27.    Defendant Charles E. Phillips, Jr. ("Phillips") is a Morgan Stanley director and has been since 2006. Phillips is also a member of the Audit Committee and has been since September 2006. Because of his positions, defendant Phillips knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Morgan Stanley. During the Relevant Period, Phillips participated in the issuance of

- 8 -

improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Morgan Stanley shareholders. Defendant Phillips is a citizen of New York.

28.      Defendant O. Griffith Sexton ("Sexton") is a Morgan Stanley director and has been since 2005. Because of his position, defendant Sexton knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Morgan Stanley. During the Relevant Period, Sexton participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Morgan Stanley shareholders. Defendant Sexton is a citizen of Connecticut.

29.      Defendant Klaus Zumwinkel ("Zumwinkel") is a Morgan Stanley director and has been since 2004. Because of his position, defendant Zumwinkel knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Morgan Stanley. During the Relevant Period, Zumwinkel participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Morgan Stanley shareholders. Defendant Zumwinkel is a citizen of Germany.

30.      Defendant David H. Sidwell ("Sidwell") was Morgan Stanley's Executive Vice President and CFO from March 2004 to October 2007. Because of his positions, defendant Sidwell knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of Morgan Stanley. During the Relevant Period, Sidwell participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Morgan Stanley shareholders. Defendant Sidwell is a citizen of New York.

31.      The defendants identified in ¶¶12, 19-29 are referred to herein as the "Director Defendants." The defendants identified in ¶¶12-18, 30 are referred to herein as the "Officer

Defendants." The defendants identified in ¶¶12-17, 19-20 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

32. By reason of their positions as officers, directors and/or fiduciaries of Morgan Stanley and because of their ability to control the business and corporate affairs of Morgan Stanley, the Individual Defendants owed Morgan Stanley and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Morgan Stanley in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Morgan Stanley and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

33. Each director and officer of the Company owes to Morgan Stanley and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

34. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Morgan Stanley, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with Morgan Stanley, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of Morgan Stanley.

-10-

35.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Morgan Stanley, and was at all times acting within the course and scope of such agency.

36.     To discharge their duties, the officers and directors of Morgan Stanley were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Morgan Stanley were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     remain informed as to how Morgan Stanley conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

37.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Morgan Stanley, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period have been ratified by the remaining Individual Defendants who collectively comprised all of Morgan Stanley's Board during the Relevant Period.

38.    The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

39.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

40.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its business prospects; (ii) enhance the Individual Defendants' executive and directorial positions at Morgan Stanley and the profits, power and prestige that the Individual Defendants enjoyed as a result of holding these positions; (iii) sell over $57 million of their personally held shares; and (iv) deceive the investing public, including shareholders

-12-

of Morgan Stanley, regarding the Individual Defendants' management of Morgan Stanley's operations, the Company's financial health and stability, and its future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

41.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct during the Relevant Period. During this time, the Individual Defendants caused the Company to conceal the true fact that Morgan Stanley was misrepresenting its business prospects.

42.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of federal securities law, breaches of fiduciary duty, waste of corporate assets and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition and future business prospects.

43.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

44.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## BACKGROUND: THE SUBPRIME MORTGAGE CRISIS

45.     Morgan Stanley provides a wide range of financial services. Some of those services include the management of collateralized debt obligations ("CDOs"). A CDO consists of a portfolio

- 13 -

of credit-risky fixed-income assets such as asset-backed securities including securitized mortgages. An investment bank, such as Morgan Stanley, creates a CDO by acquiring an inventory of asset-backed securities and then selling rights to the cash flow from the securities in a number of tranches rated by credit risk. Morgan Stanley then profits from the fees that it charges to manage the CDO.

46.    During times relevant hereto, the Individual Defendants directed Morgan Stanley to acquire a vast inventory of securities backed by mortgages made to subprime borrowers. A subprime borrower is someone with a low credit score, higher debt-to-income ratio, or other characteristics associated with a high probability of default relative to "prime" or less-risky borrowers.

47.    In an environment of appreciating home prices and low interest rates, subprime lenders are typically able to stay current due to the rising equity in their property. But in an environment of depreciating home prices, increasing default rates are the norm. This is exactly what has been occurring since at least June 2006.

48.    Thus, a subprime mortgage crisis erupted during the summer of 2006. During the first stage of this crisis, several prominent subprime lenders including New Century Financial Corporation declared bankruptcy as liquidity dried up and the lenders found themselves unable to continue originating loans. Other subprime lenders, such as Accredited Home Lenders Holding Company, staged fire sales in a desperate attempt to raise cash to stay afloat.

49.    During December 2006, despite the impending subprime mortgage crisis, the Individual Defendants directed Morgan Stanley to acquire Saxon, an originator and servicer of subprime mortgages, for $706 million. On information and belief, the Saxon acquisition provided the Individual Defendants with an insider's view of the subprime mortgage crisis.

## IMPROPER STATEMENTS

50.    The Individual Defendants by their fiduciary duties of care, good faith and loyalty owe to Morgan Stanley a duty to insure that the Company's financial reporting fairly represents the operations and financial condition of the Company. In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material, non-public information that should be either disclosed or omitted from the Company's public statements.

51.     This material, non-public information principally included Morgan Stanley's exposure

to the subprime lending market crisis. Furthermore, defendants Nicolaisen, Noski, Phillips and

Davies, as members of the Audit Committee, had a special duty to know and understand this material

information as set out in the Audit Committee's charter which provides that the committee is

responsible for reviewing and discussing earnings press releases and financial information and

earnings guidance provided to analysts and rating agencies.

52.     Defendants Mack, Cruz, Murray, Lynch, Nides, Daula, Kelleher and Sidwell had

ample opportunity to discuss this material information with their fellow officers at management

meetings and via internal corporate documents and reports. Moreover, defendants Mack, Tyson,

Kidder, Bostock, Bowles, Davies, Nicolaisen, Noski, Olayan, Phillips, Sexton and Zumwinkel as

directors of Morgan Stanley had ample opportunity to discuss this material information with

management and fellow directors at any of the Board meetings that occurred during the Relevant

Period, as well as at meetings of committees of the Board. Despite these duties, the Individual

Defendants negligently, recklessly and/or intentionally caused or allowed, by their actions or

inactions, the following improper statements to be disseminated by Morgan Stanley to the investing

public and the Company's shareholders during the Relevant Period.

53.     On June 21, 2006, the Individual Defendants caused or allowed Morgan Stanley to

issue an earnings press release for its second fiscal quarter 2006. The press release announced

earnings of $1.957 billion for the quarter. The press release also announced $2.4 billion of net

revenues from fixed income sales and trading. Defendant Mack commented that Morgan Stanley

was "continuing to make significant progress in executing on [its] plan to derive improved growth,

margins and ROE." In particular, the earnings press release provided as follows:

> Morgan Stanley today reported net income for the second quarter ended May 31,
> 2006 of $1,957 million, up 111 percent from the second quarter of 2005 and 25
> percent above the first quarter of 2006. Net revenues (total revenues less interest
> expense and the provision for loan losses) were a record $8.9 billion, 48 percent
> above last year's second quarter. Non-interest expenses of $5.8 billion increased 24
> percent from last year, primarily resulting from increased compensation costs.
> Diluted earnings per share were $1.86 compared with $0.86 in the second quarter of
> 2005 and the annualized return on average common equity for the second quarter was
> 25.1 percent compared with 13.1 percent a year ago.

-15-

For the first six months of 2006, net income was $3,518 million, a 51 percent increase from $2,330 million a year ago. Net revenues rose 35 percent to $17.4 billion and non-interest expenses increased 26 percent to $11.8 billion. Diluted earnings per share were $3.33 compared with $2.15 a year ago. The annualized return on average common equity was 23.1 percent compared with 16.4 percent a year ago.

### Business Highlights

- Institutional Securities achieved record net revenues of $5.7 billion, up 71 percent from the same period last year, and record income before taxes of $2.3 billion, up 179 percent.

- Equity achieved the highest sales and trading revenues and equity underwriting revenues in six years. These strong sales and trading results included record results in Prime Brokerage.

- Fixed income delivered sales and trading revenues of $2.4 billion, up 95 percent from the same period last year and the second highest ever. This increase reflected record results in credit products and the second best quarter ever in commodities.

- Global Wealth Management Group achieved its highest net revenues since the first quarter of 2001.

- Asset Management launched nine new products this quarter, including international funds and institutional and alternative products. The division also appointed a new head of alternative investments and acquired hedge fund Oxhead Capital Management.

- Discover achieved record net revenues of $1.2 billion and record income before taxes of $541 million as it continued to benefit from improvements in underlying credit quality and low bankruptcies following last fall's spike in bankruptcy filings. Discover also announced the launch of the Discover Business Card, targeting small businesses and leveraging Discover's core Cashback Bonus® rewards feature.

John J. Mack, Chairman and CEO, said, "I could not be more pleased with the outstanding results the employees of Morgan Stanley delivered in the second quarter. Building on our strong momentum in recent quarters, the Firm posted record revenues of $8.9 billion and ROE of 25 percent. We have seen improvement in all of our businesses, with the Firm achieving four straight quarters of improving PBT, and particularly robust results in the first six months of this year. We are continuing to make significant progress in executing on our plan to drive improved growth, margins and ROE. There is still a great deal of work to be done, but we are moving aggressively on many fronts and we see significant opportunities to create shareholder value."

\* \* \*

### INSTITUTIONAL SECURITIES

Institutional Securities posted record income before taxes of $2,267 million, up 179 percent from $813 million in the second quarter of 2005. Record net revenues of $5.7 billion were 71 percent higher, driven by strong results across all businesses. The

quarter's pre-tax margin was 40 percent, compared with 24 percent in last year's second quarter.

- Advisory revenues were $385 million, an 8 percent increase from last year's second quarter.

- Underwriting revenues were $670 million, a 77 percent increase from last year's second quarter. Equity underwriting revenues increased 156 percent to $371 million and fixed income underwriting revenues rose 28 percent to $299 million.

- Fixed income sales and trading net revenues were $2.4 billion, a 95 percent increase over the second quarter of 2005 and the second best quarter. The increase was broad-based, driven by record revenues in credit products and strong performance in commodities. Credit products benefited from significantly improved performance in corporate credit trading following a weak second quarter of 2005 and continuing strong results in residential and commercial securitized products. The higher revenues in commodities were primarily attributable to results in electricity and natural gas. Interest rate & currency products were up slightly, benefiting from strong customer flows and higher foreign exchange trading revenue.

- Equity sales and trading net revenues were $1.7 billion, an increase of 54 percent from last year and the second best quarter on record. Increased client flows across both the cash and derivatives markets drove revenues higher, particularly in Europe and Asia. Trading revenues were also significantly higher. Prime Brokerage financed higher client balances for the 13th consecutive quarter, which contributed to record revenues for the business.

- Investment revenues were $595 million compared with $226 million in the second quarter of last year and included significant gains from investments in the Company's real estate funds, Grifols S.A., Wacker Chemie AG and NYSE Group, Inc.

- The Company's aggregate average trading VaR was $96 million compared with $87 million in the second quarter of 2005 and $84 million in the first quarter of 2006. Total aggregate average trading and non-trading VaR was $106 million compared with $99 million in the second quarter of 2005 and $94 million in the first quarter of 2006. At quarter end, the Company's aggregate trading VaR was $83 million, and the aggregate trading and non-trading VaR was $88 million.

- Non-interest expenses were $3.5 billion, a 37 percent increase from a year ago reflecting increased compensation costs primarily resulting from higher net revenues. Non-compensation expenses were relatively flat as higher expenses resulting from increased levels of business activity were offset by lower charges for legal and regulatory matters.

54.     On September 20, 2006, the Individual Defendants caused or allowed Morgan Stanley

to issue an earnings press release for its third fiscal quarter 2006. The press release announced

-17-

earnings of $1.851 billion for the quarter.    The press release also announced $2.2 billion of net revenues from fixed income sales and trading.    Defendant Mack commented that "[d]espite challenging market conditions, Morgan Stanley achieved its best third quarter ever, demonstrating the continued progress [Morgan Stanley is] making in executing on [its] plan to improve financial performance."  In particular, the earnings press release provided as follows:

> Morgan Stanley today reported income from continuing operations for the third quarter ended August 31, 2006 of $1,851 million, an increase of 59 percent from $1,166 million in the third quarter of 2005. The annualized return on average common equity from continuing operations was 22.7 percent in the current quarter, compared with 17.1 percent in the third quarter of 2005. Diluted earnings per share from continuing operations were $1.75 compared with $1.09 a year ago. Net revenues (total revenues less interest expense and the provision for loan losses) were $8.0 billion, 15 percent above last year's third quarter. Non-interest expenses of $5.3 billion increased 2 percent from last year.

> For the first nine months of 2006, income from continuing operations was $5,291 million, a 54 percent increase from $3,446 million a year ago. The annualized return on average common equity from continuing operations was 22.7 percent compared with 17.0 percent a year ago. Diluted earnings per share from continuing operations were $5.01 compared with $3.19 last year.

> Net income for the quarter, including discontinued operations, was $1,851 million, compared with $144 million in the third quarter of 2005. For the first nine months of 2006, net income, including discontinued operations, was $5,266 million, a 113 percent increase from $2,474 million a year ago. Results for the third quarter and first nine months of 2005 include an after-tax charge of approximately $1 billion for discontinued operations related to the sale of the Company's aircraft financing business. Diluted earnings per share, including discontinued operations, were $1.75 for the quarter, compared with $0.13 in the third quarter of 2005, and the annualized return on average common equity, including discontinued operations, for the third quarter was 22.7 percent compared with 2.0 percent a year ago. For the first nine months, diluted earnings per share, including discontinued operations, were $4.99 compared with $2.29 a year ago and the annualized return on average common equity, including discontinued operations, was 22.6 percent compared with 11.6 percent last year.

> **Business Highlights**

> - Institutional Securities delivered its best third quarter results ever, with net revenues of $5.0 billion and income before taxes of $2.0 billion, up 55 percent from last year.
>
> - Equities sales and trading revenues of $1.5 billion included record results in Prime Brokerage. Fixed Income sales and trading revenues of $2.2 billion reflected record third quarter results in commodities and credit products.
>
> - The Firm reached agreements on several "bolt-on" acquisitions, including the acquisition of TransMontaigne and Heidenreich Marine,

-18-

> Inc. in our commodities business and Saxon Capital in our residential mortgage business.

- Global Wealth Management Group achieved record average annualized revenue and total client assets per global representative of $675,000 and $81 million, respectively, and it recorded $5.4 billion in net new domestic assets during the quarter.

- Asset Management continued to expand its product offerings with the launch of 23 new products primarily targeted at the Company's institutional and non-US client bases, including 10 in Alternatives, 10 in Equities and 3 in Fixed Income.

- Discover achieved record third quarter net revenues and income before taxes and continued its strategy of broadening acceptance of the Discover Card through agreements with merchant acquirers First Data, Global Payments, Inc. and RBS Lynk. Discover also entered a strategic partnership with JCB, the leading card issuer in Japan.

John J. Mack, Chairman and CEO, said, "Despite challenging market conditions, Morgan Stanley achieved its best third quarter ever, demonstrating the continued progress we're making in executing on our plan to improve financial performance. Building on our positive momentum in recent quarters, the people of Morgan Stanley delivered record revenues and earnings in the first nine months of 2006 and an ROE of more than 20% for the fourth quarter in a row. Just as important, we have made substantial progress strengthening key businesses and investing in key areas where we see significant opportunities to further improve our performance and create additional shareholder value."

*  *  *

### INSTITUTIONAL SECURITIES

Institutional Securities posted income before taxes of $2.0 billion, up 55 percent from $1.3 billion in the third quarter of 2005. Net revenues of $5.0 billion were 20 percent higher, driven by strong results across all businesses. The quarter's pre-tax margin was 40 percent, compared with 31 percent in last year's third quarter. The quarter's return on average common equity was 30 percent compared with 24 percent a year ago.

- Advisory revenues were $461 million, a 19 percent increase from last year's third quarter.

- Underwriting revenues were $548 million, a 7 percent increase from last year's third quarter. Equity underwriting revenues increased 19 percent to $237 million and fixed income underwriting revenues were virtually unchanged at $311 million.

- Fixed income sales and trading net revenues were $2.2 billion, a 13 percent increase over the third quarter of 2005. The increase was driven by strong results in commodities and credit products, partially offset by lower results in interest rate & currency products. The increase in commodities was driven by strong results in oil liquids, electricity and natural gas due to strong client activity including revenues recognized on a few large structured transactions as a result

-19-

of increased visibility of market value. Credit products had a record third quarter benefiting from activity in structured products, particularly in Europe. Interest rate & currency products were adversely affected by a less favorable environment as customer driven flow and volatility declined and the yield curve flattened. In addition, emerging markets revenues were significantly lower due to slower customer flow and market conditions. These factors more than offset an increase in revenues recognized on structured transactions in interest rate & currency products.

- Equity sales and trading net revenues of $1.5 billion were a record third quarter and increased 18 percent from last year's third quarter. Increased client flows across both the cash and derivatives markets and record results in Prime Brokerage drove revenues higher.

- Investment revenues were $188 million compared with $69 million in the third quarter of last year and included significant gains from investments in the Company's real estate funds, IntercontinentalExchange and Grifols S.A.

- The Company's aggregate average trading VaR measured at the 95% confidence level was $56 million compared with $52 million in the third quarter of 2005 and $63 million in the second quarter of 2006. Total aggregate average trading and non-trading VaR was $66 million compared with $58 million in the third quarter of 2005 and $70 million in the second quarter of 2006. At quarter end, the Company's aggregate trading VaR was $61 million, and the aggregate trading and non-trading VaR was $75 million.

- Non-interest expenses were $3.0 billion, a 4 percent increase from a year ago. Non-compensation expenses increased as a result of higher levels of business activity and charges for legal and regulatory matters. Compensation costs declined slightly from a year ago reflecting the Company's current estimate of 2006 full year compensation based on forecasted full year performance and market conditions. In addition, the prior year included charges for senior management severance and new hires.

55.    On December 19, 2006, the Individual Defendants caused or allowed Morgan Stanley

to issue an earnings press release for its fiscal year 2006. The press release reported "record" income

of $7.497 billion. The press release also reported $2.3 billion of net revenues from fixed income

sales and trading for Morgan Stanley's fourth fiscal quarter 2006. Defendant Mack commented that

"2006 was a year of outstanding performance and progress for Morgan Stanley." In particular, the

earnings press release provided as follows:

Morgan Stanley today reported record income from continuing operations for the fourth quarter and the full year 2006. In addition, the Board of Directors has approved the spin-off of Discover in order to enhance shareholder value.

-20-

The Firm achieved record income from continuing operations for the fiscal year ended November 30, 2006 of $7,497 million, a 44 percent increase from $5,192 million a year ago. Diluted earnings per share from continuing operations were a record $7.09 compared with $4.81 last year. Record net revenues (total revenues less interest expense and the provision for loan losses) of $33.9 billion were 26 percent higher than last year. Non-interest expenses of $22.9 billion were 18 percent above 2005. Compensation expenses increased 27 percent primarily reflecting higher revenues. Non-compensation expenses increased 5 percent as costs associated with higher levels of business activity were partly offset by lower charges for legal and regulatory matters. Results for the current year include an income tax benefit of $280 million, or $0.27 per diluted share, resulting from the outcome of a federal tax audit, while the prior year included a tax benefit of $309 million, or $0.29 per diluted share, related to the provisions of the American Jobs Creation Act. The return on average common equity from continuing operations was 23.6 percent compared with 19.0 percent a year ago.

Income from continuing operations for the fourth quarter was a record $2,206 million, an increase of 26 percent from $1,746 million in the fourth quarter of 2005. Diluted earnings per share from continuing operations were a record $2.08 compared with $1.64 a year ago. Net revenues were $8.6 billion, 24 percent above last year's fourth quarter. Non-interest expenses of $5.8 billion increased 19 percent from last year. The results for the fourth quarters of 2006 and 2005 include the $0.27 and $0.29 per diluted share tax benefits noted above. The annualized return on average common equity from continuing operations was 26.0 percent in the current quarter, compared with 24.9 percent in the fourth quarter of 2005.

Net income (including discontinued operations) for the year was a record $7,472 million, a 51 percent increase from $4,939 million a year ago. For the quarter, net income was $2,206 million, compared with $2,465 million in the fourth quarter of 2005, which included an after-tax gain of approximately $700 million related to the sale of the Company's aircraft leasing business. Diluted earnings per share were a record $7.07 for the year compared with $4.57 a year ago and the return on average common equity was 23.5 percent compared with 17.3 percent last year. For the quarter, diluted earnings per share were $2.08, compared with $2.32 in the fourth quarter of 2005, and the annualized return on average common equity for the fourth quarter was 26.0 percent compared with 34.6 percent a year ago.

**Full Year Business Highlights**

- Institutional Securities delivered its best full-year results ever, with record net revenues of $21.6 billion and record income before taxes of $8.2 billion, up 72 percent from last year.

- Record equity sales and trading revenues of $6.3 billion this year were up 32 percent from 2005. This increase reflected the third consecutive year of record results in Prime Brokerage.

- Record fixed income sales and trading revenues and fixed income underwriting revenues were up 41 percent and 29 percent, respectively, from 2005. Record results across commodities, credit products and interest rate & currency products drove fixed income sales and trading revenues.

- Global Wealth Management delivered its highest revenues in six years and demonstrated improvement in many areas, with financial

advisor productivity and assets per global representative at all time highs in the fourth quarter, and assets in its bank deposit program exceeding $13 billion.

- Asset Management made significant progress this year in executing its strategic plan and building a solid foundation for future profitable growth. During the fourth quarter, the division launched 15 new products and expanded its alternative investment business through the announced acquisition of FrontPoint Partners and minority investments in Avenue Capital and Lansdowne Partners.

- Discover achieved its best full-year results ever, with net revenues of $4.3 billion and income before taxes of $1.6 billion, up 72 percent from last year.

John J. Mack, Chairman and CEO, said, "2006 was a year of outstanding performance and progress for Morgan Stanley. Capitalizing on a strong market environment, the people of Morgan Stanley achieved record fourth quarter results and the best full-year revenues and earnings in the Firm's history. In our securities business, we delivered powerful performance across our Institutional Securities franchise and made significant strides in our Asset Management and Global Wealth Management businesses. Discover also achieved record results this year and made substantial progress in executing critical growth initiatives."

Mr. Mack continued, "Given the record results and significant momentum both in our securities business and our cards and payments business, we have concluded, after our most recent strategic review, that they can best execute their growth strategies as two stand-alone, well-capitalized companies with independent boards of directors focused on creating shareholder value. The spin-off will allow Discover to continue building on its strong brand and significant scale. We also believe the spin-off will unlock considerable value for the shareholders of Morgan Stanley."

Mr. Mack concluded, "Thanks to the hard work and commitment of Morgan Stanley's employees, we have now delivered five straight quarters with an ROE above 20 percent. While there is still room for improvement in many of our businesses, the investments we have made - and the significant strategic steps we have taken - will position Morgan Stanley and Discover for continued success as each focuses intensely on accelerating growth and creating additional shareholder value."

\* \* \*

### INSTITUTIONAL SECURITIES

### FULL YEAR

Institutional Securities reported record pre-tax income of $8,160 million, a 72 percent increase from 2005. Net revenues rose 38 percent to a record $21.6 billion, driven by record results in fixed income sales and trading, equity sales and trading, and fixed income underwriting and strong results in advisory. Non-interest expenses rose 23 percent from the prior year to $13.4 billion primarily due to increased compensation costs resulting from higher revenues. Non-compensation expenses increased modestly as costs associated with higher levels of business activity were offset by significantly lower charges for legal and regulatory matters. The year's pre-tax margin was 38 percent compared with 30 percent in 2005 and the full-year return on average common equity was 31 percent up from 24 percent in the prior year.

-22-

Advisory revenues rose 25 percent from last year to $1.8 billion. Fixed income underwriting revenues rose 29 percent to a record $1.4 billion and equity underwriting revenues rose 17 percent to $1.1 billion.

For the calendar year-to-date, the Company ranked second in global completed M&A with a 30 percent market share, second in global IPOs with a 9 percent market share, third in global announced M&A with a 27 percent market share, third in global equity and equity-related issuances with an 8 percent market share and fifth in global debt issuance with a 6 percent market share.

Fixed income sales and trading revenues were a record $9.6 billion, up 41 percent from 2005. The increase was driven by record results in commodities, credit products and interest rate & currency products. Commodities generated strong results in electricity, natural gas and oil liquids. Credit products benefited from significantly improved corporate credit trading and strength in residential and commercial securitized products. Both commodities and interest rate & currency products benefited from revenues recognized on structured transactions as a result of increased visibility of market value.

Equity sales and trading revenues were a record $6.3 billion, a 32 percent increase from the prior year. The increase was broad based, with strength in derivatives and cash markets on higher market volumes, particularly in Europe and Asia, and strong trading results. Financing products had higher revenues resulting from increased client activity and Prime Brokerage achieved record results due to robust growth in client asset balances.

Principal investment gains were $1,477 million for the year compared with $656 million in 2005. Significant gains resulted from the Company's interest in real estate funds, IntercontinentalExchange, Grifols S.A., NYSE Group, Inc. and Wacker Chemie AG.

**FOURTH QUARTER**

- Institutional Securities posted record pre-tax income of $2.3 billion, up 46 percent from $1.6 billion in the fourth quarter of 2005. Record net revenues of $5.6 billion were 34 percent higher, driven by strong results across all businesses. The quarter's pre-tax margin was 41 percent, compared with 38 percent in last year's fourth quarter. The quarter's return on average common equity was 36 percent compared with 35 percent a year ago.

- Advisory revenues were $642 million, a 34 percent increase from last year's fourth quarter, and the highest in seven years. The increase was driven by M&A activity as well as strength in real estate.

- Underwriting revenues were $709 million, a 14 percent increase from last year's fourth quarter. Fixed income underwriting revenues were a record $455 million, a 72 percent increase from the prior year's fourth quarter. Equity underwriting revenues decreased 29 percent to $254 million over the same period.

- Fixed income sales and trading net revenues of $2.3 billion were a record fourth quarter and increased 41 percent from last year's fourth quarter. The increase was driven by record results in interest rate & currency products and strong results in credit products. Interest rate &

currency products benefited from favorable positioning and activity in emerging markets. Credit products had a record fourth quarter and benefited from increased customer flows and continued strength in residential securitized products. Commodities revenues were down slightly. Both commodities and interest rate & currency products benefited from revenues recognized on structured transactions as a result of increased visibility of market value.

- Equity sales and trading net revenues of $1.4 billion were a record fourth quarter and increased 20 percent from last year's fourth quarter. Increased client flows across the derivatives and cash markets drove revenues higher, particularly in Europe. Financing products also had higher revenues compared with last year. Prime Brokerage financed higher client balances for the 15th consecutive quarter, which contributed to record revenues for the business.

- Investment revenues were $410 million compared with $270 million in the fourth quarter of last year and included significant gains from investments in the Company's interest in real estate funds and IntercontinentalExchange.

- The Company's aggregate average trading VaR measured at the 95 percent confidence level was $61 million compared with $52 million in the fourth quarter of 2005 and $56 million in the third quarter of 2006. Total aggregate average trading and non-trading VaR was $67 million compared with $60 million in the fourth quarter of 2005 and $66 million in the third quarter of 2006. At quarter end, the Company's aggregate trading VaR was $85 million, and the aggregate trading and non-trading VaR was $89 million.

- Non-interest expenses were $3.3 billion, a 26 percent increase from a year ago. Compensation costs increased from a year ago reflecting higher revenues. Non-compensation expenses increased as a result of higher levels of business activity, partly offset by a favorable variance for legal and regulatory matters.

\* \* \*

**OTHER MATTERS**

\* \* \*

As of November 30, 2006, the Company repurchased approximately $3.4 billon of its common stock (approximately 52 million shares) since the end of fiscal 2005. *The Company also announced that its Board of Directors authorized the repurchase of up to $6 billion of the Company's outstanding stock.* This share repurchase authorization replaces the Company's previous repurchase authorizations with one repurchase program for capital management purposes that will consider, among other things, business unit capital needs, as well as equity-based compensation and benefit plan requirements. The authorization will be exercised over the next 12-18 months at prices the Company deems appropriate, subject to its surplus capital position, market conditions and regulatory considerations.

-24-

56.    On March 21, 2007, the Individual Defendants caused or allowed Morgan Stanley to

issue an earnings press release for its first fiscal quarter 2007. The press release reported income of

$2.559 billion for the quarter. The press release also reported $3.6 billion of "record" net revenues

from fixed income sales and trading. Defendant Mack commented that "[t]his strong performance

was in large part the result of *effective, disciplined risk-taking* by our team in Institutional Securities

...." In particular, the earnings press release provided as follows:

> Morgan Stanley today reported record income from continuing operations for the first quarter ended February 28, 2007 of $2,559 million, an increase of 60 percent from $1,602 million in the first quarter of 2006. Diluted earnings per share from continuing operations were a record $2.40 compared with $1.51 a year ago. Net revenues were a record $11.0 billion, 29 percent above last year's first quarter. Non-interest expenses of $7.1 billion increased 17 percent from last year. The annualized return on average common equity from continuing operations was 28.8 percent in the current quarter, compared with 21.9 percent in the first quarter of 2006.
>
> Net income was a record $2,672 million, an increase of 70 percent from $1,574 million in the first quarter of 2006. This quarter's results included an after-tax gain of $109 million reported in discontinued operations related to the sale of Quilter Holdings Ltd. Record diluted earnings per share were $2.51, compared with $1.48 in the first quarter of 2006, and the annualized return on average common equity for the first quarter was 29.9 percent compared with 21.3 percent a year ago.
>
> **Business Highlights**
>
> - Institutional Securities achieved record net revenues of $7.6 billion, up 37 percent from last year. Pre-tax income rose 71 percent to a record $3.0 billion and return on average common equity was 40 percent.
>
> - Equity sales and trading delivered record revenues of $2.2 billion, up 36 percent from last year. These results reflect record revenues in derivatives and Prime Brokerage, two key areas that the Company has invested in as part of its growth plans.
>
> - Fixed income sales and trading achieved record revenues of $3.6 billion, up 31 percent from last year. These results reflect record revenues in credit products, up 94 percent, and strength across our interest rate & currency and commodities businesses.
>
> - Global Wealth Management Group delivered a pre-tax margin of 15 percent and its highest quarterly revenues since 2000, as financial advisor productivity and client assets per global representative reached all time highs and client assets in our bank deposit sweep program exceeded $16 billion.
>
> - Asset Management continued to make good progress in its plan for growth. The business delivered its second consecutive quarter of positive net flows and posted long-term inflows for the first time in

-25-

> two years, driven, in part, by new products launched during the past year.

- Discover delivered strong results, including record transaction volume and the fifth consecutive quarter of managed receivables growth, and it continues to be well-positioned for success as a stand-alone company. The spin-off of Discover remains on track for the third quarter of this year.

John J. Mack, Chairman and CEO, said, "Morgan Stanley delivered outstanding results this quarter - with record revenues and earnings along with ROE of more than 20 percent for the sixth quarter in a row. This strong performance was in large part the result of effective, disciplined risk-taking by our team in Institutional Securities, which helped deliver record results across our sales and trading businesses. Our Global Wealth Management business this quarter delivered its highest revenues since 2000 and we continued to make substantial progress in executing our growth plan in Asset Management. We see many opportunities to further improve our performance, and remain intensely focused on helping our clients navigate the constantly changing markets and leveraging our global franchise to create additional value for our shareholders."

\* \* \*

### INSTITUTIONAL SECURITIES

Institutional Securities posted record pre-tax income of $3.0 billion, up 71 percent from $1.8 billion in the first quarter of 2006. Record net revenues of $7.6 billion were 37 percent higher, driven by record results in fixed income and equities. The quarter's pre-tax margin was 40 percent, compared with 32 percent in last year's first quarter. The quarter's return on average common equity was 40 percent compared with 29 percent a year ago.

- Advisory revenues were $390 million, a 10 percent increase from last year's first quarter.

- Underwriting revenues were $659 million, a 20 percent increase from last year's first quarter. Fixed income underwriting revenues were $359 million, a 2 percent increase from the prior year's first quarter, and equity underwriting revenues increased 52 percent to $300 million over the same period.

- Fixed income sales and trading net revenues were a record $3.6 billion, a 31 percent increase over the previous record in the first quarter of 2006. Performance was broad based across credit products, interest rate & currency products and commodities. Credit products had record results driven by a significant increase in revenues from securitized products. Trading revenues were significantly higher, driven by favorable positioning in the residential mortgage markets, robust performance in corporate credit trading, and strong customer flows. Interest rate & currency products benefited from improved results in interest rate trading and record revenues in emerging markets. Commodities, although down from last year's record first quarter, produced its second best quarter ever, benefiting from trading results in electricity, natural gas and oil liquids.

- Equity sales and trading net revenues were a record $2.2 billion, an increase of 36 percent from last year's first quarter. Increased client flows and trading across both the cash and derivatives markets drove revenues higher. Rising stock market indices in the quarter fueled growth in client volumes across all regions. Prime Brokerage financed higher client balances for the 16th consecutive quarter, which contributed to record revenues for the business.

- Investment revenues were $801 million compared with $312 million in the first quarter of last year. The increase was driven by significant gains from investment banking's interest in real estate funds and $237 million of investment revenue associated with returns in our employee deferred compensation and co-investment plans that are substantially offset by increased compensation expense related to these plans. The quarter also included gains on fixed income's investments in Grifols S.A. and IntercontinentalExchange.

- The Company's aggregate average trading VaR measured at the 95 percent confidence level was $90 million compared with $58 million in the first quarter of 2006 and $61 million in the fourth quarter of 2006. Total aggregate average trading and non-trading VaR was $92 million compared with $65 million in the first quarter of 2006 and $67 million in the fourth quarter of 2006. The overall increase from last year was due, in part, to increases in the equities price and commodities price VaR. At quarter end, the Company's aggregate trading VaR was $76 million, and the aggregate trading and non-trading VaR was $78 million.

- Non-interest expenses were $4.6 billion, an increase of 22 percent from the first quarter of last year. Compensation costs were higher compared with a year ago as increases resulting from higher revenues 3 were partly offset by the incremental compensation charges recorded in the first quarter of 2006.1 In addition, non-compensation expenses increased as a result of higher levels of business activity.

57.    On June 20, 2007, the Individual Defendants caused or allowed Morgan Stanley to

issue an earnings press release for its second fiscal quarter 2007. The press release reported income

of $2.582 billion for the quarter. The press release also reported $2.9 billion of net revenues from

fixed income sales and trading, which were offset by "lower securitized products revenues, primarily

in residential mortgaged securities." Despite the lower mortgage related revenues, defendant Mack

commented that Morgan Stanley "continued to build momentum across our securities businesses and

continued to see the benefits of [its] diverse mix of products, clients and businesses around the globe.

In particular, the earnings press release provided as follows:

Morgan Stanley today reported record income from continuing operations for the second quarter ended May 31, 2007 of $2,582 million, an increase of 41 percent from $1,828 million in the second quarter of 2006. Diluted earnings per share from continuing operations were a record $2.45 compared with $1.74 a year ago. Net

-27-

revenues were a record $11.5 billion, 32 percent above last year's second quarter. Non-interest expenses of $7.6 billion increased 31 percent from last year. The annualized return on average common equity from continuing operations was 27.5 percent in the current quarter, compared with 23.7 percent in the second quarter of 2006.

For the first six months of 2007, income from continuing operations was a record $5,141 million, a 50 percent increase from $3,430 million a year ago. Diluted earnings per share from continuing operations were a record $4.86 compared with $3.25 last year. Net revenues rose 31 percent to a record $22.5 billion and non-interest expenses increased 24 percent to $14.8 billion. The annualized return on average common equity from continuing operations was 28.2 percent, compared with 22.8 percent a year ago.

Net income for the quarter was $2,582 million, an increase of 40 percent from $1,841 million in the second quarter of 2006. For the first six months of 2007, net income was a record $5,254 million, a 54 percent increase from $3,415 million a year ago. Diluted earnings per share were $2.45 for the quarter, compared with $1.75 in the second quarter of 2006, and the annualized return on average common equity for the second quarter was 27.5 percent compared with 23.7 percent a year ago. For the first six months, diluted earnings per share were a record $4.96, compared with $3.23 a year ago, and the annualized return on average common equity was 28.7 percent compared with 22.5 percent last year.

## Business Highlights

- Institutional Securities achieved record net revenues of $7.4 billion, up 39 percent from last year. Pre-tax income rose 55 percent to a record $3.0 billion.

- Investment Banking achieved record results, with revenues of $1.7 billion, a 65 percent increase from the second quarter of 2006. Advisory revenues and underwriting revenues both reached record highs.

- Equity sales and trading delivered record revenues of $2.2 billion, up 33 percent from last year, reflecting record results in Prime Brokerage and Derivatives.

- Fixed income sales and trading revenues increased 34 percent to $2.9 billion, the second-best quarter ever in this business.

- Global Wealth Management delivered its fifth consecutive quarter of improved performance and achieved a pre-tax margin of 16 percent. Client assets per global representative and financial advisor productivity reached all-time highs, and the Firm increased the number of global representatives to 8,137.

- Asset Management recorded net customer inflows of $9.3 billion - more than double the prior quarter. Assets under management reached $560 billion at quarter-end, a 23 percent increase from a year ago.

- Discover continues to be well positioned for success as a stand-alone company, and delivered its sixth consecutive quarter of receivables growth due to increased net sales volume and stable payment rates.

The spin-off of Discover remains on track and is scheduled to occur on June 30, 2007.

John J. Mack, Chairman and CEO, said, "Morgan Stanley delivered record revenues and earnings in the second quarter and the first half of the year, as we continued to build momentum across our securities businesses and continued to see the benefits of our diverse mix of products, clients and businesses around the globe. Thanks to the commitment and focus of our people, we've now achieved seven straight quarters with ROE above 20 percent, and we're well on our way to reaching our goal of doubling 2005 earnings over five years. But we believe there is still work that remains to be done, and we remain intensely focused on delivering value to Morgan Stanley's clients and shareholders over the long term."

\* \* \*

### INSTITUTIONAL SECURITIES

Institutional Securities posted record pre-tax income of $3.0 billion, up 55 percent from $1.9 billion in the second quarter of 2006. Record net revenues of $7.4 billion were 39 percent higher, driven by strong results across all businesses. The quarter's pre-tax margin was 40 percent, compared with 36 percent in last year's second quarter. The quarter's return on average common equity was 35 percent compared with 28 percent a year ago.

- Advisory revenues were a record $725 million, a 99 percent increase from last year's second quarter.

- Record underwriting revenues of $979 million increased 46 percent from last year's second quarter. Fixed income underwriting revenues were a record $486 million, a 63 percent increase from the prior year's second quarter and equity underwriting revenues increased 33 percent to $493 million over the same period.

- Fixed income sales and trading net revenues were $2.9 billion, a 34 percent increase over the second quarter of 2006. The increase was driven by strong results in interest rate & currency and credit products, partly offset by lower results in commodities. Interest rate & currency products benefited from record revenues in emerging markets and higher results in interest rate trading. Credit products had strong results, with higher client activity and trading revenues driven by corporate credit and structured products. These were offset by lower securitized products revenues, primarily in residential mortgage securities. Commodities revenues were down slightly from last year's second quarter with lower revenues in electricity and natural gas.

- Equity sales and trading net revenues were a record $2.2 billion, an increase of 33 percent from last year's second quarter. Favorable global market conditions and increased client flows in all regions across cash, derivatives and financing markets drove revenues higher. Prime Brokerage financed higher client balances for the 17th consecutive quarter, which contributed to record revenues for the business.

- Investment revenues were $396 million compared with $389 million in the second quarter of last year.

- The Company's aggregate average trading VaR measured at the 95 percent confidence level was $81 million compared with $63 million for the second quarter of 2006 and $90 million for the first quarter of 2007. Total aggregate average trading and non-trading VaR was $87 million compared with $70 million for the second quarter of 2006 and $92 million for the first quarter of 2007. At quarter end, the Company's aggregate trading VaR was $86 million, and the aggregate trading and non-trading VaR was $93 million.

- Non-interest expenses were $4.4 billion, an increase of 30 percent from the second quarter of last year. Compensation costs were higher compared with a year ago resulting from higher revenues and non-compensation expenses increased as a result of higher levels of business activity and business investment.

58.     On September 19, 2007, the Individual Defendants caused or allowed Morgan Stanley

to issue an earnings press release for its third fiscal quarter 2007. The press release announced

disappointing earnings of $1.474 billion—a decrease of 7 percent compared to Morgan Stanley's

earnings for the third fiscal quarter 2006. The press release also announced a 3 percent decrease in

its net revenues from fixed income sales and trading, which totaled $2.2 billion. The reduced

revenues resulted from "lower credit revenues as spread widening, lower liquidity and higher

volatility resulted in lower origination, securitization and trading results across most products."

Nevertheless, defendant Mack commented that "[e]ven with these turbulent markets, Morgan Stanley

still delivered strong performances across many core businesses …." In particular the press release

provided as follows:

Morgan Stanley today reported income from continuing operations for the third quarter ended August 31, 2007 of $1,474 million, a decrease of 7 percent from $1,588 million in the third quarter of 2006. Diluted earnings per share from continuing operations were $1.38 compared with $1.50 a year ago. Net revenues were $8.0 billion, 13 percent above last year's third quarter. Non-interest expenses of $5.7 billion increased 18 percent from last year. The annualized return on average common equity from continuing operations was 17.2 percent in the current quarter compared with 23.3 percent in the third quarter of 2006.

For the first nine months of 2007, income from continuing operations was a record $6,151 million, a 41 percent increase from $4,353 million a year ago. Diluted earnings per share from continuing operations were a record $5.79 compared with $4.12 last year. Net revenues rose 29 percent to a record $28.5 billion and non-interest expenses increased 24 percent to $19.2 billion. The annualized return on average common equity from continuing operations was 25.5 percent compared with 22.4 percent a year ago.

The results for Discover Financial Services prior to its spin-off on June 30, 2007 are reported in discontinued operations on an after-tax basis. Including these results, net income for the quarter was $1,543 million, a decrease of 17 percent from $1,851

million in the third quarter of 2006. For the first nine months of 2007, net income was a record $6,797 million, a 29 percent increase from $5,266 million a year ago. Diluted earnings per share were $1.44 for the quarter compared with $1.75 in the third quarter of 2006, and the annualized return on average common equity for the third quarter was 17.1 percent compared with 22.7 percent a year ago. For the first nine months, diluted earnings per share were a record $6.40 compared with $4.99 a year ago, and the annualized return on average common equity was 24.9 percent compared with 22.6 percent last year.

## Business Highlights

- Institutional Securities achieved net revenues of $5.0 billion, up 2 percent from last year, although down from the record second quarter.

- Investment Banking revenues increased 45 percent to $1.4 billion from the third quarter of 2006. Morgan Stanley ranked #1 in Global Completed M&A and #2 in Global Announced M&A1 and our pipeline remains strong.

- Equity sales and trading net revenues increased 16 percent to $1.8 billion from last year. Record results in derivatives and prime brokerage and record trading volumes in our core equity business were partly offset by significant trading losses in quantitative strategies.

- Fixed income sales and trading net revenues decreased 3 percent to $2.2 billion from last year, as significantly lower revenues in credit products were offset by record revenues in interest rate & currency products.

- Other sales and trading included losses of approximately $940 million due to the marking to market of loans as well as closed and pipeline commitments. These losses reduced third quarter earnings per share from continuing operations by approximately $0.33. The markdowns reflect the illiquidity created by current market conditions.

- Global Wealth Management delivered its sixth consecutive quarter of improved performance - with the third highest quarterly net revenues ever and a pre-tax margin of 17 percent. Client inflows of nearly $15 billion reached all-time highs, and annualized revenue per global representative was a record $817,000.

- Asset Management recorded its fourth consecutive quarter of net positive flows. Record net customer inflows for the quarter of $20.8 billion compared with $9.3 billion in the prior quarter. Assets under management reached $577 billion at quarter-end, a 25 percent increase from a year ago.

John J. Mack, Chairman and CEO, said, "Morgan Stanley's diversification across businesses and regions helped us deliver ROE of 17.2% this quarter, despite the impact of the severe market disruption on some areas of the Firm--including our credit products, leveraged lending and quantitative strategies businesses. Even with these turbulent markets, Morgan Stanley still delivered strong performances across many core businesses and achieved record results in our prime brokerage, derivatives and interest rate & currencies businesses. In addition, we continued making progress

-31-

in executing our growth plans and vastly improving performance in Asset Management and Global Wealth Management.

"As always, the people of Morgan Stanley remain intensely focused on helping our clients navigate the constantly changing markets and seizing the opportunities they offer our clients and the Firm. In the months ahead, we will continue to leverage our diverse, global franchise to create value for our clients and shareholders."

*   *   *

## INSTITUTIONAL SECURITIES

Institutional Securities posted pre-tax income of $1.5 billion, down 22 percent from $1.9 billion in the third quarter of 2006. Net revenues of $5.0 billion were 2 percent higher than a year ago. The quarter's pre-tax margin was 30 percent compared with 39 percent in last year's third quarter. The quarter's return on average common equity was 16 percent compared with 30 percent a year ago.

- Advisory revenues were $664 million, a 50 percent increase from last year's third quarter.

- Underwriting revenues of $775 million increased 41 percent from last year's third quarter. Equity underwriting revenues were $429 million, an 81 percent increase from the prior year's third quarter and fixed income underwriting revenues increased 11 percent to $346 million over the same period.

- Fixed income sales and trading net revenues were $2.2 billion, a 3 percent decrease from the third quarter of 2006. The decrease was driven by significantly lower credit revenues as spread widening, lower liquidity and higher volatility resulted in lower origination, securitization and trading results across most products. Commodities revenues were down on lower trading results. These decreases were partly offset by record results in interest rate & currency products, which benefited from stronger revenues in interest rates and foreign exchange. Fixed income sales and trading also benefited by approximately $290 million from the widening of Morgan Stanley's credit spreads on certain long-term debt.

- Equity sales and trading net revenues were $1.8 billion, an increase of 16 percent from last year's third quarter. Record results in derivatives and prime brokerage were partly offset by trading losses in quantitative strategies of approximately $480 million resulting from unfavorable positioning as the market significantly reduced leverage late in the quarter.

- Other sales and trading net losses of $877 million primarily reflect losses of approximately $940 million from marking to market loans and closed and pipeline commitments, largely related to acquisition financing provided to non-investment grade companies.

- Investment revenues were $217 million compared with $114 million in the third quarter of last year.

- The Company's aggregate average trading VaR measured at the 95 percent confidence level was $87 million compared with $56 million in the third quarter of 2006 and $81 million in the second quarter of 2007. Total aggregate average trading and non-trading VaR was $91 million compared with $66 million in the third quarter of 2006 and $87 million in the second quarter of 2007. At quarter-end, the Company's aggregate trading VaR was $81 million, and the aggregate trading and non-trading VaR was $84 million, down from $86 million and $93 million, respectively, at the end of this year's second quarter. The Company actively reduced positions during the quarter, but the change in market conditions implied higher volatility and higher risk as measured by VaR for these reduced exposures.

- Non-interest expenses were $3.5 billion, an increase of 17 percent from the third quarter of last year. Non-compensation expenses increased from a year ago primarily as a result of higher levels of business activity, business investment and operating expenses associated with Saxon Capital, TransMontaigne and Heidenreich Marine, Inc. Compensation costs in the current quarter were higher than a year ago as the prior year included an adjustment in the compensation ratio based on an assessment of 2006 compensation levels.

## THE TRUTH IS REVEALED

59.     Then on November 7, 2007, Morgan Stanley issued a press release that revealed the

true extent of the Company's exposure to the subprime mortgage market crisis. The press release

revealed that Morgan Stanley had $12.3 billion in subprime related balance sheet exposures. The

press release also announced that Morgan Stanley was writing-down these subprime exposures by

*$3.7 billion*. Moreover, Morgan Stanley warned that "these exposures will frequently change and

could *further deteriorate*." In particular, the press release provided as follows:

Morgan Stanley today provided additional information about the Firm's U.S. subprime related exposures, which have declined in value as a result of continued market deterioration since August 2007.

At the end of Morgan Stanley's fiscal third quarter on August 31, 2007, the Firm had $12.3 billion in U.S. subprime related balance sheet exposures representing $10.4 billion in net exposures, as indicated in the attached table. Net exposure as of October 31, 2007 is $6.0 billion. Net exposures are defined as potential loss to the firm in a 100 percent loss default scenario, with zero recovery.

Since that time, the fair value of these exposures has declined as a result of the continued deterioration in market data, as reflected by the sharp decline in the ABX Indices, and other market developments, including updates to mortgage remittance data and cumulative loss forecasts. The declines in value are outlined in the attached table as of August 31, 2007 and October 31, 2007.

As a result of these declines in value, Morgan Stanley's revenues for the two months ended October 31, 2007, were reduced by $3.7 billion (representing a decline of

-33-

approximately $2.5 billion in net income on an after-tax basis). The actual impact on the Firm's fourth quarter financial results, which will include results for the month of November, will depend on future market developments and could differ from the amounts noted.

While these writedowns will negatively impact the fourth quarter results in the Firm's fixed income business, Morgan Stanley expects to deliver solid results in each of its other businesses, including Investment Banking, Equities, Global Wealth Management and Asset Management – subject to market conditions through the end of the year.

Valuation of Subprime Exposures

In determining the fair value of the Firm's ABS CDO-related exposures – which represent the most senior tranches of the capital structure of subprime ABS CDOs – Morgan Stanley took into consideration observable data for relevant benchmark instruments in synthetic subprime markets. Deterioration of value in the benchmark instruments as well as the market developments referred to earlier have led to significant declines in the estimates of fair value. These declines reflect increases in implied cumulative losses across this portfolio. These loss levels are consistent with the cumulative losses implied by ABX Indices in the range between 11-19 percent. At a severity rate of 50 percent, these levels of cumulative loss imply defaults in the range of 40-50 percent of outstanding mortgages for 2005 and 2006 vintages.

In calculating the fair value of the Firm's U.S. subprime mortgage related exposures – including loans, total rate-of-return swaps, ABS bonds (including subprime residuals) and ABS CDS – Morgan Stanley took into consideration observable transactions, the continued deterioration in market conditions, as reflected by the sharp decline in the ABX Indices, and other market developments, including updated cumulative loss data. The fair value of the ABS Bonds declined significantly, which was driven by increases in implied cumulative loss rates applied to subprime residuals at levels consistent with those implied by current market indicators.

It is expected that market conditions will continue to evolve, and that the fair value of these exposures will frequently change and could further deteriorate. Given these anticipated fluctuations, Morgan Stanley does not intend to update this information until it announces its fourth quarter 2007 earnings in December 2007. Investors also should not expect the Company to provide information about the results of future quarters in advance of scheduled quarterly earnings announcement dates.

## REASONS THE STATEMENTS WERE IMPROPER

60.    Morgan Stanley's Relevant Period statements failed to disclose and misrepresented the following material adverse facts, which the Individual Defendants knew, consciously disregarded, were reckless and grossly negligent in not knowing or should have known:

(a)    Morgan Stanley was more exposed to the subprime mortgage crisis than it had disclosed;

(b)    Morgan Stanley's risk-taking in regard to subprime mortgage related assets was anything but effective and disciplined; and

-34-

(c)     As a result of the foregoing, Morgan Stanley's reported business prospects for its fiscal year 2007 were inaccurate.

## THE IMPROPER BUYBACK

61.     On December 12, 2006, Morgan Stanley announced that the Board had authorized the repurchase of up to $6 billion of the Company's shares.  Under the Board's authorization, while Morgan Stanley's stock was artificially inflated due to the improper statements described above, the Company bought back over $3.2 billion worth of the Company's own shares at an average price of approximately $76 per share, which is substantially higher than Morgan Stanley's current share price of less than $54 per share and comparable to the $78.15 per share the defendants averaged in selling their own Morgan Stanley stock holdings during the Relevant Period.  On information and belief, in authorizing the buyback, the Board members failed to properly discuss and consider the subprime mortgage lending crisis and its effect on the Company's billions in warehoused subprime loans. While Morgan Stanley was repurchasing these shares, the Insider Selling Defendants made the sales described below.

## DAMAGES TO MORGAN STANLEY CAUSED BY THE INDIVIDUAL DEFENDANTS

62.     As a result of the Individual Defendants' improprieties, Morgan Stanley disseminated improper statements concerning its business prospects as alleged above.  These improper statements have devastated Morgan Stanley's credibility as reflected by the Company's $37.1 billion market capitalization loss.

63.     Further, as a direct and proximate result of the Individual Defendants' action, Morgan Stanley has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)     Costs incurred from compensation and benefits paid to the defendants who have breached their duties to Morgan Stanley;

(b)     Costs incurred from the $3.2 billion that Morgan Stanley spent repurchasing its own inflated stock; and

- 35 -

(c)    Costs incurred from the hundreds of millions in subprime loans and other related assets recklessly purchased during the Relevant Period.

64.    Moreover, these actions have irreparably damaged Morgan Stanley's corporate image and goodwill. For at least the foreseeable future, Morgan Stanley will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Morgan Stanley's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## INSIDER SELLING

65.    The Insider Selling Defendants, because of their positions, knew that the statements the Company publicly made were incorrect. They also knew that the misstatements would create an inflated stock price. The Insider Selling Defendants took advantage of this undisclosed information to sell their personally held stock for considerably more than they were worth. Therefore, while in possession of undisclosed material adverse information, the Insider Selling Defendants sold the following shares of Morgan Stanley's stock:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| CRUZ | 7/14/2006 | 100 | $61.55 | $6,155.00 |
|  | 7/14/2006 | 2,800 | $61.57 | $172,396.00 |
|  | 7/14/2006 | 1,500 | $61.58 | $92,370.00 |
|  | 7/14/2006 | 900 | $61.59 | $55,431.00 |
|  | 7/14/2006 | 10,400 | $61.60 | $640,640.00 |
|  | 7/14/2006 | 700 | $61.61 | $43,127.00 |
|  | 7/14/2006 | 2,700 | $61.62 | $166,374.00 |
|  | 7/14/2006 | 2,900 | $61.63 | $178,727.00 |
|  | 7/14/2006 | 11,000 | $61.66 | $678,260.00 |
|  | 9/8/2006 | 23,571 | $66.03 | $1,556,393.13 |
|  | 1/9/2007 | 142,009 | $81.29 | $11,543,911.61 |
|  | 9/10/2007 | 30,712 | $62.88 | $1,931,170.56 |
|  |  | 229,292 |  | $17,064,955.30 |
|  |  |  |  |  |
| DAULA | 10/10/2006 | 393 | $75.15 | $29,533.95 |
|  | 10/11/2006 | 200 | $74.57 | $14,914.00 |
|  | 10/11/2006 | 100 | $74.59 | $7,459.00 |
|  | 10/11/2006 | 2,066 | $74.60 | $154,123.60 |
|  |  | 2,759 |  | $206,030.55 |
|  |  |  |  |  |
| KIDDER | 1/5/2007 | 700 | $80.66 | $56,462.00 |
|  | 1/5/2007 | 100 | $80.67 | $8,067.00 |

| | 1/5/2007 | 500 | $80.68 | $40,340.00 |
|---|---|---|---|---|
| | 1/5/2007 | 600 | $80.69 | $48,414.00 |
| | 1/5/2007 | 300 | $80.70 | $24,210.00 |
| | 1/5/2007 | 600 | $80.71 | $48,426.00 |
| | 1/5/2007 | 400 | $80.72 | $32,288.00 |
| | 1/5/2007 | 1,200 | $80.73 | $96,876.00 |
| | 1/5/2007 | 2,600 | $80.74 | $209,924.00 |
| | 1/5/2007 | 700 | $80.75 | $56,525.00 |
| | 1/5/2007 | 200 | $80.76 | $16,152.00 |
| | 1/5/2007 | 100 | $80.77 | $8,077.00 |
| | | 8,000 | | $645,761.00 |
| | | | | |
| **LYNCH** | 1/19/2007 | 42,422 | $81.86 | $3,472,664.92 |
| | 4/3/2007 | 100 | $80.00 | $8,000.00 |
| | 4/3/2007 | 1,000 | $80.01 | $80,010.00 |
| | 4/3/2007 | 16,000 | $80.04 | $1,280,640.00 |
| | 4/3/2007 | 1,100 | $80.05 | $88,055.00 |
| | 4/3/2007 | 12,300 | $80.15 | $985,845.00 |
| | 4/3/2007 | 2,500 | $80.20 | $200,500.00 |
| | 4/3/2007 | 6,400 | $80.26 | $513,664.00 |
| | | 81,822 | | $6,629,378.92 |
| | | | | |
| **MACK** | 3/23/2007 | 150,901 | $80.75 | $12,185,255.75 |
| | 3/26/2007 | 7,900 | $80.05 | $632,395.00 |
| | 3/26/2007 | 2,500 | $80.08 | $200,200.00 |
| | 3/26/2007 | 500 | $80.10 | $40,050.00 |
| | 3/26/2007 | 700 | $80.11 | $56,077.00 |
| | 3/26/2007 | 500 | $80.12 | $40,060.00 |
| | 3/26/2007 | 1,500 | $80.15 | $120,225.00 |
| | 3/26/2007 | 900 | $80.16 | $72,144.00 |
| | 3/26/2007 | 900 | $80.17 | $72,153.00 |
| | 3/26/2007 | 5,000 | $80.20 | $401,000.00 |
| | 3/26/2007 | 4,100 | $80.25 | $329,025.00 |
| | 3/26/2007 | 600 | $80.26 | $48,156.00 |
| | 3/26/2007 | 300 | $80.27 | $24,081.00 |
| | 3/26/2007 | 600 | $80.30 | $48,180.00 |
| | 3/26/2007 | 7,930 | $80.40 | $637,572.00 |
| | 3/26/2007 | 2,500 | $80.43 | $201,075.00 |
| | 3/26/2007 | 13,500 | $81.22 | $1,096,470.00 |
| | 3/26/2007 | 1,300 | $81.24 | $105,612.00 |
| | 3/26/2007 | 2,700 | $81.25 | $219,375.00 |
| | 3/26/2007 | 2,500 | $81.28 | $203,200.00 |
| | | 207,331 | | $16,732,305.75 |
| | | | | |
| **MURRAY** | 1/19/2007 | 33,027 | $81.86 | $2,703,590.22 |
| | 4/3/2007 | 43,333 | $80.00 | $3,466,640.00 |
| | 4/3/2007 | 7,200 | $80.01 | $576,072.00 |
| | 4/3/2007 | 7,300 | $80.02 | $584,146.00 |
| | 4/3/2007 | 16,874 | $80.03 | $1,350,426.22 |
| | 4/3/2007 | 5,200 | $80.04 | $416,208.00 |

| | | | | |
|---|---|---|---|---|
| | 4/3/2007 | 9,000 | $80.05 | $720,450.00 |
| | 4/3/2007 | 1,200 | $80.06 | $96,072.00 |
| | 4/3/2007 | 2,900 | $80.07 | $232,203.00 |
| | 4/3/2007 | 300 | $80.08 | $24,024.00 |
| | 4/3/2007 | 10,000 | $80.10 | $801,000.00 |
| | 4/3/2007 | 1,600 | $80.15 | $128,240.00 |
| | 4/3/2007 | 1,800 | $80.16 | $144,288.00 |
| | 4/3/2007 | 400 | $80.17 | $32,068.00 |
| | 4/3/2007 | 3,300 | $80.18 | $264,594.00 |
| | 4/3/2007 | 2,900 | $80.19 | $232,551.00 |
| | 4/3/2007 | 10,000 | $80.20 | $802,000.00 |
| | | 156,334 | | $12,574,572.44 |
| | | | | |
| NIDES | 9/1/2006 | 8,206 | $66.35 | $544,468.10 |
| | 12/21/2006 | 6,500 | $81.10 | $527,150.00 |
| | 12/21/2006 | 500 | $81.29 | $40,645.00 |
| | 12/21/2006 | 600 | $81.30 | $48,780.00 |
| | 12/21/2006 | 600 | $81.35 | $48,810.00 |
| | 12/21/2006 | 500 | $81.42 | $40,710.00 |
| | 12/21/2006 | 1,900 | $81.43 | $154,717.00 |
| | 12/21/2006 | 600 | $81.50 | $48,900.00 |
| | 9/4/2007 | 9,642 | $63.56 | $612,845.52 |
| | | 29,048 | | $2,067,025.62 |
| | | | | |
| TYSON | 7/6/2007 | 100 | $72.42 | $7,242.00 |
| | 7/6/2007 | 200 | $72.47 | $14,494.00 |
| | 7/6/2007 | 100 | $72.50 | $7,250.00 |
| | 7/6/2007 | 100 | $72.52 | $7,252.00 |
| | 7/6/2007 | 100 | $72.54 | $7,254.00 |
| | 7/6/2007 | 100 | $72.62 | $7,262.00 |
| | 7/6/2007 | 100 | $72.64 | $7,264.00 |
| | 7/6/2007 | 100 | $72.65 | $7,265.00 |
| | 7/6/2007 | 200 | $72.66 | $14,532.00 |
| | 7/6/2007 | 500 | $72.67 | $36,335.00 |
| | 7/6/2007 | 100 | $72.68 | $7,268.00 |
| | 7/6/2007 | 400 | $72.69 | $29,076.00 |
| | 7/6/2007 | 200 | $72.70 | $14,540.00 |
| | 7/6/2007 | 100 | $72.71 | $7,271.00 |
| | 7/6/2007 | 100 | $72.72 | $7,272.00 |
| | 7/6/2007 | 200 | $72.73 | $14,546.00 |
| | 7/6/2007 | 300 | $72.75 | $21,825.00 |
| | 7/6/2007 | 100 | $72.76 | $7,276.00 |
| | 7/6/2007 | 500 | $72.77 | $36,385.00 |
| | 7/6/2007 | 100 | $72.78 | $7,278.00 |
| | 7/6/2007 | 100 | $72.79 | $7,279.00 |
| | 7/6/2007 | 400 | $72.81 | $29,124.00 |
| | 7/6/2007 | 100 | $72.82 | $7,282.00 |
| | 7/6/2007 | 200 | $72.84 | $14,568.00 |
| | 7/6/2007 | 200 | $72.86 | $14,572.00 |
| | 7/6/2007 | 200 | $72.87 | $14,574.00 |

-38 -

| | 7/6/2007 | 100 | $72.88 | $7,288.00 |
|---|---|---|---|---|
| | 7/6/2007 | 200 | $72.89 | $14,578.00 |
| | 7/6/2007 | 300 | $72.90 | $21,870.00 |
| | 7/6/2007 | 200 | $72.91 | $14,582.00 |
| | 7/6/2007 | 500 | $72.92 | $36,460.00 |
| | 7/6/2007 | 200 | $72.93 | $14,586.00 |
| | 7/6/2007 | 100 | $72.94 | $7,294.00 |
| | 7/6/2007 | 100 | $72.95 | $7,295.00 |
| | 7/6/2007 | 100 | $72.96 | $7,296.00 |
| | 7/6/2007 | 600 | $72.97 | $43,782.00 |
| | 7/6/2007 | 200 | $72.98 | $14,596.00 |
| | 7/6/2007 | 200 | $72.99 | $14,598.00 |
| | 7/6/2007 | 100 | $73.00 | $7,300.00 |
| | 7/6/2007 | 100 | $73.01 | $7,301.00 |
| | 7/6/2007 | 200 | $73.02 | $14,604.00 |
| | 7/6/2007 | 200 | $73.03 | $14,606.00 |
| | 7/6/2007 | 300 | $73.05 | $21,915.00 |
| | 7/6/2007 | 100 | $73.06 | $7,306.00 |
| | 7/6/2007 | 200 | $73.07 | $14,614.00 |
| | 7/6/2007 | 300 | $73.08 | $21,924.00 |
| | 7/6/2007 | 300 | $73.09 | $21,927.00 |
| | 7/6/2007 | 100 | $73.10 | $7,310.00 |
| | 7/6/2007 | 100 | $73.11 | $7,311.00 |
| | 7/6/2007 | 600 | $73.12 | $43,872.00 |
| | 7/6/2007 | 100 | $73.13 | $7,313.00 |
| | 7/6/2007 | 200 | $73.15 | $14,630.00 |
| | 7/6/2007 | 95 | $73.16 | $6,950.20 |
| | 7/6/2007 | 105 | $73.19 | $7,684.95 |
| | 7/6/2007 | 100 | $73.20 | $7,320.00 |
| | 7/6/2007 | 100 | $73.21 | $7,321.00 |
| | 7/6/2007 | 100 | $73.22 | $7,322.00 |
| | 7/6/2007 | 100 | $73.23 | $7,323.00 |
| | 7/6/2007 | 100 | $73.24 | $7,324.00 |
| | 7/6/2007 | 300 | $73.25 | $21,975.00 |
| | 7/6/2007 | 700 | $73.26 | $51,282.00 |
| | 7/6/2007 | 400 | $73.28 | $29,312.00 |
| | 7/6/2007 | 100 | $73.29 | $7,329.00 |
| | 7/6/2007 | 600 | $73.31 | $43,986.00 |
| | 7/6/2007 | 300 | $73.33 | $21,999.00 |
| | 7/6/2007 | 200 | $73.34 | $14,668.00 |
| | 7/6/2007 | 100 | $73.35 | $7,335.00 |
| | 7/6/2007 | 300 | $73.36 | $22,008.00 |
| | 7/6/2007 | 100 | $73.37 | $7,337.00 |
| | 7/6/2007 | 100 | $73.38 | $7,338.00 |
| | 7/6/2007 | 100 | $73.45 | $7,345.00 |
| | 7/6/2007 | 100 | $73.48 | $7,348.00 |
| | 7/6/2007 | 100 | $73.49 | $7,349.00 |

| | 7/6/2007 | 100 | $73.50 | $7,350.00 |
|---|---|---|---|---|
| | 7/6/2007 | 100 | $73.54 | $7,354.00 |
| | | 15,000 | | $1,095,004.15 |
| | | | | |
| TOTAL | | 729,586 | | $57,015,033.73 |

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

66.    Plaintiff brings this action derivatively in the right and for the benefit of Morgan Stanley to redress injuries suffered, and to be suffered, by Morgan Stanley as a direct result of breaches of fiduciary duty, waste of corporate assets, unjust enrichment and violations of the Exchange Act, as well as the aiding and abetting thereof, by the Individual Defendants. Morgan Stanley is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

67.    Plaintiff will adequately and fairly represent the interests of Morgan Stanley in enforcing and prosecuting its rights.

68.    Plaintiff is and was an owner of the stock of Morgan Stanley during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

69.    The current Board of Morgan Stanley consists of the following twelve individuals: defendants Mack, Tyson, Kidder, Bostock, Bowles, Davies, Nicolaisen, Noski, Olayan, Phillips, Sexton and Zumwinkel.

70.    Defendants Mack, Tyson, Kidder, Bostock, Bowles, Davies, Nicolaisen, Noski, Olayan, Phillips, Sexton and Zumwinkel, as members of the Board during December 2006, authorized a share repurchase program under which the Company repurchased over $3.2 billion worth of its own shares at artificially inflated prices. The Board's decision to authorize the repurchase program was not the product of valid business judgment. Among other things, the Board failed to properly discuss or consider the negative effects that the subprime mortgage crisis would have on the Company's business prospects. Further, defendants Mack, Tyson and Kidder, engaged in self-dealing in that they sold their personally held shares while directing the Company to buy shares. Accordingly, demand is futile.

71.     As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse non-public information regarding Morgan Stanley's true business prospects. While in possession of this material adverse non-public information regarding the Company, the following current members of the Morgan Stanley Board participated in the illegal insider selling by selling the following amounts:

(a)     while in possession of adverse non-public information, Mack sold 207,331 shares of Morgan Stanley stock for proceeds of $16,732,305.75;

(b)     while in possession of adverse non-public information, Tyson sold 15,000 shares of Morgan Stanley stock for proceeds of $1,095,004.15; and

(c)     while in possession of adverse non-public information, Kidder sold 8,000 shares of Morgan Stanley stock for proceeds of $645,761.

Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested. Moreover, these defendants face a sufficiently substantial threat of liability for breach of their fiduciary duties for insider selling. These defendants' sales are especially suspicious since they traded after Morgan Stanley purchased Saxon during December 2006. Because Saxon is an originator and servicer of subprime loans, this acquisition brought with it an insider's view of the subprime mortgage crisis. Since these directors have breached their fiduciary duties and are interested, any demand upon them is futile.

72.     Defendants Nicolaisen, Noski, Phillips and Davies were, during the Relevant Period, members of the Audit Committee. The Committee's charter provides that the committee is responsible for reviewing and discussing earnings press releases and financial information and earnings guidance provided to analysts and rating agencies. In particular, the Audit Committee charter provides as follows:

The Committee shall:

*  *  *

20. Review or discuss, as and when appropriate: (i) the types of information to be disclosed and the type of presentation to be made in earnings press releases, including

-41-

the use of "pro forma" or "adjusted" non-GAAP information and any reconciliation to GAAP information, that have been, or will be, issued by the Company, as well as financial information and earnings guidance that have been provided to analysts and rating agencies; and (ii) the effect of regulatory and accounting initiatives and off-balance sheet structures on the Company's consolidated financial statements.

Thus, the Audit Committee was responsible for overseeing and directly participating in the dissemination of Morgan Stanley's earnings press releases. Accordingly, defendants Nicolaisen, Noski, Phillips and Davies breached their fiduciary duties of due care, loyalty, and good faith because the Audit Committee participated in the preparation of improper statements and earnings press releases that contained improper material information. Particularly, these defendants reviewed and failed to correct Morgan Stanley's improper earnings press releases described above. Thus, Nicolaisen, Noski, Phillips and Davies face a sufficiently substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

 73. The principal professional occupation of Mack is his employment with Morgan Stanley, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. Specifically, Morgan Stanley paid Mack the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $800,000 | $36,206,766 | $36,206,766 | 178,945 | $343,395 |
| 2005 | $337,534 | $11,584,207 | $26,235,000 | - | $423,440 |

Accordingly, Mack lacks independence from defendants Bowles, Kidder and Nicolaisen, who are not disinterested and/or independent and who exert influence over Mack's compensation by virtue of their positions as members of the Compensation, Management Development and Succession Committee. The Compensation, Management Development and Succession Committee has the authority to review and approve Mack's base salary, bonus and equity compensation. This lack of independence rendered defendant Mack incapable of impartially considering a demand to commence and vigorously prosecute this action.

 74. Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

 75. The Director Defendants of Morgan Stanley, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and

-42-

participated in efforts to conceal or disguise those wrongs from Morgan Stanley's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein and are therefore not disinterested parties.

76.    The acts complained of constitute violations of the Exchange Act and violations of fiduciary duties owed by Morgan Stanley's officers and directors and these acts are incapable of ratification.

77.    Each of the Director Defendants of Morgan Stanley authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

78.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek recovery for Morgan Stanley for any of the wrongdoing alleged by plaintiff herein.

79.    Plaintiff has not made any demand on shareholders of Morgan Stanley to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    Morgan Stanley is a publicly held company with over 1.06 billion shares outstanding, and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

### COUNT I

**Derivatively Against the Director Defendants and Defendant Sidwell for Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

80.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

81.    During the Relevant Period, the Director Defendants and defendant Sidwell

disseminated or approved public statements that improperly portrayed Morgan Stanley's business prospects, growth and margins. The Director Defendants and defendant Sidwell knew or deliberately disregarded that the Company's public statements concerning its business prospects were misleading.

82.     The Insider Selling Defendants also sold over $57 million worth of shares of Morgan Stanley's common stock at inflated prices during the Relevant Period while in possession of material non-public information.     These defendants misappropriated Morgan Stanley's proprietary information and violated their so-called "abstain or disclose" duties under the federal securities laws when they sold Morgan Stanley stock without disclosing the information alleged to have been concealed herein.

83.     At the same time the price of the Company's common stock was inflated due to the improper reporting of the value of Morgan Stanley's business prospects, especially concerning the Company's exposure to the subprime mortgage market crisis, and the Insider Selling Defendants were selling stock into the market, the Director Defendants and defendant Sidwell were causing Morgan Stanley to repurchase over $3.2 billion worth of its own stock on the open market at an average inflated price of approximately $76 per share, which is substantially higher than Morgan Stanley's current share price of under $54 per share.

84.     As such, the Director Defendants and defendant Sidwell violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Morgan Stanley and others in connection with their purchases of Morgan Stanley common stock during the Relevant Period.

85.     As a result of the Director Defendants' and defendant Sidwell's misconduct, Morgan Stanley has and will suffer damages in that it paid artificially inflated prices for Morgan Stanley

-44-

common stock purchased on the open market. Morgan Stanley would not have purchased Morgan Stanley common stock at the prices it paid, had the market previously been aware that the market price of Morgan Stanley's stock was artificially and falsely inflated by defendants' misleading statements. As a direct and proximate result of these defendants' wrongful conduct, Morgan Stanley suffered damages in connection with its purchases of Morgan Stanley common stock during the Relevant Period. By reason of such conduct, the Director Defendants and defendant Sidwell are liable to the Company pursuant to §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### Derivatively Against Defendants Mack, Sidwell, Nicolaisen, Noski, Phillips and Davies for Violation of §20(a) of the Exchange Act

86.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

87.     Defendant Mack, Morgan Stanley's Chairman and CEO, defendant Sidwell, Morgan Stanley's former CFO, and defendants Nicolaisen, Noski, Phillips and Davies, as members of the Audit Committee, directly or indirectly controlled or induced the Individual Defendants who violated §10(b) of the Exchange Act and Rule 10b-5 as alleged above.

88.     These defendants are jointly and severally liable to the same extent as the Individual Defendants under §20(a) of the Exchange Act. These defendants did not act in good faith.

## COUNT III

### Against All Defendants for Breach of Fiduciary Duty

89.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

90.     The Individual Defendants owed and owe Morgan Stanley fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Morgan Stanley the highest obligation of good faith, fair dealing, loyalty and due care.

91.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

92.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the Company's business prospects and financial results.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

93.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Morgan Stanley has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

94.    Plaintiff, on behalf of Morgan Stanley, has no adequate remedy at law.

## COUNT IV

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

95.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

96.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Morgan Stanley common stock on the basis of such information.

97.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Morgan Stanley common stock.

98.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of Morgan Stanley common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

99.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT V

### Against All Defendants for Waste of Corporate Assets

100.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

101.    As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, paying $3.2 billion to repurchase the Company' stock, paying bonuses to certain of its executive officers and incurring potentially hundreds of millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

102.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

103.    Plaintiff, on behalf of Morgan Stanley, has no adequate remedy at law.

## COUNT VI

### Against All Defendants for Unjust Enrichment

104.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

105.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Morgan Stanley.

106.    Plaintiff, as a shareholder and representative of Morgan Stanley, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets and unjust enrichment;

-47 -

B.      Declaring that the Director Defendants and defendant Sidwell are liable under of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and that defendants Mack, Sidwell, Nicolaisen, Noski, Phillips and Davies are jointly and severally liable under §20(a) of the Exchange Act and awarding Morgan Stanley damages;

C.      Directing Morgan Stanley to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Morgan Stanley and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      a provision to permit the shareholders of Morgan Stanley to nominate at least three candidates for election to the Board;

3.      a proposal to ensure the accuracy of the qualifications of Morgan Stanley's directors, executives and other employees;

4.      a proposal to control insider selling;

5.      a proposal to ensure that Morgan Stanley prudently expends funds in stock repurchase programs; and

6.      appropriately test and then strengthen the internal audit and control functions.

D.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting defendants' assets so as to assure that plaintiff on behalf of Morgan Stanley has an effective remedy;

E.      Awarding to Morgan Stanley restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

F.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: November 14, 2007

LAW OFFICES OF THOMAS G. AMON

THOMAS G. AMON (TGA-1515)

500 Fifth Avenue, Suite 1650
New York, NY 10110
Telephone: (212) 810-2430
Facsimile:  (212) 810-2427

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
MARC M. UMEDA
MARK A. GOLOVACH
DANIEL R. FORDE
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991

Attorneys for Plaintiff

295957_6.DOC

## VERIFICATION

I, Steve Staehr, am a citizen of the state of Nevada. I purchased 400 shares of Morgan Stanley stock in December of 2004. I currently own 400 shares.

I have read the Morgan Stanley Verified Shareholder Derivative Complaint and know the contents thereof. The Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:


Dated: _____11/17/07_____


_____

STEVE STAEHR