UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                       :

STEVE STAEHR, Derivatively on Behalf of    :
Morgan Stanley,
                       Plaintiff,      :

   -against-                           :
                                         :

JOHN J. MACK, ZOE CRUZ, EILEEN K.     :
MURRAY, GARY G. LYNCH, THOMAS R.   :
NIDES, THOMAS V. DAULA, COLM       :
KELLEHER, LAURA D. TYSON, C. ROBERT  :      07 Civ. 10368 (GEL)
KIDDER, ROY J. BOSTOCK, ERSKINE B.   :
BOWLES, SIR HOWARD J. DAVIES,       :      DECLARATION OF
DONALD T. NICHOLAISEN, CHARLES H.   :      ROBERT F. WISE, JR., IN
NOSKI, HUTHAM S. OLAYAN, CHARLES E.  :      SUPPORT OF DEFENDANTS'
PHILLIPS, JR., O. GRIFFITH SEXTON,     :      <u>JOINT MOTION TO DISMISS</u>
KLAUS ZUMWINKEL, and DAVID H.      :
SIDWELL,                                :
                     Defendants,    :

   -and-                                :
                                         :

MORGAN STANLEY, a Delaware corporation,  :
                                         :

               Nominal Defendant.   :
                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        I, ROBERT F. WISE, JR., pursuant to 28 U.S.C. § 1746, hereby declare under penalty of

perjury, that:

        I am a member of the Bar of this Court and of the law firm of Davis Polk & Wardwell.  I

respectfully submit this Declaration in support of Defendants' Joint Motion to Dismiss the

Verified Shareholders Derivative Complaint.

        1.       Attached hereto as Exhibit A is a true and correct copy of Morgan Stanley's

Annual Report on Form 10-K for the fiscal year ended November 30, 2006.

2.      Attached hereto as Exhibit B is a true and correct copy of Morgan Stanley's

Amended and Restated Certificate of Incorporation, which was attached as Exhibit 3 to Morgan

Stanley's Quarterly Report on Form 10-Q for the quarter ended February 28, 2007.

3.      Each of the foregoing documents was publicly filed with the United States

Securities & Exchange Commission.


Dated:   New York, NY
         May 5, 2008

                                              By:    /s/ Robert F. Wise, Jr.
                                                     Robert F. Wise, Jr. (RW 1508)

2

**Exhibit A**

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549
## FORM 10-K
### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
### OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended November 30, 2006
Commission File Number 1-11758

# Morgan Stanley
#### (Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **36-3145972** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **1585 Broadway** | |
| **New York, NY 10036** | **(212) 761-4000** |
| (Address of principal executive offices, including zip code) | (Registrant's telephone number, including area code) |

| Title of each class | Name of exchange on which registered |
|---|---|
| **Securities registered pursuant to Section 12(b) of the Act:** | |
| Common Stock, $0.01 par value | New York Stock Exchange |
| Depository Shares, each representing 1/1,000th interest in a share of Floating Rate Non-Cumulative Preferred Stock, Series A, $0.01 par value | New York Stock Exchange |
| 8.03% Capital Units | New York Stock Exchange |
| 7¼% Capital Securities of Morgan Stanley Capital Trust II (and Registrant's guaranty with respect thereto) | New York Stock Exchange |
| 6¼% Capital Securities of Morgan Stanley Capital Trust III (and Registrant's guaranty with respect thereto) | New York Stock Exchange |
| 6¼% Capital Securities of Morgan Stanley Capital Trust IV (and Registrant's guaranty with respect thereto) | New York Stock Exchange |
| 5¾% Capital Securities of Morgan Stanley Capital Trust V (and Registrant's guaranty with respect thereto) | New York Stock Exchange |
| 6.60% Capital Securities of Morgan Stanley Capital Trust VI (and Registrant's guaranty with respect thereto) | New York Stock Exchange |
| 6.60% Capital Securities of Morgan Stanley Capital Trust VII (and Registrant's guaranty with respect thereto) | New York Stock Exchange |
| SPARQS℠ due February 20, 2007 (2 issuances); SPARQS due March 20, 2007 (2 issuances); SPARQS due April 20, 2007; SPARQS due May 20, 2007; SPARQS due June 20, 2007; SPARQS due August 20, 2007; SPARQS due September 20, 2007 (2 issuances); SPARQS due October 20, 2007 (2 issuances); SPARQS due November 20, 2007; SPARQS due December 20, 2007 (2 issuances); SPARQS due January 20, 2008 (2 issuances); SPARQS due February 20, 2008 | American Stock Exchange |
| Exchangeable Notes due December 30, 2008 (2 issuances); Exchangeable Notes due December 30, 2010; Exchangeable Notes due April 30, 2011; Exchangeable Notes due June 30, 2011 | American Stock Exchange |
| Callable Index-Linked Notes due December 30, 2008 | American Stock Exchange |
| BRIDGES℠ due August 30, 2008 (2 issuances); BRIDGES due December 30, 2008 (2 issuances); BRIDGES due February 28, 2009; BRIDGES due March 30, 2009; BRIDGES due June 30, 2009; BRIDGES due July 30, 2009; BRIDGES due August 30, 2009; BRIDGES due October 30, 2009; BRIDGES due December 30, 2009; BRIDGES due June 15, 2010 | American Stock Exchange |
| Capital Protected Notes due June 30, 2008; Capital Protected Notes due July 20, 2008; Capital Protected Notes due September 30, 2008; Capital Protected Notes due October 30, 2008; Capital Protected Notes due December 30, 2009; Capital Protected Notes due April 20, 2010; Capital Protected Notes due July 20, 2010 (2 issuances); Capital Protected Notes due August 30, 2010; Capital Protected Notes due October 30, 2010; Capital Protected Notes due January 30, 2011; Capital Protected Notes due March 30, 2011 (2 issuances); Capital Protected Notes due June 30, 2011; Capital Protected Notes due October 30, 2011; Capital Protected Notes due December 30, 2011; Capital Protected Notes due September 30, 2012 | American Stock Exchange |
| Capital Protected Notes due September 1, 2010 | The NASDAQ Stock Market LLC |
| HITS℠ due March 20, 2007; HITS due April 20, 2007; HITS due May 20, 2007; HITS due June 20, 2007; HITS due December 20, 2007; HITS due January 20, 2008; HITS due February 20, 2008 | American Stock Exchange |
| MPS℠ due December 30, 2008; MPS due December 30, 2009; MPS due February 1, 2010; MPS due June 15, 2010; MPS due December 30, 2010 (2 issuances); MPS due March 30, 2012 | American Stock Exchange |
| MPS due March 30, 2009 | The NASDAQ Stock Market LLC |
| Stock Participation Notes due September 15, 2010; Stock Participation Notes due December 30, 2010 | American Stock Exchange |
| PLUS℠ due February 20, 2007; PLUS due March 20, 2007; PLUS due April 20, 2007; PLUS due April 30, 2007; PLUS due June 20, 2007; PLUS due July 20, 2007; PLUS due September 20, 2007; PLUS due October 20, 2007 (2 issuances); PLUS due November 20, 2007 (2 issuances); PLUS due January 20, 2008; PLUS due February 20, 2008; PLUS due March 20, 2008; PLUS due April 30, 2008; PLUS due June 30, 2009 | American Stock Exchange |
| PLUS due February 20, 2007; PLUS due July 20, 2007; PLUS due August 20, 2007; PLUS due September 30, 2009 | The NASDAQ Stock Market LLC |
| PROPELS℠ due December 30, 2011 (3 issuances) | American Stock Exchange |
| Strategic Total Return Securities due December 17, 2009; Strategic Total Return Securities due March 30, 2010; Strategic Total Return Securities due July 30, 2011(2 issuances); Strategic Total Return Securities due January 15, 2012 | American Stock Exchange |
| Strategic Total Return Securities due October 30, 2011 | The NASDAQ Stock Market LLC |
| BOXES℠ due October 30, 2031; BOXES due January 30, 2032 | American Stock Exchange Philadelphia Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:** None

Indicate by check mark if Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. YES ☒ NO ☐

Indicate by check mark if Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. YES ☐ NO ☒

Indicate by check mark whether Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. YES ☒ NO ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether Registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer" and "large accelerated filer" in Exchange Act Rule 12b-2. Large accelerated filer ☒ Accelerated filer ☐ Non-accelerated filer ☐

Indicate by check mark whether Registrant is a shell company (as defined in Exchange Act Rule 12b-2). YES ☐ NO ☒

As of May 31, 2006, the aggregate market value of the common stock of Registrant held by non-affiliates of Registrant was approximately $63,258,828,406.58. This calculation does not reflect a determination that persons are affiliates for any other purposes.

As of January 31, 2007, there were 1,066,418,476 shares of Registrant's common stock, $.01 par value, outstanding.

**Documents Incorporated By Reference:** Portions of Registrant's definitive proxy statement for its annual stockholders' meeting to be held on April 10, 2007 are incorporated by reference in Part III of this Form 10-K.

# Morgan Stanley

**Annual Report on Form 10-K**
**for the fiscal year ended November 30, 2006**

**Table of Contents**

|  |  |  | Page |
|---|---|---|---|
| **Part I** | | | |
| Item 1. | Business | | |
| | Overview | | 1 |
| | Available Information | | 1 |
| | Business Segments | | 2 |
| | | Institutional Securities | 2 |
| | | Global Wealth Management Group | 5 |
| | | Asset Management | 6 |
| | | Discover | 7 |
| | Competition | | 8 |
| | Regulation | | 10 |
| | Executive Officers of Morgan Stanley | | 14 |
| Item 1A. | Risk Factors | | 15 |
| Item 1B. | Unresolved Staff Comments | | 22 |
| Item 2. | Properties | | 23 |
| Item 3. | Legal Proceedings | | 24 |
| Item 4. | Submission of Matters to a Vote of Security Holders | | 29 |
| **Part II** | | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | | 30 |
| Item 6. | Selected Financial Data | | 32 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | | 34 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | | 93 |
| Item 8. | Financial Statements and Supplementary Data | | 109 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | | 173 |
| Item 9A. | Controls and Procedures | | 173 |
| Item 9B. | Other Information | | 176 |
| **Part III** | | | |
| Item 10. | Directors and Executive Officers of the Registrant | | 177 |
| Item 11. | Executive Compensation | | 177 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | | 178 |
| Item 13. | Certain Relationships and Related Transactions | | 178 |
| Item 14. | Principal Accountant Fees and Services | | 178 |
| **Part IV** | | | |
| Item 15. | Exhibits and Financial Statement Schedules | | 179 |
| **Signatures** | | | 180 |
| **Index to Financial Statements and Financial Statement Schedules** | | | S-1 |
| **Exhibit Index** | | | E-1 |

Morgan Stanley

## Forward-Looking Statements

We have included or incorporated by reference into this report, and from time to time may make in our public filings, press releases or other public statements, certain statements, including (without limitation) those under "Legal Proceedings" in Part I, Item 3, "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7 and "Quantitative and Qualitative Disclosures about Market Risk" in Part II, Item 7A, that may constitute forward-looking statements. In addition, our management may make forward-looking statements to analysts, investors, representatives of the media and others. These forward-looking statements are not historical facts and represent only Morgan Stanley's beliefs regarding future events, many of which, by their nature, are inherently uncertain and beyond our control.

The nature of Morgan Stanley's business makes predicting the future trends of our revenues, expenses and net income difficult. The risks and uncertainties involved in our businesses could affect the matters referred to in such statements and it is possible that our actual results may differ from the anticipated results indicated in these forward looking statements. Important factors that could cause actual results to differ from those in the forward-looking statements include (without limitation):

- the expected timing and completion of the proposed distribution to Morgan Stanley's shareholders of all of the outstanding shares of Discover;

- the credit ratings assigned to Morgan Stanley;

- the effect of political, economic and market conditions and geopolitical events;

- the availability and cost of capital;

- the level and volatility of equity prices, commodity prices and interest rates, currency values and other market indices;

- the actions and initiatives of current and potential competitors;

- the impact of current, pending and future legislation, regulation and regulatory and legal actions in the U.S. and worldwide;

- our reputation;

- investor sentiment;

- the potential effects of technological changes; and

- other risks and uncertainties detailed under "Risk Factors" in Part I, Item 1A, "Competition" and "Regulation" in Part I, Item 1 and elsewhere throughout this report.

Accordingly, you are cautioned not to place undue reliance on forward-looking statements, which speak only as of the date on which they are made. Morgan Stanley undertakes no obligation to update publicly or revise any forward-looking statements to reflect the impact of circumstances or events that arise after the dates they are made, whether as a result of new information, future events or otherwise except as required by applicable law. You should, however, consult further disclosures Morgan Stanley may make in future filings of its Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K and any amendments thereto or in future press releases or other public statements.

Morgan Stanley

# Part I

## Item 1.   Business.

## Overview.

Morgan Stanley is a global financial services firm that, through its subsidiaries and affiliates, provides its products and services to a large and diversified group of clients and customers, including corporations, governments, financial institutions and individuals. Morgan Stanley was originally incorporated under the laws of the State of Delaware in 1981, and its predecessor companies date back to 1924. Morgan Stanley conducts its business from its headquarters in and around New York City, its regional offices and branches throughout the U.S. and its principal offices in London, Tokyo, Hong Kong and other world financial centers. At November 30, 2006, Morgan Stanley had 55,310 employees worldwide. Unless the context otherwise requires, the terms "Morgan Stanley," the "Company," "we" and "our" mean Morgan Stanley and its consolidated subsidiaries.

Financial information concerning Morgan Stanley, our business segments and geographic regions for each of the fiscal years ended November 30, 2006, November 30, 2005 and November 30, 2004 is included in the consolidated financial statements and the notes thereto in "Financial Statements and Supplementary Data" in Part II, Item 8.

## Available Information.

Morgan Stanley files annual, quarterly and current reports, proxy statements and other information with the Securities and Exchange Commission (the "SEC"). You may read and copy any document we file with the SEC at the SEC's public reference room at 100 F Street, NE, Washington, DC 20549. Please call the SEC at 1-800-SEC-0330 for information on the public reference room. The SEC maintains an internet site that contains annual, quarterly and current reports, proxy and information statements and other information that issuers (including Morgan Stanley) file electronically with the SEC. Morgan Stanley's electronic SEC filings are available to the public at the SEC's internet site, *www.sec.gov*.

Morgan Stanley's internet site is *www.morganstanley.com*. You can access Morgan Stanley's Investor Relations webpage at *www.morganstanley.com/about/ir*. Morgan Stanley makes available free of charge, on or through our Investor Relations webpage, its proxy statements, Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and any amendments to those reports filed or furnished pursuant to the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as soon as reasonably practicable after such material is electronically filed with, or furnished to, the SEC. Morgan Stanley also makes available, through its Investor Relations webpage, via a link to the SEC's internet site, statements of beneficial ownership of Morgan Stanley's equity securities filed by its directors, officers, 10% or greater shareholders and others under Section 16 of the Exchange Act.

Morgan Stanley has a Corporate Governance webpage. You can access information about Morgan Stanley's corporate governance at *www.morganstanley.com/about/company/governance*. Morgan Stanley posts the following on its Corporate Governance webpage:

- Composite Certificate of Incorporation;
- Bylaws;
- Charters for our Audit Committee, Compensation, Management Development and Succession Committee and Nominating and Governance Committee;
- Corporate Governance Policies;
- Policy Regarding Communication with the Board of Directors;
- Policy Regarding Director Candidates Recommended by Shareholders;
- Policy Regarding Corporate Political Contributions;
- Policy Regarding Shareholder Rights Plan;

Morgan Stanley

- Code of Ethics and Business Conduct; and
- Integrity Hotline.

Morgan Stanley's Code of Ethics and Business Conduct applies to all directors, officers and employees, including its Chief Executive Officer, its Chief Financial Officer and its Controller and Principal Accounting Officer. Morgan Stanley will post any amendments to the Code of Ethics and Business Conduct and any waivers that are required to be disclosed by the rules of either the SEC or the New York Stock Exchange, Inc. ("NYSE") on its internet site. You can request a copy of these documents, excluding exhibits, at no cost, by contacting Investor Relations, 1585 Broadway, New York, NY 10036 (212-761-4000). The information on Morgan Stanley's internet site is not incorporated by reference into this report.

## Business Segments.

Morgan Stanley is a global financial services firm that maintains significant market positions in each of its business segments—Institutional Securities, Global Wealth Management Group, Asset Management and Discover. A summary of the activities of each of the business segments follows.

*Institutional Securities* includes capital raising; financial advisory services, including advice on mergers and acquisitions, restructurings, real estate and project finance; corporate lending; sales, trading, financing and market-making activities in equity securities and related products and fixed income securities and related products, including foreign exchange and commodities; benchmark indices and risk management analytics; research; and investment activities.

*Global Wealth Management Group* provides brokerage and investment advisory services covering various investment alternatives; financial and wealth planning services; annuity and insurance products; credit and other lending products; banking and cash management services; retirement services; and trust and fiduciary services.

*Asset Management* provides global asset management products and services in equity, fixed income, alternative investments and private equity to institutional and retail clients through proprietary and third party retail distribution channels, intermediaries and Morgan Stanley's institutional distribution channel. Asset Management also engages in investment activities.

*Discover* offers Discover®-branded credit cards and related consumer products and services and operates the Discover Network, a merchant and cash access network for Discover Network-branded cards, and PULSE® EFT Association LP ("PULSE"), an automated teller machine/debit and electronic funds transfer network. Discover also offers consumer finance products and services in the U.K., including Morgan Stanley-branded, Goldfish-branded and various other credit cards issued on the MasterCard® and Visa® networks.

On December 19, 2006, Morgan Stanley announced that its Board of Directors had approved the spin-off of Discover in order to enhance shareholder value (the "Discover Spin-off"). The Discover Spin-off will allow the Company to focus its efforts on more closely aligned firm-wide strategic priorities within its Institutional Services, Global Wealth Management Group and Asset Management business segments. The Discover Spin-off is subject to regulatory approval and other customary conditions, and is expected to take place in the third quarter of 2007. At the time of the Discover Spin-off, Morgan Stanley shareholders will receive shares in Discover on a tax-free basis.

## Institutional Securities.

Morgan Stanley provides financial advisory and capital-raising services to a diverse group of corporate and other institutional clients globally, primarily through wholly-owned subsidiaries that include Morgan Stanley & Co. Incorporated ("MS&Co."), Morgan Stanley & Co. International Limited, Morgan Stanley Japan Securities Co., Ltd. and Morgan Stanley Dean Witter Asia Limited. These and other subsidiaries also conduct sales and trading activities worldwide, as principal and agent, and provide related financing services on behalf of institutional investors.

Morgan Stanley

**Investment Banking.**

*Capital Raising.*    Morgan Stanley manages and participates in public offerings and private placements of debt, equity and other securities worldwide. Morgan Stanley is a leading underwriter of common stock, preferred stock and other equity-related securities, including convertible securities and American Depositary Receipts ("ADRs"). Morgan Stanley is a leading underwriter of fixed income securities, including investment grade debt, non-investment grade instruments, mortgage-related and other asset-backed securities, tax-exempt securities and commercial paper and other short-term securities.

*Financial Advisory Services.*    Morgan Stanley provides corporate and other institutional clients globally with advisory services on key strategic matters, such as mergers and acquisitions, divestitures, corporate defense strategies, joint ventures, privatizations, spin-offs, restructurings, proxy and consent solicitations, tender offers, exchange offers and leveraged buyouts. Morgan Stanley provides advice concerning recapitalizations, rights offerings, dividend policy, valuations, foreign exchange exposure, financial risk management strategies and financial planning. Morgan Stanley furnishes advice and services regarding project financings and provides advisory services in connection with the purchase, sale, leasing and financing of real estate.

*Corporate Lending.*    Morgan Stanley provides to selected corporate clients through subsidiaries (including Morgan Stanley Bank) loans or lending commitments, including bridge financing. These loans and commitments have varying terms, may be senior or subordinated and/or secured or unsecured, are generally contingent upon representations, warranties and contractual conditions applicable to the borrower and may be syndicated, hedged or traded by Morgan Stanley.* The borrowers may be rated investment grade or non-investment grade (as determined by Morgan Stanley's Institutional Credit Department using methodologies generally consistent with those employed by external rating agencies).

**Sales, Trading, Financing and Market-Making Activities.\*\***

Morgan Stanley conducts sales, trading, financing and market-making activities on securities and futures exchanges and in over-the-counter ("OTC") markets around the world. Morgan Stanley's combined management oversight of the Equity and Fixed Income divisions enhances the delivery of services to clients across asset classes.

*Equity Securities and Related Products.*

*Core.*    Morgan Stanley acts as principal (including as a market maker) and agent in executing transactions globally in equity and equity-related products, including common stock, ADRs, global depositary receipts and exchange-traded funds.

*Derivatives.*    Morgan Stanley's equity derivatives sales, trading and market-making activities cover equity-related products globally, including equity swaps, options, warrants and futures overlying individual securities, indices and baskets of securities and other equity-related products. Morgan Stanley also issues and makes a principal market in equity-linked products to institutional and individual investors, including principal-protected securities.

*Equity Financing Services.*    Morgan Stanley provides equity financing services, including prime brokerage, which offers, among other services, consolidated clearance, settlement, custody, financing and portfolio reporting services to clients trading multiple asset classes. Morgan Stanley also engages in principal securities lending with clients, institutional lenders and other broker-dealers.

*Proprietary Trading.*    Morgan Stanley engages in proprietary trading and investing activities utilizing several strategies and involving, among others, equity securities and derivative instruments related to equity securities.

---

\*    Revenues and expenses associated with the trading of syndicated loans are included in "Sales, Trading, Financing and Market-Making Activities."

\*\*    See also "Risk Management" in Part II, Item 7A for a description of Morgan Stanley's trading risk management structure, policies and procedures.

Morgan Stanley

***Fixed Income Securities and Related Products.***

*Credit Products.*   Morgan Stanley trades, makes markets and takes proprietary positions in fixed income securities and related products globally, including investment grade corporate debt, non-investment grade instruments, credit derivative products (including credit default swaps), distressed debt, bank loans, convertible bonds, preferred stock and commercial paper, money market and other short-term securities. Morgan Stanley originates, trades, makes markets and takes proprietary positions in, and acts as principal with respect to, mortgage-related and other asset-backed securities and real estate loan products. In December 2006, Morgan Stanley acquired Saxon Capital, Inc., a servicer and originator of subprime residential mortgage loans, and CityMortgage Bank, a leading Moscow based mortgage bank that specializes in originating, servicing and securitizing residential mortgage loans in the Russian Federation. Morgan Stanley also provides financing to customers for commercial and residential real estate loan products and other securitizable asset classes. Morgan Stanley advises on investment and liability strategies and assists corporations in their debt repurchases and tax planning. Morgan Stanley structures debt securities and derivatives with risk/return factors designed to suit client objectives, including using repackaged asset vehicles through which clients can restructure asset portfolios to provide liquidity or reconfigure risk profiles.

*Interest Rate and Currency Products.*   Morgan Stanley is a primary dealer of U.S. government securities and a member of the selling groups that distribute various U.S. agency and other debt securities. Morgan Stanley trades, makes markets and takes proprietary positions in interest rate, currency and other fixed income swaps and derivative products, OTC options on U.S. and non-U.S. government bonds and mortgage-backed forward agreements, options and swaps. Through the use of repurchase and reverse repurchase agreements, Morgan Stanley acts as an intermediary between borrowers and lenders of short-term funds and provides funding for various inventory positions. Morgan Stanley also trades fixed income futures. Through its triple-A rated subsidiary, Morgan Stanley Derivative Products Inc., Morgan Stanley enters into swaps and related derivative transactions with counterparties seeking a triple-A rated counterparty. Morgan Stanley also trades and makes markets in U.S. and non-U.S. government securities, municipal securities and emerging market securities. Morgan Stanley is a primary dealer or market-maker of government securities in numerous European, Asian and emerging market countries. Morgan Stanley is a market-maker in foreign currencies. Most of Morgan Stanley's foreign exchange business relates to major foreign currencies such as Yen, Euro, Sterling, Swiss francs and Canadian dollars. Morgan Stanley trades on a principal basis in the spot, forward, option and futures markets and takes proprietary positions in such currencies.

*Commodities.*   Morgan Stanley trades as principal and maintains proprietary trading positions in the spot, forward and futures markets in several commodities, including metals (base and precious), crude oil, oil products, natural gas, electric power, emission credits, coal and related products. In October 2006, Morgan Stanley announced its plans to invest approximately $3 billion in carbon/emissions credits, projects and other initiatives related to greenhouse gas emissions reductions over the next five years. Morgan Stanley is a market-maker in exchange-traded options and futures and OTC options and swaps on commodities, and offers counterparties hedging programs relating to production, consumption, reserve/inventory management and structured transactions, including energy-contract securitizations. Morgan Stanley is an electricity power marketer in the U.S. and owns three electric generators in the U.S. and one in the Netherlands from which Morgan Stanley is the exclusive purchaser. On September 1, 2006, Morgan Stanley acquired TransMontaigne Inc. and its affiliates, a group of companies operating in the refined petroleum products marketing and distribution business, and the Heidmar Group of companies, which provide international marine transportation and U.S. marine logistics services.

**Other Activities.**

***Benchmark Indices and Risk Management Analytics.***   As of November 30, 2006, Morgan Stanley's majority-owned subsidiary, Morgan Stanley Capital International Inc. ("MSCI®"), calculates and distributes over 40,000 international and U.S. equity benchmark indices (including the MSCI World and EAFE® Indices) covering over 55 countries, and has a 37-year historical database that includes fundamental and valuation data on thousands of equity securities in developed and emerging market countries. MSCI also calculates and distributes over 7,500 fixed income and over 190 hedge fund indices. MSCI's subsidiary, Barra, Inc., is a global leader in providing risk analytic tools and services to investors to help them analyze, measure and manage portfolio and firm-wide investment risk.

Morgan Stanley

*Research.*   Morgan Stanley's global research department ("Research") consists of economists, strategists and industry analysts. Research engages in equity and fixed income research activities and produces reports and studies on the U.S. and global economy, financial markets, portfolio strategy, technical market analyses, individual companies and industry developments. Research examines worldwide trends covering numerous industries and as of November 30, 2006 approximately 2,250 individual companies, the majority of which are located outside of the U.S. Research provides analysis and forecasts relating to economic and monetary developments that affect matters such as interest rates, foreign currencies, securities, derivatives and economic trends. Research provides analytical support and publishes reports on asset-backed securities and the markets in which such securities are traded. Research reports and data are disseminated to investors through third party distributors, proprietary internet sites such as Client Link and Morgan Stanley's sales forces.

*Investments.*   Morgan Stanley from time to time makes investments that represent business facilitation or principal investing activities. Business facilitation investments are strategic investments undertaken by Morgan Stanley to facilitate core business activities. Principal investing activities are capital commitments provided to private companies, funds and other entities generally for proprietary purposes to maximize total returns to Morgan Stanley. Morgan Stanley expects to make additional principal investments over time. These principal investment activities are conducted within the investment banking and sales and trading areas in Institutional Securities.

Morgan Stanley sponsors and manages investment vehicles and separate accounts for clients seeking exposure to private equity, real estate-related and other alternative investments. Morgan Stanley may also invest in and provide capital to such investment vehicles. See also "Asset Management."

**Operations and Information Technology.**

Morgan Stanley's Operations and Information Technology departments provide the process and technology platform that supports Institutional Securities sales and trading activity, including post-execution trade processing and related internal controls over activity from trade entry through settlement and custody, including asset servicing. This is done for proprietary and customer transactions in listed and OTC transactions in commodities, equity and fixed income securities, including both primary and secondary trading, as well as listed, OTC and structured derivatives in markets around the world. This activity is undertaken through Morgan Stanley's own facilities as well as through membership in various clearing and settlement organizations globally.

# Global Wealth Management Group.

Morgan Stanley's Global Wealth Management Group business provides comprehensive financial services to clients spanning the wealth spectrum through a network of 8,030 global representatives with over 500 locations globally, including over 450 U.S. retail locations at fiscal year end. As of November 30, 2006, Morgan Stanley had $686 billion in client assets. Morgan Stanley will merge its primary broker-dealer for Global Wealth Management Group, Morgan Stanley DW Inc. ("MSDWI"), into MS&Co. Upon completion of the merger, which Morgan Stanley currently anticipates to take place in April 2007, the surviving entity, MS&Co., will be Morgan Stanley's principal U.S. broker-dealer.

**Clients.**

Global Wealth Management Group professionals serve individual investors and small-to-medium size businesses and institutions with an emphasis on affluent and high net worth investors. In the U.S., products and services are delivered through several channels. Global Wealth Management Group's network of global representatives provide solutions designed to accommodate individual investment objectives, risk tolerance and liquidity needs for affluent and high net worth investors, and call centers are available to meet the needs of emerging affluent clients. Specialized Private Wealth Management investment representative teams provide sophisticated investment solutions and services for ultra high net worth individuals, families and foundations.

Outside the U.S., Morgan Stanley offers financial services to clients in Europe, the Middle East, Asia and Latin America. In addition to serving ultra high net worth clients throughout these regions, Morgan Stanley's international operations also include Morgan Stanley S.V., S.A. (Spain) and Morgan Stanley Gestión SGIIC,

Morgan Stanley

S.A., which provide investment advice and execution and discretionary investment management services, respectively, to individual investors in Spain. In December 2006, Morgan Stanley announced that it had reached an agreement to sell Quilter Holdings Ltd., its stand-alone U.K. mass affluent business.

**Products and Services.**

Morgan Stanley's Global Wealth Management Group provides clients with a comprehensive array of financial solutions comprising Morgan Stanley's products and services, as well as products and services from third party providers, such as insurance companies and mutual fund families. Morgan Stanley offers brokerage and investment advisory services covering various investment alternatives, including equities, options, fixed income securities, mutual funds, structured products, alternative investments, unit investment trusts, managed futures, separately managed accounts and mutual fund asset allocation programs. Morgan Stanley also offers financial and wealth planning services, including education savings programs, as well as annuity and insurance products, including life, disability and long-term care insurance. Credit and other lending products are also available, including Morgan Stanley Home Loans, which provides residential mortgages and home equity lines of credit originated through Morgan Stanley's affiliated entities. Morgan Stanley's BusinesScape$^{SM}$ program offers cash management and commercial credit solutions to qualified small businesses in the U.S. Morgan Stanley offers banking and cash management services, including cash sweeps into bank deposits and money market funds, check writing, direct deposit, debit cards and business cash management. Morgan Stanley also provides retirement services, including defined contribution plans, 401(k) plans and stock plan administration to businesses of all sizes and trust and fiduciary services to individual and corporate clients. Global Wealth Management Group also provides clients with transactional services in futures, foreign currencies and precious metals.

Morgan Stanley's Global Wealth Management Group offers its clients a variety of ways to establish a relationship and conduct business to help meet their needs and preferences, including transaction-based pricing and asset-based fee pricing. The Active Assets Account® offers clients brokerage and banking services in one account. For clients who prefer fee-based pricing, Morgan Stanley Choice$^{SM}$ charges an asset-based fee in lieu of commissions. Clients can also choose to have a fee-based, separately managed account managed by affiliated or unaffiliated professional asset managers.

**Operations and Information Technology.**

Morgan Stanley's Operations and Information Technology departments provide the process and technology platform that supports its Global Wealth Management Group activities from trade capture through clearance, settlement and custody, including asset servicing as well as bank deposit and loan processing through Morgan Stanley's affiliated banks. These activities are undertaken through Morgan Stanley's own facilities, through systems at computer centers operated by unaffiliated services providers and through memberships in various clearing corporations.

# Asset Management.

Morgan Stanley Investment Management is one of the largest global asset management organizations of any full-service securities firm and offers individual and institutional clients a diverse array of equity, fixed income, alternative investment and private equity strategies. Morgan Stanley had $478 billion of assets under management or supervision as of November 30, 2006. Morgan Stanley's asset management activities are principally conducted under the Morgan Stanley and Van Kampen brands. Portfolio managers located in the U.S., Europe, Japan, Singapore and India manage investment products ranging from money market funds to equity, taxable and tax-exempt fixed income funds and alternative investment products in developed and emerging markets. Morgan Stanley offers clients various investment styles, such as value, growth, core, fixed income and asset allocation; global investments; active and passive management; and diversified and concentrated portfolios.

Morgan Stanley offers a range of alternative investment products for institutional investors and high net worth individuals, including hedge funds, private equity funds, funds of hedge funds, funds of private equity funds and portable alpha overlays. Morgan Stanley typically acts as general partner of, and investment adviser to, its alternative investment funds and typically commits to invest a minority of the capital of such funds with subscribing investors contributing the majority. In 2006, Morgan Stanley completed an important phase in the

Morgan Stanley

build-out of its alternatives platform by purchasing FrontPoint Partners LLC, a leading provider of absolute return strategies with over $5.5 billion in assets under management, and acquiring minority stakes in Lansdowne Partners and Avenue Capital Group.

**Institutional Investors.**

Morgan Stanley provides asset management products and services to institutional investors worldwide, including pension plans, corporations, private funds, non-profit organizations, foundations, endowments, governmental agencies, insurance companies and banks. Products and services are available to institutional investors primarily through separate accounts, U.S. mutual funds and other pooled vehicles. Morgan Stanley Investment Management also sub-advises funds for various unaffiliated financial institutions and intermediaries. A global sales force and a team dedicated to covering the investment consultant industry serve institutional investors.

**Individual Investors.**

Morgan Stanley offers open-end funds and separately managed accounts to individual investors through affiliated and unaffiliated broker-dealers, banks, insurance companies and financial planners. Closed-end funds managed by Morgan Stanley or Van Kampen are available to individual investors through affiliated and unaffiliated broker-dealers. A small number of unaffiliated broker-dealers account for a substantial portion of Van Kampen open-end fund sales. Morgan Stanley also sells Van Kampen funds through numerous retirement plan platforms. Internationally, Morgan Stanley distributes investment products to individuals outside the U.S. through non-proprietary distributors.

**Operations and Information Technology.**

Morgan Stanley's Operations and Information Technology departments provide or oversee the process and technology platform required to support its asset management business. Support activities include transfer agency, mutual fund accounting and administration, transaction processing and certain fiduciary services, on behalf of institutional, retail and intermediary clients. These activities are undertaken either through its own facilities or through agreements with unaffiliated third parties.

# Discover.*

Based on its approximately 45.3 million general purpose credit card accounts at November 30, 2006, Morgan Stanley, through its Discover business, is one of the largest single issuers of general purpose credit cards in the U.S. Morgan Stanley's Discover business includes Discover Financial Services, which offers Discover-branded credit cards issued by Discover Bank and other consumer products and services; Discover Network, which operates a merchant and cash access network for Discover-branded cards; PULSE, an ATM/debit and electronic funds transfer network; and its Consumer Banking Group International in the U.K.

**Credit Cards and Services.**

Discover offers several types of general purpose credit and stored value cards that are designed to appeal to different market segments of consumers and businesses and that are accepted by merchants on the Discover Network. These card products include the Discover Platinum Card, the Discover Titanium Card, the Discover Business Card, the Discover Card with Pay-on-Time Bonus, the Miles Card from Discover and Discover pre-paid cards. Discover offers other consumer finance products and services and credit protection products. For example, Discover offers cardmembers certificates of deposit and money market accounts and the ability to transfer balances from other accounts or credit sources. In the U.K., Discover offers the Morgan Stanley Card, Goldfish-branded cards, the i24™ Card, the Leeds Building Society Card, the Black Horse Card and the Morgan Stanley buy and fly! MasterCard on the MasterCard network and sells third party insurance and personal loan products. We are also a member of Visa Europe.

---

\*    See also "Risk Management" in Part II, Item 7A for a description of Morgan Stanley's interest rate and credit risk management structure, policies and procedures.

Morgan Stanley

Discover offers cardmembers other customer services. Pursuant to the Cashback Bonus® reward program, Discover provides certain cardmembers rewards based upon their level and type of purchases. Cardmembers may register their accounts online at *www.discovercard.com*, which offers cardmembers services such as timely e-mail reminders that help cardmembers avoid late payments, the capability to redeem Cashback Bonus rewards, make payments and view detailed account information. In addition, Discover offers cardmembers secure online account numbers that allow cardmembers to shop online without having to reveal their actual card number. As of November 30, 2006, Discover had over 16 million Discover cardmembers registered at *www.discovercard.com*.

**Networks.**

Established in 1986, Discover Network is the largest proprietary credit card network in the U.S. Participants in the Discover Network accept Discover's general purpose credit cards and Discover Network cards. GE Money Bank issues two consumer credit cards, the Wal-Mart® Discover® and SAM'S CLUB® Discover® cards, on the Discover Network. Discover also has entered into agreements with several other financial institutions to issue cards on the Discover Network, including HSBC Bank Nevada, N.A. and CompuCredit Corporation. In 2006, Discover signed agreements with several companies, including First Data Corp., Global Payments Inc. and RBS Lynk to act as merchant acquirers for Discover Network and provide processing services for such merchants. Discover and China UnionPay have an agreement that enables China UnionPay cards to be accepted on the PULSE network in the U.S. and Discover Network cards to be accepted at China UnionPay ATMs and merchant locations in China. In fiscal 2006, Discover entered into an agreement with JCB, the largest card issuer in Japan, to facilitate acceptance of JCB cards on the Discover Network in the U.S. and of Discover Network cards on the JCB network in Japan.

Discover Network operates its network and acquiring businesses primarily in the U.S., provides customized programs to certain merchants in such areas as processing, and otherwise tailors program terms to meet merchant needs, either directly or through merchant acquirers. In addition to agreements with merchant acquirers, Discover Network also utilizes its own national sales and support force, independent sales agents and telemarketing force to maintain and increase its base among certain types of merchants.

Discover's business also includes PULSE, an ATM/debit and electronic funds transfer network. As of November 30, 2006, PULSE links cardholders of more than 4,400 financial institutions with almost 260,000 ATMs, as well as point-of-sale terminals located throughout the U.S. PULSE offers financial institutions a full-service debit platform and a complete product set, including signature debit and credit, PIN debit, gift card, stored value card and ATM services.

**Operations and Information Technology.**

Discover performs the functions required to service and operate card accounts either by itself or through agreements with unaffiliated third parties. These functions include new account solicitation, application processing, new account fulfillment, transaction authorization and processing, cardmember billing, payment processing, fraud prevention and investigation, cardmember services, collection of delinquent accounts and other activities. Discover maintains several operations centers throughout the U.S. and one in Scotland. Systems at computer centers operated by an unaffiliated services provider also support the operations of Discover.

# Competition.

All aspects of Morgan Stanley's businesses are highly competitive and Morgan Stanley expects them to remain so. Morgan Stanley competes in the U.S. and globally for clients, market share and human talent in all aspects of its business segments. Morgan Stanley's competitive position depends on its reputation, the quality of its products, services and advice. Morgan Stanley's ability to sustain or improve its competitive position also depends substantially on its ability to continue to attract and retain qualified employees while managing compensation and other costs.

**Institutional Securities and Global Wealth Management Group.**

Morgan Stanley's competitive position depends on innovation, execution capability and relative pricing. Morgan Stanley competes directly in the U.S. and globally with other securities and financial services firms and broker-dealers, and with others on a regional or product basis. Morgan Stanley competes with commercial banks,

Morgan Stanley

8

insurance companies, sponsors of mutual funds, hedge funds, energy companies and other companies offering financial services in the U.S., globally and through the internet.

Morgan Stanley's ability to access capital at competitive rates (which is generally dependent on Morgan Stanley's credit ratings) and to commit capital efficiently, particularly in its capital-intensive underwriting and sales, trading, financing and market-making activities, also affects its competitive position. Corporate clients continue to request that Morgan Stanley provide loans or lending commitments in connection with certain investment banking activities.

Over time, certain sectors of the financial services industry have become more concentrated, as financial institutions involved in a broad range of financial services industries have been acquired by or merged into other firms. This convergence could result in Morgan Stanley's competitors gaining greater capital and other resources, such as a broader range of products and services and geographic diversity. It is possible that competition may become even more intense as Morgan Stanley continues to compete with financial institutions that may be larger, or better capitalized, or may have a stronger local presence and longer operating history in certain areas. Many of these firms have greater capital than Morgan Stanley and have the ability to offer a wide range of products that may enhance their competitive position and could result in pricing pressure in our businesses. The complementary trends in the financial services industry of consolidation and globalization present, among other things, technological, risk management, regulatory and other infrastructure challenges that require effective resource allocation in order for Morgan Stanley to remain competitive.

Morgan Stanley has experienced intense price competition in some of its businesses in recent years. In particular, the ability to execute trades electronically through the internet and other alternative trading systems has increased the pressure on trading commissions. The trend toward the use of alternative trading systems will likely continue. It is possible that Morgan Stanley will experience competitive pressures in these and other areas in the future as some of its competitors may seek to obtain market share by reducing prices.

**Asset Management.**

Competition in the asset management industry is affected by several factors, including Morgan Stanley's reputation, investment objectives, quality of investment professionals, performance of investment products relative to peers and an appropriate benchmark index, advertising and sales promotion efforts, fee levels, the effectiveness of and access to distribution channels, and the types and quality of products offered. Morgan Stanley's products compete with the funds and separately managed account products of other asset management firms and other investment alternatives.

**Discover.**

Credit cards issued by Discover compete directly with other bank-issued credit cards (the vast majority of which bear the MasterCard or Visa servicemark), charge cards, credit cards issued by travel, entertainment and financial advisory companies and debit cards. Credit cards issued on the Discover Network by third parties may also compete with credit cards offered by Discover. Competition centers on merchant acceptance of credit and debit cards (either directly or through merchant acquirers), account acquisition and customer utilization of credit and debit cards. Merchant acceptance is based on, among other factors, competitive transaction pricing and the volume and usage of cards in circulation. Credit card account acquisition and customer utilization are driven by competitive and appealing credit card features, such as fee levels, interest rates and other customized features targeting specific consumer groups. Credit card industry participants have increasingly used advertising, targeted marketing, account acquisitions and pricing competition in interest rates, annual fees, reward programs and low-priced balance transfer programs to compete and grow.

The Discover Network competes with other card networks, including among others, MasterCard, Visa and American Express. The principal competitive factors that affect the network business include the number of merchants that accept cards, the number of cards in force and the amount of spending on these cards, the quantity

Morgan Stanley

and quality of places where cards can be used, the economic attractiveness to card issuers and merchants participating in the network, reputation and brand recognition, innovation in systems, technology and product offerings, and quality of customer service.

## Regulation.

Most aspects of Morgan Stanley's business are subject to stringent regulation by U.S. federal and state regulatory agencies and securities exchanges and by non-U.S. government agencies or regulatory bodies and securities exchanges. Aspects of Morgan Stanley's public disclosure, corporate governance principles, internal control environment and the roles of auditors and counsel are subject to the Sarbanes-Oxley Act of 2002 and related regulations and rules of the SEC and the NYSE.

New laws or regulations or changes to existing laws and regulations (including changes in the interpretation or enforcement thereof) either in the U.S. or elsewhere could materially adversely affect Morgan Stanley's financial condition or results of operations. As a global financial institution, to the extent that different regulatory regimes impose inconsistent or iterative requirements on the conduct of its business, Morgan Stanley faces complexity and additional costs in its compliance efforts.

**Consolidated Supervision and Revised Capital Standards.**

Effective December 1, 2005, Morgan Stanley became a consolidated supervised entity ("CSE") as defined by the SEC. As such, Morgan Stanley is subject to group-wide supervision and examination by the SEC and to minimum capital requirements on a consolidated basis. Morgan Stanley continues to work with its regulators on the implementation of the CSE rules and Basel II capital standards. As rules related to Basel II are released, Morgan Stanley will consult with regulators on the new requirements. Compliance with EU requirements (capital, oversight and reporting) will be a focus item through 2008.

**Anti-Money Laundering.**

Morgan Stanley's Anti-Money Laundering ("AML") program is coordinated and implemented on an enterprise-wide basis. In the U.S., for example, the USA PATRIOT Act of 2001 (the "PATRIOT Act") imposes significant obligations to detect and deter money laundering and terrorist financing activity, including requiring banks, broker-dealers and mutual funds to identify and verify customers that maintain accounts. The PATRIOT Act also mandates that certain types of financial institutions report suspicious activity to appropriate law enforcement or regulatory authorities. An institution subject to the PATRIOT Act also must provide employees with AML training, designate an AML compliance officer and undergo an annual, independent audit to assess the effectiveness of its AML program. Outside the U.S., applicable laws and regulations subject designated types of financial institutions to similar AML requirements. Morgan Stanley has established policies, procedures and internal controls that are designed to comply with these AML requirements.

**Protection of Client Information.**

Many aspects of Morgan Stanley's business are subject to increasingly comprehensive legal requirements concerning the use and protection of certain client information including those adopted pursuant to the Gramm-Leach-Bliley Act of 1999 and the Fair and Accurate Credit Transactions Act of 2003 in the U.S., the European Union Data Protection Directive in the EU and various laws in Asia, including the Japanese Personal Information (Protection) Law, the Hong Kong Personal Data (Protection) Ordinance and the Australian Privacy Act. Morgan Stanley has adopted measures in response to such requirements.

**Institutional Securities and Global Wealth Management Group.**

***Broker-Dealer Regulation.***   MS&Co. and MSDWI are registered as broker-dealers with the SEC and in all 50 states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands, and are members of self-regulatory organizations, including the National Association of Securities Dealers, Inc. (the "NASD") and securities exchanges, including the NYSE. Broker-dealers are subject to laws and regulations covering all aspects of the securities business, including sales and trading practices, securities offerings, publication of research reports, use

Morgan Stanley

of customers' funds and securities, capital structure, record-keeping and retention and the conduct of their directors, officers, employees and other associated persons. Broker-dealers are also regulated by securities administrators in those states where they do business. Violations of the laws and regulations governing a broker-dealer's actions could result in censures, fines, the issuance of cease-and-desist orders, revocation of licenses or registrations, the suspension or expulsion from the securities industry of such broker-dealer or its officers or employees, or other similar consequences by both federal and state securities administrators.

Margin lending by broker-dealer subsidiaries is regulated by the Federal Reserve Board's restrictions on lending in connection with customer and proprietary purchases and short sales of securities, as well as securities borrowing and lending activities. Such subsidiaries are also required by NASD and NYSE rules to impose maintenance requirements on the value of securities contained in margin accounts. In many cases, Morgan Stanley's margin policies are more stringent than these rules.

Morgan Stanley conducts some of its government securities activities through Morgan Stanley Market Products Inc., a NASD member registered as a government securities broker-dealer with the SEC and in certain states. The Department of Treasury has promulgated regulations concerning, among other things, capital adequacy, custody and use of government securities and transfers and control of government securities subject to repurchase transactions. The rules of the Municipal Securities Rulemaking Board, which are enforced by the NASD, govern the municipal securities activities of Morgan Stanley.

As registered U.S. broker-dealers, certain subsidiaries of Morgan Stanley, including MS&Co. and MSDWI, are subject to the SEC's net capital rule and the net capital requirements of various securities exchanges. Many non-U.S. securities exchanges and regulatory authorities either have imposed or are proposing rules relating to capital requirements applicable to Morgan Stanley's non-U.S. broker-dealer subsidiaries. These rules, which specify minimum capital requirements, are generally designed to measure general financial integrity and liquidity and require that at least a minimum amount of net assets be kept in relatively liquid form. See also "Consolidated Supervision and Revised Capital Standards" above and Note 13 in "Notes to Consolidated Financial Statements" in Part II, Item 8. Rules of the NASD, NYSE, Chicago Mercantile Exchange and Chicago Board of Trade also impose limitations on the transfer of a broker-dealer's assets.

Compliance with the capital requirements may limit Morgan Stanley's operations requiring the intensive use of capital. Such requirements restrict Morgan Stanley's ability to withdraw capital from its broker-dealer subsidiaries, which in turn may limit its ability to pay dividends, repay debt or redeem or purchase shares of its own outstanding stock. Any change in such rules or the imposition of new rules affecting the scope, coverage, calculation or amount of capital requirements, or a significant operating loss or any unusually large charge against capital, could adversely affect Morgan Stanley's ability to pay dividends or to expand or maintain present business levels. In addition, such rules may require Morgan Stanley to make substantial capital infusions into one or more of its broker-dealer subsidiaries in order for such subsidiaries to comply with such rules, either in the form of cash or subordinated loans made in accordance with the requirements of the SEC's net capital rule.

***Regulation of Certain Commodities Activities.*** In connection with the commodities activities in the Institutional Securities business, Morgan Stanley engages in the production, storage, transportation, marketing and trading of several commodities, including metals (base and precious), crude oil, oil products, natural gas, electric power, emission credits, coal and related products. Morgan Stanley also conducts certain power generation and energy trading activities through Morgan Stanley Capital Group Inc. and/or entities in which Morgan Stanley is the sole or majority shareholder. These activities are subject to extensive and evolving energy, environmental and other governmental laws and regulations in the U.S. and abroad. In the past several years, intensified scrutiny of the energy markets by U.S. federal, state and local authorities in the U.S. and abroad and the public has resulted in increased regulatory and legal enforcement and remedial proceedings involving energy companies, including those engaged in power generation and liquid hydrocarbons trading. The EU has increased its focus on the energy markets which has resulted in increased regulation of companies participating in the energy markets, including those engaged in power generation and liquid hydrocarbons trading.

Morgan Stanley

Terminal facilities and other assets relating to Morgan Stanley's commodities activities are also subject to environmental laws both in the U.S. and abroad, including the U.S. Clean Air Act, which imposes obligations related to air emissions, and the U.S. Water Pollution Control Act, which regulates the discharge of wastewaters. In addition, pipeline, transport and terminal operations are also subject to the U.S. Comprehensive Environmental Response, Compensation and Liability Act, or the Superfund law, the Resource Conservation and Recovery Act and analogous state laws in connection with the cleanup of hazardous substances that may have been released at properties currently or previously owned or operated by us or locations to which we have sent wastes for disposal.

The workplaces associated with the transport, processing and storage facilities and pipelines Morgan Stanley or its subsidiaries own or operate are subject to the requirements of the federal Occupational Safety and Health Act, or OSHA, other federal statutes and comparable state statutes that regulate the protection of the health and safety of terminal and marine workers. In addition, the OSHA hazard communication standard requires the maintenance of information about hazardous materials used or produced in operations and that this information is provided to Morgan Stanley's employees, state and local government authorities and local residents. Failure to comply with OSHA requirements, including general industry standards, record keeping requirements and monitoring of occupational exposure to regulated substances, could result in significant fines or additional compliance costs.

***Additional Regulation of U.S. Entities.***    As registered futures commission merchants, MS&Co. and MSDWI are subject to the net capital requirements of, and their activities are regulated by, the Commodity Futures Trading Commission (the "CFTC") and various commodity exchanges. Certain subsidiaries of Morgan Stanley are registered with the CFTC as commodity trading advisors and/or commodity pool operators. Morgan Stanley's futures and options-on-futures businesses are also regulated by the National Futures Association (the "NFA"), a registered futures association, of which MS&Co. and MSDWI and certain of their affiliates are members. Violations of the rules of the CFTC, the NFA or the commodity exchanges could result in remedial actions including fines, registration restrictions or terminations, trading prohibitions or revocations of commodity exchange memberships.

Morgan Stanley Bank, through which Morgan Stanley conducts certain financing and lending activities, is an industrial bank chartered under the laws of the State of Utah. It has deposits that are eligible for insurance by the Federal Deposit Insurance Corporation ("FDIC") in accordance with FDIC rules and is subject to comprehensive regulation and periodic examination by the Utah Department of Financial Institutions and the FDIC. Morgan Stanley Bank is not considered a "bank" under the Bank Holding Company Act of 1956, as amended (the "BHCA"). See also "Discover" below.

Morgan Stanley Trust National Association, a wholly-owned subsidiary, is a federally chartered national bank whose activities are limited to fiduciary activities, primarily personal trust services. It is subject to comprehensive regulation and periodic examination by the Office of the Comptroller of the Currency. Morgan Stanley Trust National Association is not FDIC-insured and is not considered a "bank" for purposes of the BHCA.

***Non-U.S. Regulation.***    Morgan Stanley's businesses are also regulated extensively by non-U.S. regulators, including governments, securities exchanges, commodity exchanges, self-regulatory organizations, central banks and regulatory bodies, especially in those jurisdictions in which Morgan Stanley maintains an office. As Morgan Stanley continues to expand its business internationally, including in such countries as China, Dubai, Italy, Korea, Russia, Turkey and Qatar, it will become subject to regulation in the jurisdictions in which it conducts business. Certain Morgan Stanley subsidiaries are regulated as broker-dealers under the laws of the jurisdictions in which they operate. Subsidiaries engaged in banking and trust activities outside the U.S. are regulated by various government agencies in the particular jurisdiction where they are chartered, incorporated and/or conduct their business activity. For instance, the Financial Services Authority, the London Stock Exchange and Euronext.liffe regulate the Company's activities in the U.K.; the Deutsche Borse AG and the Bundesanstalt für Finanzdienstleistungsaufsicht (the Federal Financial Supervisory Authority) regulate its activities in the Federal Republic of Germany; the Swiss Federal Banking Commission regulates its activities in Switzerland; the Comisión Nacional del Mercado del Valores (C.N.M.V.) regulates its activities in Spain; the Financial Services Agency, the Bank of Japan, the Japanese Securities Dealers Association and several Japanese securities and futures exchanges, including the Tokyo Stock Exchange, the Osaka Securities Exchange and the Tokyo International Financial Futures Exchange, regulate its

Morgan Stanley

activities in Japan; the Hong Kong Securities and Futures Commission, the Stock Exchange of Hong Kong Limited and the Hong Kong Futures Exchange Limited regulate its operations in Hong Kong; and the Monetary Authority of Singapore and the Singapore Exchange Securities Trading Limited regulate its business in Singapore.

The EU's European Markets in Financial Instruments Directive (Directive 2004/39/EC, the "Directive") will affect several of Morgan Stanley's European subsidiaries by imposing detailed pan-European requirements in areas such as internal organization (including conflict management), best execution, real-time disclosure of completed transactions in shares, quoting obligations for internalized client orders in shares, transaction reporting to regulators, client documentation and regulation of investment services related to commodity derivatives. The practical consequences of some of these changes on the European markets are becoming clearer as the Directive is implemented into the national legislation.

*Research.*    Both U.S. and non-U.S. regulators continue to focus on research conflicts of interest. Research-related regulations have been implemented in many jurisdictions and are proposed or under consideration in other jurisdictions. New and revised requirements resulting from these regulations and the global research settlement with U.S. Federal and state regulators (to which Morgan Stanley is a party) have necessitated the development or enhancement of corresponding policies and procedures.

## Asset Management.

The majority of subsidiaries related to Morgan Stanley's asset management activities and others, including MS&Co. and MSDWI, are registered as investment advisers with the SEC, and, in certain states, some employees or representatives of subsidiaries are registered as investment adviser representatives. Many aspects of Morgan Stanley's asset management activities are subject to federal and state laws and regulations primarily intended to benefit the investor or client. These laws and regulations generally grant supervisory agencies and bodies broad administrative powers, including the power to limit or restrict Morgan Stanley from carrying on its asset management activities in the event that it fails to comply with such laws and regulations. Sanctions that may be imposed for such failure include the suspension of individual employees, limitations on Morgan Stanley engaging in various asset management activities for specified periods of time, the revocation of registrations, other censures and fines.

Morgan Stanley's Asset Management business is also regulated outside the U.S. For example, the Financial Services Authority regulates Morgan Stanley's business in the U.K.; the Financial Services Agency regulates Morgan Stanley's business in Japan; the Securities and Exchange Board of India regulates Morgan Stanley's business in India; and the Monetary Authority of Singapore regulates Morgan Stanley's business in Singapore.

Morgan Stanley Trust, a wholly-owned subsidiary, is a federally chartered savings bank subject to comprehensive regulation and periodic examination by the Office of Thrift Supervision ("OTS"). As a result of its ownership of Morgan Stanley Trust, Morgan Stanley is registered with the OTS as a unitary savings and loan holding company ("SLHC") and subject to regulation and examination by the OTS as a SLHC. Subsidiaries of Morgan Stanley, including Morgan Stanley Trust, are registered transfer agents subject to regulation and examination by the SEC.

## Discover.

Morgan Stanley conducts substantial portions of its Discover business in the U.S. through its wholly-owned indirect subsidiary, Discover Bank, a Delaware chartered state bank. Discover Bank's deposits are eligible for insurance by the FDIC in accordance with FDIC rules and Discover Bank is subject to comprehensive regulation and periodic examination by the Office of the Delaware Bank Commissioner and by the FDIC.

Generally, a company that controls a "bank," as defined in the BHCA, is required to register as a bank holding company and is regulated as a bank holding company by the Board of Governors of the Federal Reserve System. Discover Bank is considered a "bank" under the BHCA; however, under the BHCA, Morgan Stanley's control of Discover Bank is grandfathered and Morgan Stanley is generally not treated as a bank holding company for purposes of the BHCA as long as Discover Bank refrains from either engaging in commercial lending or taking demand deposits.

Morgan Stanley

Federal and state consumer protection laws and regulations regulate extensively the relationships among cardholders and credit card issuers. Under federal law, Discover Bank may charge interest at the rate allowed by Delaware law, the state in which it is located, and export such interest rate to all other states. Delaware law does not limit the amount of interest that may be charged on loans of the type offered by Discover Bank. Federal and state bankruptcy laws, debtor relief laws and bank regulatory guidance may have a financial impact on Discover to the extent such laws or guidance result in any loans being charged off as uncollectible.

Under the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA"), the federal bank regulatory agencies are required to take "prompt corrective action" in respect of banks that do not meet minimum capital requirements, and certain restrictions are imposed upon banks that meet certain capital requirements but are not "well capitalized" for purposes of FDICIA. A bank that is not well capitalized, as defined for purposes of FDICIA, is, among other consequences, generally prohibited from accepting brokered deposits and offering interest rates on any deposits significantly higher than the prevailing rate in its normal market area or nationally (depending upon where the deposits are solicited). Discover Bank and Morgan Stanley Bank currently use brokered deposits as a funding source and, if they were not able to do so, their funding costs could be impacted.

Discover conducts its U.K. credit card business through Morgan Stanley Bank International Limited, Morgan Stanley's chartered bank in the U.K., which is subject to regulation related to capital adequacy, consumer protection and deposit protection. The bank is governed primarily by the U.K.'s Financial Services and Markets Act 2000 and its activities are supervised by the Financial Services Authority and by the Office of Fair Trading in relation to its consumer credit activities.

## Executive Officers of Morgan Stanley.

The executive officers of Morgan Stanley and their ages and titles as of February 12, 2007 are set forth below. Business experience for the past five years is provided in accordance with SEC rules.

**John J. Mack (62).**   Chairman of the Board of Directors and Chief Executive Officer (since June 2005). Chairman of Pequot Capital Management (June 2005). Co-Chief Executive Officer of Credit Suisse Group (January 2003 to June 2004). President, Chief Executive Officer and Director of Credit Suisse First Boston (July 2001 to June 2004). President and Chief Operating Officer of Morgan Stanley (May 1997 to March 2001).

**Zoe Cruz (52).**   Co-President (since February 2006 and March 2005 to July 2005). Acting President (July 2005 to February 2006). Director (March 2005 to June 2005). Head of Fixed Income Division (September 2000 to March 2005).

**Robert W. Scully (57).**   Co-President (since February 2006). Chairman of Global Capital Markets (December 2004 to February 2006) and Vice Chairman of Investment Banking (September 1999 to February 2006). Director of GMAC LLC (since November 2006).

**Gary G. Lynch (56).**   Chief Legal Officer (since October 2005). Global General Counsel (October 2001 to October 2005) of Credit Suisse First Boston. Vice Chairman (December 2002 to July 2004) and Executive Vice Chairman (July 2004 to October 2005) of Credit Suisse First Boston. Partner at the law firm of Davis Polk & Wardwell (September 1989 to October 2001).

**Eileen K. Murray (48).**   Head of Global Operations and Technology (since October 2005). Head of Global Technology and Operations of Credit Suisse First Boston (February 2002 to July 2005). Chief Administrative Officer of Institutional Securities of Morgan Stanley (March 1999 to January 2002).

**Thomas R. Nides (45).**   Executive Vice President, Chief Administrative Officer and Secretary (since September 2005). Worldwide President and CEO of Burson-Marsteller (November 2004 to August 2005). Chief Administrative Officer of Credit Suisse First Boston (June 2001 to June 2004).

**David H. Sidwell (53).**   Executive Vice President and Chief Financial Officer (since March 2004). Chief Financial Officer of the investment bank of J.P. Morgan Chase & Co. (December 2000 to March 2004).

Morgan Stanley

## Item 1A.    Risk Factors.

**Liquidity Risk.**

Liquidity and funding risk refers to the risk that Morgan Stanley will be unable to finance its operations due to a loss of access to the capital markets or difficulty in liquidating its assets. Liquidity and funding risk also encompasses the ability of Morgan Stanley to meet its financial obligations without experiencing significant business disruption or reputational damage that may threaten its viability as a going concern. For more information on how we monitor and manage liquidity and funding risk, see "Management's Discussion and Analysis of Results of Operations—Liquidity and Capital Resources" in Part II, Item 7 below.

*Liquidity is essential to our businesses and we rely on external sources to finance a significant portion of our operations.*

Liquidity is essential to our businesses. Our liquidity could be substantially negatively affected by an inability to raise funding in the long-term or short-term debt capital markets or an inability to access the secured lending markets. Factors that we cannot control, such as disruption of the financial markets or negative views about the financial services industry generally, could impair our ability to raise funding. In addition, our ability to raise funding could be impaired if lenders develop a negative perception of our long-term or short-term financial prospects. Such negative perceptions could be developed if we incur large trading losses, we are downgraded or put on negative watch by the rating agencies, we suffer a decline in the level of our business activity, regulatory authorities take significant action against us, or we discover serious employee misconduct or illegal activity, among other reasons. If we are unable to raise funding using the methods described above, we would likely need to liquidate unencumbered assets, such as our investment and trading portfolios, to meet maturing liabilities. We may be unable to sell some of our assets, or we may have to sell assets at a discount from market value, either of which could adversely affect our results of operations.

*Our borrowing costs and access to the debt capital markets depend significantly on our credit ratings.*

The cost and availability of unsecured financing generally are dependent on our short-term and long-term credit ratings. Factors that are significant to the determination of our credit ratings or otherwise affect our ability to raise short-term and long-term financing include the level and volatility of our earnings; our relative competitive position in the markets in which we operate; our geographic and product diversification; our ability to retain key personnel; our risk profile; our risk management policies; our cash liquidity; our capital adequacy; our corporate lending credit risk; and legal and regulatory developments. A deterioration in any of these factors or combination of these factors may lead rating agencies to downgrade our credit ratings, thereby increasing our cost of obtaining unsecured funding.

Our debt ratings also can have a significant impact on certain trading revenues, particularly in those businesses where longer term counterparty performance is critical, such as OTC derivative transactions, including credit derivatives and interest rate swaps. In connection with certain OTC trading agreements and certain other agreements associated with the Institutional Securities business, we would be required to provide additional collateral to certain counterparties in the event of a downgrade by either Moody's Investors Service or Standard & Poor's.

*We are a holding company and depend on payments from our subsidiaries.*

We depend on dividends, distributions and other payments from our subsidiaries to fund dividend payments and to fund all payments on our obligations, including debt obligations. Regulatory and other legal restrictions may limit our ability to transfer funds freely, either to or from our subsidiaries. In particular, many of our subsidiaries, including our broker-dealer subsidiaries, are subject to laws and regulations that authorize regulatory bodies to block or reduce the flow of funds to the parent holding company, or that prohibit such transfers altogether in certain circumstances. These laws and regulations may hinder our ability to access funds that we may need to make payments on our obligations.

Morgan Stanley

*If our liquidity and funding policies are not adequate, we may be unable to access sufficient financing.*

Our liquidity and funding policies have been designed to ensure that we maintain sufficient liquid financial resources to continue to conduct our business for an extended period in a stressed liquidity environment. If our liquidity and funding policies are not adequate or we do not adhere to the policies, we may be unable to access sufficient financing to service our financial obligations when they come due, which could have a material adverse franchise or business impact.

**Market Risk.**

Market risk refers to the risk that a change in the level of one or more market prices of commodities or securities, rates, indices, implied volatilities (the price volatility of the underlying instrument imputed from option prices), correlations or other market factors, such as liquidity, will result in losses for a position or portfolio. For more information on how we monitor and manage market risk, see "Market Risk" in Part II, Item 7A below.

*Our results of operations may be materially affected by market fluctuations and by economic and other factors.*

The amount, duration and range of our market risk exposures have been increasing over the past several years, and may continue to do so. Our results of operations may be materially affected by market fluctuations due to economic factors. Results of operations in the past have been, and in the future may continue to be, materially affected by many factors of a global nature, including political, economic and market conditions; the availability and cost of capital; the liquidity of global markets; the level and volatility of equity prices, commodity prices and interest rates; currency values and other market indices; technological changes and events; the availability and cost of credit; inflation; and investor sentiment and confidence in the financial markets. In addition, there have been legislative, legal and regulatory developments related to our businesses that potentially could increase costs, thereby affecting future results of operations. These factors also may have an impact on our ability to achieve our strategic objectives.

The results of our Institutional Securities business, particularly results relating to our involvement in primary and secondary markets for all types of financial products, are subject to substantial fluctuations due to a variety of factors, such as those enumerated above that we cannot control or predict with great certainty. These fluctuations impact results by causing variations in new business flows and in the fair value of securities and other financial products. Fluctuations also occur due to the level of global market activity, which, among other things, affects the size, number and timing of investment banking client assignments and transactions and the realization of returns from our principal investments.

During periods of unfavorable market or economic conditions, the level of individual investor participation in the global markets may also decrease, which would negatively impact the results of our Global Wealth Management Group business. In addition, fluctuations in global market activity could impact the flow of investment capital into or from assets under management or supervision and the way customers allocate capital among money market, equity, fixed income or other investment alternatives, which could negatively impact our Asset Management business. Furthermore, changes in economic variables, such as the number and size of personal bankruptcy filings, the rate of unemployment and the level of consumer confidence and consumer debt, may substantially affect consumer loan levels and credit quality, which, in turn, could impact the results of our Discover business.

*Holding large and concentrated positions may expose us to losses.*

Concentration of risk may reduce revenues or result in losses in our market-making, proprietary trading, investing, block trading, underwriting and lending businesses in the event of unfavorable market movements. We have committed substantial amounts of capital to these businesses, which often require us to take large positions in the securities of, or make large loans to, a particular issuer or issuers in a particular industry, country or region. Moreover, the trend in all major capital markets is towards larger and more frequent commitments of capital in many of these activities, and we expect this trend to continue.

Morgan Stanley

***The profitability of certain of our commodities marketing activities depends on the availability of supplies of petroleum products. A significant decrease in available supplies for any reason could adversely affect the sales and results of operations of certain businesses within our commodities activities.***

The success of our marketing and distribution in our commodities business depends on our ability to generate positive margins on sales of refined petroleum products. In addition, our terminal, tug and barge business depends on an active market for refined petroleum products to create demand for terminal services. The availability of supplies of refined petroleum products is essential to our pipeline, transport and terminal operations. A material disruption in the flow of refined petroleum product supplies could adversely affect our revenues from rack spot and contract sales, as well as throughput and storage fees. Among such risks are "force majeure" conditions caused by natural disasters, adverse weather conditions, terrorist attacks and other events beyond our control. These conditions also may adversely affect the pipeline and marine operations as well as the shipping and terminaling operations in our commodities business.

***We may incur significant losses in the real estate sector.***

We finance and acquire principal positions in a number of real estate and real estate-related products for our own account, for investment vehicles managed by affiliates in which we also may have a significant investment, for separate accounts managed by affiliates and for major participants in the commercial and residential real estate markets, and originate loans secured by commercial and residential properties. We also securitize and trade in a wide range of commercial and residential real estate and real estate-related whole loans, mortgages and other real estate and commercial assets and products, including residential and commercial mortgage-backed securities. These businesses could be adversely affected by a downturn in the real estate sector.

## Credit Risk.

Credit risk refers to the risk of loss arising from the default by a borrower, counterparty or other obligor when it is unable or unwilling to meet its obligations to us. We are exposed to three distinct types of credit risk in our businesses. For more information on how we monitor and manage credit risk, see "Credit Risk" in Part II, Item 7A below.

***We are exposed to the risk that third parties that are indebted to us will not perform their obligations.***

We incur significant, "single-name" credit risk exposure through the Institutional Securities business. This risk may arise, for example, from entering into swap or other derivative contracts under which counterparties have long-term obligations to make payments to us and by extending credit to our clients through various credit arrangements. We incur "individual consumer" credit risk in the Global Wealth Management Group business through margin loans to individual investors and loans to small businesses, both of which are generally collateralized. We incur "consumer portfolio" credit risk in the Discover business primarily through cardholder receivables. Credit risk in a pool of cardholder receivables is generally highly diversified, without significant individual exposures, and, accordingly, is managed on a portfolio and not a single-name basis.

The amount, duration and range of our credit exposures have been increasing over the past several years, and may continue to do so. In recent years, we have significantly expanded our use of swaps and other derivatives and we may continue to do so. Corporate clients are increasingly seeking loans or lending commitments from us in connection with investment banking and other assignments. In addition, we have experienced, due to competitive factors, increased pressure to assume longer-term credit risk, to extend credit against less liquid collateral and to price derivatives instruments more aggressively based on the credit risks that we take. As a clearing member firm, we finance our customer positions and we could be held responsible for the defaults or misconduct of our customers. Although we regularly review our credit exposures, default risk may arise from events or circumstances that are difficult to detect or foresee.

***Defaults by another larger financial institution could adversely affect financial markets generally.***

The commercial soundness of many financial institutions may be closely interrelated as a result of credit, trading, clearing or other relationships between the institutions. As a result, concerns about, or a default or threatened

Morgan Stanley

default by, one institution could lead to significant market-wide liquidity problems, losses or defaults by other institutions. This is sometimes referred to as "systemic risk" and may adversely affect financial intermediaries, such as clearing agencies, clearing houses, banks, securities firms and exchanges, with which we interact on a daily basis, and therefore could adversely affect Morgan Stanley.

**Operational Risk.**

Operational risk refers to the risk of financial or other loss, or potential damage to a firm's reputation, arising from inadequate or failed internal processes, people, resources and systems or from external events (e.g. external or internal fraud, legal and compliance risks, damage to physical assets, etc.). Morgan Stanley may incur operational risk across its full scope of business activities, including revenue generating activities (e.g. sales and trading) and support functions (e.g. information technology and facilities management). As such, Morgan Stanley may incur operational risk in each of its businesses, as well as within the control groups. For more information on how we monitor and manage operational risk, see "Operational Risk" in Part II, Item 7A below.

*We are subject to operational risk and an operational event could adversely affect our businesses.*

Our businesses are highly dependent on our ability to process, on a daily basis, a large number of transactions across numerous and diverse markets in many currencies. In general, the transactions we process are increasingly complex. We perform the functions required to operate our different businesses either by ourselves or through agreements with third parties. We rely on the ability of our employees, our internal systems and systems at technology centers operated by third parties to process a high volume of transactions. We also face the risk of operational failure or termination of any of the clearing agents, exchanges, clearing houses or other financial intermediaries we use to facilitate our securities transactions. In the event of a breakdown or improper operation of our or third party's systems or improper action by third parties or employees, we could suffer financial loss, an impairment to our liquidity, a disruption of our businesses, regulatory sanctions or damage to our reputation.

Despite the business contingency plans we have in place, our ability to conduct business may be adversely affected by a disruption in the infrastructure that supports our business and the communities where we are located. This may include a disruption involving physical site access, terrorist activities, disease pandemics, electrical, communications or other services used by Morgan Stanley, its employees or third parties with whom we conduct business.

**Legal Risk.**

Legal risk refers to the risk of non-compliance with applicable legal and regulatory requirements and standards. Legal risk also includes contractual and commercial risk such as the risk that a counterparty's performance obligations will be unenforceable. For more information on how we monitor and manage legal risk, see "Legal Risk" in Part II, Item 7A below.

*The financial services industry faces substantial litigation and regulatory risks, and we may face damage to our reputation and legal liability.*

We have been named, from time to time, as a defendant in various legal actions, including arbitrations, class actions, and other litigation, arising in connection with our activities as a global diversified financial services institution. Certain of the actual or threatened legal actions include claims for substantial compensatory and/or punitive damages or claims for indeterminate amounts of damages. In some cases, the issuers that would otherwise be the primary defendants in such cases are bankrupt or in financial distress.

We are also involved, from time to time, in other reviews, investigations and proceedings (both formal and informal) by governmental and self-regulatory agencies regarding our business, including, among other things, accounting and operational matters, certain of which may result in adverse judgments, settlements, fines, penalties, injunctions or other relief. The number of these investigations and proceedings has increased in recent years with regard to many firms in the financial services industry, including us. Like any large corporation, we are also subject to risk from potential employee misconduct, including non-compliance with policies and improper use or disclosure

Morgan Stanley

18

of confidential information. Substantial legal liability or significant regulatory action against us could materially adversely affect our business, financial condition or results of operations or cause us significant reputational harm, which could seriously harm our business. For more information regarding legal proceedings in which we are involved and in particular, the *Coleman Litigation*, see "Legal Proceedings" in Part I, Item 3 below.

***We are subject to extensive regulation in the jurisdictions in which we conduct our businesses.***

We are subject to extensive regulation globally and face the risk of significant intervention by regulatory authorities in the jurisdictions in which we conduct our businesses. Among other things, we could be fined, prohibited from engaging in some of our business activities or subject to limitations or conditions on our business activities. Significant regulatory action against us could have material adverse financial effects, cause significant reputational harm to us, or harm our business prospects. New laws or regulations or changes in the enforcement of existing laws or regulations applicable to our clients may also adversely affect our business. For more information regarding the regulatory environment in which we operate, see "Regulation" in Part I, Item 1 above.

***Our commodities activities subject us to extensive regulation, potential catastrophic events and environmental risks and regulation that may expose us to significant costs and liabilities.***

In connection with the commodities activities in our Institutional Securities business, we engage in the production, storage, transportation, marketing and trading of several commodities, including metals (base and precious), crude oil, oil products, natural gas, electric power, emission credits, coal and related products. In addition, we own three exempt wholesale generators in the U.S. and one electric generation facility in the Netherlands. As a result of these activities, we are subject to extensive and evolving energy, environmental, safety and other governmental laws and regulations. Our commodities business also exposes us to the risk of unforeseen and catastrophic events, including leaks, spills and terrorist attacks.

Although we have attempted to mitigate our pollution and other environmental risks, including those discussed below, by, among other measures, adopting appropriate policies and procedures for power plant operations, monitoring the quality of petroleum storage facilities and transport vessels and implementing emergency response programs, these actions may not prove adequate to address every contingency. In addition, insurance covering some of these risks may not be available, and the proceeds, if any, from insurance recovery may not be adequate to cover liabilities with respect to particular incidents. As a result, our financial condition and results of operations may be adversely affected by these events.

We also expect the other laws and regulations affecting our energy business to increase in both scope and complexity. During the past several years, intensified scrutiny of the energy markets by federal, state and local authorities in the U.S. and abroad and the public has resulted in increased regulatory and legal enforcement, litigation and remedial proceedings involving companies engaged in the activities in which we are engaged. We may incur substantial costs in complying with current or future laws and regulations and our overall businesses and reputation may be adversely affected by the current legal environment.

*Pipeline, Marine Transport and Terminal Operations.* The risk of substantial environmental costs and liabilities is inherent in pipeline, marine transport and terminal operations. As is the case with respect to our other commodities activities, both U.S. and international environmental laws are or may be applicable, including U.S. and foreign oil spill anti-pollution statutes. Liability may be incurred without regard to fault under federal laws and regulations and analogous state laws for the remediation of contaminated areas.

Prior owners, tenants or users of properties now owned by us or our subsidiaries may have disposed of or released hydrocarbons or solid wastes on or under such assets. Additionally, the acquired pipeline, transport and terminal operations are located near current or former refining and terminal operations. There is a risk that contamination, if ever present, has migrated or could migrate from those properties. Increasingly strict environmental laws, regulations and enforcement policies and claims for damages and other similar developments could result in substantial costs and liabilities.

Morgan Stanley

Certain operations in our commodities business are subject to the hazards inherent in the transportation and storage of volatile and sometimes toxic petroleum products, including explosions, the release of toxic substances, fires and accidents on land and at sea that could result in personal injuries, loss of life and suspension of operations. These operations also are subject to risks associated with natural disasters, adverse weather conditions, terrorist attacks and other events beyond our control. Although we maintain substantial insurance coverage, catastrophic events of this kind could exceed such coverage.

*Power Generation Facilities.*    The power generation facilities we own are subject to wide-ranging U.S. federal, state and local environmental laws and regulations in the U.S. and abroad relating to air quality, water quality and hazardous and solid waste management. They also are regulated under U.S. health and safety regulations. These laws may require capital expenditures as well as remediation where the facility has failed to comply with environmental, health or safety rules or has released pollutants into the environment. Additionally, the owners of such facilities may be subject to fines or penalties for failure to comply with environmental, health or safety rules.

*Oil Trading Activities.*    The U.S. and foreign water pollution laws and numerous specific oil spill anti-pollution statutes apply to our oil trading activities to the extent we own petroleum in storage or during waterborne or overland transit or we arrange for transportation or storage. In the event of an oil spill, one or more entities we own could be held responsible for remediation as well as property and natural resource damages. Other U.S. federal and state laws apply to the specifications of the gasoline and diesel fuel that we blend and import and provide for substantial penalties in the event of non-compliance. Oil pollution laws in non-U.S. jurisdictions also apply to us in certain instances when we trade petroleum internationally and/or charter vessels. Like the U.S. statutes, these laws often provide for penalties and damage assessments should a spill event occur.

### Conflicts of interest are increasing and a failure to appropriately deal with conflicts of interest could adversely affect our businesses.

Our reputation is one of our most important assets. As we have expanded the scope of our businesses and our client base, we increasingly have to address potential conflicts of interest, including those relating to our proprietary activities. For example, conflicts may arise between our position as a financial advisor in a merger transaction and a principal investment we hold in one of the parties to the transaction. In addition, hedge funds and private equity funds are an increasingly important portion of our client base, and also compete with us in a number of our businesses. We have procedures and controls that are designed to address conflicts of interest. However, appropriately dealing with conflicts of interest is complex and difficult and our reputation could be damaged if we fail, or appear to fail, to deal appropriately with conflicts of interest. In addition, the SEC and other federal and state regulators have increased their scrutiny of potential conflicts of interest. It is possible that potential or perceived conflicts could give rise to litigation or enforcement actions. It is possible that the regulatory scrutiny of, and litigation in connection with, conflicts of interest will make our clients less willing to enter into transactions in which such a conflict may occur, and will adversely affect our businesses.

### We are subject to tax contingencies that could adversely affect results.

We are subject to the income and indirect tax laws of the U.S., its states and municipalities and those of the foreign jurisdictions in which we have significant business operations. These tax laws are complex and subject to different interpretations by the taxpayer and the relevant governmental taxing authorities. We must make judgments and interpretations about the application of these inherently complex tax laws when determining the provision for income taxes and the expense for indirect taxes and must also make estimates about when in the future certain items affect taxable income in the various tax jurisdictions. Disputes over interpretations of the tax laws may be settled with the taxing authority upon examination or audit.

Morgan Stanley                                20

**Competitive Environment.**

*We face strong competition from other financial services firms, which could lead to pricing pressures that could materially adversely affect our revenue and profitability.*

The financial services industry, and all of our businesses, are intensely competitive, and we expect them to remain so. We compete with commercial banks, insurance companies, sponsors of mutual funds, hedge funds, energy companies and other companies offering financial services in the U.S., globally and through the internet. We compete on the basis of several factors, including transaction execution, capital or access to capital, products and services, innovation, reputation and price. Over time, certain sectors of the financial services industry have become considerably more concentrated, as financial institutions involved in a broad range of financial services have been acquired by or merged into other firms. This convergence could result in our competitors gaining greater capital and other resources, such as a broader range of products and services and geographic diversity. We may experience pricing pressures as a result of these factors and as some of our competitors seek to increase market share by reducing prices. For more information regarding the competitive environment in which we operate, see "Competition" in Part I, Item 1 above.

*Our ability to retain and attract qualified employees is critical to the success of our business and the failure to do so may materially adversely affect our performance.*

Our people are our most important resource and competition for qualified employees is intense. In order to attract and retain qualified employees, we must compensate such employees at market levels. Typically, those levels have caused employee compensation to be our greatest expense as compensation is highly variable and moves with performance. If we are unable to continue to attract and retain qualified employees, or do so at rates necessary to maintain our competitive position, or if compensation costs required to attract and retain employees become more expensive, our performance, including our competitive position, could be materially adversely affected.

**International Risk.**

*We are subject to numerous political, economic, legal, operational and other risks as a result of our international operations which could adversely impact our businesses in many ways.*

We are subject to political, economic, legal, operational and other risks that are inherent in operating in many countries, including risks of possible nationalization, expropriation, price controls, capital controls, exchange controls and other restrictive governmental actions, as well as the outbreak of hostilities. In many countries, the laws and regulations applicable to the securities and financial services industries are uncertain and evolving, and it may be difficult for us to determine the exact requirements of local laws in every market. Our inability to remain in compliance with local laws in a particular market could have a significant and negative effect not only on our businesses in that market but also on our reputation generally. We are also subject to the enhanced risk that transactions we structure might not be legally enforceable in all cases.

We have expanded, and continue to look at opportunities to expand, in the emerging markets. In the last several years, various emerging market countries have experienced severe economic and financial disruptions, including significant devaluations of their currencies, capital and currency exchange controls and low or negative growth rates in their economies. These conditions could adversely impact our businesses and increase volatility in financial markets generally.

The emergence of a pandemic or other widespread health emergency, or concerns over the possibility of such an emergency, could create economic and financial disruptions in emerging markets and other areas throughout the world, and could lead to operational difficulties (including travel limitations) that could impair our ability to manage our businesses around the world.

Morgan Stanley

**Acquisition Risk.**

*We may be unable to fully capture the expected value from future acquisitions, joint ventures and minority stakes.*

We expect to grow in part through acquisitions, joint ventures and minority stakes. To the extent we make acquisitions or enter into combinations or joint ventures, we face numerous risks and uncertainties combining or integrating the relevant businesses and systems, including the need to combine accounting and data processing systems and management controls and to integrate relationships with clients and business partners. In the case of joint ventures and minority stakes, we are subject to additional risks and uncertainties in that we may be dependent upon, and subject to liability, losses or reputational damage relating to, systems, controls and personnel that are not under our control. In addition, conflicts or disagreements between us and our joint venture partners may negatively impact the benefits to be achieved by the joint venture. There is no assurance that our recent acquisitions or any business we acquire in the future will be successfully integrated and result in all of the positive benefits anticipated. If we are not able to integrate successfully our past and future acquisitions, there is a risk that our results of operations may be materially and adversely affected.

**Credit Card Risk.**

*Our Discover business subjects us to risks that impact the credit card industry.*

The performance of our Discover business is subject to numerous risks that impact the credit card industry, including rising cost of funds pressuring spreads; slow industry growth with rising payment rates; future loan loss rate uncertainty, especially given bankruptcy reform and changing minimum payment requirements; and a consolidating industry with competitive pressures and increasing marketing constraints. Changes in economic variables, such as the number and size of personal bankruptcy filings, the rate of unemployment and the level of consumer confidence, consumer spending and consumer debt may substantially affect consumer loan levels and credit quality. Our financial condition and results of operations may be adversely affected by these factors.

**Risk Management.**

*Our hedging strategies and other risk management techniques may not be fully effective in mitigating our risk exposure in all market environments or against all types of risk.*

We have devoted significant resources to develop our risk management policies and procedures and expect to continue to do so in the future. Nonetheless, our hedging strategies and other risk management techniques may not be fully effective in mitigating our risk exposure in all market environments or against all types of risk, including risks that are unidentified or unanticipated. Some of our methods of managing risk are based upon our use of observed historical market behavior. As a result, these methods may not predict future risk exposures, which could be significantly greater than the historical measures indicate. Management of operational, legal and regulatory risks requires, among other things, policies and procedures to record properly and verify a large number of transactions and events, and these policies and procedures may not be fully effective. For more information on how we monitor and manage market risk, see "Market Risk" in Part II, Item 7A below.

## Item 1B.    Unresolved Staff Comments.

Morgan Stanley, like other well-known seasoned issuers, from time to time receives written comments from the staff of the SEC regarding its periodic or current reports under the Exchange Act. There are no comments that remain unresolved that Morgan Stanley received not less than 180 days before the end of its fiscal year to which this report relates that Morgan Stanley believes are material.

Morgan Stanley

## Item 2.  Properties.

Morgan Stanley has offices, operations and processing centers and warehouse facilities located throughout the U.S., and certain subsidiaries maintain offices and other facilities in international locations. Morgan Stanley's properties that are not owned are leased on terms and for durations that are reflective of commercial standards in the communities where these properties are located. Morgan Stanley believes the facilities it owns or occupies are adequate for the purposes for which they are currently used and are well maintained. Our principal offices consist of the following properties:

| Location | Owned/ Leased | Lease Expiration | Approximate Square Footage as of November 30, 2006* |
|---|---|---|---|
| **U.S. Locations** | | | |
| 1585 Broadway New York, New York (*Executive Office*) | Owned | N/A | 894,000 square feet |
| 522 Fifth Avenue New York, New York (*Asset Management Headquarters*) | Leased | 2021 | 580,000 square feet** |
| 2000 Westchester Avenue Purchase, New York (*Global Wealth Management Group Headquarters*) | Owned | N/A | 570,000 square feet |
| 2500 Lake Cook Road Riverwoods, Illinois (*Discover Executive Office*) | Owned | N/A | 1,200,000 square feet |
| New York, New York | Leased | 2007 – 2018 | 2,605,000 square feet |
| Brooklyn, New York | Leased | 2013 | 457,000 square feet |
| Jersey City, New Jersey | Leased | 2008 – 2013 | 499,000 square feet |
| **International Locations** | | | |
| 25 Cabot Square, Canary Wharf (*London Headquarters*) | Owned*** | N/A | 455,000 square feet |
| Canary Wharf | Leased | 2007 – 2038 | 970,000 square feet |
| Sapporo's Yebisu Garden Place, Ebisu, Shibuya-ku (*Tokyo Headquarters*) | Leased | Option to cancel in 2007, or at any time thereafter | 307,000 square feet |

---

\*    The indicated total aggregate square footage leased does not include space occupied by Morgan Stanley securities branch offices.

\*\*   The landlord of this location is a joint venture in which Morgan Stanley has a majority interest. Morgan Stanley has the right to purchase the remainder of the interest in the joint venture in fiscal 2007.

\*\*\*  Morgan Stanley holds the freehold interest in the land and building.

Morgan Stanley

## Item 3.  Legal Proceedings.

In addition to the matters described below, in the normal course of business, Morgan Stanley has been named, from time to time, as a defendant in various legal actions, including arbitrations, class actions and other litigation, arising in connection with its activities as a global diversified financial services institution. Certain of the actual or threatened legal actions include claims for substantial compensatory and/or punitive damages or claims for indeterminate amounts of damages. In some cases, the issuers that would otherwise be the primary defendants in such cases are bankrupt or in financial distress.

Morgan Stanley is also involved, from time to time, in other reviews, investigations and proceedings (both formal and informal) by governmental and self-regulatory agencies regarding Morgan Stanley's business, including, among other matters, accounting and operational matters, certain of which may result in adverse judgments, settlements, fines, penalties, injunctions or other relief. The number of these reviews, investigations and proceedings has increased in recent years with regard to many firms in the financial services industry, including Morgan Stanley.

Morgan Stanley contests liability and/or the amount of damages as appropriate in each pending matter. In view of the inherent difficulty of predicting the outcome of such matters, particularly in cases where claimants seek substantial or indeterminate damages or where investigations and proceedings are in the early stages, Morgan Stanley cannot predict with certainty the loss or range of loss, if any, related to such matters, how or if such matters will be resolved, when they will ultimately be resolved, or what the eventual settlement, fine, penalty or other relief, if any, might be. Subject to the foregoing, and except for the *Coleman Litigation* (see also Note 9 in "Notes to Consolidated Financial Statements" in Part II, Item 8), Morgan Stanley believes, based on current knowledge and after consultation with counsel, that the outcome of all other pending matters will not have a material adverse effect on the consolidated financial condition of Morgan Stanley, although the outcome of such matters could be material to Morgan Stanley's operating results for a particular future period, depending on, among other things, the level of Morgan Stanley's revenues or income for such period.

### Coleman Litigation.

On May 8, 2003, Coleman (Parent) Holdings Inc. ("CPH") filed a complaint against Morgan Stanley in the Circuit Court of the Fifteenth Judicial Circuit for Palm Beach County, Florida. The complaint relates to the 1998 merger between The Coleman Company, Inc. ("Coleman") and Sunbeam, Inc. ("Sunbeam"). The complaint, as amended, alleges that CPH was induced to agree to the transaction with Sunbeam based on certain financial misrepresentations, and it asserts claims against Morgan Stanley for aiding and abetting fraud, conspiracy and punitive damages. Shortly before trial, which commenced in April 2005, the trial court granted, in part, a motion for entry of a default judgment against Morgan Stanley and ordered that portions of CPH's complaint, including those setting forth CPH's primary allegations against Morgan Stanley, be read to the jury and deemed established for all purposes in the action. In May 2005, the jury returned a verdict in favor of CPH and awarded CPH $604 million in compensatory damages and $850 million in punitive damages. On June 23, 2005, the trial court issued a final judgment in favor of CPH in the amount of $1,578 million, which includes prejudgment interest and excludes certain payments received by CPH in settlement of related claims against others.

On June 27, 2005, Morgan Stanley filed a notice of appeal with the District Court of Appeal for the Fourth District of Florida (the "Court of Appeal") and posted a supersedeas bond, which automatically stayed execution of the judgment pending appeal. Morgan Stanley filed its initial brief in support of its appeal on December 7, 2005 and, on June 28, 2006, the Court of Appeal heard oral argument. Morgan Stanley's appeal seeks to reverse the judgment of the trial court on several grounds and asks that the case be remanded for entry of a judgment in favor of Morgan Stanley or, in the alternative, for a new trial.

### IPO Fee Litigation.

Starting in late 1998, purported class actions, later captioned *In re Public Offering Fee Antitrust Litigation* (the "purchaser actions") and *In re Issuer Plaintiff Initial Public Offering Fee Antitrust Litigation* (the "issuer

actions"), were initiated in the U.S. District Court for the Southern District of New York (the "SDNY") against Morgan Stanley and numerous other underwriters. The consolidated proceedings, one on behalf of purchasers and the other on behalf of issuers of certain shares in initial public offerings ("IPOs"), allege that defendants conspired to fix the underwriters' spread at 7% in IPOs of U.S. companies in the $20 million to $80 million range in violation of Section 1 of the Sherman Act. The complaints seek treble damages and injunctive relief. Plaintiffs' claims for damages in the purchaser actions have been dismissed, but the claims for injunctive relief remain. Plaintiffs' claims for damages and injunctive relief remain in the issuer actions. Plaintiffs moved for class certification in both actions, and defendants opposed that motion on May 25, 2005. On October 25, 2005, plaintiffs moved for summary judgment, which defendants opposed. On April 18, 2006, the court denied plaintiffs' motion for class certification in the issuer actions. On May 1, 2006, plaintiffs filed a petition pursuant to Federal Rule of Civil Procedure 23(f) for leave to appeal the denial of class certification, and on August 1, 2006, the U.S. Court of Appeals for the Second Circuit (the "Second Circuit") granted plaintiffs' petition. The case is otherwise stayed pending the appeal on class certification.

**IPO Allocation Matters.**

In March 2001, a purported class action, now captioned *In re Initial Public Offering Antitrust Litigation*, was initiated in the SDNY against Morgan Stanley and numerous other underwriters of various IPOs. The consolidated amended complaint alleges that defendants required customers who wanted allocations of "hot" IPO securities to pay undisclosed and excessive underwriters' compensation in the form of increased brokerage commissions and to buy shares of securities offered in the IPOs after the IPOs were completed ("tie-in purchases") at escalating price levels higher than the IPO price (a practice plaintiffs refer to as "laddering"). The complaint alleges violations of federal and/or state antitrust laws, including Section 1 of the Sherman Act. On September 28, 2005, the Second Circuit reversed the district court's dismissal of this matter. On January 12, 2006, the Second Circuit denied defendants' petition for rehearing *en banc*. On March 8, 2006, defendants filed a petition to the U.S. Supreme Court for writ of certiorari, which was granted on December 7, 2006.

Also beginning in March 2001, numerous purported class actions, now captioned *In re Initial Public Offering Securities Litigation*, were filed in the SDNY against certain issuers of IPO securities, certain individual officers of those issuers, Morgan Stanley and other underwriters of those IPOs, purportedly on behalf of purchasers of stock in the IPOs or the aftermarket. These complaints make factual allegations similar to the complaint in the antitrust action described above, but claim violations of the federal securities laws, including Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act") and Section 10(b) of the Exchange Act. Some of the complaints also allege that continuous "buy" recommendations by the defendants' research analysts improperly increased or sustained the prices at which the securities traded after the IPOs. On February 19, 2003, the underwriter defendants' joint motion to dismiss was denied, except as to certain specified offerings. On December 5, 2006, the Second Circuit reversed the SDNY's grant of class certification, and ruled that these cases could not be certified for class treatment. On January 5, 2007, plaintiffs filed a petition for rehearing and rehearing *en banc*.

On June 10, 2004, plaintiffs and issuer defendants entered into a definitive settlement agreement under which insurers of the issuers would guarantee recovery of at least $1 billion by class members. As part of the settlement, the settling issuer defendants agreed to assign to class members certain claims they had against the underwriters. Starting in late 2004, purported assignees of certain issuers filed suits in the SDNY against several underwriter defendants, including Morgan Stanley, on the ground that underwriters breached the underwriting agreement and related duties by allocating shares in each company's IPO to customers who allegedly paid the underwriters "excess compensation." On October 11, 2005, the SDNY dismissed the complaint with leave to replead. Plaintiffs filed a second amended complaint, which was dismissed with prejudice on February 24, 2006. Plaintiff filed a notice of appeal on May 31, 2006.

On April 2, 2002, a purported class action complaint, captioned *Breakaway Solutions, Inc. v. Morgan Stanley & Co. Incorporated, et al.*, was filed in the Delaware Court of Chancery against Morgan Stanley and two other

25

Morgan Stanley

underwriters. The complaint was brought on behalf of a class of issuers that issued IPO securities from January 1, 1998 to October 31, 2000 pursuant to underwriting agreements with defendants and whose securities increased in value by 15 percent or more within 30 days following the IPO. The complaint alleges that defendants allocated underpriced stock to certain of defendants' favored clients and, directly or indirectly, shared in portions of the profits of such favored clients pursuant to side agreements or understandings, with the alleged effect of depriving issuers of millions of dollars in IPO proceeds. The complaint alleges breach of contract, breach of covenant of good faith, breach of fiduciary duty, indemnification or contribution and unjust enrichment and restitution. The court dismissed plaintiffs' claims except for its breach of fiduciary duty claim.

On September 30, 2005, Breakaway Solutions, Inc. ("Breakaway") filed another complaint in an individual action against Morgan Stanley and two other underwriters in the Supreme Court of the State of New York. The complaint alleges that defendants underpriced Breakaway's IPO stock, allocated this underpriced stock to favored clients pursuant to a profit sharing arrangement, and that Morgan Stanley improperly sold Breakaway shares before expiration of the lock-up period. The complaint alleges breach of fiduciary duty and breach of the covenant of good faith against all the defendants and fraud and unjust enrichment against Morgan Stanley. This action has been stayed by agreement of the parties.

**Global Wealth Management Group Employment Matters.**

*Wage and Hour Matters.*    Complaints raising allegations of unpaid overtime and unlawful wage deductions against Morgan Stanley have been filed in New Jersey, New York, Connecticut, Texas, Florida, Illinois and California seeking damages on behalf of certain current and former employees. In New Jersey, a purported class action, captioned *Steinberg v. Morgan Stanley & Co., Inc. and Morgan Stanley DW Inc.*, was filed in the Superior Court of New Jersey, Law Division, Bergen County ("New Jersey Superior Court") on September 1, 2005 and was removed to the U.S. District Court for the District of New Jersey (the "New Jersey District Court") on October 7, 2005. A second purported class action, captioned *Robert Adler et al. v. Morgan Stanley & Co., Inc. and Morgan Stanley DW Inc.*, was filed in New Jersey Superior Court on May 22, 2006. On September 25, 2006, a third purported New Jersey class action, captioned *Jeff Quinn and John Volpe v. Morgan Stanley*, was filed in the New Jersey District Court.

On September 9, 2005, a purported class action, captioned *Gasman v. Morgan Stanley,* was filed in the SDNY. On September 23, 2005, another purported class action, captioned *Roles v. Morgan Stanley et al.,* was filed in the U.S. District Court for the Eastern District of New York.

On May 22, 2006, a purported class action, captioned *Janemarie Lenihan v. Morgan Stanley & Co., Inc. and Morgan Stanley DW Inc.*, was filed in the U.S. District Court for the District of Connecticut. On June 23, 2006, a purported class action, captioned *Kyle R. Armitage v. Morgan Stanley & Co., Inc.*, was filed in the U.S. District Court for the Eastern District of Texas. On September 15, 2006, Morgan Stanley filed its answer and affirmative defenses to the *Armitage* complaint. On June 26, 2006, a purported class action, captioned *Jennifer Taub v. Morgan Stanley DW Inc.*, was filed in the U.S. District Court for the Southern District of Florida. On August 24, 2006, a purported class action, captioned *Joseph Stowell, Jr., v. Morgan Stanley DW Inc.*, was filed in the U.S. District Court for the Central District of Illinois. On September 8, 2006, plaintiffs in the *Armitage* and *Stowell* matters moved before the Judicial Panel on Multi-District Litigation (the "Judicial Panel") to coordinate the various pending matters in the U.S. District Court for the Northern District of Illinois (the "Northern District of Illinois").

On October 18, 2006, a purported class action, captioned *Vernon Brown v. Morgan Stanley* was filed in the U.S. District Court for the Southern District of California (the "Southern District of California").

On October 9, 2006, Morgan Stanley reached an agreement to resolve the wage and hour claims filed by the *Steinberg*, *Adler*, *Gasman*, *Roles, Lenihan* and *Brown* plaintiffs. The agreement, which is subject to, among other things, court approval, will resolve all claims brought by plaintiffs in New Jersey, New York, Connecticut and

Morgan Stanley

California as well as those of all other potential class members nationwide. On November 29, 2006, for purposes of executing the settlement, a consolidated amended complaint, captioned *Steinberg, et al. v. Morgan Stanley* ("*Steinberg II*"), was filed in the Southern District of California.

On November 21, 2006, the *Taub* matter was dismissed with prejudice.

On November 30, 2006, a hearing was held in St. Louis, Missouri before the Judicial Panel on the *Armitage* and *Stowell* plaintiffs' motion for consolidation in the Northern District of Illinois. On December 27, 2006, the Panel issued an order centralizing the *Gasman*, *Roles*, *Steinberg*, *Lenihan*, *Armitage* and *Stowell* matters in the Southern District of California. The Judicial Panel also treated the *Quinn*, *Brown* and *Steinberg II* matters as potential "tag along" cases and issued a conditional transfer order transferring those cases to the Southern District of California as well.

***Gender Matters.***  Morgan Stanley has also been named in two purported class actions alleging gender discrimination under state and federal law. On June 22, 2006, a purported class action, captioned *Joanne Augst-Johnson et al. v. Morgan Stanley DW Inc.*, was filed in the U.S. District Court for the District of Columbia. On June 22, 2006, a second purported class action, captioned *Daisy Jaffe v. Morgan Stanley DW Inc.*, was filed in the U.S. District Court for the Northern District of California. Plaintiffs seek damages in law and in equity.

On October 12, 2006, a first amended complaint adding an additional named plaintiff, Denise Williams, was filed in the *Jaffe* matter. On October 30, 2006, Morgan Stanley filed a motion to stay the class claims and a motion to dismiss certain of plaintiff Williams' claims. On November 13, 2006, plaintiffs agreed to voluntarily dismiss without prejudice the claims which were the subject of Morgan Stanley's motion to dismiss. On January 19, 2007, the court granted Morgan Stanley's motion to stay the class-wide allegations until March 15, 2007.

**Late Trading and Market Timing.**

Starting in July 2003, Morgan Stanley received subpoenas and requests for information from various regulatory and governmental agencies, including the SEC, the NYSE and various states, in connection with industry-wide investigations of broker-dealers and mutual fund complexes relating to possible late trading and market timing of mutual funds. Morgan Stanley continues to cooperate with and provide information to regulators in connection with their inquiries.

**AOL Time Warner Litigation.**

Since 2003, Morgan Stanley has been named as a defendant in a number of state court actions involving AOL Time Warner, including cases in California, Ohio and West Virginia. All of these cases also name as defendants AOL Time Warner, numerous individual defendants, AOL Time Warner's auditors and other investment banking defendants. The complaints allege that AOL Time Warner issued false and misleading financial statements by, among other things, inflating advertising revenues. These complaints name Morgan Stanley in its capacity as financial advisor to Time Warner in the merger of America Online and Time Warner and/or as underwriter of bond offerings completed in 2001 and 2002. The complaints allege violations of Section 11 of the Securities Act and Section 14(a) of the Exchange Act (and Rule 14a-9 thereunder) in connection with the merger registration statement, as well as various state and common laws and violations of Section 11 and 12(a)(2) of the Securities Act in connection with the bond registration statements.

In the coordinated California proceedings, claims based on California common law fraud and Sections 25400 and 25500 of the California Corporations Code remain against Morgan Stanley. In the Ohio action, state securities law claims remain against Morgan Stanley. Motions to dismiss are pending in the West Virginia action.

On January 30, 2006, numerous new individual actions were filed against Morgan Stanley and other defendants by plaintiffs opting out of the class settlement of a previously filed federal class action. The claims against

Morgan Stanley

Morgan Stanley in that class action had been dismissed by the SDNY. The new complaints contain similar factual allegations against Morgan Stanley and assert similar claims, but also include a claim for violation of Section 10(b) of the Exchange Act. These actions were transferred to the SDNY and consolidated. Plaintiffs have filed amended complaints in these actions. On June 30, 2006, defendants filed motions to dismiss the claims common to all complaints.

**Global Wealth Management Group NASD Email Matter.**

On December 19, 2006, the NASD commenced a disciplinary proceeding against MSDWI, alleging that it provided false information regarding the existence of emails and failed to provide such emails to arbitration claimants and regulators in response to discovery obligations and regulatory inquiries, failed to preserve books and records and failed to establish and maintain systems and written procedures reasonably designed to preserve required records and to ensure that it conducted adequate searches in response to regulatory inquiries and discovery requests for email, in violation of section 17(a) of the Exchange Act, Rule 17a-4 thereunder, NASD Conduct Rules 2110, 3010 (a) and (b) and 3110, NASD Procedural Rule 8210 and Interpretative Material 10100 under NASD Code of Arbitration Procedure.

**Shareholder Derivative Matters.**

Beginning on July 19, 2005, shareholder plaintiffs filed purported derivative actions on behalf of Morgan Stanley against certain present and former directors and its former chief legal officer based on, among other things, agreements to pay the former CEO and co-President of Morgan Stanley and the handling of a lawsuit resulting in an adverse judgment against Morgan Stanley. Four lawsuits filed in the SDNY have been consolidated, under the heading *In re Morgan Stanley Derivative Litigation*, and on January 23, 2006, plaintiffs filed a second amended consolidated complaint that includes claims for, among other things, violations of Sections 10(b) and 14(a) of the Exchange Act and breach of fiduciary duties and seeks, among other things, rescission of the severance and compensation agreements and damages. On March 9, 2006, defendants moved to dismiss.

On July 19, 2005, a derivative lawsuit was filed in a New York state court challenging the agreement to pay the former co-President of Morgan Stanley and seeking an accounting for losses as a result thereof. This matter has been stayed by agreement of the parties.

**Indonesian Litigation.**

In November 2003, two proceedings were initiated in the Indonesian District Courts by two members of the Asia Pulp & Paper Group (PT Indah Kiat Pulp & Paper Tbk and PT Lontar Papyrus Pulp & Paper Industry, respectively) against Morgan Stanley and 13 other defendants with respect to two bond issues in 1994 and 1995 that were guaranteed by plaintiffs and in which Morgan Stanley acted as underwriter. The claims alleged that the bond issues were invalid and contrary to Indonesian law, and alleged damages in the amount of all principal and interest paid under the bonds as well as other amounts. In November 2006 the Indonesian Supreme Court upheld the decisions at first instance and on appeal in favor of the plaintiff and declared the bond issues to be illegal and void, holding that defendants (including Morgan Stanley) had committed unspecified tortious acts, but awarding no damages.

In April 2004, another proceeding was filed in the Indonesian District Courts by PT Lontar Papyrus against Morgan Stanley and 28 other defendants, alleging that the defendants violated injunctions issued by the Indonesian District Court in the first claim brought by PT Lontar Papyrus and conspired to cause the failure of plaintiff's restructuring negotiations. Plaintiff seeks damages in respect of losses allegedly suffered. On September 28, 2005, the Indonesian District Court rejected the plaintiff's claim against Morgan Stanley. On September 13, 2006, Morgan Stanley filed its counter-arguments to the plaintiff's memorandum of appeal that was filed with the Indonesian High Court on April 19, 2006.

In October 2004, an additional proceeding was filed in the Indonesian District Courts by APP International Finance Company BV, a member of the Asia Pulp & Paper Group and the issuer of the 1995 bond issue, against

Morgan Stanley

Morgan Stanley and 18 other defendants, making allegations similar to those in the November 2003 claim brought by PT Lontar Papyrus. Plaintiff seeks damages in respect of losses allegedly suffered. On December 28, 2006, the Indonesian District Court issued its judgment, declaring the bond issue to be illegal and void, holding that defendants (including Morgan Stanley) had committed unspecified tortious acts, but awarding no damages. Morgan Stanley has appealed this decision to the Indonesian High Court.

In January 2005, an additional proceeding was filed in the Indonesian District Courts by Indah Kiat International Finance Company BV, a member of the Asia Pulp & Paper Group and the issuer of the 1994 bond issue, against Morgan Stanley and other defendants, making allegations similar to those in the November 2003 claim brought by PT Indah Kiat. Plaintiff seeks damages in respect of losses allegedly suffered. In October 2006, the Indonesian High Court upheld on appeal the decision of the Indonesian District Court in favor of the plaintiff, declaring the bond issue to be null and void, holding that defendants (including Morgan Stanley) had committed unspecified tortious acts, but awarding no damages. Morgan Stanley has appealed this decision to the Indonesian Supreme Court in Jakarta.

The following matter was terminated during the quarter ended November 30, 2006:

**General American Litigation.**

On April 24, 2006, a Second Amended Petition, captioned *Finke, et al. v. Morgan Stanley & Co. Incorporated, et al.*, was filed in the Missouri Circuit Court, Twenty-Second Judicial Circuit (St. Louis City), by the Director of the Department of Insurance for the State of Missouri and the Special Deputy Liquidator for General American Mutual Holding Company against MS&Co., Morgan Stanley and a former officer of General American. The amended petition, which updated a petition first filed on or about July 28, 2004, asserts several causes of action against the Morgan Stanley defendants, including claims for fraud, breach of fiduciary duty and negligent misrepresentation. The case arises out of the firm's investment banking work in connection with a potential demutualization and initial public offering of General American in 1998-1999. Plaintiffs sought compensatory damages of over $1 billion and punitive damages of over $3 billion. On November 8, 2006, the court granted final approval of a settlement agreement between the parties to resolve the matter.

## Item 4.    Submission of Matters to a Vote of Security Holders.

There were no matters submitted to a vote of security holders during the fourth quarter of our fiscal year ended November 30, 2006.

Morgan Stanley

## Part II

## Item 5.   Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.

Morgan Stanley's common stock trades on the NYSE under the symbol "MS." At January 31, 2007, Morgan Stanley had approximately 101,062 holders of record; however, Morgan Stanley believes the number of beneficial owners of common stock exceeds this number.

The table below sets forth, for each of the last eight fiscal quarters, the low and high sales prices per share of Morgan Stanley's common stock as reported by Bloomberg Financial Markets and the amount of any cash dividends declared per share of Morgan Stanley's common stock.

|  | Low Sale Price | High Sale Price | Dividends |
|---|---|---|---|
| **Fiscal 2006:** | | | |
| Fourth Quarter | $65.26 | $80.00 | $0.27 |
| Third Quarter | $54.52 | $69.50 | $0.27 |
| Second Quarter | $57.58 | $66.00 | $0.27 |
| First Quarter | $55.89 | $62.15 | $0.27 |
| **Fiscal 2005:** | | | |
| Fourth Quarter | $50.61 | $57.98 | $0.27 |
| Third Quarter | $48.61 | $54.61 | $0.27 |
| Second Quarter | $47.66 | $60.40 | $0.27 |
| First Quarter | $51.00 | $60.51 | $0.27 |

Morgan Stanley

The table below sets forth the information with respect to purchases made by or on behalf of Morgan Stanley of its common stock during the fourth quarter of our fiscal year ended November 30, 2006.

### Issuer Purchases of Equity Securities
(dollars in millions, except per share amounts)

| Period | Total Number of Shares Purchased | Average Price Paid Per Share | Total Number of Shares Purchased As Part of Publicly Announced Plans or Programs (C) | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| **Month #1 (Sept. 1, 2006—Sept. 30, 2006)** | | | | |
| Equity Anti-dilution Program (A) . . . . . . . . . . | 281,889 | $71.25 | 281,889 | (A) |
| Capital Management Program (B) . . . . . . . . . . | — | N/A | — | $600 |
| Employee Transactions (D) . . . . . . . . . . . . . . . | 2,582,654 | $66.49 | N/A | N/A |
| **Month #2 (Oct. 1, 2006—Oct. 31, 2006)** | | | | |
| Equity Anti-dilution Program (A) . . . . . . . . . . | 4,704,445 | $75.76 | 4,704,445 | (A) |
| Capital Management Program (B) . . . . . . . . . . | — | N/A | — | $600 |
| Employee Transactions (D) . . . . . . . . . . . . . . . | 190,788 | $76.24 | N/A | N/A |
| **Month #3 (Nov. 1, 2006—Nov. 30, 2006)** | | | | |
| Equity Anti-dilution Program (A) . . . . . . . . . . | 8,061,526 | $76.78 | 8,061,526 | (A) |
| Capital Management Program (B) . . . . . . . . . . | — | N/A | — | $600 |
| Employee Transactions (D) . . . . . . . . . . . . . . . | 44,771 | $76.58 | N/A | N/A |
| **Total** | | | | |
| Equity Anti-dilution Program (A) . . . . . . . . . . | 13,047,860 | $76.29 | 13,047,860 | (A) |
| Capital Management Program (B) . . . . . . . . . . | — | N/A | — | $600 |
| Employee Transactions (D) . . . . . . . . . . . . . . . | 2,818,213 | $67.31 | N/A | N/A |

(A) Morgan Stanley's Board of Directors authorized this program to purchase common stock to offset the dilutive impact of grants and exercises of awards under Morgan Stanley's equity-based compensation and benefit plans. At the time the program was publicly announced on January 7, 1999, it had no set expiration or termination date. There is no maximum amount of shares that may be purchased under the program.

(B) Morgan Stanley's Board of Directors authorized this program to purchase common stock for capital management purposes. The program was publicly announced on February 12, 1998 at which time up to $3 billion of stock was authorized to be purchased. The program was subsequently increased by $1 billion on December 18, 1998, $1 billion on December 20, 1999 and $1.5 billion on June 20, 2000. This program has a remaining capacity of $600 million at November 30, 2006 and has no set expiration or termination date.

(C) Share purchases under publicly announced programs are made pursuant to open-market purchases, Rule 10b5-1 plans or privately negotiated transactions (including with employee benefit plans) as market conditions warrant and at prices Morgan Stanley deems appropriate.

(D) Includes: (1) shares delivered or attested to in satisfaction of the exercise price and/or tax withholding obligations by holders of employee stock options (granted under employee stock compensation plans) who exercised options; (2) restricted shares withheld (under the terms of grants under employee stock compensation plans) to offset tax withholding obligations that occur upon vesting and release of restricted shares; and (3) shares withheld (under the terms of grants under employee stock compensation plans) to offset tax withholding obligations that occur upon the delivery of outstanding shares underlying restricted stock units. Morgan Stanley's employee stock compensation plans provide that the value of the shares delivered or attested, or withheld, shall be valued using the fair market value of Morgan Stanley common stock on the date the relevant transaction occurs, using a valuation methodology established by Morgan Stanley.

On December 19, 2006, Morgan Stanley announced that its Board of Directors authorized the repurchase of up to $6 billion of Morgan Stanley's outstanding stock under a new share repurchase program. The new program replaces the Company's Equity Anti-dilution Program and Capital Management Program with one repurchase program for capital management purposes that will consider, among other things, business segment capital needs, as well as equity-based compensation and benefit plan requirements. Morgan Stanley expects to exercise the authorization over the next 12-18 months at prices Morgan Stanley deems appropriate, subject to its surplus capital position, market conditions and regulatory considerations.

Information relating to compensation plans under which Morgan Stanley equity securities are authorized for issuance is set forth in Morgan Stanley's definitive proxy statement for its annual shareholders meeting to be held on April 10, 2007 (to be filed within 120 days after November 30, 2006) ("Morgan Stanley's Proxy Statement") under the captions "Item 3—Company proposal to approve the 2007 Equity Incentive Plan" and "Equity Compensation Plan Information" and is incorporated by reference herein.

Morgan Stanley

## Item 6.    Selected Financial Data.

**MORGAN STANLEY**

**SELECTED FINANCIAL DATA**
**(dollars in millions, except share and per share data)**

| | | | Fiscal Year | | |
|---|---|---|---|---|---|
| | **2006** | **2005** | **2004** | **2003** | **2002** |
| **Income Statement Data:** | | | | | |
| Revenues: | | | | | |
| Investment banking ...................................... | $ 4,755 | $ 3,843 | $ 3,341 | $ 2,440 | $ 2,478 |
| Principal transactions: | | | | | |
|     Trading ............................................. | 11,738 | 7,365 | 5,510 | 6,262 | 3,521 |
|     Investments .......................................... | 1,669 | 981 | 607 | 110 | (25) |
| Commissions .......................................... | 3,810 | 3,363 | 3,264 | 2,887 | 3,191 |
| Fees: ................................................. | | | | | |
|     Asset management, distribution and administration ........ | 5,288 | 4,958 | 4,473 | 3,814 | 4,033 |
|     Merchant, cardmember and other fees, net ............... | 1,167 | 1,323 | 1,317 | 1,377 | 1,421 |
| Servicing and securitization income ......................... | 2,338 | 1,609 | 1,921 | 1,922 | 2,032 |
| Interest and dividends .................................... | 45,216 | 28,175 | 18,584 | 15,738 | 15,876 |
| Other ................................................ | 570 | 464 | 324 | 226 | 399 |
|     Total revenues ...................................... | 76,551 | 52,081 | 39,341 | 34,776 | 32,926 |
| Interest expense ....................................... | 41,937 | 24,425 | 14,707 | 12,693 | 12,515 |
| Provision for consumer loan losses ........................ | 756 | 878 | 926 | 1,266 | 1,337 |
|     Net revenues ....................................... | 33,858 | 26,778 | 23,708 | 20,817 | 19,074 |
| Non-interest expenses: | | | | | |
| Compensation and benefits ............................... | 14,387 | 11,313 | 9,853 | 8,522 | 7,910 |
| Other ................................................ | 8,471 | 8,355 | 7,037 | 6,135 | 6,070 |
| Restructuring and other charges ........................... | — | — | — | — | 235 |
| September 11th related insurance recoveries, net ............... | — | (251) | — | — | — |
|     Total non-interest expenses ........................... | 22,858 | 19,417 | 16,890 | 14,657 | 14,215 |
| Income from continuing operations before losses from unconsolidated investees, income taxes, dividends on preferred securities subject to mandatory redemption and cumulative effect of accounting change, net ............................................... | 11,000 | 7,361 | 6,818 | 6,160 | 4,859 |
| Losses from unconsolidated investees ......................... | 228 | 311 | 328 | 279 | 77 |
| Provision for income taxes ................................ | 3,275 | 1,858 | 1,856 | 1,707 | 1,625 |
| Dividends on preferred securities subject to mandatory redemption .... | — | — | 45 | 154 | 87 |
| Income from continuing operations before cumulative effect of accounting change, net ...................................... | 7,497 | 5,192 | 4,589 | 4,020 | 3,070 |
| Discontinued operations: | | | | | |
| Loss from discontinued operations ......................... | (42) | (486) | (172) | (393) | (138) |
| Income tax benefit .................................... | 17 | 184 | 69 | 160 | 56 |
|     Loss on discontinued operations ...................... | (25) | (302) | (103) | (233) | (82) |
| Cumulative effect of accounting change, net ..................... | — | 49 | — | — | — |
| Net income ............................................ | $ 7,472 | $ 4,939 | $ 4,486 | $ 3,787 | $ 2,988 |
| Preferred stock dividend requirements .......................... | $ 19 | $ — | $ — | $ — | $ — |
| Earnings applicable to common shares(1) ........................ | $ 7,453 | $ 4,939 | $ 4,486 | $ 3,787 | $ 2,988 |

| | | Fiscal Year | | | |
|---|---|---|---|---|---|
| | **2006** | **2005** | **2004** | **2003** | **2002** |
| **Per Share Data:** | | | | | |
| Earnings per basic common share: | | | | | |
|   Income from continuing operations . . . . . . . . . . . . . | $ 7.40 | $ 4.94 | $ 4.25 | $ 3.74 | $ 2.84 |
|   Loss on discontinued operations . . . . . . . . . . . . . | (0.02) | (0.29) | (0.10) | (0.22) | (0.08) |
|   Cumulative effect of accounting change, net . . . | — | 0.05 | — | — | — |
|    Earnings per basic common share . . . . . . | $ 7.38 | $ 4.70 | $ 4.15 | $ 3.52 | $ 2.76 |
| Earnings per diluted common share: | | | | | |
|   Income from continuing operations . . . . . . . . . . . . . | $ 7.09 | $ 4.81 | $ 4.15 | $ 3.66 | $ 2.76 |
|   Loss on discontinued operations . . . . . . . . . . . . . | (0.02) | (0.29) | (0.09) | (0.21) | (0.07) |
|   Cumulative effect of accounting change, net . . . | — | 0.05 | — | — | — |
|    Earnings per diluted common share . . . . . . | $ 7.07 | $ 4.57 | $ 4.06 | $ 3.45 | $ 2.69 |
| Book value per common share . . . | $ 32.67 | $ 27.59 | $ 25.95 | $ 22.93 | $ 20.24 |
| Dividends per common share . . . | $ 1.08 | $ 1.08 | $ 1.00 | $ 0.92 | $ 0.92 |
| **Balance Sheet and Other Operating Data:** | | | | | |
| Total assets . . . . . . . . . . . . . . . . . . | $ 1,120,645 | $ 898,523 | $ 747,334 | $ 602,843 | $ 529,499 |
| Consumer loans, net . . . . . . . . . . . | 24,173 | 22,916 | 20,226 | 19,382 | 23,014 |
| Total capital(2) . . . . . . . . . . . . . . . | 162,134 | 125,891 | 110,793 | 82,769 | 65,936 |
| Long-term borrowings(2) . . . . . . . | 126,770 | 96,709 | 82,587 | 57,902 | 44,051 |
| Shareholders' equity . . . . . . . . . . . | 35,364 | 29,182 | 28,206 | 24,867 | 21,885 |
| Return on average common shareholders' equity . . . . . . . . . | 23.5% | 17.3% | 16.8% | 16.5% | 14.1% |
| Average common and equivalent shares(1) . . . . . . . . . . . . . . . . . | 1,010,254,255 | 1,049,896,047 | 1,080,121,708 | 1,076,754,740 | 1,083,270,783 |

(1)  Amounts shown are used to calculate earnings per basic common share.

(2)  These amounts exclude the current portion of long-term borrowings and include Capital Units and junior subordinated debt issued to capital trusts.

Morgan Stanley

## Item 7.   Management's Discussion and Analysis of Financial Condition and Results of Operations.

### Introduction.

Morgan Stanley (the "Company") is a global financial services firm that maintains significant market positions in each of its business segments—Institutional Securities, Global Wealth Management Group, Asset Management and Discover. The Company, through its subsidiaries and affiliates, provides a wide variety of products and services to a large and diversified group of clients and customers, including corporations, governments, financial institutions and individuals. A summary of the activities of each of the segments follows:

*Institutional Securities* includes capital raising; financial advisory services, including advice on mergers and acquisitions, restructurings, real estate and project finance; corporate lending; sales, trading, financing and market-making activities in equity securities and related products and fixed income securities and related products, including foreign exchange and commodities; benchmark indices and risk management analytics; research; and investment activities.

*Global Wealth Management Group* provides brokerage and investment advisory services covering various investment alternatives; financial and wealth planning services; annuity and insurance products; credit and other lending products; banking and cash management services; retirement services; and trust and fiduciary services.

*Asset Management* provides global asset management products and services in equity, fixed income, alternative investments and private equity to institutional and retail clients through proprietary and third party retail distribution channels, intermediaries and the Company's institutional distribution channel. Asset Management also engages in investment activities.

*Discover* offers Discover®-branded credit cards and related consumer products and services and operates the Discover Network, a merchant and cash access network for Discover Network-branded cards, and PULSE® EFT Association LP ("PULSE"), an automated teller machine/debit and electronic funds transfer network. Discover also offers consumer finance products and services in the U.K., including Morgan Stanley-branded, Goldfish-branded and various other credit cards issued on the MasterCard and Visa networks.

On December 19, 2006, the Company announced that its Board of Directors had approved the spin-off of Discover (the "Discover Spin-off") (see "Discover Spin-off" herein).

The Company's results of operations for the 12 months ended November 30, 2006 ("fiscal 2006"), November 30, 2005 ("fiscal 2005") and November 30, 2004 ("fiscal 2004") are discussed below. The results of the aircraft leasing business are reported as discontinued operations for all periods presented through its sale on March 24, 2006 (see "Discontinued Operations" herein).

## Results of Operations.

**Executive Summary.**

*Financial Information.*

|  | Fiscal Year | | |
|---|---|---|---|
|  | **2006** | **2005** | **2004** |
| **Net revenues (dollars in millions):** | | | |
| Institutional Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $21,562 | $15,673 | $13,113 |
| Global Wealth Management Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,505 | 5,019 | 4,615 |
| Asset Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,770 | 2,907 | 2,738 |
| Discover . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,290 | 3,452 | 3,533 |
| Intersegment Eliminations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (269) | (273) | (291) |
| Consolidated net revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $33,858 | $26,778 | $23,708 |
| **Income before taxes (dollars in millions)(1):** | | | |
| Institutional Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 8,160 | $ 4,754 | $ 4,281 |
| Global Wealth Management Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 509 | 585 | 371 |
| Asset Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 711 | 1,007 | 827 |
| Discover . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,587 | 921 | 1,221 |
| Intersegment Eliminations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 33 | 94 | 118 |
| Consolidated income before taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $11,000 | $ 7,361 | $ 6,818 |
| **Consolidated net income (dollars in millions)** . . . . . . . . . . . . . . . . . . . . . | $ 7,472 | $ 4,939 | $ 4,486 |
| **Earnings applicable to common shareholders (dollars in millions)(2)** . . . . . . . | $ 7,453 | $ 4,939 | $ 4,486 |
| **Earnings per basic common share:** | | | |
| Income from continuing operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 7.40 | $ 4.94 | $ 4.25 |
| Loss on discontinued operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (0.02) | (0.29) | (0.10) |
| Cumulative effect of accounting change, net . . . . . . . . . . . . . . . . . . . . . . . | — | 0.05 | — |
| Earnings per basic common share . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 7.38 | $ 4.70 | $ 4.15 |
| **Earnings per diluted common share:** | | | |
| Income from continuing operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 7.09 | $ 4.81 | $ 4.15 |
| Loss on discontinued operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (0.02) | (0.29) | (0.09) |
| Cumulative effect of accounting change, net . . . . . . . . . . . . . . . . . . . . . . . | — | 0.05 | — |
| Earnings per diluted common share . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 7.07 | $ 4.57 | $ 4.06 |
| *Statistical Data.* | | | |
| **Book value per common share(3)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 32.67 | $ 27.59 | $ 25.95 |
| **Average common equity (dollars in billions)(4):** | | | |
| Institutional Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 18.2 | $ 14.6 | $ 13.3 |
| Global Wealth Management Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3.2 | 3.7 | 3.5 |
| Asset Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.2 | 1.7 | 1.7 |
| Total from securities businesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23.6 | 20.0 | 18.5 |
| Discover . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.9 | 4.4 | 3.9 |
| Total from operating segments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28.5 | 24.4 | 22.4 |
| Discontinued operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 1.2 | 1.5 |
| Unallocated capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3.2 | 2.9 | 2.8 |
| Consolidated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 31.7 | $ 28.5 | $ 26.7 |

Morgan Stanley

*Statistical Data (Continued).*

|  | Fiscal Year | | |
|---|---|---|---|
|  | 2006 | 2005 | 2004 |
| **Return on average common equity(4):** | | | |
| Consolidated | 23% | 17% | 17% |
| Institutional Securities | 31% | 24% | 22% |
| Global Wealth Management Group | 11% | 11% | 7% |
| Asset Management | 19% | 36% | 30% |
| Discover | 22% | 13% | 20% |
| **Effective income tax rate** | 30.4% | 26.5% | 28.8% |
| **Worldwide employees** | 55,310 | 53,218 | 53,284 |
| **Consolidated assets under management or supervision by asset class (dollars in billions):** | | | |
| Equity | $ 325 | $ 285 | $ 246 |
| Fixed income | 113 | 108 | 118 |
| Money market | 89 | 83 | 87 |
| Alternative investments | 21 | 19 | 19 |
| Real estate | 64 | 41 | 31 |
| Subtotal | 612 | 536 | 501 |
| Unit trusts | 14 | 12 | 11 |
| Other(5) | 63 | 51 | 44 |
| Total assets under management or supervision(6) | 689 | 599 | 556 |
| Share of minority interest assets(7) | 4 | — | — |
| Total | $ 693 | $ 599 | $ 556 |
| **Institutional Securities:** | | | |
| Mergers and acquisitions completed transactions (dollars in billions)(8): | | | |
| Global market volume | $ 723.7 | $ 518.3 | $ 351.6 |
| Market share | 26.8% | 24.6% | 23.7% |
| Rank | 2 | 3 | 2 |
| Mergers and acquisitions announced transactions (dollars in billions)(8): | | | |
| Global market volume | $ 977.2 | $ 725.0 | $ 320.7 |
| Market share | 27.4% | 28.6% | 19.2% |
| Rank | 3 | 2 | 5 |
| Global equity and equity-related issues (dollars in billions)(8): | | | |
| Global market volume | $ 57.3 | $ 45.9 | $ 54.3 |
| Market share | 8.2% | 8.7% | 10.6% |
| Rank | 3 | 3 | 1 |
| Global debt issues (dollars in billions)(8): | | | |
| Global market volume | $ 397.3 | $ 347.2 | $ 362.2 |
| Market share | 5.7% | 5.7% | 6.9% |
| Rank | 5 | 5 | 3 |
| Global initial public offerings (dollars in billions)(8): | | | |
| Global market volume | $ 22.7 | $ 14.7 | $ 13.9 |
| Market share | 8.8% | 8.9% | 10.0% |
| Rank | 2 | 2 | 1 |
| Pre-tax profit margin(9) | 38% | 30% | 32% |

*Statistical Data (Continued).*

|  | Fiscal Year | | |
|---|---|---|---|
|  | **2006** | **2005** | **2004** |
| **Global Wealth Management Group:** | | | |
| Global representatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8,030 | 9,526 | 10,962 |
| Annualized net revenue per global representative (dollars in thousands)(10) . . . | $ 643 | $ 495 | $ 424 |
| Client assets by segment (dollars in billions)(10): | | | |
| $10 million or more . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 202 | $ 157 | $ 140 |
| $1 million – $10 million . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 248 | 218 | 202 |
| Subtotal $1 million or more . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 450 | 375 | 342 |
| $100,000 – $1 million . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 179 | 181 | 193 |
| Less than $100,000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 26 | 32 | 40 |
| Client assets excluding corporate and other accounts . . . . . . . . . . . . . . . . | 655 | 588 | 575 |
| Corporate and other accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 31 | 29 | 27 |
| Total client assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 686 | $ 617 | $ 602 |
| Fee-based assets as a percentage of total client assets . . . . . . . . . . . . . . . . . . | 30% | 28% | 26% |
| Client assets per global representative (dollars in millions)(11) . . . . . . . . . . . . | $ 85 | $ 65 | $ 55 |
| Bank deposit program (dollars in millions)(12) . . . . . . . . . . . . . . . . . . . . . . . . | $13,301 | $ 1,689 | $ 435 |
| Pre-tax profit margin(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9% | 12% | 8% |
| **Asset Management:** | | | |
| Assets under management or supervision (dollars in billions)(13) . . . . . . . . . . | $ 478 | $ 431 | $ 424 |
| Percent of fund assets in top half of Lipper rankings(14) . . . . . . . . . . . . . . . . | 40% | 61% | 63% |
| Pre-tax profit margin(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 26% | 35% | 30% |
| **Discover (dollars in millions, unless otherwise noted)(15):** | | | |
| Period-end credit card loans—Owned . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $23,588 | $22,496 | $19,724 |
| Period-end credit card loans—Managed . . . . . . . . . . . . . . . . . . . . . . . . . . . | $50,291 | $46,936 | $48,261 |
| Average credit card loans—Owned . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $21,647 | $19,932 | $17,608 |
| Average credit card loans—Managed . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $48,207 | $47,330 | $47,387 |
| Net principal charge-off rate—Owned . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3.79% | 4.84% | 5.53% |
| Net principal charge-off rate—Managed . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.08% | 5.23% | 6.00% |
| Return on average receivables—Owned . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.98% | 2.92% | 4.43% |
| Return on average receivables—Managed . . . . . . . . . . . . . . . . . . . . . . . . . | 2.24% | 1.23% | 1.65% |
| Transaction volume (dollars in billions): | | | |
| Net sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 96.6 | $ 86.0 | $ 79.5 |
| Other transaction volume . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18.1 | 18.1 | 20.1 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 114.7 | $ 104.1 | $ 99.6 |
| Payment services transaction volume (in millions): | | | |
| Discover network . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,399 | 1,301 | 1,226 |
| PULSE network . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,857 | 1,556 | — |
| Total network transaction volume . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,256 | 2,857 | 1,226 |
| Pre-tax profit margin(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 37% | 27% | 35% |

(1) Amounts represent income from continuing operations before losses from unconsolidated investees, income taxes, dividends on preferred securities subject to mandatory redemption and cumulative effect of accounting change, net.

(2) Earnings applicable to common shareholders are used to calculate earnings per share ("EPS") information. Fiscal 2006 includes a preferred stock dividend of $19 million.

(3) Book value per common share equals common shareholders' equity of $34,264 million at November 30, 2006, $29,182 million at November 30, 2005 and $28,206 million at November 30, 2004, divided by common shares outstanding of 1,049 million at November 30, 2006, 1,058 million at November 30, 2005 and 1,087 million at November 30, 2004.

Morgan Stanley

(4) The computation of average common equity for each segment is based upon an economic capital model that the Company uses to determine the amount of equity capital needed to support the risk of its business activities and to ensure that the Company remains adequately capitalized. Economic capital is defined as the amount of capital needed to run the business through the business cycle and satisfy the requirements of regulators, rating agencies and the market. The Company's methodology is based on an approach that assigns economic capital to each segment based on regulatory capital usage plus additional capital for stress losses, goodwill and intangible assets, and principal investment risk. The economic capital model and allocation methodology may be enhanced over time in response to changes in the business and regulatory environment. The effective tax rates used in the computation of segment return on average common equity were determined on a separate entity basis.

(5) Amounts include assets under management or supervision associated with the Global Wealth Management Group business segment.

(6) Revenues and expenses associated with these assets are included in the Company's Asset Management, Global Wealth Management Group and Institutional Securities business segments.

(7) Amount represents Asset Management's proportional share of assets managed by entities in which it owns a minority interest.

(8) Source: Thomson Financial, data as of January 2, 2007—The data for fiscal 2006, fiscal 2005 and fiscal 2004 are for the periods from January 1 to December 31, 2006, January 1 to December 31, 2005 and January 1 to December 31, 2004, respectively, as Thomson Financial presents these data on a calendar-year basis.

(9) Percentages represent income from continuing operations before losses from unconsolidated investees, income taxes and cumulative effect of accounting change, net, as a percentage of net revenues.

(10) Annualized net revenue per global representative amounts equal Global Wealth Management Group's net revenues divided by the quarterly average global representative headcount for the periods presented. Fiscal 2005 and fiscal 2004 amounts were restated to conform to the current year's presentation. Global Wealth Management Group's fiscal 2005 and fiscal 2004 client assets by segment were also reclassified to conform to the current year's presentation.

(11) Client assets per global representative equals total client assets divided by period-end global representative headcount.

(12) Bank deposits are held at certain of the Company's Federal Deposit Insurance Corporation insured depository institutions for the benefit of retail clients through their brokerage accounts.

(13) Amount includes Asset Management's proportional share of assets managed by entities in which it owns a minority interest.

(14) Source: Lipper, one-year performance excluding money market funds as of November 30, 2006, November 30, 2005 and November 30, 2004, respectively.

(15) Managed data include owned and securitized credit card loans. For an explanation of managed data and a reconciliation of credit card loan and asset quality data, see "Discover—Managed General Purpose Credit Card Loan Data" herein.

Morgan Stanley

*Fiscal 2006 Performance.*

***Company Results.*** The Company recorded net income of $7,472 million in fiscal 2006, a 51% increase from $4,939 million in the prior year. Net revenues (total revenues less interest expense and the provision for loan losses) rose 26% to a record $33,858 million in fiscal 2006, and non-interest expenses increased 18% to $22,858 million. Diluted earnings per share were $7.07 compared with $4.57 a year ago. Compensation and benefits expense increased 27%, primarily reflecting higher net revenues. Non-compensation expenses increased 5% as costs associated with higher levels of business activity were partially offset by lower charges for legal and regulatory matters. Diluted earnings per share from continuing operations were $7.09 compared with $4.81 last year. The return on average common equity in fiscal 2006 was 23.5% compared with 17.3% in the prior year. The return on average common equity from continuing operations for fiscal 2006 was 23.6% compared with 19.0% last year.

Results for fiscal 2006 included non-cash incremental compensation expenses of approximately $270 million for stock-based awards granted to retirement-eligible employees (see "Other Items—Stock-Based Compensation" herein). Results for fiscal 2005 included a charge of $509 million ($316 million after-tax) for discontinued operations related to the sale of the aircraft leasing business (see "Other Items—Discontinued Operations" herein). In addition, pre-tax results for fiscal 2005 included a $360 million charge related to the *Coleman Litigation*, legal accruals of approximately $120 million related to the Parmalat matter, a $109 million charge for the correction in the method of accounting for certain real estate leases, charges for senior management severance and new hires of approximately $311 million, and a gain of $251 million related to an insurance settlement (see "Other Items" herein).

The Company's effective income tax rate was 30.4% in fiscal 2006 compared with 26.5% in fiscal 2005. Fiscal 2006's income tax provision included an income tax benefit of $280 million resulting from the resolution of a federal tax audit, while fiscal 2005's income tax provision included an income tax benefit of $309 million related to the provisions of the American Jobs Creation Act (see "Other Items" herein). Excluding the benefits from the federal tax audit and the American Jobs Creation Act, the Company's effective income tax rates in fiscal 2006 and fiscal 2005 would have been 33.0% and 30.8%, respectively. The increase primarily reflected lower estimated domestic tax credits and higher earnings, which reduced the effect of permanent differences, partially offset by the effects of lower tax rates applicable to non-U.S. earnings.

At fiscal year-end, the Company had 55,310 employees worldwide compared with 53,218 at the prior year-end.

***Institutional Securities.*** Institutional Securities recorded income from continuing operations before losses from unconsolidated investees, income taxes and net cumulative effect of accounting change of $8,160 million, a 72% increase from a year ago. Net revenues rose 38% to $21,562 million driven by record results in fixed income and equity sales and trading and fixed income underwriting, along with strong results in advisory revenues. Non-interest expenses increased 23% to $13,402 million, primarily due to higher compensation and benefits expense resulting from higher net revenues. Non-compensation expenses were relatively unchanged as higher costs associated with higher levels of business activity were offset by lower charges for legal and regulatory matters.

Investment banking revenues rose 24% from last year to $4,318 million. Underwriting revenues rose 24% from last year to $2,475 million. Advisory fees from merger, acquisition and restructuring transactions were $1,843 million, an increase of 25% from fiscal 2005.

Fixed income sales and trading revenues were a record $9,577 million, up 41% from a year ago. The increase was driven by record results from commodities, credit products, and interest rate and currency products. Commodities revenues reflected strong results from electricity, natural gas products and oil liquids. Credit product revenues benefited from significantly improved corporate credit trading and strength in residential and commercial securitized products. Commodities and interest rate and currency products benefited from revenues recognized on structured transactions as a result of increased observability of market value (see "Other Items— Accounting Developments—Fair Value Measurements" herein). Equity sales and trading revenues were a record $6,320 million, up 32% from a year ago. The increase was broad based and included higher revenues from derivatives and equity cash products, financing products, prime brokerage and principal trading strategies.

Morgan Stanley

Principal transaction net investment revenues increased 125% to $1,477 million in fiscal 2006. Fiscal 2006's results primarily related to net gains associated with the Company's investments, including both realized and unrealized gains from investments in the Company's real estate funds, IntercontinentalExchange, Grifols S.A., the NYSE Group, Inc. (the "NYSE") and Wacker Chemie AG.

*Global Wealth Management Group.* Global Wealth Management Group recorded income before taxes and net cumulative effect of accounting change of $509 million, down 13% from the prior year. Fiscal 2005 included a benefit of $198 million resulting from the insurance settlement related to the events of September 11, 2001 (see "Other Items—Insurance Settlement" herein), partially offset by a $29 million charge for the correction in the method of accounting for certain real estate leases (see "Other Items—Lease Adjustment" herein). Net revenues were $5,505 million, a 10% increase over a year ago, primarily reflecting higher net interest revenue from the bank deposit program and an increase in revenues from fee-based products. Total non-interest expenses were $4,996 million, a 13% increase from a year ago. Excluding the insurance settlement and the lease adjustment, total non-interest expenses increased 9%, primarily reflecting higher compensation and benefits expense resulting from higher net revenues, partially offset by lower non-compensation expenses due to lower charges for legal and regulatory costs. Total client assets increased to $686 billion, up 11% from the prior fiscal year-end. In addition, client assets in fee-based accounts increased 19% from a year ago to a record $206 billion and increased as a percentage of total client assets to 30% from last year's 28%. At fiscal year-end, the number of global representatives was 8,030, a decline of 1,496 from a year ago, resulting largely from planned sales force reductions completed in the second quarter of fiscal 2006 and attrition.

*Asset Management.* Asset Management recorded income before taxes and net cumulative effect of accounting change of $711 million, a 29% decrease from last year. Net revenues of $2,770 million decreased 5% from the prior year, largely due to lower investment revenues, primarily in the private equity business. Principal transaction net investment gains for the year were $139 million compared with $326 million a year ago. Non-interest expenses increased 8% from the prior year to $2,059 million, primarily reflecting higher compensation and benefits expense associated with critical business initiatives to retain and attract new talent in the business and support areas. Assets under management or supervision within Asset Management of $478 billion were up $47 billion, or 11%, from last year, primarily due to market appreciation, partially offset by net outflows of customer assets. In fiscal 2007, the Company expects that Asset Management's profit margins will be affected by its continued investments in its core business, alternative products and private equity.

*Discover.* Discover recorded record income before losses from unconsolidated investees, income taxes and net cumulative effect of accounting change of $1,587 million, an increase of 72% from last year. Net revenues of $4,290 million were 24% higher than a year ago, benefiting from improvements in credit quality and a continued favorable impact on charge-offs following the enactment of federal bankruptcy legislation that became effective in October 2005. Servicing and securitization income of $2,338 million increased 45% from a year ago due primarily to a lower Provision for consumer loan losses and higher Merchant, cardmember and other fees, net. The increase also reflected higher Other revenues, which was attributable to an increase in the fair value of the Company's retained interests in securitized receivables. Non-interest expenses of $2,703 million increased 7% from the prior year, primarily due to costs associated with the Goldfish acquisition (see "Other Items—Business and Other Acquisitions and Dispositions" herein), higher compensation and benefits expense and higher legal costs. In fiscal 2006, Discover's results benefited from the continued favorable credit environment. In fiscal 2007, the Company expects Discover's margins to return to more normal levels.

The managed credit card net principal charge-off rate decreased 115 basis points from a year ago to 4.08%. The managed over 30-day delinquency rate decreased 47 basis points to 3.51% from a year ago, and the managed over 90-day delinquency rate was 10 basis points lower than a year ago at 1.65%. Managed credit card loans were $50,291 million at year-end, a 7% increase from a year ago.

**Global Market and Economic Conditions in Fiscal 2006.**

Global market and economic conditions were generally favorable throughout most of fiscal 2006, which contributed to the increased revenues and net income achieved by the Company during the fiscal year. Although

Morgan Stanley    40

there were concerns about energy prices, inflation and geopolitical risks, activity in the global capital markets was robust, and the volume of merger and acquisition and underwriting transactions increased from the prior year.

The U.S. economy continued to demonstrate strength during fiscal 2006. The rate of economic growth was generally strong, although it moderated during the second half of the fiscal year as consumer spending was affected by higher energy prices and a slowdown in the residential real estate market. The U.S. unemployment rate declined to 4.5% from 5.0% at the end of the prior fiscal year. Conditions in the U.S. equity markets were also generally favorable during fiscal 2006. Major equity market indices increased despite experiencing a correction during the summer as the favorable economic environment and strong corporate earnings outweighed concerns about inflation, energy prices and rising interest rates. The Federal Reserve Board (the "Fed") raised both the overnight lending rate and the discount rate by an aggregate of 1.25% in fiscal 2006. The Fed held interest rates steady after the end of June, however, as there were indications that inflationary pressures had subsided.

In Europe, economic growth continued at a moderate pace during fiscal 2006, primarily driven by domestic demand and exports. Major equity market indices in Europe increased during the year, reflecting strong corporate profits, merger and acquisition activity, and favorable economic conditions. The European Central Bank (the "ECB") raised the benchmark interest rate by an aggregate of 1.25% during fiscal 2006. In December 2006, the ECB raised the benchmark interest rate by an additional 0.25%. Economic growth also continued in the U.K., supported by domestic demand and business investment. The Bank of England (the "BOE") raised the benchmark interest rate by an aggregate of 0.50% during fiscal 2006. In January 2007, the BOE raised the benchmark interest rate by an additional 0.25%.

In Japan, economic growth continued to be driven by domestic demand and exports. The level of unemployment also remained relatively low, and Japanese equity market indices increased during the fiscal year. During fiscal 2006, the Bank of Japan raised the benchmark interest rate from 0.0% to 0.25%. Economies elsewhere in Asia also expanded, particularly in China, which benefited from strength in exports, domestic demand and continued globalization. Equity market indices in China increased sharply during the year. In fiscal 2006, the People's Bank of China raised the benchmark interest rate by an aggregate of 0.54%.

**Business Segments.**

The remainder of "Results of Operations" is presented on a business segment basis before discontinued operations. Substantially all of the Company's operating revenues and operating expenses can be directly attributed to its business segments. Certain revenues and expenses have been allocated to each business segment, generally in proportion to its respective revenues or other relevant measures.

As a result of treating certain intersegment transactions as transactions with external parties, the Company includes an Intersegment Eliminations category to reconcile the business segment results to the Company's consolidated results. Income before taxes in Intersegment Eliminations primarily represents the effect of timing differences associated with the revenue and expense recognition of commissions paid by Asset Management to Global Wealth Management Group associated with sales of certain products and the related compensation costs paid to Global Wealth Management Group's global representatives. Income before taxes recorded in Intersegment Eliminations was $33 million, $94 million and $118 million in fiscal 2006, fiscal 2005 and fiscal 2004, respectively. In addition, the results in Institutional Securities for fiscal 2006 included a $30 million advisory fee related to the Company's sale of the aircraft leasing business that was eliminated in consolidation.

Morgan Stanley

**INSTITUTIONAL SECURITIES**

**INCOME STATEMENT INFORMATION**

|  | Fiscal 2006 | Fiscal 2005 | Fiscal 2004 |
|---|---|---|---|
|  | (dollars in millions) | | |
| Revenues: | | | |
| Investment banking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 4,318 | $ 3,477 | $ 3,008 |
| Principal transactions: | | | |
| Trading . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11,272 | 6,906 | 4,998 |
| Investments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,477 | 656 | 364 |
| Commissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,606 | 2,160 | 1,998 |
| Asset management, distribution and administration fees . . . . . . . . . . . . . . | 259 | 152 | 144 |
| Interest and dividends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 41,979 | 25,455 | 16,395 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 404 | 301 | 190 |
| Total revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 62,315 | 39,107 | 27,097 |
| Interest expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 40,753 | 23,434 | 13,984 |
| Net revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 21,562 | 15,673 | 13,113 |
| Total non-interest expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13,402 | 10,919 | 8,832 |
| Income from continuing operations before losses from unconsolidated investees, income taxes, dividends on preferred securities subject to mandatory redemption and cumulative effect of accounting change, net . . . . | 8,160 | 4,754 | 4,281 |
| Losses from unconsolidated investees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 225 | 311 | 328 |
| Provision for income taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,308 | 909 | 932 |
| Dividends on preferred securities subject to mandatory redemption . . . . . . . . . | — | — | 45 |
| Income from continuing operations before cumulative effect of accounting change, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 5,627 | $ 3,534 | $ 2,976 |

*Investment Banking.*   Investment banking revenues are derived from the underwriting of securities offerings and fees from advisory services. Investment banking revenues were as follows:

|  | Fiscal 2006 | Fiscal 2005 | Fiscal 2004 |
|---|---|---|---|
|  | (dollars in millions) | | |
| Advisory fees from merger, acquisition and restructuring transactions . . . . . . . . | $ 1,843 | $ 1,478 | $ 1,156 |
| Equity underwriting revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,059 | 905 | 993 |
| Fixed income underwriting revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,416 | 1,094 | 859 |
| Total investment banking revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 4,318 | $ 3,477 | $ 3,008 |

Investment banking revenues increased 24% in fiscal 2006. The increase was due to higher revenues from merger, acquisition and restructuring activities and fixed income and equity underwriting transactions. In fiscal 2005, investment banking revenues increased 16%, primarily reflecting higher revenues from merger, acquisition and restructuring activities and fixed income underwriting transactions, partially offset by lower revenues from equity underwritings.

In fiscal 2006, advisory fees from merger, acquisition and restructuring transactions increased 25% to $1,843 million. Advisory fees in fiscal 2006 reflected certain internal revenues, including a $30 million fee related to the Company's sale of the aircraft leasing business that was eliminated in consolidation. In fiscal 2005, advisory fees from merger, acquisition and restructuring transactions increased 28% to $1,478 million. The results in both fiscal years reflected a strong volume of transaction activity as conditions in the worldwide merger and acquisition markets were generally favorable throughout both fiscal 2006 and fiscal 2005.

Morgan Stanley

Equity underwriting revenues increased 17% to $1,059 million in fiscal 2006 and reflected higher global industry-wide equity and equity-related activity, most notably relating to a strong volume of initial public offerings. Equity underwriting revenues decreased 9% to $905 million in fiscal 2005, reflective of lower global industry-wide equity and equity-related activity.

Fixed income underwriting revenues rose 29% to a record $1,416 million in fiscal 2006 and increased 27% to $1,094 million in fiscal 2005. The increase in fiscal 2006 was primarily due to an increase in underwriting revenues from non-investment grade and investment grade products as the level of issuer refinancings rose due to record levels of maturing debt. The increase in fiscal 2005 was primarily due to higher revenues from global high-yield and securitized fixed income transactions. Acquisition-related financing resulting from a strong market for merger and acquisition activity contributed to the increases in both fiscal 2006 and fiscal 2005. Both fiscal years also reflected generally favorable conditions in the global fixed income markets, and, although the Fed increased the overnight interest rate in both fiscal years, longer-term interest rates remained at relatively low levels. The attractive debt financing environment contributed to higher revenues as issuers continued to take advantage of relatively low financing costs.

At the end of fiscal 2006, the backlog of merger, acquisition and restructuring transactions and equity and fixed income underwriting transactions was higher as compared with the end of fiscal 2005. The backlog of merger, acquisition and restructuring transactions and equity and fixed income underwriting transactions is subject to the risk that transactions may not be completed due to unforeseen economic and market conditions, adverse developments regarding one of the parties to the transaction, a failure to obtain required regulatory approval or a decision on the part of the parties involved not to pursue a transaction.

***Sales and Trading Revenues.*** Sales and trading revenues are composed of principal transaction trading revenues, commissions and net interest revenues (expenses). In assessing the profitability of its sales and trading activities, the Company views principal trading, commissions and net interest revenues in the aggregate. In addition, decisions relating to principal transactions are based on an overall review of aggregate revenues and costs associated with each transaction or series of transactions. This review includes, among other things, an assessment of the potential gain or loss associated with a transaction, including any associated commissions, dividends, the interest income or expense associated with financing or hedging the Company's positions and other related expenses.

The components of the Company's sales and trading revenues are described below:

*Principal Transactions–Trading.* Principal transaction trading revenues include revenues from customers' purchases and sales of financial instruments in which the Company acts as principal and gains and losses on the Company's positions. The Company also engages in proprietary trading activities for its own account.

*Commissions.* Commission revenues primarily arise from agency transactions in listed and over-the-counter ("OTC") equity securities and options.

*Net Interest.* Interest and dividend revenues and interest expense are a function of the level and mix of total assets and liabilities, including financial instruments owned and financial instruments sold, not yet purchased, reverse repurchase and repurchase agreements, trading strategies, customer activity in the Company's prime brokerage business, and the prevailing level, term structure and volatility of interest rates. Reverse repurchase and repurchase agreements and securities borrowed and securities loaned transactions may be entered into with different customers using the same underlying securities, thereby generating a spread between the interest revenue on the reverse repurchase agreements or securities borrowed transactions and the interest expense on the repurchase agreements or securities loaned transactions.

Total sales and trading revenues increased 36% in fiscal 2006 and 18% in fiscal 2005. The increase in both periods reflected higher fixed income and equity sales and trading revenues.

Morgan Stanley

Sales and trading revenues included the following:

| | Fiscal 2006(1) | Fiscal 2005(1) | Fiscal 2004(1) |
|---|---|---|---|
| | (dollars in millions) | | |
| Equity | $6,320 | $4,804 | $4,067 |
| Fixed income(2) | 9,577 | 6,782 | 5,567 |

(1) Amounts exclude sales and trading revenues of $(793) million, $(499) million and $(227) million in fiscal 2006, fiscal 2005 and fiscal 2004, respectively, which relate to unallocated net revenues, net revenues associated with corporate lending activities and certain other adjustments.

(2) Amounts include interest rate and currency products, credit products and commodities. Amounts exclude corporate lending activities.

Equity sales and trading revenues increased 32% to a record $6,320 million in fiscal 2006. The increase was broad based and included higher revenues from derivatives and equity cash products, financing products, prime brokerage and principal trading strategies. Derivative revenues increased due to strong customer flows, although volatility in the global equity markets continued to be generally low. Revenues from equity cash products reflected higher market volumes, particularly in Europe and Asia. Financing products revenues also benefited from increased client activity. Prime brokerage generated record revenues for the third consecutive fiscal year, reflecting continued growth in global client asset balances. Global equity markets generally trended higher and created favorable opportunities for principal trading strategies. Although commission revenues increased, revenues continued to be affected by intense competition, particularly in the U.S., and a continued shift toward electronic trading.

Equity sales and trading revenues increased 18% in fiscal 2005. The increase was broad based and included increased customer flows in derivatives, higher revenues in prime brokerage, improved performance in principal trading strategies and higher revenues from equity cash products. Derivative revenues increased due to strong customer flows despite continued low levels of volatility in the equity markets. Revenues in prime brokerage were driven by robust growth in client balances. Global equity markets generally trended higher and created favorable trading opportunities for principal trading strategies. Revenue from equity cash products rose on higher market volumes, particularly in the European and Asian markets.

Fixed income sales and trading revenues increased 41% to a record $9,577 million in fiscal 2006. The increase was driven by record results from commodities, credit products, and interest rate and currency products. Commodities revenues increased 112% due to strong results from electricity, natural gas products and oil liquids. Credit product revenues increased 46%, primarily due to significantly improved corporate credit trading and strength in residential and commercial securitized products. Interest rate and currency products increased 4%. Both commodity and interest rate and currency products benefited from revenues recognized on structured transactions as a result of increased observability of market value in accordance with EITF Issue No. 02-3, "Issues Involved in Accounting for Derivative Contracts Held for Trading Purposes and Contracts Involved in Energy Trading and Risk Management Activities" ("EITF Issue No. 02-3"). With the adoption of SFAS No. 157, "Fair Value Measurements" ("SFAS No. 157") on December 1, 2006, the Company will no longer apply the revenue recognition criteria of EITF Issue No. 02-3 (see "Other Items—Accounting Developments—Fair Value Measurements" herein).

Fixed income sales and trading revenues increased 22% in fiscal 2005, primarily due to higher revenues from interest rate and currency and credit products, partially offset by lower revenues from commodities products. Interest rate and currency product revenues increased 41% primarily due to higher revenues from interest rate cash and derivative products and higher revenues from emerging market fixed income securities, partially offset by lower revenues from foreign exchange products. Interest rate and currency product revenues benefited from strong new client transaction activity and favorable positioning results. The 19% increase in credit product revenues was primarily due to increased customer flows in securitized products and favorable trading conditions. Commodities revenues decreased 8% from the prior year as lower revenues in oil liquids were partially offset by record results in electricity and natural gas products.

Morgan Stanley

In addition to the equity and fixed income sales and trading revenues discussed above, sales and trading revenues include the net revenues from the Company's corporate lending activities. In fiscal 2006, revenues from corporate lending activities decreased by approximately $50 million from the prior year. In fiscal 2005, revenues from corporate lending activities decreased by approximately $240 million. In both fiscal 2006 and fiscal 2005, revenues from corporate lending activities reflected the impact of mark-to-market valuations on a higher level of new loans made in both fiscal years.

***Principal Transactions-Investments.***   The Company's investments generally are held for appreciation and to facilitate other business activities. It is not possible to determine when the Company will realize the value of such investments since, among other factors, such investments generally are subject to significant sales restrictions. Moreover, estimates of the fair value of the investments involve significant judgment and may fluctuate significantly over time in light of business, market, economic and financial conditions generally or in relation to specific transactions.

Principal transaction net investment revenues aggregating $1,477 million were recognized in fiscal 2006 as compared with $656 million in fiscal 2005 and $364 million in fiscal 2004. The increase in fiscal 2006 was primarily related to net gains associated with the Company's investments, including both realized and unrealized gains from investments in the Company's real estate funds, IntercontinentalExchange, Grifols S.A., the NYSE and Wacker Chemie AG. Fiscal 2005's results included gains from investments in IntercontinentalExchange, International Securities Exchange and Digital Globe Inc.

***Asset Management, Distribution and Administration Fees.***   Asset management, distribution and administration fees include revenues from asset management services, primarily fees associated with the Company's real estate fund investment activities.

Asset management, distribution and administration fees increased 70% in fiscal 2006 and 6% in fiscal 2005. The increase in fiscal 2006 was primarily related to higher fees associated with real estate fund investments.

***Other.***   Other revenues consist primarily of revenues from providing benchmark indices and risk management analytics associated with Morgan Stanley Capital International Inc., which includes the results of Barra, Inc. ("Barra"). Other revenues also include revenues related to the operation of pipelines, terminals and barges and the distribution of refined petroleum products associated with TransMontaigne Inc. ("TransMontaigne") and the marine transportation and logistics services associated with the Heidmar Group (see "Other Items—Business and Other Acquisitions and Dispositions" herein).

Other revenues increased 34% in fiscal 2006 and 58% in fiscal 2005. The increase in both fiscal 2006 and fiscal 2005 was primarily attributable to higher sales of benchmark indices and risk management analytic products. The increase in fiscal 2006 was also partly attributable to revenues associated with TransMontaigne, which was acquired on September 1, 2006.

***Non-Interest Expenses.***   Non-interest expenses increased 23% in fiscal 2006. Compensation and benefits expense increased 36%, primarily reflecting higher incentive-based compensation costs resulting from higher net revenues. Fiscal 2006 also included Institutional Securities' share ($190 million) of incremental compensation expense related to equity awards to retirement-eligible employees (see "Other Items—Stock-Based Compensation" herein), while fiscal 2005 included Institutional Securities' share ($193 million) of the costs associated with senior management changes (see "Other Items—Senior Management Compensation Charges" herein). Excluding compensation and benefits expense, non-interest expenses remained relatively unchanged. Occupancy and equipment expense decreased 6%, primarily due to a $71 million charge that was recorded in the first quarter of fiscal 2005 for the correction in the method of accounting for certain real estate leases (see "Other Items—Lease Adjustment" herein). Brokerage, clearing and exchange fees increased 32%, primarily reflecting increased equity and fixed income trading activity. Professional services expense increased 18%, primarily due to higher legal and consulting costs, reflecting increased levels of business activity. Other expenses decreased 49%

Morgan Stanley

due to lower charges for legal and regulatory matters. Fiscal 2006 reflected a net reduction in legal accruals of approximately $40 million related to the *IPO Allocation Matters*, the LVMH litigation and the settlement of the *General American Litigation*. Other expenses in fiscal 2005 included legal accruals of $360 million related to the *Coleman Litigation* and approximately $170 million related to the Parmalat settlement and the *IPO Allocation Matters*.

Fiscal 2005's total non-interest expenses increased 24%. Compensation and benefits expense increased 21%, reflecting higher incentive-based compensation costs due to higher net revenues and Institutional Securities' share ($193 million) of the costs associated with senior management changes. Excluding compensation and benefits expense, non-interest expenses increased 29%. Occupancy and equipment expense increased 41%, reflecting higher rental costs, primarily in North America. The increase also included a $71 million charge for the correction in the method of accounting for certain real estate leases. Brokerage, clearing and exchange fees increased 14%, primarily reflecting increased trading activity. Information processing and communications expense increased 11%, primarily due to higher telecommunications, market data and data processing costs. Professional services expense increased 31%, primarily due to higher consulting and legal costs, including costs of $55 million related to the matters below. Other expenses increased 71%, reflecting legal accruals of $360 million related to the *Coleman Litigation*, approximately $170 million related to the Parmalat settlement and the *IPO Allocation Matters*, while fiscal 2004 included legal accruals of $110 million related to the Parmalat settlement and the *IPO Allocation Matters*.

Morgan Stanley

46

## GLOBAL WEALTH MANAGEMENT GROUP

## INCOME STATEMENT INFORMATION

| | Fiscal 2006 | Fiscal 2005 | Fiscal 2004 |
|---|---|---|---|
| | (dollars in millions) | | |
| Revenues: | | | |
| Investment banking | $ 428 | $ 320 | $ 290 |
| Principal transactions: | | | |
| Trading | 474 | 464 | 518 |
| Investments | 53 | (1) | (5) |
| Commissions | 1,208 | 1,228 | 1,327 |
| Asset management, distribution and administration fees | 2,693 | 2,517 | 2,099 |
| Interest and dividends | 1,018 | 662 | 409 |
| Other | 155 | 167 | 133 |
| Total revenues | 6,029 | 5,357 | 4,771 |
| Interest expense | 524 | 338 | 156 |
| Net revenues | 5,505 | 5,019 | 4,615 |
| Total non-interest expenses | 4,996 | 4,434 | 4,244 |
| Income before taxes and cumulative effect of accounting change, net | 509 | 585 | 371 |
| Provision for income taxes | 164 | 197 | 120 |
| Income before cumulative effect of accounting change, net | $ 345 | $ 388 | $ 251 |

The revenues and expenses discussed below include the results of Quilter Holdings Ltd. ("Quilter"), the Global Wealth Management Group's standalone U.K. mass affluent business. On December 13, 2006, the Company announced that it had reached an agreement to sell Quilter (see "Other Items—Business and Other Acquisitions and Dispositions" herein). The impact of Quilter to the Global Wealth Management Group's operating results for all periods presented was not material.

***Investment Banking.*** Global Wealth Management Group investment banking includes revenues from the distribution of equity and fixed income securities, including initial public offerings, secondary offerings, closed-end funds and unit trusts. Revenues also include fees earned from offerings underwritten by the Institutional Securities business. Investment banking revenues increased 34% and 10% in fiscal 2006 and fiscal 2005, respectively. The increase in both periods was primarily due to higher revenues from equity-related offerings and unit trust products. The increase in fiscal 2005 was partially offset by lower revenues from fixed income underwritings.

***Principal Transactions–Trading.*** Principal transactions include revenues from customers' purchases and sales of financial instruments in which the Company acts as principal and gains and losses on the Company's inventory positions held, primarily to facilitate customer transactions. Principal transaction trading revenues increased 2% in fiscal 2006, primarily reflecting higher revenue from foreign exchange products, equity linked notes and municipal fixed income securities, partially offset by lower revenues from corporate and government fixed income products and other securities. In fiscal 2005, principal transaction trading revenues decreased 10%, primarily due to lower customer transaction activity in corporate, government and municipal fixed income securities.

***Principal Transactions–Investments.*** Principal transaction net investment revenues were $53 million in fiscal 2006 compared with a net loss of $(1) million in fiscal 2005 and a net loss of $(5) million in fiscal 2004. The results in fiscal 2006 were primarily related to realized and unrealized gains on the Company's investments in Bolsas y Mercados Españoles (BME) and the NYSE.

47

Morgan Stanley

***Commissions.***   Commission revenues primarily arise from agency transactions in listed and OTC equity securities and sales of mutual funds, futures, insurance products and options. Commission revenues decreased 2% and 7% in fiscal 2006 and fiscal 2005, respectively. The decrease in both fiscal years largely reflected lower revenues from equity products, which was related to lower agency activity with customers due, in part, to growth in other product areas, including investment banking and asset management.

***Net Interest.***   Interest and dividend revenues and interest expense are a function of the level and mix of total assets and liabilities, including customer bank deposits and margin loans and securities borrowed and securities loaned transactions. Net interest revenues increased 52% and 28% in fiscal 2006 and fiscal 2005, respectively. The increase in fiscal 2006 was primarily due to increased customer account balances in the bank deposit program that was launched in November 2005. Balances in the bank deposit program rose to $13,301 million at November 30, 2006 from $1,689 million at November 30, 2005. The increase in net interest income in fiscal 2005 was primarily due to growth in customer margin balances.

***Asset Management, Distribution and Administration Fees.***   Asset management, distribution and administration fees include revenues from individual investors electing a fee-based pricing arrangement and fees for investment management, account services and administration. The Company also receives fees for services it provides in distributing certain open-ended mutual funds and other products. Mutual fund distribution fees are based on either the average daily fund net asset balances or average daily aggregate net fund sales and are affected by changes in the overall level and mix of assets under management or supervision.

Asset management, distribution and administration fees increased 7% in fiscal 2006 and 20% in fiscal 2005. In both fiscal years, the increase was driven by higher client asset balances in fee-based accounts.

Client assets in fee-based accounts rose 19% to $206 billion at November 30, 2006 and increased as a percentage of total client assets to 30% of total client assets from 28% in the prior year. Client assets in fee-based accounts rose 10% to $173 billion at November 30, 2005 and increased as a percentage of total client assets to 28% of total client assets from 26% in the prior year. Client asset balances increased to $686 billion at November 30, 2006 from $617 billion at November 30, 2005, primarily due to market appreciation. Client asset balances in accounts greater than $1 million increased to $450 billion at November 30, 2006 from $375 billion at November 30, 2005.

***Other.***   Other revenues primarily include customer account service fees and other miscellaneous revenues. Other revenues decreased 7% in fiscal 2006 and increased 26% in fiscal 2005. In fiscal 2006, the decrease primarily reflected lower service fees. In fiscal 2005, the increase was primarily due to higher service fees and other miscellaneous revenues.

***Non-Interest Expenses.***   Non-interest expenses increased 13% in fiscal 2006. Fiscal 2005 included a reduction in non-interest expenses related to Global Wealth Management Group's share ($198 million) of the insurance settlement related to the events of September 11, 2001 (see "Other Items—Insurance Settlement" herein). Compensation and benefits expense increased 15%, primarily reflecting higher incentive-based compensation costs. In addition, fiscal 2006 expenses included Global Wealth Management Group's share ($50 million) of the incremental compensation expense related to equity awards to retirement-eligible employees, including new hires (see "Other Items—Stock-Based Compensation" herein), while fiscal 2005 included Global Wealth Management Group's share ($48 million) of the costs associated with senior management changes (see "Other Items—Senior Management Compensation Charges" herein). Excluding compensation and benefits expense and the insurance settlement, non-interest expenses decreased 4%. Occupancy and equipment expense decreased 5%, primarily due to a $29 million charge for the correction in the method of accounting for certain real estate leases that was recorded in the first quarter of fiscal 2005 (see "Other Items—Lease Adjustment" herein). Professional services expense increased 17%, largely due to higher sub-advisory fees associated with growth in fee-based assets and higher costs for outside legal counsel. Other expenses decreased 21%, primarily resulting from lower costs

Morgan Stanley

associated with legal and regulatory matters. During fiscal 2006 and fiscal 2005, the Company recorded legal and regulatory expenses of approximately $105 million and $170 million, respectively, related to ongoing regulatory, employment and branch litigation matters.

Non-interest expenses increased 4% in fiscal 2005 and included Global Wealth Management Group's share ($198 million) of the insurance settlement related to the events of September 11, 2001. Excluding the insurance settlement, non-interest expenses increased 9% in fiscal 2005. Compensation and benefits expense increased 5%, reflecting higher incentive-based compensation costs and Global Wealth Management Group's share ($48 million) of the costs associated with senior management changes. In addition, fiscal 2004 included a reduction in compensation expense of $27 million associated with the change in the method of accounting for certain asset management and account fees (see "Other Items—Asset Management and Account Fees" herein). Excluding compensation and benefits expense, non-interest expenses increased 3%. Occupancy and equipment expense increased 11%, primarily due to a $29 million charge recorded in the first quarter of fiscal 2005 for the correction in the method of accounting for certain real estate leases. Information processing and communications expense increased 9%, primarily due to higher telecommunications costs within the branch network. Professional services expense increased 31%, largely due to higher sub-advisory fees associated with growth in fee-based assets and revenues, as well as higher outside legal counsel and consulting costs. Other expenses increased 16%, primarily due to costs associated with branch closings and higher legal and regulatory costs. In fiscal 2005, the Company recorded legal and regulatory expenses of approximately $170 million, primarily related to employment matters and certain regulatory and branch litigation matters.

Morgan Stanley

**ASSET MANAGEMENT**

**INCOME STATEMENT INFORMATION**

|  | Fiscal 2006 | Fiscal 2005 | Fiscal 2004 |
|---|---|---|---|
|  | (dollars in millions) | | |
| Revenues: | | | |
| Investment banking | $    48 | $    50 | $    43 |
| Principal transactions: | | | |
| Investments | 139 | 326 | 248 |
| Commissions | 25 | 29 | 27 |
| Asset management, distribution and administration fees | 2,504 | 2,460 | 2,390 |
| Interest and dividends | 45 | 23 | 8 |
| Other | 23 | 30 | 28 |
| Total revenues | 2,784 | 2,918 | 2,744 |
| Interest expense | 14 | 11 | 6 |
| Net revenues | 2,770 | 2,907 | 2,738 |
| Total non-interest expenses | 2,059 | 1,900 | 1,911 |
| Income before taxes and cumulative effect of accounting change, net | 711 | 1,007 | 827 |
| Provision for income taxes | 285 | 378 | 318 |
| Income before cumulative effect of accounting change, net | $  426 | $  629 | $  509 |

***Investment Banking.*** Asset Management generates investment banking revenues primarily from the underwriting of unit trust products. Investment banking revenues decreased 4% in fiscal 2006 and increased 16% in fiscal 2005. The decrease in fiscal 2006 primarily reflected a lower volume of fixed income unit trust sales, partially offset by higher equity unit trust sales, which generate lower revenues in comparison with fixed income unit trust sales. The increase in fiscal 2005 was primarily due to a higher volume of unit trust sales. Unit trust sales volume increased 20% to $7.3 billion in fiscal 2006 and increased 11% to $6.1 billion in fiscal 2005.

***Principal Transactions-Investments.*** Asset Management principal transaction investment revenues consist primarily of gains and losses on investments associated with the Company's private equity activities and capital investments in certain of the Company's investment funds, primarily in alternative products.

Principal transaction net investment gains aggregating $139 million were recognized in fiscal 2006 as compared with $326 million in fiscal 2005. The results in both fiscal years primarily reflected net investment gains on certain investments in the Company's private equity portfolio, including Aventine Renewable Energy Holdings, LLC. Fiscal 2005's results also included a net investment gain on Triana Energy Holdings, LLC.

Private equity investments generally are held for appreciation. It is not possible to determine when the Company will realize the value of such investments since, among other factors, such investments generally are subject to significant sales restrictions. Moreover, estimates of the fair value of the investments involve significant judgment and may fluctuate significantly over time in light of business, market, economic and financial conditions generally or in relation to specific transactions.

***Commissions.*** Asset Management primarily generates commission revenues from dealer and distribution concessions on sales of certain funds. Commission revenues decreased 14% in fiscal 2006 and increased 7% in fiscal 2005. The decrease in fiscal 2006 was primarily due to a decrease in commissionable sales of certain fund products, while fiscal 2005 reflected an increase in such commissionable sales.

Morgan Stanley

***Asset Management, Distribution and Administration Fees.*** Asset management, distribution and administration fees primarily include revenues from the management and supervision of assets, including fees for distributing certain open-ended mutual funds, shareholder servicing fees and management fees associated with the Company's private equity activities. These fees arise from investment management services the Company provides to investment vehicles pursuant to various contractual arrangements. The Company receives fees primarily based upon mutual fund daily average net assets or quarterly assets for other vehicles.

Asset Management's period-end and average customer assets under management or supervision were as follows:

| | At November 30, | | | Average for | | |
|---|---|---|---|---|---|---|
| | **2006** | **2005(1)** | **2004(1)** | **Fiscal 2006** | **Fiscal 2005(1)** | **Fiscal 2004(1)** |
| | | | (dollars in billions) | | | |
| Assets under management or supervision by distribution channel: | | | | | | |
| Americas Retail Morgan Stanley brand | $ 57 | $ 62 | $ 67 | $ 59 | $ 64 | $ 66 |
| Americas Retail Van Kampen brand | 94 | 88 | 79 | 90 | 84 | 75 |
| Americas Intermediary(2) | 63 | 48 | 47 | 55 | 45 | 41 |
| U.S. Institutional | 88 | 87 | 89 | 87 | 88 | 86 |
| Non-U.S. | 88 | 67 | 59 | 77 | 62 | 53 |
| Total long-term assets under management or supervision | 390 | 352 | 341 | 368 | 343 | 321 |
| Institutional money markets/liquidity | 49 | 33 | 31 | 39 | 33 | 18 |
| Retail money markets | 35 | 46 | 52 | 40 | 49 | 51 |
| Total money markets | 84 | 79 | 83 | 79 | 82 | 69 |
| Total assets under management or supervision | 474 | 431 | 424 | 447 | 425 | 390 |
| Share of minority interest assets(3) | 4 | — | — | — | — | — |
| Total | $478 | $431 | $424 | $447 | $425 | $390 |
| Assets under management or supervision by asset class: | | | | | | |
| Equity | $239 | $218 | $198 | $228 | $207 | $183 |
| Fixed income | 94 | 91 | 104 | 91 | 96 | 103 |
| Money market | 84 | 79 | 83 | 79 | 82 | 69 |
| Alternative investments | 21 | 19 | 19 | 20 | 19 | 18 |
| Real estate | 22 | 12 | 9 | 16 | 10 | 7 |
| Subtotal | 460 | 419 | 413 | 434 | 414 | 380 |
| Unit trusts | 14 | 12 | 11 | 13 | 11 | 10 |
| Total assets under management or supervision | 474 | 431 | 424 | 447 | 425 | 390 |
| Share of minority interest assets(3) | 4 | — | — | — | — | — |
| Total | $478 | $431 | $424 | $447 | $425 | $390 |

(1) Certain prior-year information has been reclassified to conform to the current year's presentation.

(2) Americas Intermediary channel primarily represents client flows through defined contribution, insurance and bank trust platforms.

(3) Amount represents Asset Management's proportional share of assets managed by entities in which it owns a minority interest.

Morgan Stanley

Activity in Asset Management's customer assets under management or supervision during fiscal 2006 and fiscal 2005 were as follows:

| | Fiscal 2006 | Fiscal 2005 |
|---|---|---|
| | (dollars in billions) | |
| **Balance at beginning of period** | $431 | $424 |
| Net flows by distribution channel: | | |
| Americas Retail Morgan Stanley brand | (10) | (11) |
| Americas Retail Van Kampen brand | (2) | 3 |
| Americas Intermediary(1) | 9 | (2) |
| U.S. Institutional | (14) | (12) |
| Non-U.S. | 5 | 7 |
| Net outflows excluding money markets | (12) | (15) |
| Money market net flows: | | |
| Institutional | 13 | 3 |
| Retail | (13) | (7) |
| Total money market net flows | — | (4) |
| Net market appreciation | 55 | 26 |
| Total net increase | 43 | 7 |
| Net increase in share of minority interest assets(2) | 4 | — |
| **Balance at end of period** | $478 | $431 |

---

(1)  Americas Intermediary channel primarily represents client flows through defined contribution, insurance and bank trust platforms.

(2)  Amount represents Asset Management's proportional share of assets managed by entities in which it owns a minority interest.

Net outflows (excluding money markets) in fiscal 2006 were primarily associated with the Company's U.S. Institutional products and Americas Retail Morgan Stanley branded products, partially offset by positive flows into Americas Intermediary products. For fiscal 2005, positive flows into institutional liquidity assets were offset by outflows from certain money market funds that were impacted by the growth of the Global Wealth Management Group's bank deposit program.

Asset management, distribution and administration fees increased 2% in fiscal 2006 and 3% in fiscal 2005. The increase in both periods was due to higher management and administration fees, partially offset by lower distribution fees. The higher management and administration fees in fiscal 2006 and fiscal 2005 were associated with increases in average assets under management of 5% and 9%, respectively.

***Non-Interest Expenses.***    Non-interest expenses increased 8% in fiscal 2006. Fiscal 2005 included a reduction in non-interest expenses from Asset Management's share ($43 million) of the insurance settlement related to the events of September 11, 2001 (see "Other Items—Insurance Settlement" herein). Compensation and benefits expense increased 22% in fiscal 2006, primarily reflecting higher incentive-based compensation costs as well as the impact of new hires. In addition, fiscal 2006 included Asset Management's share ($20 million) of the incremental compensation expense related to equity awards to retirement-eligible employees (see "Other Items— Stock-Based Compensation" herein), while fiscal 2005 included Asset Management's share ($41 million) of the costs associated with senior management changes (see "Other Items—Senior Management Compensation Charges" herein). Excluding compensation and benefits expense and the insurance settlement, non-interest expenses decreased 4%. Brokerage, clearing and exchange fees decreased 14%, primarily reflecting lower amortization expense associated with certain open-ended funds. The decrease in amortization expense reflected a lower level of deferred costs in recent periods due to a decrease in sales of certain open-ended funds. Marketing and business development expense increased 11%, primarily due to higher advertising and marketing costs.

Morgan Stanley

Fiscal 2005's total non-interest expenses decreased 1%, including Asset Management's share ($43 million) of the insurance settlement related to the events of September 11, 2001. Excluding the insurance settlement, non-interest expenses increased 2%. Compensation and benefits expense increased 9%, primarily reflecting higher incentive-based compensation costs due to higher net revenues and Asset Management's share ($41 million) of the costs associated with senior management changes. Brokerage, clearing and exchange fees decreased 7%, primarily reflecting lower amortization expense associated with certain open-ended funds. The decrease in amortization expense reflected a lower level of deferred costs in recent periods due to a decrease in sales of certain open-ended funds. Marketing and business development expense increased 19%, primarily due to higher promotional costs associated with the Company's Van Kampen products. Professional services expense increased 6% due to higher sub-advisory fees, partially offset by lower legal and consulting fees. Other expenses decreased 20%, primarily due to a reduction in legal reserves resulting from the resolution of certain legal matters, partially offset by higher insurance expense.

Morgan Stanley

## DISCOVER

## INCOME STATEMENT INFORMATION

|  | Fiscal 2006 | Fiscal 2005 | Fiscal 2004 |
|---|---|---|---|
|  | (dollars in millions) | | |
| Merchant, cardmember and other fees, net | $1,167 | $1,323 | $1,317 |
| Servicing and securitization income | 2,338 | 1,609 | 1,921 |
| Other revenue | 35 | 5 | 10 |
| Total non-interest revenues | 3,540 | 2,937 | 3,248 |
| Interest revenue | 2,458 | 2,174 | 1,859 |
| Interest expense | 952 | 781 | 648 |
| Net interest income | 1,506 | 1,393 | 1,211 |
| Provision for consumer loan losses | 756 | 878 | 926 |
| Net credit income | 750 | 515 | 285 |
| Net revenues | 4,290 | 3,452 | 3,533 |
| Total non-interest expenses | 2,703 | 2,531 | 2,312 |
| Income before losses from unconsolidated investees, income taxes and cumulative effect of accounting change, net | 1,587 | 921 | 1,221 |
| Losses from unconsolidated investees | 3 | — | — |
| Provision for income taxes | 506 | 340 | 443 |
| Income before cumulative effect of accounting change, net | $1,078 | $ 581 | $ 778 |

On December 19, 2006, the Company announced that its Board of Directors had approved the spin-off of Discover (see "Other Items—Discover Spin-off" herein).

***Merchant, Cardmember and Other Fees, Net.*** Merchant, cardmember and other fees, net, include revenues from fees charged to merchants on credit card sales (net of interchange fees paid to banks that issue cards on the Company's merchant and cash access network), transaction processing fees on debit card transactions as well as charges to cardmembers for late payment fees, overlimit fees, balance transfer fees, credit protection fees and cash advance fees, net of cardmember rewards. Cardmember rewards include various reward programs, including the Cashback Bonus® reward program, pursuant to which the Company pays certain cardmembers a percentage of their purchase amounts based upon a cardmember's level and type of purchases.

In fiscal 2006, Merchant, cardmember and other fees, net, decreased 12%, primarily due to higher cardmember rewards and lower merchant discount revenues, partially offset by higher cardmember and other fees. The increase in cardmember rewards reflected record sales volume and the impact of promotional programs. The decrease in merchant discount revenues was due to higher allocations of interchange revenue to securitization transactions, partially offset by record sales volume. For securitization transactions completed on or after November 3, 2004, the Company allocated interchange revenue to new securitization transactions, which has the effect of decreasing Merchant, cardmember and other fees, net, and increasing Servicing and securitization income. During fiscal 2006, the Company had a higher level of outstanding securitization transactions receiving interchange revenue allocations than in the prior year. The increase in sales volume reflected increased cardmember usage and the acquisition of Goldfish in February 2006 (see "Other Items—Business and Other Acquisitions and Dispositions" herein). The increase in cardmember and other fees was primarily related to higher balance transfer fees, lower fee net charge-offs and higher credit protection fees.

In fiscal 2005, Merchant, cardmember and other fees, net, were relatively unchanged as higher transaction processing revenues were offset by higher net cardmember rewards. The increase in transaction processing

Morgan Stanley

revenues was related to the acquisition of PULSE on January 12, 2005 (see "Other Items—Business and Other Acquisitions and Dispositions" herein). The increase in net cardmember rewards reflected record sales volume and the impact of promotional programs.

***Servicing and Securitization Income.*** Servicing and securitization income is revenue derived from consumer loans that have been sold to investors through asset securitizations. Cash flows from the interest yield and cardmember fees generated by securitized general purpose credit card loans as well as interchange fees for certain securitization transactions are used to pay investors in these loans a predetermined fixed or floating rate of return on their investment, to reimburse investors for losses of principal resulting from charged-off loans and to pay the Company a fee for servicing the loans ("servicing rights"). Any excess cash flows remaining ("excess servicing rights") are paid to the Company. The sale of general purpose credit card loans through asset securitizations, therefore, has the effect of converting portions of net credit income and fee income to servicing and securitization income.

Included in Servicing and securitization income are revenues from servicing rights, excess servicing rights and gains or losses on general purpose credit card asset securitizations as well as the change in the fair value of the Company's retained interests in general purpose credit card asset securitizations.

The table below presents the components of Servicing and securitization income:

|  | Fiscal 2006 | Fiscal 2005 | Fiscal 2004 |
|---|---|---|---|
|  | (dollars in millions) | | |
| Merchant, cardmember and other fees, net | $1,014 | $ 694 | $ 650 |
| Other revenue | 159 | (78) | (8) |
| Total non-interest revenues | 1,173 | 616 | 642 |
| Interest revenue | 3,709 | 3,530 | 3,842 |
| Interest expense | 1,398 | 1,025 | 692 |
| Net interest income | 2,311 | 2,505 | 3,150 |
| Provision for consumer loan losses | 1,146 | 1,512 | 1,871 |
| Net credit income | 1,165 | 993 | 1,279 |
| Servicing and securitization income | $2,338 | $1,609 | $1,921 |

Servicing and securitization income is affected by the level of securitized loans, the spread between the net interest yield on the securitized loans and the yield paid to the investors, the rate of credit losses on securitized loans and the level of merchant, cardmember and other fees earned. The Other revenue component of Servicing and securitization income includes net securitization gains and losses on general purpose credit card loans and the change in the fair value of the Company's retained interests in general purpose credit card asset securitizations.

Servicing and securitization income increased 45% in fiscal 2006, primarily due to a lower Provision for consumer loan losses, higher Merchant, cardmember and other fees, net, and higher Other revenue, partially offset by lower net interest revenues. The lower Provision for consumer loan losses was primarily attributable to a lower level of average securitized general purpose credit card loans and a lower rate of net principal charge-offs on the securitized general purpose credit card loan portfolio. The increase in Merchant, cardmember and other fees, net, primarily reflected a higher level of outstanding securitization transactions that received interchange revenues. The increase in Other revenue was attributable to an increase in the fair value of the Company's retained interests in securitized receivables, primarily resulting from a continued favorable impact on charge-offs following the enactment of federal bankruptcy legislation effective in October 2005. The increase in Other revenue also reflected higher levels of general purpose credit card securitization transactions and a decrease in

Morgan Stanley

net gain amortization related to prior securitization transactions. The decrease in net interest revenues was primarily attributable to a lower net interest spread and a lower level of average securitized general purpose credit card loans.

In fiscal 2005, Servicing and securitization income decreased 16%, reflecting lower net interest revenues and Other revenue, partially offset by a lower Provision for consumer loan losses and higher Merchant, cardmember and other fees, net. The decrease in net interest revenues was attributable to a lower level of average securitized general purpose credit card loans and a higher weighted average coupon rate paid to investors associated with the higher short-term interest rate environment. The interest yield was relatively unchanged from fiscal 2004 as the impact of the increase in the prime rate was offset by a decline in higher rate loans due to improved credit quality and various pricing initiatives. The decrease in Other revenue was primarily due to a lower level of securitized receivables and a decline in the fair value of the Company's retained interests in securitized receivables as a result of an increase in bankruptcy notifications and its impact on future charge-offs. The lower Provision for consumer loan losses was primarily attributable to a lower rate of net principal charge-offs related to the securitized general purpose credit card loan portfolio and a lower level of average securitized general purpose credit card loans, partially offset by an increase in bankruptcy charge-offs. The increase in Merchant, cardmember and other fees, net, reflected the allocation of interchange revenue to certain securitization transactions and lower fee net charge-offs, partially offset by lower assessed late payment and overlimit fees.

The net proceeds received from general purpose credit card asset securitizations were $8,738 million in fiscal 2006 and $7,240 million in fiscal 2005. The credit card asset securitization transactions completed in fiscal 2006 have expected maturities ranging from approximately three to seven years from the date of issuance.

***Net Interest Income.*** Net interest income represents the difference between interest revenue derived from consumer loans and short-term investment assets and interest expense incurred to finance those loans and assets. Assets, consisting primarily of consumer loans, currently earn interest revenue at both fixed rates and market-indexed variable rates. The Company incurs interest expense at fixed and floating rates. Interest expense also includes the effects of any interest rate contracts entered into by the Company as part of its interest rate risk management program. This program is designed to reduce the volatility of earnings resulting from changes in interest rates by having a financing portfolio that reflects the existing repricing schedules of consumer loans as well as the Company's right, with notice to cardmembers, to reprice certain fixed rate consumer loans to a new interest rate in the future.

Net interest income increased 8% in fiscal 2006 due to an increase in Interest revenue, partially offset by an increase in Interest expense. The increase in Interest revenue was due to an increase in average owned general purpose credit card loans and a higher interest yield. The increase in average owned general purpose credit card loans was due to the acquisition of Goldfish, record sales volume and a lower level of average securitized general purpose credit card loans. The increase in Interest expense was primarily related to an increase in the Company's average cost of borrowings and a higher level of average interest bearing liabilities, primarily to support the increase in average owned general purpose credit card loans.

Net interest income increased 15% in fiscal 2005 due to an increase in Interest revenue, partially offset by an increase in Interest expense. The increase in Interest revenue was primarily due to an increase in average general purpose credit card loans, which was partly attributable to a higher level of securitization maturities and the deferment of new securitization transactions due to the exploration of the potential spin-off of Discover in fiscal 2005. The increase in Interest expense was largely due to a higher level of average interest bearing liabilities, primarily to support the increase in average general purpose credit card loans.

Morgan Stanley

The following tables present analyses of Discover's average balance sheets and interest rates in fiscal 2006, fiscal 2005 and fiscal 2004 and changes in net interest income during those fiscal years:

**Average Balance Sheet Analysis.**

| | Fiscal 2006 | | | Fiscal 2005 | | | Fiscal 2004 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Average Balance | Rate | Interest | Average Balance | Rate | Interest | Average Balance | Rate | Interest |
| | | | | (dollars in millions) | | | | | |
| **ASSETS** | | | | | | | | | |
| Interest earning assets: | | | | | | | | | |
| General purpose credit card loans . . . . . . . . . . . . . . . | $21,647 | 10.39% | $2,248 | $19,932 | 10.12% | $2,017 | $17,608 | 10.05% | $1,770 |
| Other consumer loans . . . . . . | 185 | 7.32 | 14 | 364 | 7.64 | 28 | 427 | 8.14 | 35 |
| Investment securities . . . . . . | 60 | 3.99 | 2 | 52 | 1.86 | 1 | 40 | 1.92 | 1 |
| Other . . . . . . . . . . . . . . . . . . | 3,654 | 5.30 | 194 | 3,426 | 3.74 | 128 | 2,526 | 2.11 | 53 |
| Total interest earning assets . . . . . . . . . . . . | 25,546 | 9.62 | 2,458 | 23,774 | 9.15 | 2,174 | 20,601 | 9.02 | 1,859 |
| Allowance for loan losses . . | (802) | | | (864) | | | (972) | | |
| Non-interest earning assets . . . . . . . . . . . . . . . . | 2,629 | | | 2,479 | | | 2,343 | | |
| Total assets . . . . . . . . . . | $27,373 | | | $25,389 | | | $21,972 | | |
| **LIABILITIES AND SHAREHOLDER'S EQUITY** | | | | | | | | | |
| Interest bearing liabilities: | | | | | | | | | |
| Interest bearing deposits: | | | | | | | | | |
| Savings . . . . . . . . . . . . . | $ 1,710 | 4.86% | $ 83 | $ 691 | 2.89% | $ 20 | $ 688 | 1.05% | $ 7 |
| Brokered . . . . . . . . . . . . | 10,920 | 4.68 | 511 | 11,639 | 4.38 | 510 | 8,601 | 5.07 | 436 |
| Other time . . . . . . . . . . | 1,665 | 4.57 | 76 | 2,190 | 3.71 | 81 | 2,154 | 3.33 | 72 |
| Total interest bearing deposits . . . . . . . . . . | 14,295 | 4.69 | 670 | 14,520 | 4.21 | 611 | 11,443 | 4.50 | 515 |
| Other borrowings . . . . . . . . . | 5,536 | 5.09 | 282 | 4,131 | 4.10 | 170 | 4,247 | 3.14 | 133 |
| Total interest bearing liabilities . . . . . . . . . . | 19,831 | 4.80 | 952 | 18,651 | 4.19 | 781 | 15,690 | 4.13 | 648 |
| Shareholder's equity/other liabilities . . . . . . . . . . . . . . | 7,542 | | | 6,738 | | | 6,282 | | |
| Total liabilities and shareholder's equity . . . . . . . . . . . | $27,373 | | | $25,389 | | | $21,972 | | |
| Net interest income . . . . . . . . | | | $1,506 | | | $1,393 | | | $1,211 |
| Net interest margin(1) . . . . . | | 5.90% | | | 5.86% | | | 5.88% | |
| Interest rate spread(2) . . . . . . | 4.82% | | | 4.96% | | | 4.89% | | |

(1) Net interest margin represents net interest income as a percentage of total interest earning assets.

(2) Interest rate spread represents the difference between the rate on total interest earning assets and the rate on total interest bearing liabilities.

Morgan Stanley

**Rate/Volume Analysis.**

| Increase/(Decrease) due to Changes in: | Fiscal 2006 vs. Fiscal 2005 | | | Fiscal 2005 vs. Fiscal 2004 | | |
|---|---|---|---|---|---|---|
| | Volume | Rate | Total | Volume | Rate | Total |
| | | | (dollars in millions) | | | |
| **Interest Revenue** | | | | | | |
| General purpose credit card loans .................... | $174 | $ 57 | $231 | $233 | $ 14 | $247 |
| Other consumer loans ............................... | (14) | — | (14) | (5) | (2) | (7) |
| Investment securities .............................. | — | 1 | 1 | — | — | — |
| Other ............................................. | 9 | 57 | 66 | 19 | 56 | 75 |
| Total interest revenue ......................... | 162 | 122 | 284 | 285 | 30 | 315 |
| **Interest Expense** | | | | | | |
| Interest bearing deposits: | | | | | | |
| Savings ...................................... | 29 | 34 | 63 | — | 13 | 13 |
| Brokered .................................... | (32) | 33 | 1 | 154 | (80) | 74 |
| Other time ................................... | (19) | 14 | (5) | 1 | 8 | 9 |
| Total interest bearing deposits .................. | (9) | 68 | 59 | 138 | (42) | 96 |
| Other borrowings ................................. | 58 | 54 | 112 | (3) | 40 | 37 |
| Total interest expense ......................... | 49 | 122 | 171 | 122 | 11 | 133 |
| Net interest income ............................... | $113 | $— | $113 | $163 | $ 19 | $182 |

*Provision for Consumer Loan Losses.* The Provision for consumer loan losses is the amount necessary to establish the allowance for consumer loan losses at a level that the Company believes is adequate to absorb estimated losses in its consumer loan portfolio at the balance sheet date. The allowance for consumer loan losses is a significant estimate that represents management's estimate of probable losses inherent in the owned consumer loan portfolio. The allowance for consumer loan losses is primarily applicable to the owned homogeneous consumer credit card loan portfolio. The allowance is evaluated quarterly for adequacy and is established through a charge to the Provision for consumer loan losses. In estimating the allowance for consumer loan losses, the Company uses a systematic and consistently applied approach. This process starts with a migration analysis (a technique used to estimate the likelihood that a consumer loan will progress through the various stages of delinquency and ultimately charge-off) of delinquent and current consumer credit card accounts in order to determine the appropriate level of the allowance for consumer loan losses. The migration analysis considers uncollectible principal, interest and fees reflected in consumer loans. In evaluating the adequacy of the allowance for consumer loan losses, management also considers factors that may impact credit losses, including current economic conditions, recent trends in delinquencies and bankruptcy filings, account collection management, policy changes, account seasoning, loan volume and amounts, payment rates and forecasting uncertainties.

The Company's provision for consumer loan losses was $756 million, $878 million and $926 million for fiscal 2006, fiscal 2005 and fiscal 2004, respectively. The Company's allowance for consumer loan losses was $831 million at November 30, 2006 and $838 million at November 30, 2005.

The provision for consumer loan losses decreased 14% in fiscal 2006. The decrease reflected lower net charge-offs and a lower net reduction of reserves as compared with the prior year. The decrease in net charge-offs primarily reflected a decline in bankruptcy filings following the federal bankruptcy legislation effective in October 2005 and improved portfolio credit quality. The net reduction in reserves in fiscal 2006 was approximately $71 million as compared with approximately $100 million in the prior year.

In fiscal 2005, the provision for consumer loan losses decreased 5%, primarily due to a higher net reduction of reserves and lower net charge-offs as compared with fiscal 2004 due to improvement in credit quality in the

Morgan Stanley

Company's consumer loan portfolio, partially offset by the impact of higher bankruptcy filings in advance of the new U.S. bankruptcy legislation effective in October 2005. The net reduction in reserves in fiscal 2005 totaled approximately $100 million as compared with a net reduction of approximately $60 million in fiscal 2004.

***Delinquencies and Charge-offs.***   General purpose credit card loans are considered delinquent when contractual payments become 30 days past due. General purpose credit card loans generally are charged off at the end of the month during which an account becomes 180 days contractually past due, except in the case of cardmember bankruptcies, probate accounts and fraudulent transactions. Cardmember bankruptcies and probate accounts are charged off at the end of the month 60 days following the receipt of notification of the bankruptcy or death but not later than the 180-day contractual time frame. Fraudulent transactions are reported in consumer loans at their net realizable value upon receipt of notification of the fraud through a charge to operating expenses and are subsequently written off at the end of the month 90 days following notification but not later than the contractual 180-day time frame. Loan delinquencies and charge-offs are affected by changes in economic conditions, account collection management and policy changes and may vary throughout the year due to seasonal consumer spending and payment behaviors.

Delinquency rates in both the over 30-day and over 90-day categories and net principal charge-off rates were lower for both the owned and managed portfolios in fiscal 2006, reflecting strong portfolio credit quality and the continued favorable impact following federal bankruptcy legislation effective in fiscal 2005 (see "Managed General Purpose Credit Card Loan Data" herein). While credit costs are expected to continue to rise, the Company expects charge-off rates to remain relatively low and reach between 4.5% and 5.0% by the end of fiscal 2007.

In fiscal 2005, delinquency rates in both the over 30-day and over 90-day categories and net principal charge-off rates were lower for both the owned and managed portfolios, reflecting improvements in portfolio credit quality (see "Managed General Purpose Credit Card Loan Data" herein). The improvement in net principal charge-off rates was partially offset by an increase in bankruptcy charges-offs related to consumers filing for bankruptcy in advance of the new U.S. bankruptcy legislation effective in October 2005.

In response to industry-wide regulatory guidance, the Company has increased minimum payment requirements on certain general purpose credit card loans. Bank regulators have discretion to interpret the guidance or its application, and changes in such guidance or its application by the regulators could impact minimum payment requirements. Increases in minimum payment requirements could negatively impact future levels of general purpose credit card loans and related interest and fee revenue and charge-offs.

The Company's future charge-off rates and credit quality are subject to uncertainties that could cause actual results to differ materially from what has been discussed above. Factors that influence the provision for consumer loan losses include the level and direction of general purpose credit card loan delinquencies and charge-offs, changes in consumer spending and payment behaviors, bankruptcy trends, regulatory changes or new guidance, the seasoning of the Company's general purpose credit card loan portfolio, interest rate movements and their impact on consumer behavior, and the rate and magnitude of changes in the Company's general purpose credit card loan portfolio, including the overall mix of accounts, products and loan balances within the portfolio.

***Non-Interest Expenses.***   Non-interest expenses increased 7% in fiscal 2006. Compensation and benefits expense increased 7% and included Discover's share ($10 million) of the incremental compensation expense related to equity awards to retirement-eligible employees (see "Other Items—Stock-Based Compensation" herein) as well as an increase in salaries and wages. Fiscal 2005 included Discover's share ($29 million) of the costs associated with senior management changes (see "Other Items—Senior Management Compensation Charges" herein). Information processing and communications expense increased 10%, primarily due to higher data and transaction processing costs related to the acquisition of Goldfish in February 2006. Marketing and business development expense increased 3% due to increased marketing costs associated with account

Morgan Stanley

acquisitions, the launch of the Discover Business Card and higher advertising expenses due to the branding campaign launched at the end of the third quarter of fiscal 2006. Professional services expense increased 25% due to higher legal fees and investments in infrastructure and technology.

Fiscal 2005's non-interest expenses increased 9% from fiscal 2004, partially resulting from the acquisition of PULSE (see "Other Items—Business and Other Acquisitions and Dispositions" herein). Compensation and benefits expense increased 15%, including Discover's share ($29 million) of the costs associated with senior management changes, as well as an increase in personnel costs, including salaries and benefits. Excluding compensation and benefits expense, non-interest expenses increased 7%. Marketing and business development expense increased 2% due to increased marketing and advertising costs. Professional services expense increased 12% due to higher consulting fees, partially related to the exploration of the potential spin-off of Discover in fiscal 2005 and an increase in legal and account collection fees. Other expenses increased 16%, primarily reflecting an increase in certain operating expenses, including accruals for losses associated with cardmember fraud and higher legal accruals.

***Seasonal Factors.*** Discover's activities are affected by seasonal patterns of retail purchasing. Historically, a substantial percentage of general purpose credit card loan growth occurs in the fourth calendar quarter, followed by a flattening or decline of these loans in the following calendar quarter. Merchant fees, therefore, historically have tended to increase in the first fiscal quarter, reflecting higher sales activity in the month of December. Additionally, higher cardmember rewards incentives historically have been accrued for as a reduction of merchant and cardmember fee revenues in the first fiscal quarter, reflecting seasonal growth in retail sales volume.

***Managed General Purpose Credit Card Loan Data.*** The Company analyzes its financial performance on both a "managed" loan basis and as reported under U.S. Generally Accepted Accounting Principles ("U.S. GAAP") ("owned" loan basis). Managed loan data assume that the Company's securitized loan receivables have not been sold and present the results of the securitized loan receivables in the same manner as the Company's owned loans. The Company operates its Discover business and analyzes its financial performance on a managed basis. Accordingly, underwriting and servicing standards are comparable for both owned and securitized loans. The Company believes that managed loan information is useful to investors because it provides information regarding the quality of loan origination and credit performance of the entire managed portfolio and allows investors to understand the related credit risks inherent in owned loans and retained interests in securitizations. In addition, investors often request information on a managed basis, which provides a comparison with industry competitors.

The following table provides a reconciliation of owned and managed average loan balances, returns on receivables, interest yields and interest rate spreads for the periods indicated:

**Reconciliation of General Purpose Credit Card Loan Data (dollars in millions)**

| | Fiscal 2006 | | | | Fiscal 2005 | | | | Fiscal 2004 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Average Balance | Return on Receivables(1) | Interest Yield | Interest Rate Spread | Average Balance | Return on Receivables(1) | Interest Yield | Interest Rate Spread | Average Balance | Return on Receivables(1) | Interest Yield | Interest Rate Spread |
| General Purpose Credit Card Loans: | | | | | | | | | | | | |
| Owned . . . . . . . . . . . | $21,647 | 4.98% | 10.39% | 5.59% | $19,932 | 2.92% | 10.12% | 5.94% | $17,608 | 4.43% | 10.05% | 5.92% |
| Securitized . . . . . . . . | 26,560 | 4.06% | 13.96% | 8.69% | 27,398 | 2.12% | 12.88% | 9.16% | 29,779 | 2.62% | 12.90% | 10.56% |
| Managed . . . . . . . . . | $48,207 | 2.24% | 12.36% | 7.29% | $47,330 | 1.23% | 11.72% | 7.81% | $47,387 | 1.65% | 11.84% | 8.88% |

(1)  Return on receivables is equal to Discover income divided by average owned, securitized or managed credit card receivables, as applicable.

Morgan Stanley

The following tables present a reconciliation of owned and managed general purpose credit card loans and delinquency and net charge-off rates:

**Reconciliation of General Purpose Credit Card Loan Asset Quality Data (dollars in millions)**

| | Fiscal 2006 | | | Fiscal 2005 | | | Fiscal 2004 | | |
| | | Delinquency Rates | | | Delinquency Rates | | | Delinquency Rates | |
| | Period-End Loans | Over 30 Days | Over 90 Days | Period-End Loans | Over 30 Days | Over 90 Days | Period-End Loans | Over 30 Days | Over 90 Days |
|---|---|---|---|---|---|---|---|---|---|
| **General Purpose Credit Card Loans:** | | | | | | | | | |
| Owned .................. | $23,588 | 3.22% | 1.53% | $22,496 | 3.69% | 1.62% | $19,724 | 4.08% | 1.97% |
| Securitized .................. | 26,703 | 3.76% | 1.75% | 24,440 | 4.24% | 1.87% | 28,537 | 4.87% | 2.34% |
| Managed .................. | $50,291 | 3.51% | 1.65% | $46,936 | 3.98% | 1.75% | $48,261 | 4.55% | 2.18% |

| | Fiscal 2006 | Fiscal 2005 | Fiscal 2004 |
|---|---|---|---|
| **Net Principal Charge-offs:** | | | |
| Owned ................................................ | 3.79% | 4.84% | 5.53% |
| Securitized ................................................ | 4.31% | 5.52% | 6.28% |
| Managed ................................................ | 4.08% | 5.23% | 6.00% |

| | Fiscal 2006 | Fiscal 2005 | Fiscal 2004 |
|---|---|---|---|
| **Net Total Charge-offs (inclusive of interest and fees):** | | | |
| Owned ................................................ | 5.15% | 6.59% | 7.68% |
| Securitized ................................................ | 6.15% | 7.72% | 9.01% |
| Managed ................................................ | 5.70% | 7.25% | 8.51% |

Morgan Stanley

## Other Items.

### Staff Accounting Bulletin No. 108.

In September 2006, the Securities and Exchange Commission ("SEC") released Staff Accounting Bulletin No. 108, *"Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements"* ("SAB 108"). SAB 108 permits the Company to adjust for the cumulative effect of errors relating to prior years in the carrying amount of assets and liabilities as of the beginning of the current fiscal year, with an offsetting adjustment to the opening balance of retained earnings in the year of adoption. SAB 108 also requires the adjustment of any prior quarterly financial statements within the fiscal year of adoption for the effects of such errors on the quarters when the information is next presented. Such adjustments do not require previously filed reports with the SEC to be amended. Effective August 31, 2006, the Company elected early application of SAB 108. In accordance with SAB 108, the Company has adjusted its opening retained earnings for fiscal 2006 and its financial results for the first two quarters of fiscal 2006 for the items described below. The Company considers these adjustments to be immaterial to prior annual periods.

*Trust Preferred Securities.* The Company adjusted its opening retained earnings for fiscal 2006 and its financial results for the first two quarters of fiscal 2006 to reflect a change in its hedge accounting under Statement of Financial Accounting Standards ("SFAS") No. 133, "Accounting for Derivative Instruments and Hedging Activities," as amended ("SFAS No. 133"). The change is being made following a clarification by the SEC of its interpretation of SFAS No. 133 related to the accounting for fair value hedges of fixed-rate trust preferred securities.

Since January 2005, the Company entered into various interest rate swaps to hedge the interest rate risk inherent in its trust preferred securities. The terms of the interest rate swaps and the corresponding trust preferred securities mirrored one another, and the Company determined in the past that the changes in the fair value of the swaps and hedged instruments were the same. The Company applied the commonly used "short-cut method" in accounting for these fair value hedges and, therefore, did not reflect any gains or losses during the relevant periods. Based upon the SEC's clarification of SFAS No. 133, the Company determined that since it has the ability at its election to defer interest payments on its trust preferred securities, these swaps did not qualify for the short-cut method. These swaps performed as expected as effective economic hedges of interest rate risk. The Company ended hedging of the interest rate risk on these trust preferred securities effective August 2006 and adjusted its financial results as if hedge accounting was never applied. Prospectively, the Company will manage the interest rate risk on these securities as part of its overall asset liability management.

*Compensation and Benefits.* The Company also adjusted its opening retained earnings for fiscal 2006 and its financial results for the first two quarters of fiscal 2006 for two compensation and benefits accruals. Such accruals are related to (i) the overaccrual of certain payroll taxes in certain non-U.S. locations, primarily in the U.K., which arose in fiscal 2000 through fiscal 2006 and (ii) an adjustment to the amortization expense associated with stock-based compensation awards, which arose in fiscal 2003 and fiscal 2004.

*Impact of Adjustments.* The impact of each of the items noted above on fiscal 2006 opening Shareholders' equity and Retained earnings and on Net income for the first and second quarters of fiscal 2006 is presented below (dollars in millions):

|  | Trust Preferred Securities | Non-U.S. Payroll Taxes | Amortization of Stock-Based Compensation Awards | Total |
|---|---|---|---|---|
| Cumulative effect on Shareholders' equity as of December 1, 2005 | $ (84) | $ 38 | $ 12 | $ (34) |
| Cumulative effect on Retained earnings as of December 1, 2005 | $ (84) | $ 38 | $(22) | $ (68) |
| Effect on: |  |  |  |  |
| Net income for the three months ended February 28, 2006 | $   (1) | $ 14 | $— | $   13 |
| Net income for the three months ended May 31, 2006 | $(116) | $— | $— | $(116) |
| Net income for the six months ended May 31, 2006 | $(117) | $ 14 | $— | $(103) |

The aggregate impact of these adjustments is summarized below (dollars in millions, except per share data):

| As of and for the Three Months Ended February 28, 2006 | Previously Reported | Adjustment | As Adjusted |
|---|---|---|---|
| Other assets | $ 15,988 | $   12 | $ 16,000 |
| Other liabilities | $ 14,984 | $ (98) | $ 14,886 |
| Long-term borrowings | $121,395 | $ 131 | $121,526 |
| Shareholders' equity | $ 30,124 | $ (21) | $ 30,103 |
| Principal transactions trading revenue | $  3,067 | $  13 | $  3,080 |
| Compensation and benefits expense | $  4,183 | $ (22) | $  4,161 |
| Interest expense | $  9,481 | $  15 | $  9,496 |
| Net income | $  1,561 | $  13 | $  1,574 |
| Diluted EPS | $   1.47 | $0.01 | $   1.48 |
| Annualized return on common equity | 21.1% | 0.2% | 21.3% |

| As of and for the Three Months Ended May 31, 2006 | Previously Reported | Adjustment | As Adjusted |
|---|---|---|---|
| Other assets | $ 17,651 | $   12 | $ 17,663 |
| Other liabilities | $ 18,159 | $ (162) | $ 17,997 |
| Long-term borrowings | $127,985 | $ 311 | $128,296 |
| Shareholders' equity | $ 32,255 | $ (137) | $ 32,118 |
| Principal transactions trading revenue | $  3,735 | $ (170) | $  3,565 |
| Compensation and benefits expense | $  3,723 | $  — | $  3,723 |
| Interest expense | $  9,988 | $   9 | $  9,997 |
| Net income | $  1,957 | $ (116) | $  1,841 |
| Diluted EPS | $   1.86 | $(0.11) | $   1.75 |
| Annualized return on common equity | 25.1% | (1.4)% | 23.7% |

| For the Six Months Ended May 31, 2006 | Previously Reported | Adjustment | As Adjusted |
|---|---|---|---|
| Principal transactions trading revenue | $  6,802 | $ (157) | $  6,645 |
| Compensation and benefits expense | $  7,906 | $  (22) | $  7,884 |
| Interest expense | $ 19,469 | $  24 | $ 19,493 |
| Net income | $  3,518 | $ (103) | $  3,415 |
| Diluted EPS | $   3.33 | $(0.10) | $   3.23 |
| Annualized return on common equity | 23.1% | (0.6)% | 22.5% |

**Stock-Based Compensation.**

The Company early adopted SFAS No. 123R, "Share-Based Payment" ("SFAS No. 123R"), using the modified prospective approach as of December 1, 2004. SFAS No. 123R revised the fair value-based method of accounting for share-based payment liabilities, forfeitures and modifications of stock-based awards and clarified guidance in several areas, including measuring fair value, classifying an award as equity or as a liability and attributing compensation cost to service periods. Upon adoption, the Company recognized an $80 million gain ($49 million after-tax) as a cumulative effect of a change in accounting principle in the first quarter of fiscal 2005 resulting from the requirement to estimate forfeitures at the date of grant instead of recognizing them as incurred. The cumulative effect gain increased both basic and diluted earnings per share in fiscal 2005 by $0.05.

For stock-based awards issued prior to the adoption of SFAS No. 123R, the Company's accounting policy for awards granted to retirement-eligible employees was to recognize compensation cost over the service period specified in the award terms. The Company accelerates any unrecognized compensation cost for such awards if and when a retirement-eligible employee leaves the Company. For stock-based awards made to retirement-eligible employees during fiscal 2005, the Company recognized compensation expense for such awards on the date of grant.

Morgan Stanley

For fiscal 2005 year-end stock-based compensation awards that were granted to retirement-eligible employees in December 2005, the Company recognized the compensation cost for such awards at the date of grant instead of over the service period specified in the award terms. As a result, the Company recorded non-cash incremental compensation expenses of approximately $270 million in fiscal 2006 for stock-based awards granted to retirement-eligible employees as part of the fiscal 2005 year-end award process. These incremental expenses were included within Compensation and benefits expense and reduced income before taxes within the Institutional Securities ($190 million), Global Wealth Management Group ($50 million), Asset Management ($20 million) and Discover ($10 million) business segments.

Additionally, based on interpretive guidance related to SFAS No. 123R in the first quarter of fiscal 2006, the Company changed its accounting policy for expensing the cost of anticipated fiscal 2006 year-end equity awards that were granted to retirement-eligible employees in the first quarter of fiscal 2007. Effective December 1, 2005, the Company accrues the estimated cost of these awards over the course of the current fiscal year rather than expensing the awards on the date of grant (which occurred in December 2006).

As a result, fiscal 2006 stock-based compensation expense primarily included the following costs:

- amortization of fiscal 2003 year-end awards;

- amortization of fiscal 2004 year-end awards;

- amortization of fiscal 2005 year-end awards to non-retirement eligible employees;

- the full cost of fiscal 2005 year-end awards to retirement eligible employees (made in December 2005); and

- the full cost of fiscal 2006 year-end awards to retirement eligible employees (made in December 2006).

Fiscal 2007 stock-based compensation expense will primarily include the following costs:

- amortization of fiscal 2004 year-end awards;

- amortization of fiscal 2005 year-end awards to non-retirement eligible employees;

- amortization of fiscal 2006 year-end awards to non-retirement eligible employees; and

- the full cost of fiscal 2007 year-end awards to retirement eligible employees (expected to be made in December 2007).

Fiscal 2003 and fiscal 2004 year-end awards are generally amortized over three and four years, while fiscal 2005 and fiscal 2006 year-end awards are generally amortized over two and three years.

**Discontinued Operations.**

As described in Note 18 to the consolidated financial statements, on August 17, 2005, the Company announced that its Board of Directors had approved management's recommendation to sell the Company's non-core aircraft leasing business. In connection with this action, the aircraft leasing business was classified as "held for sale" under the provisions of SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" ("SFAS No. 144"), and reported as discontinued operations in the Company's consolidated financial statements.

On January 30, 2006, the Company announced that it had signed a definitive agreement under which it would sell its aircraft leasing business to Terra Firma, a European private equity group, for approximately $2.5 billion in cash and the assumption of liabilities. The sale was completed on March 24, 2006. The results for discontinued operations in fiscal 2006 include a loss of $125 million ($75 million after-tax) related to the impact of the finalization of the sales proceeds and balance sheet adjustments related to the closing. The results for fiscal 2005 reflected a charge of $509 million ($316 million after-tax) to reflect the write-down of the aircraft leasing business to its estimated fair value in accordance with SFAS No. 144.

Morgan Stanley

In fiscal 2004, the Company entered into agreements for the sale of certain aircraft. Accordingly, the Company designated such aircraft as "held for sale" and recorded a $42 million pre-tax loss related to the write-down of these aircraft to fair value in accordance with SFAS No. 144. As of February 3, 2005, all of these aircraft were sold. In addition, during fiscal 2004, the Company recorded aircraft impairment charges in accordance with SFAS No. 144.

The table below provides information regarding the pre-tax loss on discontinued operations and the aircraft impairment charges that are included in these amounts (dollars in millions):

|  | Fiscal Year | | |
|  | 2006 | 2005 | 2004 |
|---|---|---|---|
| Pre-tax loss from discontinued operations | $ 42 | $486 | $172 |
| Aircraft impairment charges | — | — | 109 |

Fiscal 2006 reflected a net loss of $25 million on discontinued operations, which included the results of operations of the aircraft leasing business through the date of sale. Fiscal 2005 and fiscal 2004 reflected a net loss on discontinued operations of $302 million and $103 million, respectively.

**Discover Spin-off.**

On December 19, 2006, the Company announced that its Board of Directors had approved the spin-off of Discover in order to enhance shareholder value. The Discover Spin-off will allow the Company to focus its efforts on more closely aligned firm-wide strategic priorities within its Institutional Securities, Global Wealth Management Group and Asset Management business segments. The Discover Spin-off is subject to regulatory approval and other customary conditions, and is expected to occur in the third quarter of fiscal 2007. At the time of the Discover Spin-off, shareholders of the Company will receive shares in Discover on a tax-free basis.

**Business and Other Acquisitions and Dispositions.**

*Subsequent to Fiscal 2006.*

*CityMortgage Bank.*    On December 21, 2006, the Company acquired CityMortgage Bank ("CityMortgage"), a leading Moscow-based mortgage bank that specializes in originating, servicing and securitizing residential mortgage loans in the Russian Federation. The results of CityMortgage will be included within the Institutional Securities business segment.

*Olco Petroleum Group Inc.*    On December 15, 2006, the Company acquired a 60% equity stake in Olco Petroleum Group Inc. ("Olco"), a petroleum products marketer and distributor based in eastern Canada. The results of Olco will be included within the Institutional Securities business segment.

*Quilter.*    On December 13, 2006, the Company announced that it had reached an agreement to sell Quilter, its standalone U.K. mass affluent business. The transaction is expected to close during the first quarter of fiscal 2007. The results of Quilter have been included within the Global Wealth Management Group business segment.

*Saxon Capital, Inc.*    On December 4, 2006, the Company acquired Saxon Capital, Inc. ("Saxon"), a servicer and originator of residential mortgages. The results of Saxon will be included within the Institutional Securities business segment.

*FrontPoint Partners.*    On December 4, 2006, the Company acquired FrontPoint Partners ("FrontPoint"), a leading provider of absolute return investment strategies. The results of FrontPoint will be included within the Asset Management business segment.

Morgan Stanley

**Fiscal 2006.**

**Lansdowne Partners.**   On November 1, 2006, the Company acquired a 19% stake in Lansdowne Partners ("Lansdowne"), a London-based investment manager. The investment in Lansdowne is accounted for under the equity method of accounting within the Asset Management business segment.

**Avenue Capital Group.**   On October 30, 2006, the Company formed a strategic alliance with Avenue Capital Group ("Avenue"), a New York-based investment manager with approximately $12 billion in assets under management. The Company acquired a minority interest in Avenue. The investment in Avenue is accounted for under the equity method of accounting within the Asset Management business segment.

**Nan Tung Bank.**   On September 29, 2006, the Company acquired Nan Tung Bank Ltd. Zhuhai ("Nan Tung"), a bank in the People's Republic of China. Since the acquisition date, the results of Nan Tung have been included within the Institutional Securities business segment.

**TransMontaigne.**   On September 1, 2006, the Company acquired TransMontaigne and its affiliates, a group of companies operating in the refined petroleum products marketing and distribution business. Since the acquisition date, the results of TransMontaigne and its affiliates have been included within the Institutional Securities business segment.

**Heidmar Group.**   On September 1, 2006, the Company acquired the Heidmar Group of companies that provides international shipping and U.S. marine logistics services. Since the acquisition date, the results of the Heidmar Group of companies have been included within the Institutional Securities business segment.

**Office Building.**   On June 19, 2006, the Company purchased a majority interest in a joint venture that indirectly owns title to 522 Fifth Avenue, a 23-floor office building in New York City (the "Building"), for approximately $420 million. Concurrently, the Company entered into an occupancy agreement with the joint venture pursuant to which the Company will occupy the office space in the Building (approximately 580,000 square feet).

**Goldfish.**   On February 17, 2006, the Company acquired the Goldfish credit card business in the U.K. Since the acquisition date, the results of Goldfish have been included within the Discover business segment. The acquisition price was $1,676 million, which was paid in cash in February 2006.

**Fiscal 2005.**

**PULSE.**   On January 12, 2005, the Company acquired PULSE, a U.S.-based automated teller machine/debit and electronic funds transfer network currently serving banks, credit unions, and savings and other financial institutions. Since the acquisition date, the results of PULSE have been included within the Discover business segment.

**Fiscal 2004.**

**Barra.**   On June 3, 2004, the Company acquired Barra, a global leader in delivering risk management systems and services to managers of portfolio and firm-wide investment risk. Since the acquisition date, the results of Barra have been included within the Institutional Securities business segment. In February 2005, the Company sold its 50% interest in POSIT, an equity crossing system that matches institutional buyers and sellers, to Investment Technology Group, Inc. The Company acquired the POSIT interest as part of its acquisition of Barra.

Morgan Stanley

**Coleman Litigation.**

On May 8, 2003, Coleman (Parent) Holdings Inc. ("CPH") filed a complaint against the Company in the Circuit Court of the Fifteenth Judicial Circuit for Palm Beach County, Florida. The complaint relates to the 1998 merger between The Coleman Company, Inc. ("Coleman") and Sunbeam, Inc. ("Sunbeam"). The complaint, as amended, alleges that CPH was induced to agree to the transaction with Sunbeam based on certain financial misrepresentations, and it asserts claims against the Company for aiding and abetting fraud, conspiracy and punitive damages. Shortly before trial, which commenced in April 2005, the trial court granted, in part, a motion for entry of a default judgment against the Company and ordered that portions of CPH's complaint, including those setting forth CPH's primary allegations against the Company, be read to the jury and deemed established for all purposes in the action. In May 2005, the jury returned a verdict in favor of CPH and awarded CPH $604 million in compensatory damages and $850 million in punitive damages. On June 23, 2005, the trial court issued a final judgment in favor of CPH in the amount of $1,578 million, which includes prejudgment interest and excludes certain payments received by CPH in settlement of related claims against others. On June 27, 2005, the Company filed a notice of appeal with the District Court of Appeal for the Fourth District of Florida (the "Court of Appeal") and posted a supersedeas bond, which automatically stayed execution of the judgment pending appeal. Included in cash and securities deposited with clearing organizations or segregated under federal and other regulations or requirements in the consolidated statement of financial condition is $1,840 million of money market deposits that have been pledged to obtain the supersedeas bond. The Company filed its initial brief in support of its appeal on December 7, 2005, and, on June 28, 2006, the Court of Appeal heard oral argument. The Company's appeal seeks to reverse the judgment of the trial court on several grounds and asks that the case be remanded for entry of a judgment in favor of the Company or, in the alternative, for a new trial.

The Company believes, after consultation with outside counsel, that it is probable that the compensatory and punitive damages awards will be overturned on appeal and the case remanded for a new trial. Taking into account the advice of outside counsel, the Company is maintaining a reserve of $360 million for the Coleman litigation, which it believes to be a reasonable estimate, under SFAS No. 5, "Accounting for Contingencies" ("SFAS No. 5"), of the low end of the range of its probable exposure in the event the judgment is overturned and the case remanded for a new trial. If the compensatory and/or punitive awards are ultimately upheld on appeal, in whole or in part, the Company may incur an additional expense equal to the difference between the amount affirmed on appeal (and post-judgment interest thereon) and the amount of the reserve. While the Company cannot predict with certainty the amount of such additional expense, such additional expense could have a material adverse effect on the consolidated financial condition of the Company and/or the Company's or Institutional Securities' operating results and cash flows for a particular future period, and the upper end of the range could exceed $1.4 billion. For further information, see Note 9 to the consolidated financial statements.

**Insurance Settlement.**

On September 11, 2001, the U.S. experienced terrorist attacks targeted against New York City and Washington, D.C. The attacks in New York resulted in the destruction of the World Trade Center complex, where approximately 3,700 of the Company's employees were located, and the temporary closing of the debt and equity financial markets in the U.S. Through the implementation of its business recovery plans, the Company relocated its displaced employees to other facilities.

In the first quarter of fiscal 2005, the Company settled its claim with its insurance carriers related to the events of September 11, 2001. The Company recorded a pre-tax gain of $251 million as the insurance recovery was in excess of previously recognized costs related to the terrorist attacks (primarily write-offs of leasehold improvements and destroyed technology and telecommunications equipment in the World Trade Center complex, employee relocation and certain other employee-related expenditures).

The pre-tax gain was recorded as a reduction to non-interest expenses and is included within the Global Wealth Management Group ($198 million), Asset Management ($43 million) and Institutional Securities ($10 million) business segments. The insurance settlement was allocated to the respective segments in accordance with the relative damages sustained by each segment.

Morgan Stanley

**Lease Adjustment.**

Prior to the first quarter of fiscal 2005, the Company did not record the effects of scheduled rent increases and rent-free periods for certain real estate leases on a straight-line basis. In addition, the Company had been accounting for certain tenant improvement allowances as reductions to the related leasehold improvements instead of recording funds received as deferred rent and amortizing them as reductions to lease expense over the lease term. In the first quarter of fiscal 2005, the Company changed its method of accounting for these rent escalation clauses, rent-free periods and tenant improvement allowances to properly reflect lease expense over the lease term on a straight-line basis. The impact of this correction resulted in the Company recording $109 million of additional rent expense in the first quarter of fiscal 2005. The impact of this change was included within non-interest expenses and reduced income before taxes within the Institutional Securities ($71 million), Global Wealth Management Group ($29 million), Asset Management ($5 million) and Discover ($4 million) business segments. The impact of this correction was not material to the pre-tax income of each of the segments or to the Company.

**Senior Management Compensation Charges.**

Compensation and benefits expense in fiscal 2005 included charges for certain members of senior management related to severance and new hires, which increased non-interest expenses by approximately $311 million. These compensation charges were allocated to the Company's business segments as follows: Institutional Securities ($193 million), Global Wealth Management Group ($48 million), Asset Management ($41 million) and Discover ($29 million).

**Tax Matters.**

*Income Tax Examinations.*

The Company is under continuous examination by the Internal Revenue Service (the "IRS") and other tax authorities in certain countries, such as Japan and the U.K., and states in which the Company has significant business operations, such as New York. The tax years under examination vary by jurisdiction; for example, the current IRS examination covers 1999-2005. The Company regularly assesses the likelihood of additional assessments in each of the taxing jurisdictions resulting from these and subsequent years' examinations. The Company has established tax reserves that the Company believes are adequate in relation to the potential for additional assessments. Once established, the Company adjusts tax reserves only when more information is available or when an event occurs necessitating a change to the reserves. The Company believes that the resolution of tax matters will not have a material effect on the consolidated financial condition of the Company, although a resolution could have a material impact on the Company's consolidated statement of income for a particular future period and on the Company's effective income tax rate for any period in which such resolution occurs.

Fiscal 2006 included an income tax benefit of $280 million, or $0.27 per diluted share, related to the resolution of the IRS examination of years 1994-1998.

*American Jobs Creation Act of 2004.*

The American Jobs Creation Act, adopted on October 22, 2004, provided for a special one-time tax deduction, or dividend received deduction, of 85% of qualifying foreign earnings that are repatriated in either a company's last tax year that began before the enactment date or the first tax year that begins during the one-year period beginning on the enactment date. In the fourth quarter of fiscal 2005, the Company recorded an income tax benefit of $309 million, or $0.29 per diluted share, resulting from the Company's repatriation of approximately $4.0 billion of qualifying foreign earnings under the provisions of the American Jobs Creation Act. The $309 million tax benefit resulted from the reversal of net deferred tax liabilities previously provided under SFAS No. 109, "Accounting for Income Taxes," net of additional taxes associated with these qualifying earnings.

Morgan Stanley                                    68

***Investments in Unconsolidated Investees.***

The Company invests in unconsolidated investees that own synthetic fuel production plants. The Company accounts for these investments under the equity method of accounting. The Company's share of the operating losses generated by these investments is recorded within Losses from unconsolidated investees, and the tax credits and the tax benefits associated with these operating losses are recorded within the Provision for income taxes.

In fiscal 2006, fiscal 2005 and fiscal 2004, the losses from unconsolidated investees were more than offset by the respective tax credits and tax benefits on the losses. The table below provides information regarding the losses from unconsolidated investees, tax credits and tax benefits on the losses:

| | Fiscal Year | | |
|---|---|---|---|
| | **2006** | **2005** | **2004** |
| | (dollars in millions) | | |
| Losses from unconsolidated investees ................................... | $228 | $311 | $328 |
| Tax credits ............................................................. | 159 | 336 | 351 |
| Tax benefits on losses ................................................ | 90 | 124 | 132 |

Under the current tax law, synthetic fuels tax credits are granted under Section 45K of the Internal Revenue Code. Synthetic fuels tax credits are available in full only when the price of oil is less than a base price specified by the tax code, as adjusted for inflation ("Base Price"). The Base Price for each calendar year is determined by the Secretary of the Treasury by April 1 of the following year. If the annual average price of a barrel of oil in 2006 or future years exceeds the applicable Base Price, the synthetic fuels tax credits generated by the Company's synthetic fuel facilities will be phased out, on a ratable basis, over the phase-out range. Synthetic fuels tax credits realized in prior years are not affected by this limitation. Due to the high level of crude oil prices in fiscal 2006 and continued uncertainty regarding the value of tax credits associated with synthetic fuel investments, all of the Company's investees idled production at their synthetic fuel production facilities during the second and third quarters of fiscal 2006. In the fourth quarter of fiscal 2006, all of the Company's investees began production at their synthetic fuel production facilities, largely due to a decline in the level of crude oil prices in the fourth quarter as compared with the second and third quarters of fiscal 2006. Additionally, based on fiscal year to date and futures prices at November 30, 2006, the Company estimates that there will be a partial phase-out of tax credits earned in fiscal 2006. The impact of this anticipated partial phase-out is included within Losses from unconsolidated investees and the Provision for income taxes for the fiscal year ended November 30, 2006.

The Company has entered into derivative contracts designed to reduce its exposure to rising oil prices and the potential phase-out of the synthetic fuels tax credits. Changes in fair value relative to these derivative contracts are included within Principal transactions—trading revenues.

**Asset Management and Account Fees.**

Prior to the fourth quarter of fiscal 2004, the Company was improperly recognizing certain management fees, account fees and related compensation expense paid at the beginning of the relevant contract periods, which is when such fees were billed. In the fourth quarter of fiscal 2004, the Company changed its method of accounting for such fees to properly recognize such fees and related expenses over the relevant contract period, generally quarterly or annually. As a result of the change, the Company's results in the fourth quarter of fiscal 2004 included an adjustment to reflect the cumulative impact of the deferral of certain management fees, account fees and related compensation expense paid to global representatives. The impact of this change reduced net revenues by $107 million, non-interest expenses by $27 million and income before taxes by $80 million, at both the Company and the Global Wealth Management Group business segment in the fourth quarter of fiscal 2004. Such adjustment reduced fiscal 2004 net income by approximately $50 million and basic and diluted earnings per share by $0.05.

Morgan Stanley

**Pension Plans.**

*Contributions.*   The Company made contributions of $114 million and $272 million to its U.S. and non-U.S. defined benefit pension plans in fiscal 2006 and fiscal 2005, respectively. These contributions were funded with cash from operations and were recorded as a component of prepaid pension benefit cost in the Company's consolidated statements of financial condition.

The Company determines the amount of its pension contributions to its funded plans by considering several factors, including the level of plan assets relative to plan liabilities, expected plan liquidity needs and expected future contribution requirements. The Company's policy is to fund at least the amounts sufficient to meet minimum funding requirements under applicable employee benefit and tax regulations; for example, in the U.S., the minimum required contribution under the Employee Retirement Income Security Act of 1974 ("ERISA"). At November 30, 2006, there were no minimum required ERISA contributions for the Company's U.S. pension plan that is qualified under Section 401(a) of the Internal Revenue Code (the "Qualified Plan"). Liabilities for benefits payable under its unfunded supplementary plans are accrued by the Company and are funded when paid to the beneficiaries.

*Pension Expense.*   In accordance with U.S. GAAP, the Company recognizes the compensation cost of employee's pension benefits (including prior service cost) over the employee's approximate service period. This process involves making certain estimates and assumptions, including the discount rate and the expected long-term rate of return on plan assets.

The assumed discount rate, which reflects the rates at which pension benefits could be effectively settled, is used to measure the projected and accumulated benefit obligations and to calculate the service cost and interest cost. For fiscal 2006 and fiscal 2005, the assumed discount rate for all U.S. plans was selected by the Company, in consultation with its independent actuaries, using a pension discount yield curve based on the characteristics of the Qualified Plan liabilities. The pension discount yield curve represents spot discount yields based on the duration implicit in a representative broad-based Aa corporate bond universe of high-quality fixed income investments. It includes only bonds of reasonable issue size and excludes certain types of bonds, such as callable bonds. As of November 30, 2006, the Qualified Plan liabilities represented 79% of the total liabilities of the Company's U.S. and non-U.S. pension plans combined. The Company, in consultation with its independent actuaries, set the assumed discount rates used for non-U.S. pension plans based on the nature of liabilities, local economic environments and available bond indices.

The expected long-term rate of return on assets represents the Company's best estimate of the long-term return on plan assets and generally was estimated by computing a weighted average return of the underlying long-term expected returns on the different asset classes based on the target asset allocations and taking into consideration estimated expenses and the benefits of diversification and the rebalancing of the portfolio. This rate is expected to remain the same from one year to the next, but is adjusted when there is a significant change in the target asset allocation, the fees and expenses paid by the plan or market conditions.

As of November 30, 2006, the Qualified Plan assets represented 89% of the total assets of the Company's U.S. and non-U.S. pension plans combined. To better align the duration of plan assets with the duration of plan liabilities, the Qualified Plan's target asset allocation policy was changed in September 2005 from 50%/50% equity/fixed income to 45%/55% equity/fixed income, and the duration of the fixed income portfolio was extended from 13 to 18 years. As a result, the Company, in consultation with its independent investment consultants and actuaries, lowered its expected long-term rate of return on its Qualified Plan assets from 7.00% to 6.75% for fiscal 2006 (see Note 15 to the consolidated financial statements). The impact of this change was not material to the Company's consolidated results of operations in fiscal 2006. The preliminary expected long-term rate of return on Qualified Plan assets remains unchanged at 6.75% for fiscal 2007.

The Company's fiscal 2006 expected long-term rate of return on assets for its Qualified Plan was based on the following target asset allocation:

| | Target Investment Mix | Expected Annual Return(1) |
|---|---|---|
| Domestic equity: | | |
|     Large capitalization | 30% | 8.0% |
|     Small capitalization | 3% | 8.4% |
| International equity | 12% | 8.4% |
| Fixed income: | | |
|     Long-term government/corporate | 55% | 5.0% |

(1) These returns do not include the impact of diversification on the overall expected portfolio return.

Each year the Company compares its initial estimate of the expected long-term rate of return on assets for the Qualified Plan (and adjusts, if necessary) with a portfolio return calculator model (the "Portfolio Model") that produces a range of expected returns for the portfolio. Return assumptions used are forward-looking gross returns that are not developed solely by an examination of historical returns. The Portfolio Model begins with the current U.S. Treasury yield curve, recognizing that expected returns on bonds are heavily influenced by the current level of yields. Corporate bond spreads and equity risk premiums, based on current market conditions, are then added to develop the return expectations for each asset class. The resulting expected portfolio investment is then adjusted downward to reflect assumed expenses, which include investment and transaction fees that typically are paid from plan assets, added to the cost basis or subtracted from sale proceeds, as well as administrative expenses paid from plan assets.

The Company uses the expected long-term rate of return on plan assets to compute the expected return on assets component of pension expense. For the Qualified Plan, expected returns are computed based on a market-related value of assets. The market-related value of assets is a smoothed actuarial value of assets equal to a moving average of market values in which investment income is recognized over a five-year period. The market-related value of assets must be no greater than 120% and no less than 80% of the market value of assets. Investment income equal to the expected return on the plan's assets as calculated for the prior year's expense is recognized immediately. Any difference between the actual investment income (on a market-value basis) and the expected return is recognized over a five-year period in accordance with SFAS No. 87, "Employers' Accounting for Pensions."

Other assumptions, including mortality rates, long-term salary growth and employee turnover rates, are set by the Company in consultation with its independent actuaries. These assumptions are tested every year by monitoring gains and losses, performing assumption studies as needed, and monitoring Company objectives and actuarial trends. These assumptions are adjusted whenever necessary.

The Company amortizes (as a component of pension expense) unrecognized net gains and losses over the average future service of active participants (5 to 20 years depending upon the plan) to the extent that the gain/loss exceeds 10% of the greater of the projected benefit obligation or the market-related value of plan assets. The loss amortization component for the U.S. and the non-U.S. pension plans was $60 million for fiscal 2006 (33% of pension expense) and $49 million for fiscal 2005 (31% of pension expense).

**Accounting Developments.**

***Determining the Variability in Variable Interest Entities.***    In April 2006, the Financial Accounting Standards Board ("FASB") issued FASB Staff Position No. FIN 46(R)-6, "Determining the Variability to Be Considered in Applying FASB Interpretation No. 46(R)" ("FSP FIN 46(R)-6"). FSP FIN 46(R)-6 requires that the determination of the variability to be considered in applying FASB Interpretation No. 46 (revised December 2003), "Consolidation of Variable Interest Entities" ("FIN 46R"), be based on an analysis of the design of the

Morgan Stanley

entity. In evaluating whether an interest with a variable interest entity creates or absorbs variability, FSP FIN 46(R)-6 focuses on the role of a contract or arrangement in the design of an entity, regardless of its legal form or accounting classification. The Company adopted the guidance in FSP FIN 46(R)-6 prospectively on September 1, 2006 to all entities that the Company first becomes involved with and to all entities previously required to be analyzed under FIN 46R when a reconsideration event has occurred under paragraph 7 of FIN 46R. The adoption of FSP FIN 46(R)-6 did not have a material impact on the Company's consolidated financial statements.

**Limited Partnerships.**    In June 2005, the FASB ratified the consensus reached in Emerging Issues Task Force ("EITF") Issue No. 04-5, "Determining Whether a General Partner, or the General Partners as a Group, Controls a Limited Partnership or Similar Entity When the Limited Partners Have Certain Rights" ("EITF Issue No. 04-5"). Under the provisions of EITF Issue No. 04-5, a general partner in a limited partnership is presumed to control that limited partnership and, therefore, should include the limited partnership in its consolidated financial statements, regardless of the amount or extent of the general partner's interest unless a majority of the limited partners can vote to dissolve or liquidate the partnership or otherwise remove the general partner without having to show cause or the limited partners have substantive participating rights that can overcome the presumption of control by the general partner. EITF Issue No. 04-5 was effective immediately for all newly formed limited partnerships and existing limited partnerships for which the partnership agreements have been modified. For all other existing limited partnerships for which the partnership agreements have not been modified, the Company adopted EITF Issue No. 04-5 on December 1, 2006. The adoption of EITF Issue No. 04-5 on December 1, 2006 did not have a material impact on the Company's consolidated financial statements.

**Accounting for Certain Hybrid Financial Instruments.**    In February 2006, the FASB issued SFAS No. 155, "Accounting for Certain Hybrid Financial Instruments" ("SFAS No. 155"), which amends SFAS No. 133 and SFAS No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities" ("SFAS No. 140"). SFAS No. 155 permits hybrid financial instruments that contain an embedded derivative that would otherwise require bifurcation to irrevocably be accounted for at fair value, with changes in fair value recognized in the statement of income. The fair value election may be applied on an instrument-by-instrument basis. SFAS No. 155 also eliminates a restriction on the passive derivative instruments that a qualifying special purpose entity may hold. The Company adopted SFAS No. 155 on December 1, 2006 and has elected to fair value only certain hybrid financial instruments acquired, issued or subject to a remeasurement event after December 1, 2006.

**Accounting for Servicing of Financial Assets.**    In March 2006, the FASB issued SFAS No. 156, "Accounting for Servicing of Financial Assets, an amendment of FASB Statement No. 140" ("SFAS No. 156"). SFAS No. 156 requires all separately recognized servicing assets and servicing liabilities to be initially measured at fair value, if practicable. The standard permits an entity to subsequently measure each class of servicing assets or servicing liabilities at fair value and report changes in fair value in the statement of income in the period in which the changes occur. The Company adopted SFAS No. 156 on December 1, 2006 and has elected to fair value certain servicing rights held as of the date of adoption. This election did not have a material impact on the Company's opening balance of Retained earnings as of December 1, 2006. The Company will also elect to fair value certain servicing rights acquired after December 1, 2006.

**Accounting for Uncertainty in Income Taxes.**    In July 2006, the FASB issued FASB Interpretation No. 48, "Accounting for Uncertainty in Income Taxes, an interpretation of FASB Statement No. 109" ("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in a company's financial statements and prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in an income tax return. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition. FIN 48 is effective for the Company as of December 1, 2007. The Company is currently evaluating the potential impact of adopting FIN 48.

Morgan Stanley

***Fair Value Measurements.***   In September 2006, the FASB issued SFAS No. 157. SFAS No. 157 defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements. In addition, SFAS No. 157 disallows the use of block discounts for large holdings of unrestricted financial instruments where quoted prices are readily and regularly available in an active market, and nullifies select guidance provided by EITF Issue No. 02-3, which prohibited the recognition of trading gains or losses at the inception of a derivative contract, unless the fair value of such derivative is obtained from a quoted market price, or other valuation technique that incorporates observable market data. SFAS No. 157 also requires the Company to consider its own credit spreads when measuring the fair value of liabilities, including derivatives. Effective December 1, 2006, the Company elected early adoption of SFAS No. 157. In accordance with the provisions of SFAS No. 157 related to block discounts and EITF Issue No. 02-3, the Company recorded a cumulative effect adjustment of approximately $80 million after-tax as an increase to the opening balance of retained earnings as of December 1, 2006, which was primarily associated with EITF Issue No. 02-3. The impact of considering the Company's own credit spreads when measuring the fair value of liabilities, including derivatives, did not have a material impact on fair value measurements at the date of adoption. With the adoption of SFAS No. 157, the Company will no longer apply the revenue recognition criteria of EITF Issue No. 02-3. The Company is currently unable to quantify the impact, if any, that this change in accounting methodology will have on its results of operations in fiscal 2007, since such impact will be dependent upon, among other things, the nature, volume and size of structured derivative transactions that the Company may enter into during fiscal 2007.

***Employee Benefit Plans.***   In September 2006, the FASB issued SFAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans, an amendment of FASB Statements No. 87, 88, 106, and 132(R)" ("SFAS No. 158"). Among other items, SFAS No. 158 requires recognition of the overfunded or underfunded status of an entity's defined benefit and postretirement plans as an asset or liability in the financial statements and requires the measurement of defined benefit and postretirement plan assets and obligations as of the end of the employer's fiscal year. SFAS No. 158's requirement to recognize the funded status in the financial statements is effective for fiscal years ending after December 15, 2006, and its requirement to use the fiscal year-end date as the measurement date is effective for fiscal years ending after December 15, 2008. The Company is currently assessing the impact that SFAS No. 158 will have on its consolidated results of operations and cash flows. However, if SFAS No. 158 were to be applied by the Company as of November 30, 2006, based on a September 30, 2006 measurement date, the effect on its consolidated statement of financial position would be an after-tax charge to Shareholders' equity of approximately $355 million.

Morgan Stanley

## Critical Accounting Policies.

The Company's consolidated financial statements are prepared in accordance with U.S. GAAP, which requires the Company to make estimates and assumptions (see Note 1 to the consolidated financial statements). The Company believes that of its accounting policies (see Note 2 to the consolidated financial statements), the following may involve a higher degree of judgment and complexity.

### Financial Instruments Used For Trading and Investment.

Financial instruments owned and Financial instruments sold, not yet purchased, which include cash and derivative products, are recorded at fair value in the consolidated statements of financial condition, and gains and losses are reflected in Principal transactions trading and investment revenues in the consolidated statements of income. Fair value is the amount at which financial instruments could be exchanged in a current transaction between willing parties, other than in a forced or liquidation sale.

The fair value of the Company's Financial instruments owned and Financial instruments sold, not yet purchased are generally based on observable market prices, observable market parameters or derived from such prices or parameters based on bid prices or parameters for Financial instruments owned and ask prices or parameters for Financial instruments sold, not yet purchased. In the case of financial instruments transacted on recognized exchanges, the observable prices represent quotations for completed transactions from the exchange on which the financial instrument is principally traded. Bid prices represent the highest price a buyer is willing to pay for a financial instrument at a particular time. Ask prices represent the lowest price a seller is willing to accept for a financial instrument at a particular time.

A substantial percentage of the fair value of the Company's Financial instruments owned and Financial instruments sold, not yet purchased is based on observable market prices, observable market parameters, or is derived from such prices or parameters. The availability of observable market prices and pricing parameters can vary from product to product. Where available, observable market prices and pricing parameters in a product (or a related product) may be used to derive a price without requiring significant judgment. In certain markets, observable market prices or market parameters are not available for all products, and fair value is determined using techniques appropriate for each particular product. These techniques involve some degree of judgment.

The price transparency of the particular product will determine the degree of judgment involved in determining the fair value of the Company's financial instruments. Price transparency is affected by a wide variety of factors, including, for example, the type of product, whether it is a new product and not yet established in the marketplace, and the characteristics particular to the transaction. Products for which actively quoted prices or pricing parameters are available or for which fair value is derived from actively quoted prices or pricing parameters will generally have a higher degree of price transparency. By contrast, products that are thinly traded or not quoted will generally have reduced to no price transparency. Even in normally active markets, the price transparency for actively quoted instruments may be reduced for periods of time during periods of market dislocation. Alternatively, in thinly quoted markets, the participation of market-makers willing to purchase and sell a product provides a source of transparency for products that otherwise are not actively quoted or during periods of market dislocation.

The Company's cash products include securities issued by the U.S. government and its agencies, other sovereign debt obligations, corporate and other debt securities, corporate equity securities, exchange traded funds and physical commodities. The fair value of these products is based principally on observable market prices or is derived using observable market parameters. These products generally do not entail a significant degree of judgment in determining fair value. Examples of products for which actively quoted prices or pricing parameters are available or for which fair value is derived from actively quoted prices or pricing parameters include securities issued by the U.S. government and its agencies, exchange traded corporate equity securities, most municipal debt securities, most corporate debt securities, most high-yield debt securities, physical commodities, certain tradable loan products and most mortgage-backed securities.

In certain circumstances, principally involving loan products and other financial instruments held for securitization transactions, the Company determines fair value from within the range of bid and ask prices such that fair value indicates the value likely to be realized in a current market transaction. Bid prices reflect the price that the Company and others pay, or stand ready to pay, to originators of such assets. Ask prices represent the prices that the Company and others require to sell such assets to the entities that acquire the financial instruments for purposes of completing the securitization transactions. Generally, the fair value of such acquired assets is based upon the bid price in the market for the instrument or similar instruments. In general, the loans and similar assets are valued at bid pricing levels until structuring of the related securitization is substantially complete and such that the value likely to be realized in a current transaction is consistent with the price that a securitization entity will pay to acquire the financial instruments. Factors affecting securitized value and investor demand relating specifically to loan products include, but are not limited to, loan type, underlying property type and geographic location, loan interest rate, loan to value ratios, debt service coverage ratio, investor demand and credit enhancement levels.

In addition, some cash products exhibit little or no price transparency, and the determination of fair value requires more judgment. Examples of cash products with little or no price transparency include certain high-yield debt, certain collateralized mortgage obligations, certain tradable loan products, distressed debt securities (i.e., securities of issuers encountering financial difficulties, including bankruptcy or insolvency) and equity securities that are not publicly traded. Generally, the fair value of these types of cash products is determined using one of several valuation techniques appropriate for the product, which can include cash flow analysis, revenue or net income analysis, default recovery analysis (i.e., analysis of the likelihood of default and the potential for recovery) and other analyses applied consistently.

The following table presents the valuation of the Company's cash products included within Financial instruments owned and Financial instruments sold, not yet purchased by level of price transparency (dollars in millions):

| | At November 30, 2006 | | At November 30, 2005 | |
| --- | --- | --- | --- | --- |
| | Assets | Liabilities | Assets | Liabilities |
| Observable market prices, parameters or derived from observable prices or parameters | $295,547 | $124,708 | $203,590 | $101,972 |
| Reduced or no price transparency | 29,863 | 920 | 11,131 | 76 |
| Total | $325,410 | $125,628 | $214,721 | $102,048 |

The Company's derivative products include exchange traded and OTC derivatives. Exchange traded derivatives have valuation attributes similar to the cash products valued using observable market prices or market parameters described above. OTC derivatives, whose fair value is derived using pricing models, include a wide variety of instruments, such as interest rate swap and option contracts, foreign currency option contracts, credit and equity swap and option contracts, and commodity swap and option contracts.

The following table presents the fair value of the Company's exchange traded and OTC derivatives included within Financial instruments owned and Financial instruments sold, not yet purchased (dollars in millions):

| | At November 30, 2006 | | At November 30, 2005 | |
| --- | --- | --- | --- | --- |
| | Assets | Liabilities | Assets | Liabilities |
| Exchange traded | $12,554 | $17,094 | $ 4,491 | $ 8,151 |
| OTC | 42,889 | 40,397 | 41,403 | 36,801 |
| Total | $55,443 | $57,491 | $45,894 | $44,952 |

The fair value of OTC derivative contracts is derived primarily using pricing models, which may require multiple market input parameters. Where appropriate, valuation adjustments are made to account for credit quality and market liquidity. These adjustments are applied on a consistent basis and are based upon observable market data

Morgan Stanley

where available. Prior to the adoption of SFAS No. 157 on December 1, 2006, the Company followed the provisions of EITF Issue No. 02-3 (see "Other Items—Accounting Developments" herein). Under EITF Issue No. 02-3, in the absence of observable market prices or parameters in an active market, observable prices or parameters of other comparable current market transactions, or other observable data supporting a fair value based on a pricing model at the inception of a contract, revenue recognition at the inception of an OTC derivative financial instrument is not permitted. Such revenue is recognized in income at the earlier of when there is market value observability or at the end of the contract period. In the absence of observable market prices or parameters in an active market, observable prices or parameters of other comparable current market transactions, or other observable data supporting a fair value based on a pricing model at the inception of a contract, fair value is based on the transaction price. The Company also uses pricing models to manage the risks introduced by OTC derivatives. Depending on the product and the terms of the transaction, the fair value of OTC derivative products can be modeled using a series of techniques, including closed-form analytic formulae, such as the Black-Scholes option pricing model, simulation models or a combination thereof, applied consistently. In the case of more established derivative products, the pricing models used by the Company are widely accepted by the financial services industry. Pricing models take into account the contract terms, including the maturity, as well as market parameters such as interest rates, volatility and the creditworthiness of the counterparty.

Many pricing models do not entail material subjectivity because the methodologies employed do not necessitate significant judgment, and the pricing inputs are observed from actively quoted markets, as is the case for generic interest rate swap and option contracts. A substantial majority of OTC derivative products valued by the Company using pricing models fall into this category. Other derivative products, typically the newest and most complex products, will require more judgment in the implementation of the modeling technique applied due to the complexity of the modeling assumptions and the reduced price transparency surrounding the model's market parameters. The Company manages its market exposure for OTC derivative products primarily by entering into offsetting derivative contracts or other related financial instruments. The Company's trading divisions, the Financial Control Department and the Market Risk Department continuously monitor the price changes of the OTC derivatives in relation to the offsetting positions. For a further discussion of the price transparency of the Company's OTC derivative products, see "Quantitative and Qualitative Disclosures about Market Risk—Risk Management—Credit Risk" in Part II, Item 7A.

Equity and debt investments purchased in connection with private equity and other principal investment activities initially are valued at cost to approximate fair value. The carrying value of such investments is adjusted when changes in the underlying fair values are readily ascertainable, generally as evidenced by observable market prices or transactions that directly affect the value of such investments. Downward adjustments relating to such investments are made in the event that the Company determines that the fair value is less than the carrying value. The Company's partnership interests, including general partnership and limited partnership interests in real estate funds, are included within Other assets in the consolidated statements of financial condition and are recorded at fair value based upon changes in the fair value of the underlying partnership's net assets.

The Company employs control processes to validate the fair value of its financial instruments, including those derived from pricing models. These control processes are designed to assure that the values used for financial reporting are based on observable market prices or market-based parameters wherever possible. In the event that market prices or parameters are not available, the control processes are designed to assure that the valuation approach utilized is appropriate and consistently applied and that the assumptions are reasonable. These control processes include reviews of the pricing model's theoretical soundness and appropriateness by Company personnel with relevant expertise who are independent from the trading desks. Additionally, groups independent from the trading divisions within the Financial Control and Market Risk Departments participate in the review and validation of the fair values generated from pricing models, as appropriate. Where a pricing model is used to determine fair value, recently executed comparable transactions and other observable market data are considered for purposes of validating assumptions underlying the model. Consistent with market practice, the Company has individually negotiated agreements with certain counterparties to exchange collateral ("margining") based on the level of fair values of the derivative contracts they have executed. Through this margining process, one party or

Morgan Stanley

both parties to a derivative contract provides the other party with information about the fair value of the derivative contract to calculate the amount of collateral required. This sharing of fair value information provides additional support of the Company's recorded fair value for the relevant OTC derivative products. For certain OTC derivative products, the Company, along with other market participants, contributes derivative pricing information to aggregation services that synthesize the data and make it accessible to subscribers. This information is then used to evaluate the fair value of these OTC derivative products. For more information regarding the Company's risk management practices, see "Quantitative and Qualitative Disclosures about Market Risk—Risk Management" in Part II, Item 7A.

**Allowance for Consumer Loan Losses.**

The allowance for consumer loan losses in the Company's Discover business is established through a charge to the provision for consumer loan losses. Provisions are made to reserve for estimated losses in outstanding loan balances. The allowance for consumer loan losses is a significant estimate that represents management's estimate of probable losses inherent in the consumer loan portfolio. The allowance for consumer loan losses is primarily applicable to the owned homogeneous consumer credit card loan portfolio and is evaluated quarterly for adequacy.

In estimating the allowance for consumer loan losses, the Company uses a systematic and consistently applied approach. This process starts with a migration analysis (a technique used to estimate the likelihood that a consumer loan will progress through the various stages of delinquency and ultimately charge-off) of delinquent and current consumer credit card accounts in order to determine the appropriate level of the allowance for consumer loan losses. The migration analysis considers uncollectible principal, interest and fees reflected in consumer loans. In evaluating the adequacy of the allowance for consumer loan losses, management also considers factors that may impact credit losses, including current economic conditions, recent trends in delinquencies and bankruptcy filings, account collection management, policy changes, account seasoning, loan volume and amounts, payment rates and forecasting uncertainties. A provision for consumer loan losses is charged against earnings to maintain the allowance for consumer loan losses at an appropriate level. The use of different estimates or assumptions could produce different provisions for consumer loan losses (see "Discover—Provision for Consumer Loan Losses" herein).

**Legal, Regulatory and Tax Contingencies.**

In the normal course of business, the Company has been named, from time to time, as a defendant in various legal actions, including arbitrations, class actions and other litigation, arising in connection with its activities as a global diversified financial services institution. Certain of the actual or threatened legal actions include claims for substantial compensatory and/or punitive damages or claims for indeterminate amounts of damages. In some cases, the issuers that would otherwise be the primary defendants in such cases are bankrupt or in financial distress.

The Company is also involved, from time to time, in other reviews, investigations and proceedings (both formal and informal) by governmental and self-regulatory agencies regarding the Company's business, including, among other matters, accounting and operational matters, certain of which may result in adverse judgments, settlements, fines, penalties, injunctions or other relief. The number of these reviews, investigations and proceedings has increased in recent years with regard to many firms in the financial services industry, including the Company.

Reserves for litigation and regulatory proceedings are generally determined on a case-by-case basis and represent an estimate of probable losses after considering, among other factors, the progress of each case, prior experience and the experience of others in similar cases, and the opinions and views of internal and external legal counsel. Given the inherent difficulty of predicting the outcome of such matters, particularly in cases where claimants seek substantial or indeterminate damages or where investigations and proceedings are in the early stages, the

Morgan Stanley

Company cannot predict with certainty the loss or range of loss, if any, related to such matters, how such matters will be resolved, when they will ultimately be resolved or what the eventual settlement, fine, penalty or other relief, if any, might be.

The Company is subject to the income tax laws of the U.S., its states and municipalities and those of the foreign jurisdictions in which the Company has significant business operations. These tax laws are complex and subject to different interpretations by the taxpayer and the relevant governmental taxing authorities. The Company must make judgments and interpretations about the application of these inherently complex tax laws when determining the provision for income taxes and must also make estimates about when in the future certain items affect taxable income in the various tax jurisdictions. Disputes over interpretations of the tax laws may be settled with the taxing authority upon examination or audit. The Company regularly assesses the likelihood of assessments in each of the taxing jurisdictions resulting from current and subsequent years' examinations, and tax reserves are established as appropriate.

The Company establishes reserves for potential losses that may arise out of litigation, regulatory proceedings and tax audits to the extent that such losses are probable and can be estimated in accordance with SFAS No. 5. Once established, reserves are adjusted when there is more information available or when an event occurs requiring a change. Significant judgment is required in making these estimates, and the actual cost of a legal claim, tax assessment or regulatory fine/penalty may ultimately be materially different from the recorded reserves, if any.

See Notes 9 and 16 to the consolidated financial statements for additional information on legal proceedings and tax examinations.

**Special Purpose Entities.**

The Company enters into a variety of transactions with special purpose entities ("SPE"), primarily in connection with securitization activities. The Company engages in securitization activities related to commercial and residential mortgage loans, U.S. agency collateralized mortgage obligations, corporate bonds and loans, municipal bonds, credit card loans and other types of financial instruments. In most cases, these SPEs are deemed to be variable interest entities ("VIE"). Unless a VIE is determined to be a qualifying special purpose entity ("QSPE"), the Company is required under accounting guidance to perform an analysis of each VIE at the date upon which the Company becomes involved with it to determine whether the Company is the primary beneficiary of the VIE, in which case the Company must consolidate the VIE. QSPEs are not consolidated. The determination of whether an SPE meets the accounting requirements of a QSPE requires significant judgment, particularly in evaluating whether the permitted activities of the SPE are significantly limited and in determining whether derivatives held by the SPE are passive and nonexcessive. In addition, the analysis involved in determining whether an entity is a VIE, and in determining the primary beneficiary of a VIE, also requires significant judgment.

# Certain Factors Affecting Results of Operations.

The Company's results of operations may be materially affected by market fluctuations and by economic factors. In addition, results of operations in the past have been, and in the future may continue to be, materially affected by many factors of a global nature, including political, economic and market conditions; the availability and cost of capital; the level and volatility of equity prices, commodity prices and interest rates; currency values and other market indices; technological changes and events; the availability and cost of credit; inflation; and investor sentiment and confidence in the financial markets. In addition, there continues to be a heightened level of legislative, legal and regulatory developments related to the financial services industry that potentially could increase costs, thereby affecting future results of operations. Such factors also may have an impact on the Company's ability to achieve its strategic objectives on a global basis. For a further discussion of these and other important factors that could affect the Company's business, see "Risk Factors" in Part I, Item 1A.

Morgan Stanley

## Liquidity and Capital Resources.

The Company's senior management establishes the overall liquidity and capital policies of the Company. Through various risk and control committees, the Company's senior management reviews business performance relative to these policies, monitors the availability of alternative sources of financing, and oversees the liquidity and interest rate and currency sensitivity of the Company's asset and liability position. These committees, along with the Company's Treasury Department and other control groups, also assist in evaluating, monitoring and controlling the impact that the Company's business activities have on its consolidated balance sheet, liquidity and capital structure, thereby helping to ensure that its business activities are integrated with the Company's liquidity and capital policies. For a description of the Company's other principal risks and how they are monitored and managed, see "Quantitative and Qualitative Disclosures about Market Risk—Risk Management" in Part II, Item 7A.

The Company's liquidity and funding risk management policies are designed to mitigate the potential risk that the Company may be unable to access adequate financing to service its financial obligations when they come due without material, adverse franchise or business impact. The key objectives of the liquidity and funding risk management framework are to support the successful execution of the Company's business strategies while ensuring ongoing and sufficient liquidity through the business cycle and during periods of financial distress. The principal elements of the Company's liquidity framework are the cash capital policy, the liquidity reserve and stress testing through the contingency funding plan. Comprehensive financing guidelines (collateralized funding, long-term funding strategy, surplus capacity, diversification, staggered maturities and committed credit facilities) support the Company's target liquidity profile.

### The Balance Sheet.

The Company monitors and evaluates the composition and size of its balance sheet. Given the nature of the Company's market-making and customer financing activities, the size of the balance sheet fluctuates from time to time. A substantial portion of the Company's total assets consists of highly liquid marketable securities and short-term receivables arising principally from its Institutional Securities sales and trading activities. The highly liquid nature of these assets provides the Company with flexibility in financing and managing its business.

The Company's total assets increased to $1,120,645 million at November 30, 2006 from $898,523 million at November 30, 2005. The increase was primarily due to increases in financial instruments owned (largely driven by increases in corporate and other debt and corporate equities), securities borrowed, receivables from customers, and securities received as collateral. The increases were largely the result of an increase in client business opportunities.

Balance sheet leverage ratios are one indicator of capital adequacy when viewed in the context of a company's overall liquidity and capital policies. The Company views the adjusted leverage ratio as a more relevant measure of financial risk when comparing financial services firms and evaluating leverage trends. The Company has adopted a definition of adjusted assets that excludes certain self-funded assets considered to have minimal market, credit and/or liquidity risk. These low-risk assets generally are attributable to the Company's matched book and securities lending businesses. Adjusted assets are calculated by reducing gross assets by aggregate resale agreements and securities borrowed less non-derivative short positions and assets recorded under certain provisions of SFAS No. 140 and FIN 46R. The adjusted leverage ratio reflects the deduction from shareholders' equity of the amount of equity used to support goodwill and intangible assets (as the Company does not view this amount of equity as available to support its risk capital needs). In addition, the Company views junior subordinated debt issued to capital trusts as a component of its capital base given the inherent characteristics of the securities. These characteristics include the long-dated nature (e.g., some have final maturity at issuance of 30 years extendible at the Company's option by a further 19 years, others have a 60-year final maturity at issuance), the Company's ability to defer coupon interest for up to 20 consecutive quarters and the subordinated nature of the obligations in the capital structure. The Company also receives rating agency equity credit for these securities.

Morgan Stanley

The following table sets forth the Company's total assets, adjusted assets and leverage ratios as of November 30, 2006 and November 30, 2005 and for the average month-end balances during fiscal 2006 and fiscal 2005:

| | Balance at | | Average Month-End Balance | |
| --- | --- | --- | --- | --- |
| | November 30, 2006 | November 30, 2005 | Fiscal 2006(1) | Fiscal 2005 |
| | (dollars in millions, except ratio data) | | | |
| Total assets ........................................ | $1,120,645 | $ 898,523 | $1,022,113 | $ 828,009 |
| Less: Securities purchased under agreements to resell ..... | (174,866) | (174,330) | (183,266) | (147,057) |
| Securities borrowed ........................... | (299,631) | (244,241) | (274,807) | (225,984) |
| Add: Financial instruments sold, not yet purchased ....... | 183,119 | 147,000 | 157,678 | 130,936 |
| Less: Derivative contracts sold, not yet purchased ........ | (57,491) | (44,952) | (47,176) | (42,192) |
| Subtotal ................................. | 771,776 | 582,000 | 674,542 | 543,712 |
| Less: Segregated customer cash and securities balances ... | (16,782) | (30,540) | (29,286) | (30,483) |
| Assets recorded under certain provisions of SFAS No. 140 and FIN 46R ........................ | (100,236) | (67,091) | (82,992) | (56,865) |
| Goodwill and net intangible assets ............... | (3,350) | (2,500) | (2,886) | (2,471) |
| Adjusted assets .................................... | $ 651,408 | $ 481,869 | $ 559,378 | $ 453,893 |
| Common equity .................................... | $ 34,264 | $ 29,182 | $ 31,740 | $ 28,501 |
| Preferred equity .................................. | 1,100 | — | 423 | — |
| Shareholders' equity .............................. | 35,364 | 29,182 | 32,163 | 28,501 |
| Junior subordinated debt issued to capital trusts .......... | 4,884 | 2,764 | 3,875 | 2,859 |
| Subtotal ................................. | 40,248 | 31,946 | 36,038 | 31,360 |
| Less: Goodwill and net intangible assets ............... | (3,350) | (2,500) | (2,886) | (2,471) |
| Tangible shareholders' equity ........................ | $ 36,898 | $ 29,446 | $ 33,152 | $ 28,889 |
| Leverage ratio(2) .................................. | 30.4x | 30.5x | 30.8x | 28.7x |
| Adjusted leverage ratio(3) ........................... | 17.7x | 16.4x | 16.9x | 15.7x |

(1) The results for the Company and for the Institutional Securities segment for the first two quarters of fiscal 2006 were adjusted (see "Other Items—Staff Accounting Bulletin No. 108" herein).

(2) Leverage ratio equals total assets divided by tangible shareholders' equity.

(3) Adjusted leverage ratio equals adjusted assets divided by tangible shareholders' equity.

## Activity in Fiscal 2006.

The Company's total capital consists of shareholders' equity, long-term borrowings (debt obligations scheduled to mature in more than 12 months), junior subordinated debt issued to capital trusts, and Capital Units. At November 30, 2006, total capital was $162,134 million, an increase of $36,243 million from November 30, 2005.

During the 12 months ended November 30, 2006, the Company issued senior notes aggregating $49.5 billion, including non-U.S. dollar currency notes aggregating $21.3 billion and $1,989 million of junior subordinated debentures. In connection with the note issuances, the Company has entered into certain transactions to obtain floating interest rates based primarily on short-term London Interbank Offered Rates ("LIBOR") trading levels. At November 30, 2006, the aggregate outstanding principal amount of the Company's Senior Indebtedness (as defined in the Company's senior debt indentures) was approximately $158 billion (including guaranteed obligations of the indebtedness of subsidiaries). The weighted average maturity of the Company's long-term borrowings, based upon stated maturity dates, was approximately 5.5 years at November 30, 2006. Subsequent to fiscal year-end and through January 31, 2007, the Company's long-term borrowings (net of repayments) increased by approximately $11 billion.

Morgan Stanley

Subsequent to fiscal year-end, the Company and Morgan Stanley Finance plc, a U.K. subsidiary, announced the Company's intention to redeem all of the outstanding Capital Units on February 28, 2007.

In July 2006, the Company issued 44,000,000 Depositary Shares, in an aggregate of $1,100 million, representing 1/1,000th of a Share of Floating Rate Non-Cumulative Preferred Stock, Series A, $0.01 par value ("Series A Preferred Stock"). The Series A Preferred Stock is redeemable at the Company's option, in whole or in part, on or after July 15, 2011 at a redemption price of $25,000 per share (equivalent to $25 per Depositary Share). The Series A Preferred Stock also has a preference over the Company's common stock upon liquidation.

**Economic Capital.**

The Company uses an economic capital model to determine the amount of equity capital needed to support the risk of its business activities and to ensure that the Company remains adequately capitalized. The Company calculates economic capital on a going-concern basis, which is defined as the amount of capital needed to run the business through the business cycle and satisfy the requirements of regulators, rating agencies and the market. Business unit economic capital allocations are evaluated by benchmarking to similarly rated peer firms by business segment. The Company believes this methodology provides an indication of the appropriate level of capital for each business segment as if each were an independent operating entity.

Economic capital requirements are allocated to each business segment and are sub-allocated to product lines as appropriate. This process is intended to align equity capital with the risks in each business, provide business managers with tools for measuring and managing risk, and allow senior management to evaluate risk-adjusted returns (such as return on economic capital and shareholder value added) to facilitate resource allocation decisions.

The Company's methodology is based on a going-concern approach that assigns common equity to each business unit based on regulatory capital usage plus additional capital for stress losses, including principal investment risk. Regulatory capital, including additional capital assigned for goodwill and intangible assets, is a minimum requirement to ensure the Company's access to funding and credibility in the market. The Company believes it must be able to sustain stress losses and maintain capital substantially above regulatory minimums while supporting ongoing business activities. The difference between the Company's consolidated book equity and aggregate common equity requirements denotes the Company's unallocated capital position, which is not currently reflected in business segment performance metrics.

The Company assesses stress loss capital across various dimensions of market, credit, business and operational risks. Stress losses are defined at the 90% to 95% confidence interval in order to capture worst potential losses in 10 to 20 years. Stress loss calculations are tangible and transparent and avoid reliance on extreme loss statistical models.

Market risk scenarios capture systematic, idiosyncratic and random market risk through the use of internal market stress data. Credit risk is included in the form of idiosyncratic counterparty default events. Business risk incorporates earnings volatility due to variability in revenue flows, with estimates on the mix of fixed versus variable expenses at various points in the business cycle. Operational stress losses primarily reflect legal risk across the Company.

The Company may enhance the economic capital model and allocation methodology over time in response to changes in the business and regulatory environment to ensure that the model continues to reflect the risks inherent in the Company's business activities and to reflect changes in the drivers of the level and cost of required capital.

Morgan Stanley

The following table presents the Company's allocated average common equity ("economic capital") during fiscal 2006 and fiscal 2005:

| | Fiscal Year | |
| --- | --- | --- |
| | 2006 | 2005 |
| **Average common equity (dollars in billions):** | | |
| Institutional Securities | $18.2 | $14.6 |
| Global Wealth Management Group | 3.2 | 3.7 |
| Asset Management | 2.2 | 1.7 |
| Discover | 4.9 | 4.4 |
| Total from operating segments | 28.5 | 24.4 |
| Discontinued operations | — | 1.2 |
| Unallocated capital | 3.2 | 2.9 |
| Consolidated | $31.7 | $28.5 |

The increase in economic capital allocated to Institutional Securities reflects the increased risk profile that has resulted from the Company's decisions to invest in key businesses. The Company expects this growth to continue, provided market opportunities continue to warrant such investments.

Beginning in the first quarter of fiscal 2007, economic capital will be met by regulatory Tier 1 equity (including common shareholders' equity, certain preferred stock, eligible hybrid capital instruments and deductions of goodwill and certain intangible assets and deferred tax assets), subject to regulatory limits. The Tier 1 equity components will also be reflected in the average common equity allocated to the business segments. This enhancement to the Company's equity capital model and related disclosures will be made on a prospective basis.

The following table presents the Company's fiscal 2006 fourth quarter average common equity as calculated under the current methodology and under the new methodology commencing in the first quarter of fiscal 2007:

| | Current Methodology | Pro Forma under New Methodology | |
| --- | --- | --- | --- |
| | Common Equity | Tier 1 Equity | Common Equity |
| **Fiscal 2006 Fourth Quarter Average Common Equity (dollars in billions):** | | | |
| Total from operating segments | $30.2 | $27.2 | $27.7 |
| Unallocated capital | 3.5 | 6.0 | 6.0 |
| Consolidated | $33.7 | $33.2 | $33.7 |

The $2.5 billion of incremental unallocated capital under the pro forma new methodology is due to the inclusion of eligible hybrid capital instruments, which is partially offset by the inclusion of certain deferred tax assets. A portion of the unallocated capital existing as of November 30, 2006 has been used for the acquisitions and investments that closed subsequent to fiscal year-end (see also "Other Items—Business and Other Acquisitions and Dispositions" herein). The Company currently anticipates that unallocated capital will be used for organic growth, additional acquisitions and other capital needs, including repurchases of common stock.

During fiscal 2007, the Company's shareholders' equity will be affected by the adoption of SFAS No. 157 and SFAS No. 158 (see "Other Items — Accounting Developments" herein).

*Equity Capital Management Policies.*    The Company's senior management views equity capital as an important source of financial strength and, therefore, pursues a strategy of ensuring that the Company's equity capital base adequately reflects and provides protection from the economic risks inherent in its businesses. Capital is required for, among other things, the Company's inventories, underwritings, principal investments, consumer loans, bridge loans and other financings, investments in fixed assets and for future uses. Capital for future uses will be included within unallocated capital until required by the business segments. The Company also considers return

Morgan Stanley

on common equity to be an important measure of its performance, in the context of both the particular business environment in which the Company is operating and its peer group's results. In this regard, the Company actively manages its consolidated equity capital position based upon, among other things, business opportunities, capital availability and rates of return together with internal capital policies, regulatory requirements and rating agency guidelines and, therefore, in the future may expand or contract its equity capital base to address the changing needs of its businesses. The Company attempts to maintain total equity, on a consolidated basis, at least equal to the sum of its operating subsidiaries' equity.

At November 30, 2006, the Company's equity capital (which includes shareholders' equity and junior subordinated debt issued to capital trusts) was $40,248 million, an increase of $8,302 million from November 30, 2005. The Company returns internally generated equity capital that is in excess of the needs of its businesses to its shareholders through common stock repurchases and dividends. During fiscal 2006, the Company purchased approximately $3.4 billion of its common stock (approximately 52 million shares) through open market purchases at an average cost of $65.43 (see also "Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities" in Part II, Item 5).

In December 2006, the Company announced that its Board of Directors had authorized the repurchase of up to $6 billion of the Company's outstanding common stock. This share repurchase authorization replaces the Company's previous repurchase authorizations with one repurchase program for capital management purposes that will consider, among other things, business segment capital needs, as well as equity-based compensation and benefit plan requirements. The Company expects to exercise the authorization over the next 12-18 months at prices the Company deems appropriate, subject to its surplus capital position, market conditions and regulatory considerations.

The Board of Directors determines the declaration and payment of dividends on a quarterly basis. In December 2006, the Company announced that its Board of Directors declared a quarterly dividend per common share of $0.27. The Company also announced that its Board of Directors declared a quarterly dividend of $388.045 per share of Series A Floating Rate Non-Cumulative Preferred Stock (represented by depositary shares, each representing 1/1,000th interest in a share of preferred stock and each having a dividend of $0.388045).

**Liquidity Management Policies.**

The primary goal of the Company's liquidity and funding activities is to ensure adequate financing over a wide range of potential credit ratings and market environments. Given the highly liquid nature of the Company's balance sheet, day-to-day funding requirements are largely fulfilled through the use of stable collateralized financing. The Company has centralized management of credit-sensitive unsecured funding sources in the Treasury Department. In order to meet target liquidity requirements and withstand an unforeseen contraction in credit availability, the Company has designed a liquidity management framework.

| Liquidity Management Framework: | Designed to: |
|---|---|
| Contingency Funding Plan | Ascertain the Company's ability to manage a prolonged liquidity contraction and provide a course of action over a one-year time period to ensure orderly functioning of the businesses. The contingency funding plan sets forth the process and the internal and external communication flows necessary to ensure effective management of the contingency event. Analytical processes exist to periodically evaluate and report the liquidity risk exposures of the organization under management-defined scenarios. |
| Cash Capital | Ensure that the Company can fund its balance sheet while repaying its financial obligations maturing within one year without issuing new unsecured debt. The Company attempts to achieve this by maintaining sufficient cash capital (long-term debt and equity capital) to finance illiquid assets and the portion of its securities inventory that is not expected to be financed on a secured basis in a credit-stressed environment. |

Morgan Stanley

| Liquidity Management Framework: | Designed to: |
|---|---|
| Liquidity Reserve | Maintain, at all times, a liquidity reserve composed of immediately available cash and cash equivalents and a pool of unencumbered securities that can be sold or pledged to provide same-day liquidity to the Company. The reserve is periodically assessed and determined based on day-to-day funding requirements and strategic liquidity targets. The liquidity reserve averaged approximately $44 billion during fiscal 2006, of which approximately $36 billion on average was held at the parent company. |

**Contingency Funding Plan.**

The Company's Contingency Funding Plan ("CFP") model incorporates a wide range of potential cash outflows during a liquidity stress event, including, but not limited to, the following: (i) repayment of all unsecured debt maturing within one year; (ii) maturity roll-off of outstanding letters of credit with no further issuance and replacement with cash collateral; (iii) return of unsecured securities borrowed and any cash raised against these securities; (iv) additional collateral that would be required by counterparties in the event of a ratings downgrade; (v) higher haircuts on or lower availability of secured funding; (vi) client cash withdrawals; (vii) drawdowns on unfunded commitments provided to third parties; and (viii) discretionary unsecured debt buybacks.

The Company's CFP is developed at the legal entity level in order to capture specific cash requirements and availability for the parent company and each of its major operating subsidiaries. The CFP assumes that the parent company does not have access to cash that may be trapped at subsidiaries due to regulatory, legal or tax constraints. In addition, the CFP assumes that the parent company does not draw down on its committed credit facilities.

**Cash Capital.**

The Company maintains a cash capital model that measures long-term funding sources against requirements. Sources of cash capital include the parent company's equity and the non-current portion of certain long-term borrowings. Uses of cash capital include the following: (i) illiquid assets such as buildings, equipment, goodwill, net intangible assets, exchange memberships, deferred tax assets and principal investments; (ii) a portion of securities inventory that is not expected to be financed on a secured basis in a credit-stressed environment (i.e., stressed haircuts); and (iii) expected drawdowns on unfunded commitments.

The Company seeks to maintain a surplus cash capital position. The Company's equity capital of $40,248 million (including junior subordinated debt issued to capital trusts), long-term borrowings (debt obligations scheduled to mature in more than 12 months) of $121,820 million and Capital Units of $66 million comprised the Company's total capital of $162,134 million as of November 30, 2006, which substantially exceeded cash capital requirements.

**Liquidity Reserve.**

The Company seeks to maintain a target liquidity reserve that is sized to cover daily funding needs and to meet strategic liquidity targets, including coverage of a significant portion of expected cash outflows over a short-term horizon in a potential liquidity crisis. This liquidity reserve is held in the form of cash deposits with banks and a pool of unencumbered securities. The Company manages the pool of unencumbered securities, against which funding can be raised, on a global basis, and securities for the pool are chosen accordingly. The U.S. and non-U.S. components, held in the form of a reverse repurchase agreement at the parent company, consists of U.S. and European government bonds and other high-quality collateral and at November 30, 2006 were approximately $41 billion and averaged approximately $26 billion for the year ended November 30, 2006. The parent company cash component of the liquidity reserve at November 30, 2006 was approximately $7 billion and averaged approximately $10 billion for the year ended November 30, 2006. The Company believes that diversifying the form in which its liquidity reserve (cash and securities) is maintained enhances its ability to quickly and

Morgan Stanley

efficiently source funding in a stressed environment. The Company's funding requirements and target liquidity reserve may vary based on changes in the level and composition of its balance sheet, timing of specific transactions, client financing activity, market conditions and seasonal factors.

**Committed Credit Facilities.**

The maintenance of committed credit facilities serves to further diversify the Company's funding sources. The Company values committed credit as a secondary component of its liquidity management framework. The committed credit facilities include a diversification of lenders to the Company covering geographic regions, including North America, Europe and Asia.

The Company maintains a senior revolving credit agreement with a group of banks to support general liquidity needs, including the issuance of commercial paper, which consists of three separate tranches: a U.S. dollar tranche with the Company as borrower; a Japanese yen tranche with Morgan Stanley Japan Securities Co., Ltd. ("MSJS") as borrower and the Company as borrower and guarantor for MSJS borrowings; and a multicurrency tranche available in both euro and sterling with the Company as borrower. Under this combined facility (the "Credit Facility"), the banks are committed to provide up to $7.5 billion under the U.S. dollar tranche, 80 billion Japanese yen under the Japanese yen tranche and $3.25 billion under the multicurrency tranche. At November 30, 2006, the Company had a $16.4 billion consolidated stockholders' equity surplus as compared with the Credit Facility's covenant requirement.

The Company anticipates that it may utilize the Credit Facility for short-term funding from time to time (see Note 7 to the consolidated financial statements). The Company does not believe that any of the covenant requirements in its Credit Facility will impair its ability to obtain funding under the Credit Facility, pay its current level of dividends or obtain loan arrangements, letters of credit and other financial guarantees or other financial accommodations. At November 30, 2006, no borrowings were outstanding under the Credit Facility.

The Company and its subsidiaries also maintain certain committed bilateral credit facilities to support general liquidity needs. These facilities are expected to be drawn from time to time to cover short-term funding needs.

On a yearly basis, the Company's committed credit strategy is reviewed and approved by its senior management. This strategy takes the Company's total liquidity sources into consideration when determining the appropriate size and mix of committed credit.

The Company, through several of its subsidiaries, maintains several funded committed credit facilities to support various businesses, including (without limitation), the collateralized commercial and residential mortgage whole loan, derivative contracts, warehouse lending, emerging market loan, structured product, corporate loan, investment banking and prime brokerage businesses.

**Capital Covenant.**

In October 2006, the Company executed a replacement capital covenant in connection with the offering by Morgan Stanley Capital Trust VII (the "Trust") of $1,100,000,000 aggregate liquidation amount of its 6.60% Trust Preferred Securities (the "Capital Securities"). Under the terms of the replacement capital covenant, the Company has agreed, for the benefit of the holders of covered debt, as described below, that it will not, and will cause the Trust and its subsidiaries not to, redeem or repurchase any of the Capital Securities (or the debentures that the Company issued to the Trust that underlie the Capital Securities) on or after January 15, 2046 and prior to October 15, 2066, unless (i) the Company has obtained any then required regulatory approval and (ii) during a specified 180-day period the Company has received net proceeds from the sale of specified replacement capital securities. The initial class of covered debtholders are the holders of the junior subordinated debentures underlying the capital securities of Morgan Stanley Capital Trust VI and the holders of such capital securities. For a complete description of the replacement capital securities and the other terms of the replacement capital covenant, see the Company's Current Report on Form 8-K dated October 12, 2006.

Morgan Stanley

**Funding Management Policies.**

The Company funds its balance sheet on a global basis through diverse sources. These sources include the Company's equity capital; long-term debt; repurchase agreements; U.S., Canadian, Euro, Japanese and Australian commercial paper; asset-backed securitizations; letters of credit; unsecured bond borrowings; securities lending; buy/sell agreements; municipal reinvestments; promissory notes; master notes; and committed and uncommitted lines of credit. Repurchase agreement transactions, securities lending and a portion of the Company's bank borrowings are made on a collateralized basis and, therefore, provide a more stable source of funding than short-term unsecured borrowings. The Company has active financing programs for both standard and structured products in the U.S., European and Asian markets, targeting global investors and currencies such as the U.S. dollar, euro, British pound, Australian dollar and Japanese yen.

The Company's bank subsidiaries solicit deposits from consumers, purchase Federal Funds, issue short-term institutional certificates of deposits and issue bank notes. Interest bearing deposits are classified by type as savings, brokered and other time deposits. Savings deposits consist primarily of money market deposit accounts sold nationally and savings deposits obtained from individual securities clients. Brokered deposits consist primarily of certificates of deposit issued by the Company's bank subsidiaries. Other time deposits include individual and institutional certificates of deposit.

The Company's funding management policies are designed to provide for financings that are executed in a manner that reduces the risk of disruption to the Company's operations that would result from an interruption in the availability of the Company's funding sources. The Company pursues a strategy of diversification of funding sources (by product, by investor and by region) and attempts to ensure that the tenor of the Company's liabilities equals or exceeds the expected holding period of the assets being financed. Maturities of financings are designed to manage exposure to refinancing risk in any one period. The Company maintains a surplus of unused short-term funding sources at all times to withstand any unforeseen contraction in credit capacity. In addition, the Company attempts to maintain cash and unhypothecated marketable securities equal to at least 110% of its outstanding short-term unsecured borrowings. The Company also maintains committed credit facilities (described above) to support its ongoing borrowing programs.

*Secured Financing.*   A substantial portion of the Company's total assets consists of highly liquid marketable securities and short-term receivables arising principally from its Institutional Securities sales and trading activities. The highly liquid nature of these assets provides the Company with flexibility in financing these assets with stable collateralized borrowings, while the securitization market allows for the securitization of the credit card receivables arising from the Company's Discover business.

The Company's goal is to maximize funding through less credit sensitive collateralized borrowings and asset securitizations in order to reduce reliance on unsecured financing. The Institutional Securities business emphasizes the use of collateralized short-term borrowings to limit the growth of short-term unsecured funding, which is more typically subject to disruption during periods of financial stress. As part of this effort, the Institutional Securities business continually seeks to expand its global secured borrowing capacity. Similarly, Discover, through its use of the securitization market, reduces the need for other unsecured parent company financing.

*Unsecured Financing.*   The Company views long-term debt as a stable source of funding for core inventories, consumer loans and illiquid assets. In general, securities inventories not financed by secured funding sources and the majority of current assets are financed with a combination of short-term funding, floating rate long-term debt or fixed rate long-term debt swapped to a floating rate. Fixed assets are financed with fixed rate long-term debt. Both fixed rate and floating rate long-term debt (in addition to sources of funds accessed directly by the Company's Discover business) are used to finance the Company's consumer loan portfolio. Consumer loan financing is targeted to match the repricing and duration characteristics of the loans financed. The Company uses

Morgan Stanley                                              86

derivative products (primarily interest rate, currency and equity swaps) to assist in asset and liability management, reduce borrowing costs and hedge interest rate risk (see Note 8 to the consolidated financial statements).

The Company issues long-term debt in excess of the amount necessary to meet the needs of its securities inventory and less liquid assets as determined by its Cash Capital Policy. In addition to these needs, long-term debt funding is employed to enhance the Company's liquidity position by reducing reliance on short-term credit sensitive instruments (e.g., commercial paper and other unsecured short-term borrowings). Availability and cost of financing to the Company can vary depending on market conditions, the volume of certain trading and lending activities, the Company's credit ratings and the overall availability of credit.

The Company has a portfolio approach for managing the unsecured debt issued by the parent company. This approach gives the Company flexibility to manage the unsecured debt portfolio across maturities, currencies, investors and regions, taking into account market capacity and pricing. Down-lending to subsidiaries is managed to ensure that intercompany borrowings mature before those of the parent company. Liquidity and funding policies recognize potential constraints on the Company's ability to transfer funds between regulated entities and the parent company.

During fiscal 2006, the Company's long-term financing strategy was driven, in part, by its continued focus on improving its balance sheet strength (evaluated through enhanced capital and liquidity positions), a significant factor in the maintenance of strong credit ratings. As a result, for fiscal 2006, $39 billion of unsecured debt was issued (excluding certain equity-linked and credit-linked products not considered to be a component of the Company's cash capital). Financing transactions were structured to ensure staggered maturities, thereby mitigating refinancing risk, and a diversified investor base was targeted through sales to domestic as well as international institutional and retail clients. Unsecured debt issuance activity resulted in a net increase in the long-term debt component of the cash capital portfolio of approximately $24 billion. During fiscal 2006, the Company also issued an aggregate of $3.1 billion of hybrid and equity capital securities in furtherance of its capital management objectives. This included $1.1 billion of non-cumulative perpetual preferred stock and $1.1 billion of enhanced trust preferred securities.

## Credit Ratings.

The Company's reliance on external sources to finance a significant portion of its day-to-day operations makes access to global sources of financing important. The cost and availability of unsecured financing generally are dependent on the Company's short-term and long-term credit ratings. Factors that are significant to the determination of the Company's credit ratings or that otherwise affect its ability to raise short-term and long-term financing include the Company's level and volatility of earnings, relative positions in the markets in which it operates, geographic and product diversification, retention of key personnel, risk profile, risk management policies, cash liquidity, capital structure, corporate lending credit risk, and legal and regulatory developments. In addition, continuing consolidation in the credit card industry presents Discover with stronger competitors that may challenge future growth. A deterioration in any of the previously mentioned factors or combination of these factors may lead rating agencies to downgrade the credit ratings of the Company, thereby increasing the cost to the Company in obtaining unsecured funding. In addition, the Company's debt ratings can have a significant impact on certain trading revenues, particularly in those businesses where longer term counterparty performance is critical, such as OTC derivative transactions, including credit derivatives and interest rate swaps.

In connection with certain OTC trading agreements and certain other agreements associated with the Institutional Securities business, the Company would be required to provide additional collateral to certain counterparties in the event of a downgrade by either Moody's Investors Service or Standard & Poor's. At November 30, 2006, the amount of additional collateral that would be required in the event of a one-notch downgrade of the Company's senior debt credit rating was approximately $1,184 million. Of this amount, $561 million relates to bilateral

Morgan Stanley

arrangements between the Company and other parties where upon the downgrade of one party, the downgraded party must deliver incremental collateral to the other. These bilateral downgrade arrangements are a risk management tool used extensively by the Company as credit exposures are reduced if counterparties are downgraded.

As of January 31, 2007, the Company's credit ratings were as follows:

|  | Commercial Paper | Senior Debt |
|---|---|---|
| Dominion Bond Rating Service Limited ................................... | R-1 (middle) | AA (low) |
| Fitch Ratings(1) ........................................................ | F1+ | AA- |
| Moody's Investors Service .............................................. | P-1 | Aa3 |
| Rating and Investment Information, Inc. .................................. | a-1+ | AA |
| Standard & Poor's(2) ................................................... | A-1 | A+ |

(1) On December 19, 2006, Fitch Ratings changed the outlook on the Company's senior debt ratings from Stable to Negative.
(2) On October 27, 2006, Standard & Poor's changed the outlook on the Company's senior debt ratings from Stable to Positive.

**Off-Balance Sheet Arrangements.**

The Company enters into various arrangements with unconsolidated entities, including variable interest entities, primarily in connection with its Institutional Securities and Discover businesses.

***Institutional Securities Activities.*** The Company utilizes SPEs primarily in connection with securitization activities. The Company engages in securitization activities related to commercial and residential mortgage loans, U.S. agency collateralized mortgage obligations, corporate bonds and loans, municipal bonds and other types of financial assets. The Company may retain interests in the securitized financial assets as one or more tranches of the securitization. These retained interests are included in the consolidated statements of financial condition at fair value. Any changes in the fair value of such retained interests are recognized in the consolidated statements of income. Retained interests in securitized financial assets associated with the Company's Institutional Securities business were approximately $4.8 billion at November 30, 2006, the majority of which were related to residential mortgage loan, U.S. agency collateralized mortgage obligation and commercial mortgage loan securitization transactions. For further information about the Company's Institutional Securities securitization activities, see Notes 2 and 4 to the consolidated financial statements. In addition, see Note 19 to the consolidated financial statements for information about variable interest entities and the Company's arrangements with these entities.

The Company has entered into liquidity facilities with SPEs and other counterparties, whereby the Company is required to make certain payments if losses or defaults occur. The Company often may have recourse to the underlying assets held by the SPEs in the event payments are required under such liquidity facilities (see Note 20 to the consolidated financial statements).

***Discover Activities.*** The asset securitization market is an important source of funding for the Company's Discover business. By utilizing this market, the Company further diversifies its funding sources, realizes cost-effective funding and reduces reliance on the Company's other funding sources, including unsecured debt. The securitization transaction structures utilized for the Discover business are accounted for as sales; i.e., off-balance sheet transactions in accordance with U.S. GAAP (see Notes 2 and 5 to the consolidated financial statements). In connection with its credit card securitization program, the Company transfers credit card receivables, on a revolving basis, to a trust, which issues asset-backed securities that are registered with the SEC, are used to support the issuance of publicly listed notes or are privately placed. This structure includes certain features designed to protect the investors that could result in earlier-than-expected amortization of the transactions,

Morgan Stanley

potentially resulting in the need for the Company to obtain alternative funding arrangements. The primary feature relates to the availability and adequacy of cash flows in the securitized pool of receivables to meet contractual requirements ("economic early amortization").

Economic early amortization risk reflects the possibility of negative net securitization cash flows (which would occur if the coupon, contractual servicing fee and net charge-offs exceeded the collections of finance charges and cardmember fees on securitized credit card receivables) and is driven primarily by the trust's credit card receivables performance (in particular, receivables yield, cardmember fees and credit losses incurred) as well as the contractual rate of return of the asset-backed securities. In the event of an economic early amortization, receivables that otherwise would have been subsequently purchased by the trust from the Company would instead continue to be recognized on the Company's consolidated statements of financial condition since the cash flows generated in the trust would instead be used to repay investors in the asset-backed securities. Recognizing these receivables would require the Company to obtain alternative funding.

***Guarantees.*** FASB Interpretation No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others" ("FIN 45") requires the Company to disclose information about its obligations under certain guarantee arrangements. FIN 45 defines guarantees as contracts and indemnification agreements that contingently require a guarantor to make payments to the guaranteed party based on changes in an underlying measure (such as an interest or foreign exchange rate, a security or commodity price, an index, or the occurrence or non-occurrence of a specified event) related to an asset, liability or equity security of a guaranteed party. FIN 45 also defines guarantees as contracts that contingently require the guarantor to make payments to the guaranteed party based on another entity's failure to perform under an agreement as well as indirect guarantees of the indebtedness of others.

The table below summarizes certain information regarding derivative contracts, financial guarantees to third parties, market value guarantees and liquidity facilities at November 30, 2006:

| Type of Guarantee | Maximum Potential Payout/Notional | | | | | Carrying Amount | Collateral/ Recourse |
| | Years to Maturity | | | | | | |
| | Less than 1 | 1-3 | 3-5 | Over 5 | Total | | |
| | (dollars in millions) | | | | | | |
| Notional amount of derivative contracts . . . . . . . . . . . . . . . | $688,352 | $688,882 | $1,267,757 | $1,240,811 | $3,885,802 | $37,547 | $119 |
| Standby letters of credit and other financial guarantees . . . . . . . . . . . . . | 2,017 | 772 | 552 | 3,231 | 6,572 | 152 | 1,621 |
| Market value guarantees . . . . | — | 172 | 30 | 628 | 830 | 48 | 133 |
| Liquidity facilities . . . . . . . . . | 1,692 | — | — | 110 | 1,802 | — | — |

See Note 20 to the consolidated financial statements for information on indemnities, exchange/clearinghouse member guarantees, general partner guarantees, securitized asset guarantees, merchant chargeback guarantees and other guarantees.

Morgan Stanley

**Contractual Obligations and Contingent Liabilities and Commitments.**

In connection with its operating activities, the Company enters into certain contractual obligations, as well as commitments to fund certain fixed assets and other less liquid investments.

In the normal course of business, the Company enters into various contractual obligations that may require future cash payments. Contractual obligations at November 30, 2006 include long-term borrowings, operating leases and purchase obligations. The Company's future cash payments associated with its contractual obligations as of November 30, 2006 are summarized below:

| | Payments Due in: | | | | |
| --- | --- | --- | --- | --- | --- |
| | Fiscal 2007 | Fiscal 2008-2009 | Fiscal 2010-2011 | Thereafter | Total |
| | (dollars in millions) | | | | |
| Long-term borrowings(1) .......................... | $18,274 | $45,665 | $22,719 | $58,320 | $144,978 |
| Operating leases – office facilities(2) ................ | 506 | 913 | 590 | 1,852 | 3,861 |
| Operating leases – equipment(2) ................... | 374 | 428 | 145 | 44 | 991 |
| Purchase obligations(3) .......................... | 1,736 | 601 | 157 | 24 | 2,518 |
| Total ...................................... | $20,890 | $47,607 | $23,611 | $60,240 | $152,348 |

(1) See Note 8 to the consolidated financial statements.
(2) See Note 9 to the consolidated financial statements.
(3) Purchase obligations for goods and services include payments for, among other things, consulting, outsourcing, advertising, sponsorship, and computer and telecommunications maintenance agreements. Purchase obligations at November 30, 2006 reflect the minimum contractual obligation under legally enforceable contracts with contract terms that are both fixed and determinable. These amounts exclude obligations for goods and services that already have been incurred and are reflected on the Company's consolidated balance sheet. Purchase obligations also include amounts related to the acquisitions of Saxon, FrontPoint and CityMortgage (see "Other Items — Business and Other Acquisitions and Dispositions" herein).

The Company's commitments associated with outstanding letters of credit, other financial guarantees, investment activities, and corporate lending and financing commitments as of November 30, 2006 are summarized below by period of expiration. Since commitments associated with letters of credit, other financial guarantees, and lending and financing arrangements may expire unused, the amounts shown do not necessarily reflect the actual future cash funding requirements:

| | Years to Maturity | | | | |
| --- | --- | --- | --- | --- | --- |
| | Less than 1 | 1-3 | 3-5 | Over 5 | Total |
| | (dollars in millions) | | | | |
| Letters of credit and other financial guarantees(1) ........ | $ 5,694 | $ 66 | $ — | $ — | $ 5,760 |
| Investment activities ................................ | 636 | 422 | 8 | 213 | 1,279 |
| Investment grade corporate lending commitments(2) ...... | 4,023 | 5,662 | 17,009 | 7,612 | 34,306 |
| Non-investment grade corporate lending commitments(2) .. | 1,357 | 2,881 | 2,316 | 11,255 | 17,809 |
| Commitments for secured lending transactions(3) ........ | 9,813 | 5,879 | 30 | 166 | 15,888 |
| Commitments to purchase mortgage loans(4) ............ | 5,062 | — | — | — | 5,062 |
| Total(5) ...................................... | $26,585 | $14,910 | $19,363 | $19,246 | $80,104 |

(1) This amount represents the Company's outstanding letters of credit and other financial guarantees, which are primarily used to satisfy various collateral requirements. This amount also includes commercial loan commitments to small businesses.
(2) The Company's investment grade and non-investment grade primary and secondary lending commitments are made in connection with corporate lending and other business activities. Credit ratings for primary commitments are determined by the Company's Institutional Credit Department using methodologies generally consistent with those employed by external rating agencies. Credit ratings of BB+ or lower are considered non-investment grade.

Morgan Stanley

(3)  This amount represents lending commitments extended by the Company to companies that are secured by assets of the borrower. Loans made under these arrangements typically are at variable rates and generally provide for over-collateralization based upon the creditworthiness of the borrower.

(4)  This amount represents the Company's forward purchase contracts involving mortgage loans.

(5)  See Note 9 to the consolidated financial statements.

The table above does not include commitments to extend credit for consumer loans of approximately $274 billion. Such commitments arise primarily from agreements with customers for unused lines of credit on certain credit cards, provided there is no violation of conditions established in the related agreement. These commitments, substantially all of which the Company can terminate at any time and which do not necessarily represent future cash requirements, are periodically reviewed based on account usage and customer creditworthiness. In addition, in the ordinary course of business, the Company guarantees the debt and/or certain trading obligations (including obligations associated with derivatives, foreign exchange contracts and the settlement of physical commodities) of certain subsidiaries. These guarantees generally are entity or product specific and are required by investors or trading counterparties. The activities of the subsidiaries covered by these guarantees (including any related debt or trading obligations) are included in the Company's consolidated financial statements.

At November 30, 2006, the Company had commitments to enter into reverse repurchase and repurchase agreements of approximately $104 billion and $76 billion, respectively.

**Principal Investments.**

Principal investing activities are capital investments in companies, generally for proprietary purposes, to maximize total returns to the Company. The Company has committed to increasing its principal investing activity. At November 30, 2006, the Company had aggregate principal investments with a carrying value of approximately $1.8 billion, which are included within Other assets in the consolidated statement of financial condition. The Company intends to make additional investments over time to bring the level of principal investments to approximately $2.5 billion.

**Regulatory Requirements.**

Morgan Stanley & Co. Incorporated ("MS&Co.") and Morgan Stanley DW Inc. ("MSDWI") are registered broker-dealers and registered futures commission merchants and, accordingly, are subject to the minimum net capital requirements of the SEC, the NYSE and the Commodity Futures Trading Commission. Morgan Stanley & Co. International Limited ("MSIL"), a London-based broker-dealer subsidiary, is subject to the capital requirements of the Financial Services Authority, and MSJS, a Tokyo-based broker-dealer subsidiary, is subject to the capital requirements of the Financial Services Agency. MS&Co., MSDWI, MSIL and MSJS have consistently operated in excess of their respective regulatory capital requirements (see Note 13 to the consolidated financial statements).

In fiscal 2007, the Company intends to merge MSDWI into MS&Co. Upon completion of the merger, the surviving entity, MS&Co., will be the Company's principal U.S. broker-dealer.

Under regulatory capital requirements adopted by the Federal Deposit Insurance Corporation (the "FDIC") and other bank regulatory agencies, FDIC-insured financial institutions must maintain (a) 3% to 5% of Tier 1 capital, as defined, to average assets ("leverage ratio"), (b) 4% of Tier 1 capital, as defined, to risk-weighted assets ("Tier 1 risk-weighted capital ratio") and (c) 8% of total capital, as defined, to risk-weighted assets ("total risk-weighted capital ratio"). At November 30, 2006, the leverage ratio, Tier 1 risk-weighted capital ratio and total risk-weighted capital ratio of each of the Company's FDIC-insured financial institutions exceeded these regulatory minimums.

Morgan Stanley

Certain other U.S. and non-U.S. subsidiaries are subject to various securities, commodities and banking regulations and capital adequacy requirements promulgated by the regulatory and exchange authorities of the countries in which they operate. These subsidiaries have consistently operated in excess of their local capital adequacy requirements. Morgan Stanley Derivative Products Inc., the Company's triple-A rated derivative products subsidiary, maintains certain operating restrictions that have been reviewed by various rating agencies.

Effective December 1, 2005, the Company became a consolidated supervised entity ("CSE") as defined by the SEC. As such, the Company is subject to group-wide supervision and examination by the SEC and to minimum capital requirements on a consolidated basis. As of November 30, 2006, the Company was in compliance with the CSE capital requirements.

MS&Co. is required to hold tentative net capital in excess of $1 billion and net capital in excess of $500 million in accordance with the market and credit risk standards of Appendix E of Rule 15c3-1. MS&Co. is also required to notify the SEC in the event that its tentative net capital is less than $5 billion. As of November 30, 2006, MS&Co. had tentative net capital in excess of the minimum and the notification requirements.

**Effects of Inflation and Changes in Foreign Exchange Rates.**

The Company's assets to a large extent are liquid in nature and, therefore, are not significantly affected by inflation, although inflation may result in increases in the Company's expenses, which may not be readily recoverable in the price of services offered. To the extent inflation results in rising interest rates and has other adverse effects upon the securities markets, upon the value of financial instruments and upon the markets for consumer credit services, it may adversely affect the Company's financial position and profitability.

A significant portion of the Company's business is conducted in currencies other than the U.S. dollar, and changes in foreign exchange rates relative to the U.S. dollar can therefore affect the value of non-U.S. dollar net assets, revenues and expenses. Potential exposures as a result of these fluctuations in currencies are closely monitored, and, where cost-justified, strategies are adopted that are designed to reduce the impact of these fluctuations on the Company's financial performance. These strategies may include the financing of non-U.S. dollar assets with direct or swap-based borrowings in the same currency and the use of currency forward contracts or the spot market in various hedging transactions related to net assets, revenues, expenses or cash flows.

## Item 7A.   Quantitative and Qualitative Disclosures about Market Risk.

## Risk Management.

### Risk Management Policy and Control Structure.

Risk is an inherent part of the Company's business and activities. The Company's ability to properly and effectively identify, assess, monitor and manage each of the various types of risk involved in its activities is critical to its soundness and profitability. The Company's broad-based portfolio of business activities helps reduce the impact that volatility in any particular area or related areas may have on its net revenues as a whole. The Company seeks to identify, assess, monitor and manage, in accordance with defined policies and procedures, the following principal risks involved in the Company's business activities: market, credit, operational, legal, and liquidity and funding risk. Liquidity and funding risk is discussed in "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources" in Part II, Item 7. The Company's currency exposure relating to its net monetary investments in non-U.S. dollar functional currency subsidiaries is discussed in Note 13 to the consolidated financial statements.

The cornerstone of the Company's risk management philosophy is protection of the Company's franchise, reputation and financial standing. The Company's risk management philosophy is based on the following principles: comprehensiveness, independence, accountability, defined risk tolerance and transparency. Given the importance of effective risk management to the Company's reputation, senior management requires thorough and frequent communication and appropriate escalation of risk matters.

Risk management at the Company requires independent Company-level oversight, accountability of the Company's business segments, constant communication, judgment, and knowledge of specialized products and markets. The Company's senior management takes an active role in the identification, assessment and management of various risks at both the Company and business segment level. In recognition of the increasingly varied and complex nature of the global financial services business, the Company's risk management philosophy, with its attendant policies, procedures and methodologies, is evolutionary in nature and subject to ongoing review and modification.

The nature of the Company's risks, coupled with this risk management philosophy, informs the Company's risk governance structure. The Company's risk governance structure includes the Firm Risk Committee and the Capital Structure and Strategic Transactions Committee, the Chief Risk Officer, the Internal Audit Department, independent control groups, and various risk control managers, committees and groups located within the business segments.

The Firm Risk Committee, composed of the Company's most senior officers, oversees the Company's risk management structure. The Firm Risk Committee's responsibilities include oversight of the Company's risk management principles, procedures and limits, and the monitoring of material financial, operational and franchise risks. The Firm Risk Committee is overseen by the Audit Committee of the Board of Directors (the "Audit Committee"). The Capital Structure and Strategic Transactions Committee (the "Capital Committee") reviews strategic transactions for the Company and significant changes to the Company's capital structure. The Capital Committee's responsibilities include reviewing measures of capital and evaluating capital resources relative to the Company's risk profile and strategy.

The Chief Risk Officer, a member of the Firm Risk Committee, oversees compliance with Company risk limits; approves certain excessions of Company risk limits; reviews material market and credit risks; and reviews results of risk management processes with the Audit Committee.

The Internal Audit Department provides independent risk and control assessment and reports to the Audit Committee and administratively to the Chief Legal Officer. The Internal Audit Department periodically examines the Company's operational and control environment and conducts audits designed to cover all major risk categories.

Morgan Stanley

The Market Risk, Credit Risk, Operational Risk, Financial Control, Treasury, and Legal and Compliance Departments (collectively, the "Company Control Groups"), which are all independent of the Company's business units, assist senior management and the Firm Risk Committee in monitoring and controlling the Company's risk through a number of control processes. The Company is committed to employing qualified personnel with appropriate expertise in each of its various administrative and business areas to implement effectively the Company's risk management and monitoring systems and processes.

Each business segment has a risk committee that is responsible for ensuring that the business segment, as applicable, adheres to established limits for market, credit, operational and other risks; implements risk measurement, monitoring, and management policies and procedures that are consistent with the risk framework established by the Firm Risk Committee; and reviews, on a periodic basis, its aggregate risk exposures, risk exception experience, and the efficacy of its risk identification, measurement, monitoring and management policies and procedures, and related controls.

Each of the Company's business segments also has designated operations officers, committees and groups, including operations and information technology groups (collectively, "Segment Control Groups" and, together with the Company Control Groups, the "Control Groups") to manage and monitor specific risks and report to the business segment risk committee. The Control Groups work together to review the risk monitoring and risk management policies and procedures relating to, among other things, the business segment's market and credit risk profile, sales practices, pricing of consumer loans and reserve adequacy, reputation, legal enforceability, and operational and technological risks. Participation by the senior officers of the Control Groups helps ensure that risk policies and procedures, exceptions to risk limits, new products and business ventures, and transactions with risk elements undergo a thorough review.

The following is a discussion of the Company's risk management policies and procedures for its principal risks (other than liquidity and funding risk). The discussion focuses on the Company's securities activities (primarily its institutional trading activities) and consumer lending and related activities. The Company believes that these activities generate a substantial portion of its principal risks. This discussion and the estimated amounts of the Company's market risk exposure generated by the Company's statistical analyses are forward-looking statements. However, the analyses used to assess such risks are not predictions of future events, and actual results may vary significantly from such analyses due to events in the markets in which the Company operates and certain other factors described below.

**Market Risk.**

Market risk refers to the risk that a change in the level of one or more market prices, rates, indices, implied volatilities (the price volatility of the underlying instrument imputed from option prices), correlations or other market factors, such as liquidity, will result in losses for a position or portfolio. Generally, the Company incurs market risk as a result of trading and client facilitation activities, principally within the Institutional Securities business where the substantial majority of the Company's Value-at-Risk ("VaR") for market risk exposures is generated. In addition, the Company incurs trading-related market risk within the Global Wealth Management Group. Asset Management incurs non-trading market risk primarily from capital investments in funds and investments in private equity vehicles. In its consumer lending activities, Discover is also exposed to non-trading market risk primarily through changes in interest rates.

Sound market risk management is an integral part of the Company's culture. The various business units and trading desks are responsible for ensuring that market risk exposures are well-managed and prudent. The Control Groups help ensure that these risks are measured and closely monitored and are made transparent to senior management. The Market Risk Department is responsible for ensuring transparency of material market risks, monitoring compliance with established limits, and escalating risk concentrations to appropriate senior management. To execute these responsibilities, the Market Risk Department monitors the Company's risk against limits on aggregate risk exposures, performs a variety of risk analyses, routinely reports risk summaries

and maintains the Company's VaR system. A variety of limits are designed to control price and liquidity risk. Market risk is monitored through various measures: statistically (using VaR and related analytical measures); by measures of position sensitivity; and through routine stress testing and scenario analyses conducted by the Market Risk Department in collaboration with the business units. The material risks identified by these processes are summarized in reports produced by the Market Risk Department that are circulated to, and discussed with, senior management.

*Sales and Trading and Related Activities.*

*Primary Market Risk Exposures and Market Risk Management.*   During fiscal 2006, the Company had exposures to a wide range of interest rates, equity prices, foreign exchange rates and commodity prices—and the associated implied volatilities and spreads—related to the global markets in which it conducts its trading activities. The Company is exposed to interest rate and credit spread risk as a result of its market-making activities and proprietary trading in interest rate sensitive financial instruments (e.g., risk arising from changes in the level or implied volatility of interest rates, the timing of mortgage prepayments, the shape of the yield curve and credit spreads). Among the markets in which the Company is active and from which activities those exposures arise are the following: emerging market corporate and government debt, non-investment grade and distressed corporate debt, investment grade corporate debt, and asset-backed debt. Moreover, some of these markets, such as non-investment grade corporate debt, have experienced periods of illiquidity in the past, and may do so in the future. The Company is exposed to equity price and implied volatility risk as a result of making markets in equity securities and derivatives and maintaining proprietary positions (including positions in non-public entities). The Company is exposed to foreign exchange rate and implied volatility risk as a result of making markets in foreign currencies and foreign currency options and from maintaining foreign exchange positions. The Company is exposed to commodity price and implied volatility risk as a result of market-making activities and maintaining positions in physical commodities (such as crude and refined oil products, natural gas, electricity, and precious and base metals) and related derivatives.

The Company manages its trading positions by employing a variety of risk mitigation strategies. These strategies include diversification of risk exposures and hedging. Hedging activities consist of the purchase or sale of positions in related securities and financial instruments, including a variety of derivative products (e.g., futures, forwards, swaps and options). The Company manages the market risk associated with its trading activities on a Company-wide basis, on a worldwide trading division level and on an individual product basis. The Company manages and monitors its market risk exposures in such a way as to maintain a portfolio that the Company believes is well-diversified in the aggregate with respect to market risk factors and that reflects the Company's aggregate risk tolerance as established by the Company's senior management.

Aggregate market risk limits have been approved for the Company and for its major trading divisions worldwide (equity and fixed income, which includes interest rate products, credit products, foreign exchange and commodities). Additional market risk limits are assigned to trading desks and, as appropriate, products and regions. Trading division risk managers, desk risk managers, traders and the Market Risk Department monitor market risk measures against limits in accordance with policies set by senior management.

The Market Risk Department independently reviews the Company's trading portfolios on a regular basis from a market risk perspective utilizing VaR and other quantitative and qualitative risk measures and analyses. The Company's trading businesses and the Market Risk Department also use, as appropriate, measures such as sensitivity to changes in interest rates, prices, implied volatilities and time decay to monitor and report market risk exposures. Stress testing, which measures the impact on the value of existing portfolios of specified changes in market factors for certain products, is performed periodically and is reviewed by trading division risk managers, desk risk managers and the Market Risk Department. The Market Risk Department also conducts scenario analyses, which estimate the Company's revenue sensitivity to a set of specific, predefined market and geopolitical events.

*Value-at-Risk (VaR).*   The Company uses the statistical technique known as VaR as one of the tools used to measure, monitor and review the market risk exposures of its trading portfolios. The Market Risk Department calculates and distributes daily VaR-based risk measures to various levels of management.

Morgan Stanley

***VaR Methodology, Assumptions and Limitations.*** The Company estimates VaR using a model based on historical simulation for major market risk factors and Monte Carlo simulation for name-specific risk in certain equity and fixed income exposures. Historical simulation involves constructing a distribution of hypothetical daily changes in the value of trading portfolios based on two sets of inputs: historical observation of daily changes in key market indices or other market factors ("market risk factors"); and information on the sensitivity of the portfolio values to these market risk factor changes. The Company's VaR model uses approximately four years of historical data to characterize potential changes in market risk factors. The Company's 95%/one-day VaR corresponds to the unrealized loss in portfolio value that, based on historically observed market risk factor movements, would have been exceeded with a frequency of 5%, or five times in every 100 trading days, if the portfolio were held constant for one day.

The Company's VaR model generally takes into account linear and non-linear exposures to price risk and interest rate risk, and linear exposures to implied volatility risks. Market risks that are incorporated in the VaR model include equity and commodity prices, interest rates, foreign exchange rates and associated implied volatilities. As a supplement to the use of historical simulation for major market risk factors, the Company's VaR model uses Monte Carlo simulation to capture name-specific risk in equities and credit products (i.e., corporate bonds and credit derivatives).

The Company's VaR models evolve over time in response to changes in the composition of trading portfolios and to improvements in modeling techniques and systems capabilities. As part of regular process improvement, additional systematic and name-specific risk factors may be added to improve the VaR model's ability to more accurately estimate risks to specific asset classes or industry sectors.

Among their benefits, VaR models permit estimation of a portfolio's aggregate market risk exposure, incorporating a range of varied market risks; reflect risk reduction due to portfolio diversification or hedging activities; and can cover a wide range of portfolio assets. However, VaR risk measures should be interpreted carefully in light of the methodology's limitations, which include the following: past changes in market risk factors may not always yield accurate predictions of the distributions and correlations of future market movements; changes in portfolio value in response to market movements (especially for complex derivative portfolios) may differ from the responses calculated by a VaR model; VaR using a one-day time horizon does not fully capture the market risk of positions that cannot be liquidated or hedged within one day; the historical market risk factor data used for VaR estimation may provide only limited insight into losses that could be incurred under market conditions that are unusual relative to the historical period used in estimating the VaR; and published VaR results reflect past trading positions while future risk depends on future positions. The Company is aware of these and other limitations and, therefore, uses VaR as only one component in its risk management oversight process. As explained above, this process also incorporates stress testing and scenario analyses and extensive risk monitoring, analysis, and control at the trading desk, division and Company levels.

***VaR for Fiscal 2006.*** The table below presents the Company's Aggregate (Trading and Non-trading), Trading and Non-trading VaR for each of the Company's primary market risk exposures at November 30, 2006 and November 30, 2005, incorporating substantially all financial instruments generating market risk that are managed by the Company's trading businesses. This measure of VaR incorporates most of the Company's trading-related market risks. However, a small proportion of trading positions generating market risk is not included in VaR, and the modeling of the risk characteristics of some positions relies upon approximations that, under certain circumstances, could produce significantly different VaR results from those produced using more precise measures. For example, risks associated with residential mortgage-backed securities have been approximated as it is difficult to capture precisely these risks within a VaR context.

Aggregate Trading and Non-trading VaR also incorporates (a) the funding liabilities related to institutional trading positions and (b) public company equity positions recorded as investments by the Company. Investments made by the Company that are not publicly traded are not reflected in the VaR results reported below. Aggregate

Morgan Stanley

Trading and Non-trading VaR also excludes certain funding liabilities primarily related to fixed and other non-trading assets. As of November 30, 2006, the notional amount of funding liabilities related to non-trading assets (including office facilities and other equipment, goodwill, deferred tax assets, and intangible assets) was approximately $7.9 billion, with a duration of approximately 7.3 years.

Since the VaR statistics reported below are estimates based on historical position and market data, VaR should not be viewed as predictive of the Company's future revenues or financial performance or of its ability to monitor and manage risk. There can be no assurance that the Company's actual losses on a particular day will not exceed the VaR amounts indicated below or that such losses will not occur more than five times in 100 trading days.

In the third quarter of fiscal 2006, the Company changed the confidence level at which VaR is reported for limit and other management purposes from a 99% confidence level to a 95% confidence level. The Company believes that for risk management purposes, the 95% VaR statistic is a more useful estimator of possible trading losses resulting from adverse daily market moves. The Company also believes this change will facilitate comparisons with other companies in the financial services industry. The table below presents 95%/one-day VaR for each of the Company's primary risk exposures and on an aggregate basis at November 30, 2006 and November 30, 2005.

| | Aggregate (Trading and Non-trading) 95%/One-Day VaR at November 30, | | Trading 95%/One-Day VaR at November 30, | | Non-trading 95%/One-Day VaR at November 30, | |
|---|---|---|---|---|---|---|
| **Table 1: 95% Total VaR** **Primary Market Risk Category** | **2006** | **2005** | **2006** | **2005** | **2006** | **2005** |
| | | | (dollars in millions) | | | |
| Interest rate and credit spread ........... | $ 41 | $ 37 | $ 38 | $ 34 | $ 13 | $ 20 |
| Equity price ......................... | 58 | 29 | 55 | 26 | 5 | 7 |
| Foreign exchange rate .................. | 9 | 6 | 9 | 6 | — | — |
| Commodity price ..................... | 31 | 34 | 31 | 34 | — | — |
| Subtotal ............................ | 139 | 106 | 133 | 100 | 18 | 27 |
| Less diversification benefit(1) ........... | 50 | 45 | 48 | 44 | 3 | 4 |
| Total VaR ........................... | $ 89 | $ 61 | $ 85 | $ 56 | $ 15 | $ 23 |

(1)  Diversification benefit equals the difference between Total VaR and the sum of the VaRs for the four risk categories. This benefit arises because the simulated one-day losses for each of the four primary market risk categories occur on different days; similar diversification benefits also are taken into account within each category.

The Company's Aggregate VaR and Trading VaR at November 30, 2006 were $89 million and $85 million, respectively, compared with $61 million and $56 million, respectively, at November 30, 2005. The increase in Aggregate VaR and Trading VaR at year-end was driven primarily by increased directional exposure to equity products. Non-trading VaR at November 30, 2006 decreased to $15 million from $23 million at November 30, 2005, primarily due to a decrease in Non-trading interest rate and credit spread VaR. The overall increase reflects the Company's strategy to grow key businesses, such as its principal investing activities, and to take advantage of the opportunities presented by market conditions. The Company expects to continue to invest in its businesses and to increase its risk profile, provided market opportunities continue to warrant such growth.

The Company views average Trading VaR over the fiscal year as more representative of trends in the business than VaR at any single point in time. Table 2 below, which presents the high, low and average 95%/one-day Trading VaR during fiscal 2006 and fiscal 2005, represents substantially all of the Company's trading activities. Certain market risks included in the year-end Aggregate VaR discussed above are excluded from these measures (e.g., equity price risk in public company equity positions recorded as principal investments by the Company and certain funding liabilities related to trading positions).

Morgan Stanley

Average Trading VaR for fiscal 2006 increased to $60 million from $57 million in fiscal 2005, reflecting increases in equity price VaR and commodity price VaR. The increase in equity price VaR was predominantly driven by increased directional exposure to equity products. The increase in commodity price VaR was predominantly driven by increased exposures to energy products (i.e., natural gas and electricity) and oil products (i.e., crude and distillates).

| Table 2: 95% High/Low/Average Trading VaR | Daily 95%/One-Day VaR for Fiscal 2006 | | | Daily 95%/One-Day VaR for Fiscal 2005 | | |
|---|---|---|---|---|---|---|
| Primary Market Risk Category | High | Low | Average | High | Low | Average |
| | | | (dollars in millions) | | | |
| Interest rate and credit spread . . . . . . . . . . . . . . . . . . . . . . . . | $48 | $29 | $35 | $57 | $27 | $37 |
| Equity price . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 55 | 21 | 28 | 34 | 18 | 25 |
| Foreign exchange rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23 | 5 | 9 | 16 | 5 | 8 |
| Commodity price  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 43 | 23 | 30 | 35 | 19 | 26 |
| Trading VaR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $85 | $49 | $60 | $77 | $38 | $57 |

### VaR Statistics Under Varying Assumptions.

VaR statistics are not readily comparable across firms because of differences in the breadth of products included in each firm's VaR model, in the statistical assumptions made when simulating changes in market factors, and in the methods used to approximate portfolio revaluations under the simulated market conditions. These differences can result in materially different VaR estimates for similar portfolios. As a result, VaR statistics are more reliable and relevant when used as indicators of trends in risk taking within a firm rather than as a basis for inferring differences in risk taking across firms. Table 3 below presents the VaR statistics that would result if the Company were to adopt alternative parameters for its calculations, such as the reported confidence level (95% versus 99%) for the VaR statistic or a shorter historical time series (four years versus one year) for market data upon which it bases its simulations:

| Table 3: Average 95% and 99% Trading VaR with Four-Year/One-Year Historical Time Series | Average 95%/One-Day VaR for Fiscal 2006 | | Average 99%/One-Day VaR for Fiscal 2006 | |
|---|---|---|---|---|
| Primary Market Risk Category | Four-Year Factor History | One-Year Factor History | Four-Year Factor History | One-Year Factor History |
| | | (dollars in millions) | | |
| Interest rate and credit spread . . . . . . . . . . . . . . . . . . . | $35 | $29 | $59 | $44 |
| Equity price . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28 | 28 | 41 | 41 |
| Foreign exchange rate . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 | 9 | 14 | 14 |
| Commodity price  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30 | 35 | 48 | 69 |
| Trading VaR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $60 | $58 | $92 | $94 |

In addition, if the Company were to report Trading VaR (using a four-year historical time series) with respect to a 10-day holding period, the Company's 95% and 99% Average Trading VaR for fiscal 2006 would have been $188 million and $291 million, respectively.

Morgan Stanley

***Distribution of VaR Statistics and Net Revenues for Fiscal 2006.***

As shown in Table 2 above, the Company's average 95%/one-day Trading VaR for fiscal 2006 was $60 million. The histogram below presents the distribution of the Company's daily 95%/one-day Trading VaR for fiscal 2006. The most frequently occurring value was between $57 million and $60 million, while for approximately 93% of trading days during the fiscal year, VaR ranged between $51 million and $69 million.



One method of evaluating the reasonableness of the Company's VaR model as a measure of the Company's potential volatility of net revenue is to compare the VaR with actual trading revenue. Assuming no intra-day trading, for a 95%/one-day VaR, the expected number of times that trading losses should exceed VaR during the fiscal year is 13, and, in general, if trading losses were to exceed VaR more than 21 times in a year, the accuracy of the VaR model could be questioned. Accordingly, the Company evaluates the reasonableness of its VaR model by comparing the potential declines in portfolio values generated by the model with actual trading results. The histogram below shows the distribution of daily net revenue during fiscal 2006 for the Company's trading businesses (including net interest and commissions but excluding primary and prime brokerage revenue credited to the trading businesses).

Morgan Stanley



The Company observed a net trading loss of $87 million on one business day during fiscal 2006, which exceeded the 95%/one-day VaR for that day.

**Consumer Lending and Related Activities.**

*Interest Rate Risk and Management.*    In its consumer lending activities, the Company is exposed to market risk primarily from changes in interest rates. Such changes in interest rates impact interest earning assets, principally credit card and other consumer loans and net excess servicing fees received in connection with consumer loans sold through asset securitizations, as well as the interest sensitive liabilities that finance these assets, including asset-backed securitizations, long-term borrowings and deposits.

The Company's interest rate risk management policies are designed to reduce the potential volatility of earnings that may arise from changes in interest rates by having a financing portfolio that reflects the existing repricing schedules of consumer loans as well as the Company's right, with notice to cardmembers, to reprice certain fixed rate consumer loans to a new interest rate in the future. To the extent that asset and related financing repricing characteristics of a particular portfolio are not matched effectively, the Company may utilize interest rate derivative contracts, such as swap agreements, to achieve its objectives. Interest rate swap agreements effectively convert the underlying asset or financing from fixed to variable repricing or from variable to fixed repricing.

*Sensitivity Analysis Methodology, Assumptions and Limitations.*    For its consumer lending activities, the Company uses a variety of techniques to assess its interest rate risk exposure, one of which is interest rate sensitivity simulation. For purposes of presenting the possible earnings effect of a hypothetical, adverse change in interest rates over the 12-month period from its fiscal year-end, the Company assumes that all interest rate sensitive assets and liabilities will be impacted by a hypothetical, immediate 100-basis-point increase in interest rates as of the beginning of the period.

Interest rate sensitive assets are assumed to be those for which the stated interest rate is not contractually fixed for the next 12-month period. A portion of the Company's credit card receivables has a fixed interest rate, although the Company has the right, with notice to cardmembers, to subsequently reprice these receivables to a

Morgan Stanley                    100

new interest rate. Therefore, the Company considers the receivables with a fixed interest rate to be interest rate sensitive. The Company measured the earnings sensitivity for these assets from the expected repricing date, which takes into consideration the required notice period and billing cycles. In addition, assets that have a market-based index, such as the prime rate, which will reset before the end of the 12-month period, or assets with rates that are fixed at fiscal year-end but which will mature, or otherwise contractually reset to a market-based indexed or other fixed rate prior to the end of the 12-month period, are rate sensitive. The latter category includes certain credit card loans that may be offered at below-market rates for an introductory period, such as for balance transfers and special promotional programs, after which the loans will contractually reprice in accordance with the Company's normal market-based pricing structure. For purposes of measuring rate sensitivity for such loans, only the effect of the hypothetical 100-basis-point change in the underlying market-based indexed or other fixed rate has been considered rather than the full change in the rate to which the loan would contractually reprice. For assets that have a fixed interest rate at fiscal year-end but which contractually will, or are assumed to, reset to a market-based indexed or other fixed rate during the next 12 months, earnings sensitivity is measured from the expected repricing date. In addition, for all interest rate sensitive assets, earnings sensitivity is calculated net of expected loan losses.

Interest rate sensitive liabilities are assumed to be those for which the stated interest rate is not contractually fixed for the next 12-month period. Thus, liabilities that have a market-based index, such as Fed Funds or LIBOR rates, which will reset before the end of the 12-month period, or liabilities whose rates are fixed at fiscal year-end but which will mature and are assumed to be replaced with a market-based indexed rate prior to the end of the 12-month period, are rate sensitive. For these fixed rate liabilities, earnings sensitivity is measured from the expected repricing date.

Assuming a hypothetical, immediate 100-basis-point increase in the interest rates affecting all interest rate sensitive assets and liabilities as of November 30, 2006, it is estimated that the pre-tax income of consumer lending and related activities over the following 12-month period would be reduced by approximately $125 million. The comparable reduction of pre-tax income for the 12-month period following November 30, 2005 was estimated to be approximately $36 million. The increase in the reduction in pre-tax income at November 30, 2006 was due to a higher level of variable rate funding.

The hypothetical model assumes that the balances of interest rate sensitive assets and liabilities at fiscal year-end will remain constant over the next 12-month period. It does not assume any growth, strategic change in business focus, change in asset pricing philosophy or change in asset/liability funding mix. Thus, this model represents a static analysis that cannot adequately portray how the Company would respond to significant changes in market conditions. Furthermore, the analysis does not necessarily reflect the Company's expectations regarding the movement of interest rates in the near term, including the likelihood of an immediate 100-basis-point change in market interest rates, nor necessarily the actual effect on earnings if such rate changes were to occur.

**Credit Risk.**

Credit risk refers to the risk of loss arising from borrower or counterparty default when a borrower, counterparty or obligor is unable to meet its financial obligations. The Company is exposed to three distinct types of credit risk in its businesses. The Company incurs significant, "single-name" credit risk exposure through the Institutional Securities business. This type of risk requires credit analysis of specific counterparties, both initially and on an ongoing basis. The Company incurs "individual consumer" credit risk in the Global Wealth Management Group business through margin loans to individual investors, which are generally collateralized, and loans to small businesses. The Company incurs "consumer portfolio" credit risk in the Discover business primarily through cardholder receivables. Credit risk in a pool of credit card receivables is generally highly diversified, without significant individual exposures, and, accordingly, is managed on a portfolio and not a single-name basis.

The Company has structured its credit risk management framework to reflect that each of these businesses generates unique credit risks that are appropriately managed discretely. The Institutional Credit Department ("Institutional Credit") manages credit risk exposure for the Institutional Securities business. Institutional Credit

Morgan Stanley

is responsible for ensuring transparency of material credit risks, ensuring compliance with established limits, approving material extensions of credit, and escalating risk concentrations to appropriate senior management. Credit risk exposure in the Global Wealth Management Group business is managed through various credit risk committees, whose membership includes Institutional Credit. The Global Wealth Management Group Risk Management Department is responsible for monitoring, measuring and analyzing credit risk exposures, including margin loans and credit sensitive, higher risk transactions. Credit risk exposure in the Discover business is managed through the Discover Credit and Market Risk Committee, which, in turn, is supported by business line specific risk committees and the Credit Risk Management Department, which is responsible for the development, validation and implementation of credit policy criteria, for predictive models, for the monitoring of performance for both new and existing products, and for oversight of adherence to existing policies and limits.

*Institutional Securities Activities.*

*Corporate Lending.*   In connection with certain of its Institutional Securities business activities, the Company provides loans or lending commitments (including bridge financing) to selected clients. These loans and commitments have varying terms, may be senior or subordinated, may be secured or unsecured, are generally contingent upon representations, warranties and contractual conditions applicable to the borrower, and may be syndicated or traded by the Company. The borrowers may be rated investment grade or non-investment grade. Credit risk with respect to loans and lending commitments arises from the failure of a borrower to perform according to the terms of the loan agreement. Commitments associated with these business activities may expire unused, or may be cancelled or reduced at the request of the counterparty, and, therefore, they do not necessarily reflect the actual future cash funding requirements. In addition, commitments associated with acquisition financing activities are generally contingent on the completion of the underlying transaction as well as upon various terms and conditions, and also can be short-term in nature, as borrowers often replace them with other funding sources.

*Securitized Products.*   The Company also extends loans and lending commitments to clients that are secured by assets of the borrower and generally provide for over-collateralization, including commercial real estate, loans secured by loan pools, corporate and operating company loans, and secured lines of revolving credit. Credit risk with respect to these loans and lending commitments arises from the failure of a borrower to perform according to the terms of the loan agreement and a decline in collateral value.

*Other.*   In addition to the activities performed by Institutional Credit, there are credit risks managed by various business areas within Institutional Securities. For example, certain businesses with heightened settlement risk monitor compliance with established settlement risk limits. Certain risk management activities as they pertain to establishing appropriate collateral amounts for the Company's prime brokerage and securitized product businesses are primarily monitored within those areas in that they determine the appropriate collateral level for each strategy or position. In addition, a collateral management group monitors collateral levels against requirements and oversees the administration of the collateral function.

*Derivative Contracts.*   In the normal course of business, the Company enters into a variety of derivative contracts related to financial instruments and commodities. The Company uses these instruments for trading and investment purposes, as well as for asset and liability management. These instruments generally represent future commitments to swap interest payment streams, exchange currencies, or purchase or sell commodities and other financial instruments on specific terms at specified future dates. Many of these products have maturities that do not extend beyond one year, although swaps, options and equity warrants typically have longer maturities.

The Company incurs credit risk as a dealer in OTC derivatives. Credit risk with respect to derivative instruments arises from the failure of a counterparty to perform according to the terms of the contract. The Company's exposure to credit risk at any point in time is represented by the fair value of the derivative contracts reported as assets. The fair value of derivatives represents the amount at which the derivative could be exchanged in a current transaction between willing parties, other than in a forced or liquidation sale, and is further described in Note 2 to the consolidated financial statements. Future changes in interest rates, foreign currency exchange rates,

Morgan Stanley                                          102

or the fair values of the financial instruments, commodities, or indices underlying these contracts ultimately may result in cash settlements exceeding fair value amounts recognized in the consolidated statements of financial condition.

***Analyzing Credit Risk.*** Credit risk management takes place at the transaction, counterparty and portfolio levels. In order to help protect the Company from losses resulting from these activities, Institutional Credit analyzes all material lending and derivative transactions and ensures that the creditworthiness of the Company's counterparties and borrowers is reviewed regularly and that credit exposure is actively monitored and managed. Institutional Credit assigns obligor credit ratings to the Company's counterparties and borrowers. These credit ratings are intended to assess a counterparty's probability of default and are derived using methodologies generally consistent with those employed by external rating agencies. Credit ratings of "BB+" or below are considered non-investment grade. Additionally, for lending transactions, Institutional Credit evaluates the relative position of the Company's particular obligation in the borrower's capital structure and relative recovery prospects, as well as collateral (if applicable) and other structural elements of the particular transaction. The Company has credit guidelines that limit potential credit exposure to any one borrower or counterparty and to aggregates of borrowers or counterparties. Institutional Credit administers these limits and monitors and reports credit exposure relative to limits.

***Risk Mitigation.*** The Company may seek to mitigate credit risk from its lending and derivatives transactions in multiple ways. At the transaction level, the Company seeks to mitigate risk through management of key risk elements such as size, tenor, seniority and collateral. The Company actively hedges its lending and derivatives exposure through various financial instruments which may include single name, portfolio and structured credit derivatives. Additionally, the Company may sell, assign or sub-participate funded loans and lending commitments to other financial institutions in the primary and secondary loan market. In connection with its derivatives trading activities, the Company may enter into master netting agreements and collateral arrangements with counterparties. These agreements may provide the Company with the ability to offset a counterparty's rights and obligations, request additional collateral when necessary or liquidate the collateral in the event of counterparty default.

***Credit Exposure-Corporate Lending.*** At November 30, 2006 and November 30, 2005, the aggregate value of primary investment grade loans and financial accommodations was $6.4 billion and $5.0 billion, respectively, and the aggregate value of primary non-investment grade loans and positions was $3.4 billion and $2.3 billion, respectively. At November 30, 2006 and November 30, 2005, the aggregate value of primary lending commitments outstanding was $49.2 billion and $37.0 billion, respectively. The increase from the prior year was primarily related to acquisition financing activity. In connection with these business activities (which include corporate funded loans and lending commitments), the Company had hedges with a notional amount of $26.5 billion and $17.8 billion at November 30, 2006 and November 30, 2005, respectively, including both internal and external hedges utilized by the lending business. The table below shows the Company's credit exposure from its corporate lending positions and commitments as of November 30, 2006. Since commitments associated with these business activities may expire unused, they do not necessarily reflect the actual future cash funding requirements:

### Corporate Lending Commitments and Funded Loans

| Credit Rating(1) | Years to Maturity | | | | Total Corporate Lending Exposure(2) | Corporate Loans |
|---|---|---|---|---|---|---|
| | Less than 1 | 1-3 | 3-5 | Over 5 | | |
| | | | | (dollars in millions) | | |
| AAA ............................... | $ 251 | $ 120 | $ 268 | $ — | $ 639 | $ — |
| AA ................................. | 1,452 | 1,797 | 2,364 | 931 | 6,544 | 785 |
| A .................................. | 1,151 | 2,497 | 5,886 | 1,241 | 10,775 | 387 |
| BBB .............................. | 2,246 | 4,068 | 9,579 | 4,780 | 20,673 | 5,209 |
| Non-investment grade ................ | 1,942 | 3,020 | 2,851 | 12,572 | 20,385 | 3,414 |
| Total ......................... | $7,042 | $11,502 | $20,948 | $19,524 | $59,016 | $9,795 |
| Notional amount of hedges owned ...... | | | | | $26,545 | |

Morgan Stanley

(1) Obligor credit ratings are determined by Institutional Credit using methodologies generally consistent with those employed by external rating agencies.

(2) Total corporate lending exposure includes both primary lending commitments and funded loans.

***Credit Exposure-Derivatives.***    The table below presents a summary by counterparty credit rating and remaining contract maturity of the fair value of OTC derivatives in a gain position at November 30, 2006. Fair value represents the risk reduction arising from master netting agreements, where applicable, and, in the final column, net of collateral received (principally cash and U.S. government and agency securities):

### OTC Derivative Products—Financial Instruments Owned(1)

| Credit Rating(2) | Years to Maturity | | | | Cross-Maturity and Cash Collateral Netting(3) | Net Exposure Post-Cash Collateral | Net Exposure Post-Collateral |
|---|---|---|---|---|---|---|---|
| | Less than 1 | 1-3 | 3-5 | Over 5 | | | |
| | | | | (dollars in millions) | | | |
| AAA . . . . . . . . . . . . . . . . . . . | $ 1,545 | $ 1,229 | $   977 | $ 2,517 | $ (1,675) | $ 4,593 | $ 4,457 |
| AA . . . . . . . . . . . . . . . . . . . . . | 7,933 | 3,864 | 5,048 | 13,379 | (16,384) | 13,840 | 13,134 |
| A . . . . . . . . . . . . . . . . . . . . . . | 3,669 | 2,955 | 2,645 | 7,917 | (8,572) | 8,614 | 7,581 |
| BBB . . . . . . . . . . . . . . . . . . . . | 2,903 | 2,747 | 3,085 | 2,029 | (3,363) | 7,401 | 5,559 |
| Non-investment grade . . . . . . . | 3,252 | 1,670 | 2,385 | 2,379 | (3,362) | 6,324 | 3,152 |
| Unrated(4) . . . . . . . . . . . . . . . | 1,300 | 649 | 273 | 381 | (486) | 2,117 | 212 |
| Total . . . . . . . . . . . . . . . | $20,602 | $13,114 | $14,413 | $28,602 | $(33,842) | $42,889 | $34,095 |

(1) Fair values shown present the Company's exposure to counterparties related to the Company's OTC derivative products. The table does not include the effect of any related hedges utilized by the Company. The table also excludes fair values corresponding to other credit exposures, such as those arising from the Company's lending activities.

(2) Obligor credit ratings are determined by Institutional Credit using methodologies generally consistent with those employed by external rating agencies.

(3) Amounts represent the netting of receivable balances with payable balances for the same counterparty across maturity categories. Receivable and payable balances with the same counterparty in the same maturity category are netted within such maturity category, where appropriate. Cash collateral received is netted on a counterparty basis, provided right of offset exists.

(4) In lieu of making an individual assessment of the creditworthiness of unrated companies, the Company makes a determination that the collateral held with respect to such obligations is sufficient to cover a substantial portion of its exposure. In making this determination, the Company takes into account various factors, including legal uncertainties and market volatility.

The following tables summarize the fair values of the Company's OTC derivative products recorded in Financial instruments owned and Financial instruments sold, not yet purchased by product category and maturity at November 30, 2006, including on a net basis, where applicable, reflecting the fair value of related non-cash collateral for financial instruments owned:

### OTC Derivative Products—Financial Instruments Owned

| Product Type | Years to Maturity | | | | Cross-Maturity and Cash Collateral Netting(1) | Net Exposure Post-Cash Collateral | Net Exposure Post-Collateral |
|---|---|---|---|---|---|---|---|
| | Less than 1 | 1-3 | 3-5 | Over 5 | | | |
| | | | | (dollars in millions) | | | |
| Interest rate and currency swaps, interest rate options, credit derivatives and other fixed income securities contracts . . . . . . . . . . . | $ 3,804 | $ 5,402 | $ 8,882 | $26,351 | $(25,072) | $19,367 | $16,414 |
| Foreign exchange forward contracts and options . . . . . . . . . . . . . . . | 7,333 | 679 | 147 | 23 | (869) | 7,313 | 5,842 |
| Equity securities contracts (including equity swaps, warrants and options) . . . . . . . . . . . . . . . | 4,604 | 1,924 | 999 | 179 | (2,890) | 4,816 | 2,594 |
| Commodity forwards, options and swaps . . . . . . . . . . . . . . . . . . . . | 4,861 | 5,109 | 4,385 | 2,049 | (5,011) | 11,393 | 9,245 |
| Total . . . . . . . . . . . . . . . . . . . . | $20,602 | $13,114 | $14,413 | $28,602 | $(33,842) | $42,889 | $34,095 |

Morgan Stanley

(1) Amounts represent the netting of receivable balances with payable balances for the same counterparty across maturity and product categories. Receivable and payable balances with the same counterparty in the same maturity category are netted within the maturity category, where appropriate. Cash collateral received is netted on a counterparty basis, provided legal right of offset exists.

**OTC Derivative Products—Financial Instruments Sold, Not Yet Purchased(1)**

| Product Type | Years to Maturity | | | | Cross-Maturity and Cash Collateral Netting(2) | Total |
|---|---|---|---|---|---|---|
| | Less than 1 | 1-3 | 3-5 | Over 5 | | |
| | | | (dollars in millions) | | | |
| Interest rate and currency swaps, interest rate options, credit derivatives and other fixed income securities contracts . . . . . . | $ 4,947 | $ 5,606 | $ 6,953 | $18,014 | $(19,946) | $15,574 |
| Foreign exchange forward contracts and options . . . . . . . . . . . . . . . . . . . . . . . . | 8,014 | 551 | 89 | 37 | (967) | 7,724 |
| Equity securities contracts (including equity swaps, warrants and options) . . . . | 2,823 | 3,028 | 1,697 | 694 | (1,329) | 6,913 |
| Commodity forwards, options and swaps . . . . . . . . . . . . . . . . . . . . . . . . . | 5,888 | 6,214 | 2,220 | 1,695 | (5,831) | 10,186 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . | $21,672 | $15,399 | $10,959 | $20,440 | $(28,073) | $40,397 |

(1) Since these amounts are liabilities of the Company, they do not result in credit exposures.
(2) Amounts represent the netting of receivable balances with payable balances for the same counterparty across maturity and product categories. Receivable and payable balances with the same counterparty in the same maturity category are netted within the maturity category, where appropriate. Cash collateral paid is netted on a counterparty basis, provided legal right of offset exists.

The Company's derivatives (both listed and OTC) at November 30, 2006 and November 30, 2005 are summarized in the table below, showing the fair value of the related assets and liabilities by product:

| Product Type | At November 30, 2006 | | At November 30, 2005 | |
|---|---|---|---|---|
| | Assets | Liabilities | Assets | Liabilities |
| | | (dollars in millions) | | |
| Interest rate and currency swaps, interest rate options, credit derivatives and other fixed income securities contracts . . . . . . . . . . | $19,444 | $15,688 | $17,157 | $13,212 |
| Foreign exchange forward contracts and options . . . . . . . . . . . . . . . . . . | 7,325 | 7,725 | 7,548 | 7,597 |
| Equity securities contracts (including equity swaps, warrants and options) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16,705 | 23,155 | 7,290 | 11,957 |
| Commodity forwards, options and swaps . . . . . . . . . . . . . . . . . . . . . . . | 11,969 | 10,923 | 13,899 | 12,186 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $55,443 | $57,491 | $45,894 | $44,952 |

Each category of OTC derivative products in the above tables includes a variety of instruments, which can differ substantially in their characteristics. Instruments in each category can be denominated in U.S. dollars or in one or more non-U.S. currencies.

The fair values recorded in the above tables are determined by the Company using various pricing models. For a discussion of fair value as it affects the consolidated financial statements, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Policies" in Part II, Item 7 and Note 2 to the consolidated financial statements. As discussed under "Critical Accounting Policies," the structure of the transaction, including its maturity, is one of several important factors that may impact the price transparency. The impact of maturity on price transparency can differ significantly among product categories. For example, single currency and multi-currency interest rate derivative products involving highly standardized terms and the major currencies (e.g., the U.S. dollar or the euro) will generally have greater price transparency

Morgan Stanley

from published external sources even in maturity ranges beyond 20 years. Credit derivatives with highly standardized terms and liquid underlying reference instruments can have price transparency from published external sources in a maturity ranging up to 10 years, while equity and foreign exchange derivative products with standardized terms in major currencies can have price transparency from published external sources within a two-year maturity range. Commodity derivatives with standardized terms and delivery locations can have price transparency from published external sources within various maturity ranges up to 10 years, depending on the commodity. In most instances of limited price transparency based on published external sources, dealers in these markets, in their capacities as market-makers and liquidity providers, provide price transparency beyond the above maturity ranges.

*Country Exposure.*   The Company monitors its credit exposure and risk to individual countries. Credit exposure to a country arises from the Company's lending activities and derivatives activities in a country. At November 30, 2006, approximately 5% of the Company's total credit exposure (including primary corporate loans and lending commitments and current exposure arising from the Company's derivative contracts) was to emerging markets, and no one emerging market country accounted for more than 0.6% of the Company's total credit exposure. Country credit ratings are derived using methodologies generally consistent with those employed by external rating agencies.

*Industry Exposure.*   The Company also monitors its credit exposure and risk to individual industries. At November 30, 2006, the Company's material credit exposure (including primary corporate loans and lending commitments and current exposure arising from the Company's derivative contracts) was to entities engaged in the following industries: utilities, sovereign-related entities, financial institutions, media, consumer-related entities and healthcare.

### Global Wealth Management Group Activities.

*Margin Lending.*   Customer margin accounts, the primary source of retail credit exposure, are collateralized in accordance with internal and regulatory guidelines. The Company monitors required margin levels and established credit limits daily and, pursuant to such guidelines, requires customers to deposit additional collateral, or reduce positions, when necessary. Factors considered in the review of all margin loans are the amount of the loan, the intended purpose, the degree of leverage being employed in the account, and overall evaluation of the portfolio to ensure proper diversification or, in the case of concentrated positions, possible hedging strategies. Additionally, all transactions relating to concentrated or restricted positions require a review of any legal impediments to liquidation of the underlying collateral. Underlying collateral for margin loans is reviewed with respect to the liquidity of the proposed collateral positions, historic trading range, volatility analysis and an evaluation of industry concentrations. At November 30, 2006, there were approximately $6.8 billion of customer margin loans outstanding.

*Commercial Lending.*   Global Wealth Management Group provides commercial lending to small and medium-size domestic businesses through Morgan Stanley Commercial Financial Services, Inc. ("CFS"). CFS' suite of products include working capital lines of credit, revolving lines of credit, standby letters of credit, term loans and owner-occupied commercial real estate mortgages. Clients are required to submit a comprehensive credit application, including financial statements, to CFS' centralized credit processing platform. Once the information is received by CFS' experienced underwriting professionals, a comprehensive analysis is performed to assess the business model and to determine appropriate structure, guarantors' strengths, debt and cash flow capacity, liquidity and collateral coverage. For standard transactions, credit requests are approved via signature of independent credit officers, and where transactions are of size and higher complexity, approval is secured through a formal loan committee chaired by independent credit professionals. The facility is risk rated and upon credit approval is moved to the general portfolio where it is monitored periodically through account management, covenants compliance certificates, and spot and cycle audits.

Morgan Stanley                                         106

### *Consumer Lending Activities.*

With respect to its consumer lending activities, potential credit cardholders undergo credit reviews by the Credit Department of Discover Financial Services to establish that they meet standards of ability and willingness to pay. Credit card applications are evaluated using scoring models (statistical evaluation models) based on information obtained from applicants and credit bureaus. The Company's credit scoring systems include both industry and customized models using the Company's criteria and historical data. Each cardmember's credit line is reviewed at least annually, and actions resulting from such review may include raising or lowering a cardmember's credit line or closing the account. In addition, the Company, on a portfolio basis, performs periodic monitoring and review of consumer behavior and risk profiles. The Company also reviews the creditworthiness of prospective Discover Network merchants and conducts annual reviews of merchants, with the greatest scrutiny given to merchants with substantial sales volume, chargeback, return and discount volumes. With respect to first mortgages and second mortgages within the Company's Institutional Securities business segment, including home equity lines of credit ("mortgage lending"), a loan evaluation process is adopted within a framework of credit underwriting policies and collateral valuation. The Company's underwriting policy is designed to ensure that all borrowers pass an assessment of capacity and willingness to pay, which includes an analysis of applicable industry standard credit scoring models (e.g., FICO scores), debt ratios and reserves of the borrower. Loan-to-collateral value ratios are determined based on independent third-party property appraisal/valuations, and security lien position is established through title/ownership reports. As part of the mortgage lending business strategy, almost all loans are sold in the secondary market through securitizations and whole loan sales, while almost all servicing rights are retained. These sales and securitizations pass the risk of credit loss onto the purchaser/investor. For further information on the Company's consumer loans, see Note 5 to the consolidated financial statements.

### Operational Risk.

Operational risk refers to the risk of financial or other loss, or potential damage to a firm's reputation, resulting from inadequate or failed internal processes, people, resources and systems or from external events (e.g. external or internal fraud, legal and compliance risks, damage to physical assets, etc.). The Company may incur operational risk across the full scope of its business activities, including revenue generating activities (e.g. sales and trading) and support functions (e.g. information technology and facilities management). As such, the Company may incur operational risk in each of its businesses, as well as within the Control Groups. Legal and compliance risk is included in the scope of operational risk and is discussed below under "Legal Risk."

The goal of the Company's operational risk management framework is to establish firm-wide operational risk standards related to risk measurement, monitoring and management. Operational risk policies are designed to reduce the likelihood and/or impact of operational incidents as well as to mitigate legal, regulatory and reputational risks.

The Company's Operational Risk Manager ("ORM") oversees, monitors, measures and analyzes operational risk across the Company. The ORM is also responsible for facilitating, designing, implementing and monitoring the firm-wide operational risk program. The ORM is independent of the business segments and is supported by the firm-wide Operational Risk Department ("ORD"). The ORD works with the business segments, Control Groups and other support functions to help ensure a transparent, consistent and comprehensive framework for managing operational risk within each area and across the Company.

Primary responsibility for the management of operational risk is with the business segments and the Control Groups, and the business managers therein. The business managers generally maintain processes and controls designed to identify, assess, manage, mitigate and report operational risk. As new products and business activities are developed and processes are designed and modified, operational risks are considered. Each business segment has a designated operational risk coordinator. In addition, business segment risk committees review operational risk matters and/or reports on a regular basis. Each Control Group also has a designated operational risk coordinator, or equivalent, and a forum for discussing operational risk matters and/or reports with senior

Morgan Stanley

management. Oversight of business segment operational risk is provided by business segment risk committees, a firmwide operational risk committee and ultimately senior management through the Firm Risk Committee.

Business Continuity Planning is an ongoing program of analysis and planning which ensures a recovery strategy and required resources for the resumption of critical business functions following a disaster or other business interruption. Disaster recovery plans are in place for critical facilities and resources on a Company-wide basis, and redundancies are built into the systems as deemed appropriate. The key components of the Company's disaster recovery plans include: crisis management; business segment recovery plans; applications/data recovery; work area recovery; and other elements addressing management, analysis, training and testing.

The Company maintains an information security program that coordinates the management of information security risks and satisfies regulatory requirements. Information security procedures are designed to protect the Company's information assets against unauthorized disclosure, modification or misuse. These procedures cover a broad range of areas including: application system entitlement; data protection; internet and intranet access, communications and usage; and, mobile and portable information usage. The Company has also established policies, procedures and technologies to protect its computer and other assets from unauthorized access.

The Company utilizes the services of external vendors in connection with the Company's ongoing operations. These may include, for example, outsourced processing and support functions and consulting and other professional services. The Company manages its exposures to the quality of these services through a variety of means, including service level and other contractual agreements, service and quality reviews, and ongoing monitoring of the vendors' performance. It is anticipated that the use of these services will continue and possibly increase in the future.

**Legal Risk.**

Legal risk includes the risk of non-compliance with applicable legal and regulatory requirements and standards. Legal risk also includes contractual and commercial risk such as the risk that a counterparty's performance obligations will be unenforceable. The Company is generally subject to extensive regulation in the different jurisdictions in which it conducts its business (see "Business—Regulation" in Part I, Item 1). The Company has established procedures based on legal and regulatory requirements on a worldwide basis that are designed to foster compliance with applicable statutory and regulatory requirements. The Company, principally through the Legal and Compliance Division, also has established procedures that are designed to require that the Company's policies relating to conduct, ethics and business practices are followed globally. In connection with its businesses, the Company has and continuously develops various procedures addressing issues such as regulatory capital requirements, sales and trading practices, new products, potential conflicts of interest, structured transactions, use and safekeeping of customer funds and securities, credit granting, collection activities, money-laundering, privacy and recordkeeping. In addition, the Company has established procedures to mitigate the risk that a counterparty's performance obligations will be unenforceable, including consideration of counterparty legal authority and capacity, adequacy of legal documentation, the permissibility of a transaction under applicable law and whether applicable bankruptcy or insolvency laws limit or alter contractual remedies. The legal and regulatory focus on the financial services industry presents a continuing business challenge for the Company.

Morgan Stanley

**Item 8.    Financial Statements and Supplementary Data.**

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Shareholders of Morgan Stanley:

We have audited the accompanying consolidated statements of financial condition of Morgan Stanley and subsidiaries (the "Company") as of November 30, 2006 and 2005, and the related consolidated statements of income, comprehensive income, cash flows and changes in shareholders' equity for each of the three years in the period ended November 30, 2006. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Morgan Stanley and subsidiaries as of November 30, 2006 and 2005, and the results of their operations and their cash flows for each of the three years in the period ended November 30, 2006, in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 2 and Note 14, in fiscal 2005, the Company adopted Statement of Financial Accounting Standards No. 123(R), "Share-Based Payment", and effective December 1, 2005, Morgan Stanley changed its accounting policy for recognition of equity awards granted to retirement-eligible employees.

Also, as discussed in Note 24 to the consolidated financial statements, effective August 31, 2006, Morgan Stanley elected application of Staff Accounting Bulletin No. 108, "Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements".

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of the Company's internal control over financial reporting as of November 30, 2006, based on the criteria established in "Internal Control—Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 12, 2007, expressed an unqualified opinion on management's assessment of the effectiveness of the Company's internal control over financial reporting and an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

*Deloitte & Touche LLP*

New York, New York
February 12, 2007

**MORGAN STANLEY**

**Consolidated Statements of Financial Condition**
**(dollars in millions, except share data)**

| | November 30, 2006 | November 30, 2005 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 20,606 | $ 29,414 |
| Cash and securities deposited with clearing organizations or segregated under federal and other regulations or requirements (including securities at fair value of $8,648 in 2006 and $30,223 in 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29,565 | 40,130 |
| Financial instruments owned (approximately $125 billion in 2006 and $93 billion in 2005 were pledged to various parties): | | |
| U.S. government and agency securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 39,352 | 31,742 |
| Other sovereign government obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . | 27,305 | 22,750 |
| Corporate and other debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 169,664 | 105,381 |
| Corporate equities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 86,058 | 52,238 |
| Derivative contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 55,443 | 45,894 |
| Physical commodities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,031 | 2,610 |
| Total financial instruments owned . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 380,853 | 260,615 |
| Securities received as collateral . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 64,588 | 43,557 |
| Collateralized agreements: | | |
| Securities purchased under agreements to resell . . . . . . . . . . . . . . . . . . . . . . | 174,866 | 174,330 |
| Securities borrowed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 299,631 | 244,241 |
| Receivables: | | |
| Consumer loans (net of allowances of $831 in 2006 and $838 in 2005) . . . . . . . | 24,173 | 22,916 |
| Customers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 82,931 | 50,979 |
| Brokers, dealers and clearing organizations . . . . . . . . . . . . . . . . . . . . . . . . . | 7,633 | 5,030 |
| Fees, interest and other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9,700 | 6,137 |
| Office facilities and other equipment, at cost (net of accumulated depreciation of $3,645 in 2006 and $3,196 in 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,086 | 2,733 |
| Aircraft held for sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 3,145 |
| Goodwill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,792 | 2,206 |
| Intangible assets (net of accumulated amortization of $109 million in 2006 and $63 million in 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 558 | 294 |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18,663 | 12,796 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1,120,645 | $898,523 |

See Notes to Consolidated Financial Statements.

Morgan Stanley

**MORGAN STANLEY**

**Consolidated Statements of Financial Condition—(Continued)**
**(dollars in millions, except share data)**

| | November 30, 2006 | November 30, 2005 |
|---|---|---|
| **Liabilities and Shareholders' Equity** | | |
| Commercial paper and other short-term borrowings | $ 29,092 | $ 31,120 |
| Deposits | 28,343 | 18,663 |
| Financial instruments sold, not yet purchased: | | |
| U.S. government and agency securities | 26,168 | 20,425 |
| Other sovereign government obligations | 28,961 | 25,355 |
| Corporate and other debt | 10,336 | 5,480 |
| Corporate equities | 59,399 | 45,936 |
| Derivative contracts | 57,491 | 44,952 |
| Physical commodities | 764 | 4,852 |
| Total financial instruments sold, not yet purchased | 183,119 | 147,000 |
| Obligation to return securities received as collateral | 64,588 | 43,557 |
| Collateralized financings: | | |
| Securities sold under agreements to repurchase | 267,566 | 237,274 |
| Securities loaned | 150,257 | 120,454 |
| Other secured financings | 45,556 | 23,534 |
| Payables: | | |
| Customers | 134,907 | 112,246 |
| Brokers, dealers and clearing organizations | 7,635 | 4,789 |
| Interest and dividends | 4,746 | 3,338 |
| Other liabilities and accrued expenses | 24,428 | 16,835 |
| Long-term borrowings | 144,978 | 110,465 |
| | 1,085,215 | 869,275 |
| Capital Units | 66 | 66 |
| Commitments and contingencies | | |
| Shareholders' equity: | | |
| Preferred stock | 1,100 | — |
| Common stock, $0.01 par value; | | |
| Shares authorized: 3,500,000,000 in 2006 and 2005; | | |
| Shares issued: 1,211,701,552 in 2006 and 2005; | | |
| Shares outstanding: 1,048,877,006 in 2006 and 1,057,677,994 in 2005 | 12 | 12 |
| Paid-in capital | 2,213 | 2,389 |
| Retained earnings | 41,422 | 35,185 |
| Employee stock trust | 4,315 | 3,060 |
| Accumulated other comprehensive loss | (35) | (190) |
| Common stock held in treasury, at cost, $0.01 par value; | | |
| 162,824,546 shares in 2006 and 154,023,558 shares in 2005 | (9,348) | (8,214) |
| Common stock issued to employee trust | (4,315) | (3,060) |
| Total shareholders' equity | 35,364 | 29,182 |
| Total liabilities and shareholders' equity | $1,120,645 | $898,523 |

See Notes to Consolidated Financial Statements.

Morgan Stanley

## MORGAN STANLEY

### Consolidated Statements of Income
**(dollars in millions, except share and per share data)**

| | Fiscal Year | | |
|---|---|---|---|
| | **2006** | **2005** | **2004** |
| Revenues: | | | |
| Investment banking | $ 4,755 | $ 3,843 | $ 3,341 |
| Principal transactions: | | | |
| Trading | 11,738 | 7,365 | 5,510 |
| Investments | 1,669 | 981 | 607 |
| Commissions | 3,810 | 3,363 | 3,264 |
| Fees: | | | |
| Asset management, distribution and administration | 5,288 | 4,958 | 4,473 |
| Merchant, cardmember and other fees, net | 1,167 | 1,323 | 1,317 |
| Servicing and securitization income | 2,338 | 1,609 | 1,921 |
| Interest and dividends | 45,216 | 28,175 | 18,584 |
| Other | 570 | 464 | 324 |
| Total revenues | 76,551 | 52,081 | 39,341 |
| Interest expense | 41,937 | 24,425 | 14,707 |
| Provision for consumer loan losses | 756 | 878 | 926 |
| Net revenues | 33,858 | 26,778 | 23,708 |
| Non-interest expenses: | | | |
| Compensation and benefits | 14,387 | 11,313 | 9,853 |
| Occupancy and equipment | 1,000 | 1,046 | 846 |
| Brokerage, clearing and exchange fees | 1,306 | 1,070 | 932 |
| Information processing and communications | 1,469 | 1,405 | 1,309 |
| Marketing and business development | 1,247 | 1,162 | 1,123 |
| Professional services | 2,247 | 1,903 | 1,542 |
| Other | 1,202 | 1,769 | 1,285 |
| September 11th related insurance recoveries, net | — | (251) | — |
| Total non-interest expenses | 22,858 | 19,417 | 16,890 |
| Income from continuing operations before losses from unconsolidated investees, income taxes, dividends on preferred securities subject to mandatory redemption and cumulative effect of accounting change, net | 11,000 | 7,361 | 6,818 |
| Losses from unconsolidated investees | 228 | 311 | 328 |
| Provision for income taxes | 3,275 | 1,858 | 1,856 |
| Dividends on preferred securities subject to mandatory redemption | — | — | 45 |
| Income from continuing operations before cumulative effect of accounting change, net | 7,497 | 5,192 | 4,589 |
| Discontinued operations: | | | |
| Loss from discontinued operations | (42) | (486) | (172) |
| Income tax benefit | 17 | 184 | 69 |
| Loss on discontinued operations | (25) | (302) | (103) |
| Cumulative effect of accounting change, net | — | 49 | — |
| Net income | $ 7,472 | $ 4,939 | $ 4,486 |
| Preferred stock dividend requirements | $ 19 | $ — | $ — |
| Earnings applicable to common shareholders | $ 7,453 | $ 4,939 | $ 4,486 |
| Earnings per basic common share: | | | |
| Income from continuing operations | $ 7.40 | $ 4.94 | $ 4.25 |
| Loss on discontinued operations | (0.02) | (0.29) | (0.10) |
| Cumulative effect of accounting change, net | — | 0.05 | — |
| Earnings per basic common share | $ 7.38 | $ 4.70 | $ 4.15 |
| Earnings per diluted common share: | | | |
| Income from continuing operations | $ 7.09 | $ 4.81 | $ 4.15 |
| Loss on discontinued operations | (0.02) | (0.29) | (0.09) |
| Cumulative effect of accounting change, net | — | 0.05 | — |
| Earnings per diluted common share | $ 7.07 | $ 4.57 | $ 4.06 |
| Average common shares outstanding: | | | |
| Basic | 1,010,254,255 | 1,049,896,047 | 1,080,121,708 |
| Diluted | 1,054,796,062 | 1,079,936,315 | 1,105,185,480 |

See Notes to Consolidated Financial Statements.

Morgan Stanley

**MORGAN STANLEY**

**Consolidated Statements of Comprehensive Income**
**(dollars in millions)**

| | Fiscal Year | | |
|---|---|---|---|
| | **2006** | **2005** | **2004** |
| Net income .................................................................... | $7,472 | $4,939 | $4,486 |
| Other comprehensive income (loss), net of tax: | | | |
|     Foreign currency translation adjustments ............................ | 104 | (89) | 76 |
|     Net change in cash flow hedges ..................................... | 53 | (70) | 26 |
|     Minimum pension liability adjustment ............................... | (2) | 25 | (2) |
| Comprehensive income ......................................................... | $7,627 | $4,805 | $4,586 |

See Notes to Consolidated Financial Statements.

113

Morgan Stanley

**MORGAN STANLEY**

**Consolidated Statements of Cash Flows**
**(dollars in millions)**

| | Fiscal Year | | |
|---|---|---|---|
| | **2006** | **2005** | **2004** |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | |
| Net income ............................................................... | $ 7,472 | $ 4,939 | $ 4,486 |
| Adjustments to reconcile net income to net cash used for operating activities: | | | |
| Cumulative effect of accounting change, net ............................. | — | (49) | — |
| Deferred income taxes ............................................... | 212 | (1,076) | (261) |
| Compensation payable in common stock and options ..................... | 1,955 | 836 | 663 |
| Depreciation and amortization ....................................... | 876 | 815 | 805 |
| Provision for consumer loan losses .................................. | 756 | 878 | 926 |
| Lease adjustment ................................................... | — | 109 | — |
| Insurance settlement ............................................... | — | (251) | — |
| Aircraft-related charges ............................................ | 125 | 509 | 109 |
| Changes in assets and liabilities: | | | |
| Cash and securities deposited with clearing organizations or segregated under federal and other regulations or requirements ....................................... | 10,592 | (3,388) | (8,216) |
| Financial instruments owned, net of financial instruments sold, not yet purchased .............. | (82,142) | (22,981) | (5,490) |
| Securities borrowed ................................................ | (55,390) | (35,892) | (54,536) |
| Securities loaned .................................................. | 29,803 | 23,308 | 32,771 |
| Receivables and other assets ....................................... | (38,421) | (2,674) | (17,112) |
| Payables and other liabilities ...................................... | 33,603 | (822) | 21,314 |
| Securities purchased under agreements to resell ....................... | (536) | (51,289) | (44,836) |
| Securities sold under agreements to repurchase ........................ | 30,292 | 55,676 | 41,919 |
| Net cash used for operating activities ................................. | (60,803) | (31,352) | (27,458) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | |
| Net (payments for) proceeds from: | | | |
| Office facilities and aircraft under operating leases ................... | 993 | (540) | (533) |
| Business acquisitions, net of cash acquired ........................... | (2,706) | (323) | (758) |
| Net principal disbursed on consumer loans ............................ | (12,164) | (14,093) | (9,360) |
| Sales of consumer loans ............................................ | 11,532 | 10,525 | 7,590 |
| Sale of interest in POSIT .......................................... | — | 90 | — |
| Insurance settlement ............................................... | — | 220 | — |
| Net cash used for investing activities ................................. | (2,345) | (4,121) | (3,061) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | |
| Net proceeds from (payments for): | | | |
| Short-term borrowings .............................................. | (2,422) | (5,183) | 7,917 |
| Derivatives financing activities ..................................... | 546 | 1,044 | 1,895 |
| Other secured financings ........................................... | 22,022 | 16,487 | (892) |
| Deposits .......................................................... | 9,647 | 4,886 | 938 |
| Tax benefits associated with stock-based awards ...................... | 144 | 355 | — |
| Net proceeds from: | | | |
| Issuance of preferred stock ......................................... | 1,097 | — | — |
| Issuance of common stock .......................................... | 643 | 327 | 322 |
| Issuance of long-term borrowings .................................... | 47,849 | 35,768 | 37,601 |
| Payments for: | | | |
| Repayments of long-term borrowings ................................. | (20,643) | (16,735) | (11,915) |
| Repurchases of common stock ....................................... | (3,376) | (3,693) | (1,132) |
| Cash dividends .................................................... | (1,167) | (1,180) | (1,096) |
| Net cash provided by financing activities ............................. | 54,340 | 32,076 | 33,638 |
| Net (decrease) increase in cash and cash equivalents .................... | (8,808) | (3,397) | 3,119 |
| Cash and cash equivalents, at beginning of period ...................... | 29,414 | 32,811 | 29,692 |
| Cash and cash equivalents, at end of period ........................... | $ 20,606 | $ 29,414 | $ 32,811 |

See Notes to Consolidated Financial Statements.

# MORGAN STANLEY

## Consolidated Statements of Changes in Shareholders' Equity
### (dollars in millions)

| | Preferred Stock | Common Stock | Paid-in Capital | Retained Earnings | Employee Stock Trust | Accumulated Other Comprehensive Income (Loss) | Note Receivable Related to ESOP | Common Stock Held in Treasury at Cost | Common Stock Issued to Employee Trust | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **BALANCE AT NOVEMBER 30, 2003** | $ — | $ 12 | $ 3,155 | $28,038 | $3,008 | $(156) | $ (4) | $(6,766) | $(2,420) | $24,867 |
| Net income | — | — | — | 4,486 | — | — | — | — | — | 4,486 |
| Dividends | — | — | — | (1,098) | — | — | — | — | — | (1,098) |
| Issuance of common stock | — | — | (1,304) | — | — | — | — | 1,626 | — | 322 |
| Repurchases of common stock | — | — | — | — | — | — | — | (1,132) | — | (1,132) |
| Compensation payable in common stock and options | — | — | (172) | — | 816 | — | 4 | 69 | (54) | 663 |
| Tax benefits associated with stock-based awards | — | — | 331 | — | — | — | — | — | — | 331 |
| Employee tax withholdings and other | — | — | 78 | — | — | — | — | (411) | — | (333) |
| Net change in cash flow hedges | — | — | — | — | — | 26 | — | — | — | 26 |
| Minimum pension liability adjustment | — | — | — | — | — | (2) | — | — | — | (2) |
| Translation adjustments | — | — | — | — | — | 76 | — | — | — | 76 |
| **BALANCE AT NOVEMBER 30, 2004** | — | 12 | 2,088 | 31,426 | 3,824 | (56) | — | (6,614) | (2,474) | 28,206 |
| Net income | — | — | — | 4,939 | — | — | — | — | — | 4,939 |
| Dividends | — | — | — | (1,180) | — | — | — | — | — | (1,180) |
| Issuance of common stock | — | — | (780) | — | — | — | — | 1,107 | — | 327 |
| Repurchases of common stock | — | — | — | — | — | — | — | (3,693) | — | (3,693) |
| Compensation payable in common stock and options | — | — | 669 | — | (764) | — | — | 1,437 | (586) | 756 |
| Tax benefits associated with stock-based awards | — | — | 317 | — | — | — | — | — | — | 317 |
| Employee tax withholdings and other | — | — | 95 | — | — | — | — | (451) | — | (356) |
| Net change in cash flow hedges | — | — | — | — | — | (70) | — | — | — | (70) |
| Minimum pension liability adjustment | — | — | — | — | — | 25 | — | — | — | 25 |
| Translation adjustments | — | — | — | — | — | (89) | — | — | — | (89) |
| **BALANCE AT NOVEMBER 30, 2005** | — | 12 | 2,389 | 35,185 | 3,060 | (190) | — | (8,214) | (3,060) | 29,182 |
| Adjustment to opening shareholders' equity | — | — | 34 | (68) | — | — | — | — | — | (34) |
| Net income | — | — | — | 7,472 | — | — | — | — | — | 7,472 |
| Dividends | — | — | — | (1,167) | — | — | — | — | — | (1,167) |
| Issuance of preferred stock | 1,100 | — | — | — | — | — | — | — | — | 1,100 |
| Issuance of common stock | — | — | (1,949) | — | — | — | — | 2,592 | — | 643 |
| Repurchases of common stock | — | — | — | — | — | — | — | (3,376) | — | (3,376) |
| Compensation payable in common stock and options | — | — | 1,486 | — | 1,255 | — | — | 5 | (1,255) | 1,491 |
| Tax benefits associated with stock-based awards | — | — | 72 | — | — | — | — | — | — | 72 |
| Employee tax withholdings and other | — | — | 181 | — | — | — | — | (355) | — | (174) |
| Net change in cash flow hedges | — | — | — | — | — | 53 | — | — | — | 53 |
| Minimum pension liability adjustment | — | — | — | — | — | (2) | — | — | — | (2) |
| Translation adjustments | — | — | — | — | — | 104 | — | — | — | 104 |
| **BALANCE AT NOVEMBER 30, 2006** | $1,100 | $ 12 | $ 2,213 | $41,422 | $4,315 | $ (35) | $— | $(9,348) | $(4,315) | $35,364 |

See Notes to Consolidated Financial Statements.

Morgan Stanley

## MORGAN STANLEY

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**1.  Introduction and Basis of Presentation.**

*The Company.*   Morgan Stanley (the "Company") is a global financial services firm that maintains significant market positions in each of its business segments—Institutional Securities, Global Wealth Management Group, Asset Management and Discover.

A summary of the activities of each of the Company's business segments is as follows:

*Institutional Securities* includes capital raising; financial advisory services, including advice on mergers and acquisitions, restructurings, real estate and project finance; corporate lending; sales, trading, financing and market-making activities in equity securities and related products and fixed income securities and related products, including foreign exchange and commodities; benchmark indices and risk management analytics; research; and investment activities.

*Global Wealth Management Group* provides brokerage and investment advisory services covering various investment alternatives; financial and wealth planning services; annuity and insurance products; credit and other lending products; banking and cash management services; retirement services; and trust and fiduciary services.

*Asset Management* provides global asset management products and services in equity, fixed income, alternative investments and private equity to institutional and retail clients through proprietary and third party retail distribution channels, intermediaries and the Company's institutional distribution channel. Asset Management also engages in investment activities.

*Discover* offers Discover®-branded credit cards and related consumer products and services and operates the Discover Network, a merchant and cash access network for Discover Network-branded cards, and PULSE® EFT Association LP ("PULSE"), an automated teller machine/debit and electronic funds transfer network. Discover also offers consumer finance products and services in the U.K., including Morgan Stanley-branded, Goldfish-branded and various other credit cards issued on the MasterCard and Visa networks.

On December 19, 2006, the Company announced that its Board of Directors had approved the spin-off of Discover (the "Discover Spin-off"). The Discover Spin-off, which is subject to regulatory approval and other customary conditions, is expected to take place in the third quarter of fiscal 2007.

*Basis of Financial Information.*   The consolidated financial statements for the 12 months ended November 30, 2006 ("fiscal 2006"), November 30, 2005 ("fiscal 2005") and November 30, 2004 ("fiscal 2004") are prepared in accordance with accounting principles generally accepted in the U.S., which require the Company to make estimates and assumptions regarding the valuations of certain financial instruments, consumer loan loss levels, the outcome of litigation, tax and other matters that affect the consolidated financial statements and related disclosures. The Company believes that the estimates utilized in the preparation of the consolidated financial statements are prudent and reasonable. Actual results could differ materially from these estimates.

The Company, in accordance with Staff Accounting Bulletin No. 108, "Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements" ("SAB 108"), adjusted its opening retained earnings for fiscal 2006 and financial results for the first two quarters of fiscal 2006 to reflect a change in its hedge accounting for certain securities under Statement of Financial Accounting Standards ("SFAS") No. 133, "Accounting for Derivatives Instruments and Hedging Activities," as amended ("SFAS No. 133"). The same periods also reflect the adjustments of two compensation and benefit accruals. See Note 24 for additional information on SAB 108.

All material intercompany balances and transactions have been eliminated.

Morgan Stanley

## MORGAN STANLEY

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Consolidation*.   The consolidated financial statements include the accounts of the Company, its wholly-owned subsidiaries and other entities in which the Company has a controlling financial interest.

For entities where (1) the total equity investment at risk is sufficient to enable the entity to finance its activities independently, and (2) the equity holders bear the economic residual risks of the entity and have the right to make decisions about the entity's activities, the Company consolidates those entities it controls through a majority voting interest or otherwise. For entities that do not meet these criteria, commonly known as variable interest entities ("VIE"), the Company consolidates those entities where the Company absorbs a majority of the expected losses or a majority of the expected residual returns, or both, of such entity.

Notwithstanding the above, certain securitization vehicles, commonly known as qualifying special purpose entities, are not consolidated by the Company if they meet certain criteria regarding the types of assets and derivatives they may hold, the types of sales they may engage in, and the range of discretion they may exercise in connection with the assets they hold.

For investments in entities in which the Company does not have a controlling financial interest, but has significant influence over operating and financial decisions, the Company generally applies the equity method of accounting.

Equity and partnership interests held by entities qualifying for accounting purposes as investment companies are carried at fair value.

The Company's U.S. and international subsidiaries include Morgan Stanley & Co. Incorporated ("MS&Co."), Morgan Stanley & Co. International Limited ("MSIL"), Morgan Stanley Japan Securities Co., Ltd. ("MSJS"), Morgan Stanley DW Inc. ("MSDWI"), Morgan Stanley Investment Advisors Inc. and NOVUS Credit Services Inc. In fiscal 2007, the Company intends to merge MSDWI into MS&Co. Upon completion of the merger, the surviving entity, MS&Co., will be the Company's principal U.S. broker-dealer.

*Income Statement Presentation*.   The Company, through its subsidiaries and affiliates, provides a wide variety of products and services to a large and diversified group of clients and customers, including corporations, governments, financial institutions and individuals. In connection with the delivery of the various products and services to clients, the Company manages its revenues and related expenses in the aggregate. As such, when assessing the performance of its businesses, the Company considers its principal trading, investment banking, commissions and interest and dividend income, along with the associated interest expense and provision for loan losses, as one integrated activity for each of the Company's separate businesses.

The Company's cost infrastructure supporting its businesses varies by activity. In some cases, these costs are directly attributable to one line of business, and, in other cases, such costs relate to multiple businesses. As such, when assessing the performance of its businesses, the Company does not consider these costs separately, but rather assesses performance in the aggregate along with the related revenues.

Therefore, the Company's pricing structure considers various items, including the level of expenses incurred directly and indirectly to support the cost infrastructure, the risk it incurs in connection with a transaction, the overall client relationship and the availability in the market for the particular product and/or service. Accordingly, the Company does not manage or capture the costs associated with the products or services sold or its general and administrative costs by revenue line, in total or by product.

*Discontinued Operations.*   The Company's aircraft leasing business was classified as "held for sale" prior to its sale on March 24, 2006, and associated revenues and expenses through the date of sale have been reported as

117

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

discontinued operations for all years presented. Prior to being reclassified as discontinued operations, the results of the Company's aircraft leasing business were included in the Institutional Securities business segment. See Note 18 for additional information on discontinued operations.

## 2.   Summary of Significant Accounting Policies.

### Revenue Recognition.

*Investment Banking.*   Underwriting revenues and fees for mergers, acquisitions and advisory assignments are recorded when services for the transactions are determined to be completed, generally as set forth under the terms of the engagement. Transaction-related expenses, primarily consisting of legal, travel and other costs directly associated with the transaction, are deferred and recognized in the same period as the related investment banking transaction revenue. Underwriting revenues are presented net of related expenses. Non-reimbursed expenses associated with advisory transactions are recorded within Non-interest expenses.

*Commissions.*   The Company generates commissions from executing and clearing customer transactions on stock, options and futures markets. Commission revenues are recorded in the accounts on trade date.

*Asset Management, Distribution and Administration Fees.*   Asset management, distribution and administration fees are recognized over the relevant contract period, generally quarterly or annually. In certain management fee arrangements, the Company is entitled to receive performance fees when the return on assets under management exceeds certain benchmark returns or other performance targets. In such arrangements, performance fee revenue is accrued quarterly based on measuring account/fund performance to date versus the performance benchmark stated in the investment management agreement.

*Merchant, Cardmember and Other Fees, Net.*   Merchant, cardmember and other fees include revenues from fees charged to merchants on credit card sales (net of interchange fees paid to banks that issue cards on the Company's merchant and cash access network), transaction processing fees on debit card transactions as well as charges to cardmembers for late payment fees, overlimit fees, balance transfer fees, credit protection fees and cash advance fees, net of cardmember rewards. Merchant, cardmember and other fees are recognized as earned. Cardmember rewards include various reward programs, including the Cashback Bonus® reward program, pursuant to which the Company pays certain cardmembers a percentage of their purchase amounts based upon a cardmember's level and type of purchases. The liability for cardmember rewards, included in Other liabilities and accrued expenses, is accrued at the time that qualified cardmember transactions occur and is calculated on an individual cardmember basis. In determining the liability for cardmember rewards, the Company considers estimated forfeitures based on historical account closure, charge-off and transaction activity. The Company records the cost of its cardmember reward programs as a reduction of Merchant, cardmember and other fees.

*Consumer Loans.*   Consumer loans, which consist primarily of general purpose credit card, mortgage and consumer installment loans, are reported at their principal amounts outstanding less applicable allowances. Interest on consumer loans is recorded to income as earned. Interest is generally accrued on credit card loans until the date of charge-off, which generally occurs at the end of the month during which an account becomes 180 contractually days past due, except in the case of cardmember bankruptcies, probate accounts, and fraudulent transactions. Cardmember bankruptcies and probate accounts are charged off at the end of the month 60 days following the receipt of notification of the bankruptcy or death but not later than the 180-day contractual time frame. Fraudulent transactions are reported in consumer loans at their net realizable value upon receipt of notification of the fraud through a charge to operating expenses and are subsequently written off at the end of the month 90 days following notification but not later than the contractual 180-day time frame. The interest portion of charged-off credit card loans is written off against interest revenue. Origination costs related to the issuance of credit cards are charged to earnings over periods not exceeding 12 months.

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The Company classifies a portion of its consumer loans as held for sale. Loans held for sale include the lesser of loans eligible for securitization or sale, or loans that management intends to securitize within three months, net of amortizing securitizations. These loans are carried at the lower of aggregate cost or fair value.

*Financial Instruments Used for Trading and Investment.* Financial instruments owned and Financial instruments sold, not yet purchased, which include cash and derivative products, are recorded at fair value in the consolidated statements of financial condition, and gains and losses are reflected net in Principal transactions trading and investment revenues in the consolidated statements of income. Loans and lending commitments are recorded at fair value or the lower of cost or market, depending on the nature of the transaction. Fair value is the amount at which financial instruments could be exchanged in a current transaction between willing parties, other than in a forced or liquidation sale.

The fair value of the Company's Financial instruments owned and Financial instruments sold, not yet purchased are generally based on observable market prices, observable market parameters or derived from such prices or parameters based on bid prices or parameters for Financial instruments owned and ask prices or parameters for Financial instruments sold, not yet purchased. In the case of financial instruments transacted on recognized exchanges, the observable prices represent quotations for completed transactions from the exchange on which the financial instrument is principally traded. Bid prices represent the highest price a buyer is willing to pay for a financial instrument at a particular time. Ask prices represent the lowest price a seller is willing to accept for a financial instrument at a particular time.

A substantial percentage of the fair value of the Company's Financial instruments owned and Financial instruments sold, not yet purchased is based on observable market prices, observable market parameters, or is derived from such prices or parameters. The availability of observable market prices and pricing parameters can vary from product to product. Where available, observable market prices and pricing parameters in a product (or a related product) may be used to derive a price without requiring significant judgment. In certain markets, observable market prices or market parameters are not available for all products, and fair value is determined using techniques appropriate for each particular product. These techniques involve some degree of judgment. The price transparency of the particular product will determine the degree of judgment involved in determining the fair value of the Company's financial instruments. Price transparency is affected by a wide variety of factors, including, for example, the type of product, whether it is a new product and not yet established in the marketplace, and the characteristics particular to the transaction. Products for which actively quoted prices or pricing parameters are available or for which fair value is derived from actively quoted prices or pricing parameters will generally have a higher degree of price transparency. By contrast, products that are thinly traded or not quoted will generally have reduced to no price transparency.

The fair value of over-the-counter ("OTC") derivative contracts is derived primarily using pricing models, which may require multiple market input parameters. Where appropriate, valuation adjustments are made to account for credit quality and market liquidity. These adjustments are applied on a consistent basis and are based upon observable market data where available. Prior to the adoption of SFAS No. 157, "Fair Value Measurements" ("SFAS No. 157"), on December 1, 2006, the Company followed the provisions of Emerging Issues Task Force ("EITF") Issue No. 02-3, "Issues Involved in Accounting for Derivative Contracts Held for Trading Purposes and Contracts Involved in Energy Trading and Risk Management Activities" ("EITF Issue No. 02-3"). See also Note 28. Under EITF Issue No. 02-3, in the absence of observable market prices or parameters in an active market, observable prices or parameters of other comparable current market transactions, or other observable data supporting a fair value based on a pricing model at the inception of a contract, revenue recognition at the inception of an OTC derivative financial instrument is not permitted. Such revenue is recognized in income at the earlier of when there is market value observability or at the end of the contract period. In the absence of observable market prices or parameters in an active market, observable prices or parameters of other comparable

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

current market transactions, or other observable data supporting a fair value based on a pricing model at the inception of a contract, fair value is based on the transaction price. The Company also uses pricing models to manage the risks introduced by OTC derivatives. Depending on the product and the terms of the transaction, the fair value of OTC derivative products can be modeled using a series of techniques, including closed-form analytic formulae, such as the Black-Scholes option pricing model, simulation models or a combination thereof, applied consistently. In the case of more established derivative products, the pricing models used by the Company are widely accepted by the financial services industry. Pricing models take into account the contract terms, including the maturity, as well as market parameters such as interest rates, volatility and the creditworthiness of the counterparty.

Purchases and sales of financial instruments and related expenses are recorded on trade date. Unrealized gains and losses arising from the Company's dealings in OTC financial instruments, including derivative contracts related to financial instruments and commodities, are presented in the accompanying consolidated statements of financial condition on a net-by-counterparty basis, when appropriate.

The Company nets cash collateral paid or received against its derivatives inventory under credit support annexes, which the Company views as conditional contracts, pursuant to legally enforceable master netting agreements.

Equity and debt investments purchased in connection with private equity and other principal investment activities initially are valued at cost to approximate fair value. The carrying value of such investments is adjusted when changes in the underlying fair values are readily ascertainable, generally as evidenced by observable market prices or transactions that directly affect the value of such investments. Downward adjustments relating to such investments are made in the event that the Company determines that the fair value is less than the carrying value. The Company's partnership interests, including general partnership and limited partnership interests in real estate funds, are included within Other assets in the consolidated statements of financial condition and are recorded at fair value based upon changes in the fair value of the underlying partnership's net assets.

*Financial Instruments Used for Asset and Liability Management.*   The Company applies hedge accounting to various derivative financial instruments used to hedge interest rate, foreign exchange and credit risk arising from assets, liabilities and forecasted transactions. These instruments are included within Financial instruments owned—derivative contracts or Financial instruments sold, not yet purchased—derivative contracts within the consolidated statements of financial condition.

These hedges are designated and qualify for accounting purposes as one of the following types of hedges: hedges of changes in fair value of assets and liabilities due to the risk being hedged (fair value hedges), hedges of the variability of future cash flows from forecasted transactions and floating rate assets and liabilities due to the risk being hedged (cash flow hedges) and hedges of net investments in foreign operations whose functional currency is different from the reporting currency of the parent company (net investment hedges).

For all hedges where hedge accounting is being applied, effectiveness testing and other procedures to ensure the ongoing validity of the hedges are performed at least monthly. The impact of hedge ineffectiveness and amounts excluded from the assessment of hedge effectiveness on the consolidated statements of income was not material for all periods presented. If a derivative is de-designated as a hedge, it is thereafter accounted for as a financial instrument used for trading.

Fair Value Hedges.   The Company's designated fair value hedges consist primarily of benchmark interest rate hedges of fixed rate borrowings, including certificates of deposit and senior long-term borrowings.

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Interest rate swaps, including swaps with embedded options that mirror features contained in the hedged items, are used as hedging instruments in these programs. For these hedges, the Company ensures that the terms of the hedging instruments and hedged items match and other accounting criteria are met so that the hedges are assumed to have no ineffectiveness (i.e., the Company applies the "shortcut" method of hedge accounting).

The Company also uses interest rate swaps as fair value hedges of the benchmark interest rate risk from host contracts of equity-linked notes that contain embedded derivatives. For these hedge relationships, regression analysis is used for the prospective and retrospective assessments of hedge effectiveness. At the inception of a hedge, the prospective analysis is based on what the hedge results would have been at regular points over an immediately preceding period. Over the life of the hedge, the length of the observation period and number of data points remain constant and the hypothetical data are replaced with actual hedge results so that the rolling analysis serves as both a prospective and retrospective test.

For qualifying fair value hedges of benchmark interest rates, the changes in the fair value of the derivative and the changes in the fair value of the hedged liability provide offset of one another and, together with any resulting ineffectiveness, are recorded in Interest expense. If a derivative is de-designated as a hedge, any basis adjustment remaining on the hedged liability is amortized to Interest expense over the life of the liability using the effective interest method.

The Company has designated a portion of the credit derivative embedded in a non-recourse structured note liability as a fair value hedge of the credit risk arising from a loan receivable to which the structured note liability is specifically linked. Regression analysis is used to perform prospective and retrospective assessments of hedge effectiveness for this hedge relationship. The changes in the fair value of the derivative and the changes in the fair value of the hedged item provide offset of one another and, together with any resulting ineffectiveness, are recorded in Principal transactions–Trading revenues.

Cash Flow Hedges.    Before the sale of the aircraft leasing business (see Note 18), the Company applied hedge accounting to interest rate swaps used to hedge variable rate long-term borrowings associated with this business. Changes in the fair value of the swaps were recorded in Accumulated other comprehensive income (loss) in Shareholders' equity, net of tax effects, and then reclassified to Interest expense as interest on the hedged borrowings was recognized.

In connection with the sale of the aircraft financing business (see Note 18), the Company de-designated the interest rate swaps associated with this business effective August 31, 2005 and no longer accounts for them as cash flow hedges. Amounts in Accumulated other comprehensive income (loss) related to those interest rate swaps continue to be reclassified to Interest expense since the related borrowings remain outstanding. The Company estimates that approximately $15 million of the unrealized loss recognized in Accumulated other comprehensive income (loss) as of November 30, 2006 will be reclassified into earnings within the next 12 months.

Net Investment Hedges.    The Company utilizes forward foreign exchange contracts and non-U.S. dollar-denominated debt to manage the currency exposure relating to its net investments in non-U.S. dollar functional currency operations. No hedge ineffectiveness is recognized in earnings since the notional amounts of the hedging instruments equal the portion of the investments being hedged, and, where forward contracts are used, the currencies being exchanged are the functional currencies of the parent and investee; where debt instruments are used as hedges, they are denominated in the functional currency of the investee. The gain or loss from revaluing hedges of net investments in foreign operations at the spot rate is deferred and reported within Accumulated other comprehensive income (loss) in Shareholders' equity, net of tax effects. The forward points on the hedging instruments are recorded in Interest and dividend revenues.

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Securitization Activities.*   The Company engages in securitization activities related to commercial and residential mortgage loans, corporate bonds and loans, U.S. agency collateralized mortgage obligations, credit card loans and other types of financial assets (see Notes 4 and 5). The Company may retain interests in the securitized financial assets as one or more tranches of the securitization, undivided seller's interests, accrued interest receivable subordinate to investors' interests (see Note 5), cash collateral accounts, servicing rights, rights to any excess cash flows remaining after payments to investors in the securitization trusts of their contractual rate of return and reimbursement of credit losses, and other retained interests. The exposure to credit losses from securitized loans is limited to the Company's retained contingent risk, which represents the Company's retained interest in securitized loans, including any credit enhancement provided. The gain or loss on the sale of financial assets depends, in part, on the previous carrying amount of the assets involved in the transfer, and each subsequent transfer in revolving structures, allocated between the assets sold and the retained interests based upon their respective fair values at the date of sale. To obtain fair values, observable market prices are used if available. However, observable market prices are generally not available for retained interests so the Company estimates fair value based on the present value of expected future cash flows using its best estimates of the key assumptions, including forecasted credit losses, payment rates, forward yield curves and discount rates commensurate with the risks involved. The present value of future net excess cash flows that the Company estimates it will receive over the term of the securitized loans is recognized in income as the loans are securitized. An asset also is recorded and charged to income over the term of the securitized loans, with actual net excess cash flows continuing to be recognized in income as they are earned.

*Consolidated Statements of Cash Flows.*   For purposes of these statements, cash and cash equivalents consist of cash and highly liquid investments not held for resale with maturities, when purchased, of three months or less. In connection with business acquisitions, the Company assumed liabilities of $1,377 million, $58 million and $145 million in fiscal 2006, fiscal 2005 and fiscal 2004, respectively.

*Allowance for Consumer Loan Losses.*   The allowance for consumer loan losses is a significant estimate that represents management's estimate of probable losses inherent in the owned consumer loan portfolio. The allowance for consumer loan losses is primarily applicable to the owned homogeneous consumer credit card loan portfolio. The allowance is evaluated quarterly for adequacy and is established through a charge to the Provision for consumer loan losses.

In estimating the allowance for consumer loan losses, the Company uses a systematic and consistently applied approach. This process starts with a migration analysis (a technique used to estimate the likelihood that a consumer loan will progress through the various stages of delinquency and ultimately charge-off) of delinquent and current consumer credit card accounts in order to determine the appropriate level of the allowance for consumer loan losses. The migration analysis considers uncollectible principal, interest and fees reflected in consumer loans. In evaluating the adequacy of the allowance for consumer loan losses, management also considers factors that may impact credit losses, including current economic conditions, recent trends in delinquencies and bankruptcy filings, account collection management, policy changes, account seasoning, loan volume and amounts, payment rates and forecasting uncertainties. The Provision for consumer loan losses is charged against earnings to maintain the allowance for consumer loan losses at an appropriate level.

*Office Facilities, Other Equipment and Software Costs.*   Office facilities and other equipment are stated at cost less accumulated depreciation and amortization. Depreciation and amortization of buildings, leasehold improvements, furniture, fixtures, equipment, tugs, barges, terminals and pipelines are provided principally by the straight-line and accelerated methods over the estimated useful life of the asset. Estimates of useful lives are generally as follows: buildings—39 years; furniture and fixtures—7 years; computer and communications equipment—3 to 5 years; terminals and pipelines—3 to 25 years; and tugs and barges—15 years. Leasehold improvements are amortized over the lesser of the estimated useful life of the asset or, where applicable, the remaining term of the lease, but generally not exceeding 15 years.

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Certain costs incurred in connection with internal-use software projects are capitalized and amortized over the expected useful life of the asset.

*Income Taxes.*  Income tax expense is provided for using the asset and liability method, under which deferred tax assets and liabilities are determined based upon the temporary differences between the financial statement and income tax bases of assets and liabilities using currently enacted tax rates.

*Earnings per Common Share.*  Basic earnings per common share ("EPS") is computed by dividing income available to common shareholders by the weighted average number of common shares outstanding for the period. Diluted EPS reflects the assumed conversion of all dilutive securities (see Note 10).

*Stock-Based Compensation.*  The Company early adopted SFAS No. 123R, "Share-Based Payment" ("SFAS No. 123R"), using the modified prospective approach as of December 1, 2004. SFAS No. 123R revised the fair value-based method of accounting for share-based payment liabilities, forfeitures and modifications of stock-based awards and clarified guidance in several areas, including measuring fair value, classifying an award as equity or as a liability and attributing compensation cost to service periods. Upon adoption, the Company recognized an $80 million gain ($49 million after-tax) as a cumulative effect of a change in accounting principle in the first quarter of fiscal 2005 resulting from the requirement to estimate forfeitures at the date of grant instead of recognizing them as incurred. The cumulative effect gain increased both basic and diluted earnings per share in fiscal 2005 by $0.05.

For stock-based awards issued prior to the adoption of SFAS No. 123R, the Company's accounting policy for awards granted to retirement-eligible employees was to recognize compensation cost over the service period specified in the award terms. The Company accelerates any unrecognized compensation cost for such awards if and when a retirement-eligible employee leaves the Company. For stock-based awards made to retirement-eligible employees during fiscal 2005, the Company recognized compensation expense for such awards on the date of grant.

For fiscal 2005 year-end stock-based compensation awards that were granted to retirement-eligible employees in December 2005, the Company recognized the compensation cost for such awards at the date of grant instead of over the service period specified in the award terms. As a result, the Company recorded non-cash incremental compensation expenses of approximately $270 million in fiscal 2006 for stock-based awards granted to retirement-eligible employees as part of the fiscal 2005 year-end award process. These incremental expenses were included within Compensation and benefits expense and reduced income before taxes within the Institutional Securities ($190 million), Global Wealth Management Group ($50 million), Asset Management ($20 million) and Discover ($10 million) business segments.

Additionally, based on interpretive guidance related to SFAS No. 123R in the first quarter of fiscal 2006, the Company changed its accounting policy for expensing the cost of anticipated fiscal 2006 year-end equity awards that were granted to retirement-eligible employees in the first quarter of fiscal 2007. Effective December 1, 2005, the Company accrues the estimated cost of these awards over the course of the current fiscal year rather than expensing the awards on the date of grant (which occurred in December 2006). The Company believes that this method of recognition for retirement-eligible employees is preferable because it better reflects the period over which the compensation is earned.

If the Company had accrued the estimated cost of equity awards granted to retirement-eligible employees over the course of the fiscal year ended November 30, 2005 rather than expensing such awards at the grant date in December 2005, net income would have decreased during fiscal 2005. The approximate resulting pro forma net income would have been $4,684 million rather than the reported amount of $4,939 million. The approximate

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

resulting impact on earnings per share for fiscal 2005 would have been a reduction in the reported amounts of earnings per basic share from $4.70 to $4.46 and earnings per diluted share from $4.57 to $4.34.

***Translation of Foreign Currencies.***    Assets and liabilities of operations having non-U.S. dollar functional currencies are translated at year-end rates of exchange, and income statement accounts are translated at weighted average rates of exchange for the year. Gains or losses resulting from translating foreign currency financial statements, net of hedge gains or losses and related tax effects, are reflected in Accumulated other comprehensive income (loss), a separate component of Shareholders' equity. Gains or losses resulting from foreign currency transactions are included in net income.

***Goodwill and Intangible Assets.***    Goodwill and indefinite-lived assets are not amortized and are reviewed annually (or more frequently under certain conditions) for impairment. Other intangible assets are amortized over their useful lives.

***Investments in Unconsolidated Investees.***    The Company invests in unconsolidated investees that own synthetic fuel production plants. The Company accounts for these investments under the equity method. The Company's share of the operating losses generated by these investments is recorded within Losses from unconsolidated investees, and the tax credits and the tax benefits associated with these operating losses are recorded within the Provision for income taxes.

***Deferred Compensation Arrangements.***    The Company maintains trusts, commonly referred to as rabbi trusts, in connection with certain deferred compensation plans. Assets of rabbi trusts are consolidated, and the value of the Company's stock held in rabbi trusts are classified in Shareholders' equity and generally accounted for in a manner similar to treasury stock. The Company has included its obligations under certain deferred compensation plans in Employee stock trust. Shares that the Company has issued to its rabbi trusts are recorded in Common stock issued to employee trust. Both Employee stock trust and Common stock issued to employee trust are components of Shareholders' equity. The Company recognizes the original amount of deferred compensation (fair value of the deferred stock award at the date of grant—see Note 14) as the basis for recognition in Employee stock trust and Common stock issued to employee trust. Changes in the fair value of amounts owed to employees are not recognized as the Company's deferred compensation plans do not permit diversification and must be settled by the delivery of a fixed number of shares of the Company's common stock.

**3.    Goodwill and Net Intangible Assets.**

During fiscal 2006, fiscal 2005 and fiscal 2004, the Company completed the annual goodwill impairment test (as of December 1 in each fiscal year). The Company's testing did not indicate any goodwill impairment.

Morgan Stanley

## MORGAN STANLEY

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Changes in the carrying amount of the Company's goodwill and intangible assets for fiscal 2006 and fiscal 2005 were as follows:

| | Institutional Securities | Global Wealth Management Group | Asset Management | Discover | Total |
|---|---|---|---|---|---|
| | | (dollars in millions) | | | |
| *Goodwill:* | | | | | |
| **Balance as of November 30, 2004** . . . . . . . . . . . . | $319 | $583 | $966 | $— | $1,868 |
| Translation adjustments . . . . . . . . . . . . . . . . . . . . . | — | (43) | — | — | (43) |
| Goodwill acquired during the year and other(1) . . . . . | 125 | — | — | 256 | 381 |
| **Balance as of November 30, 2005** . . . . . . . . . . . . | 444 | 540 | 966 | 256 | 2,206 |
| Translation adjustments . . . . . . . . . . . . . . . . . . . . . | — | 49 | — | 31 | 80 |
| Goodwill acquired during the year and other(2) . . . . . | 257 | — | 2 | 247 | 506 |
| **Balance as of November 30, 2006** . . . . . . . . . . . . | $701 | $589 | $968 | $534 | $2,792 |
| *Intangible assets:* | | | | | |
| **Balance as of November 30, 2004** . . . . . . . . . . . . | $331 | $— | $— | $— | $ 331 |
| Intangible assets sold(3) . . . . . . . . . . . . . . . . . . . . . | (75) | — | — | — | (75) |
| Intangible assets acquired during the year(1) . . . . . . . | — | — | — | 73 | 73 |
| Amortization expense . . . . . . . . . . . . . . . . . . . . . . | (29) | — | — | (6) | (35) |
| **Balance as of November 30, 2005** . . . . . . . . . . . . | 227 | — | — | 67 | 294 |
| Intangible assets acquired during the year(2) . . . . . . . | 160 | — | 4 | 130 | 294 |
| Translation adjustments . . . . . . . . . . . . . . . . . . . . . | — | — | — | 16 | 16 |
| Amortization expense . . . . . . . . . . . . . . . . . . . . . . | (33) | — | (1) | (12) | (46) |
| **Balance as of November 30, 2006** . . . . . . . . . . . . | $354 | $— | $ 3 | $201 | $ 558 |

---

(1) Institutional Securities activity includes adjustments to goodwill related to the sale of the Company's interest in POSIT (see Note 23) and for the recognition of deferred tax liabilities in connection with the Company's acquisition of Barra, Inc. ("Barra"). Discover activity represents goodwill and intangible assets acquired in connection with the Company's acquisition of PULSE (see Note 23).

(2) Institutional Securities activity primarily represents goodwill and intangible assets acquired in connection with the Company's acquisition of TransMontaigne Inc., Heidmar Group and Nan Tung Bank Ltd. Zhuhai. Discover activity represents goodwill and intangible assets acquired in connection with the Company's acquisition of Goldfish and other acquisitions (see Note 23).

(3) Amount is related to the sale of the Company's interest in POSIT (see Note 23).

Amortizable intangible assets, which are included in the Institutional Securities, Asset Management and Discover business segments, were as follows:

| | At November 30, 2006 | | At November 30, 2005 | |
|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Gross Carrying Amount | Accumulated Amortization |
| | | (dollars in millions) | | |
| Amortizable intangible assets: | | | | |
|     Trademarks . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $193 | $ 15 | $105 | $ 7 |
|     Technology-related . . . . . . . . . . . . . . . . . . . . . | 153 | 55 | 147 | 37 |
|     Customer relationships . . . . . . . . . . . . . . . . . . . | 214 | 25 | 96 | 11 |
|     Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 107 | 14 | 9 | 8 |
|       **Total amortizable intangible assets** . . . . . | $667 | $109 | $357 | $63 |

Amortization expense associated with intangible assets is estimated to be approximately $58 million per year over the next five fiscal years.

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**4. Collateralized and Securitization Transactions.**

Securities purchased under agreements to resell ("reverse repurchase agreements") and Securities sold under agreements to repurchase ("repurchase agreements"), principally government and agency securities, are carried at the amounts at which the securities subsequently will be resold or reacquired as specified in the respective agreements; such amounts include accrued interest. Reverse repurchase agreements and repurchase agreements are presented on a net-by-counterparty basis, when appropriate. The Company's policy is to take possession of securities purchased under agreements to resell. Securities borrowed and Securities loaned are carried at the amounts of cash collateral advanced and received in connection with the transactions. Other secured financings include the liabilities related to transfers of financial assets that are accounted for as financings rather than sales, consolidated variable interest entities where the Company is deemed to be the primary beneficiary and certain equity-referenced securities and loans where in all instances these liabilities are payable solely from the cash flows of the related assets accounted for as Financial instruments owned.

The Company pledges its financial instruments owned to collateralize repurchase agreements and other securities financings. Pledged securities that can be sold or repledged by the secured party are identified as Financial instruments owned (pledged to various parties) in the consolidated statements of financial condition. The carrying value and classification of securities owned by the Company that have been loaned or pledged to counterparties where those counterparties do not have the right to sell or repledge the collateral were as follows:

|  | At November 30, 2006 | At November 30, 2005 |
|---|---|---|
|  | (dollars in millions) | |
| Financial instruments owned: | | |
| U.S. government and agency securities | $12,111 | $12,494 |
| Other sovereign government obligations | 893 | 328 |
| Corporate and other debt | 44,237 | 21,775 |
| Corporate equities | 6,662 | 5,290 |
| Total | $63,903 | $39,887 |

The Company enters into reverse repurchase agreements, repurchase agreements, securities borrowed and securities loaned transactions to, among other things, acquire securities to cover short positions and settle other securities obligations, to accommodate customers' needs and to finance the Company's inventory positions. The Company also engages in securities financing transactions for customers through margin lending. Under these agreements and transactions, the Company either receives or provides collateral, including U.S. government and agency securities, other sovereign government obligations, corporate and other debt, and corporate equities. The Company receives collateral in the form of securities in connection with reverse repurchase agreements, securities borrowed and derivative transactions, and customer margin loans. In many cases, the Company is permitted to sell or repledge these securities held as collateral and use the securities to secure repurchase agreements, to enter into securities lending and derivative transactions or for delivery to counterparties to cover short positions. At November 30, 2006 and November 30, 2005, the fair value of securities received as collateral where the Company is permitted to sell or repledge the securities was $942 billion and $798 billion, respectively, and the fair value of the portion that had been sold or repledged was $780 billion and $737 billion, respectively.

The Company additionally receives securities as collateral in connection with certain securities for securities transactions in which the Company is the lender. In instances where the Company is permitted to sell or repledge these securities, the Company reports the fair value of the collateral received and the related obligation to return the collateral in the consolidated statement of financial condition. At November 30, 2006 and November 30, 2005, $64,588 million and $43,557 million, respectively, were reported as Securities received as collateral and an Obligation to return securities received as collateral in the consolidated statements of financial condition.

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The Company manages credit exposure arising from reverse repurchase agreements, repurchase agreements, securities borrowed and securities loaned transactions by, in appropriate circumstances, entering into master netting agreements and collateral arrangements with counterparties that provide the Company, in the event of a customer default, the right to liquidate collateral and the right to offset a counterparty's rights and obligations. The Company also monitors the fair value of the underlying securities as compared with the related receivable or payable, including accrued interest, and, as necessary, requests additional collateral to ensure such transactions are adequately collateralized. Where deemed appropriate, the Company's agreements with third parties specify its rights to request additional collateral. Customer receivables generated from margin lending activity are collateralized by customer-owned securities held by the Company. For these transactions, adherence to the Company's collateral policies significantly limits the Company's credit exposure in the event of customer default. The Company may request additional margin collateral from customers, if appropriate, and, if necessary, may sell securities that have not been paid for or purchase securities sold, but not delivered from customers.

In connection with its Institutional Securities business, the Company engages in securitization activities related to residential and commercial mortgage loans, U.S. agency collateralized mortgage obligations, corporate bonds and loans, and other types of financial assets. These assets are carried at fair value, and any changes in fair value are recognized in the consolidated statements of income. The Company may act as underwriter of the beneficial interests issued by securitization vehicles. Underwriting net revenues are recognized in connection with these transactions. The Company may retain interests in the securitized financial assets as one or more tranches of the securitization. These retained interests are included in the consolidated statements of financial condition at fair value. Any changes in the fair value of such retained interests are recognized in the consolidated statements of income. Retained interests in securitized financial assets associated with the Institutional Securities business were approximately $4.8 billion at November 30, 2006, the majority of which were related to residential mortgage loan, U.S. agency collateralized mortgage obligation and commercial mortgage loan securitization transactions. Net gains at the time of securitization were not material in fiscal 2006. The assumptions that the Company used to determine the fair value of its retained interests at the time of securitization related to those transactions that occurred during fiscal 2006 were not materially different from the assumptions included in the table below. Additionally, as indicated in the table below, the Company's exposure to credit losses related to these retained interests was not material to the Company's results of operations.

The following table presents information on the Company's residential mortgage loan, U.S. agency collateralized mortgage obligation and commercial mortgage loan securitization transactions. Key economic assumptions and the sensitivity of the current fair value of the retained interests to immediate 10% and 20% adverse changes in those assumptions at November 30, 2006 were as follows (dollars in millions):

| | Residential Mortgage Loans | U.S. Agency Collateralized Mortgage Obligations | Commercial Mortgage Loans |
|---|---|---|---|
| Retained interests (carrying amount/fair value) . . . . . . . . . . | $    2,863 | $    1,098 | $    682 |
| Weighted average life (in months) . . . . . . . . . . . . . . . . . . . . | 37 | 64 | 99 |
| Credit losses (rate per annum) . . . . . . . . . . . . . . . . . . . . . . . | 0.00-4.50% | — | 0.00-10.93% |
|    Impact on fair value of 10% adverse change . . . . . . . . . | $    (128) | $    — | $    (6) |
|    Impact on fair value of 20% adverse change . . . . . . . . . | $    (248) | $    — | $    (11) |
| Weighted average discount rate (rate per annum) . . . . . . . . . | 10.93% | 5.46% | 6.62% |
|    Impact on fair value of 10% adverse change . . . . . . . . . | $    (51) | $    (24) | $    (24) |
|    Impact on fair value of 20% adverse change . . . . . . . . . | $    (103) | $    (47) | $    (47) |
| Prepayment speed assumption(1)(2) . . . . . . . . . . . . . . . . . . . | 199-2833PSA | 147-538PSA | — |
|    Impact on fair value of 10% adverse change . . . . . . . . . | $    (105) | $    (4) | $    — |
|    Impact on fair value of 20% adverse change . . . . . . . . . | $    (145) | $    (8) | $    — |

(1)  Amounts for residential mortgage loans exclude positive valuation effects from immediate 10% and 20% changes.

(2)  Commercial mortgage loans typically contain provisions that either prohibit or economically penalize the borrower from prepaying the loan for a specified period of time.

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The table above does not include the offsetting benefit of any financial instruments that the Company may utilize to hedge risks inherent in its retained interests. In addition, the sensitivity analysis is hypothetical and should be used with caution. Changes in fair value based on a 10% or 20% variation in an assumption generally cannot be extrapolated because the relationship of the change in the assumption to the change in fair value may not be linear. Also, the effect of a variation in a particular assumption on the fair value of the retained interests is calculated independent of changes in any other assumption; in practice, changes in one factor may result in changes in another, which might magnify or counteract the sensitivities. In addition, the sensitivity analysis does not consider any corrective action that the Company may take to mitigate the impact of any adverse changes in the key assumptions.

In connection with its Institutional Securities business, during fiscal 2006, fiscal 2005 and fiscal 2004, the Company received proceeds from new securitization transactions of $68 billion, $65 billion and $72 billion, respectively, and cash flows from retained interests in securitization transactions of $6.0 billion, $7.1 billion and $6.1 billion, respectively.

**5.  Consumer Loans.**

Consumer loans were as follows:

|  | At November 30, 2006 | At November 30, 2005 |
|---|---|---|
|  | (dollars in millions) | |
| General purpose credit card, mortgage and consumer installment . . . . . . . . . . . . . . . | $25,004 | $23,754 |
| Less: | | |
| Allowance for consumer loan losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 831 | 838 |
| Consumer loans, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $24,173 | $22,916 |

Activity in the allowance for consumer loan losses was as follows:

|  | Fiscal 2006 | Fiscal 2005(1) | Fiscal 2004(1) |
|---|---|---|---|
|  | (dollars in millions) | | |
| Balance at beginning of period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 838 | $ 943 | $ 1,002 |
| Additions: | | | |
| Provision for consumer loan losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 756 | 878 | 926 |
| Purchase of consumer loans(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 55 | — | — |
| Deductions: | | | |
| Charge-offs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,001) | (1,145) | (1,120) |
| Recoveries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 174 | 167 | 132 |
| Net charge-offs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (827) | (978) | (988) |
| Translation adjustments and other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 | (5) | 3 |
| Balance at end of period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 831 | $ 838 | $ 943 |

---

(1)  Certain reclassifications have been made to prior-year amounts to conform to the current year's presentation.

(2)  Amounts relate to the Company's acquisition of Goldfish (see Note 23) and other acquisitions.

Morgan Stanley

128

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Information on net charge-offs of interest and cardmember fees was as follows:

| | Fiscal 2006 | Fiscal 2005 | Fiscal 2004 |
|---|---|---|---|
| | (dollars in millions) | | |
| Interest accrued on general purpose credit card loans subsequently charged off, net of recoveries (recorded as a reduction of Interest revenue) | $196 | $227 | $233 |
| Cardmember fees accrued on general purpose credit card loans subsequently charged off, net of recoveries (recorded as a reduction to Merchant, cardmember and other fee revenue) | $ 97 | $122 | $145 |

At November 30, 2006, the Company had commitments to extend credit for consumer loans of approximately $274 billion. Such commitments arise primarily from agreements with customers for unused lines of credit on certain credit cards, provided that there are no violations of conditions established in the related agreements. These commitments, substantially all of which the Company can terminate at any time and which do not necessarily represent future cash requirements, are periodically reviewed based on account usage and customer creditworthiness.

At November 30, 2006 and November 30, 2005, $5,570 million and $4,960 million, respectively, of the Company's consumer loans had minimum contractual maturities of less than one year. Because of the uncertainty regarding consumer loan repayment patterns, which historically have been higher than contractually required minimum payments, this amount may not necessarily be indicative of the Company's actual consumer loan repayments.

The Company received net proceeds from consumer loan sales of $11,532 million, $10,525 million and $7,590 million in fiscal 2006, fiscal 2005 and fiscal 2004, respectively.

At November 30, 2006 and November 30, 2005, $2.3 billion and $4.0 billion, respectively, of the Company's consumer loans were classified as held for sale.

The Company's U.S. consumer loan portfolio, including securitized loans, is geographically diverse, with a distribution approximating that of the population of the U.S.

***Credit Card Securitization Activities.*** The Company's retained interests in credit card asset securitizations include undivided seller's interests, accrued interest receivable on securitized credit card receivables, cash collateral accounts, servicing rights, rights to any excess cash flows ("Residual Interests") remaining after payments to investors in the securitization trusts of their contractual rate of return and reimbursement of credit losses, and other retained interests. The undivided seller's interests less an applicable allowance for loan losses is recorded in Consumer loans. The Company's undivided seller's interests rank *pari passu* with investors' interests in the securitization trusts, and the remaining retained interests are subordinate to investors' interests. Accrued interest receivable and certain other subordinated retained interests are recorded in Other assets at amounts that approximate fair value. The Company receives annual servicing fees of 2% of the investor principal balance outstanding. The Company does not recognize servicing assets or servicing liabilities for servicing rights as the servicing contracts provide just adequate compensation, as defined in SFAS No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities" ("SFAS No. 140"), to the Company for performing the servicing. Residual Interests and cash collateral accounts are recorded in Other assets and reflected at fair value with changes in fair value recorded currently in earnings. At November 30, 2006, the Company had $12,661 million of retained interests, including $9,370 million of undivided seller's interests, in

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

credit card asset securitizations. The retained interests are subject to credit, payment and interest rate risks on the transferred credit card assets. The investors and the securitization trusts have no recourse to the Company's other assets for failure of cardmembers to pay when due.

During fiscal 2006 and fiscal 2005, the Company completed credit card asset securitizations of $8.7 billion and $7.2 billion, respectively, and recognized net securitization gains of $159 million and net securitization losses of $78 million, respectively, as servicing and securitization income in the consolidated statements of income. The amount for fiscal 2006 includes an increase in the fair value of the Company's retained interests in securitized credit card receivables primarily resulting from a favorable impact on charge-offs following the enactment of federal bankruptcy legislation effective in October 2005. The uncollected balances of securitized general purpose credit card loans were $26.7 billion and $24.4 billion at November 30, 2006 and November 30, 2005, respectively.

Key economic assumptions used in measuring the Residual Interests at the date of securitization resulting from credit card asset securitizations completed during fiscal 2006 and fiscal 2005 were as follows:

|  | Fiscal 2006 | Fiscal 2005 |
|---|---|---|
| Weighted average life (in months) ...................... | 3.7-4.7 | 4.1-5.9 |
| Payment rate (rate per month) ........................ | 19.69-21.58% | 18.52-21.14% |
| Credit losses (rate per annum) ........................ | 4.57-5.23% | 5.60-6.00% |
| Discount rate (rate per annum) ........................ | 11.00% | 11.00-12.00% |

Key economic assumptions and the sensitivity of the current fair value of the Residual Interests to immediate 10% and 20% adverse changes in those assumptions were as follows (dollars in millions):

|  | At November 30, 2006 |
|---|---|
| Residual Interests (carrying amount/fair value) ......................... | $  338 |
| Weighted average life (in months) .................................. | 4.4 |
| Weighted average payment rate (rate per month) ....................... | 21.44% |
| Impact on fair value of 10% adverse change ........................ | $   (27) |
| Impact on fair value of 20% adverse change ........................ | $   (50) |
| Weighted average credit losses (rate per annum) ....................... | 4.48% |
| Impact on fair value of 10% adverse change ........................ | $   (39) |
| Impact on fair value of 20% adverse change ........................ | $   (78) |
| Weighted average discount rate (rate per annum) ....................... | 11.00% |
| Impact on fair value of 10% adverse change ........................ | $    (1) |
| Impact on fair value of 20% adverse change ........................ | $    (3) |

The sensitivity analysis in the table above is hypothetical and should be used with caution. Changes in fair value based on a 10% or 20% variation in an assumption generally cannot be extrapolated because the relationship of the change in the assumption to the change in fair value may not be linear. Also, the effect of a variation in a particular assumption on the fair value of the Residual Interests is calculated independent of changes in any other assumption; in practice, changes in one factor may result in changes in another (for example, increases in market interest rates may result in lower payments and increased credit losses), which might magnify or counteract the sensitivities. In addition, the sensitivity analysis does not consider any corrective action that the Company may take to mitigate the impact of any adverse changes in the key assumptions.

Morgan Stanley

## MORGAN STANLEY

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The table below summarizes certain cash flows received from the securitization master trusts (dollars in billions):

| | Fiscal 2006 | Fiscal 2005 | Fiscal 2004 |
|---|---|---|---|
| Proceeds from new credit card asset securitizations ..................... | $ 8.7 | $ 7.2 | $ 3.7 |
| Proceeds from collections reinvested in previous credit card asset securitizations ................................................ | $60.9 | $54.9 | $61.6 |
| Contractual servicing fees received .................................. | $ 0.5 | $ 0.6 | $ 0.6 |
| Cash flows received from retained interests ........................... | $ 2.3 | $ 2.3 | $ 1.8 |

The table below presents quantitative information about delinquencies, net principal credit losses and components of managed general purpose credit card loans, including securitized loans (dollars in millions):

| | At November 30, 2006 | | Fiscal 2006 | |
|---|---|---|---|---|
| | Loans Outstanding | Loans Delinquent | Average Loans | Net Principal Credit Losses |
| Managed general purpose credit card loans ................... | $50,291 | $1,763 | $48,207 | $1,967 |
| Less: Securitized general purpose credit card loans ............. | 26,703 | | | |
| Owned general purpose credit card loans ..................... | $23,588 | | | |

## 6. Deposits.

Deposits were as follows:

| | At November 30, 2006 | At November 30, 2005 |
|---|---|---|
| | (dollars in millions) | |
| Demand, passbook and money market accounts .................... | $14,872 | $ 2,629 |
| Consumer certificate accounts ................................. | 4,076 | 1,826 |
| $100,000 minimum certificate accounts .......................... | 9,395 | 14,208 |
| Total ................................................. | $28,343 | $18,663 |

The weighted average interest rates of interest-bearing deposits outstanding during fiscal 2006 and fiscal 2005 were 4.4% and 4.1%, respectively. The increase in deposits in fiscal 2006 primarily reflected growth in the Company's bank deposit program.

At November 30, 2006, interest-bearing deposits maturing over the next five years were as follows:

| Fiscal Year | (dollars in millions) |
|---|---|
| 2007 ......................................................... | $24,354 |
| 2008 ......................................................... | 1,430 |
| 2009 ......................................................... | 651 |
| 2010 ......................................................... | 715 |
| 2011 ......................................................... | 142 |

Morgan Stanley

# MORGAN STANLEY

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**7.  Short-Term Borrowings.**

The table below summarizes certain information regarding short-term borrowings for fiscal 2006 and fiscal 2005 (dollars in millions):

|  | At November 30, | |
|---|---|---|
|  | **2006** | **2005** |
| *Commercial paper:* | | |
| Balance at year-end | $22,433 | $23,209 |
| Average amount outstanding | $23,962 | $28,270 |
| Weighted average interest rate on year-end balance | 4.6% | 3.3% |
| *Other short-term borrowings(1):* | | |
| Balance at year-end | $ 6,659 | $ 7,911 |
| Average amount outstanding | $ 7,773 | $ 9,100 |

_____

(1)  These borrowings included bank loans, Federal Funds and bank notes.

The Company maintains a senior revolving credit agreement with a group of banks to support general liquidity needs, including the issuance of commercial paper, which consists of three separate tranches: a U.S. dollar tranche with the Company as borrower; a Japanese yen tranche with MSJS as borrower and the Company as borrower and guarantor for MSJS borrowings; and a multicurrency tranche available in both euro and sterling with the Company as borrower. Under this combined facility (the "Credit Facility"), the banks are committed to provide up to $7.5 billion under the U.S. dollar tranche, 80 billion Japanese yen under the Japanese yen tranche and $3.25 billion under the multicurrency tranche. At November 30, 2006, the Company had a $16.4 billion consolidated stockholders' equity surplus as compared with the Credit Facility's covenant requirement.

The Company anticipates that it may utilize the Credit Facility for short-term funding from time to time. The Company does not believe that any of the covenant requirements in its Credit Facility will impair its ability to obtain funding under the Credit Facility, pay its current level of dividends or obtain loan arrangements, letters of credit and other financial guarantees or other financial accommodations. At November 30, 2006, no borrowings were outstanding under the Credit Facility.

The Company and its subsidiaries also maintain certain committed bilateral credit facilities to support general liquidity needs. These facilities are expected to be drawn from time to time to cover short-term funding needs.

The Company, through several of its subsidiaries, maintains several funded committed credit facilities to support various businesses, including (without limitation) the collateralized commercial and residential mortgage whole loan, derivative contracts, warehouse lending, emerging market loan, structured product, corporate loan, investment banking and prime brokerage businesses.

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**8. Long-Term Borrowings.**

*Maturities and Terms.*   Long-term borrowings at fiscal year-end consisted of the following:

| | U.S. Dollar | | | Non-U.S. Dollar(1) | | | At November 30, | |
|---|---|---|---|---|---|---|---|---|
| | Fixed Rate | Floating Rate(2) | Index/ Equity Linked | Fixed Rate | Floating Rate(2) | Index/ Equity Linked | 2006 Total(3) | 2005 Total(3) |
| | (dollars in millions) | | | | | | | |
| Due in fiscal 2006 ....... | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ 13,822 |
| Due in fiscal 2007 ....... | 3,692 | 6,651 | 3,515 | 590 | 3,680 | 146 | 18,274 | 30,308 |
| Due in fiscal 2008 ....... | 1,566 | 24,287 | 2,720 | 1,333 | 3,153 | 699 | 33,758 | 10,790 |
| Due in fiscal 2009 ....... | 1,968 | 3,635 | 1,545 | 2,929 | 331 | 1,499 | 11,907 | 7,590 |
| Due in fiscal 2010 ....... | 3,621 | 1,346 | 1,151 | 2,116 | 1,816 | 1,547 | 11,597 | 9,946 |
| Due in fiscal 2011 ....... | 5,683 | 1,998 | 784 | 1,585 | 10 | 1,062 | 11,122 | 8,295 |
| Thereafter ............. | 21,936 | 6,058 | 3,074 | 11,891 | 13,033 | 2,328 | 58,320 | 29,714 |
| Total ............. | $38,466 | $43,975 | $12,789 | $20,444 | $22,023 | $7,281 | $144,978 | $110,465 |
| Weighted average coupon at fiscal year-end ...... | 5.6% | 5.5% | n/a | 3.9% | 4.0% | n/a | 5.0% | 4.6% |

(1)  Weighted average coupon was calculated utilizing non-U.S. dollar interest rates.

(2)  U.S. dollar contractual floating rate borrowings bear interest based on a variety of money market indices, including London Interbank Offered Rates ("LIBOR") and Federal Funds rates. Non-U.S. dollar contractual floating rate borrowings bear interest based primarily on Euribor floating rates.

(3)  Amounts include a decrease of approximately $326 million at November 30, 2006 and $324 million at November 30, 2005 to the carrying amount of certain of the Company's long-term borrowings associated with fair value hedges under SFAS No. 133.

The Company's long-term borrowings included the following components:

| | At November 30, | |
|---|---|---|
| | 2006 | 2005 |
| | (dollars in millions) | |
| Senior debt .................................................................... | $136,213 | $103,694 |
| Subordinated debt .............................................................. | 3,881 | 4,007 |
| Junior subordinated debentures .................................................. | 4,884 | 2,764 |
| Total ....................................................................... | $144,978 | $110,465 |

Senior debt securities often are denominated in various non-U.S. dollar currencies and may be structured to provide a return that is equity-linked, credit-linked or linked to some other index (e.g., the consumer price index). Senior debt also may be structured to be callable by the Company or extendible at the option of holders of the senior debt securities. Debt containing provisions that effectively allow the holders to put or extend the notes aggregated $16,016 million at November 30, 2006 and $16,018 million at November 30, 2005. Subordinated debt and junior subordinated debentures typically are issued to meet the capital requirements of the Company or its regulated subsidiaries and primarily are U.S. dollar denominated.

*Senior Debt—Structured Borrowings.*   The Company's index/equity-linked borrowings include various structured instruments whose payments and redemption values are linked to the performance of a specific index (e.g., Standard & Poor's 500), a basket of stocks, a specific equity security, a credit exposure or basket of credit exposures. To minimize the exposure resulting from movements in the underlying equity, credit, or other position or index, the Company has entered into various swap contracts and purchased options that effectively convert the

133

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

borrowing costs into floating rates based upon LIBOR. These instruments are included in the preceding table at their redemption values based on the performance of the underlying indices, baskets of stocks, or specific equity securities, credit or other position or index. The Company accounts for its structured borrowings as having embedded derivatives. The embedded derivatives are bifurcated from the hybrid notes and are accounted for at fair value, with the changes in fair value reported in Principal transactions trading revenues. The swaps and purchased options used to economically hedge the embedded features are derivatives and also are carried at fair value, with changes in fair value reported in Principal transactions trading revenues.

*Subordinated Debt and Junior Subordinated Debentures.*   Included in the Company's long-term borrowings are subordinated notes (including the notes issued by MS&Co. discussed below) of $3,881 million having a contractual weighted average coupon of 4.77% at November 30, 2006 and $4,007 million having a weighted average coupon of 4.86% at November 30, 2005. Junior subordinated debentures issued by the Company were $4,884 million at November 30, 2006 and $2,764 million at November 30, 2005 having a contractual weighted average coupon of 6.51% at November 30, 2006 and 6.45% at November 30, 2005. Maturities of the subordinated and junior subordinated notes range from fiscal 2011 to fiscal 2033. Maturities of certain junior subordinated debentures can be extended to 2066 at the Company's option.

At November 30, 2006, MS&Co. had outstanding a $25 million 7.82% fixed rate subordinated Series F note. The note matures in fiscal 2016. The terms of the note contain restrictive covenants that require, among other things, MS&Co. to maintain specified levels of Consolidated Tangible Net Worth and Net Capital, each as defined. As of November 30, 2006, MS&Co. was in compliance with these restrictive covenants.

*Asset and Liability Management.*   In general, securities inventories not financed by secured funding sources and the majority of current assets are financed with a combination of short-term funding, floating rate long-term debt or fixed rate long-term debt swapped to a floating rate. Fixed assets are financed with fixed rate long-term debt. Both fixed rate long-term debt and floating rate long-term debt (in addition to sources of funds accessed directly by the Company's Discover business segment) are used to finance the Company's consumer loan portfolio. The Company uses interest rate swaps to more closely match these borrowings to the duration, holding period and interest rate characteristics of the assets being funded and to manage interest rate risk. These swaps effectively convert certain of the Company's fixed rate borrowings into floating rate obligations. In addition, for non-U.S. dollar currency borrowings that are not used to fund assets in the same currency, the Company has entered into currency swaps that effectively convert the borrowings into U.S. dollar obligations. The Company's use of swaps for asset and liability management affected its effective average borrowing rate as follows:

|  | Fiscal 2006 | Fiscal 2005 | Fiscal 2004 |
|---|---|---|---|
| Weighted average coupon of long-term borrowings at fiscal year-end(1) | 5.0% | 4.6% | 4.2% |
| Effective average borrowing rate for long-term borrowings after swaps at fiscal year-end(1) | 5.0% | 4.1% | 2.9% |

_____
(1)   Included in the weighted average and effective average calculations are non-U.S. dollar interest rates.

Cash paid for interest for the Company's borrowings and deposits approximated the related interest expense in fiscal 2006, fiscal 2005 and fiscal 2004.

Subsequent to fiscal year-end and through January 31, 2007, the Company's long-term borrowings (net of repayments) increased by approximately $11 billion.

Morgan Stanley                                                    134

# MORGAN STANLEY

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**9. Commitments and Contingencies.**

***Office Facilities.*** The Company has non-cancelable operating leases covering office space and equipment. At November 30, 2006, future minimum rental commitments under such leases (net of subleases, principally on office rentals) were as follows (dollars in millions):

Fiscal Year

| | |
|---|---|
| 2007 | $ 506 |
| 2008 | 500 |
| 2009 | 413 |
| 2010 | 322 |
| 2011 | 268 |
| Thereafter | 1,852 |

Occupancy lease agreements, in addition to base rentals, generally provide for rent and operating expense escalations resulting from increased assessments for real estate taxes and other charges. Total rent expense, net of sublease rental income, was $491 million, $595 million and $444 million in fiscal 2006, fiscal 2005 and fiscal 2004, respectively. The net rent expense for fiscal 2005 included $109 million related to the lease adjustment charge recorded in the first quarter of fiscal 2005 (see Note 26).

***Equipment.*** In connection with its commodities business, the Company enters into operating leases for both crude oil and refined products storage and for vessel charters. These operating leases are integral parts of the Company's commodities risk management business. At November 30, 2006, future minimum rental commitments under such leases were as follows (dollars in millions):

Fiscal Year

| | |
|---|---|
| 2007 | $ 374 |
| 2008 | 247 |
| 2009 | 181 |
| 2010 | 99 |
| 2011 | 46 |
| Thereafter | 44 |

***Letters of Credit and Other Financial Guarantees.*** At November 30, 2006 and November 30, 2005, the Company had approximately $5.8 billion and $6.9 billion, respectively, of letters of credit and other financial guarantees outstanding to satisfy various collateral requirements.

***Securities Activities.*** In connection with certain of its Institutional Securities business activities, the Company provides loans or lending commitments (including bridge financing) to selected clients. The borrowers may be rated investment grade or non-investment grade. These loans and commitments have varying terms, may be senior or subordinated, are generally contingent upon representations, warranties and contractual conditions applicable to the borrower, and may be syndicated or traded by the Company.

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The aggregate value of the investment grade and non-investment grade primary and secondary lending commitments are shown below:

| | At November 30, 2006 | At November 30, 2005 |
|---|---|---|
| | (dollars in millions) | |
| Investment grade corporate lending commitments | $34,306 | $23,968 |
| Non-investment grade corporate lending commitments | 17,809 | 13,066 |
| Total | $52,115 | $37,034 |

Financial instruments sold, not yet purchased include obligations of the Company to deliver specified financial instruments at contracted prices, thereby creating commitments to purchase the financial instruments in the market at prevailing prices. Consequently, the Company's ultimate obligation to satisfy the sale of financial instruments sold, not yet purchased may exceed the amounts recognized in the consolidated statements of financial condition.

The Company has commitments to fund other less liquid investments, including at November 30, 2006, $1,279 million in connection with investment activities, $15,888 million related to secured lending transactions and $5,062 million related to forward purchase contracts involving mortgage loans. Additionally, the Company has provided and will continue to provide financing, including margin lending and other extensions of credit, to clients that may subject the Company to increased credit and liquidity risks.

At November 30, 2006, the Company had commitments to enter into reverse repurchase and repurchase agreements of approximately $104 billion and $76 billion, respectively.

*Legal.* In the normal course of business, the Company has been named, from time to time, as a defendant in various legal actions, including arbitrations, class actions and other litigation, arising in connection with its activities as a global diversified financial services institution. Certain of the actual or threatened legal actions include claims for substantial compensatory and/or punitive damages or claims for indeterminate amounts of damages. In some cases, the issuers that would otherwise be the primary defendants in such cases are bankrupt or in financial distress.

The Company is also involved, from time to time, in other reviews, investigations and proceedings (both formal and informal) by governmental and self-regulatory agencies regarding the Company's business, including, among other matters, accounting and operational matters, certain of which may result in adverse judgments, settlements, fines, penalties, injunctions or other relief. The number of these reviews, investigations and proceedings has increased in recent years with regard to many firms in the financial services industry, including the Company.

The Company contests liability and/or the amount of damages as appropriate in each pending matter. In view of the inherent difficulty of predicting the outcome of such matters, particularly in cases where claimants seek substantial or indeterminate damages or where investigations and proceedings are in the early stages, the Company cannot predict with certainty the loss or range of loss, if any, related to such matters, how or if such matters will be resolved, when they will ultimately be resolved, or what the eventual settlement, fine, penalty or other relief, if any, might be. Subject to the foregoing, and except for the pending matter described in the paragraphs below, the Company believes, based on current knowledge and after consultation with counsel, that the outcome of the pending matters will not have a material adverse effect on the consolidated financial condition

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

of the Company, although the outcome of such matters could be material to the Company's operating results and cash flows for a particular future period, depending on, among other things, the level of the Company's revenues or income for such period. Legal reserves have been established in accordance with SFAS No. 5, "Accounting for Contingencies" ("SFAS No. 5"). Once established, reserves are adjusted when there is more information available or when an event occurs requiring a change.

*Coleman Litigation.*    On May 8, 2003, Coleman (Parent) Holdings Inc. ("CPH") filed a complaint against the Company in the Circuit Court of the Fifteenth Judicial Circuit for Palm Beach County, Florida. The complaint relates to the 1998 merger between The Coleman Company, Inc. ("Coleman") and Sunbeam, Inc. ("Sunbeam"). The complaint, as amended, alleges that CPH was induced to agree to the transaction with Sunbeam based on certain financial misrepresentations, and it asserts claims against the Company for aiding and abetting fraud, conspiracy and punitive damages. Shortly before trial, which commenced in April 2005, the trial court granted, in part, a motion for entry of a default judgment against the Company and ordered that portions of CPH's complaint, including those setting forth CPH's primary allegations against the Company, be read to the jury and deemed established for all purposes in the action. In May 2005, the jury returned a verdict in favor of CPH and awarded CPH $604 million in compensatory damages and $850 million in punitive damages. On June 23, 2005, the trial court issued a final judgment in favor of CPH in the amount of $1,578 million, which includes prejudgment interest and excludes certain payments received by CPH in settlement of related claims against others.

On June 27, 2005, the Company filed a notice of appeal with the District Court of Appeal for the Fourth District of Florida (the "Court of Appeal") and posted a supersedeas bond, which automatically stayed execution of the judgment pending appeal. Included in cash and securities deposited with clearing organizations or segregated under federal and other regulations or requirements in the consolidated statement of financial condition is $1,840 million of money market deposits that have been pledged to obtain the supersedeas bond. The Company filed its initial brief in support of its appeal on December 7, 2005, and, on June 28, 2006, the Court of Appeal heard oral argument. The Company's appeal seeks to reverse the judgment of the trial court on several grounds and asks that the case be remanded for entry of a judgment in favor of the Company or, in the alternative, for a new trial.

The Company believes, after consultation with outside counsel, that it is probable that the compensatory and punitive damages awards will be overturned on appeal and the case remanded for a new trial. Taking into account the advice of outside counsel, the Company is maintaining a reserve of $360 million for the Coleman litigation, which it believes to be a reasonable estimate, under SFAS No. 5, of the low end of the range of its probable exposure in the event the judgment is overturned and the case remanded for a new trial. If the compensatory and/or punitive awards are ultimately upheld on appeal, in whole or in part, the Company may incur an additional expense equal to the difference between the amount affirmed on appeal (and post-judgment interest thereon) and the amount of the reserve. While the Company cannot predict with certainty the amount of such additional expense, such additional expense could have a material adverse effect on the consolidated financial condition of the Company and/or the Company's or Institutional Securities' operating results and cash flows for a particular future period, and the upper end of the range could exceed $1.4 billion.

*Income Taxes.*    For information on contingencies associated with income tax examinations, see Note 16.

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**10.   Earnings per Common Share.**

Basic EPS is computed by dividing income available to common shareholders by the weighted average number of common shares outstanding for the period. Diluted EPS reflects the assumed conversion of all dilutive securities. The following table presents the calculation of basic and diluted EPS (in millions, except for per share data):

|  | Fiscal 2006 | Fiscal 2005 | Fiscal 2004 |
|---|---|---|---|
| **Basic EPS:** | | | |
| Income from continuing operations before cumulative effect of accounting change, net | $7,497 | $5,192 | $4,589 |
| Loss on discontinued operations, net | (25) | (302) | (103) |
| Cumulative effect of accounting change, net | — | 49 | — |
| Preferred stock dividend requirements | (19) | — | — |
| Net income applicable to common shareholders | $7,453 | $4,939 | $4,486 |
| Weighted average common shares outstanding | 1,010 | 1,050 | 1,080 |
| Earnings per basic common share: | | | |
| Income from continuing operations | $ 7.40 | $ 4.94 | $ 4.25 |
| Loss on discontinued operations | (0.02) | (0.29) | (0.10) |
| Cumulative effect of accounting change, net | — | 0.05 | — |
| Earnings per basic common share | $ 7.38 | $ 4.70 | $ 4.15 |

|  | Fiscal 2006 | Fiscal 2005 | Fiscal 2004 |
|---|---|---|---|
| **Diluted EPS:** | | | |
| Net income applicable to common shareholders | $7,453 | $4,939 | $4,486 |
| Weighted average common shares outstanding | 1,010 | 1,050 | 1,080 |
| Effect of dilutive securities: | | | |
| Stock options and restricted stock units | 45 | 30 | 25 |
| Weighted average common shares outstanding and common stock equivalents | 1,055 | 1,080 | 1,105 |
| Earnings per diluted common share: | | | |
| Income from continuing operations | $ 7.09 | $ 4.81 | $ 4.15 |
| Loss on discontinued operations | (0.02) | (0.29) | (0.09) |
| Cumulative effect of accounting change, net | — | 0.05 | — |
| Earnings per diluted common share | $ 7.07 | $ 4.57 | $ 4.06 |

The following securities were considered antidilutive and therefore were excluded from the computation of diluted EPS:

|  | Fiscal 2006 | Fiscal 2005 | Fiscal 2004 |
|---|---|---|---|
|  | (shares in millions) | | |
| Number of antidilutive securities (including stock options and restricted stock units) outstanding at end of period | 38 | 93 | 95 |

Morgan Stanley                          138

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**11.   Sales and Trading Activities.**

The Company's institutional sales and trading activities are conducted through the integrated management of its client-driven and proprietary transactions along with the hedging and financing of these positions. Sales and trading activities include revenues from customer purchases and sales of financial instruments in which the Company acts as principal and gains and losses on the Company's positions. The Company also engages in proprietary trading activities for its own account.

The Company's trading portfolios are managed with a view toward the risk and profitability of the portfolios. The following discussions of risk management, market risk, credit risk, concentration risk and customer activities relate to the Company's sales and trading activities.

***Risk Management.***   The cornerstone of the Company's risk management philosophy is protection of the Company's franchise, reputation and financial standing. The Company's risk management philosophy is based on the following principles: comprehensiveness, independence, accountability, defined risk tolerance and transparency. Given the importance of effective risk management to the Company's reputation, senior management requires thorough and frequent communication and appropriate escalation of risk matters.

Risk management at the Company requires independent Company-level oversight, accountability of the Company's business segments, constant communication, judgment, and knowledge of specialized products and markets. The Company's senior management takes an active role in the identification, assessment and management of various risks at both the Company and business segment level. In recognition of the increasingly varied and complex nature of the global financial services business, the Company's risk management philosophy, with its attendant policies, procedures and methodologies, is evolutionary in nature and subject to ongoing review and modification.

The nature of the Company's risks, coupled with this risk management philosophy, informs the Company's risk governance structure. The Company's risk governance structure includes the Firm Risk Committee and the Capital Structure and Strategic Transactions Committee, the Chief Risk Officer, the Internal Audit Department, independent control groups, and various risk control managers, committees and groups located within the business segments.

The Firm Risk Committee, composed of the Company's most senior officers, oversees the Company's risk management structure. The Firm Risk Committee's responsibilities include oversight of the Company's risk management principles, procedures and limits, and the monitoring of material financial, operational and franchise risks. The Firm Risk Committee is overseen by the Audit Committee of the Board of Directors (the "Audit Committee"). The Capital Structure and Strategic Transactions Committee (the "Capital Committee") reviews strategic transactions for the Company and significant changes to the Company's capital structure. The Capital Committee's responsibilities include reviewing measures of capital and evaluating capital resources relative to the Company's risk profile and strategy.

The Chief Risk Officer, a member of the Firm Risk Committee, oversees compliance with Company risk limits; approves certain excessions of Company risk limits; reviews material market and credit risks; and reviews results of risk management processes with the Audit Committee.

The Internal Audit Department provides independent risk and control assessment and reports to the Audit Committee and administratively to the Chief Legal Officer. The Internal Audit Department periodically examines the Company's operational and control environment and conducts audits designed to cover all major risk categories.

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The Market Risk, Credit Risk, Operational Risk, Financial Control, Treasury, and Legal and Compliance Departments (collectively, the "Company Control Groups"), which are all independent of the Company's business units, assist senior management and the Firm Risk Committee in monitoring and controlling the Company's risk through a number of control processes. The Company is committed to employing qualified personnel with appropriate expertise in each of its various administrative and business areas to implement effectively the Company's risk management and monitoring systems and processes.

Each business segment has a risk committee that is responsible for ensuring that the business segment, as applicable, adheres to established limits for market, credit, operational and other risks; implements risk measurement, monitoring, and management policies and procedures that are consistent with the risk framework established by the Firm Risk Committee; and reviews, on a periodic basis, its aggregate risk exposures, risk exception experience, and the efficacy of its risk identification, measurement, monitoring and management policies and procedures, and related controls.

Each of the Company's business segments also has designated operations officers, committees and groups, including operations and information technology groups (collectively, "Segment Control Groups" and, together with the Company Control Groups, the "Control Groups") to manage and monitor specific risks and report to the business segment risk committee. The Control Groups work together to review the risk monitoring and risk management policies and procedures relating to, among other things, the business segment's market and credit risk profile, sales practices, pricing of consumer loans and reserve adequacy, reputation, legal enforceability, and operational and technological risks. Participation by the senior officers of the Control Groups helps ensure that risk policies and procedures, exceptions to risk limits, new products and business ventures, and transactions with risk elements undergo a thorough review.

***Market Risk.***   Market risk refers to the risk that a change in the level of one or more market prices, rates, indices, implied volatilities (the price volatility of the underlying instrument imputed from option prices), correlations or other market factors, such as liquidity, will result in losses for a position or portfolio.

The Company manages the market risk associated with its trading activities on a Company-wide basis, on a worldwide trading division level and on an individual product basis. Aggregate market risk limits have been approved for the Company and for its major trading divisions worldwide (equity and fixed income, which includes interest rate products, credit products, foreign exchange and commodities). Additional market risk limits are assigned to trading desks and, as appropriate, products and regions. Trading division risk managers, desk risk managers, traders and the Market Risk Department monitor market risk measures against limits in accordance with policies set by senior management.

The Market Risk Department independently reviews the Company's trading portfolios on a regular basis from a market risk perspective utilizing Value-at-Risk and other quantitative and qualitative risk measures and analyses. The Company's trading businesses and the Market Risk Department also use, as appropriate, measures such as sensitivity to changes in interest rates, prices, implied volatilities and time decay to monitor and report market risk exposures. Stress testing, which measures the impact on the value of existing portfolios of specified changes in market factors for certain products, is performed periodically and is reviewed by trading division risk managers, desk risk managers and the Market Risk Department. The Market Risk Department also conducts scenario analyses, which estimate the Company's revenue sensitivity to a set of specific, predefined market and geopolitical events.

***Credit Risk.***   Credit risk refers to the risk of loss arising from borrower or counterparty default when a borrower, counterparty or obligor is unable to meet its financial obligations. The Company incurs significant, "single name" credit risk exposure through the Institutional Securities business. This type of risk requires credit analysis of specific counterparties, both initially and on an ongoing basis.

Morgan Stanley

140

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The Institutional Credit Department ("Institutional Credit") manages credit risk exposure for the Institutional Securities business. Institutional Credit is responsible for ensuring transparency of material credit risks, ensuring compliance with established limits, approving material extensions of credit, and escalating risk concentrations to appropriate senior management.

*Concentration Risk.*   The Company is subject to concentration risk by holding large positions in certain types of securities or commitments to purchase securities of a single issuer, including sovereign governments and other entities, issuers located in a particular country or geographic area, public and private issuers involving developing countries, or issuers engaged in a particular industry. Financial instruments owned by the Company include U.S. government and agency securities and securities issued by other sovereign governments (principally Japan, United Kingdom, Italy and Germany), which, in the aggregate, represented approximately 6% of the Company's total assets at November 30, 2006. In addition, substantially all of the collateral held by the Company for resale agreements or bonds borrowed, which together represented approximately 25% of the Company's total assets at November 30, 2006, consist of securities issued by the U.S. government, federal agencies or other sovereign government obligations. Positions taken and commitments made by the Company, including positions taken and underwriting and financing commitments made in connection with its private equity, principal investment and lending activities, often involve substantial amounts and significant exposure to individual issuers and businesses, including non-investment grade issuers. In addition, the Company may originate or purchase certain residential and commercial mortgage loans that could contain certain terms and features that may result in additional credit risk as compared with more traditional types of mortgages. Such terms and features may include loans made to borrowers subject to payment increases or loans with high loan-to-value ratios. The Company seeks to limit concentration risk through the use of the systems and procedures described in the preceding discussions of risk management, market risk and credit risk.

*Customer Activities.*   The Company's customer activities involve the execution, settlement and financing of various securities and commodities transactions on behalf of customers. Customer securities activities are transacted on either a cash or margin basis. Customer commodities activities, which include the execution of customer transactions in commodity futures transactions (including options on futures), are transacted on a margin basis.

The Company's customer activities may expose it to off-balance sheet credit risk. The Company may have to purchase or sell financial instruments at prevailing market prices in the event of the failure of a customer to settle a trade on its original terms or in the event cash and securities in customer margin accounts are not sufficient to fully cover customer losses. The Company seeks to control the risks associated with customer activities by requiring customers to maintain margin collateral in compliance with various regulations and Company policies.

*Derivative Contracts.*   The amounts in the following table represent unrealized gains and losses on exchange traded and OTC options and other contracts (including interest rate, foreign exchange, and other forward contracts and swaps) for derivatives for trading and investment purposes and for asset and liability management, net of offsetting positions in situations where netting is appropriate. The asset amounts are not reported net of non-cash collateral, which the Company obtains with respect to certain of these transactions to reduce its exposure to credit losses.

Credit risk with respect to derivative instruments arises from the failure of a counterparty to perform according to the terms of the contract. The Company's exposure to credit risk at any point in time is represented by the fair value of the derivative contracts reported as assets. The Company monitors the creditworthiness of counterparties to these transactions on an ongoing basis and requests additional collateral when deemed necessary.

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The Company's derivatives (both listed and OTC) at November 30, 2006 and November 30, 2005 are summarized in the table below, showing the fair value of the related assets and liabilities by product:

| Product Type | At November 30, 2006 | | At November 30, 2005 | |
| --- | --- | --- | --- | --- |
| | Assets | Liabilities | Assets | Liabilities |
| | | (dollars in millions) | | |
| Interest rate and currency swaps, interest rate options, credit derivatives and other fixed income securities contracts .......... | $19,444 | $15,688 | $17,157 | $13,212 |
| Foreign exchange forward contracts and options ................. | 7,325 | 7,725 | 7,548 | 7,597 |
| Equity securities contracts (including equity swaps, warrants and options) ............................................... | 16,705 | 23,155 | 7,290 | 11,957 |
| Commodity forwards, options and swaps ...................... | 11,969 | 10,923 | 13,899 | 12,186 |
| Total ............................................... | $55,443 | $57,491 | $45,894 | $44,952 |

**12. Capital Units.**

The Company has Capital Units outstanding that were issued by the Company and Morgan Stanley Finance plc ("MSF"), a U.K. subsidiary. A Capital Unit consists of (a) a Subordinated Debenture of MSF guaranteed by the Company and maturing in 2017 and (b) a related Purchase Contract issued by the Company, which may be accelerated by the Company, requiring the holder to purchase one Depositary Share representing shares of the Company's Cumulative Preferred Stock. The aggregate amount of Capital Units outstanding was $66 million at both November 30, 2006 and November 30, 2005. Subsequent to fiscal year-end, the Company and MSF announced the Company's intention to redeem all of the outstanding Capital Units on February 28, 2007.

**13. Shareholders' Equity.**

***Common Stock.*** Changes in shares of common stock outstanding for fiscal 2006 and fiscal 2005 were as follows (share data in millions):

| | Fiscal 2006 | Fiscal 2005 |
| --- | --- | --- |
| Shares outstanding at beginning of period ........................................... | 1,058 | 1,087 |
| Net impact of stock option exercises and other share issuances ........................... | 43 | 39 |
| Treasury stock purchases ............................................................. | (52) | (68) |
| Shares outstanding at end of period .................................................. | 1,049 | 1,058 |

***Treasury Shares.*** During fiscal 2006, the Company purchased $3.4 billion of its common stock through open market purchases at an average cost of $65.43 per share. During fiscal 2005, the Company purchased $3.7 billion of its common stock through a combination of open market purchases and purchases from employees at an average cost of $54.31 per share. In December 2006, the Company announced that its Board of Directors had authorized the repurchase of up to $6 billion of the Company's outstanding common stock. This share repurchase authorization replaces the Company's previous repurchase authorizations with one repurchase program for capital management purposes that will consider, among other things, business segment capital needs, as well as equity-based compensation and benefit plan requirements. The Company expects to exercise the authorization over the next 12-18 months at prices the Company deems appropriate, subject to its surplus capital position, market conditions and regulatory considerations.

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Rabbi Trusts.*   The Company has established rabbi trusts (the "Trusts") to provide common stock voting rights to certain employees who hold outstanding restricted stock units. The number of shares of common stock outstanding in the Trusts was 81 million at November 30, 2006 and 60 million at November 30, 2005. The assets of the Trusts are consolidated with those of the Company, and the value of the Company's stock held in the Trusts is classified in Shareholders' equity and generally accounted for in a manner similar to treasury stock.

*Preferred Stock.*   In July 2006, the Company issued 44,000,000 Depositary Shares, in an aggregate of $1,100 million, representing 1/1,000th of a Share of Floating Rate Non-Cumulative Preferred Stock, Series A, $0.01 par value ("Series A Preferred Stock"). The Series A Preferred Stock is redeemable at the Company's option in whole or in part on or after July 15, 2011 at a redemption price of $25,000 per share (equivalent to $25 per Depositary Share). The Series A Preferred Stock also has a preference over the Company's common stock upon liquidation. Subsequent to fiscal year-end, the Company declared a quarterly dividend of $388.045 per share of Series A Preferred Stock that was paid on January 16, 2007 to preferred shareholders of record on January 1, 2007.

*Regulatory Requirements.*   MS&Co. and MSDWI are registered broker-dealers and registered futures commission merchants and, accordingly, are subject to the minimum net capital requirements of the Securities and Exchange Commission (the "SEC"), the New York Stock Exchange, Inc. and the Commodity Futures Trading Commission. MS&Co. and MSDWI have consistently operated in excess of these requirements. MS&Co.'s net capital totaled $4,498 million at November 30, 2006, which exceeded the amount required by $3,168 million. MSDWI's net capital totaled $1,251 million at November 30, 2006, which exceeded the amount required by $1,180 million. MSIL, a London-based broker-dealer subsidiary, is subject to the capital requirements of the Financial Services Authority, and MSJS, a Tokyo-based broker-dealer subsidiary, is subject to the capital requirements of the Financial Services Agency. MSIL and MSJS have consistently operated in excess of their respective regulatory capital requirements.

In fiscal 2007, the Company intends to merge MSDWI into MS&Co. Upon completion of the merger, the surviving entity, MS&Co., will be the Company's principal U.S. broker-dealer.

Under regulatory capital requirements adopted by the Federal Deposit Insurance Corporation (the "FDIC") and other bank regulatory agencies, FDIC-insured financial institutions must maintain (a) 3% to 5% of Tier 1 capital, as defined, to average assets ("leverage ratio"), (b) 4% of Tier 1 capital, as defined, to risk-weighted assets ("Tier 1 risk-weighted capital ratio") and (c) 8% of total capital, as defined, to risk-weighted assets ("total risk-weighted capital ratio"). At November 30, 2006, the leverage ratio, Tier 1 risk-weighted capital ratio and total risk-weighted capital ratio of each of the Company's FDIC-insured financial institutions exceeded these regulatory minimums.

Certain other U.S. and non-U.S. subsidiaries are subject to various securities, commodities and banking regulations, and capital adequacy requirements promulgated by the regulatory and exchange authorities of the countries in which they operate. These subsidiaries have consistently operated in excess of their local capital adequacy requirements. Morgan Stanley Derivative Products Inc., the Company's triple-A rated derivative products subsidiary, maintains certain operating restrictions that have been reviewed by various rating agencies.

Effective December 1, 2005, the Company became a consolidated supervised entity ("CSE") as defined by the SEC. As such, the Company is subject to group-wide supervision and examination by the SEC and to minimum capital requirements on a consolidated basis. As of November 30, 2006, the Company was in compliance with the CSE capital requirements.

MS&Co. is required to hold tentative net capital in excess of $1 billion and net capital in excess of $500 million in accordance with the market and credit risk standards of Appendix E of Rule 15c3-1. MS&Co. is also required to notify the SEC in the event that its tentative net capital is less than $5 billion. As of November 30, 2006, MS&Co. had tentative net capital in excess of the minimum and the notification requirements.

Morgan Stanley

# MORGAN STANLEY

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The regulatory capital requirements referred to above, and certain covenants contained in various agreements governing indebtedness of the Company, may restrict the Company's ability to withdraw capital from its subsidiaries. At November 30, 2006, approximately $14.0 billion of net assets of consolidated subsidiaries may be restricted as to the payment of cash dividends and advances to the Company.

***Cumulative Translation Adjustments.*** Cumulative translation adjustments include gains or losses resulting from translating foreign currency financial statements from their respective functional currencies to U.S. dollars, net of hedge gains or losses and related tax effects. The Company uses foreign currency contracts and designates certain non-U.S. dollar currency debt as hedges to manage the currency exposure relating to its net monetary investments in non-U.S. dollar functional currency subsidiaries. Increases or decreases in the value of the Company's net foreign investments generally are tax deferred for U.S. purposes, but the related hedge gains and losses are taxable currently. The Company attempts to protect its net book value from the effects of fluctuations in currency exchange rates on its net monetary investments in non-U.S. dollar subsidiaries by selling the appropriate non-U.S. dollar currency in the forward market. However, under some circumstances, the Company may elect not to hedge its net monetary investments in certain foreign operations due to market conditions, including the availability of various currency contracts at acceptable costs. Information relating to the hedging of the Company's net monetary investments in non-U.S. dollar functional currency subsidiaries and their effects on cumulative translation adjustments is summarized below:

|  | At November 30, | |
|---|---|---|
|  | 2006 | 2005 |
|  | (dollars in millions) | |
| Net monetary investments in non-U.S. dollar functional currency subsidiaries . . . . . . . . . . . . . | $6,195 | $3,716 |
| Cumulative translation adjustments resulting from net investments in subsidiaries with a non-U.S. dollar functional currency | $ 741 | $ 194 |
| Cumulative translation adjustments resulting from realized or unrealized losses on hedges, net of tax . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (692) | (249) |
| Total cumulative translation adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 49 | $ (55) |

## 14. Employee Compensation Plans.

As of December 1, 2004, the Company early adopted SFAS No. 123R using the modified prospective method (see Note 2). SFAS No. 123R requires measurement of compensation cost for equity-based awards at fair value and recognition of compensation cost over the service period, net of estimated forfeitures. The fair value of restricted stock units is determined based on the number of units granted and the grant date fair value of the Company's common stock. The fair value of stock options is determined using the Black-Scholes valuation model.

The components of the Company's stock-based compensation expense (net of cancellations and a cumulative effect of a change in accounting principle in fiscal 2005 associated with the adoption of SFAS No. 123R) are presented below:

|  | Fiscal 2006(1) | Fiscal 2005 | Fiscal 2004 |
|---|---|---|---|
|  | (dollars in millions) | | |
| Deferred stock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1,791 | $601 | $487 |
| Stock options . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 155 | 146 | 163 |
| Employee Stock Purchase Plan . . . . . . . . . . . . . . . . . . . . . . | 9 | 9 | 9 |
| Employee Stock Ownership Plan . . . . . . . . . . . . . . . . . . . . | — | — | 4 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1,955 | $756 | $663 |

(1) Amounts for fiscal 2006 include $464 million of accrued stock-based compensation expense for fiscal 2006 year-end equity awards granted to retirement-eligible employees in December 2006.

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The tax benefit for stock-based compensation expense related to deferred stock and stock options was $748 million, $260 million and $250 million for fiscal 2006, fiscal 2005 and fiscal 2004, respectively.

At November 30, 2006, the Company had approximately $1,188 million of compensation cost related to unvested stock-based awards not yet recognized (excluding fiscal 2006 year-end awards granted in December 2006 to non-retirement-eligible employees, which will begin to be amortized in fiscal 2007). The unrecognized compensation cost as of November 30, 2006 will primarily be recognized in fiscal 2007 and fiscal 2008.

In connection with awards under its equity-based compensation and benefit plans, the Company is authorized to issue shares of its common stock held in treasury or newly issued shares. At November 30, 2006, approximately 107 million shares were available for future grant under these plans.

***Deferred Stock Awards.*** The Company has made deferred stock awards pursuant to several equity-based compensation plans. The plans provide for the deferral of a portion of certain key employees' discretionary compensation with awards made in the form of restricted common stock or in the right to receive unrestricted shares of common stock in the future ("restricted stock units"). Awards under these plans are generally subject to vesting over time and to restrictions on sale, transfer or assignment until the end of a specified period, generally five years from date of grant. All or a portion of an award may be canceled if employment is terminated before the end of the relevant vesting period. All or a portion of a vested award also may be canceled in certain limited situations, including termination for cause during the relevant restriction period.

The following table sets forth activity relating to the Company's vested and unvested restricted stock units (share data in millions):

|  | Fiscal 2006 | Fiscal 2005 | Fiscal 2004 |
|---|---|---|---|
| Restricted stock units at beginning of year | 60 | 78 | 65 |
| Granted | 38 | 4 | 29 |
| Conversions to common stock | (12) | (18) | (14) |
| Canceled | (5) | (4) | (2) |
| Restricted stock units at end of year | 81 | 60 | 78 |

The weighted average price of restricted stock units at the beginning and end of fiscal 2006 was $51.47 and $53.57, respectively. During fiscal 2006, the weighted average price for granted, converted and canceled restricted stock units was $57.86, $56.41 and $54.10, respectively. The weighted average price for restricted stock units granted during fiscal 2005 and fiscal 2004 was $53.10 and $54.69, respectively.

The total fair value of restricted stock units converted to common stock during fiscal 2006, fiscal 2005 and fiscal 2004 was $768 million, $986 million and $791 million, respectively.

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table sets forth activity relating to the Company's unvested restricted stock units (share data in millions):

|  | Fiscal 2006 | |
|---|---|---|
|  | Number of Shares | Weighted Average Grant Date Fair Value |
| Unvested restricted stock units at beginning of period ................... | 36 | $52.04 |
| Granted ................................................ | 38 | 57.86 |
| Vested ................................................. | (18) | 51.75 |
| Canceled ............................................... | (5) | 54.14 |
| Unvested restricted stock units at end of period(1) ....................... | 51 | $54.70 |

---

(1) Unvested restricted stock units represent awards where recipients have yet to satisfy either the explicit vesting terms or retirement-eligible requirements.

***Stock Option Awards.*** The Company has made stock option awards pursuant to several equity-based compensation plans. The plans provide for the deferral of a portion of certain key employees' discretionary compensation with awards made in the form of stock options generally having an exercise price not less than the fair value of the Company's common stock on the date of grant. Such stock option awards generally become exercisable over a one- to five-year period and expire 10 years from the date of grant, subject to accelerated expiration upon termination of employment. Stock option awards have vesting, restriction and cancellation provisions that are similar to those in deferred stock awards.

The weighted average fair values of options granted during fiscal 2006, fiscal 2005 and fiscal 2004 were $14.15, $12.77 and $16.67, respectively, utilizing the following weighted average assumptions:

|  | Fiscal 2006 | Fiscal 2005 | Fiscal 2004 |
|---|---|---|---|
| Risk-free interest rate ................................... | 4.8% | 3.7% | 3.5% |
| Expected option life in years ............................. | 3.3 | 3.1 | 5.3 |
| Expected stock price volatility ........................... | 28.6% | 34.3% | 34.6% |
| Expected dividend yield ................................. | 1.7% | 2.0% | 1.9% |

The Company's expected option life has been determined based upon historical experience, and the expected stock price volatility has been determined based upon historical stock price data over a similar time period of the expected option life.

The following table sets forth activity relating to the Company's stock options (share data in millions):

|  | Fiscal 2006 | | Fiscal 2005 | | Fiscal 2004 | |
|---|---|---|---|---|---|---|
|  | Number of Options | Weighted Average Exercise Price | Number of Options | Weighted Average Exercise Price | Number of Options | Weighted Average Exercise Price |
| Options outstanding at beginning of period ....... | 125.8 | $51.01 | 152.2 | $47.09 | 175.5 | $43.66 |
| Granted ................................. | 2.1 | 64.05 | 0.9 | 54.73 | 4.2 | 51.83 |
| Exercised ................................ | (14.5) | 44.60 | (19.5) | 18.13 | (21.0) | 16.71 |
| Canceled ................................ | (4.0) | 57.41 | (7.8) | 57.01 | (6.5) | 55.55 |
| Options outstanding at end of period ............. | 109.4 | $51.88 | 125.8 | $51.01 | 152.2 | $47.09 |
| Options exercisable at end of period ............. | 92.6 | $51.65 | 95.4 | $50.10 | 95.9 | $44.57 |

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The total intrinsic value of stock options exercised during fiscal 2006, fiscal 2005 and fiscal 2004 was $326 million, $722 million and $766 million, respectively.

As of November 30, 2006, the intrinsic value of in-the-money exercisable stock options was $2,292 million.

The following table presents information relating to the Company's stock options outstanding at November 30, 2006 (number of options outstanding data in millions):

| Range of Exercise Prices | Options Outstanding | | | Options Exercisable | | |
|---|---|---|---|---|---|---|
| | Number Outstanding | Weighted Average Exercise Price | Average Remaining Life (Years) | Number Exercisable | Weighted Average Exercise Price | Average Remaining Life (Years) |
| $16.00 – $ 29.99 . . . . . . . | 9.1 | $26.67 | 1.1 | 9.1 | $26.67 | 1.1 |
| $30.00 – $ 39.99 . . . . . . . | 9.7 | 35.64 | 2.1 | 9.7 | 35.64 | 2.1 |
| $40.00 – $ 49.99 . . . . . . . | 17.0 | 42.84 | 5.5 | 14.9 | 42.86 | 5.4 |
| $50.00 – $ 59.99 . . . . . . . | 45.0 | 55.50 | 6.0 | 30.8 | 56.04 | 5.5 |
| $60.00 – $ 69.99 . . . . . . . | 25.8 | 63.11 | 3.7 | 25.4 | 63.12 | 3.6 |
| $70.00 – $106.99 . . . . . . . | 2.8 | 83.20 | 2.2 | 2.7 | 83.31 | 2.1 |
| Total . . . . . . . . . . . . . . . . | 109.4 | | | 92.6 | | |

***Employee Stock Purchase Plan.***  The Employee Stock Purchase Plan (the "ESPP") allows employees to purchase shares of the Company's common stock at a 15% discount from market value. The Company expenses the 15% discount associated with the ESPP.

***Morgan Stanley 401(k) and Profit Sharing Awards.***  Eligible U.S. employees receive 401(k) matching contributions which are invested in the Company's common stock. The Company also provides discretionary profit sharing to certain employees. The pre-tax expense associated with the 401(k) match and profit sharing for fiscal 2006, fiscal 2005 and fiscal 2004 was $132 million, $132 million and $118 million, respectively.

## 15.  Employee Benefit Plans.

The Company sponsors various pension plans for the majority of its U.S. and non-U.S. employees. The Company provides certain other postretirement benefits, primarily health care and life insurance, to eligible U.S. employees. The Company also provides certain other postemployment benefits other than pension and postretirement benefits to certain former employees or inactive employees prior to retirement. The following summarizes these plans:

***Pension and Other Postretirement Plans.***  Substantially all of the U.S. employees of the Company and its U.S. affiliates are covered by a non-contributory pension plan that is qualified under Section 401(a) of the Internal Revenue Code (the "Qualified Plan"). Unfunded supplementary plans (the "Supplemental Plans") cover certain executives. In addition, certain of the Company's non-U.S. subsidiaries have pension plans covering substantially all of their employees. These pension plans generally provide pension benefits that are based on each employee's years of credited service and on compensation levels specified in the plans. The Company's policy is to fund at least the amounts sufficient to meet minimum funding requirements under applicable employee benefit and tax regulations. Liabilities for benefits payable under its Supplemental Plans are accrued by the Company and are funded when paid to the beneficiaries.

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The Company also has unfunded postretirement benefit plans that provide medical and life insurance for eligible U.S. retirees and their dependents.

The Company uses a measurement date of September 30 to calculate obligations under its pension and postretirement plans.

The following tables present information for the Company's pension and postretirement plans on an aggregate basis:

*Net Periodic Benefit Expense.*

Net periodic benefit expense included the following components:

|  | Pension | | | Postretirement | | |
|---|---|---|---|---|---|---|
|  | Fiscal 2006 | Fiscal 2005 | Fiscal 2004 | Fiscal 2006 | Fiscal 2005 | Fiscal 2004 |
|  | (dollars in millions) | | | | | |
| Service cost, benefits earned during the year | $ 133 | $ 122 | $ 114 | $ 10 | $ 8 | $ 9 |
| Interest cost on projected benefit obligation | 139 | 129 | 120 | 11 | 11 | 10 |
| Expected return on plan assets | (139) | (128) | (129) | — | — | — |
| Net amortization—transition obligation/ prior service cost | (12) | (13) | (13) | (2) | (2) | (2) |
| Net amortization—actuarial loss | 60 | 49 | 39 | 2 | 2 | 2 |
| Special termination benefits/settlements | 2 | — | — | — | — | — |
| Net periodic benefit expense | $ 183 | $ 159 | $ 131 | $ 21 | $ 19 | $ 19 |

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Benefit Obligations and Funded Status.*

The following table provides a reconciliation of the changes in the benefit obligation and fair value of plan assets for fiscal 2006 and fiscal 2005 as well as a summary of the funded status at November 30, 2006 and November 30, 2005:

| | Pension | | Postretirement | |
|---|---|---|---|---|
| | Fiscal 2006 | Fiscal 2005 | Fiscal 2006 | Fiscal 2005 |
| | (dollars in millions) | | | |
| **Reconciliation of benefit obligation:** | | | | |
| Benefit obligation at beginning of year .................. | $2,524 | $2,255 | $ 196 | $ 183 |
| Service cost ........................................ | 133 | 122 | 10 | 8 |
| Interest cost ....................................... | 139 | 129 | 11 | 11 |
| Plan amendments ................................... | 2 | — | — | — |
| Actuarial (gain) loss ................................ | (88) | 167 | (40) | 3 |
| Benefits paid and settlements ......................... | (190) | (122) | (9) | (9) |
| Other, including foreign currency exchange rate changes ... | 43 | (27) | — | — |
| Benefit obligation at end of year .................. | $2,563 | $2,524 | $ 168 | $ 196 |
| **Reconciliation of fair value of plan assets:** | | | | |
| Fair value of plan assets at beginning of year ............ | $2,217 | $1,868 | $ — | $ — |
| Actual return on plan assets ......................... | 144 | 215 | — | — |
| Employer contributions ............................. | 114 | 272 | 9 | 9 |
| Benefits paid and settlements ......................... | (190) | (122) | (9) | (9) |
| Other, including foreign currency exchange rate changes ... | 27 | (16) | — | — |
| Fair value of plan assets at end of year .............. | $2,312 | $2,217 | $ — | $ — |
| **Funded status:** | | | | |
| Unfunded status .................................... | $ (251) | $ (307) | $(168) | $(196) |
| Amount contributed to plan after measurement date ....... | 4 | 3 | — | — |
| Unrecognized prior-service cost ....................... | (113) | (128) | (6) | (8) |
| Unrecognized loss .................................. | 708 | 852 | 9 | 52 |
| Net amount recognized ........................ | $ 348 | $ 420 | $(165) | $(152) |
| **Amounts recognized in the consolidated statements of financial condition consist of:** | | | | |
| Prepaid benefit cost ................................ | $ 598 | $ 657 | $ — | $ — |
| Accrued benefit liability ............................. | (263) | (255) | (165) | (152) |
| Intangible asset .................................... | 1 | 1 | — | — |
| Accumulated other comprehensive income .............. | 12 | 17 | — | — |
| Net amount recognized ........................ | $ 348 | $ 420 | $(165) | $(152) |

The accumulated benefit obligation for all defined benefit pension plans was $2,385 million and $2,351 million at November 30, 2006 and November 30, 2005, respectively.

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table contains information for pension plans with projected benefit obligations in excess of the fair value of plan assets as of fiscal year-end:

|  | November 30, 2006 | November 30, 2005 |
| --- | --- | --- |
|  | (dollars in millions) | |
| Projected benefit obligation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $338 | $2,402 |
| Fair value of plan assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36 | 2,089 |

The following table contains information for pension plans with accumulated benefit obligations in excess of the fair value of plan assets as of fiscal year-end:

|  | November 30, 2006 | November 30, 2005 |
| --- | --- | --- |
|  | (dollars in millions) | |
| Accumulated benefit obligation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $287 | $278 |
| Fair value of plan assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36 | 28 |

In accordance with SFAS No. 87, "Employers' Accounting for Pensions," the Company has recognized an additional minimum pension liability of $13 million at November 30, 2006 and $18 million at November 30, 2005 for defined benefit pension plans whose accumulated benefit obligations exceeded plan assets. An intangible asset of $1 million was recognized as of November 30, 2006 and November 30, 2005, which represented the unrecognized prior-service cost for such plans. The remaining balance of $12 million ($7 million, net of income taxes) in fiscal 2006 and $17 million ($5 million, net of income taxes) in fiscal 2005 was recorded as a reduction of Accumulated other comprehensive income (loss), a component of Shareholders' equity.

*Assumptions.*

The following table presents the weighted average assumptions used to determine benefit obligations at fiscal year-end:

|  | Pension | | Postretirement | |
| --- | --- | --- | --- | --- |
|  | Fiscal 2006 | Fiscal 2005 | Fiscal 2006 | Fiscal 2005 |
| Discount rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5.79% | 5.60% | 5.97% | 5.75% |
| Rate of future compensation increases . . . . . . . . . . | 4.40 | 4.35 | n/a | n/a |

The following table presents the weighted average assumptions used to determine net periodic benefit costs for fiscal 2006, fiscal 2005 and fiscal 2004:

|  | Pension | | | Postretirement | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | Fiscal 2006 | Fiscal 2005 | Fiscal 2004 | Fiscal 2006 | Fiscal 2005 | Fiscal 2004 |
| Discount rate . . . . . . . . . . . . . . . . . . . . . . | 5.60% | 5.90% | 6.05% | 5.75% | 6.05% | 6.20% |
| Expected long-term rate of return on plan assets . . . . . . . . . . . . . . . . . . . . . . . . . | 6.65 | 6.95 | 7.20 | n/a | n/a | n/a |
| Rate of future compensation increases . . . | 4.35 | 4.45 | 4.85 | n/a | n/a | n/a |

The expected long-term rate of return on assets represents the Company's best estimate of the long-term return on plan assets and generally was estimated by computing a weighted average return of the underlying long-term expected returns on the different asset classes, based on the target asset allocations. For plans where there is no established target asset allocation, actual asset allocations were used. The expected long-term return on assets is a long-term assumption that generally is expected to remain the same from one year to the next, but is adjusted when there is a significant change in the target asset allocation, the fees and expenses paid by the plan or market conditions.

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The following table presents assumed health care cost trend rates used to determine the postretirement benefit obligations at fiscal year-end:

|  | November 30, 2006 | November 30, 2005 |
|---|---|---|
| Health care cost trend rate assumed for next year: |  |  |
|     Medical . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9.00-9.33% | 9.70-10.05% |
|     Prescription . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12.33% | 13.55% |
| Rate to which the cost trend rate is assumed to decline (ultimate trend rate) . . . . . . . . | 5.00% | 5.00% |
| Year that the rate reaches the ultimate trend rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2012 | 2012 |

Assumed health care cost trend rates can have a significant effect on the amounts reported for the Company's postretirement benefit plans. A one-percentage point change in assumed health care cost trend rates would have the following effects:

|  | One-Percentage Point Increase | One-Percentage Point Decrease |
|---|---|---|
|  | (dollars in millions) | |
| Effect on total of service and interest cost . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 4 | $ (3) |
| Effect on postretirement benefit obligation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23 | (16) |

*Qualified Plan Assets.*

The Qualified Plan assets represent 89% of the Company's total pension plan assets. The weighted average asset allocations for the Qualified Plan at November 30, 2006 and November 30, 2005 and the targeted asset allocation for fiscal 2007 by asset class were as follows:

|  | Fiscal 2007 Targeted | November 30, 2006 | November 30, 2005 |
|---|---|---|---|
|     Equity securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 45% | 44% | 47% |
|     Fixed income securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 55 | 51 | 43 |
|     Other—primarily cash . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 5 | 10 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100% | 100% | 100% |

*Qualified Pension Plan Asset Allocation.* The Company, in consultation with its independent investment consultants and actuaries, determined the asset allocation targets for its Qualified Plan based on its assessment of business and financial conditions, demographic and actuarial data, funding characteristics and related risk factors. Other relevant factors, including industry practices, long-term historical and prospective capital market returns, were considered as well.

The Qualified Plan return objectives provide long-term measures for monitoring the investment performance against growth in the pension obligations. The overall allocation is expected to help protect the plan's funded status while generating sufficiently stable real returns (net of inflation) to help cover current and future benefit payments. Total Qualified Plan portfolio performance is assessed by comparing actual returns with relevant benchmarks, such as the Standard & Poor's 500 Index, the Russell 2000 Index, the MSCI EAFE Index and, in the case of the fixed income portfolio, the Qualified Plan's liability profile.

Both the equity and fixed income portions of the asset allocation use a combination of active and passive investment strategies and different investment styles. The fixed income asset allocation consists of longer-

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

duration fixed income securities in order to help reduce plan exposure to interest rate variation and to better correlate assets with obligations. The longer-duration fixed income allocation is expected to help stabilize plan contributions over the long run.

The asset mix of the Company's Qualified Plan is reviewed by the Morgan Stanley Retirement Plan Investment Committee on a regular basis. When asset class exposure reaches a minimum or maximum level, an asset allocation review process is initiated, and the portfolio is automatically rebalanced back to target allocation levels unless the Investment Committee determines otherwise.

The Investment Committee has determined to allocate no more than 10% of the Qualified Plan assets to "alternative" asset classes that provide attractive diversification benefits, absolute return enhancement and/or other potential benefit to the plan. Allocations to alternative asset classes will be made based upon an evaluation of particular attributes and relevant considerations of each asset class.

Derivative instruments are permitted in the Qualified Plan's portfolio only to the extent that they comply with all of its policy guidelines and are consistent with its risk and return objectives. In addition, any investment in derivatives must meet the following conditions:

- Derivatives may be used only if the vehicle is deemed by the investment manager to be more attractive than a similar direct investment in the underlying cash market or if the vehicle is being used to manage risk of the portfolio.

- Under no circumstances may derivatives be used in a speculative manner or to leverage the portfolio.

- Derivatives may not be used as short-term trading vehicles. The investment philosophy of the Qualified Plan is that investment activity is undertaken for long-term investment rather than short-term trading.

- Derivatives may be used only in the management of the Qualified Plan's portfolio when their possible effects can be quantified, shown to enhance the risk-return profile of the portfolio, and reported in a meaningful and understandable manner.

As a fundamental operating principle, any restrictions on the underlying assets apply to a respective derivative product. This includes percentage allocations and credit quality. The purpose of the use of derivatives is to enhance investment in the underlying assets, not to circumvent portfolio restrictions.

*Cash Flows.*

The Company expects to contribute approximately $140 million to its pension and postretirement benefit plans (U.S. and non-U.S.) in fiscal 2007 based upon their current funded status and expected asset return assumptions for fiscal 2007, as applicable.

Expected benefit payments associated with the Company's pension and postretirement benefit plans for the next five fiscal years and in aggregate for the five fiscal years thereafter are as follows:

|  | Pension | Postretirement |
|---|---|---|
|  | (dollars in millions) | |
| Fiscal 2007 | $ 99 | $ 9 |
| Fiscal 2008 | 104 | 9 |
| Fiscal 2009 | 107 | 9 |
| Fiscal 2010 | 110 | 9 |
| Fiscal 2011 | 122 | 10 |
| Fiscal 2012-2016 | 749 | 50 |

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Defined Contribution Pension Plans.*

The Company maintains separate defined contribution pension plans that cover substantially all employees of certain non-U.S. subsidiaries. Under such plans, benefits are determined by the purchasing power of the accumulated value of contributions paid. In fiscal 2006, fiscal 2005 and fiscal 2004, the Company's expense related to these plans was $91 million, $73 million and $58 million, respectively.

***Postemployment Benefits.*** Postemployment benefits include, but are not limited to, salary continuation, severance benefits, disability-related benefits, and continuation of health care and life insurance coverage provided to former employees or inactive employees after employment but before retirement. The postemployment benefit obligations were not material as of November 30, 2006 and November 30, 2005.

**16.   Income Taxes.**

The provision for income taxes from continuing operations consisted of:

|  | Fiscal 2006 | Fiscal 2005 | Fiscal 2004 |
|---|---|---|---|
|  | (dollars in millions) | | |
| Current: | | | |
| U.S. federal ............................................... | $1,545 | $ 1,674 | $1,191 |
| U.S. state and local ...................................... | 233 | 238 | 217 |
| Non-U.S. ................................................. | 1,285 | 1,022 | 709 |
|  | 3,063 | 2,934 | 2,117 |
| Deferred: | | | |
| U.S. federal ............................................... | 230 | (949) | (152) |
| U.S. state and local ...................................... | (24) | (69) | (22) |
| Non-U.S. ................................................. | 6 | (58) | (87) |
|  | 212 | (1,076) | (261) |
| Provision for income taxes from continuing operations ................. | $3,275 | $ 1,858 | $1,856 |
| Income tax benefit from discontinued operations ...................... | $    17 | $    184 | $   69 |

The following table reconciles the provision for income taxes to the U.S. federal statutory income tax rate:

|  | Fiscal 2006 | Fiscal 2005 | Fiscal 2004 |
|---|---|---|---|
| U.S. federal statutory income tax rate ............................... | 35.0% | 35.0% | 35.0% |
| U.S. state and local income taxes, net of U.S. federal income tax benefits ... | 1.3 | 1.6 | 1.9 |
| Lower tax rates applicable to non-U.S. earnings ........................ | (2.0) | (4.7) | (1.2) |
| Domestic tax credits .............................................. | (2.0) | (5.5) | (5.4) |
| Other ........................................................... | (1.9) | 0.1 | (1.5) |
| Effective income tax rate(1) ....................................... | 30.4% | 26.5% | 28.8% |

---

(1)   The fiscal 2006 effective tax rate includes the impact of a $280 million income tax benefit related to the resolution of the Internal Revenue Service examination of years 1994-1998. The fiscal 2005 effective tax rate includes the impact of a $309 million income tax benefit resulting from repatriation of foreign earnings under the provisions of the American Jobs Creation Act of 2004.

As of November 30, 2006, the Company had approximately $4.4 billion of earnings attributable to foreign subsidiaries for which no provisions have been recorded for income tax that could occur upon repatriation. Except to the extent such earnings can be repatriated tax efficiently, they are permanently invested abroad. It is not practicable to determine the amount of income taxes payable in the event all such foreign earnings are repatriated.

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The American Jobs Creation Act, adopted on October 22, 2004, provided for a special one-time tax deduction, or dividend received deduction, of 85% of qualifying foreign earnings that are repatriated in either a company's last tax year that began before the enactment date or the first tax year that begins during the one-year period beginning on the enactment date. In the fourth quarter of fiscal 2005, the Company recorded an income tax benefit of $309 million, or $0.29 per diluted share, resulting from the Company's repatriation of approximately $4.0 billion of qualifying foreign earnings under the provisions of the American Jobs Creation Act. The $309 million tax benefit resulted from the reversal of net deferred tax liabilities previously provided under SFAS No. 109, "Accounting for Income Taxes," net of additional taxes associated with these qualifying earnings.

Deferred income taxes reflect the net tax effects of temporary differences between the financial reporting and tax bases of assets and liabilities and are measured using the enacted tax rates and laws that will be in effect when such differences are expected to reverse. Significant components of the Company's deferred tax assets and liabilities at November 30, 2006 and November 30, 2005 were as follows:

|  | November 30, 2006 | November 30, 2005 |
|---|---|---|
|  | (dollars in millions) | |
| Deferred tax assets: | | |
| Employee compensation and benefit plans | $2,966 | $2,313 |
| Loan loss allowance | 326 | 305 |
| Other valuation and liability allowances | 870 | 1,047 |
| Deferred expenses | 26 | 20 |
| Other | 836 | 1,452 |
|     Total deferred tax assets | 5,024 | 5,137 |
| Deferred tax liabilities: | | |
| Valuation of inventory, investments and receivables | 20 | — |
| Prepaid commissions | 91 | 132 |
| Fixed assets | 721 | 551 |
| Other | 1,076 | 887 |
|     Total deferred tax liabilities | 1,908 | 1,570 |
|     Net deferred tax assets | $3,116 | $3,567 |

Cash paid for income taxes was $3,115 million, $1,536 million and $818 million in fiscal 2006, fiscal 2005 and fiscal 2004, respectively.

The Company recorded income tax benefits of $72 million, $317 million and $331 million related to employee stock compensation transactions in fiscal 2006, fiscal 2005 and fiscal 2004, respectively. Such benefits were credited to Paid-in capital.

***Income Tax Examinations.***    The Company is under continuous examination by the Internal Revenue Service (the "IRS") and other tax authorities in certain countries, such as Japan and the U.K., and states in which the Company has significant business operations, such as New York. The tax years under examination vary by jurisdiction; for example, the current IRS examination covers 1999-2005. The Company regularly assesses the likelihood of additional assessments in each of the taxing jurisdictions resulting from these and subsequent years' examinations. The Company has established tax reserves that the Company believes are adequate in relation to the potential for additional assessments. Once established, the Company adjusts tax reserves only when more information is available or when an event occurs necessitating a change to the reserves. The Company believes that the resolution of tax matters will not have a material effect on the consolidated financial condition of the

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Company, although a resolution could have a material impact on the Company's consolidated statement of income for a particular future period and on the Company's effective income tax rate for any period in which such resolution occurs.

The effective income tax rate in fiscal 2006 included an income tax benefit of $280 million, or $0.27 per diluted share, related to the resolution of the IRS examination of years 1994-1998.

**17.   Segment and Geographic Information.**

The Company structures its segments primarily based upon the nature of the financial products and services provided to customers and the Company's management organization. The Company provides a wide range of financial products and services to its customers in each of its business segments: Institutional Securities, Global Wealth Management Group, Asset Management and Discover. For further discussion of the Company's business segments, see Note 1.

Revenues and expenses directly associated with each respective segment are included in determining their operating results. Other revenues and expenses that are not directly attributable to a particular segment are allocated based upon the Company's allocation methodologies, generally based on each segment's respective net revenues, non-interest expenses or other relevant measures.

As a result of treating certain intersegment transactions as transactions with external parties, the Company includes an Intersegment Eliminations category to reconcile the business segment results to the Company's consolidated results. Income before taxes in Intersegment Eliminations primarily represents the effect of timing differences associated with the revenue and expense recognition of commissions paid by Asset Management to the Global Wealth Management Group associated with sales of certain products and the related compensation costs paid to the Global Wealth Management Group's global representatives.

Selected financial information for the Company's segments is presented below:

| Fiscal 2006 | Institutional Securities(2) | Global Wealth Management Group | Asset Management | Discover | Intersegment Eliminations | Total |
|---|---|---|---|---|---|---|
| | (dollars in millions) | | | | | |
| Net revenues excluding net interest | $20,336 | $5,011 | $2,739 | $2,784 | $(291) | $30,579 |
| Net interest | 1,226 | 494 | 31 | 1,506 | 22 | 3,279 |
| Net revenues | $21,562 | $5,505 | $2,770 | $4,290 | $(269) | $33,858 |
| Income from continuing operations before losses from unconsolidated investees and income taxes | $ 8,160 | $ 509 | $ 711 | $1,587 | $ 33 | $11,000 |
| Losses from unconsolidated investees | 225 | — | — | 3 | — | 228 |
| Provision for income taxes | 2,308 | 164 | 285 | 506 | 12 | 3,275 |
| Income from continuing operations(1) | $ 5,627 | $ 345 | $ 426 | $1,078 | $ 21 | $ 7,497 |

155

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

| Fiscal 2005 | Institutional Securities | Global Wealth Management Group | Asset Management | Discover | Intersegment Eliminations | Total |
|---|---|---|---|---|---|---|
| | (dollars in millions) | | | | | |
| Net revenues excluding net interest | $13,652 | $4,695 | $2,895 | $2,059 | $(273) | $23,028 |
| Net interest | 2,021 | 324 | 12 | 1,393 | — | 3,750 |
| Net revenues | $15,673 | $5,019 | $2,907 | $3,452 | $(273) | $26,778 |
| Income from continuing operations before losses from unconsolidated investees, income taxes and cumulative effect of accounting change, net | $ 4,754 | $ 585 | $1,007 | $ 921 | $ 94 | $ 7,361 |
| Losses from unconsolidated investees | 311 | — | — | — | — | 311 |
| Provision for income taxes | 909 | 197 | 378 | 340 | 34 | 1,858 |
| Income from continuing operations before cumulative effect of accounting change, net(1)(3) | $ 3,534 | $ 388 | $ 629 | $ 581 | $ 60 | $ 5,192 |

| Fiscal 2004 | Institutional Securities | Global Wealth Management Group | Asset Management | Discover | Intersegment Eliminations | Total |
|---|---|---|---|---|---|---|
| | (dollars in millions) | | | | | |
| Net revenues excluding net interest | $10,702 | $4,362 | $2,736 | $2,322 | $(291) | $19,831 |
| Net interest | 2,411 | 253 | 2 | 1,211 | — | 3,877 |
| Net revenues | $13,113 | $4,615 | $2,738 | $3,533 | $(291) | $23,708 |
| Income from continuing operations before losses from unconsolidated investees, income taxes and dividends on preferred securities subject to mandatory redemption | $ 4,281 | $ 371 | $ 827 | $1,221 | $ 118 | $ 6,818 |
| Losses from unconsolidated investees | 328 | — | — | — | — | 328 |
| Provision for income taxes | 932 | 120 | 318 | 443 | 43 | 1,856 |
| Dividends on preferred securities subject to mandatory redemption | 45 | — | — | — | — | 45 |
| Income from continuing operations(1) | $ 2,976 | $ 251 | $ 509 | $ 778 | $ 75 | $ 4,589 |

| Net Interest | Institutional Securities | Global Wealth Management Group | Asset Management | Discover | Intersegment Eliminations | Total |
|---|---|---|---|---|---|---|
| | (dollars in millions) | | | | | |
| **Fiscal 2006** | | | | | | |
| Interest and dividends | $41,979 | $1,018 | $ 45 | $2,458 | $(284) | $45,216 |
| Interest expense | 40,753 | 524 | 14 | 952 | (306) | 41,937 |
| Net interest | $ 1,226 | $ 494 | $ 31 | $1,506 | $ 22 | $ 3,279 |
| **Fiscal 2005** | | | | | | |
| Interest and dividends | $25,455 | $ 662 | $ 23 | $2,174 | $(139) | $28,175 |
| Interest expense | 23,434 | 338 | 11 | 781 | (139) | 24,425 |
| Net interest | $ 2,021 | $ 324 | $ 12 | $1,393 | $ — | $ 3,750 |
| **Fiscal 2004** | | | | | | |
| Interest and dividends | $16,395 | $ 409 | $ 8 | $1,859 | $ (87) | $18,584 |
| Interest expense | 13,984 | 156 | 6 | 648 | (87) | 14,707 |
| Net interest | $ 2,411 | $ 253 | $ 2 | $1,211 | $ — | $ 3,877 |

Morgan Stanley

156

## MORGAN STANLEY

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

| Total Assets(4) | Institutional Securities | Global Wealth Management Group | Asset Management | Discover | Intersegment Eliminations | Total |
|---|---|---|---|---|---|---|
| | | | (dollars in millions) | | | |
| At November 30, 2006 . . . . . . . . . . . . . | $1,065,691 | $21,166 | $4,947 | $28,897 | $ (56) | $1,120,645 |
| At November 30, 2005 . . . . . . . . . . . . . | $ 848,943 | $19,290 | $3,543 | $26,866 | $(119) | $ 898,523 |
| At November 30, 2004 . . . . . . . . . . . . . | $ 701,853 | $17,839 | $3,759 | $24,096 | $(213) | $ 747,334 |

(1)  See Note 18 for a discussion of discontinued operations.
(2)  Net revenues for fiscal 2006 included a $30 million advisory fee related to the Company's sale of the aircraft leasing business that was eliminated in consolidation.
(3)  See Note 2 for a discussion of the cumulative effect of accounting change, net.
(4)  Corporate assets have been fully allocated to the Company's business segments.

The Company operates in both U.S. and non-U.S. markets. The Company's non-U.S. business activities are principally conducted through European and Asian locations. The following table presents selected income statement information and the total assets of the Company's operations by geographic area. The principal methodologies used in preparing the geographic area data are as follows: commission revenues are recorded based on the location of the sales force; trading revenues are principally recorded based on location of the trader; investment banking revenues are based on location of the client; and asset management and portfolio service fees are recorded based on the location of the portfolio manager.

| Fiscal 2006(1) | U.S. | Europe | Asia | Other | Eliminations | Total |
|---|---|---|---|---|---|---|
| | | | (dollars in millions) | | | |
| Net revenues . . . . . . . . . . . . . . . . . . . | $ 22,340 | $ 9,451 | $ 3,718 | $ 342 | $ (1,993) | $ 33,858 |
| Income from continuing operations before losses from unconsolidated investees and income taxes . . . . . . . | 6,428 | 3,079 | 1,277 | 216 | — | 11,000 |
| Total assets at November 30, 2006 . . . | 1,398,520 | 794,442 | 67,731 | 71,598 | (1,211,646) | 1,120,645 |

| Fiscal 2005(1)(2) | U.S. | Europe | Asia | Other | Eliminations | Total |
|---|---|---|---|---|---|---|
| | | | (dollars in millions) | | | |
| Net revenues . . . . . . . . . . . . . . . . . . . | $ 18,796 | $ 6,701 | $ 2,480 | $ 359 | $ (1,558) | $ 26,778 |
| Income from continuing operations before losses from unconsolidated investees, income taxes and cumulative effect of accounting change, net . . . . . . . . . . . . . . . . . . . | 4,185 | 1,965 | 931 | 280 | — | 7,361 |
| Total assets at November 30, 2005 . . . | 1,104,823 | 586,825 | 54,037 | 29,858 | (877,020) | 898,523 |

| Fiscal 2004(1) | U.S. | Europe | Asia | Other | Eliminations | Total |
|---|---|---|---|---|---|---|
| | | | (dollars in millions) | | | |
| Net revenues . . . . . . . . . . . . . . . . . . . | $ 17,365 | $ 5,219 | $ 1,950 | $ 520 | $ (1,346) | $ 23,708 |
| Income from continuing operations before losses from unconsolidated investees, income taxes and dividends on preferred securities subject to mandatory redemption . . | 4,324 | 1,387 | 639 | 468 | — | 6,818 |
| Total assets at November 30, 2004 . . . | 973,471 | 463,300 | 40,074 | 26,402 | (755,913) | 747,334 |

(1)  See Note 18 for a discussion of discontinued operations.

(2)  See Note 2 for a discussion of the cumulative effect of accounting change, net.

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**18. Discontinued Operations.**

*Fiscal 2006 and Fiscal 2005.*

On August 17, 2005, the Company announced that its Board of Directors had approved management's recommendation to sell the Company's non-core aircraft leasing business. In connection with this action, the aircraft leasing business was classified as "held for sale" and reported as discontinued operations in the Company's consolidated financial statements. In addition, in the third quarter of fiscal 2005, the Company recognized a charge of approximately $1.7 billion ($1.0 billion after-tax) to reflect the write-down of the aircraft leasing business to its estimated fair value of approximately $2.0 billion. In determining the charge that was recorded in the third quarter of fiscal 2005, the Company estimated the value to be realized in selling the aircraft leasing business as a whole. The estimated value of the business was based on the appraised values of the aircraft portfolio, an evaluation of then current market conditions, recent transactions involving the sales of similar aircraft leasing businesses, a detailed assessment of the portfolio and additional valuation analyses.

On January 30, 2006, the Company announced that it had signed a definitive agreement under which it would sell its aircraft leasing business to Terra Firma, a European private equity group, for approximately $2.5 billion in cash and the assumption of liabilities. Based on the terms of the agreement and in accordance with SFAS No. 144 "Accounting for the Impairment or Disposal of Long-Lived Assets" ("SFAS No. 144"), the Company revised its estimate of the fair value (less selling costs) of the aircraft leasing business and, as a result, in the fourth quarter reduced the pre-tax charge recorded in the third quarter of fiscal 2005 by approximately $1.1 billion. Full year results for fiscal 2005 reflected a charge of $509 million ($316 million after-tax).

The sale was completed on March 24, 2006. The results for discontinued operations in the quarter ended February 28, 2006 included a loss of $125 million ($75 million after-tax) related to the impact of the finalization of the sales proceeds and balance sheet adjustments related to the closing.

*Fiscal 2004.*

In the third quarter of fiscal 2004, the Company entered into agreements for the sale of certain aircraft. Accordingly, the Company designated such aircraft as "held for sale" and recorded a $42 million pre-tax loss related to the write-down of these aircraft to fair value in accordance with SFAS No. 144. As of February 3, 2005, all of these aircraft were sold.

In accordance with SFAS No. 144, the Company's aircraft were reviewed for impairment whenever events or changes in circumstances indicated that the carrying value of an aircraft may not have been recoverable. During the second quarter of fiscal 2004, the Company evaluated various financing strategies for its aircraft financing business. As part of that evaluation and to determine the potential debt ratings associated with the financing strategies, the Company commissioned appraisals of the aircraft portfolio from three independent aircraft appraisal firms. The appraisals indicated a decrease in the aircraft portfolio average market value of 12% from the appraisals obtained at the date of the prior impairment charge (May 31, 2003). In accordance with SFAS No. 144, the Company considered the decline in appraisal values a significant decrease in the market price of its aircraft portfolio and thus a trigger event to test for impairment in the carrying value of its aircraft.

In accordance with SFAS No. 144, the Company tested each of its aircraft for impairment by comparing each aircraft's projected undiscounted cash flows with its respective carrying value. For those aircraft for which impairment was indicated (because the projected undiscounted cash flows were less than the carrying value), the Company adjusted the carrying value of each aircraft to its fair value if lower than the carrying value. To determine each aircraft's fair value, the Company used the market value appraisals provided by three independent appraisers. As a result of this review, the Company recorded a non-cash pre-tax asset impairment charge of $109 million in the second quarter of fiscal 2004 based on the average of the market value appraisals provided by the independent appraisers.

Morgan Stanley

## MORGAN STANLEY

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Summarized financial information for the Company's discontinued operations:*

The table below provides information regarding amounts included within discontinued operations (dollars in millions):

|  | Fiscal Year | | |
|---|---|---|---|
|  | 2006 | 2005 | 2004 |
| Gross revenues from discontinued operations | $137 | $417 | $473 |
| Pre-tax loss on discontinued operations | 42 | 486 | 172 |

Fiscal 2006 reflected a net loss of $25 million on discontinued operations, which included the results of operations of the aircraft leasing business through the date of sale. Fiscal 2005 and fiscal 2004 reflected a net loss on discontinued operations of $302 million and $103 million, respectively.

The following is a summary of the assets and liabilities of the Company's aircraft leasing business as of November 30, 2005 (dollars in millions):

**Assets:**

| | |
|---|---|
| Aircraft under operating leases | $3,145 |
| Other assets | 54 |
| **Total assets** | $3,199 |

**Liabilities:**

| | |
|---|---|
| Payable to affiliates | $2,055 |
| Other liabilities | 690 |
| **Total liabilities** | $2,745 |

## 19.  Variable Interest Entities.

Financial Accounting Standards Board ("FASB") Interpretation No. 46, as revised ("FIN 46R"), "Consolidation of Variable Interest Entities," applies to certain entities in which equity investors do not have the characteristics of a controlling financial interest or do not have sufficient equity at risk for the entity to finance its activities without additional subordinated financial support from other parties ("variable interest entities"). Variable interest entities are required to be consolidated by their primary beneficiaries if they do not effectively disperse risks among parties involved. The primary beneficiary of a VIE is the party that absorbs a majority of the entity's expected losses, receives a majority of its expected residual returns, or both, as a result of holding variable interests. The Company is involved with various entities in the normal course of business that may be deemed to be VIEs and may hold interests therein, including debt securities, interest-only strip investments and derivative instruments that may be considered variable interests. Transactions associated with these entities include asset- and mortgage-backed securitizations and structured financings (including collateralized debt, bond or loan obligations and credit-linked notes). The Company engages in these transactions principally to facilitate client needs and as a means of selling financial assets. The Company consolidates entities in which it is deemed to be the primary beneficiary. For those entities deemed to be qualifying special purpose entities (as defined in SFAS No. 140), which includes the credit card asset securitization master trusts (see Note 5), the Company does not consolidate the entity.

The Company purchases and sells interests in entities that may be deemed to be VIEs in the ordinary course of its business. As a result of these activities, it is possible that such entities may be consolidated and deconsolidated at various points in time. Therefore, the Company's variable interests described below may not be held by the Company at the end of future quarterly reporting periods.

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

At November 30, 2006, in connection with its Institutional Securities business, the aggregate size of VIEs, including financial asset-backed securitization, mortgage-backed securitization, collateralized debt obligation, credit-linked note, structured note, municipal bond trust, loan issuing, commodities monetization, equity-linked note, equity fund and exchangeable trust entities, for which the Company was the primary beneficiary of the entities was approximately $20.4 billion, which is the carrying amount of the consolidated assets recorded as Financial instruments owned that are collateral for the entities' obligations. The nature and purpose of these entities that the Company consolidated were to issue a series of notes to investors that provides the investors a return based on the holdings of the entities. These transactions were executed to facilitate client investment objectives. The structured note, equity-linked note, equity fund, certain credit-linked note, certain collateralized debt obligation, certain mortgage-backed securitization, certain financial asset-backed securitization and municipal bond transactions also were executed as a means of selling financial assets. The Company consolidates those entities where it holds either the entire class or a majority of the class of subordinated notes or entered into a derivative instrument with the VIE, which bears the majority of the expected losses or receives a majority of the expected residual returns of the entities. The Company accounts for the assets held by the entities as Financial instruments owned and the liabilities of the entities as Other secured financings. For those liabilities that include an embedded derivative, the Company has bifurcated such derivative in accordance with SFAS No. 133. The beneficial interests of these consolidated entities are payable solely from the cash flows of the assets held by the VIE.

At November 30, 2006, also in connection with its Institutional Securities business, the aggregate size of the entities for which the Company holds significant variable interests, which consist of subordinated and other classes of beneficial interests, derivative instruments, limited partnership investments and secondary guarantees, was approximately $34.7 billion. The Company's variable interests associated with these entities, primarily credit-linked note, structured note, loan and bond issuing, collateralized debt, loan and bond obligation, financial asset-backed securitization, mortgage-backed securitization and tax credit limited liability entities, including investments in affordable housing tax credit funds and underlying synthetic fuel production plants, were approximately $19.0 billion consisting primarily of senior beneficial interests, which represent the Company's maximum exposure to loss at November 30, 2006. The Company may hedge the risks inherent in its variable interest holdings, thereby reducing its exposure to loss. The Company's maximum exposure to loss does not include the offsetting benefit of any financial instruments that the Company utilizes to hedge these risks.

**20. Guarantees.**

The Company has certain obligations under certain guarantee arrangements, including contracts and indemnification agreements that contingently require a guarantor to make payments to the guaranteed party based on changes in an underlying measure (such as an interest or foreign exchange rate, security or commodity price, an index or the occurrence or non-occurrence of a specified event) related to an asset, liability or equity security of a guaranteed party. Also included as guarantees are contracts that contingently require the guarantor to make payments to the guaranteed party based on another entity's failure to perform under an agreement, as well as indirect guarantees of the indebtedness of others. The Company's use of guarantees is disclosed below by type of guarantee:

*Derivative Contracts.*  Certain derivative contracts meet the accounting definition of a guarantee, including certain written options, contingent forward contracts and credit default swaps. Although the Company's derivative arrangements do not specifically identify whether the derivative counterparty retains the underlying asset, liability or equity security, the Company has disclosed information regarding all derivative contracts that could meet the accounting definition of a guarantee. The maximum potential payout for certain derivative contracts, such as written interest rate caps and written foreign currency options, cannot be estimated, as

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

increases in interest or foreign exchange rates in the future could possibly be unlimited. Therefore, in order to provide information regarding the maximum potential amount of future payments that the Company could be required to make under certain derivative contracts, the notional amount of the contracts has been disclosed.

The Company records all derivative contracts at fair value. For this reason, the Company does not monitor its risk exposure to such derivative contracts based on derivative notional amounts; rather, the Company manages its risk exposure on a fair value basis. Aggregate market risk limits have been established, and market risk measures are routinely monitored against these limits. The Company also manages its exposure to these derivative contracts through a variety of risk mitigation strategies, including, but not limited to, entering into offsetting economic hedge positions. The Company believes that the notional amounts of the derivative contracts generally overstate its exposure.

*Financial Guarantees to Third Parties.*   In connection with its corporate lending business and other corporate activities, the Company provides standby letters of credit and other financial guarantees to counterparties. Such arrangements represent obligations to make payments to third parties if the counterparty fails to fulfill its obligation under a borrowing arrangement or other contractual obligation.

*Market Value Guarantees.*   Market value guarantees are issued to guarantee return of principal invested to fund investors associated with certain European equity funds and to guarantee timely payment of a specified return to investors in certain affordable housing tax credit funds. The guarantees associated with certain European equity funds are designed to provide for any shortfall between the market value of the underlying fund assets and invested principal and a stipulated return amount. The guarantees provided to investors in certain affordable housing tax credit funds are designed to return an investor's contribution to a fund and the investor's share of tax losses and tax credits expected to be generated by a fund.

*Liquidity Guarantees.*   The Company has entered into liquidity facilities with special purpose entities and other counterparties, whereby the Company is required to make certain payments if losses or defaults occur. The Company often may have recourse to the underlying assets held by the special purpose entities in the event payments are required under such liquidity facilities.

The table below summarizes certain information regarding these guarantees at November 30, 2006:

| Type of Guarantee | Maximum Potential Payout/Notional | | | | | Carrying Amount | Collateral/ Recourse |
|---|---|---|---|---|---|---|---|
| | Years to Maturity | | | | | | |
| | Less than 1 | 1-3 | 3-5 | Over 5 | Total | | |
| | (dollars in millions) | | | | | | |
| Notional amount of derivative contracts ................ | $688,352 | $688,882 | $1,267,757 | $1,240,811 | $3,885,802 | $37,547 | $119 |
| Standby letters of credit and other financial guarantees ... | 2,017 | 772 | 552 | 3,231 | 6,572 | 152 | 1,621 |
| Market value guarantees ...... | — | 172 | 30 | 628 | 830 | 48 | 133 |
| Liquidity facilities .......... | 1,692 | — | — | 110 | 1,802 | — | — |

*Indemnities.*   In the normal course of its business, the Company provides standard indemnities to counterparties for certain contingent exposures and taxes, including U.S. and foreign withholding taxes, on interest and other payments made on derivatives, securities and stock lending transactions, certain annuity products and other financial arrangements. These indemnity payments could be required based on a change in the tax laws or change in interpretation of applicable tax rulings or a change in factual circumstances. Certain contracts contain provisions that enable the Company to terminate the agreement upon the occurrence of such events. The

161

Morgan Stanley

# MORGAN STANLEY

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

maximum potential amount of future payments that the Company could be required to make under these indemnifications cannot be estimated. The Company has not recorded any contingent liability in the consolidated financial statements for these indemnifications and believes that the occurrence of any events that would trigger payments under these contracts is remote.

*Exchange/Clearinghouse Member Guarantees.*  The Company is a member of various U.S. and non-U.S. exchanges and clearinghouses that trade and clear securities and/or futures contracts. Associated with its membership, the Company may be required to pay a proportionate share of the financial obligations of another member who may default on its obligations to the exchange or the clearinghouse. While the rules governing different exchange or clearinghouse memberships vary, in general the Company's guarantee obligations would arise only if the exchange or clearinghouse had previously exhausted its resources. In addition, any such guarantee obligation would be apportioned among the other non-defaulting members of the exchange or clearinghouse. Any potential contingent liability under these membership agreements cannot be estimated. The Company has not recorded any contingent liability in the consolidated financial statements for these agreements and believes that any potential requirement to make payments under these agreements is remote.

*General Partner Guarantees.*  As a general partner in certain private equity and real estate partnerships, the Company receives distributions from the partnerships according to the provisions of the partnership agreements. The Company may, from time to time, be required to return all or a portion of such distributions to the limited partners in the event the limited partners do not achieve a certain return as specified in various partnership agreements, subject to certain limitations. The maximum potential amount of future payments that the Company could be required to make under these provisions at November 30, 2006 and November 30, 2005 was $320 million and $349 million, respectively. As of November 30, 2006 and November 30, 2005, the Company's accrued liability for distributions that the Company has determined is probable it will be required to refund based on the applicable refund criteria specified in the various partnership agreements was $25 million and $36 million, respectively.

*Securitized Asset Guarantees.*  As part of the Company's Institutional Securities and Discover securitization activities, the Company provides representations and warranties that certain securitized assets conform to specified guidelines. The Company may be required to repurchase such assets or indemnify the purchaser against losses if the assets do not meet certain conforming guidelines. Due diligence is performed by the Company to ensure that asset guideline qualifications are met, and, to the extent the Company has acquired such assets to be securitized from other parties, the Company seeks to obtain its own representations and warranties regarding the assets. The maximum potential amount of future payments the Company could be required to make would be equal to the current outstanding balances of all assets subject to such securitization activities. Also, in connection with originations of residential mortgage loans under the Company's FlexSource® program, the Company may permit borrowers to pledge marketable securities as collateral instead of requiring cash down payments for the purchase of the underlying residential property. Upon sale of the residential mortgage loans, the Company may provide a surety bond that reimburses the purchasers for shortfalls in the borrowers' securities accounts up to certain limits if the collateral maintained in the securities accounts (along with the associated real estate collateral) is insufficient to cover losses that purchasers experience as a result of defaults by borrowers on the underlying residential mortgage loans. The Company requires the borrowers to meet daily collateral calls to ensure the marketable securities pledged in lieu of a cash down payment are sufficient. At November 30, 2006 and November 30, 2005, the maximum potential amount of future payments the Company may be required to make under its surety bond was $121 million and $157 million, respectively. The Company has not recorded any contingent liability in the consolidated financial statements for these representations and warranties and reimbursement agreements and believes that the probability of any payments under these arrangements is remote.

*Merchant Chargeback Guarantees.*  In connection with its Discover business, the Company issues credit cards in the U.S. and U.K. and owns and operates the Discover Network in the U.S. The Company is contingently

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

liable for certain transactions processed on the Discover Network in the event of a dispute between the cardmember and a merchant. The contingent liability arises if the disputed transaction involves a merchant or merchant acquirer with whom the Discover Network has a direct relationship. If a dispute is resolved in the cardmember's favor, the Discover Network will credit or refund the disputed amount to the Discover Network card issuer, who in turn credits its cardmember's account. Discover Network will then charge back the transaction to the merchant or merchant acquirer. If the Discover Network is unable to collect the amount from the merchant or merchant acquirer, it will bear the loss for the amount credited or refunded to the cardmember. In most instances, a payment requirement by the Discover Network is unlikely to arise because most products or services are delivered when purchased, and credits are issued by the merchant acquirer or merchant on returned items in a timely fashion. However, where the product or service is not provided until some later date following the purchase, the likelihood of payment by the Discover Network increases. Similarly, the Company is also contingently liable for the resolution of cardmember disputes associated with its general purpose credit cards issued by its U.K. chartered bank on the MasterCard and Visa networks. The maximum potential amount of future payments related to these contingent liabilities is estimated to be the total Discover Network sales transaction volume processed to date as well as the total U.K. cardmember sales transaction volume billed to date that could qualify as a valid disputed transaction under the Company's merchant processing network, issuer and cardmember agreements; however, the Company believes that this amount is not representative of the Company's actual potential loss exposure based on the Company's historical experience. The actual amount of the potential exposure cannot be quantified as the Company cannot determine whether the current or cumulative transaction volumes may include or result in disputed transactions.

The table below summarizes certain information regarding merchant chargeback guarantees during fiscal 2006 and fiscal 2005:

| | Fiscal Year | |
| | 2006 | 2005 |
| --- | --- | --- |
| Losses related to merchant chargebacks (dollars in millions) | $    5 | $    6 |
| Aggregate credit card transaction volume (dollars in billions) | 100.3 | 87.2 |

The amount of the liability related to the Company's cardmember merchant guarantee was not material at November 30, 2006. The Company mitigates this risk by withholding settlement from merchants or obtaining escrow deposits from certain merchants that are considered higher risk due to various factors such as time delays in the delivery of products or services. The table below provides information regarding the settlement withholdings and escrow deposits:

| | At November 30, | |
| | 2006 | 2005 |
| | (dollars in millions) | |
| --- | --- | --- |
| Settlement withholdings and escrow deposits | $55 | $42 |

***Other.***    The Company may, from time to time, in its role as investment banking advisor be required to provide guarantees in connection with certain European merger and acquisition transactions. If required by the regulating authorities, the Company provides a guarantee that the acquirer in the merger and acquisition transaction has or will have sufficient funds to complete the transaction and would then be required to make the acquisition payments in the event the acquirer's funds are insufficient at the completion date of the transaction. These arrangements generally cover the time frame from the transaction offer date to its closing date and therefore are generally short term in nature. The maximum potential amount of future payments that the Company could be required to make cannot be estimated. The Company believes the likelihood of any payment by the Company under these arrangements is remote given the level of the Company's due diligence associated with its role as investment banking advisor.

Morgan Stanley

# MORGAN STANLEY

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

### 21.  Fair Value of Financial Instruments.

The majority of the Company's assets and liabilities are recorded at fair value or at amounts that approximate fair value. Such assets and liabilities include: cash and cash equivalents, cash and securities deposited with clearing organizations or segregated under federal and other regulations or requirements, customer and broker receivables and payables, certain other assets, commercial paper, and other short-term borrowings and payables.

The fair value of certain of the Company's other assets and liabilities is presented below.

*Financial Instruments Owned and Financial Instruments Sold, Not Yet Purchased.*    The Company's financial instruments used for trading and investment and for asset and liability management are recorded at fair value as discussed in Note 2.

*Consumer Loans.*    The fair value of consumer loans is determined by discounting cash flows using current market rates of loans having similar characteristics. The cash flow calculation methodologies, which vary by product, include adjustments for credit risk and prepayment rates commensurate with recent and projected trends. At November 30, 2006 and November 30, 2005, the carrying value of the Company's consumer loans was approximately $0.1 billion less than their estimated fair value.

*Collateralized Transaction Activities.*    Securities purchased under agreements to resell, Securities borrowed, Securities sold under agreements to repurchase and Securities loaned are recorded at their original contract amount plus accrued interest. As the majority of such activities are short term in nature, the carrying value of these instruments approximates fair value.

*Deposits.*    The estimated fair value of the Company's deposits, using current rates for deposits with similar remaining maturities, approximated carrying value at November 30, 2006 and November 30, 2005.

*Long-Term Borrowings.*    The Company's long-term borrowings are recorded at historical amounts unless designated as a hedged item in a fair value hedge under SFAS No. 133. The fair value of the Company's long-term borrowings was estimated using either quoted market prices or discounted cash flow analyses based on the Company's current borrowing rates for similar types of borrowing arrangements. At November 30, 2006 and November 30, 2005, the carrying value of the Company's long-term borrowings was approximately $1.8 billion and approximately $0.9 billion, respectively, less than fair value.

### 22.  Investments in Unconsolidated Investees.

The Company invests in unconsolidated investees that own synthetic fuel production plants. The Company accounts for these investments under the equity method of accounting. The Company's share of the operating losses generated by these investments is recorded within Losses from unconsolidated investees, and the tax credits and the tax benefits associated with these operating losses are recorded within the Provision for income taxes.

In fiscal 2006, fiscal 2005 and fiscal 2004, the losses from unconsolidated investees were more than offset by the respective tax credits and tax benefits on the losses. The table below provides information regarding the losses from unconsolidated investees, tax credits and tax benefits on the losses:

|  | Fiscal Year | | |
|---|---|---|---|
|  | 2006 | 2005 | 2004 |
|  | (dollars in millions) | | |
| Losses from unconsolidated investees | $228 | $311 | $328 |
| Tax credits | 159 | 336 | 351 |
| Tax benefits on losses | 90 | 124 | 132 |

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Under the current tax law, synthetic fuels tax credits are granted under Section 45K of the Internal Revenue Code. Synthetic fuels tax credits are available in full only when the price of oil is less than a base price specified by the tax code, as adjusted for inflation ("Base Price"). The Base Price for each calendar year is determined by the Secretary of the Treasury by April 1 of the following year. If the annual average price of a barrel of oil in 2006 or future years exceeds the applicable Base Price, the synthetic fuels tax credits generated by the Company's synthetic fuel facilities will be phased out, on a ratable basis, over the phase-out range. Synthetic fuels tax credits realized in prior years are not affected by this limitation. Due to the high level of crude oil prices in fiscal 2006 and continued uncertainty regarding the value of tax credits associated with synthetic fuel investments, all of the Company's investees idled production at their synthetic fuel production facilities during the second and third quarters of fiscal 2006. In the fourth quarter of fiscal 2006, all of the Company's investees began production at their synthetic fuel production facilities, largely due to a decline in the level of crude oil prices in the fourth quarter as compared with the second and third quarters of fiscal 2006. Additionally, based on fiscal year to date and futures prices at November 30, 2006, the Company estimates that there will be a partial phase-out of tax credits earned in fiscal 2006. The impact of this anticipated partial phase-out is included within Losses from unconsolidated investees and the Provision for income taxes for the fiscal year ended November 30, 2006.

The Company has entered into derivative contracts designed to reduce its exposure to rising oil prices and the potential phase-out of the synthetic fuels tax credits. Changes in fair value relative to these derivative contracts are included within Principal transactions—trading revenues.

**23.   Business and Other Acquisitions and Dispositions.**

*Subsequent to Fiscal 2006.*

*CityMortgage Bank.*   On December 21, 2006, the Company acquired CityMortgage Bank ("CityMortgage"), a leading Moscow-based mortgage bank that specializes in originating, servicing and securitizing residential mortgage loans in the Russian Federation. The results of CityMortgage will be included within the Institutional Securities business segment.

*Olco Petroleum Group Inc*.   On December 15, 2006, the Company acquired a 60% equity stake in Olco Petroleum Group Inc. ("Olco"), a petroleum products marketer and distributor based in eastern Canada. The results of Olco will be included within the Institutional Securities business segment.

*Quilter Holdings Ltd.*   On December 13, 2006, the Company announced that it had reached an agreement to sell Quilter Holdings Ltd. ("Quilter"), its standalone U.K. mass affluent business. The transaction is expected to close during the first quarter of fiscal 2007. The results of Quilter have been included within the Global Wealth Management Group business segment.

*Saxon Capital, Inc.*   On December 4, 2006, the Company acquired Saxon Capital, Inc. ("Saxon"), a servicer and originator of residential mortgages. The results of Saxon will be included within the Institutional Securities business segment.

*FrontPoint Partners.*   On December 4, 2006, the Company acquired FrontPoint Partners ("FrontPoint"), a leading provider of absolute return investment strategies. The results of FrontPoint will be included within the Asset Management business segment.

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Fiscal 2006.*

*Goldfish*.   On February 17, 2006, the Company acquired the Goldfish credit card business in the U.K. The acquisition has added economies of scale through better utilization of the existing U.K. infrastructure and strengthened the Company's position in the U.K. credit card market. Since the acquisition date, the results of Goldfish have been included within the Discover business segment. The acquisition price was $1,676 million, which was paid in cash in February 2006. The Company recorded goodwill and other intangible assets of approximately $370 million in connection with the acquisition.

The following table summarizes the fair values of the assets acquired and the liabilities assumed at the date of the acquisition:

|  | At February 17, 2006 |
|---|---|
|  | (dollars in millions) |
| Consumer loans | $1,316 |
| Goodwill | 247 |
| Amortizable intangible assets | 123 |
| Other assets | 20 |
| Total assets acquired | 1,706 |
| Total liabilities assumed | 30 |
| Net assets acquired | $1,676 |

The $123 million of acquired amortizable intangible assets includes customer relationships of $54 million (15-year estimated useful life) and trademarks of $69 million (25-year estimated useful life).

*Lansdowne Partners.*   On November 1, 2006, the Company acquired a 19% stake in Lansdowne Partners ("Lansdowne"), a London-based investment manager. The investment in Lansdowne is accounted for under the equity method of accounting within the Asset Management business segment.

*Avenue Capital Group.*   On October 30, 2006, the Company formed a strategic alliance with Avenue Capital Group ("Avenue"), a New York-based investment manager with approximately $12 billion in assets under management. The Company acquired a minority interest in Avenue. The investment in Avenue is accounted for under the equity method of accounting within the Asset Management business segment.

*Nan Tung Bank.*   On September 29, 2006, the Company acquired Nan Tung Bank Ltd. Zhuhai ("Nan Tung"), a bank in the People's Republic of China. The acquisition will enable the Company to strengthen its platform in China. Since the acquisition date, the results of Nan Tung have been included within the Institutional Securities business segment. The allocation of the purchase price is preliminary and subject to further adjustment as the valuation of certain intangible assets is still in process.

*TransMontaigne Inc.*   On September 1, 2006, the Company acquired TransMontaigne Inc. and its affiliates ("TransMontaigne"), a group of companies operating in the refined petroleum products marketing and distribution business. The acquisition will enable the Company to expand its supply and distribution of oil and refined oil products across a broader range of clients and regions across the U.S., as well as increase its oil storage capacity across the U.S. Since the acquisition date, the results of TransMontaigne and its affiliates have been included within the Institutional Securities business segment. The allocation of the purchase price is preliminary and is subject to further adjustment as the valuation of certain intangible assets is still in process.

Morgan Stanley

166

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Heidmar Group.*    On September 1, 2006, the Company acquired the Heidmar Group of companies that provides international shipping and U.S. marine logistics services. The acquisition will enable the Company to expand its physical freight business across multiple vessel classes and geographies and provides an opportunity to expand into international shipping and services. Since the acquisition date, the results of the Heidmar Group of companies have been included within the Institutional Securities business segment. The allocation of the purchase price is preliminary and subject to further adjustment as the valuation of certain intangible assets is still in process.

*Office Building.*    On June 19, 2006, the Company purchased a majority interest in a joint venture that indirectly owns title to 522 Fifth Avenue, a 23-floor office building in New York City (the "Building"), for approximately $420 million. Concurrently, the Company entered into an occupancy agreement with the joint venture pursuant to which the Company will occupy the office space in the Building (approximately 580,000 square feet).

The pro forma impact of each of the above business acquisitions individually and in the aggregate was not material to the consolidated financial statements.

### Fiscal 2005.

*PULSE.*    On January 12, 2005, the Company acquired PULSE, a U.S.-based automated teller machine/debit and electronic funds transfer network currently serving banks, credit unions, and savings and other financial institutions. Since the acquisition date, the results of PULSE have been included within the Discover business segment. The acquisition price was approximately $324 million, which was paid in cash during fiscal 2005. The Company recorded goodwill and other intangible assets of $329 million in connection with the acquisition.

### Fiscal 2004.

*Barra.*    On June 3, 2004, the Company acquired Barra, Inc. ("Barra"), a global leader in delivering risk management systems and services to managers of portfolio and firm-wide investment risk. Since the acquisition date, the results of Barra have been included within the Institutional Securities business segment. The acquisition price was $41.00 per share in cash, or an aggregate consideration of approximately $800 million. The Company recorded goodwill and other intangible assets totaling $663 million in connection with the acquisition. In February 2005, the Company sold its 50% interest in POSIT, an equity crossing system that matches institutional buyers and sellers, to Investment Technology Group, Inc. The Company acquired the POSIT interest as part of its acquisition of Barra. As a result of the sale, the net carrying amount of intangible assets decreased by approximately $75 million.

### 24.  Staff Accounting Bulletin No. 108.

In September 2006, the SEC released SAB 108. SAB 108 permits the Company to adjust for the cumulative effect of errors relating to prior years in the carrying amount of assets and liabilities as of the beginning of the current fiscal year, with an offsetting adjustment to the opening balance of retained earnings in the year of adoption. SAB 108 also requires the adjustment of any prior quarterly financial statements within the fiscal year of adoption for the effects of such errors on the quarters when the information is next presented. Such adjustments do not require previously filed reports with the SEC to be amended. Effective August 31, 2006, the Company elected early application of SAB 108. In accordance with SAB 108, the Company has adjusted its opening retained earnings for fiscal 2006 and its financial results for the first two quarters of fiscal 2006 for the items described below. The Company considers these adjustments to be immaterial to prior annual periods.

*Trust Preferred Securities.*    The Company adjusted its opening retained earnings for fiscal 2006 and its financial results for the first two quarters of fiscal 2006 to reflect a change in its hedge accounting under SFAS

167

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

No. 133. The change is being made following a clarification by the SEC of its interpretation of SFAS No. 133 related to the accounting for fair value hedges of fixed-rate trust preferred securities.

Since January 2005, the Company entered into various interest rate swaps to hedge the interest rate risk inherent in its trust preferred securities. The terms of the interest rate swaps and the corresponding trust preferred securities mirrored one another, and the Company determined in the past that the changes in the fair value of the swaps and hedged instruments were the same. The Company applied the commonly used "short-cut method" in accounting for these fair value hedges and, therefore, did not reflect any gains or losses during the relevant periods. Based upon the SEC's clarification of SFAS No. 133, the Company determined that since it has the ability at its election to defer interest payments on its trust preferred securities, these swaps did not qualify for the short-cut method. These swaps performed as expected as effective economic hedges of interest rate risk. The Company ended hedging of the interest rate risk on these trust preferred securities effective August 2006 and adjusted its financial results as if hedge accounting was never applied. Prospectively, the Company will manage the interest rate risk on these securities as part of its overall asset liability management.

*Compensation and Benefits.* The Company also adjusted its opening retained earnings for fiscal 2006 and its financial results for the first two quarters of fiscal 2006 for two compensation and benefits accruals. Such accruals are related to (i) the overaccrual of certain payroll taxes in certain non-U.S. locations, primarily in the U.K., which arose in fiscal 2000 through fiscal 2006 and (ii) an adjustment to the amortization expense associated with stock-based compensation awards, which arose in fiscal 2003 and fiscal 2004.

*Impact of Adjustments.* The impact of each of the items noted above on fiscal 2006 opening Shareholders' equity and Retained earnings and on Net income for the first and second quarters of fiscal 2006 is presented below (dollars in millions):

| | Trust Preferred Securities | Non-U.S. Payroll Taxes | Amortization of Stock-Based Compensation Awards | Total |
|---|---|---|---|---|
| Cumulative effect on Shareholders' equity as of December 1, 2005 | $ (84) | $ 38 | $ 12 | $ (34) |
| Cumulative effect on Retained earnings as of December 1, 2005 | $ (84) | $ 38 | $(22) | $ (68) |
| Effect on: | | | | |
| Net income for the three months ended February 28, 2006 | $ (1) | $ 14 | $— | $ 13 |
| Net income for the three months ended May 31, 2006 | $(116) | $— | $— | $(116) |
| Net income for the six months ended May 31, 2006 | $(117) | $ 14 | $— | $(103) |

The aggregate impact of these adjustments is summarized below (dollars in millions, except per share data):

| As of and for the Three Months Ended February 28, 2006 | Previously Reported | Adjustment | As Adjusted |
|---|---|---|---|
| Other assets | $ 15,988 | $ 12 | $ 16,000 |
| Other liabilities | $ 14,984 | $ (98) | $ 14,886 |
| Long-term borrowings | $121,395 | $ 131 | $121,526 |
| Shareholders' equity | $ 30,124 | $ (21) | $ 30,103 |
| Principal transactions trading revenue | $ 3,067 | $ 13 | $ 3,080 |
| Compensation and benefits expense | $ 4,183 | $ (22) | $ 4,161 |
| Interest expense | $ 9,481 | $ 15 | $ 9,496 |
| Net income | $ 1,561 | $ 13 | $ 1,574 |
| Diluted EPS | $ 1.47 | $0.01 | $ 1.48 |

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

| As of and for the Three Months Ended May 31, 2006 | Previously Reported | Adjustment | As Adjusted |
|---|---|---|---|
| Other assets | $ 17,651 | $   12 | $ 17,663 |
| Other liabilities | $ 18,159 | $ (162) | $ 17,997 |
| Long-term borrowings | $127,985 | $  311 | $128,296 |
| Shareholders' equity | $ 32,255 | $ (137) | $ 32,118 |
| Principal transactions trading revenue | $  3,735 | $ (170) | $  3,565 |
| Compensation and benefits expense | $  3,723 | $   — | $  3,723 |
| Interest expense | $  9,988 | $    9 | $  9,997 |
| Net income | $  1,957 | $ (116) | $  1,841 |
| Diluted EPS | $   1.86 | $(0.11) | $   1.75 |

| For the Six Months Ended May 31, 2006 | Previously Reported | Adjustment | As Adjusted |
|---|---|---|---|
| Principal transactions trading revenue | $  6,802 | $ (157) | $  6,645 |
| Compensation and benefits expense | $  7,906 | $  (22) | $  7,884 |
| Interest expense | $ 19,469 | $   24 | $ 19,493 |
| Net income | $  3,518 | $ (103) | $  3,415 |
| Diluted EPS | $   3.33 | $(0.10) | $   3.23 |

**25.  Insurance Settlement.**

On September 11, 2001, the U.S. experienced terrorist attacks targeted against New York City and Washington, D.C. The attacks in New York resulted in the destruction of the World Trade Center complex, where approximately 3,700 of the Company's employees were located, and the temporary closing of the debt and equity financial markets in the U.S. Through the implementation of its business recovery plans, the Company relocated its displaced employees to other facilities.

In the first quarter of fiscal 2005, the Company settled its claim with its insurance carriers related to the events of September 11, 2001. The Company recorded a pre-tax gain of $251 million as the insurance recovery was in excess of previously recognized costs related to the terrorist attacks (primarily write-offs of leasehold improvements and destroyed technology and telecommunications equipment in the World Trade Center complex, employee relocation and certain other employee-related expenditures).

The pre-tax gain was recorded as a reduction to non-interest expenses and is included within the Global Wealth Management Group ($198 million), Asset Management ($43 million) and Institutional Securities ($10 million) business segments. The insurance settlement was allocated to the respective segments in accordance with the relative damages sustained by each segment.

**26.  Lease Adjustment.**

Prior to the first quarter of fiscal 2005, the Company did not record the effects of scheduled rent increases and rent-free periods for certain real estate leases on a straight-line basis. In addition, the Company had been accounting for certain tenant improvement allowances as reductions to the related leasehold improvements instead of recording funds received as deferred rent and amortizing them as reductions to lease expense over the lease term. In the first quarter of fiscal 2005, the Company changed its method of accounting for these rent escalation clauses, rent-free periods and tenant improvement allowances to properly reflect lease expense over the lease term on a straight-line basis. The impact of this correction resulted in the Company recording

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

$109 million of additional rent expense in the first quarter of fiscal 2005. The impact of this change was included within non-interest expenses and reduced income before taxes within the Institutional Securities ($71 million), Global Wealth Management Group ($29 million), Asset Management ($5 million) and Discover ($4 million) business segments. The impact of this correction was not material to the pre-tax income of each of the segments or to the Company.

**27.  Asset Management and Account Fees.**

Prior to the fourth quarter of fiscal 2004, the Company was improperly recognizing certain management fees, account fees and related compensation expense paid at the beginning of the relevant contract periods, which is when such fees were billed. In the fourth quarter of fiscal 2004, the Company changed its method of accounting for such fees to properly recognize such fees and related expenses over the relevant contract period, generally quarterly or annually. As a result of the change, the Company's results in the fourth quarter of fiscal 2004 included an adjustment to reflect the cumulative impact of the deferral of certain management fees, account fees and related compensation expense paid to global representatives. The impact of this change reduced net revenues by $107 million, non-interest expenses by $27 million and income before taxes by $80 million, at both the Company and the Global Wealth Management Group business segment in the fourth quarter of fiscal 2004. Such adjustment reduced fiscal 2004 net income by approximately $50 million and basic and diluted earnings per share by $0.05.

**28.  Accounting Developments.**

In April 2006, the FASB issued FASB Staff Position No. FIN 46(R)-6, "Determining the Variability to Be Considered in Applying FASB Interpretation No. 46(R)" ("FSP FIN 46(R)-6"). FSP FIN 46(R)-6 requires that the determination of the variability to be considered in applying FASB Interpretation No. 46 (revised December 2003), "Consolidation of Variable Interest Entities" ("FIN 46R"), be based on an analysis of the design of the entity. In evaluating whether an interest with a variable interest entity creates or absorbs variability, FSP FIN 46(R)-6 focuses on the role of a contract or arrangement in the design of an entity, regardless of its legal form or accounting classification. The Company adopted the guidance in FSP FIN 46(R)-6 prospectively on September 1, 2006 to all entities that the Company first becomes involved with and to all entities previously required to be analyzed under FIN 46R when a reconsideration event has occurred under paragraph 7 of FIN 46R. The adoption of FSP FIN 46(R)-6 did not have a material impact on the Company's consolidated financial statements.

In June 2005, the FASB ratified the consensus reached in EITF Issue No. 04-5, "Determining Whether a General Partner, or the General Partners as a Group, Controls a Limited Partnership or Similar Entity When the Limited Partners Have Certain Rights" ("EITF Issue No. 04-5"). Under the provisions of EITF Issue No. 04-5, a general partner in a limited partnership is presumed to control that limited partnership and, therefore, should include the limited partnership in its consolidated financial statements, regardless of the amount or extent of the general partner's interest unless a majority of the limited partners can vote to dissolve or liquidate the partnership or otherwise remove the general partner without having to show cause or the limited partners have substantive participating rights that can overcome the presumption of control by the general partner. EITF Issue No. 04-5 was effective immediately for all newly formed limited partnerships and existing limited partnerships for which the partnership agreements have been modified. For all other existing limited partnerships for which the partnership agreements have not been modified, the Company adopted EITF Issue No. 04-5 on December 1, 2006. The adoption of EITF Issue No. 04-5 on December 1, 2006 did not have a material impact on the Company's consolidated financial statements.

In February 2006, the FASB issued SFAS No. 155, "Accounting for Certain Hybrid Financial Instruments" ("SFAS No. 155"), which amends SFAS No. 133 and SFAS No. 140. SFAS No. 155 permits hybrid financial instruments that contain an embedded derivative that would otherwise require bifurcation to irrevocably be

Morgan Stanley

**MORGAN STANLEY**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

accounted for at fair value, with changes in fair value recognized in the statement of income. The fair value election may be applied on an instrument-by-instrument basis. SFAS No. 155 also eliminates a restriction on the passive derivative instruments that a qualifying special purpose entity may hold. The Company adopted SFAS No. 155 on December 1, 2006 and has elected to fair value only certain hybrid financial instruments acquired, issued or subject to a remeasurement event after December 1, 2006.

In March 2006, the FASB issued SFAS No. 156, "Accounting for Servicing of Financial Assets, an amendment of FASB Statement No. 140" ("SFAS No. 156"). SFAS No. 156 requires all separately recognized servicing assets and servicing liabilities to be initially measured at fair value, if practicable. The standard permits an entity to subsequently measure each class of servicing assets or servicing liabilities at fair value and report changes in fair value in the statement of income in the period in which the changes occur. The Company adopted SFAS No. 156 on December 1, 2006 and has elected to fair value certain servicing rights held as of the date of adoption. This election did not have a material impact on the Company's opening balance of Retained earnings as of December 1, 2006. The Company will also elect to fair value certain servicing rights acquired after December 1, 2006.

In July 2006, the FASB issued FASB Interpretation No. 48, "Accounting for Uncertainty in Income Taxes, an interpretation of FASB Statement No. 109" ("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in a company's financial statements and prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in an income tax return. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition. FIN 48 is effective for the Company as of December 1, 2007. The Company is currently evaluating the potential impact of adopting FIN 48.

In September 2006, the FASB issued SFAS No. 157. SFAS No. 157 defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements. In addition, SFAS No. 157 disallows the use of block discounts for large holdings of unrestricted financial instruments where quoted prices are readily and regularly available in an active market, and nullifies select guidance provided by EITF Issue No. 02-3, which prohibited the recognition of trading gains or losses at the inception of a derivative contract, unless the fair value of such derivative is obtained from a quoted market price, or other valuation technique that incorporates observable market data. SFAS No. 157 also requires the Company to consider its own credit spreads when measuring the fair value of liabilities, including derivatives. Effective December 1, 2006, the Company elected early adoption of SFAS No. 157. In accordance with the provisions of SFAS No. 157 related to block discounts and EITF Issue No. 02-3, the Company recorded a cumulative effect adjustment of approximately $80 million after-tax as an increase to the opening balance of retained earnings as of December 1, 2006, which was primarily associated with EITF Issue No. 02-3. The impact of considering the Company's own credit spreads when measuring the fair value of liabilities, including derivatives, did not have a material impact on fair value measurements at the date of adoption.

In September 2006, the FASB issued SFAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans, an amendment of FASB Statements No. 87, 88, 106, and 132(R)" ("SFAS No. 158"). Among other items, SFAS No. 158 requires recognition of the overfunded or underfunded status of an entity's defined benefit and postretirement plans as an asset or liability in the financial statements and requires the measurement of defined benefit and postretirement plan assets and obligations as of the end of the employer's fiscal year. SFAS No. 158's requirement to recognize the funded status in the financial statements is effective for fiscal years ending after December 15, 2006, and its requirement to use the fiscal year-end date as the measurement date is effective for fiscal years ending after December 15, 2008. The Company is currently assessing the impact that SFAS No. 158 will have on its consolidated results of operations and cash flows. However, if SFAS No. 158 were to be applied by the Company as of November 30, 2006, based on a September 30, 2006 measurement date, the effect on its consolidated statement of financial position would be an after-tax charge to Shareholders' equity of approximately $355 million.

Morgan Stanley

## MORGAN STANLEY

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

### 29.  Quarterly Results (unaudited).

| | 2006 Fiscal Quarter | | | | 2005 Fiscal Quarter | | | |
|---|---|---|---|---|---|---|---|---|
| | First(1) | Second(1) | Third | Fourth | First | Second | Third | Fourth |
| | (dollars in millions, except per share data) | | | | | | | |
| Total revenues | $18,133 | $18,890 | $20,055 | $19,473 | $11,598 | $11,801 | $13,157 | $15,525 |
| Interest expense | 9,496 | 9,997 | 11,835 | 10,609 | 4,625 | 5,561 | 5,986 | 8,253 |
| Provision for consumer loan losses | 155 | 130 | 232 | 239 | 135 | 209 | 224 | 310 |
| Net revenues | 8,482 | 8,763 | 7,988 | 8,625 | 6,838 | 6,031 | 6,947 | 6,962 |
| Total non-interest expenses | 6,014 | 5,767 | 5,321 | 5,756 | 4,743 | 4,637 | 5,205 | 4,832 |
| Income from continuing operations before losses from unconsolidated investees, income taxes and cumulative effect of accounting change, net | 2,468 | 2,996 | 2,667 | 2,869 | 2,095 | 1,394 | 1,742 | 2,130 |
| Losses from unconsolidated investees | 69 | 103 | 2 | 54 | 73 | 67 | 105 | 66 |
| Provision for income taxes | 792 | 1,060 | 814 | 609 | 673 | 396 | 471 | 318 |
| Income from continuing operations before cumulative effect of accounting change, net | 1,607 | 1,833 | 1,851 | 2,206 | 1,349 | 931 | 1,166 | 1,746 |
| Discontinued operations(2): | | | | | | | | |
| (Loss)/gain from discontinued operations | (55) | 13 | — | — | 7 | (5) | (1,700) | 1,212 |
| Income tax benefit/(provision) | 22 | (5) | — | — | (3) | 2 | 678 | (493) |
| (Loss)/gain on discontinued operations | (33) | 8 | — | — | 4 | (3) | (1,022) | 719 |
| Cumulative effect of accounting change, net(3) | — | — | — | — | 49 | — | — | — |
| Net income | $ 1,574 | $ 1,841 | $ 1,851 | $ 2,206 | $ 1,402 | $ 928 | $ 144 | $ 2,465 |
| Preferred stock dividend requirements | $ — | $ — | $ — | $ 19 | $ — | $ — | $ — | $ — |
| Earnings applicable to common shareholders | $ 1,574 | $ 1,841 | $ 1,851 | $ 2,187 | $ 1,402 | $ 928 | $ 144 | $ 2,465 |
| Earnings per basic common share(4): | | | | | | | | |
| Income from continuing operations | $ 1.57 | $ 1.81 | $ 1.83 | $ 2.19 | $ 1.26 | $ 0.88 | $ 1.12 | $ 1.69 |
| (Loss)/gain on discontinued operations | (0.03) | 0.01 | — | — | — | — | (0.98) | 0.70 |
| Cumulative effect of accounting change, net(3) | — | — | — | — | 0.05 | — | — | — |
| Earnings per basic common share | $ 1.54 | $ 1.82 | $ 1.83 | $ 2.19 | $ 1.31 | $ 0.88 | $ 0.14 | $ 2.39 |
| Earnings per diluted common share(4): | | | | | | | | |
| Income from continuing operations | $ 1.51 | $ 1.74 | $ 1.75 | $ 2.08 | $ 1.24 | $ 0.86 | $ 1.09 | $ 1.64 |
| (Loss)/gain on discontinued operations | (0.03) | 0.01 | — | — | — | — | (0.96) | 0.68 |
| Cumulative effect of accounting change, net(3) | — | — | — | — | 0.05 | — | — | — |
| Earnings per diluted common share | $ 1.48 | $ 1.75 | $ 1.75 | $ 2.08 | $ 1.29 | $ 0.86 | $ 0.13 | $ 2.32 |
| Dividends to common shareholders | $ 0.27 | $ 0.27 | $ 0.27 | $ 0.27 | $ 0.27 | $ 0.27 | $ 0.27 | $ 0.27 |
| Book value | $ 28.12 | $ 29.97 | $ 31.24 | $ 32.67 | $ 25.83 | $ 26.07 | $ 26.07 | $ 27.59 |

(1)  Results for the Company for the first two quarters of fiscal 2006 were adjusted (see Note 24).

(2)  See Note 18 for a discussion of discontinued operations.

(3)  See Note 2 for a discussion of the cumulative effect of accounting change, net.

(4)  Summation of the quarters' earnings per common share may not equal the annual amounts due to the averaging effect of the number of shares and share equivalents throughout the year.

Morgan Stanley

## Item 9.   Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.

None.


## Item 9A. Controls and Procedures.

### Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we conducted an evaluation of our disclosure controls and procedures, as such term is defined under Exchange Act Rule 13a-15(e). Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this annual report.


### Management's Report on Internal Control Over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Morgan Stanley's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

Our internal control over financial reporting includes those policies and procedures that:

- Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of Morgan Stanley;

- Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of Morgan Stanley's management and directors; and

- Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management assessed the effectiveness of Morgan Stanley's internal control over financial reporting as of November 30, 2006. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework. Based on management's assessment and those criteria, management believes that Morgan Stanley maintained effective internal control over financial reporting as of November 30, 2006.

Morgan Stanley's independent registered public accounting firm has audited and issued their attestation report on management's assessment of Morgan Stanley's internal control over financial reporting, which appears below.

Morgan Stanley

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of
Morgan Stanley:

We have audited management's assessment, included within this November 30, 2006 Form 10-K of Morgan Stanley and subsidiaries (the "Company") at Item 9A under the heading "Management's Report on Internal Control Over Financial Reporting", that the Company maintained effective internal control over financial reporting as of November 30, 2006, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that the Company maintained effective internal control over financial reporting as of November 30, 2006, is fairly stated, in all material respects, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of November 30, 2006, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated statement of financial condition of the Company as of November 30, 2006 and

174

the related consolidated statement of income, comprehensive income, cash flows and changes in shareholders' equity for the year ended November 30, 2006 and our report dated February 12, 2007 expressed an unqualified opinion on those financial statements and included explanatory paragraphs regarding the Company's change in its accounting policy for recognition of equity awards granted to retirement-eligible employees and the application of Staff Accounting Bulletin No. 108, "Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements".

*Deloitte & Touche LLP*

New York, New York
February 12, 2007

175

**Changes in Internal Control Over Financial Reporting**

No change in Morgan Stanley's internal control over financial reporting (as such term is defined in Exchange Act Rule 13a-15(f)) occurred during the fiscal quarter ended November 30, 2006 that materially affected, or is reasonably likely to materially affect, Morgan Stanley's internal control over financial reporting.

## Item 9B.   Other Information.

Not applicable.

## Part III

## Item 10.  Directors and Executive Officers of the Registrant.

Information relating to Morgan Stanley's directors and nominees under the following captions in Morgan Stanley's Proxy Statement is incorporated by reference herein.

- "Item 1—Election of directors"

- "Item 1—Election of directors—Board meetings and committees"

Information relating to Morgan Stanley's executive officers is contained in Part I, Item 1 of this report under "Executive Officers of Morgan Stanley" and in Morgan Stanley's Proxy Statement under the caption "Section 16(a) beneficial ownership reporting compliance" and incorporated by reference herein.

Morgan Stanley's Code of Ethics and Business Conduct applies to all directors, officers and employees, including our Chief Executive Officer, our Chief Financial Officer and our Controller and Principal Accounting Officer. You can find our Code of Ethics and Business Conduct on our internet site, *www.morganstanley.com*. We will post any amendments to the Code of Ethics and Business Conduct, and any waivers that are required to be disclosed by the rules of either the SEC or the NYSE, on our internet site.

Because our common stock is listed on the NYSE and was listed on the NYSE Arca, Inc. (formerly the Pacific Exchange) (the "NYSE Arca") in 2006, our Chief Executive Officer was required to make, and he has made, an annual certification to the NYSE and the NYSE Arca stating that he was not aware of any violation by Morgan Stanley of the corporate governance listing standards of the applicable exchange. Our Chief Executive Officer made his annual certification to that effect to the NYSE and the NYSE Arca as of May 3, 2006. In October 2006, Morgan Stanley delisted its common stock from the NYSE Arca. In addition, Morgan Stanley has filed, as exhibits to this Annual Report on Form 10-K, the certifications of its Chief Executive Officer and Chief Financial Officer required under Section 302 of the Sarbanes-Oxley Act of 2002 to be filed with the SEC regarding the quality of Morgan Stanley's public disclosure.

## Item 11.  Executive Compensation.

Information relating to director and executive officer compensation under the following captions in Morgan Stanley's Proxy Statement is incorporated by reference herein.

- "Item 1—Election of directors—Director compensation"

- "Executive compensation"

Morgan Stanley

## Item 12.    Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.

Information relating to equity compensation plans and security ownership of certain beneficial owners and management is set forth under the captions "Item 3—Company proposal to approve the 2007 Equity Incentive Plan," "Equity Compensation Plan Information" and "Beneficial ownership of Company common stock" in Morgan Stanley's Proxy Statement and such information is incorporated by reference herein.

## Item 13.    Certain Relationships and Related Transactions.

Information regarding certain relationships and related transactions under the following caption in Morgan Stanley's Proxy Statement is incorporated by reference herein.

- "Other Matters—Certain transactions"

## Item 14.    Principal Accountant Fees and Services.

Information regarding principal accountant fees and services under the following caption in Morgan Stanley's Proxy Statement is incorporated by reference herein.

- "Item 2—Ratification of appointment of Morgan Stanley's independent auditor" (excluding the information under the subheading "Audit Committee report")

Morgan Stanley                                    178

**Part IV**

## Item 15.    Exhibits and Financial Statement Schedules.

*Documents filed as part of this report.*

- The financial statements required to be filed hereunder are listed on page S-1.

- The financial statement schedules required to be filed hereunder are listed on page S-1.

- An exhibit index has been filed as part of this report beginning on page E-1 and is incorporated herein by reference.

Morgan Stanley

# Signatures

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on February 12, 2007.

MORGAN STANLEY
(REGISTRANT)
By: /s/    JOHN J. MACK
_____
(John J. Mack)
Chairman of the Board and
Chief Executive Officer

# Power of Attorney

We, the undersigned, hereby severally constitute Gary G. Lynch, David H. Sidwell and Ronald T. Carman, and each of them singly, our true and lawful attorneys with full power to them and each of them to sign for us, and in our names in the capacities indicated below, any and all amendments to the Annual Report on Form 10-K filed with the Securities and Exchange Commission, hereby ratifying and confirming our signatures as they may be signed by our said attorneys to any and all amendments to said Annual Report on Form 10-K.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated on the 12th day of February, 2007.

| Signature | Title |
|---|---|
| /s/    JOHN J. MACK<br>(John J. Mack) | Chairman of the Board and Chief Executive Officer<br>(Principal Executive Officer) |
| /s/    DAVID H. SIDWELL<br>(David H. Sidwell) | Executive Vice President and Chief Financial Officer<br>(Principal Financial Officer) |
| /s/    PAUL C. WIRTH<br>(Paul C. Wirth) | Controller and Principal Accounting Officer<br>(Principal Accounting Officer) |
| /s/    ROY J. BOSTOCK<br>(Roy J. Bostock) | Director |
| /s/    ERSKINE B. BOWLES<br>(Erskine B. Bowles) | Director |
| /s/    HOWARD J. DAVIES<br>(Howard J. Davies) | Director |
| /s/    C. ROBERT KIDDER<br>(C. Robert Kidder) | Director |
| /s/    DONALD T. NICOLAISEN<br>(Donald T. Nicolaisen) | Director |

Morgan Stanley

| Signature | Title |
|---|---|
| /s/   CHARLES H. NOSKI<br>(Charles H. Noski) | Director |
| /s/   HUTHAM S. OLAYAN<br>(Hutham S. Olayan) | Director |
| /s/   CHARLES E. PHILLIPS, JR.<br>(Charles E. Phillips, Jr.) | Director |
| /s/   O. GRIFFITH SEXTON<br>(O. Griffith Sexton) | Director |
| /s/   LAURA D'ANDREA TYSON<br>(Laura D'Andrea Tyson) | Director |
| /s/   KLAUS ZUMWINKEL<br>(Klaus Zumwinkel) | Director |

Morgan Stanley

# MORGAN STANLEY
## INDEX TO FINANCIAL STATEMENTS AND
## FINANCIAL STATEMENT SCHEDULES
## ITEMS (15)(a)(1) AND (15)(a)(2)

|  | Page |
|---|---|
| **Financial Statements** | |
| Report of Independent Registered Public Accounting Firm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 109 |
| Consolidated Statements of Financial Condition at November 30, 2006 and November 30, 2005 . . . . . | 110 |
| Consolidated Statements of Income for Fiscal 2006, Fiscal 2005 and Fiscal 2004 . . . . . . . . . . . . . . . . | 112 |
| Consolidated Statements of Comprehensive Income for Fiscal 2006, Fiscal 2005 and Fiscal 2004 . . . . | 113 |
| Consolidated Statements of Cash Flows for Fiscal 2006, Fiscal 2005 and Fiscal 2004 . . . . . . . . . . . . | 114 |
| Consolidated Statements of Changes in Shareholders' Equity for Fiscal 2006, Fiscal 2005 and Fiscal 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 115 |
| Notes to Consolidated Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 116 |
| **Financial Statement Schedules** | |
| Schedule I—Condensed Financial Information of Morgan Stanley (Parent Company Only) at November 30, 2006 and November 30, 2005 and for each of the three fiscal years in the period ended November 30, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | S-2 - S-6 |

Morgan Stanley

SCHEDULE I

**MORGAN STANLEY**
**(Parent Company Only)**

**Condensed Statements of Financial Condition**
**(dollars in millions, except share data)**

|  | November 30, 2006 | November 30, 2005 |
|---|---|---|
| **Assets:** | | |
| Cash and cash equivalents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 6,879 | $ 13,779 |
| Financial instruments owned . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14,823 | 13,399 |
| Securities purchased under agreement to resell with affiliate . . . . . . . . . . . . . . . | 40,353 | 24,298 |
| Advances to subsidiaries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 145,550 | 113,835 |
| Investment in subsidiaries, at equity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36,966 | 29,499 |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,629 | 7,608 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $249,200 | $202,418 |
| **Liabilities and Shareholders' Equity:** | | |
| Commercial paper and other short-term borrowings . . . . . . . . . . . . . . . . . . . . . . | $ 14,255 | $ 17,630 |
| Financial instruments sold, not yet purchased . . . . . . . . . . . . . . . . . . . . . . . . . . | 9,359 | 9,706 |
| Payables to subsidiaries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 48,105 | 32,903 |
| Other liabilities and accrued expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,969 | 7,992 |
| Long-term borrowings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 139,148 | 105,005 |
| | 213,836 | 173,236 |
| Commitments and contingencies | | |
| Shareholders' equity: | | |
| Preferred stock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,100 | — |
| Common stock, $0.01 par value; | | |
| Shares authorized: 3,500,000,000 in 2006 and 2005; . . . . . . . . . . . . . . . . . . | | |
| Shares issued: 1,211,701,522 in 2006 and 2005; . . . . . . . . . . . . . . . . . . . . . | | |
| Shares outstanding: 1,048,877,006 in 2006 and 1,057,677,994 in 2005 . . . | 12 | 12 |
| Paid-in capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,213 | 2,389 |
| Retained earnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 41,422 | 35,185 |
| Employee stock trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,315 | 3,060 |
| Accumulated other comprehensive loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (35) | (190) |
| Common stock held in treasury, at cost, $0.01 par value; 162,824,546 shares in | | |
| 2006 and 154,023,558 shares in 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (9,348) | (8,214) |
| Common stock issued to employee trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (4,315) | (3,060) |
| Total shareholders' equity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 35,364 | 29,182 |
| Total liabilities and shareholders' equity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $249,200 | $202,418 |

See Notes to Condensed Financial Statements.

Morgan Stanley

S-2

SCHEDULE I

**MORGAN STANLEY**
**(Parent Company Only)**

**Condensed Statements of Income and Comprehensive Income**
**(dollars in millions)**

| | Fiscal 2006 | Fiscal 2005 | Fiscal 2004 |
|---|---|---|---|
| **Revenues:** | | | |
| Interest and dividends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 6,036 | $3,698 | $1,827 |
| Principal transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (156) | 159 | 49 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | 6 | (2) |
| Total revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,883 | 3,863 | 1,874 |
| **Expenses:** | | | |
| Interest expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,744 | 3,126 | 1,978 |
| Non-interest expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 146 | 106 | 124 |
| Total expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,890 | 3,232 | 2,102 |
| (Loss) income before income tax benefit (provision) and equity in earnings of subsidiaries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,007) | 631 | (228) |
| Income tax benefit (provision) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 296 | (143) | 54 |
| (Loss) income before equity in earnings of subsidiaries . . . . . . . . . . . . . . . . . . | (711) | 488 | (174) |
| Equity in earnings of subsidiaries, net of tax (including a cumulative effect of accounting change of $49 in fiscal 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8,183 | 4,451 | 4,660 |
| Net income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 7,472 | $4,939 | $4,486 |
| Other comprehensive income (loss), net of tax: | | | |
| Foreign currency translation adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . . | 104 | (89) | 76 |
| Net change in cash flow hedges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 53 | (70) | 26 |
| Minimum pension liability adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (2) | 25 | (2) |
| Comprehensive income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 7,627 | $4,805 | $4,586 |
| Net income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 7,472 | $4,939 | $4,486 |
| Preferred stock dividend requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 19 | $ — | $ — |
| Earnings applicable to common shareholders . . . . . . . . . . . . . . . . . . . . . . . . . | $ 7,453 | $4,939 | $4,486 |

See Notes to Condensed Financial Statements.

S-3

Morgan Stanley

SCHEDULE I

**MORGAN STANLEY**
**(Parent Company Only)**

**Condensed Statements of Cash Flows**
**(dollars in millions)**

| | Fiscal 2006 | Fiscal 2005 | Fiscal 2004 |
|---|---|---|---|
| Cash flows from operating activities: | | | |
| Net income ................................................... | $ 7,472 | $ 4,939 | $ 4,486 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Cumulative effect of accounting change of subsidiaries ............. | — | (49) | — |
| Compensation payable in common stock and stock options .......... | 1,955 | 836 | 663 |
| Equity in subsidiaries' earnings, net of dividends .................. | (6,345) | 1,269 | (1,327) |
| Change in assets and liabilities: | | | |
| Financial instruments owned, net of financial instruments sold, not yet purchased ................................................. | (1,857) | 554 | (570) |
| Other assets ......................................... | 7,091 | (4,123) | (2,734) |
| Other liabilities and accrued expenses ............................ | 10,064 | 1,255 | 5,831 |
| Net cash provided by operating activities ......................... | 18,380 | 4,681 | 6,349 |
| Cash flows from investing activities: | | | |
| Advances to and investments in subsidiaries ....................... | (32,837) | 1,044 | (16,034) |
| Securities purchased under agreement to resell with affiliate ........... | (16,055) | (14,297) | (10,001) |
| Net cash used for investing activities ........................... | (48,892) | (13,253) | (26,035) |
| Cash flows from financing activities: | | | |
| Net (payments for) proceeds from short-term borrowings ............. | (3,375) | (11,179) | 7,622 |
| Tax benefits associated with stock based awards ................... | 144 | 355 | — |
| Net proceeds from: | | | |
| Issuance of preferred stock ...................................... | 1,097 | — | — |
| Issuance of common stock ...................................... | 643 | 327 | 322 |
| Issuance of long-term borrowings ................................ | 44,009 | 31,304 | 32,000 |
| Payments for: | | | |
| Repurchases of common stock .................................... | (3,376) | (3,693) | (1,132) |
| Repayments of long-term borrowings ............................. | (14,363) | (14,579) | (11,129) |
| Cash dividends ................................................ | (1,167) | (1,180) | (1,096) |
| Net cash provided by financing activities ...................... | 23,612 | 1,355 | 26,587 |
| Net (decrease) increase in cash and cash equivalents ..................... | (6,900) | (7,217) | 6,901 |
| Cash and cash equivalents, at beginning of period ...................... | 13,779 | 20,996 | 14,095 |
| Cash and cash equivalents, at end of period ........................... | $ 6,879 | $ 13,779 | $ 20,996 |

See Notes to Condensed Financial Statements.

Morgan Stanley

**MORGAN STANLEY**
**(Parent Company Only)**

**NOTES TO CONDENSED FINANCIAL STATEMENTS**

**1. Introduction and Basis of Presentation.**

***Basis of Financial Information.*** The accompanying condensed financial statements (the "Parent Company Financial Statements"), including the notes thereto, should be read in conjunction with the consolidated financial statements of Morgan Stanley (the "Company") and the notes thereto found on pages 110 to 172 in this Form 10-K.

The Parent Company Financial Statements for the 12 months ended November 30, 2006 ("fiscal 2006"), November 30, 2005 ("fiscal 2005") and November 30, 2004 ("fiscal 2004") are prepared in accordance with accounting principles generally accepted in the U.S., which require the Company to make estimates and assumptions regarding valuations of certain financial instruments, the potential outcome of litigation and other matters that affect the Parent Company Financial Statements and related disclosures. The Company believes that the estimates utilized in the preparation of the Parent Company Financial Statements are prudent and reasonable. Actual results could differ materially from these estimates.

**2. Transactions with Subsidiaries.**

The Company has transactions with its consolidated subsidiaries determined on an agreed-upon basis and has guaranteed certain unsecured lines of credit and contractual obligations of certain of its consolidated subsidiaries.

The Company received cash dividends from its consolidated subsidiaries totaling $1,838 million, $5,720 million and $3,333 million in fiscal 2006, fiscal 2005 and fiscal 2004, respectively.

**3. Guarantees.**

In the normal course of its business, the Company guarantees certain of its subsidiaries' obligations under derivative and other financial arrangements. The Company records all derivative contracts and Financial instruments owned and Financial instruments sold, not yet purchased at fair value on its consolidated statements of financial condition. For a discussion of the Company's risk management activities, see Note 11 to the Company's consolidated financial statements.

The Company also, in the normal course of its business, provides standard indemnities to counterparties on behalf of its subsidiaries for taxes, including U.S. and foreign withholding taxes, on interest and other payments made on derivatives, securities and stock lending transactions and certain annuity products. These indemnity payments could be required based on a change in the tax laws or change in interpretation of applicable tax rulings. Certain contracts contain provisions that enable the Company to terminate the agreement upon the occurrence of such events. The maximum potential amount of future payments that the Company could be required to make under these indemnifications cannot be estimated. The Company has not recorded any contingent liability in the condensed financial statements for these indemnifications and believes that the occurrence of any events that would trigger payments under these contracts is remote.

The Company has issued guarantees on behalf of its subsidiaries to various U.S. and non-U.S. exchanges and clearinghouses that trade and clear securities and/or futures contracts. Under these guarantee arrangements, the Company may be required to pay the financial obligations of its subsidiaries related to business transacted on or with the exchanges and clearinghouses in the event of a subsidiary's default on its obligations to the exchange or the clearinghouse. The Company has not recorded any contingent liability in the condensed financial statements for these arrangements and believes that any potential requirements to make payments under these arrangements is remote.

Morgan Stanley

The Company guarantees certain debt instruments and warrants issued by subsidiaries. The debt instruments totaled $10.5 billion and the warrants totaled $3.7 billion at November 30, 2006. In addition, the Company has provided guarantees for Morgan Stanley Japan Securities Co., Ltd.'s obligations under committed credit facilities of 80 billion Japanese yen at November 30, 2006. In connection with subsidiary lease obligations, the Company has issued guarantees to various lessors. At November 30, 2006, the Company had $1.8 billion outstanding under subsidiary lease obligations, primarily in the U.K.

**4. Commitments and Contingencies.**

For a discussion of the Company's commitments and contingencies, see Note 9 to the Company's consolidated financial statements.

Morgan Stanley

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Shareholders of Morgan Stanley:

We have audited the consolidated financial statements of Morgan Stanley and subsidiaries (the "Company") as of November 30, 2006 and 2005, and for each of the three years in the period ended November 30, 2006, management's assessment of the effectiveness of the Company's internal control over financial reporting as of November 30, 2006, and the effectiveness of the Company's internal control over financial reporting as of November 30, 2006, and have issued our reports thereon dated February 12, 2007 (such report on the consolidated financial statements expresses an unqualified opinion and includes an explanatory paragraph concerning, in fiscal 2005, the adoption of Statement of Financial Accounting Standards No. 123(R), "Share-Based Payment" ("SFAS No. 123(R)") and effective December 1, 2005, the change in accounting policy for recognition of equity awards granted to retirement-eligible employees and, in fiscal 2006, an explanatory paragraph concerning the application of Staff Accounting Bulletin No. 108 "Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in the Current Year Financial Statements" ("SAB No. 108")); such consolidated financial statements and reports are included in this 2006 Annual Report on Form 10-K. Our audits also included Schedule I listed in the Index to Financial Statements and Financial Statement Schedules. This financial statement schedule is the responsibility of the Company's management. Our responsibility is to express an opinion based on our audits. In our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

In fiscal 2005, the Company adopted SFAS No. 123(R).

In fiscal 2006, the Company changed its accounting policy for recognition of equity awards granted to retirement-eligible employees and the Company elected application of SAB No. 108.

*Deloitte & Touche LLP*

New York, New York
February 12, 2007

# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# EXHIBITS

## TO

# FORM 10-K

**For the fiscal year ended November 30, 2006**

**Commission File No. 1-11758**

# Morgan Stanley

# Exhibit Index

Certain of the following exhibits, as indicated parenthetically, were previously filed as exhibits to registration statements filed by Morgan Stanley or its predecessor companies under the Securities Act or to reports or registration statements filed by Morgan Stanley or its predecessor companies under the Exchange Act, respectively, and are hereby incorporated by reference to such statements or reports. Morgan Stanley's Exchange Act file number is 1-11758. The Exchange Act file number of Morgan Stanley Group Inc., a predecessor company ("MSG"), was 1-9085.[1]

| Exhibit No. | Description |
|---|---|
| 3.1* | Amended and Restated Certificate of Incorporation of Morgan Stanley, as amended to date. |
| 3.2 | By-Laws of Morgan Stanley, as amended to date (Exhibit 3 to Morgan Stanley's Current Report on Form 8-K dated January 22, 2007). |
| 4.1 | Indenture dated as of February 24, 1993 between Morgan Stanley and The Bank of New York, as trustee (Exhibit 4 to Morgan Stanley's Registration Statement on Form S-3 (No. 33-57202)). |
| 4.2 | Amended and Restated Senior Indenture dated as of May 1, 1999 between Morgan Stanley and The Bank of New York, as trustee (Exhibit 4-e to Morgan Stanley's Registration Statement on Form S-3/A (No. 333-75289)) as supplemented by First Supplemental Senior Indenture dated as of September 15, 2000 between Morgan Stanley and The Bank of New York, as trustee (Exhibit 4-f to Morgan Stanley's Registration Statement on Form S-3/A (No. 333-47576)) and Third Supplemental Senior Indenture dated as of August 29, 2003 between Morgan Stanley and The Bank of New York, as trustee (Exhibit 4 to Morgan Stanley's Quarterly Report on Form 10-Q for the quarter ended May 31, 2004). |
| 4.3 | Senior Indenture dated as of November 1, 2004 between Morgan Stanley and The Bank of New York, as trustee (Exhibit 4-f to Morgan Stanley's Registration Statement on Form S-3/A (No. 333-117752)). |
| 4.4 | Amended and Restated Subordinated Indenture dated as of May 1, 1999 between Morgan Stanley and The Bank of New York, as trustee (Exhibit 4-f to Morgan Stanley's Registration Statement on Form S-3/A (No. 333-75289)). |
| 4.5 | Subordinated Indenture dated as of October 1, 2004 between Morgan Stanley and The Bank of New York, as trustee (Exhibit 4-g to Morgan Stanley's Registration Statement on Form S-3/A (No. 333-117752)). |
| 4.6 | Junior Subordinated Indenture dated as of March 1, 1998 between Morgan Stanley and The Bank of New York, as trustee (Exhibit 4.1 to Morgan Stanley's Quarterly Report on Form 10-Q for the quarter ended February 28, 1998). |
| 4.7 | Junior Subordinated Indenture dated as of October 1, 2004 between Morgan Stanley and The Bank of New York, as trustee (Exhibit 4-ww to Morgan Stanley's Registration Statement on Form S-3/A (No. 333-117752)). |
| 4.8 | Junior Subordinated Indenture dated as of October 12, 2006 between Morgan Stanley and The Bank of New York, as trustee (Exhibit 4.1 to Morgan Stanley's Current Report on Form 8-K dated October 12, 2006). |

---

(1) For purposes of this Exhibit Index, references to "The Bank of New York" mean in some instances the entity successor to JPMorgan Chase Bank, N.A or J.P. Morgan Trust Company, National Association; references to "JPMorgan Chase Bank, N.A." mean the entity formerly known as The Chase Manhattan Bank, in some instances as the successor to Chemical Bank; references to "J.P. Morgan Trust Company, N.A." mean the entity formerly known as Bank One Trust Company, N.A., as successor to The First National Bank of Chicago; and references to "Discover Bank" mean the entity formerly known as Greenwood Trust Company.

Morgan Stanley

| Exhibit No. | Description |
|---|---|
| 4.9 | Certificate representing the Series A Preferred Stock (Exhibit 4.2 to Morgan Stanley's Quarterly Report on Form 10-Q for the quarter ended May 31, 2006). |
| 4.10 | Deposit Agreement dated as of July 6, 2006 among Morgan Stanley, JPMorgan Chase Bank, N.A. and the holders from time to time of the depositary receipts described therein (Exhibit 4.3 to Morgan Stanley's Quarterly Report on Form 10-Q for the quarter ended May 31, 2006). |
| 4.11 | Depositary Receipt for Depositary Shares, representing Floating Rate Non-Cumulative Preferred Stock, Series A (included in Exhibit 4.10 hereto). |
| 4.12 | Amended and Restated Trust Agreement of Morgan Stanley Capital Trust II dated as of July 19, 2001 among Morgan Stanley, as depositor, The Bank of New York, as property trustee, The Bank of New York (Delaware), as Delaware trustee and the administrators named therein (Exhibit 10.4 to Morgan Stanley's Quarterly Report on Form 10-Q for the quarter ended August 31, 2001). |
| 4.13 | Amended and Restated Trust Agreement of Morgan Stanley Capital Trust III dated as of February 27, 2003 among Morgan Stanley, as depositor, The Bank of New York, as property trustee, The Bank of New York (Delaware), as Delaware trustee, and the administrators named therein (Exhibit 4 to Morgan Stanley's Quarterly Report on Form 10-Q for the quarter ended February 28, 2003). |
| 4.14 | Amended and Restated Trust Agreement of Morgan Stanley Capital Trust IV dated as of April 21, 2003 among Morgan Stanley, as depositor, The Bank of New York, as property trustee, The Bank of New York (Delaware), as Delaware Trustee and the administrators named therein (Exhibit 4 to Morgan Stanley's Quarterly Report on Form 10-Q for the quarter ended May 31, 2003). |
| 4.15 | Amended and Restated Trust Agreement of Morgan Stanley Capital Trust V dated as of July 16, 2003 among Morgan Stanley, as depositor, The Bank of New York, as property trustee, The Bank of New York (Delaware), as Delaware trustee and the administrators named therein (Exhibit 4 to Morgan Stanley's Quarterly Report on Form 10-Q for the quarter ended August 31, 2003). |
| 4.16 | Amended and Restated Trust Agreement of Morgan Stanley Capital Trust VI dated as of January 26, 2006 among Morgan Stanley, as depositor, The Bank of New York, as property trustee, The Bank of New York (Delaware), as Delaware trustee and the administrators named therein (Exhibit 4 to Morgan Stanley's Quarterly Report on Form 10-Q for the quarter ended February 28, 2006). |
| 4.17 | Amended and Restated Trust Agreement of Morgan Stanley Capital Trust VII dated as of October 12, 2006 among Morgan Stanley, as depositor, The Bank of New York, as property trustee, The Bank of New York (Delaware), as Delaware trustee and the administrators named therein (Exhibit 4.3 to Morgan Stanley's Current Report on Form 8-K dated October 12, 2006). |
| 4.18 | Instruments defining the Rights of Security Holders, Including Indentures—Except as set forth in Exhibits 4.1 through 4.17 above, the instruments defining the rights of holders of long-term debt securities of Morgan Stanley and its subsidiaries are omitted pursuant to Section (b)(4)(iii) of Item 601 of Regulation S-K. Morgan Stanley hereby agrees to furnish copies of these instruments to the SEC upon request. |
| 10.1 | Amended and Restated Pooling and Servicing Agreement dated as of November 3, 2004 between Discover Bank, as master servicer, servicer and seller, and U.S. Bank National Association, as trustee (Exhibit 4.2 to the Discover Card Master Trust I Current Report on Form 8-K dated October 29, 2004 (Exchange Act file number 0-23108)) as amended by Amendment dated as of January 4, 2006 between Discover Bank, as master servicer, servicer and seller, and U.S. Bank National Association, as trustee (Exhibit 4.1 to the Discover Card Master Trust Current Report on Form 8-K dated January 4, 2006) and Second Amendment dated as of March 30, 2006, between Discover Bank, as master servicer, servicer and seller, and U.S. Bank National Association, as trustee (Exhibit 4.3 to the Discover Bank Registration Statement on Form S-3/A (No. 333-131898-01)). |
| 10.2 | Form of Series Supplement with respect to Discover Card Master Trust I between Discover Bank, as master servicer, servicer and seller, and U.S. Bank National Association, as trustee (Exhibit 4.4 to the Discover Bank Registration Statement on Form S-3 (No. 333-131898-01)). |

Morgan Stanley

| Exhibit No. | Description |
|---|---|
| 10.3 | Amended and Restated Trust Agreement dated as of November 30, 2000 between Morgan Stanley and State Street Bank and Trust Company (Exhibit T to Amendment No. 5 to the Schedule 13D dated as of November 30, 2000 filed by certain senior officers of Morgan Stanley) as amended by Amendment No. 1 dated as of November 30, 2000 between Morgan Stanley and State Street Bank and Trust Company, effective January 1, 2002 (Exhibit 10.10 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended November 30, 2001), Amendment No. 2 dated as of November 30, 2000 between Morgan Stanley and State Street Bank and Trust Company, effective January 1, 2003 (Exhibit 10.12 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended November 30, 2002), Amendment No. 3 dated as of November 30, 2000 between Morgan Stanley and State Street Bank and Trust Company, effective September 15, 2003 (Exhibit 10.11 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended November 30, 2003) and Amendment No. 4 dated as of March 21, 2006 between Morgan Stanley and State Street Bank and Trust Company (Exhibit 10.1 to Morgan Stanley's Quarterly Report on Form 10-Q for the quarter ended February 28, 2006). |
| 10.4† | Dean Witter Reynolds Inc. Supplemental Pension Plan (formerly known as the Dean Witter Reynolds Financial Services Inc. Supplemental Pension Plan for Executives) (amended and restated) (Exhibit 10.32 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended December 31, 1993). |
| 10.5† | Omnibus Equity Incentive Plan (Exhibit 4.1 to Morgan Stanley's Registration Statement on Form S-8 (No. 33-63024)). |
| 10.6† | Employees Replacement Stock Plan (Exhibit 4.2 to Morgan Stanley's Registration Statement on Form S-8 (No. 33-63024)) as amended by Amendment (Exhibit 10.1 to Morgan Stanley's Current Report on Form 8-K dated November 18, 1993). |
| 10.7† | Morgan Stanley 401(k) Plan (f/k/a the Morgan Stanley DPSP/START Plan) amended and restated effective as of October 1, 2002 (Exhibit 10.17 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended November 30, 2002) as amended by Amendment (Exhibit 10.18 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended November 30, 2002), Amendment (Exhibit 10.18 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended November 30, 2003), Amendment (Exhibit 10.19 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended November 30, 2003), Amendment (Exhibit 10 to Morgan Stanley's Quarterly Report on Form 10-Q for the quarter ended May 31, 2004), Amendment (Exhibit 10.16 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended November 30, 2004), Amendment (Exhibit 10.1 to Morgan Stanley's Quarterly Report on Form 10-Q for the quarter ended February 28, 2005), Amendment (Exhibit 10.2 to Morgan Stanley's Quarterly Report on Form 10-Q for the quarter ended February 28, 2005), Amendment (Exhibit 10.1 to Morgan Stanley's Quarterly Report on Form 10-Q for the quarter ended May 31, 2005) and Amendment (Exhibit 10.8 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended November 30, 2005). |
| 10.8† | 1993 Stock Plan for Non-Employee Directors (Exhibit 4.3 to Morgan Stanley's Registration Statement on Form S-8 (No. 33-63024)) as amended by Amendment (Exhibit 10.37 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended December 31, 1993). |
| 10.9† | Transferred Executives Pension Supplement as amended and restated (Exhibit 10 to Morgan Stanley's Quarterly Report on Form 10-Q for the quarter ended September 30, 1995). |
| 10.10† | 1994 Omnibus Equity Plan as amended and restated (Exhibit 10.23 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended November 30, 2003). |
| 10.11†* | Amendment to 1994 Omnibus Equity Plan, dated as of November 27, 2006. |
| 10.12†* | Tax Deferred Equity Participation Plan as amended and restated as of November 27, 2006. |

Morgan Stanley

| Exhibit No. | Description |
|---|---|
| 10.13† | Directors' Equity Capital Accumulation Plan as amended through September 19, 2006 (Exhibit 10 to Morgan Stanley's Quarterly Report on Form 10-Q for the quarter ended August 31, 2006). |
| 10.14† | Select Employees' Capital Accumulation Program (Exhibit 10.2 to Morgan Stanley's Quarterly Report on Form 10-Q for the quarter ended February 29, 2004). |
| 10.15†* | Employees' Equity Accumulation Plan as amended and restated as of November 27, 2006. |
| 10.16†* | Employee Stock Purchase Plan amended as of November 27, 2006. |
| 10.17† | Form of Agreement under the Morgan Stanley & Co. Incorporated Owners' and Select Earners' Plan (Exhibit 10.1 to MSG's Annual Report on Form 10-K for the fiscal year ended January 31, 1993). |
| 10.18† | Form of Agreement under the Officers' and Select Earners' Plan (Exhibit 10.2 to MSG's Annual Report on Form 10-K for the fiscal year ended January 31, 1993). |
| 10.19† | Morgan Stanley & Co. Incorporated Excess Benefit Plan (Exhibit 10.31 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended November 30, 1998) as amended by Amendment (Exhibit 10.32 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended November 30, 2000), Amendment (Exhibit 10.2 to Morgan Stanley's Quarterly Report on Form 10-Q for the quarter ended August 31, 2002), Amendment (Exhibit 10.32 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended November 30, 2002), Amendment (Exhibit 10.34 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended November 30, 2003), Amendment (Exhibit 10.33 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended November 30, 2004) and Amendment (Exhibit 10.20 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended November 30, 2005). |
| 10.20† | Supplemental Executive Retirement Plan (Exhibit 10.32 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended November 30, 1998) as amended by Amendment (Exhibit 10.37 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended November 30, 1999), Amendment (Exhibit 10.35 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended November 30, 2000), Amendment (Exhibit 10.3 to Morgan Stanley's Quarterly Report on Form 10-Q for the quarter ended August 31, 2002), Amendment (Exhibit 10.37 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended November 30, 2002), Amendment (Exhibit 10.40 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended November 30, 2003) and Amendment (Exhibit 10.22 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended November 30, 2005). |
| 10.21† | 1988 Equity Incentive Compensation Plan as amended (Exhibit 10.12 to MSG's Annual Report on Form 10-K for fiscal year ended January 31, 1993). |
| 10.22†* | Amendment to 1988 Equity Incentive Compensation Plan, dated as of November 27, 2006. |
| 10.23† | 1995 Equity Incentive Compensation Plan (Annex A to MSG's Proxy Statement for its 1996 Annual Meeting of Stockholders) as amended by Amendment (Exhibit 10.39 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended November 30, 2000), Amendment (Exhibit 10.5 to Morgan Stanley's Quarterly Report on Form 10-Q for the quarter ended August 31, 2005) and Amendment (Exhibit 10.3 to Morgan Stanley's Quarterly Report on Form 10-Q for the quarter ended February 28, 2006). |
| 10.24†* | Amendment to 1995 Equity Incentive Compensation Plan, dated as of November 27, 2006. |
| 10.25† | Form of Equity Incentive Compensation Plan Award Certificate (Exhibit 10.1 to Morgan Stanley's Quarterly Report on Form 10-Q for the quarter ended August 31, 2004). |
| 10.26† | Form of Equity Incentive Compensation Plan Award Certificate (Exhibit 10.10 to Morgan Stanley's Quarterly Report on Form 10-Q for the quarter ended August 31, 2005). |

Morgan Stanley

| Exhibit No. | Description |
|---|---|
| 10.27† | Form of Chief Executive Officer Equity Award Certificate for Discretionary Retention Award of Stock Units under the EICP (Exhibit 10.2 to Morgan Stanley's Current Report on Form 8-K dated December 12, 2005). |
| 10.28†* | Form of Chief Executive Officer Equity Award Certificate for Discretionary Retention Award of Stock Units and Stock Options. |
| 10.29† | Form of Management Committee Equity Award Certificate for Discretionary Retention Award of Stock Units under the EICP (Exhibit 10.3 to Morgan Stanley's Current Report on Form 8-K dated December 12, 2005). |
| 10.30†* | Form of Management Committee Equity Award Certificate for Discretionary Retention Award of Stock Units and Stock Options. |
| 10.31† | 1988 Capital Accumulation Plan as amended (Exhibit 10.13 to MSG's Annual Report on Form 10-K for the fiscal year ended January 31, 1993). |
| 10.32† | Form of Deferred Compensation Agreement under the Pre-Tax Incentive Program (Exhibit 10.12 to MSG's Annual Report on Form 10-K for the fiscal year ended January 31, 1994). |
| 10.33† | Form of Deferred Compensation Agreement under the Pre-Tax Incentive Program 2 (Exhibit 10.12 to MSG's Annual Report for the fiscal year ended November 30, 1996). |
| 10.34† | Key Employee Private Equity Recognition Plan (Exhibit 10.43 to Morgan Stanley's Annual Report on Form 10-K for the fiscal year ended November 30, 2000). |
| 10.35†* | Morgan Stanley Branch Manager Compensation Plan as amended and restated as of November 27, 2006. |
| 10.36†* | Morgan Stanley Financial Advisor and Investment Representative Compensation Plan as amended and restated as of November 27, 2006. |
| 10.37† | Settlement and Release Agreement dated June 30, 2005 between Morgan Stanley and Mr. Philip J. Purcell (Exhibit 10.1 to Morgan Stanley's Current Report on Form 8-K dated June 30, 2005). |
| 10.38† | Agreement dated June 30, 2005 between Morgan Stanley and Mr. Stephen S. Crawford (Exhibit 10.2 to Morgan Stanley's Current Report on Form 8-K dated June 30, 2005). |
| 10.39† | Agreement dated June 30, 2005 between Morgan Stanley and Mr. David H. Sidwell (Exhibit 10.3 to Morgan Stanley's Current Report on Form 8-K dated June 30, 2005) as amended by Agreement dated December 20, 2005 between Morgan Stanley and Mr. David H. Sidwell (Exhibit 10 to Morgan Stanley's Current Report on Form 8-K dated December 20, 2005). |
| 10.40† | Amended and Restated Employment Agreement dated as of September 20, 2005 between Morgan Stanley and Mr. John J. Mack (Exhibit 10 to Morgan Stanley's Current Report on Form 8-K dated September 19, 2005) as amended by Amendment dated December 13, 2005 (Exhibit 10.1 to Morgan Stanley's Current Report on Form 8-K dated December 12, 2005) and Amendment dated February 14, 2006 (Exhibit 10.4 to Morgan Stanley's Quarterly Report on Form 10-Q for the quarter ended February 28, 2006). |
| 10.41† | Form of Restrictive Covenant Agreement (Exhibit 10 to Morgan Stanley's Current Report on Form 8-K dated November 22, 2005). |
| 10.42† | Morgan Stanley Performance Formula and Provisions (Exhibit 10.3 to Morgan Stanley's Quarterly Report on Form 10-Q dated May 31, 2006). |
| 10.43† | Morgan Stanley Schedule of Non-Employee Directors Retainers effective as of July 6, 2006 (Exhibit 10 to Morgan Stanley's Current Report on Form 8-K dated June 20, 2006). |
| 11 | Statement Re: Computation of Earnings Per Common Share (The calculation of per share earnings is in Part II, Item 8, Note 10 to the Consolidated Financial Statements (Earnings per Share) and is omitted in accordance with Section (b)(11) of Item 601 of Regulation S-K). |

Morgan Stanley

| Exhibit No. | Description |
|---|---|
| 12* | Statement Re: Computation of Ratio of Earnings to Fixed Charges and Computation of Ratio of Earnings to Fixed Charges and Preferred Stock Dividends. |
| 21* | Subsidiaries of Morgan Stanley. |
| 23.1* | Consent of Deloitte & Touche LLP. |
| 24 | Powers of Attorney (included on signature page). |
| 31.1** | Rule 13a-14(a) Certification of Chief Executive Officer. |
| 31.2** | Rule 13a-14(a) Certification of Chief Financial Officer. |
| 32.1** | Section 1350 Certification of Chief Executive Officer. |
| 32.2** | Section 1350 Certification of Chief Financial Officer. |

\*    Filed herewith.
\*\*   Furnished herewith.
†    Management contract or compensatory plan or arrangement required to be filed as an exhibit to this Form 10-K pursuant to Item 15(b).

Morgan Stanley

Printed with soy ink on recycled paper.

**Exhibit B**

EXHIBIT 3

AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

OF

MORGAN STANLEY, DEAN WITTER, DISCOVER & CO.

MAY 31, 1997

## ARTICLE I

### NAME

The name of the corporation (which is hereinafter referred to as the "Corporation") is:

Morgan Stanley, Dean Witter, Discover & Co.

## ARTICLE II

### ADDRESS

The address of the Corporation's registered office in the State of Delaware is The Corporation Trust Center, 1209 Orange Street in the City of Wilmington, County of New Castle. The name of the Corporation's registered agent at such address is The Corporation Trust Company.

## ARTICLE III

### PURPOSE

The purpose of the Corporation shall be to engage in any lawful act or activity for which corporations may be organized and incorporated under the General Corporation Law of the State of Delaware.

## ARTICLE IV

### CAPITALIZATION

The total number of shares of stock which the Corporation shall have authority to issue is one billion seven hundred eighty million (1,780,000,000), consisting of thirty million (30,000,000) shares of Preferred Stock, par value $0.01 per share (hereinafter referred to as "Preferred Stock"), and one billion seven hundred fifty million (1,750,000,000) shares of Common Stock, par value $0.01 per share (hereinafter referred to as "Common Stock").

The Preferred Stock may be issued from time to time in one or more series. The Board of Directors is hereby authorized to provide for the issuance of shares of Preferred Stock in series and, by filing a certificate pursuant to the applicable law of the State of Delaware (hereinafter referred to as a "Preferred Stock Designation"), to establish from time to time the number of shares to be included in each such series, and to fix the designation, powers,

preferences and rights of the shares of each such series and the qualifications, limitations and restrictions thereof. The authority of the Board of Directors with respect to each series shall include, but not be limited to, determination of the following:

(1) The designation of the series, which may be by distinguishing number, letter or title.

(2) The number of shares of the series, which number the Board of Directors may thereafter (except where otherwise provided in the Preferred Stock Designation) increase or decrease (but not below the number of shares thereof then outstanding).

(3) The amounts payable on, and the preferences, if any, of shares of the series in respect of dividends, and whether such dividends, if any, shall be cumulative or noncumulative.

(4) Dates at which dividends, if any, shall be payable.

(5) The redemption rights and price or prices, if any, for shares of the series.

(6) The terms and amount of any sinking fund provided for the purchase or redemption of shares of the series.

(7) The amounts payable on, and the preferences, if any, of shares of the series in the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation.

(8) Whether the shares of the series shall be convertible into or exchangeable for shares of any other class or series, or any other security, of the Corporation or any other corporation, and, if so, the specification of such other class or series of such other security, the conversion or exchange price or prices or rate or rates, any adjustments thereof, the date or dates at which such shares shall be convertible or exchangeable and all other terms and conditions upon which such conversion or exchange may be made.

(9) Restrictions on the issuance of shares of the same series or of any other class or series.

(10) The voting rights, if any, of the holders of shares of the series.

The Common Stock shall be subject to the express terms of the Preferred Stock and any series thereof. Except as may be provided in this Certificate of Incorporation or in a Preferred Stock Designation or by applicable law, the holders of shares of Common Stock shall be entitled to one vote for each such share upon all questions presented to the stockholders, the Common Stock shall have the exclusive right to vote for the election of directors and for all other purposes, and holders of Preferred Stock shall not be entitled to receive notice of any meeting of stockholders at which they are not entitled to vote. The holders of the shares of Common Stock shall at all times, except as otherwise provided in this Certificate of Incorporation or as required by law, vote as one class, together with the holders of any other class or series of stock of the Corporation accorded such general voting rights.

The Corporation shall be entitled to treat the person in whose name any share of its stock is registered as the owner thereof for all purposes and shall not be bound to recognize any

2

equitable or other claim to, or interest in, such share on the part of any other person, whether or not the Corporation shall have notice thereof, except as expressly provided by applicable law.

ARTICLE V

BY-LAWS

In furtherance of, and not in limitation of, the powers conferred by law, the Board of Directors is expressly authorized and empowered:

(1) to adopt, amend or repeal the Bylaws of the Corporation; provided, however, that the Bylaws adopted by the Board of Directors under the powers hereby conferred may be amended or repealed by the Board of Directors or by the stockholders having voting power with respect thereto, provided further that, in the case of amendments by stockholders, the affirmative vote of the holders of at least 80 percent of the voting power of the then outstanding Voting Stock, voting together as a single class, shall be required in order for the stockholders to alter, amend or repeal any provision of the Bylaws or to adopt any additional Bylaw; and

(2) from time to time to determine whether and to what extent, and at what times and places, and under what conditions and regulations, the accounts and books of the Corporation, or any of them, shall be open to inspection of stockholders; and, except as so determined or as expressly provided in this Certificate of Incorporation or in any Preferred Stock Designation, no stockholder shall have any right to inspect any account, book or document of the Corporation other than such rights as may be conferred by applicable law.

The Corporation may in its Bylaws confer powers upon the Board of Directors in addition to the foregoing and in addition to the powers and authorities expressly conferred upon the Board of Directors by applicable law.

ARTICLE VI

ACTION OF STOCKHOLDERS

Subject to the rights of the holders of any series of Preferred Stock or any other series or class of stock as set forth in this Certificate of Incorporation, any action required or permitted to be taken by the stockholders of the Corporation must be effected at a duly called annual or special meeting of stockholders of the Corporation and may not be effected by any consent in writing in lieu of a meeting of such stockholders.

ARTICLE VII

BOARD OF DIRECTORS

Subject to the rights of the holders of any series of Preferred Stock, or any other series or class of stock as set forth in this Certificate of Incorporation, to elect additional directors under specified circumstances, the number of directors of the Corporation shall be fixed in such manner as prescribed by the Bylaws of the Corporation and may be increased or decreased from time to time in such manner as prescribed by the Bylaws.

3

Unless and except to the extent that the Bylaws of the Corporation shall so require, the election of directors of the Corporation need not be by written ballot.

The directors, other than those who may be elected by the holders of any series of Preferred Stock or any other series or class of stock as set forth in this Certificate of Incorporation, shall be divided into three classes, initially consisting of 6, 4 and 4 directors. One class of directors initially consisting of 4 directors shall be initially elected for a term expiring at the annual meeting of stockholders to be held in 1998, another class initially consisting of 4 directors shall be initially elected for a term expiring at the annual meeting of stockholders to be held in 1999, and another class initially consisting of 6 directors shall be initially elected for a term expiring at the annual meeting of stockholders to be held in 2000. Members of each class shall hold office until their successors are elected and qualified. At each annual meeting of the stockholders of the Corporation commencing with the 1998 annual meeting, directors elected to succeed those directors whose terms then expire shall be elected by a plurality vote of all votes cast at such meeting to hold office for a term expiring at the third succeeding annual meeting of stockholders after their election, with each director to hold office until his or her successor shall have been duly elected and qualified.

Subject to the rights of the holders of any series of Preferred Stock, or any other series or class of stock as set forth in this Certificate of Incorporation, to elect additional directors under specified circumstances, vacancies resulting from death, resignation, retirement, disqualification, removal from office or other cause, and newly created directorships resulting from any increase in the authorized number of directors, may be filled only by the affirmative vote of a majority of the remaining directors, though less than a quorum of the Board of Directors, and directors so chosen shall hold office for a term expiring at the annual meeting of stockholders at which the term of office of the class to which they have been elected expires and until such director's successor shall have been duly elected and qualified. No decrease in the number of authorized directors constituting the Board of Directors shall shorten the term of any incumbent director.

Subject to the rights of the holders of any series of Preferred Stock, or any other series or class of stock as set forth in this Certificate of Incorporation, to elect additional directors under specified circumstances, any director may be removed from office at any time, but only for cause and by the affirmative vote of the holders of at least 80 percent of the voting power of the then outstanding Voting Stock, voting together as a single class.

ARTICLE VIII

<u>INDEMNIFICATION</u>

Each person who is or was a director or officer of the Corporation shall be indemnified by the Corporation to the fullest extent permitted from time to time by the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended (but, if permitted by applicable law, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such amendment) or any other applicable laws as presently or hereafter in effect. The Corporation may, by action of the

4

Board of Directors, provide indemnification to employees and agents (other than a director or officer) of the Corporation, to directors, officers, employees or agents of a subsidiary, and to each person serving as a director, officer, partner, member, employee or agent of another corporation, partnership, limited liability company, joint venture, trust or other enterprise, at the request of the Corporation, with the same scope and effect as the foregoing indemnification of directors and officers of the Corporation. The Corporation shall be required to indemnify any person seeking indemnification in connection with a proceeding (or part thereof) initiated by such person only if such proceeding (or part thereof) was authorized by the Board of Directors or is a proceeding to enforce such person's claim to indemnification pursuant to the rights granted by this Certificate of Incorporation or otherwise by the Corporation. Without limiting the generality or the effect of the foregoing, the Corporation may enter into one or more agreements with any person which provide for indemnification greater or different than that provided in this Article VIII. Any amendment or repeal of this Article VIII shall not adversely affect any right or protection existing hereunder in respect of any act or omission occurring prior to such amendment or repeal.

## ARTICLE IX

### DIRECTORS' LIABILITY

A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (1) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (2) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (3) under Section 174 of the General Corporation Law of the State of Delaware, or (4) for any transaction from which the director derived an improper personal benefit. Any amendment or repeal of this Article IX shall not adversely affect any right or protection of a director of the Corporation existing hereunder in respect of any act or omission occurring prior to such amendment or repeal.

If the General Corporation Law of the State of Delaware shall be amended, to authorize corporate action further eliminating or limiting the liability of directors, then a director of the Corporation, in addition to the circumstances in which he is not liable immediately prior to such amendment, shall be free of liability to the fullest extent permitted by the General Corporation Law of the State of Delaware, as so amended.

## ARTICLE X

### AMENDMENTS

Except as may be expressly provided in this Certificate of Incorporation, the Corporation reserves the right at any time and from time to time to amend, alter, change or repeal any provision contained in this Certificate of Incorporation or a Preferred Stock Designation, and any other provisions authorized by the laws of the State of Delaware at the time in force may be added or inserted, in the manner now or hereafter prescribed herein or by applicable law, and all rights, preferences and privileges of whatsoever nature conferred upon stockholders, directors or any other persons whomsoever by and pursuant to this Certificate of Incorporation in its present form or as hereafter amended are granted subject to the right reserved in this Article X; provided, however, that any amendment or repeal of Article VIII or Article IX of this Certificate of Incorporation shall not adversely affect any right or

5

protection existing thereunder in respect of any act or omission occurring prior to such amendment or repeal, and provided further that no Preferred Stock Designation shall be amended after the issuance of any shares of the series of Preferred Stock created thereby, except in accordance with the terms of such Preferred Stock Designation and the requirements of applicable law.

Notwithstanding anything contained in this Certificate of Incorporation to the contrary, and in addition to approval by the Board of Directors, the affirmative vote of the holders of at least 80 percent of the voting power of the then outstanding Voting Stock, voting together as a single class, shall be required to amend, repeal or adopt any provision inconsistent with paragraph (1) of Article V, Article VI, Article VII or this second paragraph of this Article X. For the purposes of this Certificate of Incorporation, "Voting Stock" shall mean the outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors.

6

CERTIFICATE OF DESIGNATION OF PREFERENCES AND RIGHTS
OF THE
ESOP CONVERTIBLE PREFERRED STOCK
OF
DEAN WITTER, DISCOVER & CO.

Pursuant to Section 151 of the
General Corporation Law of the State of Delaware

The undersigned DOES HEREBY CERTIFY:

A. The following resolution was duly adopted by the Board of Directors (the "Board") of Dean Witter, Discover & Co., a Delaware corporation (hereinafter called the "Corporation"), by unanimous vote thereof at a meeting on May 28, 1997:

RESOLVED that, pursuant to authority expressly granted to and vested in the Board by provisions of the Amended and Restated Certificate of Incorporation of the Corporation (the "Certificate of Incorporation"), the issuance of a series of Preferred Stock, par value $0.01 per share (the "Preferred Stock"), which shall consist of 3,902,438 of the shares of Preferred Stock which the Corporation has authority to issue, is authorized, and the Board hereby fixes the powers, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, of the shares of such series (in addition to the powers, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, set forth in the Certificate of Incorporation which may be applicable to the Preferred Stock) as follows:

1. Designation and Issuance.

(A) The shares of such series shall be designated ESOP CONVERTIBLE PREFERRED STOCK (hereinafter referred to as the "ESOP Preferred Stock") and such series shall consist of

7

3,902,438 shares. Such number of shares may be increased or decreased from time to time by resolution of the Committee (as hereinafter defined), but no such increase shall result in such series consisting of more than 4,000,000 shares, and no decrease shall reduce the number of shares of ESOP Preferred Stock to a number less than that of shares of ESOP Preferred Stock then outstanding plus the number of shares issuable upon exercise of any rights, options or warrants or upon conversion of outstanding securities issued by the Corporation relating to such shares. Notwithstanding the preceding sentence, the Board may increase the number of shares of ESOP Preferred Stock to a number greater than 4,000,000 shares, or may decrease the number of such shares, subject only to any limitations imposed by applicable law or the Certificate of Incorporation. Any shares of ESOP Preferred Stock redeemed or purchased by the Corporation shall remain issued and outstanding for all purposes (except that as long as such shares are held by the Corporation or its nominee, no dividends shall be paid on such shares and they shall neither be entitled to vote nor counted for quorum purposes) and may thereafter be transferred by the Corporation from time to time to a trustee or trustees referred to in paragraph (B) of this Section 1 (whereupon the voting and dividend rights of such shares shall be restored); provided that the Corporation may provide at the time of or at any time after such redemption or purchase that any such shares then held by the Corporation or its nominee shall be retired, and such shares shall then be restored to the status of authorized but unissued shares of Preferred Stock of the Corporation. For the purposes of this Certificate of Designation, the "Committee" shall mean any committee of the Board to whom the Board, pursuant to Section 141(c) of the General Corporation Law of the State of Delaware, delegates authority to perform the functions of the Board set forth in this Certificate of Designation.

(B) Shares of ESOP Preferred Stock shall be issued only to a trustee or trustees acting on behalf of an employee stock ownership trust or plan or other employee benefit plan (a "Plan") of the Corporation. In the event of any sale, transfer or other disposition (hereinafter a "transfer") of shares of ESOP Preferred Stock to any person (including, without limitation, any participant in the Plan) other than (x) any trustee or trustees of the Plan, (y) any pledgee of such shares acquiring such shares as security for any loan or loans made to the Plan or to any trustee or trustees acting on behalf of the Plan or (z) the Corporation, the shares of ESOP Preferred Stock so transferred, upon such transfer and without any further

8

action by the Corporation or the holder, shall be automatically converted into shares of Common Stock at the Conversion Price (as hereinafter defined) and on the terms otherwise provided for the conversion of shares of ESOP Preferred Stock into shares of Common Stock pursuant to Section 5 hereof and no such transferee shall have any of the voting powers, preferences and relative, participating, optional or special rights ascribed to shares of ESOP Preferred Stock hereunder, but, rather, only the powers and rights pertaining to the Common Stock into which such shares of ESOP Preferred Stock shall be so converted; provided, however, that in the event of a foreclosure or other realization upon shares of ESOP Preferred Stock pledged as security for any loan or loans made to the Plan or to the trustee or the trustees acting on behalf of the Plan, the pledged shares so foreclosed or otherwise realized upon shall be converted automatically into shares of Common Stock at the Conversion Price and on the terms otherwise provided for conversions of shares of ESOP Preferred Stock into shares of Common Stock pursuant to Section 5 hereof. In the event of such a conversion, such transferee shall be treated for all purposes as the record holder of the shares of Common Stock into which the ESOP Preferred Stock shall have been converted as of the date of such conversion. Certificates representing shares of ESOP Preferred Stock shall be legended to reflect such restrictions on transfer. Notwithstanding the foregoing Provisions of this Section 1, shares of ESOP Preferred Stock (i) may be converted into shares of Common Stock as provided by Section 5 hereof and the shares of Common Stock issued upon such conversion may be transferred by the holder thereof as permitted by law and (ii) be redeemable by the Corporation upon the terms and conditions provided by Sections 6, 7 and 8 hereof.

2. Dividends and Distributions.

(A) (1) Subject to the provisions for adjustment hereinafter set forth, the holders of shares of ESOP Preferred Stock (other than the Corporation or its nominee) shall be entitled to receive, when and as declared by the Board out of funds legally available therefor, cash dividends ("Preferred Dividends") payable in accordance with either of the following elections, as the Board shall elect from time to time in its absolute discretion:

(i) in an amount per share initially equal to $2.78 per share per annum, and no more (such amount, as adjusted from time to time pursuant to the terms hereof, including during any period in which a

9

Semiannual Payment Election (as defined below) shall be in effect, the "Annual Dividend Rate"), payable annually in arrears on December 31 (or such later date not more than four business days thereafter as the Board may from time to time elect in its absolute discretion; such date, the "Annual Payment Date") of each year (such election, the "Annual Payment Election") beginning on the Annual Payment Date occurring immediately after the effective date of such Annual Payment Election; or

      (ii) in an amount per share initially equal to $2.78 per share per annum, and no more (such amount, as adjusted from time to time pursuant to the terms hereof, including during any period in which an Annual Payment Election is in effect, the "Semiannual Dividend Rate"; and the Semiannual Dividend Rate and the Annual Dividend Rate, as in effect at any time, are each hereinafter referred to as the "Preferred Dividend Rate"), semiannually in arrears, one-half on each June 30 and December 31 (or, in either case, such later date not more than four business days after either of such dates as the Board may from time to time elect in its absolute discretion; such dates, the "Semiannual Payment Dates") of each year (such election, the "Semiannual Payment Election"), beginning on the Semiannual Payment Date occurring immediately after the effective date of such Semiannual Payment Election;

provided that any Semiannual Payment Election shall be made effective only during the period beginning on January 5 and ending on June 29 in each year. The Board shall give prompt notice to the holders of the ESOP Preferred Stock of any Semiannual Payment Election or Annual Payment Election and any election to alter any Dividend Payment Date pursuant to this Section 2(A)(1). Each Annual Payment Date or Semiannual Payment Date, as applicable, is hereinafter referred to as a "Dividend Payment Date", and each payment of a Preferred Dividend shall be made to holders of record at the opening of business on such Dividend Payment Date.

      (2) Preferred Dividends shall begin to accrue on outstanding shares of ESOP Preferred Stock from the date of issuance of such shares, except that with respect to any shares of ESOP Preferred Stock redeemed or purchased by the Corporation and then reissued, Preferred Dividends shall accrue on such shares from their date of reissuance. Preferred Dividends shall accrue on a daily basis, whether or not the Corporation shall then have earnings or surplus

10

(computed on the basis of a 360-day year of twelve 30-day months in case of any period less than one year) based on the Preferred Dividend Rate in effect on such date; provided however, that if a Semiannual Payment Election or an Annual Payment Election becomes effective on or after such date and before the immediately succeeding Dividend Payment Date, payments in respect of dividends on the ESOP Preferred Stock made on or after the effective date of such Semiannual Payment Election or Annual Payment Election and on or before such Dividend Payment Date shall be computed using the Preferred Dividend Rate in effect on the date of such payment; provided further, the dividends payable on the first Dividend Payment Date following the issuance of the ESOP Preferred Stock shall be in an amount equal to the Annual Dividend Rate for a full annum or the Semiannual Dividend Rate for a full semiannum, as applicable. Accrued but unpaid Preferred Dividends shall cumulate as of the Dividend Payment Date on which they first become payable, but no interest shall accrue on accumulated but unpaid Preferred Dividends.

(B) So long as any shares of ESOP Preferred Stock shall be outstanding, no dividend shall be declared or paid or set apart for payment on any other series of stock ranking on a parity with the ESOP Preferred Stock as to dividends, unless there shall also be or have been declared and paid or set apart for payment on the ESOP Preferred Stock, like dividends for all dividend payment periods of the ESOP Preferred Stock ending on or before the dividend payment date of such parity stock, ratably in proportion to the respective amounts of dividends (1) accumulated and unpaid or payable on such parity stock, on the one hand, and (2) accumulated and unpaid through the dividend payment period or periods of the ESOP Preferred Stock next preceding such dividend payment date, on the other hand. If full cumulative dividends on the ESOP Preferred Stock have not been declared and paid or set apart for payment when due, the Corporation shall not declare or pay or set apart for payment any dividends or make any other distributions on, or make any payment on account of the purchase, redemption or other retirement of, any other class of stock or series thereof of the Corporation ranking, as to dividends or upon dissolution, junior to the ESOP Preferred Stock until full cumulative dividends on the ESOP Preferred Stock shall have been paid or declared and set apart; provided, however, that the foregoing shall not apply to (i) any dividend or distribution payable solely in any shares of, or options, warrants or rights to subscribe for or purchase shares of, any stock ranking, as to dividends and upon dissolution,

11

junior to the ESOP Preferred Stock or (ii) the acquisition of shares of any stock ranking, as to dividends and upon dissolution, junior to the ESOP Preferred Stock in exchange solely for or by conversion solely into shares of any other stock ranking junior to the ESOP Preferred Stock as to dividends and upon dissolution.

(C) Any dividend payment made on shares of ESOP Preferred Stock shall first be credited against the earliest accumulated but unpaid dividend due with respect to such shares.

3. Liquidation Preference.

(A) In the event of any dissolution or liquidation of the Corporation, whether voluntary or involuntary, before any payment or distribution of the assets of the Corporation (whether capital or surplus) shall be made to or set apart for the holders of any series or class or classes of stock of the Corporation ranking junior to ESOP Preferred Stock upon dissolution or liquidation, the holders of ESOP Preferred Stock (other than the Corporation or its nominee) shall be entitled to receive the Liquidation Price (as hereinafter defined) per share in effect at the time of dissolution or liquidation plus an amount equal to all dividends accrued (whether or not accumulated) and unpaid on the ESOP Preferred Stock to the date of final distribution to such holders; but such holders shall not be entitled to and shall not otherwise receive any further payments. The Liquidation Price per share that holders of ESOP Preferred Stock shall receive upon dissolution or liquidation shall be $35.875, subject to adjustment as hereinafter provided. If, upon any dissolution or liquidation of the Corporation, the assets of the Corporation, or proceeds thereof, distributable among the holders of ESOP Preferred Stock shall be insufficient to pay in full the preferential amount aforesaid and liquidating payments on any other shares ranking, as to dissolution or liquidation, on a parity with ESOP Preferred Stock, then such assets, or the proceeds thereof, shall be distributed among the holders of ESOP Preferred Stock and any such other shares ratably in accordance with the respective amounts that would be payable on such shares of ESOP Preferred Stock and any such other shares if all amounts payable thereon were paid in full. For the purposes of this Section 3, neither a consolidation or merger of the Corporation with or into one or more corporations, nor the sale, transfer, lease or exchange (for cash, shares of equity stock, securities or other consideration) of all or substantially all of the

12

assets of the Corporation, nor the distribution to the stockholders of the Corporation of all or substantially all of the consideration for such sale, unless such consideration (apart from assumption of liabilities) or the net proceeds thereof consists substantially entirely of cash, shall be deemed to be a dissolution or liquidation, voluntary or involuntary.

(B) Subject to the rights of the holders of shares of any series or class or classes of stock ranking on a parity with or senior to ESOP Preferred Stock upon dissolution or liquidation, upon any dissolution or liquidation of the Corporation, after payment shall have been made in full to the holders of ESOP Preferred Stock as provided in this Section 3, but not prior thereto, any other series or class or classes of stock ranking junior to ESOP Preferred Stock upon dissolution or liquidation shall, subject to the respective terms and provisions (if any) applying thereto, be entitled to receive any and all assets of the Corporation remaining to be paid or distributed, and the holders of ESOP Preferred Stock shall not be entitled to share therein.

4. <u>Ranking and Voting of Shares.</u>

(A) Each of (i) the Corporation's 7 $3/8$% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (ii) the Corporation's 7 $3/4$% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (iii) the Corporation's Series A Fixed/Adjustable Rate Preferred Stock, with a liquidation value of $200.00 per share, (iv) if issued, the Corporation's 7.82% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (v) if issued, the Corporation's 7.80% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (vi) if issued, the Corporation's 9.00% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (vii) if issued, the Corporation's 8.40% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (viii) if issued, the Corporation's 8.20% Cumulative Preferred Stock, with a liquidation value of $200.00 per share and (ix) if issued, the Corporation's 8.03% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, shall rank on a parity with ESOP Preferred Stock as to dividends and as to distribution of assets upon dissolution or liquidation.

Unless otherwise provided in the Certificate of Incorporation of the Corporation, as the same may be

13

amended, or in a Certificate of Designation of Rights and Preferences relating to any subsequent series of Preferred Stock, the ESOP Preferred Stock shall rank on a parity with all series of the Corporation's Preferred Stock, other than the Corporation's Series A Junior Participating Preferred Stock to which the ESOP Preferred Stock shall rank senior, as to dividends and as to the distribution of assets upon dissolution or liquidation.

(B) The holders of shares of ESOP Preferred Stock (other than the Corporation or its nominee) shall have the following voting rights:

(1) The holders of ESOP Preferred Stock shall be entitled to vote on all matters submitted to a vote of the stockholders of the Corporation, voting together with the holders of Common Stock as one class. The holder of each share of ESOP Preferred Stock shall be entitled to a number of votes equal to 1.35 times the number of shares of Common Stock into which such share of ESOP Preferred Stock could be converted on the record date for determining the stock holders entitled to vote; it being understood that whenever the "Conversion Price" (as defined in Section 5 hereof) is adjusted as provided in Section 9 hereof, the number of votes of the ESOP Preferred Stock shall also be correspondingly adjusted. Notwithstanding the immediately preceding sentence, if the governing body of the New York Stock Exchange or any other securities listing service or exchange (each, an "Exchange") or any relevant governmental or regulatory entity (each such entity, and each governing body of an Exchange, a "Regulating Entity") shall have disapproved of such voting power or taken or threatened any action against the Corporation or in respect of any of its securities in accordance with Rule 19c-4 promulgated under the Securities Exchange Act of 1934 (the "Exchange Act"), or any other rule or listing standard of any Regulating Entity regarding the voting power of securities, or if the Board of Directors determines in its sole judgment that any Regulating Entity may so disapprove or take or threaten any such action, the holder of each share of ESOP Preferred Stock shall be entitled to a maximum number of votes permissible (consistent with continued listing of the Corporation's securities on any such Exchange) in accordance with the interpretations of any such rule or listing standard by such Regulating Entity, as determined by the Board.

(2) Except as otherwise required by law or set forth herein, holders of ESOP Preferred Stock shall have no

14

special voting rights and their consent shall not be required (except to the extent they are entitled to vote with holders of Common Stock as set forth herein) for the taking of any corporate action, including the issuance of any Preferred Stock now or hereafter authorized; provided, however, that the vote of at least 66 $2/3$% of the outstanding shares of ESOP Preferred Stock, voting separately as a series, shall be necessary to approve any alteration, amendment or repeal of any provision of the Certificate of Incorporation or any alteration, amendment or repeal of any provision of the resolutions relating to the designation, preferences and rights of ESOP Preferred Stock (including any such alteration, amendment or repeal effected by any merger or consolidation in which the Corporation is the surviving or resulting corporation, but not including any alteration or amendment of rights expressly provided for in Section (B)(1) above or in Section 2(A)(1)), if such amendment, alteration or repeal would alter or change the powers, preferences, or special rights of the ESOP Preferred Stock so as to affect them adversely.

5. <u>Conversion into Common Stock.</u>

(A) A holder of shares of ESOP Preferred Stock shall be entitled, at any time prior to the close of business on the date fixed for redemption of such shares pursuant to Section 6, 7 or 8 hereof, to cause any or all of such shares to be converted into shares of Common Stock. The number of shares of Common Stock into which each share of the ESOP Preferred Stock may be converted shall be determined by dividing the Liquidation Price in effect at the time of conversion by the Conversion Price (as hereinafter defined) in effect at the time of conversion. The initial Conversion Price per share at which shares of Common Stock shall be issuable upon conversion of any shares of ESOP Preferred Stock shall be $10.871, subject to adjustment as hereinafter provided; that is, a conversion rate initially equivalent to three and three-tenths (3 $3/10$) shares of Common Stock for each share of ESOP Preferred Stock, which is subject to adjustment as hereinafter provided.

(B) Any holder of shares of ESOP Preferred Stock desiring to convert such shares into shares of Common Stock shall surrender, if certificated, the certificate or certificates representing the shares of ESOP Preferred Stock being converted, duly assigned or endorsed for transfer to the Corporation (or accompanied by duly executed stock

15

powers relating thereto), or if uncertificated, a duly executed stock power relating thereto, at the principal executive office of the Corporation or the offices of the transfer agent for the ESOP Preferred Stock or such office or offices in the continental United States of an agent for conversion as may from time to time be designated by notice to the holders of the ESOP Preferred Stock by the Corporation or the transfer agent for the ESOP Preferred Stock, accompanied by written notice of conversion. Such notice of conversion shall specify (i) the number of shares of ESOP Preferred Stock to be converted and the name or names in which such holder wishes the Common Stock and any shares of ESOP Preferred Stock not to be so converted to be issued, and (ii) the address to which such holder wishes delivery to be made of a confirmation of such conversion, if uncertificated, or any new certificates which may be issued upon such conversion, if certificated.

(C) Upon surrender, if certificated, of a certificate representing a share or shares of ESOP Preferred Stock for conversion, or if uncertificated, of a duly executed stock power relating thereto, the Corporation shall issue and send by hand delivery (with receipt to be acknowledged) or by first class mail, postage prepaid, to the holder thereof or to such holder's designee, at the address designated by such holder, if certificated, a certificate or certificates for, or if uncertificated, confirmation of, the number of shares of Common Stock to which such holder shall be entitled upon conversion. If there shall have been surrendered shares of ESOP Preferred Stock only part of which are to be converted, the Corporation shall issue and deliver to such holder or such holder's designee, if certificated, a new certificate or certificates representing the number of shares of ESOP Preferred Stock that shall not have been converted, or if uncertificated, confirmation of the number of shares of ESOP Preferred Stock that shall not have been converted.

(D) The issuance by the Corporation of shares of Common Stock upon a conversion of shares of ESOP Preferred Stock into shares of Common Stock made at the option of the holder thereof shall be effective as of the earlier of (i) the delivery to such holder or such holder's designee of the certificates representing the shares of Common Stock issued upon conversion thereof, if certificated, or confirmation, if uncertificated, and (ii) the commencement of business on the second business day after the surrender of the certificate or certificates, if certificated, or a duly executed stock power, if uncertificated, for the shares of

16

ESOP Preferred Stock to be converted. On and after the effective date of conversion, the person or persons entitled to receive Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock, and no allowance or adjustment shall be made in respect of dividends payable to holders of Common Stock of record on any date prior to such effective date. The Corporation shall not be obligated to pay any dividend that may have accrued or have been declared but that is not payable to holders of shares of ESOP Preferred Stock if the Dividend Payment Date for such dividend is on or subsequent to the effective date of conversion of such shares.

(E) The Corporation shall not be obligated to deliver to holders of ESOP Preferred Stock any fractional share or shares of Common Stock issuable upon any conversion of such shares of ESOP Preferred Stock, but in lieu thereof may make a cash payment in respect thereof in any manner permitted by law.

(F) The Corporation shall at all times reserve and keep available out of its authorized and unissued Common Stock or treasury Common Stock, solely for issuance upon the conversion of shares of ESOP Preferred Stock as herein provided, such number of shares of Common Stock as shall from time to time be issuable upon the conversion of all the shares of ESOP Preferred Stock then outstanding.

6. Redemption at the Option of the Corporation.

(A) The ESOP Preferred Stock shall be redeemable, in whole or in part, at the option of the Corporation at any time after September 19, 2000, out of funds legally available therefor, at a redemption price per share equal to 100% of the Liquidation Price plus an amount equal to all accrued (whether or not accumulated) and unpaid dividends thereon to the date fixed for redemption. Payment of the redemption price shall be made by the Corporation in cash or shares of Common Stock, or a combination thereof, as permitted by paragraph (E) of this Section 6. From and after the date fixed for redemption, dividends on shares of ESOP Preferred Stock called for redemption will cease to accrue and all rights of the holder in respect of such shares shall cease, except the right to receive the redemption price. Upon payment of the redemption price, such shares shall be deemed to have been transferred to the Corporation, to be held as treasurer shares or to be retired, in either case as provided in Section 1(A). If less than all of the

17

outstanding shares of ESOP Preferred Stock are to be redeemed, the Corporation shall either redeem a portion of the shares of each holder determined pro rata based on the number of shares held by each holder or shall select the shares to be redeemed by lot, as may be determined by the Board.

(B) Notice of redemption will be sent to the holders of ESOP Preferred Stock at the address on the books of the Corporation or any transfer agent for ESOP Preferred Stock by first class mail, postage prepaid, mailed not less than twenty (20) days nor more than sixty (60) days prior to the redemption date or in any other manner provided by law. Each notice shall state: (i) the redemption date; (ii) the total number of shares of ESOP Preferred Stock to be redeemed and, if fewer than all the shares held by such

holder are to be redeemed, the number of such shares to be redeemed from such holder; (iii) the redemption price; (iv) the place or places where certificates, if certificated, for such shares are to be surrendered for payment of the redemption price; (v) that dividends on the shares to be redeemed will cease to accrue on such redemption date; (vi) whether such redemption price should be paid in cash or in shares of Common Stock; and (vii) the conversion rights of the shares to be redeemed, the period within which conversion rights may be exercised and the Conversion Price and number of shares of Common Stock issuable upon conversion of a share of ESOP Preferred Stock at the time. Upon surrender of the certificates, if certificated, for any shares so called for redemption, or upon the date fixed for redemption, if uncertificated, such shares, if not previously converted, shall be redeemed by the Corporation as of the close of business on the date fixed for redemption and at the redemption price set forth in this Section 6.

(C) The Corporation may, in its sole discretion and notwithstanding anything to the contrary in paragraph (A) of this Section 6, at any time within one year after either of the following events:

(i) there shall be a change in the federal tax law or regulations of the United States of America or of an interpretation or application of such law or regulations or of a determination by a court of competent jurisdiction that in any case has the effect of precluding the Corporation from claiming (other than for purposes of calculating any alternative minimum tax) any of the tax deductions for dividends paid on

18

the ESOP Preferred Stock when such dividends are used as provided under Section 404(k)(2) of the Internal Revenue Code of 1986, as amended (the "Code"), as in effect on December 31, 1995.

(ii) the Corporation shall certify to the holders of the ESOP Preferred Stock that the Corporation has determined in good faith that the Plan either is not qualified as a "stock bonus plan" within the meaning of Section 401(a) of the Code or is not an "employee stock ownership plan" within the meaning of Section 4975(e)(7) of the Code,

elect either to (a) redeem, out of funds legally available therefor, any or all of such ESOP Preferred Stock for cash or, if the Corporation so elects, in shares of Common Stock, or a combination of such shares of Common Stock and cash, as permitted by paragraph (E) of this Section 6, at a redemption price equal to (x) if the relevant event is as provided in clause (i) above, the Liquidation Price per share on the date fixed for redemption, plus an amount equal to accrued (whether or not accumulated) and unpaid dividends thereon to the date fixed for redemption or (y) if the relevant event is as provided in clause (ii) above, an amount calculated on the basis of the redemption prices provided in paragraph (D) of this Section 6 on the date fixed for redemption or (b) exchange any or all of such shares of ESOP Preferred Stock for securities of at least equal value (as determined by an independent appraiser) that constitute "qualifying employer securities" with respect to a holder of ESOP Preferred Stock within the meaning of Section 409(l) of the Code and Section 407(d)(5) of the Employment Retirement Income Security Act of 1974, as amended ("ERISA"), or any successor provisions of law. If the Corporation elects to redeem any or all of the ESOP Preferred Stock pursuant to clause (a) of the preceding sentence, notice of such redemption shall be given as required in paragraph (B) of this Section 6, and if the Corporation elects to exchange any or all of the ESOP Preferred Stock for securities of at least equal value pursuant to clause (b) of the preceding sentence, it will cause notice of such election to be sent to the holders of ESOP Preferred Stock at the address shown on the books of the Corporation or any transfer agent for ESOP Preferred Stock by first class mail, postage prepaid, mailed not less than twenty (20) days nor more than sixty (60) days prior to the date of exchange or in any other manner required by law. Each notice shall state: (i) the exchange date; (ii) the total number of shares of ESOP Preferred Stock to be

19

exchanged and, if fewer than all the shares held by such holder are to be exchanged, the number of shares held by such holder to be exchanged; (iii) the exchange rate; (iv) the place or places where certificates, if certificated, for such shares are to be surrendered for exchange; and (v) that dividends on the shares to be exchanged will cease to accrue an such exchange date.

(D) Notwithstanding anything to the contrary in paragraph (A) of this Section 6, in the event that the Plan is, or contributions thereto are, terminated, the Corporation may, in its sole discretion, call for redemption any or all of the then outstanding ESOP Preferred Stock, upon notice as required in paragraph (B) of this Section 6, out of funds legally available therefor, at a redemption price per share equal to the following percentages of the Liquidation Price in effect on the date fixed for redemption:

| During the Twelve-Month Period Beginning September 19, | Percentage of Liquidation Price |
|---|---|
| 1996 | 103.10 |
| 1997 | 102.33 |
| 1998 | 101.55 |
| 1999 | 100.78 |
| 2000 | 100.00 |

and thereafter at 100%, plus, in each case, an amount equal to all accrued (whether or not accumulated) and unpaid dividends thereon to the date fixed for redemption. Payment of the redemption price shall be made by the Corporation in cash or shares of Common Stock, or a combination thereof, as permitted by paragraph (E) of this Section 6. From and after the date fixed for redemption, dividends on shares of ESOP Preferred Stock called for redemption will cease to accrue and all rights of the holder in respect of such shares shall cease, except the right to receive the redemption price. Upon payment of the redemption price, such shares shall be deemed to have been transferred to the Corporation, to be held as treasury shares or to be retired, in either case as provided in Section 1(A).

(E) The Corporation, at its option, may make payment of the redemption price required upon redemption of shares of ESOP Preferred Stock in cash or in shares of Common Stock, or in a combination of such shares and cash, any such shares of Common Stock to be valued for such purpose at their Fair Market Value (as defined in paragraph 9(H)(2)); provided, however, that in calculating

20

their Fair Market Value the Adjustment Period (as defined in paragraph 9(H)(2)) shall be deemed to be the five (5) consecutive trading days preceding the date of redemption.

7. <u>Redemption at the Option of the Holder</u>.

(A) Unless otherwise provided by law, shares of ESOP Preferred Stock shall be redeemed by the Corporation at the option of the holder, at any time and from time to time upon notice to the Corporation given not less than five business days prior to the date fixed by the holder in such notice, when and to the extent necessary for such holder to provide for distributions required to be made under, or to satisfy an investment election provided to participants in accordance with, the Plan or any successor plan or when the holder elects to redeem shares of ESOP Preferred Stock in connection with any Preferred Dividend (a "Dividend Redemption"), in shares of Common Stock legally available therefor, at a redemption price equal to the higher of (x) the Liquidation Price per share on the date fixed for redemption and (y) the Fair Market Value (as defined in paragraph 9(H)(2)) of the number of shares of Common Stock into which each share of ESOP Preferred Stock is convertible at the time the notice of such redemption is given, plus in either case an amount equal to accrued (whether or not accumulated) and unpaid dividends thereon to the date fixed for redemption (such higher price on any date, together with such accrued and unpaid dividends, the "Special Redemption Price"). At the election of the Corporation, such redemp- tion may instead be made out of funds legally available therefor in cash or a combination of Common Stock and cash. Any shares of Common Stock shall be valued for the purposes of redemption pursuant to this paragraph (A) as provided by paragraph (E) of Section 6. In the case of any Dividend Redemption, such holder shall give the notice specified above on the fifth business day after the related Dividend Payment Date and such redemption shall be effective as to such number of shares of ESOP Preferred Stock as shall equal (x) the aggregate amount of such Preferred Dividends paid with respect to shares of ESOP Preferred Stock allocated or credited to the accounts of participants in the Plan or any successor plan that are used to repay any loan associated with such allocated or credited shares divided by (y) the Special Redemption Price specified above in this paragraph (A).

(B) Unless otherwise provided by law, shares of ESOP Preferred Stock shall be redeemed by the Corporation at the option of the holder, at any time and from time to

21

time upon notice to the Corporation given not less than five business days prior to the date fixed by the holder in such notice, upon certification by such holder to the Corporation of the following events: (i) when and to the extent necessary for such holder to make any payments of principal, interest or premium due and payable (whether voluntary, scheduled, upon acceleration or otherwise) upon any obligations of the trust established under the Plan in connection with the acquisition of ESOP Preferred Stock or any indebtedness, expenses or costs incurred by the holder for the benefit of the Plan; or (ii) when and if it shall be established to the satisfaction of the holder that the Plan has not initially been determined by the Internal Revenue Service to be qualified as a "stock bonus plan" and an "employee stock ownership plan" within the meaning of Section 401(a) or 4975(e)(7) of the Code, respectively, in shares of Common Stock legally available therefor, at a redemption price equal to the Liquidation Price plus an amount equal to accrued and unpaid dividends thereon to the date fixed for redemption. At the election of the Corporation, such redemption may instead be made out of funds legally available therefor in cash or a combination of Common Stock and cash. Any shares of Common Stock shall be valued for the purposes of redemption pursuant to this paragraph (B) as provided by paragraph (E) of Section 6.

8. Consolidation, Merger, etc.

(A) If the Corporation shall consummate any consolidation or merger or similar transaction, however named, pursuant to which the outstanding shares of Common Stock are by operation of law exchanged solely for or changed, reclassified or converted solely into securities of any successor or resulting company (including the Corporation) that constitute "qualifying employer securities" with respect to a holder of ESOP Preferred Stock within the meanings of Section 409(l) of the Code and Section 407(d)(5) of ERISA, or any successor provision of law, and, if applicable, for a cash payment in lieu of fractional shares, if any, then, in such event, the terms of such consolidation or merger or similar transaction shall provide that the shares of ESOP Preferred Stock of such holder shall be converted into or exchanged for and shall become preferred securities of such successor or resulting company, having in respect of such company insofar as possible (taking into account, without limitation, any requirements relating to the listing of such preferred securities on any national securities exchange or the qualification of such preferred securities for trading in any over-the-counter market) the

22

same powers, preferences and relative, participating, optional or other special rights (including the redemption rights provided by Sections 6, 7 and 8 hereof), and the qualifications, limitations or restrictions thereon, that the ESOP Preferred Stock had immediately prior to such transaction; provided, however, that after such transaction each security into which the ESOP Preferred Stock is so converted or for which it is exchanged shall be convertible, pursuant to the terms and conditions provided by Section 5 hereof, into the number and kind of qualifying employer securities receivable by a holder equivalent to the number of shares of Common Stock into which such shares of ESOP Preferred Stock could have been converted pursuant to Section 5 hereof immediately prior to such transaction and provided further that if by virtue of the structure of such transaction, a holder of Common Stock is required to make an election with respect to the nature and kind of considera tion to be received in such transaction, which election cannot practicably be made by the holders of the ESOP Preferred Stock, then such election shall be deemed to be solely for "qualifying employer securities" (together, if applicable, with a cash payment in lieu of fractional shares) with the effect provided above on the basis of the number and kind of qualifying employer securities receivable by a holder of the number of shares of Common Stock into which the shares of ESOP Preferred Stock could have been converted pursuant to Section 5 hereof immediately prior to such transaction (it being understood that if the kind or amount of qualifying employer securities receivable in respect of each share of Common Stock upon such transaction is not the same for each such share, then the kind and amount of qualifying employer securities deemed to be receivable in respect of each share of Common Stock for purposes of this proviso shall be the kind and amount so receivable per share of Common Stock by a plurality of such shares). The rights of the ESOP Preferred Stock as preferred equity of such successor or resulting company shall successively be subject to adjustments pursuant to Section 9 hereof after any such transaction as nearly equivalent as practicable to the adjustments provided for by such Section prior to such transaction. The Corporation shall not consummate any such merger, consolidation or similar transaction unless all the terms of this paragraph (A) are complied with.

(B) If the Corporation shall consummate any consolidation or merger or similar transaction, however named, pursuant to which the outstanding shares of Common Stock are by operation of law exchanged for or changed,

23

reclassified or converted into other shares or securities or cash or any other property, or any combination thereof, other than any such consideration which is constituted solely of qualifying employer securities that are common stock or common equity (as referred to in paragraph (A) of this Section 8) and cash payments, if applicable, in lieu of fractional shares or other interests, outstanding shares of ESOP Preferred Stock shall, without any action on the part of the Corporation or any holder thereof (but subject to paragraph (C) of this Section 8), be automatically converted immediately prior to the consummation of such merger, consolidation or similar transaction into shares of Common Stock at the Conversion Price then in effect.

(C) If the Corporation shall enter into any agreement providing for any consolidation or merger or similar transaction described in paragraph (B) of this Section 8, then the Corporation shall as soon as practicable thereafter (and in any event at least ten (10) business days before consummation of such transaction) give notice of such agreement and the material terms thereof to each holder of ESOP Preferred Stock and each such holder shall have the right to elect, by written notice to the Corporation, to receive, upon consummation of such transaction (if and when such transaction is consummated), out of funds legally available therefor, from the Corporation or the successor of the Corporation, in redemption of such ESOP Preferred Stock, in lieu of any cash or other securities which such holder would otherwise be entitled to receive under paragraph (B) of this Section 8, a cash payment equal to the Liquidation Price per share on the date fixed for such transaction, plus an amount equal to accrued (whether or not accumulated) and unpaid dividends thereon to the date fixed for such transaction. No such notice of redemption shall be effective unless given to the Corporation prior to the close of business of the fifth business day prior to consummation of such transaction, unless the Corporation or the successor of the Corporation shall waive such prior notice, but any notice or redemption so given prior to such time may be withdrawn by notice of withdrawal given to the Corporation prior to the close of business on the fifth business day prior to consummation of such transaction.

9. Anti-dilution Adjustments.

(A)(1) In the event the Corporation shall, at any time or from time to time while any of the shares of the ESOP Preferred Stock are outstanding, (i) pay a dividend or make a distribution in respect of the Common Stock in shares

24

of Common Stock or (ii) subdivide the outstanding shares of Common Stock into a greater number of shares, in each case whether by reclassification of shares, recapitalization of the Corporation (excluding a recapitalization or reclass- ification effected by a merger or consolidation to which Section 8 applies) or otherwise, then, in such event, the Conversion Price shall, subject to the provisions of paragraphs (E) and (F) of this Section 9, automatically be adjusted by dividing such Conversion Price by a fraction (the "Section 9(A) Fraction"), the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock outstanding immediately before such event. Such adjustment to the Conversion Price shall be effective, upon payment of such dividend or distribution in respect of the Common Stock, as of the record date for the determination of stockholders entitled to receive such dividend or distribution (on a retroactive basis), and in the case of a subdivision shall become effective immediately as of the effective date thereof. An adjustment to the Conversion Price pursuant to this Section 9(A)(1) shall have no effect on the Liquidation Price or the Preferred Dividend Rate of the ESOP Preferred Stock.

(2) In the event the Corporation shall, at any time or from time to time while any of the shares of the ESOP Preferred Stock are outstanding, combine the outstanding shares of Common Stock into a lesser number of shares, whether by reclassification of shares, recapitalization of the Corporation (excluding a recapitalization or reclassification effected by a merger, consolidation or other transaction to which Section 8 applies) or otherwise, then, in such event, the Conversion Price shall, subject to the provisions of paragraph (F) of this Section 9, automatically be adjusted by dividing the Conversion Price in effect immediately before such event by the Section 9(A) Fraction. An adjustment to the Conversion Price made pursuant to this paragraph 9(A)(2) shall be given effect immediately as of the effective date of such combination and shall have no effect on the Liquidation Price or the Preferred Dividend Rate of the ESOP Preferred Stock.

(B) In the event the Corporation shall, at any time or from time to time while any of the shares of ESOP Preferred Stock are outstanding, issue to holders of shares of Common Stock as a dividend or distribution, including by way of a reclassification of shares

25

or a recapitalization of the Corporation, any right or warrant to purchase shares of Common Stock (but not including as a right or warrant for this purpose any security convertible into or exchangeable for shares of Common Stock) for a consideration having a Fair Market Value (as hereinafter defined) per share less than the Fair Market Value of a share of Common Stock on the date of issuance of such right or warrant (other than pursuant to any employee or director incentive, compensation or benefit plan or arrangement of the Corporation or any subsidiary of the Corporation heretofore or hereafter adopted), then, in such event, the Conversion Price shall, subject to the provisions of paragraphs (E) and (F) of this Section 9, automatically be adjusted by dividing such Conversion Price by a fraction (the "Section 9(B) Fraction"), the numerator of which is the number of shares of Common Stock outstanding immediately before such issuance of rights or warrants plus the maximum number of shares of Common Stock that could be acquired upon exercise in full of all such rights and warrants and the denominator of which is the number of shares of Common Stock outstanding immediately before such issuance of warrants or rights plus the number of shares of Common Stock that could be purchased at the Fair Market Value of a share of Common Stock at the time of such issuance for the maximum aggregate consideration payable upon exercise in full of all such rights and warrants. Such adjustment to the Conversion Price shall be effective upon such issuance of rights or warrants. An adjustment to the Conversion Price pursuant to this Section 9(B) shall have no effect on the Liquidation Price or the Preferred Dividend Rate of the ESOP Preferred Stock.

(C)(1) In the event the Corporation shall, at any time or from time to time while any of the shares of ESOP Preferred Stock are outstanding, issue, sell or exchange shares of Common Stock (other than pursuant to (x) any right or warrant to purchase or acquire shares of Common Stock (including as such a right or warrant for this purpose any security convertible into or exchangeable for shares of Common Stock) or (y) any employee or director incentive, compensation or benefit plan or arrangement of the Corporation or any subsidiary of the Corporation heretofore or hereafter adopted) at a purchase price per share less than the Fair Market Value of a share of Common Stock on the date of such issuance, sale or exchange, then, in such

26

event, the Conversion Price shall, subject to the provisions of paragraphs (E) and (F) of this Section 9, automatically be adjusted by dividing such Conversion Price by a fraction (the "Section 9(C)(1) Fraction"), the numerator of which is the number of shares of Common Stock outstanding immediately before such issuance, sale or exchange plus the number of shares of Common Stock so issued, sold or exchanged and the denominator of which is the number of shares of Common Stock outstanding immediately before such issuance, sale or exchange plus the number of shares of Common Stock that could be purchased at the Fair Market Value of a share of Common Stock at the time of such issuance, sale or exchange for the maximum aggregate consideration paid therefor.

(2) In the event that the Corporation shall, at any time or from time to time while any ESOP Preferred Stock is outstanding, issue, sell or exchange any right or warrant to purchase or acquire shares of Common Stock (including as such a right or warrant for this purpose any security convertible into or exchangeable for shares of Common Stock other than pursuant to any employee or director incentive, compensation or benefit plan or arrangement of the Corporation or any subsidiary of the Corporation heretofore or hereafter adopted) for a consideration having a Fair Market Value, on the date of such issuance, sale or exchange, less than the Non- Dilutive Amount (as hereinafter defined), then, in such event, the Conversion Price shall, subject to the provisions of paragraphs (E) and (F) of this Section 9, automatically be adjusted by dividing such Conversion Price by a fraction (the "Section 9(C)(2) Fraction"), the numerator of which is the number of shares of Common Stock outstanding immediately before such issuance of rights or warrants plus the maximum number of shares of Common Stock that could be acquired upon exercise in full of all such rights and warrants and the denominator of which is the number of shares of Common Stock outstanding immediately before such issuance of rights or warrants plus the number of shares of Common Stock that could be purchased at the Fair Market Value of a share of Common Stock at the time of such issuance for the total of (x) the maximum aggregate consideration payable at the time of the issuance, sale or exchange of such right or warrant and (y) the maximum aggregate consideration payable upon exercise in full of all such rights or warrants.

27

(3) An adjustment to the Conversion Price pursuant to this Section 9(C) shall be effective upon the effective date of any issuance, sale or exchange described in paragraph (1) or (2) above. Any such adjustment shall have no effect on the Liquidation Price or the Preferred Dividend Rate of the ESOP Preferred Stock.

(D) In the event the Corporation shall, at any time or from time to time while any of the shares of ESOP Preferred Stock are outstanding, make an Extraordinary Distribution (as hereinafter defined) in respect of the Common Stock, whether by dividend, distribution, reclassification of shares or recapitalization of the Corporation (including capitalization or reclassification effected by a merger or consolidation to which Section 8 does not apply) or effect a Pro Rata Repurchase (as hereinafter defined) of Common Stock, then, in such event, the Conversion Price shall, subject to the provisions of paragraphs (E) and (F) of this Section 9, automatically be adjusted by dividing such Conversion Price by a fraction (the "Section 9(D) Fraction"), the numerator of which is the product of (a) the number of shares of Common Stock outstanding immediately before such Extraordinary Distribution or Pro Rata Repurchase minus, in the case of a Pro Rata Repurchase, the number of shares of Common Stock repurchased by the Corporation multiplied by (b) the Fair Market Value of a share of Common Stock on the day before the ex-dividend date with respect to an Extra- ordinary Distribution that is paid in cash and on the distribution date with respect to an Extraordinary Distribution that is paid other than in cash, or on the applicable expiration date (including all extensions thereof) of any tender offer that is a Pro Rata Repurchase or on the date of purchase with respect to any Pro Rata Repurchase that is not a tender offer, as the case may be, and the denominator of which is (i) the product of (x) the number of shares of Common Stock outstanding immediately before such Extraordinary Distribution or Pro Rata Repurchase multiplied by (y) the Fair Market Value of a share of Common Stock on the day before the ex-dividend date with respect to an Extraordinary Distribution that is paid in cash and on the distribution date with respect to an Extraordinary Distribution that is paid other than in cash, or on the applicable expiration date (including all extensions thereof) of any tender offer that is a Pro Rata Repurchase, or on the date of purchase with respect to

28

any Pro Rata Repurchase that is not a tender offer, as the case may be, minus (ii) the Fair Market Value of the Extraordinary Distribution or the aggregate purchase price of the Pro Rata Repurchase, as the case may be. The Corporation shall send each holder of ESOP Preferred Stock (i) notice of its intent to make any Extraordinary Distribution and (ii) notice of any offer by the Corporation to make a Pro Rata Repurchase, in each case at the same time as, or as soon as practicable after, such offer is first communicated to holders of Common Stock or, in the case of an Extraordinary Distribution, the announcement of a record date in accordance with the rules of any stock exchange on which the Common Stock is listed or admitted to trading. Such notice shall indicate the intended record date and the amount and nature of such dividend or distribution, or the number of shares subject to such offer for a Pro Rata Repurchase and the purchase price payable by the Corporation pursuant to such offer, as well as the Conversion Price and the number of shares of Common Stock into which a share of ESOP Preferred Stock may be converted at such time. An adjustment to the Conversion Price pursuant to this Section 9(D) shall be effective (i) in the case of an Extraordinary Dividend as of the record date for the determination of holders entitled to receive such Extraordinary Dividend (on a retroactive basis) and (ii) in the case of a Pro Rata Repurchase upon the expiration date thereof (if such Pro Rata Repurchase is a tender offer) or the effective date thereof (if such Pro Rata Repurchase is not a tender offer). Any such adjustment shall have no effect on the Liquidation Price or the Preferred Dividend Rate of the ESOP Preferred Stock.

(E) The Board shall have the authority to determine that any adjustment to the Conversion Price provided for in paragraph (A)(1), (B), (C) or (D) of this Section 9 shall not be made (or if already made, to determine that such adjustment shall be cancelled prospectively), and in lieu thereof to declare a dividend in respect of the ESOP Preferred Stock in shares of ESOP Preferred Stock (a "Special Dividend") in such a manner that a holder of ESOP Preferred Stock will become a holder of that number of shares of ESOP Preferred Stock equal to the product of the number of such shares held prior to such event times the Section 9(A), Section 9(B), Section 9(C)(1), Section 9(C)(2) or Section 9(D) Fraction, as applicable.

29

The declaration of such a Special Dividend shall be authorized, if at all, by the Board no later than 30 calendar days following the authorization by the Board (or by a committee duly authorized by the Board) of the transaction or other event described in any of the foregoing paragraphs (A)(1), (B), (C) or (D) that would otherwise result in an adjustment to the Conversion Price being made pursuant to any such paragraphs, and if the Board does not authorize the declaration of a Special Dividend by the end of such 30-day period, then no such Special Dividend shall be declared and the adjustment to the Conversion Price provided for in paragraph (A)(1), (B), (C) or (D) of this Section 9 shall become final and binding on the Corporation and all stockholders of the Corporation. Concurrently with the declaration of any Special Dividend pursuant to this paragraph (E), the Conversion Price, the Liquidation Price and the Preferred Dividend Rate of all shares of ESOP Preferred Stock shall be adjusted by dividing the Conversion Price, the Liquidation Price and the Preferred Dividend Rate, respectively, in effect immediately before such event by the Section 9(A), Section 9(B), Section 9(C)(1), Section 9(C)(2) or Section 9(D) Fraction, as appli cable.

(F) Unless the Board determines otherwise, and notwithstanding any other provision of this Section 9, any adjustment to the Conversion Price provided for in any of paragraphs (A), (B), (C) or (D) of this Section 9 shall not be made unless such adjustment would require an increase or decrease of at least one percent (1%) in the Conversion Price and, similarly, the Board shall not declare any Special Dividend pursuant to paragraph (E) of this Section 9 unless such Special Dividend or adjustment would require an increase or decrease of at least one percent (1%) in the number of shares of ESOP Preferred Stock outstanding. Any lesser adjustment to the Conversion Price or Special Dividend shall be carried forward and shall be made no later than the time of, and together with, the next subsequent adjustment to the Conversion Price or Special Dividend which, together with any adjustment or adjustments or Special Dividend or Dividends so carried forward, shall amount to an increase or decrease of at least one percent (1%) of the Conversion Price or an increase or decrease of at least one percent (1%) in the number of shares of ESOP Preferred Stock outstanding, whichever the case be.

30

(G) If the Corporation shall make any dividend or distribution on the Common Stock or issue any Common Stock, other capital stock or other security of the Corporation or any rights or warrants to purchase or acquire any such security, which transaction does not result in an adjustment to the Conversion Price or to the number of shares of ESOP Preferred Stock out- standing pursuant to the foregoing provisions of this Section 9, the Board may, in its sole discretion, consider whether such action is of such a nature that some type of equitable adjustment should be made in respect of such transaction. If in such case the Board determines that some type of adjustment should be made, an adjustment shall be made effective as of such date as determined by the Board. The determination of the Board as to whether some type of adjustment should be made pursuant to the foregoing provisions of this Section 9(G), and, if so, as to what adjustment should be made and when, shall be final and binding on the Corporation and all stockholders of the Corporation. The Corporation shall be entitled, but not required, to make such additional adjustments, in addition to those required by the foregoing provisions of this Section 9, as shall be necessary in order that any dividend or distribution in shares of capital stock of the Corporation, subdivision, reclassification or combination of shares of the Corporation or any reclassification of the Corporation shall not be taxable to holders of the Common Stock.

(H) For purposes hereof, the following definitions shall apply:

(1) "Extraordinary Distribution" shall mean any dividend or other distribution to holders of Common Stock (effected while any of the shares of ESOP Preferred Stock are outstanding) of (i) cash or (ii) any shares of capital stock of the Corporation (other than shares of Common Stock), other securities of the Corporation (other than securities of the type referred to in paragraph (B) of this Section 9), evidences of indebtedness of the Corporation or any other person or any other property (including shares of any subsidiary of the Corporation), or any combination of the foregoing, where the aggregate amount of such cash dividend or other distribution together with the amount of all cash dividends and other distributions made during the preceding period of twelve months, when combined with the aggregate amount of all Pro Rata Repurchases (for this purpose, including only that portion of the aggregate

purchase price of such Pro Rata Repurchase that is in excess of the Fair Market Value of the Common Stock repurchased as determined on the applicable expiration date (including all extensions thereof) of any tender offer or exchange offer that is a Pro Rata Repurchase, or the date of purchase with respect to any other Pro Rata Repurchase that is not a tender offer or exchange offer) made during such period, exceeds twelve and one-half percent (12 $^1/_2$%) of the aggregate Fair Market Value of all shares of Common Stock outstanding on the day before the ex-dividend date with respect to such Extraordinary Distribution that is paid in cash and on the distribution date with respect to an Extraordinary Distribution that is paid other than in cash. The Fair Market Value of an Extraordinary Distribution for purposes of paragraph (D) of this Section 9 shall be the sum of the Fair Market Value of such Extraordinary Distribution plus the aggregate amount of any cash dividends or other distributions that are not Extraordinary Distributions made during such twelve-month period and not previously included in the calculation of an adjustment pursuant to paragraph (D) of this Section 9, but shall exclude the aggregate amount of regular quarterly dividends declared by the Board and paid by the Corporation in such twelve-month period.

(2) "Fair Market Value" shall mean, as to shares of Common Stock or any other class of capital stock or securities of the Corporation or any other issuer that are publicly traded, the average of the Current Market Prices (as hereinafter defined) of such shares or securities for each day of the Adjustment Period (as hereinafter defined). "Current Market Price" of publicly traded shares of Common Stock or any other class of capital stock or other security of the Corporation or any other issuer for a day shall mean the last reported sales price, regular way, or, in case no sale takes place on such day, the average of the reported closing bid and asked prices, regular way, in either case as reported on the New York Stock Exchange Composite Tape or, if such security is not listed or admitted to trading on the New York Stock Exchange, on the principal national securities exchange on which such security is listed or admitted to trading or, if not listed or admitted to trading on any national securities exchange, on the National Association of Securities Dealers Automated Quotation System ("NASDAQ") National Market System or, if such security is not quoted on such National Market System, the average of the closing bid and asked prices on such day in the over-the-counter market as reported by NASDAQ or, if bid and asked prices for such security on such day shall not have been reported through NASDAQ, the average of the bid and

32

asked prices for such day as furnished by any New York Stock Exchange member firm regularly making a market in such security selected for such purpose by the Board. "Adjustment Period" shall mean the period of five consecutive trading days, selected by the Board during the twenty (20) trading days preceding, and including, the date as of which the Fair Market Value of a security is to be determined. The "Fair Market Value" of any security that is not publicly traded or of any other property shall mean the fair value thereof as determined by an independent investment banking or appraisal firm experienced in the valuation of such securities or property selected in good faith by the Board, or, if no such investment banking or appraisal firm is in the good faith judgment of the Board available to make such determination, as determined in good faith by the Board.

(3) "Non-Dilutive Amount" in respect of an issuance, sale or exchange by the Corporation of any right or warrant to purchase, or acquire shares of Common Stock (including any security convertible into or exchangeable for shares of Common Stock) shall mean the difference between (i) the product of the Fair Market Value of a share of Common Stock on the day preceding the first public announcement of such issuance, sale or exchange multiplied by the maximum number of shares of Common Stock that could be acquired on such date upon the exercise in full of such rights or warrants (including upon the conversion or exchange of all such convertible or exchangeable securities), whether or not exercisable (or convertible or exchangeable) at such date, and (ii) the aggregate amount payable pursuant to such right or warrant to purchase or acquire such maximum number of shares of Common Stock; provided, however, that in no event shall the Non-Dilutive Amount be less than zero. For purposes of the foregoing sentence, in the case of a security convertible into or exchangeable for shares of Common Stock, the amount payable pursuant to a right or warrant to purchase or acquire shares of Common Stock shall be the Fair Market Value of such security on the date of the issuance, sale or exchange of such security by the Corporation.

(4) "Pro Rata Repurchase" shall mean any purchase of shares or Common Stock by the Corporation or any subsidiary thereof, whether for cash, shares of capital stock of the Corporation, other securities of the Corporation, evidences of indebtedness of the Corporation or any other person or any other property (including shares of a subsidiary of the Corporation), or any combination thereof,

33

effected while any of the shares of ESOP Preferred Stock are outstanding, pursuant to any tender offer or exchange offer subject to Section 13(e) of the Exchange Act, or any successor provision of law, or pursuant to any other offer available to substantially all holders of Common Stock; provided, however, that no purchase of shares by the Corporation or any subsidiary thereof made in open market transactions shall be deemed a Pro Rata Repurchase. For purposes of this Section 9(H), shares shall be deemed to have been purchased by the Corporation or any subsidiary thereof "in open market transactions" if they have been purchased substantially in accordance with the requirements of Rule 10b-18 as in effect under the Exchange Act on the date shares of ESOP Preferred Stock are initially issued by the Corporation or on such other terms and conditions as the Board shall have determined are reasonably designed to prevent such purchases from having a material effect on the trading market for the Common Stock.

(I) Whenever an adjustment to the Conversion Price of the ESOP Preferred Stock is required pursuant to this Section 9, the Corporation shall forthwith place on file with the transfer agent for the Common Stock and the ESOP Preferred Stock, if there be one, and with the Treasurer of the Corporation, a statement signed by the Treasurer or any Assistant Treasurer of the Corporation stating the adjusted Conversion Price determined as provided herein. In addition, whenever a Special Dividend is declared pursuant to paragraph (E) of this Section 9, (i) the maximum number of shares of ESOP Preferred Stock shall be adjusted by multiplying 3,902,438 (or such other number as shall be the maximum number of shares of ESOP Preferred Stock in effect prior to the authorization of such Special Dividend) by the Section 9(A), Section 9(B), Section 9(C)(1), Section 9(C)(2) or Section 9(D) Fraction, as the case may be, (ii) the Board shall take action as is necessary so that a sufficient number of shares of ESOP Preferred Stock are designated with respect to any increase in the number of shares of ESOP Preferred Stock to be outstanding as a result of such Special Dividend and (iii) the Corporation shall forthwith place on file with the transfer agent for the Common Stock and the ESOP Preferred Stock, if there be one, and with the Treasurer of the Corporation, a statement signed by the Treasurer or any Assistant Treasurer of the Corporation stating the adjusted maximum number of shares of ESOP Preferred Stock, Conversion Price, Liquidation Price and Preferred Dividend Rate determined as provided herein. The statement required by either of the two preceding sentences shall set forth in

34

reasonable detail such facts as shall be necessary to show the reason and the manner of computing such adjustments, including any determination of Fair Market Value involved in such computation. Promptly after each adjustment to the maximum number of shares of ESOP Preferred Stock, Conversion Price, the Liquidation Price, the Preferred Dividend Rate, or the number of shares of ESOP Preferred Stock outstanding, the Corporation shall mail a notice thereof and of the then prevailing maximum number of shares of ESOP Preferred Stock, Conversion Price, Liquidation Price, Preferred Dividend Rate and number of shares of ESOP Preferred Stock outstanding to each holder of shares of ESOP Preferred Stock.

       10. <u>Miscellaneous.</u>

       (A) All notices referred to herein shall be in writing, and all notices hereunder shall be deemed to have given upon the earlier of receipt thereof of three (3) business days after the mailing thereof if sent by registered mail (unless first-class mail shall be specifically permitted for such notice under the terms hereof) with postage prepaid, addressed: (i) if to the Corporation, to its office at Two World Trade Center, New York, New York 10048 (Attention: Secretary) or to the transfer agent for the ESOP Preferred Stock, or other agent of the Corporation designated as permitted hereof or (ii) if to any holder of the ESOP Preferred Stock or Common Stock, as the case may be, to such holder at the address of such holder as listed in the stock record books of the Corporation (which may include the records of any transfer agent for Common Stock) or (iii) to such other address as the Corporation or any such holder, as the case may be, shall have designated by notice similarly given.

       (B) The term "Common Stock" as used herein means the Corporation's Common Stock, par value $0.01 per share, as the same exists at the date of filing of this Certificate of Designation pursuant to Section 151 of the General Corporation Law of the State of Delaware, or any other class of stock resulting from successive changes or reclassifications of such Common Stock consisting solely of changes in par value, or par value to without par value, or from without par value to par value. In the event that, at any time as a result of an adjustment made pursuant to Section 9 hereof, the holder of any shares of the ESOP Preferred Stock upon thereafter surrendering such shares for conversion shall become entitled to receive any shares or other securities of the Corporation other than shares of Common Stock, the anti-dilution provisions contained in Section 9

35

hereof shall apply in a manner and on terms as nearly equivalent as practicable to the provisions with respect to Common Stock, and the provisions of Sections 1 through 8 and 10 hereof respect to the Common Stock shall apply on like or similar terms to any such other shares or securities.

(C) The Corporation shall pay any and all stock transfer and documentary stamp taxes that may be payable in respect of any issuance or delivery of shares of ESOP Preferred Stock or shares of Common Stock or other securities issued on account of ESOP Preferred Stock pursuant thereto or certificates representing such shares or securities. The Corporation shall not, however, be required to pay any such tax which may be payable in respect of any transfer involved in the issuance or delivery of shares of ESOP Preferred Stock or Common Stock or other securities in a name other than that in which the shares of ESOP Preferred Stock with respect to which such shares or other securities are issued or delivered were registered, or in respect of any payment to any person with respect to any shares or securities other than a payment to the registered holder thereof, and shall not be required to make any such issuance, delivery or payment unless and until the person otherwise entitled to such issuance, delivery or payment has paid to the Corporation the amount of any such tax or has established, to the satisfaction of the Corporation, that such tax has been paid or is not payable.

(D) In the event that a holder of shares of ESOP Preferred Stock shall not by written notice designate the name in which shares of Common Stock to be issued upon conversion or exchange of such shares should be registered or to whom payment upon redemption of shares of ESOP Preferred Stock should be made or the address to which the certificate or certificates representing such shares, or such payment, should be sent, the Corporation shall be entitled to register such shares, and make such payment, in the name of the holder of such ESOP Preferred Stock as shown on the records of the Corporation and to send the certificate or certificates or other documentation representing such shares, or such payment, to the address of such other holder shown on the records of the Corporation.

(E) The Corporation may appoint, and from time to time discharge and change, a transfer agent for the ESOP Preferred Stock. Upon any such appointment or discharge of a transfer agent, the Corporation, shall send notice thereof by first-class mail, postage prepaid, to each holder of record of ESOP Preferred Stock.

36

B. This Certificate of Designation shall not become effective until, and shall become effective at, 12:01 a.m. on May 31, 1997.

   IN WITNESS WHEREOF, Dean Witter, Discover & Co. has caused this Certificate of Designation to be signed by Christine A. Edwards, its Executive Vice President, General Counsel and Secretary, this 30th day of May, 1997.

                                        DEAN WITTER, DISCOVER & CO.

                                        By:    /s/ Christine A. Edwards
                                        Name:  Christine A. Edwards
                                        Title: Executive Vice President,
                                               General Counsel & Secretary

                          37

CERTIFICATE OF DESIGNATION OF PREFERENCES AND RIGHTS
OF THE
7 3/8% CUMULATIVE PREFERRED STOCK
($200.00 Stated Value)
OF
DEAN WITTER, DISCOVER & CO.

Pursuant to Section 151 of the
General Corporation Law of the State of Delaware

The undersigned DOES HEREBY CERTIFY:

A. The following resolution was duly adopted by the Board of Directors (the "Board") of Dean Witter, Discover & Co., a Delaware corporation (hereinafter called the "Corporation"), by unanimous vote thereof at a meeting on May 28, 1997:

RESOLVED that, pursuant to authority expressly granted to and vested in the Board by provisions of the Amended and Restated Certificate of Incorporation of the Corporation (the "Certificate of Incorporation"), the issuance of a series of Preferred Stock, par value $0.01 per share (the "Preferred Stock"), which shall consist of 1,000,000 of the shares of Preferred Stock which the Corporation has authority to issue, is authorized, and the Board hereby fixes the powers, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, of the shares of such series (in addition to the powers, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, set forth in the Certificate of Incorporation which may be applicable to the Preferred Stock) as follows:

1. <u>Designation and Amount; Fractional Shares.</u> The designation for such series of the Preferred Stock authorized by this resolution shall be the 7 3/8%

38

Cumulative Preferred Stock, par value $0.01 per share, with a stated value of $200.00 per share (the "Cumulative Preferred Stock"). The stated value per share of Cumulative Preferred Stock shall not for any purpose be considered to be a determination by the Board with respect to the capital and surplus of the Corporation. The number of shares of Cumulative Preferred Stock shall be 1,000,000. The Cumulative Preferred Stock is issuable in whole shares only.

2. <u>Dividends.</u> Holders of shares of Cumulative Preferred Stock will be entitled to receive, when, as and if declared by the Board or the Committee (as hereinafter defined) out of assets of the Corporation legally available for payment, cash dividends payable quarterly at the rate of $7\,^3/_8\%$ per annum. Dividends on the Cumulative Preferred Stock, calculated as a percentage of the stated value, will be payable quarterly on February 28, May 30, August 30 and November 30 (each a "dividend payment date"). Dividends on shares of the Cumulative Preferred Stock will be cumulative from the date of initial issuance of such shares of Cumulative Preferred Stock. Dividends will be payable, in arrears, to holders of record as they appear on the stock books of the Corporation on such record dates, not more than 60 days nor less than 10 days preceding the payment dates thereof, as shall be fixed by the Board or the Committee. The amount of dividends payable for the initial dividend period or any period shorter than a full dividend period shall be calculated on the basis of a 360-day year of twelve 30-day months. No dividends may be declared or paid or set apart for payment on any Parity Preferred Stock (as defined in paragraph 9(b) below) with regard to the payment of dividends unless there shall also be or have been declared and paid or set apart for payment on the Cumulative Preferred Stock, like dividends for all dividend payment periods of the Cumulative Preferred Stock ending on or before the dividend payment date of such Parity Preferred Stock, ratably in proportion to the respective amounts of dividends (x) accumulated and unpaid or payable on such Parity Preferred Stock, on the one hand, and (y) accumulated and unpaid through the dividend payment period or periods of the Cumulative Preferred Stock next preceding such dividend payment date, on the other hand. For the purposes of this Certificate of Designation, the "Committee" shall mean any committee of the Board to whom the Board, pursuant to Section 141(c) of the General Corporation Law of the State of Delaware, delegates authority to perform the functions of the Board set forth in this Certificate of Designation.

39

Except as set forth in the preceding sentence, unless full cumulative dividends on the Cumulative Preferred Stock have been paid, no dividends (other than in Common Stock of the Corporation) may be paid or declared and set aside for payment or other distribution made upon the Common Stock or on any other stock of the Corporation ranking junior to or on a parity with the Cumulative Preferred Stock as to dividends, nor may any Common Stock or any other stock of the Corporation ranking junior to or on a parity with the Cumulative Preferred Stock as to dividends be redeemed, purchased or otherwise acquired for any consideration (or any payment be made to or available for a sinking fund for the redemption of any shares of such stock; provided, however, that any moneys theretofore deposited in any sinking fund with respect to any Preferred Stock of the Corporation in compliance with the provisions of such sinking fund may thereafter be applied to the purchase or redemption of such Preferred Stock in accordance with the terms of such sinking fund, regardless of whether at the time of such application full cumulative dividends upon shares of the Cumulative Preferred Stock outstanding to the last dividend payment date shall have been paid or declared and set apart for payment) by the Corporation; provided that any such junior or parity Preferred Stock or Common Stock may be converted into or exchanged for stock of the Corporation ranking junior to the Cumulative Preferred Stock as to dividends.

3. Liquidation Preference. The shares of Cumulative Preferred Stock shall rank, as to liquidation, dissolution or winding up of the Corporation, prior to the shares of Common Stock and any other class of stock of the Corporation ranking junior to the Cumulative Preferred Stock as to rights upon liquidation, dissolution or winding up of the Corporation, so that in the event of any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the holders of the Cumulative Preferred Stock shall be entitled to receive out of the assets of the Corporation available for distribution to its stockholders, whether from capital, surplus or earnings, before any distribution is made to holders of shares of Common Stock or any other such junior stock, an amount equal to $200.00 per share (the "Liquidation Preference" of a share of Cumulative Preferred Stock)

plus an amount equal to all dividends (whether or not earned or declared) accrued and accumulated and unpaid on the shares of Cumulative Preferred Stock to the date of final distribution. The holders of the Cumulative Preferred Stock will not be entitled to receive the Liquidation Preference until the liquidation preference of any other class of stock of the Corporation ranking senior to the Cumulative Preferred Stock as to rights upon liquidation, dissolution or winding up shall have been paid (or a sum set aside therefor sufficient to provide for payment) in full. After payment of the full amount of the Liquidation Preference and such dividends, the holders of shares of Cumulative Preferred Stock will not be entitled to any further participation in any distribution of assets by the Corporation. If, upon any liquidation, dissolution or winding up of the Corporation, the assets of the Corporation, or proceeds thereof, distributable among the holders of shares of Parity Preferred Stock shall be insufficient to pay in full the preferential amount aforesaid, then such assets, or the proceeds thereof, shall be distributable among such holders ratably in accordance with the respective amounts which would be payable on such shares if all amounts payable thereon were paid in full. For the purposes hereof, neither a consolidation or merger of the Corporation with or into any other corporation, nor a merger of any other corporation with or into the Corporation, nor a sale or transfer of all or any part of the Corporation's assets for cash or securities shall be considered a liquidation, dissolution or winding up of the Corporation.

4. <u>Conversion.</u> The Cumulative Preferred Stock is not convertible into shares of any other class or series of stock of the Corporation.

5. <u>Voting Rights.</u> The holders of shares of Cumulative Preferred Stock shall have no voting rights whatsoever, except for any voting rights to which they may be entitled under the laws of the State of Delaware, and except as follows:

(a) Whenever, at any time or times, dividends payable on the shares of Cumulative Preferred Stock or on any Parity Preferred Stock with respect to payment of dividends, shall be in arrears for an aggregate number of days equal to six calendar quarters or more, whether or not consecutive, the holders of the outstanding shares

41

of Cumulative Preferred Stock shall have the right, with holders of shares of any one or more other class or series of stock upon which like voting rights have been conferred and are exercisable (voting together as a class), to elect two of the authorized number of members of the Board at the Corporation's next annual meeting of stockholders and at each subsequent annual meeting of stockholders until such arrearages have been paid or set apart for payment, at which time such right shall terminate, except as herein or by law expressly provided, subject to revesting in the event of each and every subsequent default of the character above mentioned. Upon any termination of the right of the holders of shares of Cumulative Preferred Stock as a class to vote for directors as herein provided, the term of office of all directors then in office elected by the holders of shares of Cumulative Preferred Stock shall terminate immediately.

Any director who shall have been so elected pursuant to this paragraph may be removed at any time, either with or without cause. Any vacancy thereby created may be filled only by the affirmative vote of the holders of shares of Cumulative Preferred Stock voting separately as a class (together with the holders of shares of any other class or series of stock upon which like voting rights have been conferred and are exercisable). If the office of any director elected by the holders of shares of Cumulative Preferred Stock voting as a class becomes vacant for any reason other than removal from office as aforesaid, the remaining director elected pursuant to this paragraph may choose a successor who shall hold office for the unexpired term in respect of which such vacancy occurred. At elections for such directors, each holder of shares of Cumulative Preferred Stock shall be entitled to one vote for each share held (the holders of shares of any other class or series of preferred stock having like voting rights being entitled to such number of votes, if any, for each share of such stock held as may be granted to them).

(b) So long as any shares of Cumulative Preferred Stock remain outstanding, the consent of the holders of at least two-thirds of the shares of Cumulative Preferred Stock outstanding at the

time and all other classes or series of stock upon which like voting rights have been conferred and are exercisable (voting together as a class) given in person or by proxy, either in writing or at any meeting called for the purpose, shall be necessary to permit, effect or validate any one or more of the following:

(i) the issuance or increase of the authorized amount of any class or series of shares ranking prior (as that term is defined in paragraph 9(a) hereof) to the shares of the Cumulative Preferred Stock; or

(ii) the amendment, alteration or repeal, whether by merger, consolidation or otherwise, of any of the provisions of the Certificate of Incorporation (including this resolution or any provision hereof) that would materially and adversely affect any power, preference, or special right of the shares of Cumulative Preferred Stock or of the holders thereof; provided, however, that any increase in the amount of authorized Common Stock or authorized Preferred Stock or any increase or decrease in the number of shares of any series of Preferred Stock or the creation and issuance of other series of Common Stock or Preferred Stock, in each case ranking on a parity with or junior to the shares of Cumulative Preferred Stock with respect to the payment of dividends and the distribution of assets upon liquidation, dissolution or winding up, shall not be deemed to materially and adversely affect such powers, preferences or special rights.

(c) The foregoing voting provisions shall not apply if, at or prior to the time when the act with respect to which such vote would otherwise be required shall be effected, all outstanding shares of Cumulative Preferred Stock shall have been redeemed or called for redemption and sufficient funds shall have been deposited in trust to effect such redemption.

6. <u>Redemption.</u> The shares of the Cumulative Preferred Stock may be redeemed at the option of the Corporation, as a whole, or from time to time in part, at any time, upon not less than 30 days'

43

prior notice mailed to the holders of the shares to be redeemed at their addresses as shown on the stock books of the Corporation; provided, however, that shares of the Cumulative Preferred Stock shall not be redeemable prior to August 30, 1998. Subject to the foregoing, on or after such date, shares of the Cumulative Preferred Stock are redeemable at $200.00 per share together with an amount equal to all dividends (whether or not earned or declared) accrued and accumulated and unpaid to, but excluding, the date fixed for redemption.

If full cumulative dividends on the Cumulative Preferred Stock have not been paid, the Cumulative Preferred Stock may not be redeemed in part and the Corporation may not purchase or acquire any shares of the Cumulative Preferred Stock otherwise than pursuant to a purchase or exchange offer made on the same terms to all holders of the Cumulative Preferred Stock. If fewer than all the outstanding shares of Cumulative Preferred Stock are to be redeemed, the Corporation will select those to be redeemed by lot or a substantially equivalent method.

If a notice of redemption has been given pursuant to this paragraph 6 and if, on or before the date fixed for redemption, the funds necessary for such redemption shall have been set aside by the Corporation, separate and apart from its other funds, in trust for the pro rata benefit of the holders of the shares of Cumulative Preferred Stock so called for redemption, then, notwithstanding that any certificates for such shares have not been surrendered for cancelation, on the redemption date dividends shall cease to accrue on the shares to be redeemed, and at the close of business on the redemption date the holders of such shares shall cease to be stockholders with respect to such shares and shall have no interest in or claims against the Corporation by virtue thereof and shall have no voting or other rights with respect to such shares, except the right to receive the moneys payable upon surrender (and endorsement, if required by the Corporation) of their certificates, and the shares evidenced thereby shall no longer be outstanding. Subject to applicable escheat laws, any moneys so set aside

44

by the Corporation and unclaimed at the end of two years from the redemption date shall revert to the general funds of the Corporation, after which reversion the holders of such shares so called for redemption shall look only to the general funds of the Corporation for the payment of the amounts payable upon such redemption. Any interest accrued on funds so deposited shall be paid to the Corporation from time to time.

7. <u>Authorization and Issuance of Other Securities.</u> No consent of the holders of the Cumulative Preferred Stock shall be required for (a) the creation of any indebtedness of any kind of the Corporation, (b) the creation, or increase or decrease in the amount, of any class or series of stock of the Corporation not ranking prior as to dividends or upon liquidation, dissolution or winding up to the Cumulative Preferred Stock or (c) any increase or decrease in the amount of authorized Common Stock or any increase, decrease or change in the par value thereof or in any other terms thereof.

8. <u>Amendment of Resolution.</u> The Board and the Committee each reserves the right by subsequent amendment of this resolution from time to time to increase or decrease the number of shares that constitute the Cumulative Preferred Stock (but not below the number of shares thereof then outstanding) and in other respects to amend this resolution within the limitations provided by law, this resolution and the Certificate of Incorporation.

9. <u>Rank.</u> For the purposes of this resolution, any stock of any class or classes of the Corporation shall be deemed to rank:

(a) prior to shares of the Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, if the holders of stock of such class or classes shall be entitled by the terms thereof to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of shares of the Cumulative Preferred Stock;

45

(b) on a parity with shares of the Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, whether or not the dividend rates, dividend payment dates, or redemption or liquidation prices per share thereof be different from those of the Cumulative Preferred Stock, if the holders of stock of such class or classes shall be entitled by the terms thereof to the receipt of dividends or of amounts distributed upon liquidation, dissolution or winding up, as the case may be, in proportion to their respective dividend rates or liquidation prices, without preference or priority of one over the other as between the holders of such stock and the holders of shares of Cumulative Preferred Stock (the term "Parity Preferred Stock" being used to refer to any stock on a parity with the shares of Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, as the context may require); and

(c) junior to shares of the Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, if such class shall be Common Stock or if the holders of the Cumulative Preferred Stock shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of stock of such class or classes.

The Cumulative Preferred Stock shall rank prior, as to dividends and upon liquidation, dissolution or winding up, to the Common Stock and the Corporation's Series A Junior Participating Preferred Stock, and on a parity with (i) the Corporation's ESOP Convertible Preferred Stock, with a liquidation value of $35.88 per share, (ii) the Corporation's 7 $^{3}/_{4}$% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (iii) the Corporation's Series A Fixed/Adjustable Rate Preferred Stock, with a liquidation value of $200.00 per share,(iv) if issued, the Corporation's 7.82% Cumulative Preferred Stock, with a liquidation value of

46

$200.00 per share, (v) if issued, the Corporation's 7.80% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (vi) if issued, the Corporation's 9.00% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (vii) if issued, the Corporation's 8.40% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (viii) if issued, the Corporation's 8.20% Cumulative Preferred Stock, with a liquidation value of $200.00 per share and (ix) if issued, the Corporation's 8.03% Cumulative Preferred Stock, with a liquidation value of $200.00 per share.

47

B. This Certificate of Designation shall not become effective until, and shall become effective at, 12:01 a.m. on May 31, 1997.

IN WITNESS WHEREOF, Dean Witter, Discover & Co. has caused this Certificate of Designation to be signed by Christine A. Edwards, its Executive Vice President, General Counsel and Secretary, this 30th day of May, 1997.

DEAN WITTER, DISCOVER & CO.

By:     /s/ Christine A. Edwards
Name:  Christine A. Edwards
Title:   Executive Vice President,
          General Counsel & Secretary

48

CERTIFICATE OF DESIGNATION OF PREFERENCES AND RIGHTS

OF THE

7.82% CUMULATIVE PREFERRED STOCK

($200.00 Stated Value)

OF

DEAN WITTER, DISCOVER & CO.

Pursuant to Section 151 of the

General Corporation Law of the State of Delaware

The undersigned DOES HEREBY CERTIFY:

A. The following resolution was duly adopted by the Board of Directors (the "Board") of Dean Witter, Discover & Co., a Delaware corporation (hereinafter called the "Corporation"), by unanimous vote thereof at a meeting on May 28, 1997:

RESOLVED that, pursuant to authority expressly granted to and vested in the Board by provisions of the Amended and Restated Certificate of Incorporation of the Corporation (the "Certificate of Incorporation"), the issuance of a series of Preferred Stock, par value $0.01 per share (the "Preferred Stock"), which shall consist of 611,238 of the shares of Preferred Stock which the Corporation has authority to issue, is authorized, and the Board hereby fixes the powers, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, of the shares of such series (in addition to the powers, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, set forth in the Certificate of Incorporation which may be applicable to the Preferred Stock) as follows:

1. <u>Designation and Amount; Fractional Shares.</u> The designation for such series of the Preferred Stock authorized by this resolution shall be the 7.82% Cumulative Preferred Stock, par value $0.01 per share, with a stated value of $200.00 per share (the

49

"Cumulative Preferred Stock"). The stated value per share of Cumulative Preferred Stock shall not for any purpose be considered to be a determination by the Board with respect to the capital and surplus of the Corporation. The maximum number of shares of Cumulative Preferred Stock shall be 611,238. The Cumulative Preferred Stock is issuable in whole shares only.

    2. <u>Dividends.</u> Holders of shares of Cumulative Preferred Stock will be entitled to receive, when, as and if declared by the Board or the Committee (as hereinafter defined) out of assets of the Corporation legally available for payment, cash dividends payable quarterly at the rate of 7.82% per annum. Dividends on the Cumulative Preferred Stock will be payable quarterly on February 28, May 30, August 30 and November 30 (each a "dividend payment date"). Dividends on shares of the Cumulative Preferred Stock will be cumulative from the date of initial issuance of such shares of Cumulative Preferred Stock. Dividends will be payable, in arrears, to holders of record as they appear on the stock books of the Corporation on such record dates, not more than 60 days nor less than 10 days preceding the payment dates thereof, as shall be fixed by the Board or the Committee. The amount of dividends payable for the initial dividend period or any period shorter than a full dividend period shall be calculated on the basis of a 360-day year of twelve 30-day months. No dividends may be declared or paid or set apart for payment on any Parity Preferred Stock (as defined in paragraph 9(b) below) with regard to the payment of dividends unless there shall also be or have been declared and paid or set apart for payment on the Cumulative Preferred Stock, like dividends for all dividend payment periods of the Cumulative Preferred Stock ending on or before the dividend payment date of such Parity Preferred Stock, ratably in proportion to the respective amounts of dividends (x) accumulated and unpaid or payable on such Parity Preferred Stock, on the one hand, and (y) accumulated and unpaid through the dividend payment period or periods of the Cumulative Preferred Stock next preceding such dividend payment date, on the other hand. For the purposes of this Certificate of Designation, the "Committee" shall mean any committee of the Board to whom the Board, pursuant to Section 141 (c) of the General Corporation Law of the State of Delaware, delegates authority to perform the functions of the Board set forth in this Certificate of Designation.

50

Except as set forth in the preceding sentence, unless full cumulative dividends on the Cumulative Preferred Stock have been paid, no dividends (other than in Common Stock of the Corporation) may be paid or declared and set aside for payment or other distribution made upon the Common Stock or on any other stock of the Corporation ranking junior to or on a parity with the Cumulative Preferred Stock as to dividends, nor may any Common Stock or any other stock of the Corporation ranking junior to or on a parity with the Cumulative Preferred Stock as to dividends be redeemed, purchased or otherwise acquired for any consideration (or any payment be made to or available for a sinking fund for the redemption of any shares of such stock; provided, however, that any moneys theretofore deposited in any sinking fund with respect to any Preferred Stock of the Corporation in compliance with the provisions of such sinking fund may thereafter be applied to the purchase or redemption of such Preferred Stock in accordance with the terms of such sinking fund, regardless of whether at the time of such application full cumulative dividends upon shares of the Cumulative Preferred Stock outstanding to the last dividend payment date shall have been paid or declared and set apart for payment) by the Corporation; provided, that any such junior or parity Preferred Stock or Common Stock may be converted into or exchanged for stock of the Corporation ranking junior to the Cumulative Preferred Stock as to dividends.

3. <u>Liquidation Preference.</u> The shares of Cumulative Preferred Stock shall rank, as to liquidation, dissolution or winding up of the Corporation, prior to the shares of Common Stock and any other class of stock of the Corporation ranking junior to the Cumulative Preferred Stock as to rights upon liquidation, dissolution or winding up of the Corporation, so that in the event of any liquidation, dissolution or winding up of the Corporation, whether voluntary of involuntary, the holders of the Cumulative Preferred Stock shall be entitled to receive out of the assets of the Corporation available for distribution to its stockholders, whether from capital, surplus or earnings, before any distribution is made to holders of shares of Common Stock or any other such junior stock, an amount equal to $200.00 per share (the "Liquidation Preference" of a share of Cumulative Preferred Stock) plus an amount equal to all dividends (whether or not earned or declared) accrued and accumulated and unpaid on the shares of Cumulative Preferred Stock to the date

51

of final distribution. The holders of the Cumulative Preferred Stock will not be entitled to receive the Liquidation Preference until the liquidation preference of any other class of stock of the Corporation ranking senior to the Cumulative Preferred Stock as to rights upon liquidation, dissolution or winding up shall have been paid (or a sum set aside therefor sufficient to provide for payment) in full. After payment of the full amount of the Liquidation Preference and such dividends, the holders of shares of Cumulative Preferred Stock will not be entitled to any further participation in any distribution of assets by the Corporation. If, upon any liquidation, dissolution or winding up of the Corporation, the assets of the Corporation, or proceeds thereof, distributable among the holders of shares of Parity Preferred Stock shall be insufficient to pay in full the preferential amount aforesaid, then such assets, or the proceeds thereof, shall be distributable among such holders ratably in accordance with the respective amounts which would be payable on such shares if all amounts payable thereon were paid in full. For the purposes hereof, neither a consolidation or merger of the Corporation with or into any other corporation, nor a merger of any other corporation with or into the Corporation, nor a sale or transfer of all or any part of the Corporation's assets for cash or securities shall be considered a liquidation, dissolution or winding up of the Corporation.

4. <u>Conversion.</u> The Cumulative Preferred Stock is not convertible into shares of any other class or series of stock of the Corporation.

5. <u>Voting Rights.</u> The holders of shares of Cumulative Preferred Stock shall have no voting rights whatsoever, except for any voting rights to which they may be entitled under the laws of the State of Delaware, and except as follows:

(a) Whenever, at any time or times, dividends payable on the shares of Cumulative Preferred Stock or on any Parity Preferred Stock with respect to payment of dividends, shall be in arrears for an aggregate number of days equal to six calendar quarters or more, whether or not consecutive, the holders of the outstanding shares of Cumulative Preferred Stock shall have the right, with holders of shares of any one or more other class or series of stock upon which like

52

voting rights have been conferred and are exercisable (voting together as a class), to elect two of the authorized number of members of the Board at the Corporation's next annual meeting of stockholders and at each subsequent annual meeting of stockholders until such arrearages have been paid or set apart for payment, at which time such right shall terminate, except as herein or by law expressly provided, subject to revesting in the event of each and every subsequent default of the character above mentioned. Upon any termination of the right of the holders of shares of Cumulative Preferred Stock as a class to vote for directors as herein provided, the term of office of all directors then in office elected by the holders of shares of Cumulative Preferred Stock shall terminate immediately.

Any director who shall have been so elected pursuant to this paragraph may be removed at any time, either with or without cause. Any vacancy thereby created may be filled only by the affirmative vote of the holders of shares of Cumulative Preferred Stock voting separately as a class (together with the holders of shares of any other class or series of stock upon which like voting rights have been conferred and are exercisable). If the office of any director elected by the holders of shares of Cumulative Preferred Stock voting as a class becomes vacant for any reason other than removal from office as aforesaid, the remaining director elected pursuant to this paragraph may choose a successor who shall hold office for the unexpired term in respect of which such vacancy occurred. At elections for such directors, each holder of shares of Cumulative Preferred Stock shall be entitled to one vote for each share held (the holders of shares of any other class or series of preferred stock having like voting rights being entitled to such number of votes, if any, for each share of such stock held as may be granted to them).

(b) So long as any shares of Cumulative Preferred Stock remain outstanding, the consent of the holders of at least two-thirds of the shares of Cumulative Preferred Stock outstanding at the time and all other classes or series of stock upon which like voting rights have been conferred and are exercisable (voting together as a class) given

53

in person or by proxy, either in writing or at any meeting called for the purpose, shall be necessary to permit, effect or validate any one or more of the following:

(i) the issuance or increase of the authorized amount of any class or series of shares ranking prior (as that term is defined in paragraph 9(a) hereof) to the shares of the Cumulative Preferred Stock; or

(ii) the amendment, alteration or repeal, whether by merger, consolidation or otherwise, of any of the provisions of the Certificate of Incorporation (including this resolution or any provision hereof) that would materially and adversely affect any power, preference, or special right of the shares of Cumulative Preferred Stock or of the holders thereof; provided, however, that any increase in the amount of authorized Common Stock or authorized Preferred Stock or any increase or decrease in the number of shares of any series of Preferred Stock or the creation and issuance of other series of Common Stock or Preferred Stock, in each case ranking on a parity with or junior to the shares of Cumulative Preferred Stock with respect to the payment of dividends and the distribution of assets upon liquidation, dissolution or winding up, shall not be deemed to materially and adversely affect such powers, preferences or special rights.

(c) The foregoing voting provisions shall not apply if, at or prior to the time when the act with respect to which such vote would otherwise be required shall be effected, all outstanding shares of Cumulative Preferred Stock shall have been redeemed or called for redemption and sufficient funds shall have been deposited in trust to effect such redemption.

6. <u>Redemption.</u> The shares of the Cumulative Preferred Stock may be redeemed at the option of the Corporation, as a whole, or from time to time in part, at any time, upon not less than 30 days' prior notice mailed to the holders of the shares to be redeemed at their addresses as shown on the stock books of the Corporation; provided, however, that shares of the

54

Cumulative Preferred Stock shall not be redeemable prior to November 30, 1998. Subject to the foregoing, on or after such date, shares of the Cumulative Preferred Stock are redeemable at $200.00 per share together with an amount equal to all dividends (whether or not earned or declared) accrued and accumulated and unpaid to, but excluding, the date fixed for redemption.

If full cumulative dividends on the Cumulative Preferred Stock have not been paid, the Cumulative Preferred Stock may not redeemed in part and the Corporation may not purchase or acquire any shares of the Cumulative Preferred Stock otherwise than pursuant to a purchase or exchange offer made on the same terms to all holders of the Cumulative Preferred Stock. If fewer than all the outstanding shares of Cumulative Preferred Stock are to be redeemed, the Corporation will select those to be redeemed by lot or a substantially equivalent method.

If a notice of redemption has been given pursuant to this paragraph 6 and if, on or before the date fixed for redemption, the funds necessary for such redemption shall have been set aside by the Corporation, separate and apart from its other funds, in trust for the pro rata benefit of the holders of the shares of Cumulative Preferred Stock so called for redemption, then, notwithstanding that any certificates for such shares have not been surrendered for cancelation, on the redemption date dividends shall cease to accrue on the shares to be redeemed, and at the close of business on the redemption date the holders of such shares shall cease to be stockholders with respect to such shares and shall have no interest in or claims against the Corporation by virtue thereof and shall have no voting or other rights with respect to such shares, except the right to receive the moneys payable upon surrender (and endorsement, if required by the Corporation) of their certificates, and the shares evidenced thereby shall no longer be outstanding. Subject to applicable escheat laws, any moneys so set aside by the Corporation and unclaimed at the end of two years from the redemption date shall revert to the general funds of the Corporation, after which reversion the holders of such shares so called for redemption shall look only to the general funds of the Corporation for the payment of the amounts payable upon such redemption. Any interest accrued on funds so deposited shall be paid to the Corporation from time to time.

55

7. <u>Authorization and Issuance of Other Securities.</u> No consent of the holders of the Cumulative Preferred Stock shall be required for (a) the creation of any indebtedness of any kind of the Corporation, (b) the creation, or increase or decrease in the amount, of any class or series of stock of the Corporation not ranking prior as to dividends or upon liquidation, dissolution or winding up to the Cumulative Preferred Stock or (c) any increase or decrease in the amount of authorized Common Stock or any increase, decrease or change in the par value thereof or in any other terms thereof.

8. <u>Amendment of Resolution.</u> The Board and the Committee each reserves the right by subsequent amendment of this resolution from time to time to increase or decrease the number of shares that constitute the Cumulative Preferred Stock (but not below the number of shares thereof then outstanding) and in other respects to amend this resolution within the limitations provided by law, this resolution and the Certificate of Incorporation.

9. <u>Rank.</u> For the purposes of this resolution, any stock of any class or classes of the Corporation shall be deemed to rank:

(a) prior to shares of the Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, if the holders of stock of such class or classes shall be entitled by the terms thereof to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of shares of the Cumulative Preferred Stock;

(b) on a parity with shares of the Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, whether or not the dividend rates, dividend payment dates, or redemption or liquidation prices per share thereof be different from those of the Cumulative Preferred Stock, if the holders of stock of such class or classes shall be entitled by the terms thereof to the receipt of dividends or of amounts distributed upon liquidation, dissolution or winding up, as the case may be, in proportion to their respective dividend rates or

56

liquidation prices, without preference or priority of one over the other as between the holders of such stock and the holders of shares of Cumulative Preferred Stock (the term "Parity Preferred Stock" being used to refer to any stock on a parity with the shares of Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, as the context may require); and

        (c) junior to shares of the Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, if such class shall be Common Stock or if the holders of the Cumulative Preferred Stock shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of stock of such class or classes.

    The Cumulative Preferred Stock shall rank prior, as to dividends and upon liquidation, dissolution or winding up, to the Common Stock and the Corporation's Series A Junior Participating Preferred Stock, and on a parity with (i) the Corporation's ESOP Convertible Preferred Stock, with a liquidation value of $35.88 per share, (ii) the Corporation's $7\,^3/_8$% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (iii) the Corporation's $7\,^3/_4$% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (iv) the Corporation's Series A Fixed/Adjustable Rate Preferred Stock, with a liquidation value of $200.00 per share, (v) if issued, the Corporation's 7.80% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (vi) if issued, the Corporation's 9.00% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (vii) if issued, the Corporation's 8.40% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (viii) if issued, the Corporation's 8.20% Cumulative Preferred Stock, with a liquidation value of $200.00 per share and (ix) if issued, the Corporation's 8.03% Cumulative Preferred Stock, with a liquidation value of $200.00 per share.

57

B. This Certificate of Designation shall not become effective until, and shall become effective at, 12:01 a.m. on May 31, 1997.

IN WITNESS WHEREOF, Dean Witter, Discover & Co. has caused this Certificate of Designation to be signed by Christine A. Edwards, its Executive Vice President, General Counsel and Secretary, this 30th day of May, 1997.

DEAN WITTER, DISCOVER & CO.

By:   /s/ Christine A. Edwards
Name:  Christine A. Edwards
Title:  Executive Vice President,
       General Counsel & Secretary

58

CERTIFICATE OF DESIGNATION OF PREFERENCES AND RIGHTS
OF THE
7.80% CUMULATIVE PREFERRED STOCK

($200.00 Stated Value)

OF

DEAN WITTER, DISCOVER & CO.

Pursuant to Section 151 of the
General Corporation Law of the State of Delaware

The undersigned DOES HEREBY CERTIFY:

A. The following resolution was duly adopted by the Board of Directors (the "Board") of Dean Witter, Discover & Co., a Delaware corporation (hereinafter called the "Corporation"), by unanimous vote thereof at a meeting on May 28, 1997:

RESOLVED that, pursuant to authority expressly granted to and vested in the Board by provisions of the Amended and Restated Certificate of Incorporation (the "Certificate of Incorporation"), the issuance of a series of Preferred Stock, par value $0.01 per share (the "Preferred Stock"), which shall consist of 1,150,000 of the shares of Preferred Stock which the Corporation has authority to issue, is authorized, and the Board hereby fixes the powers, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, of the shares of such series (in addition to the powers, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, set forth in the Certificate of Incorporation which may be applicable to the Preferred Stock) as follows:

1. Designation and Amount; Fractional Shares. The designation for such series of the Preferred Stock authorized by this resolution shall be the 7.80% Cumulative Preferred Stock, par value $0.01 per share, with a stated value of $200.00 per share (the "Cumulative Preferred Stock"). The stated value per

share of Cumulative Preferred Stock shall not for any purpose be considered to be a determination by the Board with respect to the capital and surplus of the Corporation. The maximum number of shares of Cumulative Preferred Stock shall be 1,150,000. The Cumulative Preferred Stock is issuable in whole shares only.

2. <u>Dividends.</u> Holders of shares of Cumulative Preferred Stock will be entitled to receive, when, as and if declared by the Board or the Committee (as hereinafter defined) out of assets of the Corporation legally available for payment, cash dividends payable quarterly at the rate of 7.80% per annum. Dividends on the Cumulative Preferred Stock will be payable quarterly on February 28, May 30, August 30 and November 30 (each a "dividend payment date"). Dividends on shares of the Cumulative Preferred Stock will be cumulative from the date of initial issuance of such shares of Cumulative Preferred Stock. Dividends will be payable, in arrears, to holders of record as they appear on the stock books of the Corporation on such record dates, not more than 60 days nor less than 10 days preceding the payment dates thereof, as shall be fixed by the Board or the Committee. The amount of dividends payable for the initial dividend period or any period shorter than a full dividend period shall be calculated on the basis of a 360-day year of twelve 30-day months. No dividends may be declared or paid or set apart for payment on any Parity Preferred Stock (as defined in paragraph 9(b) below) with regard to the payment of dividends unless there shall also be or have been declared and paid or set apart for payment on the Cumulative Preferred Stock, like dividends for all dividend payment periods of the Cumulative Preferred Stock ending on or before the dividend payment date of such Parity Preferred Stock, ratably in proportion to the respective amounts of dividends (x) accumulated and unpaid or payable on such Parity Preferred Stock, on the one hand, and (y) accumulated and unpaid through the dividend payment period or periods of the Cumulative Preferred Stock next preceding such dividend payment date, on the other hand. For the purposes of this Certificate of Designation, the "Committee" shall mean any committee of the Board to whom the Board, pursuant to Section 141 (c) of the General Corporation Law of the State of Delaware, delegates authority to perform the functions of the Board forth in this Certificate of Designation.

60

Except as set forth in the preceding sentence, unless full cumulative dividends on the Cumulative Preferred Stock have been paid, no dividends (other than in Common Stock of the Corporation) may be paid or declared and set aside for payment or other distribution made upon the Common Stock or on any other stock of the Corporation ranking junior to or on a parity with the Cumulative Preferred Stock as to dividends, nor may any Common Stock or any other stock of the Corporation ranking junior to or on a parity with the Cumulative Preferred Stock as to dividends be redeemed, purchased or otherwise acquired for any consideration (or any payment be made to or available for a sinking fund for the redemption of any shares of such stock; provided, however, that any moneys theretofore deposited in any sinking fund with respect to any Preferred Stock of the Corporation in compliance with the provisions of such sinking fund may thereafter be applied to the purchase or redemption of such Preferred Stock in accordance with the terms of such sinking fund, regardless of whether at the time of such application full cumulative dividends upon shares of the Cumulative Preferred Stock outstanding to the last dividend payment date shall have been paid or declared and set apart for payment) by the Corporation; provided that any such junior or parity Preferred Stock or Common Stock may be converted into or exchanged for stock of the Corporation ranking junior to the Cumulative Preferred Stock as to dividends.

3. <u>Liquidation Preference.</u> The shares of Cumulative Preferred Stock shall rank, as to liquidation, dissolution or winding up of the Corporation, prior to the shares of Common Stock and any other class of stock of the Corporation ranking junior to the Cumulative Preferred Stock as to rights upon liquidation, dissolution or winding up of the Corporation, so that in the event of any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the holders of the Cumulative Preferred Stock shall be entitled to receive out of the assets of the Corporation available for distribution to its stockholders, whether from capital, surplus or earnings, before any distribution is made to holders of shares of Common Stock or any other such junior stock, an amount equal to $200.00 per share (the "Liquidation Preference" of a share of Cumulative Preferred Stock) plus an amount equal to all dividends (whether or not earned or declared) accrued and accumulated and unpaid on the shares of Cumulative Preferred Stock to the date

61

of final distribution. The holders of the Cumulative Preferred Stock will not be entitled to receive the Liquidation Preference until the liquidation preference of any other class of stock of the Corporation ranking senior to the Cumulative Preferred Stock as to rights upon liquidation, dissolution or winding up shall have been paid (or a sum set aside therefor sufficient to provide for payment) in full. After payment of the full amount of the Liquidation Preference and such dividends, the holders of shares of Cumulative Preferred Stock will not be entitled to any further participation in any distribution of assets by the Corporation. If, upon any liquidation, dissolution or winding up of the Corporation, the assets of the Corporation, or proceeds thereof, distributable among the holders of shares of Parity Preferred Stock shall be insufficient to pay in full the preferential amount aforesaid, then such assets, or the proceeds thereof, shall be distributable among such holders ratably in accordance with the respective amounts which would be payable on such shares if all amounts payable thereon were paid in full. For the purposes hereof, neither a consolidation or merger of the Corporation with or into any other corporation, nor a merger of any other corporation with or into the Corporation, nor a sale or transfer of all or any part of the Corporation's assets for cash or securities shall be considered a liquidation, dissolution or winding up of the Corporation.

4. <u>Conversion.</u> The Cumulative Preferred Stock is not convertible into shares of any other class or series of stock of the Corporation.

5. <u>Voting Rights.</u> The holders of shares of Cumulative Preferred Stock shall have no voting rights whatsoever, except for any voting rights to which they may be entitled under the laws of the State of Delaware, and except as follows:

(a) Whenever, at any time or times, dividends payable on the shares of Cumulative Preferred Stock or on any Parity Preferred Stock with respect to payment of dividends, shall be in arrears for an aggregate number of days equal to six calendar quarters or more, whether or not consecutive, the holders of the outstanding shares of Cumulative Preferred Stock shall have the right, with holders of shares of any one or more other class or series of stock upon which like

voting rights have been conferred and are exercisable (voting together as a class), to elect two of the authorized number of members of the Board at the Corporation's next annual meeting of stockholders and at each subsequent annual meeting of stockholders until such arrearages have been paid or set apart for payment, at which time such right shall terminate, except as herein or by law expressly provided, subject to revesting in the event of each and every subsequent default of the character above mentioned. Upon any termination of the right of the holders of shares of Cumulative Preferred Stock as a class to vote for directors as herein provided, the term of office of all directors then in office elected by the holders of shares of Cumulative Preferred Stock shall terminate immediately.

Any director who shall have been so elected pursuant to this paragraph may be removed at any time, either with or without cause. Any vacancy thereby created may be filled only by the affirmative vote of the holders of shares of Cumulative Preferred Stock voting separately as a class (together with the holders of shares of any other class or series of stock upon which like voting rights have been conferred and are exercisable). If the office of any director elected by the holders of shares of Cumulative Preferred Stock voting as a class becomes vacant for any reason other than removal from office as aforesaid, the remaining director elected pursuant to this paragraph may choose a successor who shall hold office for the unexpired term in respect of which such vacancy occurred. At elections for such directors, each holder of shares of Cumulative Preferred Stock shall be entitled to one vote for each share held (the holders of shares of any other class or series of preferred stock having like voting rights being entitled to such number of votes, if any, for each share of such stock held as may be granted to them).

(b) So long as any shares of Cumulative Preferred Stock remain outstanding, the consent of the holders of at least two-thirds of the shares of the Cumulative Preferred Stock outstanding at the time and all other classes or series of stock upon which like voting rights have been conferred and are exercisable (voting together as a class)

63

given in person or by proxy, either in writing or at any meeting called for the purpose, shall be necessary to permit, effect or validate any one or more of the following:

(i) the issuance or increase of the authorized amount of any class or series of shares ranking prior (as that term is defined in paragraph 9(a) hereof) to the shares of the Cumulative Preferred Stock; or

(ii) the amendment, alteration or repeal, whether by merger, consolidation or otherwise, of any of the provisions of the Certificate of Incorporation (including this resolution or any provision hereof) that would materially and adversely affect any power, preference, or special right of the shares of Cumulative Preferred Stock or of the holders thereof; provided, however, that any increase in the amount of authorized Common Stock or authorized Preferred Stock or any increase or decrease in the number of shares of any series of Preferred Stock or the creation and issuance of other series of Common Stock or Preferred Stock, in each case ranking on a parity with or junior to the shares of Cumulative Preferred Stock with respect to the payment of dividends and the distribution of assets upon liquidation, dissolution or winding up, shall not be deemed to materially and adversely affect such powers, preferences or special rights.

(c) The foregoing voting provisions shall not apply if, at or prior to the time when the act with respect to which such vote would otherwise be required shall be effected, all outstanding shares of Cumulative Preferred Stock shall have been redeemed or called for redemption and sufficient funds shall have been deposited in trust to effect such redemption.

6. <u>Redemption.</u> The shares of the Cumulative Preferred Stock may be redeemed at the option of the Corporation, as a whole, or from time to time in part, at any time, upon not less than 30 days' prior notice mailed to the holders of the shares to be redeemed at their addresses as shown on the stocks books of the Corporation; provided, however, that shares of the

64

Cumulative Preferred Stock shall not be redeemable prior to February 28, 1999. Subject to the foregoing, on or after such date, shares of the Cumulative Preferred Stock are redeemable at $200.00 per share together with an amount equal to all dividends (whether or not earned or declined) accrued and accumulated and unpaid to, but excluding, the date fixed for redemption.

If full cumulative dividends on the Cumulative Preferred Stock have not been paid, the Cumulative Preferred Stock may not be redeemed in part and the Corporation may not purchase or acquire any shares of the Cumulative Preferred Stock otherwise than pursuant to a purchase or exchange offer made on the same terms to all holders of the Cumulative Preferred Stock. If fewer than all the outstanding shares of Cumulative Preferred Stock are to be redeemed, the Corporation will select those to be redeemed by lot or a substantially equivalent method.

If a notice of redemption has been given pursuant to this paragraph 6 and if, on or before the date fixed for redemption, the funds necessary for such redemption shall have been set aside by the Corporation, separate and apart from its other funds, in trust for the pro rata benefit of the holders of the shares of Cumulative Preferred Stock so called for redemption, then, notwithstanding that any certificates for such shares have not been surrendered for cancelation, on the redemption date dividends shall cease to accrue on the shares to be redeemed, and at the close of business on the redemption date the holders of such shares shall cease to be stockholders with respect to such shares and shall have no interest in or claims against the Corporation by virtue thereof and shall have no voting or other rights with respect to such shares, except the right to receive the moneys payable upon surrender (and endorsement, if required by the Corporation) of their certificates, and the shares evidenced thereby shall no longer be outstanding. Subject to applicable escheat laws, any moneys so set aside by the Corporation and unclaimed at the end of two years from the redemption date shall revert to the general funds of the Corporation, after which reversion the holders of such shares so called for redemption shall look only to the general funds of the Corporation for the payment of the amounts payable upon such redemption. Any interest accrued on funds so deposited shall be paid to the Corporation from time to time.

65

7. <u>Authorization and Issuance of Other Securities.</u> No consent of the holders of the Cumulative Preferred Stock shall be required for (a) the creation of any indebtedness of any kind of the Corporation, (b) the creation, or increase or decrease in the amount, of any class or series of stock of the Corporation not ranking prior as to dividends or upon liquidation, dissolution or winding up to the Cumulative Preferred Stock or (c) any increase or decrease in the amount of authorized Common Stock or any increase or decrease or change in the par value thereof or in any other terms thereof.

8. <u>Amendment of Resolution.</u> The Board and the Committee each reserves the right by subsequent amendment of this resolution from time to time to increase or decrease the number of shares that constitute the Cumulative Preferred Stock (but not below the number of shares thereof then outstanding) and in other respects to amend this resolution within the limitations provided by law, this resolution and the Certificate of Incorporation.

9. <u>Rank.</u> For the purposes of this resolution, any stock of any class or classes of the Corporation shall be deemed to rank:

(a) prior to shares of the Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, if the holders of stock of such class or classes shall be entitled by the terms thereof to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of shares of the Cumulative Preferred Stock;

(b) on a parity with shares of the Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, whether or not the dividend rates, dividend payment dates, or redemption or liquidation prices per share thereof be different from those of the Cumulative Preferred Stock, if the holders of stock of such class or classes shall be entitled by the terms thereof to the receipt of dividends or of amounts distributed upon liquidation, dissolution or winding up, as the case may be, in proportion to their respective dividend rates or

66

liquidation prices, without preference or priority of one over the other as between the holders of such stock and the holders of shares of Cumulative Preferred Stock (the term "Parity Preferred Stock" being used to refer to any stock on a parity with the shares of Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, as the context may require); and

       (c) junior to shares of the Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, if such class shall be Common Stock or if the holders of the Cumulative Preferred Stock shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of stock in such class or classes.

    The Cumulative Preferred Stock shall rank prior, as to dividends and upon liquidation, dissolution or winding up, to the Common Stock and the Corporation's Series A Junior Participating Preferred Stock, and on a parity with (i) the Corporation's ESOP Convertible Preferred Stock, with a liquidation value of $35.88 per share, (ii) the Corporation's 7 3/8% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (iii) the Corporation's 7 3/4% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (iv) the Corporation's Series A Fixed/Adjustable Rate Preferred Stock, with a liquidation value of $200.00 per share, (v) if issued, the Corporation's 7.82% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (vi) if issued, the Corporation's 9.00% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (vii) if issued, the Corporation's 8.40% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (viii) if issued, the Corporation's 8.20% Cumulative Preferred Stock, with a liquidation value of $200.00 per share and (ix) if issued, the Corporation's 8.03% Cumulative Preferred Stock, with a liquidation value of $200.00 per share.

B. This Certificate of Designation shall not become effective until, and shall become effective at, 12:01 a.m. on May 31, 1997.

    IN WITNESS WHEREOF, Dean Witter, Discover & Co. has caused this Certificate of Designation to be signed by Christine A. Edwards, its Executive Vice President, General Counsel and Secretary, this 30th day of May, 1997.

DEAN WITTER, DISCOVER & CO.

By:    /s/ Christine A. Edwards

Name:  Christine A. Edwards

Title:  Executive Vice President,
        General Counsel & Secretary

68

CERTIFICATE OF DESIGNATION OF PREFERENCES AND RIGHTS
OF THE
9.00% CUMULATIVE PREFERRED STOCK

($200.00 Stated Value)

OF

DEAN WITTER, DISCOVER & CO.

Pursuant to Section 151 of the
General Corporation Law of the State of Delaware

The undersigned DOES HEREBY CERTIFY:

A. The following resolution was duly adopted by the Board of Directors (the "Board") of Dean Witter, Discover & Co., a Delaware corporation (hereinafter called the "Corporation"), by unanimous vote thereof at a meeting on May 28, 1997:

RESOLVED that, pursuant to authority expressly granted to and vested in the Board by provisions of the Amended and Restated Certificate of Incorporation of the Corporation (the "Certificate of Incorporation"), the issuance of a series of Preferred Stock, par value $0.01 per share (the "Preferred Stock"), which shall consist of 720,900 of the shares of Preferred Stock which the Corporation has authority to issue, is authorized, and the Board hereby fixes the powers, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, of the shares of such series (in addition to the powers, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, set forth in the Certificate of Incorporation which may be applicable to the Preferred Stock) as follows:

1. <u>Designation and Amount; Fractional Shares.</u> The designation for such series of the Preferred Stock authorized by this resolution shall be the 9.00% Cumulative Preferred Stock, par value $0.01 per share, with a stated value of $200.00 per share (the "Cumulative Preferred Stock"). The stated value per share of Cumulative Preferred Stock shall not for any

69

purpose be considered to be a determination by the Board with respect to the capital and surplus of the Corporation. The maximum number of shares of Cumulative Preferred Stock shall be 720,900. The Cumulative Preferred Stock is issuable in whole shares only.

 2. <u>Dividends.</u> Holders of shares of Cumulative Preferred Stock will be entitled to receive, when, as and if declared by the Board or the Committee (as hereinafter defined) out of assets of the Corporation legally available for payment, cash dividends payable quarterly at the rate of 9.00% per annum. Dividends on the Cumulative Preferred Stock will be payable quarterly on February 28, May 30, August 30 and November 30 (each a "dividend payment date"). Dividends on shares of the Cumulative Preferred Stock will be cumulative from the date of initial issuance of such shares of Cumulative Preferred Stock. Dividends will be payable, in arrears, to holders of record as they appear on the stock books of the Corporation on such record dates, not more than 60 days nor less than 10 days preceding the payment dates thereof, as shall be fixed by the Board or the Committee. The amount of dividends payable for the initial dividend period or any period shorter than a full dividend period shall be calculated on the basis of a 360-day year of twelve 30-day months. No dividends may be declared or paid or set apart for payment on any Parity Preferred Stock (as defined in paragraph 9(b) below) with regard to the payment of dividends unless there shall also be or have been declared and paid or set apart for payment on the Cumulative Preferred Stock, like dividends for all dividend payment periods of the Cumulative Preferred Stock ending on or before the dividend payment date of such Parity Preferred Stock, ratably in proportion to the respective amounts of dividends (x) accumulated and unpaid or payable on such Parity Preferred Stock, on the one hand, and (y) accumulated and unpaid through the dividend payment period or periods of the Cumulative Preferred Stock next preceding such dividend payment date, on the other hand. For the purposes of this Certificate of Designation, the "Committee" shall mean any committee of the Board to whom the Board, pursuant to Section 141 (c) of the General Corporation Law of the State of Delaware, delegates authority to perform the functions of the Board set forth in this Certificate of Designation.

70

Except as set forth in the preceding sentence, unless full cumulative dividends on the Cumulative Preferred Stock have been paid, no dividends (other than in Common Stock of the Corporation) may be paid or declared and set aside for payment or other distribution made upon the Common Stock or on any other stock of the Corporation ranking junior to or on a parity with the Cumulative Preferred Stock as to dividends, nor may any Common Stock or any other stock of the Corporation ranking junior to or on a parity with the Cumulative Preferred Stock as to dividends be redeemed, purchased or otherwise acquired for any consideration (or any payment be made to or available for a sinking fund for the redemption of any shares of such stock; provided, however, that any moneys theretofore deposited in any sinking fund with respect to any Preferred Stock of the Corporation in compliance with the provisions of such sinking fund may thereafter be applied to the purchase or redemption of such Preferred Stock in accordance with the terms of such sinking fund, regardless of whether at the time of such application full cumulative dividends upon shares of the Cumulative Preferred Stock outstanding to the last dividend payment date shall have been paid or declared and set apart for payment) by the Corporation; provided that any such junior or parity Preferred Stock or Common Stock may be converted into or exchanged for stock of the Corporation ranking junior to the Cumulative Preferred Stock as to dividends.

3. <u>Liquidation Preference.</u> The Shares of Cumulative Preferred Stock shall rank, as to liquidation, dissolution or winding up of the Corporation, prior to the shares of Common Stock and any other class of stock of the Corporation ranking junior to the Cumulative Preferred Stock as to rights upon liquidation, dissolution or winding up of the Corporation, so that in the event of any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the holders of the Cumulative Preferred Stock shall be entitled to receive out of the assets of the Corporation available for distribution to its stockholders, whether from capital, surplus or earnings, before any distribution is made to holders of shares of Common Stock or any other such junior stock, an amount equal to $200.00 per share (the "Liquidation Preference" of a share of Cumulative Preferred Stock) plus an amount equal to all dividends (whether or not earned or declared) accrued and accumulated and unpaid on the shares of Cumulative Preferred Stock to the date

71

of final distribution. The holders of the Cumulative Preferred Stock will not be entitled to receive the Liquidation Preference until the liquidation preference of any other class of stock of the Corporation ranking senior to the Cumulative Preferred Stock as to rights upon liquidation, dissolution or winding up shall have been paid (or a sum set aside therefor sufficient to provide for payment) in full. After payment of the full amount of the Liquidation Preference and such dividends, the holders of shares of Cumulative Preferred Stock will not be entitled to any further participation in any distribution of assets by the Corporation. If, upon any liquidation, dissolution or winding up of the Corporation, the assets of the Corporation, or proceeds thereof, distributable among the holders of shares of Parity Preferred Stock shall be insufficient to pay in full the preferential amount aforesaid, then such assets, or the proceeds thereof, shall be distributable among such holders ratably in accordance with the respective amounts which would be payable on such shares if all amounts payable thereon were paid in full. For the purposes hereof, neither a consolidation or merger of the Corporation with or into any other corporation, nor a merger of any other corporation with or into the Corporation, nor a sale or transfer of all or any part of the Corporation's assets for cash or securities shall be considered a liquidation, dissolution or winding up of the Corporation.

4. <u>Conversion.</u> The Cumulative Preferred Stock is not convertible into shares of any other class or series of stock of the Corporation.

5. <u>Voting Rights.</u> The holders of shares of Cumulative Preferred Stock shall have no voting rights whatsoever, except for any voting rights to which they may be entitled under the laws of the State of Delaware, and except as follows:

(a) Whenever, at any time or times, dividends payable on the shares of Cumulative Preferred Stock or on any Parity Preferred Stock with respect to payment of dividends, shall be in arrears for an aggregate number of days equal to six calendar quarters or more, whether or not consecutive, the holders of the outstanding shares of Cumulative Preferred Stock shall have the right, with holders of shares of any one or more other class or series of stock upon which like

72

voting rights have been conferred and are exercisable (voting together as a class), to elect two of the authorized number of members of the Board at the Corporation's next annual meeting of stockholders and at each subsequent annual meeting of stockholders until such arrearages have been paid or set apart for payment, at which time such right shall terminate, except as herein or by law expressly provided, subject to revesting in the event of each and every subsequent default of the character above mentioned. Upon any termination of the right of the holders of shares of Cumulative Preferred Stock as a class to vote for directors as herein provided, the term of office of all directors then in office elected by the holders of shares of Cumulative Preferred Stock shall terminate immediately.

Any director who shall have been so elected pursuant to this paragraph may be removed at any time, either with or without cause. Any vacancy thereby created may be filled only by the affirmative vote of the holders of shares of Cumulative Preferred Stock voting separately as a class (together with the holders of shares of any other class or series of stock upon which like voting rights have been conferred and are exercisable). If the office of any director elected by the holders of shares of Cumulative Preferred Stock voting as a class becomes vacant for any reason other than removal from office as aforesaid, the remaining director elected pursuant to this paragraph may choose a successor who shall hold office for the unexpired term in respect of which such vacancy occurred. At elections for such directors, each holder of shares of Cumulative Preferred Stock shall be entitled to one vote for each share held (the holders of shares of any other class or series of preferred stock having like voting rights being entitled to such number of votes, if any, for each share of such stock held as may be granted to them).

(b) So long as any shares of Cumulative Preferred Stock remain outstanding, the consent of the holders of at least two-thirds of the shares of Cumulative Preferred Stock outstanding at the time and all other classes or series of stock upon which like voting rights have been conferred and are exercisable (voting together as a class) given

73

in person or by proxy, either in writing or at any meeting called for the purpose, shall be necessary to permit, effect or validate any one or more of the following:

(i) the issuance or increase of the authorized amount of any class or series of shares ranking prior (as that term is defined in paragraph 9(a) hereof) to the shares of the Cumulative Preferred Stock; or

(ii) the amendment, alteration or repeal, whether by merger, consolidation or otherwise, of any of the provisions of the Certificate of Incorporation (including this resolution or any provision hereof) that would materially and adversely affect any power, preference, or special right of the shares of Cumulative Preferred Stock or of the holders thereof; provided, however, that any increase in the amount of authorized Common Stock or authorized Preferred Stock or any increase or decrease in the number of shares of any series of Preferred Stock or the creation and issuance of other series of Common Stock or Preferred Stock, in each case ranking on a parity with or junior to the shares of Cumulative Preferred Stock with respect to the payment of dividends and the distribution of assets upon liquidation, dissolution or winding up, shall not be deemed to materially and adversely affect such powers, preferences or special rights.

(c) The foregoing voting provisions shall not apply if, at or prior to the time when the act with respect to which such vote would otherwise be required shall be effected, all outstanding shares of Cumulative Preferred Stock shall have been redeemed or called for redemption and sufficient funds shall have been deposited in trust to effect such redemption.

6. <u>Redemption.</u> The shares of the Cumulative Preferred Stock may be redeemed at the option of the Corporation, as a whole, or from time to time, in part, at any time, upon not less than 30 days' prior notice mailed to the holders of the shares to be redeemed at their addresses as shown on the stock books of the Corporation; provided, however, that shares of the

74

Cumulative Preferred Stock shall not be redeemable prior to February 28, 2000. Subject to the foregoing, on or after such date, shares of the Cumulative Preferred Stock are redeemable at $200.00 per share together with an amount equal to all dividends (whether or not earned or declared) accrued and accumulated and unpaid to, but excluding, the date fixed for redemption.

If full cumulative dividends on the Cumulative Preferred Stock have not been paid, the Cumulative Preferred Stock may not be redeemed in part and the Corporation may not purchase or acquire any shares of the Cumulative Preferred Stock otherwise than pursuant to a purchase or exchange offer made on the same terms to all holders of the Cumulative Preferred Stock. If fewer than all the outstanding shares of Cumulative Preferred Stock are to be redeemed, the Corporation will select those to be redeemed by lot or a substantially equivalent method.

If a notice of redemption has been given pursuant to this paragraph 6 and if, on or before the date fixed for redemption, the funds necessary for such redemption shall have been set aside by the Corporation, separate and apart from its other funds, in trust for the pro rata benefit of the holders of the shares of Cumulative Preferred Stock so called for redemption, then, notwithstanding that any certificates for such shares have not been surrendered for cancelation, on the redemption date dividends shall cease to accrue on the shares to be redeemed, and at the close of business on the redemption date the holders of such shares shall cease to be stockholders with respect to such shares and shall have no interest in or claims against the Corporation by virtue thereof and shall have no voting or other rights with respect to such shares, except the right to receive the moneys payable upon surrender (and endorsement, if required by the Corporation) of their certificates, and the shares evidenced thereby shall no longer be outstanding. Subject to applicable escheat laws, any moneys so set aside by the Corporation and unclaimed at the end of two years from the redemption date shall revert to the general funds of the Corporation, after which reversion the holders of such shares so called for redemption shall look only to the general funds of the Corporation for the payment of the amounts payable upon such redemption. Any interest accrued on funds so deposited shall be paid to the Corporation from time to time.

7. <u>Authorization and Issuance of Other Securities.</u> No consent of the holders of the Cumulative Preferred Stock shall be required for (a) the creation of any indebtedness of any kind of the Corporation, (b) the creation, or increase or decrease in the amount, of any class or series of stock of the Corporation not ranking prior as to dividends or upon liquidation, dissolution or winding up to the Cumulative Preferred Stock or (c) any increase or decrease in the amount of authorized Common Stock or any increase, decrease or change in the par value thereof or in any other terms thereof.

8. <u>Amendment of Resolution.</u> The Board and the Committee each reserves the right by subsequent amendment of this resolution from time to time to increase or decrease the number of shares that constitute the Cumulative Preferred Stock (but not below the number of shares thereof then outstanding) and in other respects to amend this resolution within the limitation provided by law, this resolution and the Certificate of Incorporation.

9. <u>Rank.</u> For the purposes of this resolution, any stock of any class or classes of the Corporation shall be deemed to rank:

(a) prior to shares of the Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, if the holders of stock of such class or classes shall be entitled by the terms thereof to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of shares of the Cumulative Preferred Stock;

(b) on a parity with shares of the Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, whether or not the dividend rates, dividend payment dates, or redemption or liquidation prices per share thereof be different from those of the Cumulative Preferred Stock, if the holders of stock of such class or classes shall be entitled by the terms thereof to the receipt of dividends or of amounts distributed upon liquidation, dissolution or winding up, as the case may be, in proportion to their respective dividend rates or

liquidation prices, without preference or priority of one over the other as between the holders of such stock and the holders of shares of Cumulative Preferred Stock (the term "Parity Preferred Stock" being used to refer to any stock on a parity with the shares of Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, as the context may require); and

(c) junior to shares of the Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, if such class shall be Common Stock or if the holders of the Cumulative Preferred Stock shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of stock of such class or classes.

The Cumulative Preferred Stock shall rank prior, as to dividends and upon liquidation, dissolution or winding up, to the Common Stock and the Corporation's Series A Junior Participating Preferred Stock, and on a parity with (i) the Corporation's ESOP Convertible Preferred Stock, with a liquidation value of $35.88 per share, (ii) the Corporation's 7 3/8% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (iii) the Corporation's 7 3/4% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (iv) the Corporation's Series A Fixed/ Adjustable Rate Preferred Stock, with a liquidation value of $200.00 per share, (v) if issued, the Corporation's 7.82% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (vi) if issued, the Corporation's 7.80% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (vii) if issued, the Corporation's 8.40% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (viii) if issued, the Corporation's 8.20% Cumulative Preferred Stock, with a liquidation value of $200.00 per share and (ix) if issued, the Corporation's 8.03% Cumulative Preferred Stock, with a liquidation value of $200.00 per share.

B. This Certificate of Designation shall not become effective until, and shall become effective at, 12:01 a.m. on May 31, 1997.

IN WITNESS WHEREOF, Dean Witter, Discover & Co. has caused this Certificate of Designation to be signed by Christine A. Edwards, its Executive Vice President, General Counsel and Secretary, this 30th day of May, 1997.

DEAN WITTER, DISCOVER & CO.

By:      /s/ Christine A. Edwards

Name:  Christine A. Edwards

Title:   Executive Vice President,
          General Counsel & Secretary

78

CERTIFICATE OF DESIGNATION OF PREFERENCES AND RIGHTS
OF THE
8.40% CUMULATIVE PREFERRED STOCK

($200.00 Stated Value)

OF

DEAN WITTER, DISCOVER & CO.

Pursuant to Section 151 of the
General Corporation Law of the State of Delaware

The undersigned DOES HEREBY CERTIFY:

A. The following resolution was duly adopted by the Board of Directors (the "Board") of Dean Witter, Discover & Co., a Delaware corporation (hereinafter called the "Corporation"), by unanimous vote thereof at a meeting on May 28, 1997:

RESOLVED that, pursuant to authority expressly granted to and vested in the Board by provisions of the Amended and Restated Certificate of Incorporation of the Corporation (the "Certificate of Incorporation"), the issuance of a series of Preferred Stock, par value $0.01 per share (the "Preferred Stock"), which shall consist of 996,776 of the shares of Preferred Stock which the Corporation has authority to issue, is authorized, and the Board hereby fixes the powers, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, of the shares of such series (in addition to the powers, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, set forth in the Certificate of Incorporation which may be applicable to the Preferred Stock) as follows:

1. Designation and Amount; Fractional Shares. The designation for such series of the Preferred Stock authorized by this resolution shall be the 8.40% Cumulative Preferred Stock, par value $0.01 per share, with a stated value of $200.00 per share (the "Cumulative Preferred Stock"). The stated value per share of Cumulative Preferred Stock shall not for any purpose be considered to be a determination by the

79

Board with respect to the capital and surplus of the Corporation. The total number of shares of Cumulative Preferred Stock shall be 996,776. The Cumulative Preferred Stock is issuable in whole shares only.

2. <u>Dividends.</u> Holders of shares of Cumulative Preferred Stock will be entitled to receive, when, as and if declared by the Board or the Committee (as hereinafter defined) out of assets of the Corporation legally available for payment, cash dividends payable quarterly at the rate of 8.40% per annum. Dividends on the Cumulative Preferred Stock will be payable quarterly on February 28, May 30, August 30 and November 30 (each a "dividend payment date"). Dividends on shares of the Cumulative Preferred Stock will be cumulative from the date of initial issuance of such shares of Cumulative Preferred Stock. Dividends will be payable, in arrears, to holders of record as they appear on the stock books of the Corporation on such record dates, not more than 60 days nor less than 10 days preceding the payment dates thereof, as shall be fixed by the Board or the Committee. The amount of dividends payable for the initial dividend period or any period shorter than a full dividend period shall be calculated on the basis of a 360-day year of twelve 30-day months. No dividends may be declared or paid or set apart for payment on any Parity Preferred Stock (as defined in paragraph 9(b) below) with regard to the payment of dividends unless there shall also be or have been declared and paid or set apart for payment on the Cumulative Preferred Stock, like dividends for all dividend payment periods of the Cumulative Preferred Stock ending on or before the dividend payment date of such Parity Preferred Stock, ratably in proportion to the respective amounts of dividends (x) accumulated and unpaid or payable on such Parity Preferred Stock, on the one hand, and (y) accumulated and unpaid through the dividend payment period or periods of the Cumulative Preferred Stock next preceding such dividend payment date, on the other hand. For the purposes of this Certificate of Designation, the "Committee" shall mean any committee of the Board to whom the Board, pursuant to Section 141 (c) of the General Corporation Law of the State of Delaware, delegates authority to perform the functions of the Board set forth in this Certificate of Designation.

Except as set forth in the preceding sentence, unless full cumulative dividends on the Cumulative Preferred Stock have been paid, no dividends (other than in Common Stock of the Corporation) may be paid or

80

declared and set aside for payment or other distribution made upon the Common Stock or on any other stock of the Corporation ranking junior to or on a parity with the Cumulative Preferred Stock as to dividends, nor may any Common Stock or any other stock of the Corporation ranking junior to or on a parity with the Cumulative Preferred Stock as to dividends be redeemed, purchased or otherwise acquired for any consideration (or any payment be made to or available for a sinking fund for the redemption of any shares of such stock; provided, however, that any moneys theretofore deposited in any sinking fund with respect to any Preferred Stock of the Corporation in compliance with the provisions of such sinking fund may thereafter be applied to the purchase or redemption of such Preferred Stock in accordance with the terms of such sinking fund, regardless of whether at the time of such application full cumulative dividends upon shares of the Cumulative Preferred Stock outstanding to the last dividend payment date shall have been paid or declared and set apart for payment) by the Corporation; provided that any such junior or parity Preferred Stock or Common Stock may be converted into or exchanged for stock of the Corporation ranking junior to the Cumulative Preferred Stock as to dividends.

  3. <u>Liquidation Preference.</u> The shares of Cumulative Preferred Stock shall rank, as to liquidation, dissolution or winding up of the Corporation, prior to the shares of Common Stock and any other class of stock of the Corporation ranking junior to the Cumulative Preferred Stock as to rights upon liquidation, dissolution or winding up of the Corporation, so that in the event of any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the holders of the Cumulative Preferred Stock shall be entitled to receive out of the assets of the Corporation available for distribution to its stockholders, whether from capital, surplus or earnings, before any distribution is made to holders of shares of Common Stock or any other such junior stock, an amount equal to $200.00 per share (the "Liquidation Preference" of a share of Cumulative Preferred Stock) plus an amount equal to all dividends (whether or not earned or declared) accrued and accumulated and unpaid on the shares of Cumulative Preferred Stock to the date of final distribution. The holders of the Cumulative Preferred Stock will not be entitled to receive the Liquidation Preference until the liquidation preference of any other class of stock of the Corporation ranking senior to the Cumulative Preferred Stock as to rights

upon liquidation, dissolution or winding up shall have been paid (or a sum set aside therefor sufficient to provide for payment) in full. After payment of the full amount of the Liquidation Preference and such dividends, the holders of shares of Cumulative Preferred Stock will not be entitled to any further participation in any distribution of assets by the Corporation. If, upon any liquidation, dissolution or winding up of the Corporation, the assets of the Corporation, or proceeds thereof, distributable among the holders of shares of Parity Preferred Stock shall be insufficient to pay in full the preferential amount aforesaid, then such assets, or the proceeds thereof, shall be distributable among such holders ratably in accordance with the respective amounts which would be payable on such shares if all amounts payable thereon were paid in full. For the purposes hereof, neither a consolidation or merger of the Corporation with or into any other corporation, nor a merger of any other corporation with or into the Corporation, nor a sale or transfer of all or any part of the Corporation's assets for cash or securities shall be considered a liquidation, dissolution or winding up of the Corporation.

4. <u>Conversion.</u> The Cumulative Preferred Stock is not convertible into shares of any other class or series of stock of the Corporation.

5. <u>Voting Rights.</u> The holders of shares of Cumulative Preferred Stock shall have no voting rights whatsoever, except for any voting rights to which they may be entitled under the laws of the State of Delaware, and except as follows:

(a) Whenever, at any time or times, dividends payable on the shares of Cumulative Preferred Stock or on any Parity Preferred Stock with respect to payment of dividends, shall be in arrears for an aggregate number of days equal to six calendar quarters or more, whether or not consecutive, the holders of the outstanding shares of Cumulative Preferred Stock shall have the right, with holders of shares of any one or more other class or series of stock upon which like voting rights have been conferred and are exercisable (voting together as a class), to elect two of the authorized number of members of the Board at the Corporation's next annual meeting of stockholders and at each subsequent annual meeting of stockholders until such arrearages have been

82

paid or set apart for payment, at which time such right shall terminate, except as herein or by law expressly provided, subject to revesting in the event of each and every subsequent default of the character above mentioned. Upon any termination of the right of the holders of shares of Cumulative Preferred Stock as a class to vote for directors as herein provided, the term of office of all directors then in office elected by the holders of shares of Cumulative Preferred Stock shall terminate immediately.

Any director who shall have been so elected pursuant to this paragraph may be removed at any time, either with or without cause. Any vacancy thereby created may be filled only by the affirmative vote of the holders of shares of Cumulative Preferred Stock voting separately as a class (together with the holders of shares of any other class or series of stock upon which like voting rights have been conferred and are exercisable). If the office of any director elected by the holders of shares of Cumulative Preferred Stock voting as a class becomes vacant for any reason other than removal from office as aforesaid, the remaining director elected pursuant to this paragraph may choose a successor who shall hold office for the unexpired term in respect of which such vacancy occurred. At elections for such directors, each holder of shares of Cumulative Preferred Stock shall be entitled to one vote for each share held (the holders of shares of any other class or series of preferred stock having like voting rights being entitled to such number of votes, if any, for each share of such stock held as may be granted to them).

(b) So long as any shares of Cumulative Preferred Stock remain outstanding, the consent of the holders of at least two-thirds of the shares of Cumulative Preferred Stock outstanding at the time and all other classes or series of stock upon which like voting rights have been conferred and are exercisable (voting together as a class) given in person or by proxy, either in writing or at any meeting called for the purpose, shall be necessary to permit, effect or validate any one or more of the following:

(i) the issuance or increase of the authorized amount of any class or series of shares ranking prior (as that term is defined in paragraph 9(a) hereof) to the shares of the Cumulative Preferred Stock; or

83

(ii) the amendment, alteration or repeal, whether by merger, consolidation or otherwise, of any of the provisions of the Certificate of Incorporation (including this resolution or any provision hereof) that would materially and adversely affect any power, preference, or special right of the shares of Cumulative Preferred Stock or of the holders thereof; provided, however, that any increase in the amount of authorized Common Stock or authorized Preferred Stock or any increase or decrease in the number of shares of any series of Preferred Stock or the creation and issuance of other series of Common Stock or Preferred Stock, in each case ranking on a parity with or junior to the shares of Cumulative Preferred Stock with respect to the payment of dividends and the distribution of assets upon liquidation, dissolution or winding up, shall not be deemed to materially and adversely affect such powers, preferences or special rights.

(c) The foregoing voting provisions shall not apply if, at or prior to the time when the act with respect to which such vote would otherwise be required shall be effected, all outstanding shares of Cumulative Preferred Stock shall have been redeemed or called for redemption and sufficient funds shall have been deposited in trust to effect such redemption.

6. <u>Redemption.</u> The shares of the Cumulative Preferred Stock may be redeemed at the option of the Corporation, as a whole, or from time to time in part, at any time, upon not less than 30 days' prior notice mailed to the holders of the shares to be redeemed at their addresses as shown on the stock books of the Corporation; provided, however, that shares of the Cumulative Preferred Stock shall not be redeemable prior to August 30, 2000. Subject to the foregoing, on or after such date, shares of the Cumulative Preferred Stock are redeemable at $200.00 per share together with an amount equal to all dividends (whether or not earned or declared) accrued and accumulated and unpaid to, but excluding, the date fixed for redemption.

If full cumulative dividends on the Cumulative Preferred Stock have not been paid, the Cumulative Preferred Stock may not be redeemed in part and the Corporation may not purchase or acquire any shares of the Cumulative Preferred Stock otherwise than pursuant to a purchase or exchange offer made on the same terms to all holders of the Cumulative Preferred Stock. If fewer than all the outstanding shares of Cumulative Preferred Stock are to be redeemed, the Corporation will select those to be redeemed by lot or a substantially equivalent method.

If a notice of redemption has been given pursuant to this paragraph 6 and if, on or before the date fixed for redemption, the funds necessary for such redemption shall have been set aside by the Corporation, separate and apart from its other funds, in trust for the pro rata benefit of the holders of the shares of Cumulative Preferred Stock so called for redemption, then, notwithstanding that any certificates for such shares have not been surrendered for cancelation, on the redemption date dividends shall cease to accrue on the shares to be redeemed, and at the close of business on the redemption date the holders of such shares shall cease to be stockholders with respect to such shares and shall have no interest in or claims against the Corporation by virtue thereof and shall have no voting or other rights with respect to such shares, except the right to receive the moneys payable upon surrender (and endorsement, if required by the Corporation) of their certificates, and the shares evidenced thereby shall no longer be outstanding. Subject to applicable escheat laws, any moneys so set aside by the Corporation and unclaimed at the end of two years from the redemption date shall revert to the general funds of the Corporation, after which reversion the holders of such shares so called for redemption shall look only to the general funds of the Corporation for the payment of the amounts payable upon such redemption. Any interest accrued on funds so deposited shall be paid to the Corporation from time to time.

7.  Authorization and Issuance of Other Securities. No consent of the holders of the Cumulative Preferred Stock shall be required for (a) the creation of any indebtedness of any kind of the Corporation, (b) the creation, or increase or decrease in the amount, of any class or series of stock of the Corporation not ranking prior as to dividends or upon liquidation, dissolution or winding up to the Cumulative Preferred Stock or (c) any increase or decrease in the amount of authorized Common Stock or any increase, decrease or change in the par value thereof or in any other terms thereof.

8. <u>Amendment of Resolution.</u> The Board and the Committee each reserves the right by subsequent amendment of this resolution from time to time to increase or decrease the number of shares that constitute the Cumulative Preferred Stock (but not below the number of shares thereof then outstanding) and in other respects to amend this resolution within the limitations provided by law, this resolution and the Certificate of Incorporation.

9. <u>Rank.</u> For the purposes of this resolution, any stock of any class or classes of the Corporation shall be deemed to rank:

(a) prior to shares of the Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, if the holders of stock of such class or classes shall be entitled by the terms thereof to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of shares of the Cumulative Preferred Stock;

(b) on a parity with shares of the Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, whether or not the dividend rates, dividend payment dates, or redemption or liquidation prices per share thereof be different from those of the Cumulative Preferred Stock, if the holders of stock of such class or classes shall be entitled by the terms thereof to the receipt of dividends or of amounts distributed upon liquidation, dissolution or winding up, as the case may be, in proportion to their respective dividend rates or liquidation prices, without preference or priority of one over the other as between the holders of such stock and the holders of shares of Cumulative Preferred Stock (the term "Parity Preferred Stock" being used to refer to any stock on a parity with the shares of Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, as the context may require); and

(c) junior to shares of the Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, if such class shall be Common Stock or if the holders of the Cumulative Preferred Stock shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of stock of such class or classes.

The Cumulative Preferred Stock shall rank prior, as to dividends and upon liquidation, dissolution or winding up, to the Common Stock and the Corporation's Series A Junior Participating Preferred Stock, and on a parity with (i) the Corporation's ESOP Convertible Preferred Stock, with a liquidation value of $35.88 per share, (ii) the Corporation's 7 $^3/8$% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (iii) the Corporation's 7 $^3/4$% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (iv) the Corporation's Series A Fixed/ Adjustable Rate Preferred Stock, with a liquidation value of $200.00 per share, (v) if issued, the Corporation's 7.82% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (vi) if issued, the Corporation's 7.80% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (vii) if issued, the Corporation's 9.00% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (viii) if issued, the Corporation's 8.20% Cumulative Preferred Stock, with a liquidation value of $200.00 per share and (ix) if issued, the Corporation's 8.03% Cumulative Preferred Stock, with a liquidation value of $200.00 per share.

B. This Certificate of Designation shall not become effective until, and shall become effective at, 12:01 a.m. on May 31, 1997.

IN WITNESS WHEREOF, Dean Witter, Discover & Co. has caused this Certificate of Designation to be signed by Christine A. Edwards, its Executive Vice President, General Counsel and Secretary, this 30th day of May, 1997.

DEAN WITTER, DISCOVER & CO.

By:    /s/ Christine A. Edwards
Name:  Christine A. Edwards
Title:   Executive Vice President,
        General Counsel & Secretary

88

CERTIFICATE OF DESIGNATION OF PREFERENCES AND RIGHTS

OF THE

8.20% CUMULATIVE PREFERRED STOCK

($200.00 Stated Value)

OF

DEAN WITTER, DISCOVER & CO.

Pursuant to Section 151 of the

General Corporation Law of the State of Delaware

The undersigned DOES HEREBY CERTIFY:

A. The following resolution was duly adopted by the Board of Directors (the "Board") of Dean Witter, Discover & Co., a Delaware corporation (hereinafter called the "Corporation"), by unanimous vote thereof at a meeting on May 28, 1997:

RESOLVED that, pursuant to authority expressly granted to and vested in the Board by provisions of the Amended and Restated Certificate of Incorporation of the Corporation (the "Certificate of Incorporation"), the issuance of a series of Preferred Stock, par value $0.01 per share (the "Preferred Stock"), which shall consist of 847,500 of the shares of Preferred Stock which the Corporation has authority to issue, is authorized, and the Board hereby fixes the powers, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, of the shares of such series (in addition to the powers, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, set forth in the Certificate of Incorporation which may be applicable to the Preferred Stock) as follows:

1. Designation and Amount; Fractional Shares. The designation for such series of the Preferred Stock authorized by this resolution shall be the 8.20% Cumulative Preferred Stock, par value $0.01 per share,

89

with a stated value of $200.00 per share (the "Cumulative Preferred Stock"). The stated value per share of Cumulative Preferred Stock shall not for any purpose be considered to be a determination by the Board with respect to the capital and surplus of the Corporation. The total number of shares of Cumulative Preferred Stock shall be 847,500. The Cumulative Preferred Stock is issuable in whole shares only.

    2. <u>Dividends.</u> Holders of shares of Cumulative Preferred Stock will be entitled to receive, when, as and if declared by the Board or the Committee (as hereinafter defined) out of assets of the Corporation legally available for payment, cash dividends payable quarterly at the rate of 8.20% per annum. Dividends on the Cumulative Preferred Stock will be payable quarterly on February 28, May 30, August 30 and November 30 (each a "dividend payment date"). Dividends on shares of the Cumulative Preferred Stock will be cumulative from the date of initial issuance of such shares of Cumulative Preferred Stock. Dividends will be payable, in arrears, to holders of record as they appear on the stock books of the Corporation on such record dates, not more than 60 days nor less than 10 days preceding the payment dates thereof, as shall be fixed by the Board or the Committee. The amount of dividends payable for the initial dividend period or any period shorter than a full dividend period shall be calculated on the basis of a 360-day year of twelve 30-day months. No dividends may be declared or paid or set apart for payment on any Parity Preferred Stock (as defined in paragraph 9(b) below) with regard to the payment of dividends unless there shall also be or have been declared and paid or set apart for payment on the Cumulative Preferred Stock, like dividends for all dividend payment periods of the Cumulative Preferred Stock ending on or before the dividend payment date of such Parity Preferred Stock, ratably in proportion to the respective amounts of dividends (x) accumulated and unpaid or payable on such Parity Preferred Stock, on the one hand, and (y) accumulated and unpaid through the dividend payment period or periods of the Cumulative Preferred Stock next preceding such dividend payment date, on the other hand. For the purposes of this Certificate of Designation, the "Committee" shall mean any committee of the Board to whom the Board, pursuant to Section 141 (c) of the General Corporation Law of the State of Delaware, delegates authority to perform the functions of the Board set forth in this Certificate of Designation.

90

Except as set forth in the preceding sentence, unless full cumulative dividends on the Cumulative Preferred stock have been paid, no dividends (other than in Common Stock of the Corporation) may be paid or declared and set aside for payment or other distribution made upon the Common Stock or on any other stock of the Corporation ranking junior to or on a parity with the Cumulative Preferred Stock as to dividends, nor may any Common Stock or any other stock of the Corporation ranking junior to or on a parity with the Cumulative Preferred Stock as to dividends be redeemed, purchased or otherwise acquired for any consideration (or any payment be made to or available for a sinking fund for the redemption of any shares of such stock; provided, however, that any moneys theretofore deposited in any sinking fund with respect to any Preferred Stock of the Corporation in compliance with the provisions of such sinking fund may thereafter be applied to the purchase or redemption of such Preferred Stock in accordance with the terms of such sinking fund, regardless of whether at the time of such application full cumulative dividends upon shares of the Cumulative Preferred Stock outstanding to the last dividend payment date shall have been paid or declared and set apart for payment) by the Corporation; provided that any such junior or parity Preferred Stock or Common Stock may be converted into or exchanged for stock of the Corporation ranking junior to the Cumulative Preferred Stock as to dividends.

3. Liquidation Preference. The shares of Cumulative Preferred Stock shall rank, as to liquidation, dissolution or winding up of the Corporation, prior to the shares of Common Stock and any other class of stock of the Corporation ranking junior to the Cumulative Preferred Stock as to rights upon liquidation, dissolution or winding up of the Corporation, so that in the event of any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the holders of the Cumulative Preferred Stock shall be entitled to receive out of the assets of the Corporation available for distribution to its stockholders, whether from capital, surplus or earnings, before any distribution is made to holders of shares of Common Stock or any other such junior stock, an amount equal to $200.00 per share (the "Liquidation Preference" of a share of Cumulative Preferred Stock) plus an amount equal to all dividends (whether or not earned or declared) accrued and accumulated and unpaid on the shares of Cumulative Preferred Stock to the date

91

of final distribution. The holders of the Cumulative Preferred Stock will not be entitled to receive the Liquidation Preference until the liquidation preference of any other class of stock of the Corporation ranking senior to the Cumulative Preferred Stock as to rights upon liquidation, dissolution or winding up shall have been paid (or a sum set aside therefor sufficient to provide for payment) in full. After payment of the full amount of the Liquidation Preference and such dividends, the holders of shares of Cumulative Preferred Stock will not be entitled to any further participation in any distribution of assets by the Corporation. If, upon any liquidation, dissolution or winding up of the Corporation, the assets of the Corporation, or proceeds thereof, distributable among the holders of shares of Parity Preferred Stock shall be insufficient to pay in full the preferential amount aforesaid, then such assets, or the proceeds thereof, shall be distributable among such holders ratably in accordance with the respective amounts which would be payable on such shares if all amounts payable thereon were paid in full. For the purposes hereof, neither a consolidation or merger of the Corporation with or into any other corporation, nor a merger of any other corporation with or into the Corporation, nor a sale or transfer of all or any part of the Corporation's assets for cash or securities shall be considered a liquidation, dissolution or winding up of the Corporation.

4. <u>Conversion.</u> The Cumulative Preferred Stock is not convertible into shares of any other class or series of stock of the Corporation.

5. <u>Voting Rights.</u> The holders of shares of Cumulative Preferred Stock shall have no voting rights whatsoever, except for any voting rights to which they may be entitled under the laws of the State of Delaware, and except as follows:

(a) Whenever, at any time or times, dividends payable on the shares of Cumulative Preferred Stock or on any Parity Preferred Stock with respect to payment of dividends, shall be in arrears for an aggregate number of days equal to six calendar quarters or more, whether or not consecutive, the holders of the outstanding shares of Cumulative Preferred Stock shall have the right, with holders of shares of any one or more other class or series of stock upon which like

voting rights have been conferred and are exercisable (voting together as a class), to elect two of the authorized number of members of the Board at the Corporation's next annual meeting of stockholders and at each subsequent annual meeting of stockholders until such arrearages have been paid or set apart for payment, at which time such right shall terminate, except as herein or by law expressly provided, subject to revesting in the event of each and every subsequent default of the character above mentioned. Upon any termination of the right of the holders of shares of Cumulative Preferred Stock as a class to vote for directors as herein provided, the term of office of all directors then in office elected by the holders of shares of Cumulative Preferred Stock shall terminate immediately.

Any director who shall have been so elected pursuant to this paragraph may be removed at any time, either with or without cause. Any vacancy thereby created may be filled only by the affirmative vote of the holders of shares of Cumulative Preferred Stock voting separately as a class (together with the holders of shares of any other class or series of stock upon which like voting rights have been conferred and are exercisable). If the office of any director elected by the holders of shares of Cumulative Preferred Stock voting as a class becomes vacant for any reason other than removal from office as aforesaid, the remaining director elected pursuant to this paragraph may choose a successor who shall hold office for the unexpired term in respect of which such vacancy occurred. At elections for such directors, each holder of shares of Cumulative Preferred Stock shall be entitled to one vote for each share held (the holders of shares of any other class or series of preferred stock having like voting rights being entitled to such number of votes, if any, for each share of such stock held as may be granted to them).

(b) So long as any shares of Cumulative Preferred Stock remain outstanding, the consent of the holders of at least two-thirds of the shares of Cumulative Preferred Stock outstanding at the time and all other classes or series of stock upon which like voting rights have been conferred and are exercisable (voting together as a class) given

in person or by proxy, either in writing or at any meeting called for the purpose, shall be necessary to permit, effect or validate any one or more of the following:

(i) the issuance or increase of the authorized amount of any class or series of shares ranking prior (as that term is defined in paragraph 9(a) hereof) to the shares of the Cumulative Preferred Stock; or

(ii) the amendment, alteration or repeal, whether by merger, consolidation or otherwise, of any of the provisions of the Certificate of Incorporation (including this resolution or any provision hereof) that would materially and adversely affect any power, preference, or special right of the shares of Cumulative Preferred Stock or of the holders thereof; provided, however, that any increase in the amount of authorized Common Stock or authorized Preferred Stock or any increase or decrease in the number of shares of any series of Preferred Stock or the creation and issuance of other series of Common Stock or Preferred Stock, in each case ranking on a parity with or junior to the shares of Cumulative Preferred Stock with respect to the payment of dividends and the distribution of assets upon liquidation, dissolution or winding up, shall not be deemed to materially and adversely affect such powers, preferences or special rights.

(c) The foregoing voting provisions shall not apply if, at or prior to the time when the act with respect to which such vote would otherwise be required shall be effected, all outstanding shares of Cumulative Preferred Stock shall have been redeemed or called for redemption and sufficient funds shall have been deposited in trust to effect such redemption.

6. <u>Redemption.</u> The shares of the Cumulative Preferred Stock may be redeemed at the option of the Corporation, as a whole, or from time to time in part, at any time, upon not less than 30 days' prior notice mailed to the holders of the shares to be redeemed at their addresses as shown on the stock books of the Corporation; provided, however, that shares of the

94

Cumulative Preferred Stock shall not be redeemable prior to November 30, 2000. Subject to the foregoing, on or after such date, shares of the Cumulative Preferred Stock are redeemable at $200.00 per share together with an amount equal to all dividends (whether or not earned or declared) accrued and accumulated and unpaid to, but excluding, the date fixed for redemption.

If full cumulative dividends on the Cumulative Preferred Stock have not been paid, the Cumulative Preferred Stock may not be redeemed in part and the Corporation may not purchase or acquire any shares of the Cumulative Preferred Stock otherwise than pursuant to a purchase or exchange offer made on the same terms to all holders of the Cumulative Preferred Stock. If fewer than all the outstanding shares of Cumulative Preferred Stock are to be redeemed, the Corporation will select those to be redeemed by lot or a substantially equivalent method.

If a notice of redemption has been given pursuant to this paragraph 6 and if, on or before the date fixed for redemption, the funds necessary for such redemption shall have been set aside by the Corporation, separate and apart from its other funds, in trust for the pro rata benefit of the holders of the shares of Cumulative Preferred Stock so called for redemption, then, notwithstanding that any certificates for such shares have not been surrendered for cancelation, on the redemption date dividends shall cease to accrue on the shares to be redeemed, and at the close of business on the redemption date the holders of such shares shall cease to be stockholders with respect to such shares and shall have no interest in or claims against the Corporation by virtue thereof and shall have no voting or other rights with respect to such shares, except the right to receive the moneys payable upon surrender (and endorsement, if required by the Corporation) of their certificates, and the shares evidenced thereby shall no longer be outstanding. Subject to applicable escheat laws, any moneys so set aside by the Corporation and unclaimed at the end of two years from the redemption date shall revert to the general funds of the Corporation, after which reversion the holders of such shares so called for redemption shall look only to the general funds of the Corporation for the payment of the amounts payable upon such redemption. Any interest accrued on funds so deposited shall be paid to the Corporation from time to time.

95

7. <u>Authorization and Issuance of Other Securities.</u> No consent of the holders of the Cumulative Preferred Stock shall be required for (a) the creation of any indebtedness of any kind of the Corporation, (b) the creation, or increase or decrease in the amount, of any class or series of stock of the Corporation not ranking prior as to dividends or upon liquidation, dissolution or winding up to the Cumulative Preferred Stock or (c) any increase or decrease in the amount of authorized Common Stock or any increase, decrease or change in the par value thereof or in any other terms thereof.

8. <u>Amendment of Resolution.</u> The Board and the Committee each reserves the right by subsequent amendment of this resolution from time to time to increase or decrease the number of shares that constitute the Cumulative Preferred Stock (but not below the number of shares thereof then outstanding) and in other respects to amend this resolution within the limitations provided by law, this resolution and the Certificate of Incorporation.

9. <u>Rank.</u> For the purposes of this resolution, any stock of any class or classes of the Corporation shall be deemed to rank:

(a) prior to shares of the Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, if the holders of stock of such class or classes shall be entitled by the terms thereof to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of shares of the Cumulative Preferred Stock;

(b) on a parity with shares of the Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both whether or not the dividend rates, dividend payment dates, or redemption or liquidation prices per share thereof be different from those of the Cumulative Preferred Stock, if the holders of stock of such class or classes shall be entitled by the terms thereof to the receipt of dividends or of amounts distributed upon liquidation, dissolution or winding up, as the case may be, in proportion to their respective dividend rates or

96

liquidation prices, without preference or priority of one over the other as between the holders of such stock and the holders of shares of Cumulative Preferred Stock (the term "Parity Preferred Stock" being used to refer to any stock on a parity with the shares of Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, as the context may require); and

(c) junior to shares of the Cumulative Preferred stock, either as to dividends or upon liquidation, dissolution or winding up, or both, if such class shall be Common Stock or if the holders of the Cumulative Preferred Stock shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of stock of such class or classes.

The Cumulative Preferred Stock shall rank prior, as to dividends and upon liquidation, dissolution or winding up, to the Common Stock and the Corporation's Series A Junior Participating Preferred Stock, and on a parity with (i) the Corporation's ESOP Convertible Preferred Stock, with a liquidation value of $35.88 per share, (ii) the Corporation's 7 3/8% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (iii) the Corporation's 7 3/4% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (iv) the Corporation's Series A Fixed/Adjustable Rate Preferred Stock, with a liquidation value of $200.00 per share, (v) if issued, the Corporation's 7.82% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (vi) if issued, the Corporation's 7.80% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (vii) if issued, the Corporation's 9.00% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (viii) if issued, the Corporation's 8.40% Cumulative Preferred Stock, with a liquidation value of $200.00 per share and (ix) if issued, the Corporation's 8.03% Cumulative Preferred Stock, with a liquidation value of $200.00 per share.

B. This Certificate of Designation shall not become effective until, and shall become effective at, 12:01 a.m. on May 31, 1997.

    IN WITNESS WHEREOF, Dean Witter, Discover & Co. has caused this Certificate of Designation to be signed by Christine A. Edwards, its Executive Vice President, General Counsel and Secretary, this 30th day of May, 1997.

DEAN WITTER, DISCOVER & CO.

By:    /s/ Christine A. Edwards
Name:  Christine A. Edwards
Title:   Executive Vice President,
         General Counsel & Secretary

98

CERTIFICATE OF DESIGNATION OF PREFERENCES AND RIGHTS

OF THE

7 $^3$/4% CUMULATIVE PREFERRED STOCK

($200.00 Stated Value)

OF

DEAN WITTER, DISCOVER & CO.

Pursuant to Section 151 of the

General Corporation Law of the State of Delaware

The undersigned DOES HEREBY CERTIFY:

A. The following resolution was duly adopted by the Board of Directors (the "Board") of Dean Witter, Discover & Co., a Delaware corporation (hereinafter called the "Corporation"), by unanimous vote thereof at a meeting on May 28, 1997:

RESOLVED that, pursuant to authority expressly granted to and vested in the Board by provisions of the Amended and Restated Certificate of Incorporation of the Corporation (the "Certificate of Incorporation"), the issuance of a series of Preferred Stock, par value $0.01 per share (the "Preferred Stock"), which shall consist of 1,000,000 of the shares of Preferred Stock which the Corporation has authority to issue, is authorized, and the Board hereby fixes the powers, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, of the shares of such series (in addition to the powers, designations, preferences and relative participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, set forth in the Certificate of Incorporation which may be applicable to the Preferred Stock) as follows:

1. Designation and Amount; Fractional Shares. The designation for such series of the Preferred Stock authorized by this resolution shall be the 7 $^3$/4% Cumulative Preferred Stock, par value $0.01 per share, with a stated value of $200.00 per share (the

99

"Cumulative Preferred Stock"). The stated value per share of Cumulative Preferred Stock shall not for any purpose be considered to be a determination by the Board with respect to the capital and surplus of the Corporation. The number of shares of Cumulative Preferred Stock shall be 1,000,000. The Cumulative Preferred Stock is issuable in whole shares only.

2. <u>Dividends.</u> (a) Holders of shares of Cumulative Preferred Stock will be entitled to receive, when, as and if declared by the Board or the Committee (as hereinafter defined) out of assets of the Corporation legally available for payment, cash dividends payable quarterly at the rate of 7 $^3/_4$% per annum. Dividends on the Cumulative Preferred Stock, calculated as a percentage of the stated value, will be payable quarterly on February 28, May 30, August 30 and November 30 (each a "dividend payment date"). Dividends on shares of the Cumulative Preferred Stock will be cumulative from the date of initial issuance of such shares of Cumulative Preferred Stock. Dividends will be payable, in arrears, to holders of record as they appear on the stock books of the Corporation on such record dates, not more than 60 days nor less than 10 days preceding the payment dates thereof, as shall be fixed by the Board or the Committee. The amount of dividends payable for the initial dividend period or any period shorter than a full dividend period shall be calculated on the basis of a 360-day year of twelve 30-day months. No dividends may be declared or paid or set apart for payment on any Parity Preferred Stock (as such term is defined in paragraph 9(b) below) with regard to the payment of dividends unless there shall also be or have been declared and paid or set apart for payment on the Cumulative Preferred Stock, like dividends for all dividend payment periods of the Cumulative Preferred Stock ending on or before the dividend payment date of such Parity Preferred Stock, ratably in proportion to the respective amounts of dividends (x) accumulated and unpaid or payable on such Parity Preferred Stock, on the one hand, and (y) accumulated and unpaid through the dividend payment period or periods of the Cumulative Preferred Stock next preceding such dividend payment date, on the other hand. For the purposes of this Certificate of Designation, the "Committee" shall mean any committee of the Board to whom the Board, pursuant to Section 141(c) of the General Corporation Law of the State of Delaware, delegates authority to perform the functions of the Board set forth in this Certificate of Designation.

100

Except as set forth in the preceding sentence, unless full cumulative dividends on the Cumulative Preferred Stock have been paid, no dividends (other than in Common Stock of the Corporation) may be paid or declared and set aside for payment or other distribution made upon the Common Stock or on any other stock of the Corporation ranking junior to or on a parity with the Cumulative Preferred Stock as to dividends, nor may any Common Stock or any other stock of the Corporation ranking junior to or on a parity with the Cumulative Preferred Stock as to dividends be redeemed, purchased or otherwise acquired for any consideration (or any payment be made to or available for a sinking fund for the redemption of any shares of such stock; provided, however, that any moneys theretofore deposited in any sinking fund with respect to any Preferred Stock of the Corporation in compliance with the provisions of such sinking fund may thereafter be applied to the purchase or redemption of such Preferred Stock in accordance with the terms of such sinking fund, regardless of whether at the time of such application full cumulative dividends upon shares of the Cumulative Preferred Stock outstanding to the last dividend payment date shall have been paid or declared and set apart for payment) by the Corporation; provided that any such junior or parity Preferred Stock or Common Stock may be converted into or exchanged for stock of the Corporation ranking junior to the Cumulative Preferred Stock as to dividends.

(b) If one or more amendments to the Internal Revenue Code of 1986, as amended (the "Code"), are enacted that reduce the percentage of the dividends received deduction as specified in Section 243(a)(1) of the Code or any successor provision (the "Dividends Received Percentage") to below 70%, the amount of each dividend payable per share of the Cumulative Preferred Stock for dividend payments made on or after the date of enactment of such change will be adjusted by multiplying the amount of the dividend payable determined as described above (before adjustment) by a factor, which will be the number determined in accordance with the following formula (the "DRD Formula"), and rounding the result to the nearest cent:

$$\frac{1 - (.35(1 - .70))}{1 - (.35(1 - DRP))}$$

101

For the purposes of the DRD Formula, "DRP" means the Dividends Received Percentage applicable to the dividend in question. No amendment to the Code, other than a change in the percentage of the dividends received deduction set forth in Section 243(a)(1) of the Code or any successor provision, will give rise to an adjustment. Notwithstanding the foregoing provisions, in the event that, with respect to any such amendment, the Corporation will receive either an unqualified opinion of nationally recognized independent tax counsel selected by the Corporation or a private letter ruling or similar form of authorization from the Internal Revenue Service to the effect that such an amendment would not apply to dividends payable on the Cumulative Preferred Stock, then any such amendment will not result in the adjustment provided for pursuant to the DRD Formula. The opinion referenced in the previous sentence will be based upon a specific exception in the legislation amending the DRP or upon a published pronouncement of the Internal Revenue Service addressing such legislation. Unless the context otherwise requires, references to dividends in this Certificate of Designation will mean dividends as adjusted by the DRD Formula. The Corporation's calculation of the dividends payable, as so adjusted and as certified accurate as to calculation and reasonable as to method by the independent certified public accountants then regularly engaged by the Corporation, will be final and not subject to review absent manifest error.

If any amendment to the Code which reduces the Dividends Received Percentage to below 70% is enacted after a dividend payable on a dividend payment date has been declared, the amount of dividend payable on such dividend payment date will not be increased. Instead, an amount, equal to the excess of (x) the product of the dividends paid by the Corporation on such dividend payment date and the DRD Formula (where the DRP used in the DRD Formula would be equal to the reduced Dividends Received Percentage) over (y) the dividends paid by the Corporation on such dividend payment date, will be payable to holders of record on the next succeeding dividend payment date in addition to any other amounts payable on such date.

In the event that the amount of dividends payable per share of the Cumulative Preferred Stock will be adjusted pursuant to the DRD Formula, the Corporation will cause notice of each such adjustment to be sent to

102

the holders of record as they appear on the stock books of the Corporation on such record dates, not more than 60 days nor less than 10 days preceding the payment dates thereof as shall be fixed by the Board or the Committee.

In the event that the Dividends Received Percentage is reduced to 40% or less, the Corporation may, at its option, redeem the Cumulative Preferred Stock, in whole but not in part, as described in paragraph 6 hereof.

3. <u>Liquidation Preference</u>. The shares of Cumulative Preferred Stock shall rank, as to liquidation, dissolution or winding up of the Corporation, prior to the shares of Common Stock and any other class of stock of the Corporation ranking junior to the Cumulative Preferred Stock as to rights upon liquidation, dissolution or winding up of the Corporation, so that in the event of any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the holders of the Cumulative Preferred Stock shall be entitled to receive out of the assets of the Corporation available for distribution to its stockholders, whether from capital, surplus or earnings, before any distribution is made to holders of shares of Common Stock or any other such junior stock, an amount equal to $200.00 per share (the "Liquidation Preference" of a share of Cumulative Preferred Stock) plus an amount equal to all dividends (whether or not earned or declared) accrued and accumulated and unpaid on the shares of Cumulative Preferred Stock to the date of final distribution. The holders of the Cumulative Preferred Stock will not be entitled to receive the Liquidation Preference until the liquidation preference of any other class of stock of the Corporation ranking senior to the Cumulative Preferred Stock as to rights upon liquidation, dissolution or winding up shall have been paid (or a sum set aside therefor sufficient to provide for payment) in full. After payment of the full amount of the Liquidation Preference and such dividends, the holders of shares of Cumulative Preferred Stock will not be entitled to any further participation in any distribution of assets by the Corporation. If, upon any liquidation, dissolution or winding up of the Corporation, the assets of the Corporation, or proceeds thereof, distributable among the holders of shares of Parity Preferred Stock shall be insufficient to pay in full the preferential amount aforesaid, then such assets, or the proceeds thereof,

103

shall be distributable among such holders ratably in accordance with the respective amounts which would be payable on such shares if all amounts payable thereon were paid in full. For the purposes hereof, neither a consolidation or merger of the Corporation with or into any other corporation, nor a merger of any other corporation with or into the Corporation, nor a sale or transfer of all or any part of the Corporation's assets for cash or securities shall be considered a liquidation, dissolution or winding up of the Corporation.

4. <u>Conversion</u>. The Cumulative Preferred Stock is not convertible into shares of any other class or series of stock of the Corporation.

5. <u>Voting Rights</u>. The holders of Shares of Cumulative Preferred Stock shall have no voting rights whatsoever, except for any voting rights to which they may be entitled under the laws of the State of Delaware, and except as follows:

(a) Whenever, at any time or times, dividends payable on the shares of Cumulative Preferred Stock or on any Parity Preferred Stock with respect to payment of dividends, shall be in arrears for an aggregate number of days equal to six calendar quarters or more, whether or not consecutive, the holders of the outstanding shares of Cumulative Preferred Stock shall have the right, with holders of shares of any one or more other class or series of stock upon which like voting rights have been conferred and are exercisable (voting together as a class), to elect two of the authorized number of members of the Board at the Corporation's next annual meeting of stockholders and at each subsequent annual meeting of stockholders until such arrearages have been paid or set apart for payment, at which time such right shall terminate, except as herein or by law expressly provided, subject to revesting in the event of each and every subsequent default of the character above mentioned. Upon any termination of the right of the holders of shares of Cumulative Preferred Stock as a class to vote for directors as herein provided, the term of office of all directors then in office elected by the holders of shares of Cumulative Preferred Stock shall terminate immediately.

Any director who shall have been so elected pursuant to this paragraph may be removed at any time, either with or without cause. Any vacancy thereby created may be filled only by the affirmative vote of the holders of shares of Cumulative Preferred Stock voting separately as a class (together with the holders of shares of any other class or series of stock upon which like voting rights have been conferred and are exercisable). If the office of any director elected by the holders of shares of Cumulative Preferred Stock voting as a class becomes vacant for any reason other than removal from office as aforesaid, the remaining director elected pursuant to this paragraph may choose a successor who shall hold office for the unexpired term in respect of which such vacancy occurred. At elections for such directors, each holder of shares of Cumulative Preferred Stock shall be entitled to one vote for each share held (the holders of shares of any other class or series of preferred stock having like voting rights being entitled to such number of votes, if any, for each share of such stock held as may be granted to them).

(b) So long as any shares of Cumulative Preferred Stock remain outstanding, the consent of the holders of at least two-thirds of the shares of Cumulative Preferred Stock outstanding at the time and all other classes or series of stock upon which like voting rights have been conferred and are exercisable (voting together as a class) given in person or by proxy, either in writing or at any meeting called for the purpose, shall be necessary to permit, effect or validate any one or more of the following:

(i) the issuance or increase of the authorized amount of any class or series of shares ranking prior (as that term is defined in paragraph 9(a) hereof) to the shares of the Cumulative Preferred Stock; or

(ii) the amendment, alteration or repeal, whether by merger, consolidation or otherwise of any of the provisions of the Certificate of Incorporation (including this resolution or any provision hereof) that would materially and adversely affect any power, preference, or special right of the shares of

105

Cumulative Preferred Stock or of the holders thereof; provided, however, that any increase in the amount of authorized Common Stock or authorized Preferred Stock or any increase or decrease in the number of shares of any series of Preferred Stock or the creation and issuance of other series of Common Stock or Preferred Stock, in each case ranking on a parity with or junior to the shares of Cumulative Preferred Stock with respect to the payment of dividends and the distribution of assets upon liquidation, dissolution or winding up, shall not be deemed to materially and adversely affect such powers, preferences or special rights.

(c) The foregoing voting provisions shall not apply if, at or prior to the time when the act with respect to which such vote would otherwise be required shall be effected, all outstanding shares of Cumulative Preferred Stock shall have been redeemed or called for redemption and sufficient funds shall have been deposited in trust to effect such redemption.

6. <u>Redemption</u>. The shares of the Cumulative Preferred Stock may be redeemed at the option of the Corporation, as a whole, or from time to time in part, at any time, upon not less than 30 days' prior notice mailed to the holders of the shares to be redeemed at their addresses as shown on the stock books of the Corporation; provided, however, that shares of the Cumulative Preferred Stock shall not be redeemable prior to August 30, 2001, except as stated below. Subject to the foregoing, on or after such date, shares of the Cumulative Preferred Stock are redeemable at $200.00 per share together with an amount equal to all dividends (whether or not earned or declared) accrued and accumulated and unpaid to, but excluding, the date fixed for redemption.

If full cumulative dividends on the Cumulative Preferred Stock have not been paid, the Cumulative Preferred Stock may not be redeemed in part and the Corporation may not purchase or acquire any shares of the Cumulative Preferred Stock otherwise than pursuant to a purchase or exchange offer made on the same terms to all holders of the Cumulative Preferred Stock. If fewer than all the outstanding shares of Cumulative Preferred Stock are to be redeemed, the Corporation will select those to be redeemed by lot or a substantially equivalent method.

If a notice of redemption has been given pursuant to this paragraph 6 and if, on or before the date fixed for redemption, the funds necessary for such redemption shall have been set aside by the Corporation, separate and apart from its other funds, in trust for the pro rata benefit of the holders of the shares of Cumulative Preferred Stock so called for redemption, then, notwithstanding that any certificates for such shares have not been surrendered for cancellation, on the redemption date dividends shall cease to accrue on the shares to be redeemed, and at the close of business on the redemption date the holders of such shares shall cease to be stockholders with respect to such shares and shall have no interest in or claims against the Corporation by virtue thereof and shall have no voting or other rights with respect to such shares, except the right to receive the moneys payable upon surrender (and endorsement, if required by the Corporation) of their certificates, and the shares evidenced thereby shall no longer be outstanding. Subject to applicable escheat laws, any moneys so set aside by the Corporation and unclaimed at the end of two years from the redemption date shall revert to the general funds of the Corporation, after which reversion the holders of such shares so called for redemption shall look only to the general funds of the Corporation for the payment of the amounts payable upon such redemption. Any interest accrued on funds so deposited shall be paid to the Corporation from time to time.

Notwithstanding the foregoing provisions, if the Dividends Received Percentage is equal to or less than 40% and, as a result, the amount of dividends on the Cumulative Preferred Stock payable on any dividend payment date will be or is adjusted upwards as described in paragraph 2(b) hereof, the Corporation, at its option, may redeem all, but not less than all, of the outstanding shares of the Cumulative Preferred Stock (and the Depositary Shares) (a "Dividends Received Deduction Redemption"); provided that within sixty days of the date on which an amendment to the Code is enacted which reduces the Dividends Received Percentage to 40% or less, the Corporation sends notice to holders of the Cumulative Preferred Stock relating to any Dividends Received Deduction Redemption of such redemption. A redemption of the Cumulative Preferred Stock will take place on the date specified in the

107

notice, which shall be not less than thirty nor more than sixty days from the date such notice is sent to holders of the Cumulative Preferred Stock. A Dividends Received Deduction Redemption shall be at the applicable redemption price set forth in the following table, in each case plus accrued and unpaid dividends (whether or not declared) thereon to but excluding the date fixed for redemption, including any changes in dividends payable due to changes in the Dividends Received Percentage, if any:

| | Redemption Price | |
|---|---|---|
| Redemption Period | Per Share | Per Depositary Share |
| May 31, 1997 to August 29, 1997 | $210.00 | $ 52.50 |
| August 30, 1997 to August 29, 1998 | 208.00 | 52.00 |
| August 30, 1998 to August 29, 1999 | 206.00 | 51.50 |
| August 30, 1999 to August 29, 2000 | 204.00 | 51.00 |
| August 30, 2000 to August 29, 2001 | 202.00 | 50.50 |
| On or after August 30, 2001 | 200.00 | 50.00 |

7. <u>Authorization and Issuance of Other Securities</u>. No consent of the holders of the Cumulative Preferred Stock shall be required for (a) the creation of any indebtedness of any kind of the Corporation, (b) the creation, or increase or decrease in the amount, of any class or series of stock of the Corporation not ranking prior as to dividends or upon liquidation, dissolution or winding up to the Cumulative Preferred Stock or (c) any increase or decrease in the amount of authorized Common Stock or any increase, decrease or change in the par value thereof or in any other terms thereof.

8. <u>Amendment of Resolution</u>. The Board and the Committee each reserves the right by subsequent amendment of this resolution from time to time to increase or decrease the number of shares that constitute the Cumulative Preferred Stock (but not below the number of shares thereof then outstanding) and in other respects to amend this resolution within the limitations provided by law, this resolution and the Certificate of Incorporation.

9. <u>Rank</u>. For the purposes of this resolution, any stock of any class or classes of the Corporation shall be deemed to rank:

(a) prior to shares of the Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both,

if the holders of stock of such class or classes shall be entitled by the terms thereof to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of shares of the Cumulative Preferred Stock;

(b) on a parity with shares of the Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, whether or not the dividend rates, dividend payment dates, or redemption or liquidation prices per share thereof be different from those of the Cumulative Preferred Stock, if the holders of stock of such class or classes shall be entitled by the terms thereof to the receipt of dividends or of amounts distributed upon liquidation, dissolution or winding up, as the case may be, in proportion to their respective dividend rates or liquidation prices, without preference or priority of one over the other as between the holders of such stock and the holders of shares of Cumulative Preferred Stock (the term "Parity Preferred Stock" being used to refer to any stock on a parity with the shares of Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, as the context may require); and

(c) junior to shares of the Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, if such class shall be Common Stock or if the holders of the Cumulative Preferred Stock shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of stock of such class or classes.

The Cumulative Preferred Stock shall rank prior, as to dividends and upon liquidation, dissolution or winding up, to the Common Stock and the Corporation's Series A Junior Participating Preferred Stock, and on a parity with (i) the Corporation's ESOP Convertible Preferred Stock, with a liquidation value of $35.88 per share, (ii) the Corporation's 7 $^3/_8$% Cumulative Preferred Stock, with a liquidation value of $200.00 per

109

share, (iii) the Corporation's Series A Fixed/Adjustable Rate Preferred Stock, with a liquidation value of $200.00 per share, (iv) if issued, the Corporation's 7.82% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (v) if issued, the Corporation's 7.80% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (vi) if issued, the Corporation's 9.00% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (vii) if issued, the Corporation's 8.40% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (viii) if issued, the Corporation's 8.20% Cumulative Preferred Stock, with a liquidation value of $200.00 per share and (ix) if issued, the Corporation's 8.03% Cumulative Preferred Stock, with a liquidation value of $200.00 per share.

110

B. This Certificate of Designation shall not become effective until, and shall become effective at, 12:01 a.m. on May 31, 1997.

IN WITNESS WHEREOF, Dean Witter, Discover & Co. has caused this Certificate of Designation to be signed by Christine A. Edwards, its Executive Vice President, General Counsel and Secretary, this 30th day of May, 1997.

DEAN WITTER, DISCOVER & CO.

By:     /s/ Christine A. Edwards
Name:  Christine A. Edwards
Title:   Executive Vice President,
          General Counsel & Secretary

111

CERTIFICATE OF DESIGNATION OF PREFERENCES AND RIGHTS

OF THE

SERIES A FIXED/ADJUSTABLE RATE PREFERRED STOCK

($200.00 Stated Value)

OF

DEAN WITTER, DISCOVER & CO.

Pursuant to Section 151 of the

General Corporation Law of the State of Delaware

The undersigned DOES HEREBY CERTIFY:

A. The following resolution was duly adopted by the Board of Directors (the "Board") of Dean Witter, Discover & Co., a Delaware corporation (hereinafter called the "Corporation"), by unanimous vote thereof at a meeting on May 28, 1997:

RESOLVED that, pursuant to authority expressly granted to and vested in the Board by provisions of the Amended and Restated Certificate of Incorporation of the Corporation (the "Certificate of Incorporation"), the issuance of a series of Preferred Stock, par value $0.01 per share (the "Preferred Stock"), which shall consist of 1,725,000 of the shares of Preferred Stock which the Corporation has authority to issue, is authorized, and the Board hereby fixes the powers, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, of the shares of such series (in addition to the powers, designations, preferences and relative participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, set forth in the Certificate of Incorporation which may be applicable to the Preferred Stock) as follows:

1. <u>Designation and Amount; Fractional Shares.</u> The designation for such series of the Preferred Stock authorized by this resolution

112

shall be the Series A Fixed/Adjustable Rate Cumulative Preferred Stock, par value $0.01 per share, with a stated value of $200.00 per share (the "Series A Fixed/Adjustable Rate Preferred Stock"). The stated value per share of Series A Fixed/Adjustable Rate Preferred Stock shall not for any purpose be considered to be a determination by the Board with respect to the capital and surplus of the Corporation. The number of shares of Series A Fixed/Adjustable Rate Preferred Stock shall be 1,725,000. The Series A Fixed/Adjustable Rate Preferred Stock is issuable in whole shares only.

    2. <u>Dividends.</u> (a) Holders of shares of Series A Fixed/Adjustable Rate Preferred Stock will be entitled to receive cash dividends, when, as and if declared by the Board or the Committee (as hereinafter defined) out of assets of the Corporation legally available for payment. Dividends on the Series A Fixed/Adjustable Rate Preferred Stock, calculated as a percentage of the stated value, will be payable quarterly on February 28, May 30, August 30 and November 30 (each a "dividend payment date"). From the date of issuance of the Series A Fixed/Adjustable Rate Preferred Stock and continuing through November 30, 2001, the rate of such dividend will be 5.91% per annum. For the purposes of this Certificate of Designation, the "Committee" shall mean any committee of the Board to whom the Board, pursuant to Section 141(c) of the General Corporation Law of the State of Delaware, delegates authority to perform the functions of the Board set forth in this Certificate of Designation.

After November 30, 2001, dividends on the Series A Fixed/Adjustable Rate Preferred Stock will be payable quarterly on each dividend payment date at the Applicable Rate (as defined in paragraph 3) from time to time in effect. The Applicable Rate per annum for any dividend period beginning on or after November 30, 2001 will be equal to .37% plus the highest of the Treasury Bill Rate, the Ten-Year Constant Maturity Rate and the Thirty-Year

Constant Maturity Rate (each as defined in paragraph 3), as determined in advance of such dividend period. The Applicable Rate per annum for any dividend period beginning on or after November 30, 2001, will not be less then 6.41% nor greater then 12.41% (without taking into account any adjustments set forth in paragraph 2(b)).

Dividends on shares of the Series A Fixed/Adjustable Rate Preferred Stock will be cumulative from the date of initial issuance of such shares of Series A Fixed/Adjustable Rate Preferred Stock. Dividends will be payable, in arrears, to holders of record as they appear on the stock books of the Corporation on such record dates, not more than 60 days nor less than 10 days preceding the payment dates thereof, as shall be fixed by the Board or the Committee. The amount of dividends payable for the initial dividend period or any period shorter than a full dividend period shall be calculated on the basis of a 360- day year of twelve 30-day months. No dividends may be declared or paid or set apart for payment on any Parity Preferred Stock (as defined in paragraph 10(b)) with regard to the payment of dividends unless there shall also be or have been declared and paid or set apart for payment on the Series A Fixed/Adjustable Rate Preferred Stock, like dividends for all dividend payment periods of the Series A Fixed/Adjustable Rate Preferred Stock ending on or before the dividend payment date of such Parity Preferred Stock ratably in proportion to the respective amounts of dividends (x) accumulated and unpaid or payable on such Parity Preferred Stock, on the one hand, and (y) accumulated and unpaid through the dividend payment period or periods of the Series A Fixed/Adjustable Rate Preferred Stock next preceding such dividend payment date, on the other hand.

Except as set forth in the preceding sentence, unless full cumulative dividends on the Series A Fixed/Adjustable Rate Preferred Stock have been paid, no dividends (other than in Common Stock of the Corporation) may be paid or declared

114

and set aside for payment or other distribution made upon the Common Stock or on any other stock of the Corporation ranking junior to or on a parity with the Series A Fixed/Adjustable Rate Preferred Stock as to dividends, nor may any Common Stock or any other stock of the Corporation ranking junior to or on a parity with the Series A Fixed/Adjustable Rate Preferred Stock as to dividends be redeemed, purchased or otherwise acquired for any consideration (or any payment be made to or available for a sinking fund for the redemption of any shares of such stock; provided, however, that any moneys theretofore deposited in any sinking fund with respect to any preferred stock of the Corporation in compliance with the provisions of such sinking fund may thereafter be applied to the purchase or redemption of such preferred stock in accordance with the terms of such sinking fund, regardless of whether at the time of such application full cumulative dividends upon shares of the Series A Fixed/Adjustable Rate Preferred Stock outstanding to the last dividend payment date shall have been paid or declared and set apart for payment) by the Corporation; provided that any such junior or parity Preferred Stock or Common Stock may be converted into or exchanged for stock of the Corporation ranking junior to the Series A Fixed/Adjustable Rate Preferred Stock as to dividends.

(b) If one or more amendments to the Internal Revenue Code of 1986, as amended (the "Code"), are enacted that reduce the percentage of the dividends received deduction as specified in Section 243(a)(1) of the Code or any successor provision (the "Dividends Received Percentage") to below 70%, the amount of each dividend payable per share of the Series A Fixed/Adjustable Rate Preferred Stock for dividend payments made on or after the date of enactment of such change will be adjusted by multiplying the amount of the dividend payable determined as described above (before adjustment) by a factor, which will be the number determined in accordance with the following

115

formula (the "DRD Formula"), and rounding the result to the nearest cent:

$$\frac{1 - (.35\ (1 - .70))}{1 - (.35\ (1 - \text{DRP}))}$$

For the purposes of the DRD Formula, "DRP" means the Dividends Received Percentage applicable to the dividend in question. No amendment to the Code, other than a change in the percentage of the dividends received deduction set forth in Section 243(a)(1) of the Code or any successor provision, will give rise to an adjustment. Notwithstanding the foregoing provisions, in the event that, with respect to any such amendment, the Corporation will receive either an unqualified opinion of nationally recognized independent tax counsel selected by the Corporation or a private letter ruling or similar form of authorization from the Internal Revenue Service to the effect that such an amendment would not apply to dividends payable on the Series A Fixed/Adjustable Rate Preferred Stock, then any such amendment will not result in the adjustment provided for pursuant to the DRD Formula. The opinion referenced in the previous sentence will be based upon a specific exception in the legislation amending the DRP or upon a published pronouncement of the Internal Revenue Service addressing such legislation. Unless the context otherwise requires, references to dividends in this Certificate of Designation will mean dividends as adjusted by the DRD Formula. The Corporation's calculation of the dividends payable, as so adjusted and as certified accurate as to calculation and reasonable as to method by the independent certified public accountants then regularly engaged by the Corporation, will be final and not subject to review absent manifest error.

If any amendment to the Code which reduces the Dividends Received Percentage to below 70% is enacted after a dividend payable on a dividend payment date has been declared, the amount of dividend payable on such dividend payment date

116

will not be increased. Instead, an amount, equal to the excess of (x) the product of the dividends paid by the Corporation on such dividend payment date and the DRD Formula (where the DRP used in the DRD Formula would be equal to the reduced Dividends Received Percentage) over (y) the dividends paid by the Corporation on such dividend payment date, will be payable on the next succeeding dividend payment date to holders of record in addition to any other amounts payable on such date.

In addition, if prior to May 31, 1997, an amendment to the Code is enacted that reduces the Dividends Received Percentage to below 70% and such reduction retroactively applies to a dividend payment date of the Series A Fixed/Adjustable Rate Cumulative Preferred Stock, no par value, with a stated value of $200.00 per share ("Morgan Stanley Series A Fixed/Adjustable Rate Preferred Stock") of Morgan Stanley Group Inc. ("Morgan Stanley") as to which Morgan Stanley previously paid dividends on the Morgan Stanley Series A Fixed/Adjustable Rate Preferred Stock (each an "Affected Dividend Payment Date"), holders of the Series A Fixed/Adjustable Rate Preferred Stock shall be entitled to receive when, as and if declared by the Board out of assets of the corporation legally available for payment, additional dividends (the "Additional Dividends") on the next succeeding dividend payment date (or if such amendment is enacted after the dividend payable on such dividend payment date has been declared and on or before such dividend is paid, on the second succeeding dividend payment date following the date of enactment) payable on such succeeding dividend payment date to holders of record in an amount equal to the excess of (x) the product of the dividends paid by Morgan Stanley on each Affected Dividend Payment Date and the DRD Formula (where the DRP used in the DRD Formula would be equal to the reduced Dividends Received Percentage applied to each Affected Dividend Payment Date) over (y) the dividends paid by Morgan Stanley on each Affected Dividend Payment Date.

117

Additional Dividends will not be paid in respect of the enactment of any amendment to the Code on or after May 31, 1997 which retroactively reduces the Dividends Received Percentage to below 70%, or if prior to May 31, 1997, such amendment would not result in an adjustment due to the Corporation having received either an opinion of counsel or tax ruling referred to in the third preceding paragraph. The Corporation will only make one payment of Additional Dividends.

In the event that the amount of dividends payable per share of the Series A Fixed/Adjustable Rate Preferred Stock will be adjusted pursuant to the DRD Formula and/or Additional Dividends are to be paid, the Corporation will cause notice of each such adjustment and, if applicable, any Additional Dividends, to be sent to the holders of record as they appear on the stock books of the Corporation on such record date, not more than 60 days nor less than 10 days preceding the payment date thereof as shall be fixed by the Board or the Committee.

In the event that the Dividends Received Percentage is reduced to 50% or less, the Corporation may, at its option, redeem the Series A Fixed/Adjustable Rate Preferred Stock, in whole but not in part, as described in paragraph 7 hereof.

3. Applicable Rate. Except as provided above in paragraph 2, the "Applicable Rate" per annum for any dividend period beginning on or after November 30, 2001 will be equal to .37% plus the Effective Rate (as defined herein), but not less than 6.41% nor greater than 12.41% (without taking into account any adjustments as described in paragraph 2(b)). The "Effective Rate" for any dividend period beginning on or after November 30, 2001 will be equal to the highest of the Treasury Bill Rate, the Ten-Year Constant Maturity Rate and the Thirty-Year Constant Maturity Rate (each as defined herein) for such dividend period. If the Corporation determines in good faith that for any reason: (i) any one of the Treasury Bill Rate, the

118

Ten-Year Constant Maturity Rate or the Thirty-Year Constant Maturity Rate cannot be determined for any dividend period beginning on or after November 30, 2001, then the Effective Rate for such dividend period will be equal to the higher of whichever two of such rates can be so determined; (ii) only one of the Treasury Bill Rate, the Ten-Year Constant Maturity Rate or the Thirty-Year Constant Maturity Rate can be determined for any dividend period beginning on or after November 30, 2001, then the Effective Rate for such dividend period will be equal to whichever such rate can be so determined; or (iii) none of the Treasury Bill Rate, the Ten-Year Constant Maturity Rate or the Thirty-Year Constant Maturity Rate can be determined for any dividend period beginning on or after November 30, 2001, then the Effective Rate for the preceding dividend period will be continued for such dividend period.

The "Treasury Bill Rate" for each dividend period will be the arithmetic average of the two most recent weekly per annum market discount rates (or the one weekly per annum market discount rate, if only one such rate is published during the relevant Calendar Period (as defined herein) for three-month U.S. Treasury bills, as published weekly by the Federal Reserve Board (as defined herein) during the Calendar Period immediately preceding the tenth calendar day preceding the dividend period for which the dividend rate on the Series A Fixed/Adjustable Rate Preferred Stock is being determined.

The "Ten-Year Constant Maturity Rate" for each dividend period will be the arithmetic average of the two most recent weekly per annum Ten-Year Average Yields (as defined herein) (or the one weekly per annum Ten-Year Average Yield, if only one such yield is published during the relevant Calendar Period), as published weekly by the Federal Reserve Board during the Calendar Period immediately preceding the tenth calendar day preceding the dividend period for which the dividend rate on the Series A Fixed/Adjustable Rate Preferred Stock is being determined.

119

The "Thirty-Year Constant Maturity Rate" for each dividend period will be the arithmetic average of the two most recent weekly per annum Thirty-Year Average Yields (as defined herein) the one weekly per annum Thirty-Year Average Yield, if only one such yield is published during the relevant Calendar Period), as published weekly by the Federal Reserve Board during the Calendar Period immediately preceding the tenth calendar day preceding the dividend period for which the dividend rate on the Series A Fixed/Adjustable Rate Preferred Stock is being determined.

If the Federal Reserve Board does not publish a weekly per annum market discount rate, Ten-Year Average Yield or Thirty-Year Average Yield during any applicable Calendar Period, then the Treasury Bill Rate, Ten-Year Constant Maturity Rate or Thirty-Year Constant Maturity Rate, as the case may be, for such dividend period will be the arithmetic average of the two most recent weekly per annum market discount rates for three-month U.S. Treasury bills, Ten-Year Average Yields or Thirty-Year Average Yields, as the case may be (or the one weekly per annum rate, if only one such rate is published during the relevant Calendar Period), as published weekly during such Calendar Period by any Federal Reserve Bank or by any U.S. Government department or agency selected by the Corporation. If any such rate is not published by the Federal Reserve Board or by any Federal Reserve Bank or by any U.S. Government department or agency during such Calendar Period, then the Treasury Bill Rate, Ten-Year Constant Maturity Rate or Thirty-Year Constant Maturity Rate for such dividend period will be the arithmetic average of the two most recent weekly per annum (i) in the case of the Treasury Bill Rate, market discount rates (or the one weekly per annum market discount rate, if only one such rate is published during the relevant Calendar Period) for all of the U.S. Treasury bills then having remaining maturities of not less than 80 nor more than 100 days, and (ii) in the case of the Ten-Year Constant Maturity Rate, average yields to maturity (or the one weekly per annum average yield to

120

maturity, if only one such yield is published during the relevant Calendar Period) for all of the actively traded marketable U.S. Treasury fixed interest rate securities (other then Special Securities (as defined herein)) then having remaining maturities of not less than eight nor more than twelve years, and (iii) in the case of the Thirty-Year Constant Maturity Rate, average yields to maturity (or the one weekly per annum average yield to maturity, if only one such yield is published during the relevant Calendar Period) for all of the actively traded marketable U.S. Treasury fixed interest rate securities (other than Special Securities) then having remaining maturities of not less than twenty-eight nor more than thirty years, in each case as published during such Calendar Period by the Federal Reserve Board or, if the Federal Reserve Board does not publish such rates, by any Federal Reserve Bank or by any U.S. Government department or agency selected by the Corporation. If the Corporation determines in good faith that for any reason (i) no such U.S. Treasury bill rates are published as provided above during such Calendar Period or (ii) the Corporation cannot determine the Treasury Bill Rate for any dividend period; then the Treasury Bill Rate for such dividend period will be the arithmetic average of the per annum market discount rates based upon the closing bids during such Calendar Period for each of the issues of marketable non-interest-bearing U.S. Treasury securities with a remaining maturity of not less than 80 nor more than 100 days from the date of each such quotation, as chosen and quoted daily for each business day in New York City (or less frequently if daily quotations are not generally available) to the Corporation by at least three recognized dealers in U.S. Government securities selected by the Corporation. If the Corporation determines in good faith that for any reason the Corporation cannot determine the Ten-Year Constant Maturity Rate or Thirty-Year Constant Maturity Rate for any dividend period as provided above, then the applicable rate for such dividend period will be the arithmetic average of the per annum average yields to maturity based upon the closing

121

bids during such Calendar Period for each of the issues of actively traded marketable U.S. Treasury fixed interest rate securities (other then Special Securities) with a final maturity date (i) in the case of the Ten-Year Constant Maturity Rate, not less than eight nor more then twelve years from the date of each such quotation, and (ii) in the case of the Thirty-Year Constant Maturity Rate, no less than twenty-eight nor more than thirty years from the date of each such quotation, in each case as chosen and quoted daily for each business day in New York City (or less frequently if daily quotations are not generally available) to the Corporation by at least three recognized dealers in the United States.

The Treasury Bill Rate, the Ten-Year Constant Maturity Rate and the Thirty-Year Constant Maturity Rate will each be rounded to the nearest five hundredths of a percent, with .025% being rounded upward.

The Applicable Rate with respect to each dividend period beginning on or after November 30, 2001 will be calculated as promptly as practicable by the Corporation according to the appropriate method described above. The Corporation will cause notice of each Applicable Rate to be given to the holders of Series A Fixed/Adjustable Rate Preferred Stock when payment is made of the dividend for the immediately preceding dividend period.

As used in this paragraph 3, the term "Calendar Period" means a period of fourteen calendar days; the term "Federal Reserve Board" means the Board of Governors of the Federal Reserve System; the term "Special Securities" means securities which can, at the option of the holder, be surrendered at face value in payment of any Federal estate tax or which provide tax benefits to the holder and are priced to reflect such tax benefits or which were originally issued at a deep or substantial discount; the term "Ten-Year Average Yield" means the average yield to maturity for actively traded marketable U.S.

122

Treasury fixed interest rate securities (adjusted to constant maturities of ten years); and the term "Thirty-Year Average Yield" means the average yield to maturity for actively traded marketable U.S. Treasury fixed interest rate securities (adjusted to constant maturities of thirty years).

    4. <u>Liquidation Preference.</u> The shares of Series A Fixed/Adjustable Rate Preferred Stock shall rank, as to liquidation, dissolution or winding up of the Corporation, prior to the shares of Common Stock and any other class of stock of the Corporation ranking junior to the Series A Fixed/Adjustable Rate Preferred Stock as to rights upon liquidation, dissolution or winding up of the Corporation, so that in the event of any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the holders of the Series A Fixed/Adjustable Rate Preferred Stock shall be entitled to receive out of the assets of the Corporation available for distribution to its stockholders, whether from capital, surplus or earnings, before any distribution is made to holders of shares of Common Stock or any other such junior stock, an amount equal to $200.00 per share (the "Liquidation Preference" of a share of Series A Fixed/Adjustable Rate Preferred Stock) plus an amount equal to all dividends (whether or not earned or declared) accrued and accumulated and unpaid on the shares of Series A Fixed/Adjustable Rate Preferred Stock to the date of final distribution. The holders of the Series A Fixed/Adjustable Rate Preferred Stock will not be entitled to receive the Liquidation Preference until the liquidation preference of any other class of stock of the Corporation ranking senior to the Series A Fixed/Adjustable Rate Preferred Stock as to rights upon liquidation, dissolution or winding up shall have been paid (or a sum set aside therefor sufficient to provide for payment) in full. After payment of the full amount of the Liquidation Preference and such dividends, the holders of shares of Series A Fixed/Adjustable Rate Preferred Stock will not be entitled to any further participation in any distribution of

123

assets by the Corporation. If, upon any liquidation, dissolution or winding up of the Corporation, the assets of the Corporation, or proceeds thereof, distributable among the holders of shares of Parity Preferred Stock shall be insufficient to pay in full the preferential amount aforesaid, then such assets, or the proceeds thereof, shall be distributable among such holders ratably in accordance with the respective amounts which would be payable on such shares if all amounts payable thereon were paid in full. For the purposes hereof, neither a consolidation or merger of the Corporation with or into any other corporation, nor a merger of any other corporation with or into the Corporation, nor a sale or transfer of all or any part of the Corporation's assets for cash or securities shall be considered a liquidation, dissolution or winding up of the Corporation.

5. <u>Conversion.</u> The Series A Fixed/Adjustable Rate Preferred Stock is not convertible into shares of any other class or series of stock of the Corporation.

6. <u>Voting Rights.</u> The holders of shares of Series A Fixed/Adjustable Rate Preferred Stock shall have no voting rights whatsoever, except for any voting rights to which they may be entitled under the laws of the State of Delaware, and except as follows:

(a) Whenever, at any time or times, dividends payable on the shares of Series A Fixed/Adjustable Rate Preferred Stock or on any Parity Preferred Stock with respect to payment of dividends, shall be in arrears for an aggregate number of days equal to six calendar quarters or more, whether or not consecutive, the holders of the outstanding shares of Series A Fixed/Adjustable Rate Preferred Stock shall have the right, with holders of shares of any one or more other class or series of stock upon which like voting rights have been conferred and are exercisable (voting together as a class), to

124

elect two of the authorized number of members of the Board at the Corporation's next annual meeting of stockholders and at each subsequent annual meeting of stockholders until such arrearages have been paid or set apart for payment, at which time such right shall terminate, except as herein or by law expressly provided, subject to revesting in the event of each and every subsequent default of the character above mentioned. Upon any termination of the right of the holders of shares of Series A Fixed/Adjustable Rate Preferred Stock as a class to vote for directors as herein provided, the term of office of all directors then in office elected by the holders of shares of Series A Fixed/Adjustable Rate Preferred Stock shall terminate immediately.

Any director who shall have been so elected pursuant to this paragraph may be removed at any time, either with or without cause. Any vacancy thereby created may be filled only by the affirmative vote of the holders of shares of Series A Fixed/Adjustable Rate Preferred Stock voting separately as a class (together with the holders of shares of any other class or series of stock upon which like voting rights have been conferred and are exercisable). If the office of any director elected by the holders of shares of Series A Fixed/Adjustable Rate Preferred Stock voting as a class becomes vacant for any reason other than removal from office as aforesaid, the remaining director elected pursuant to this paragraph may choose a successor who shall hold office for the unexpired term in respect of which such vacancy occurred. At elections for such directors, each holder of shares of Series A Fixed/Adjustable Rate Preferred Stock shall be entitled to one vote for each share held (the holders of shares of any other class or series of Preferred Stock having like voting rights being entitled to such number of votes, if any, for each share of such stock held as may be granted to them).

125

(b) So long as any shares of Series A Fixed/Adjustable Rate Preferred Stock remain outstanding, the consent of the holders of at least two-thirds of the shares of Series A Fixed/Adjustable Rate Preferred Stock outstanding at the time and all other classes or series of stock upon which like voting rights have been conferred and are exercisable (voting together as a class) given in person or by proxy, either in writing or at any meeting called for the purpose, shall be necessary to permit, effect or validate any one or more of the following:

(i) the issuance or increase of the authorized amount of any class or series of shares ranking prior (as that term is defined in paragraph 10(a) hereof) to the shares of the Series A Fixed/Adjustable Rate Preferred Stock; or

(ii) the amendment, alteration or repeal, whether by merger, consolidation or otherwise, of any of the provisions of the Certificate of Incorporation (including this resolution or any provision hereof) that would materially and adversely affect any power, preference, or special right of the shares of Series A Fixed/Adjustable Rate Preferred Stock or of the holders thereof; provided, however, that any increase in the amount of authorized Common Stock or authorized Preferred Stock or any increase or decrease in the number of shares of any series of Preferred Stock or the creation and issuance of other series of Common Stock or Preferred Stock, in each case ranking on a parity with or junior to the shares of Series A Fixed/Adjustable Rate Preferred Stock with respect to the

126

payment of dividends and the distribution of assets upon liquidation, dissolution or winding up, shall not be deemed to materially and adversely affect such powers, preferences or special rights.

(c) The foregoing voting provisions shall not apply if, at or prior to the time when the act with respect to which such vote would otherwise be required shall be effected, all outstanding shares of Series A Fixed/Adjustable Rate Preferred Stock shall have been redeemed or called for redemption and sufficient funds shall have been deposited in trust to effect such redemption.

7. <u>Redemption.</u> The shares of the Series A Fixed/Adjustable Rate Preferred Stock may be redeemed at the option of the Corporation, as a whole, or from time to time in part, at any time, upon not less than 30 days' prior notice mailed to the holders of the shares to be redeemed at their addresses as shown on the stock books of the Corporation; provided, however, that shares of the Series A Fixed/Adjustable Rate Preferred Stock shall not be redeemable prior to November 30, 2001, except as stated below. Subject to the foregoing, on or after such date, shares of the Series A Fixed/Adjustable Rate Preferred Stock are redeemable at $200.00 per share together with an amount equal to all dividends (whether or not earned or declared) accrued and accumulated and unpaid to, but excluding, the date fixed for redemption.

If full cumulative dividends on the Series A Fixed/Adjustable Rate Preferred Stock have not been paid, the Series A Fixed/Adjustable Rate Preferred Stock may not be redeemed in part and the Corporation may not purchase or acquire any shares of the Series A Fixed/Adjustable Rate Preferred Stock otherwise than pursuant to a purchase or exchange offer made on the same terms to all holders of the Series A Fixed/Adjustable Rate Preferred Stock. If fewer than all the

127

outstanding shares of Series A Fixed/Adjustable Rate Preferred Stock are to be redeemed, the Corporation will select those to be redeemed by lot or a substantially equivalent method.

If a notice of redemption has been given pursuant to this paragraph 7 and if, on or before the date fixed for redemption, the funds necessary for such redemption shall have been set aside by the Corporation, separate and apart from its other funds, in trust for the pro rata benefit of the holders of the shares of Series A Fixed/Adjustable Rate Preferred Stock so called for redemption, then, notwithstanding that any certificates for such shares have not been surrendered for cancellation, on the redemption date dividends shall cease to accrue on the shares to be redeemed, and at the close of business on the redemption date the holders of such shares shall cease to be stockholders with respect to such shares and shall have no interest in or claims against the Corporation by virtue thereof and shall have no voting or other rights with respect to such shares, except the right to receive the moneys payable upon surrender (and endorsement, if required by the Corporation) of their certificates, and the shares evidenced thereby shall no longer be outstanding. Subject to applicable escheat laws, any moneys so set aside by the Corporation and unclaimed at the end of two years from the redemption date shall revert to the general funds of the Corporation, after which reversion the holders of such shares so called for redemption shall look only to the general funds of the Corporation for the payment of the amounts payable upon such redemption. Any interest accrued on funds so deposited shall be paid to the Corporation from time to time.

Notwithstanding the foregoing provisions, if the Dividends Received Percentage is equal to or less than 50% and, as a result, the amount of dividends on the Series A Fixed/Adjustable Rate Preferred Stock payable on any dividend payment date will be or is adjusted upwards as described in paragraph 2(b) hereof, the Corporation, at its

128

option, may redeem all, but not less than all, of the outstanding shares of the Series A Fixed/Adjustable Rate Preferred Stock (the Depositary Shares) (a "Dividends Received Deduction Redemption") provided that within sixty days of the date on which an amendment to the Code is enacted which reduces the Dividends Received Percentage to 50% or less, the Corporation sends notice to holders of the Series A Fixed/Adjustable Rate Preferred Stock of such redemption. A Dividends Received Deduction Redemption, in accordance with this paragraph, will take place on the date specified in the notice, which shall be not less than thirty nor more then sixty days from the date such notice is sent to holders of the Series A Fixed/Adjustable Rate Preferred Stock. A Dividends Received Deduction Redemption shall be at the applicable redemption price set forth in the following table, in each case plus accrued and unpaid dividends (whether or not declared) thereon to but excluding the date fixed for redemption, including any changes in dividends payable due to changes in the Dividends Received Percentage and Additional Dividends, if any:

|  | Redeemable Price | |
|---|---|---|
| Redemption Period | Per Share | Per Depositary Share |
| May 31, 1997 to November 29, 1997 | $210.00 | $ 52.50 |
| November 30, 1997 to November 29, 1998 | 208.00 | 52.00 |
| November 30, 1998 to November 29, 1999 | 206.00 | 51.50 |
| November 30, 1999 to November 29, 2000 | 204.00 | 51.00 |
| November 30, 2000 to November 29, 2001 | 202.00 | 50.50 |
| On or after November 30, 2001 | 200.00 | 50.00 |

8. Authorization and Issuance of Other Securities. No consent of the holders of the Series A Fixed/Adjustable Rate Preferred Stock shall be required for (a) the creation of any indebtedness of any kind of the Corporation,

129

(b) the creation, or increase or decrease in the amount, of any class or series of stock of the Corporation not ranking prior as to dividends or upon liquidation, dissolution or winding up to the Series A Fixed/Adjustable Rate Preferred Stock or (c) any increase or decrease in the amount of authorized Common Stock or any increase, decrease or change in the par value thereof or in any other terms thereof.

    9. <u>Amendment of Resolution.</u> The Board and the Committee each reserves the right by subsequent amendment of this resolution from time to time to increase or decrease the number of shares that constitute the Series A Fixed/Adjustable Rate Preferred Stock (but not below the number of shares thereof then outstanding) and in other respects to amend this resolution within the limitations provided by law, this resolution and the Certificate of Incorporation.

    10. <u>Rank.</u> For the purposes of this resolution, any stock of any class or classes of the Corporation shall be deemed to rank:

        (a) prior to shares of the Series A Fixed/Adjustable Rate Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, if the holders of stock of such class or classes shall be entitled by the terms thereof to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of shares of the Series A Fixed/Adjustable Rate Preferred Stock;

        (b) on a parity with shares of the Series A Fixed/Adjustable Rate Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, whether or not the dividend rates, dividend payment dates, or redemption or liquidation prices per share thereof be

different from those of the Series A Fixed/Adjustable Rate Preferred Stock, if the holders of stock of such class or classes shall be entitled by the terms thereof to the receipt of dividends or of amounts distributed upon liquidation, dissolution or winding up, as the case may be, in proportion to their respective dividend rates or liquidation prices, without preference or priority of one over the other as between the holders of such stock and the holders of shares of Series A Fixed/Adjustable Rate Preferred Stock (the term "Parity Preferred Stock" being used to refer to any stock on a parity with the shares of Series A Fixed/Adjustable Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, as the context may require); and

(c) junior to shares of the Series A Fixed/Adjustable Rate Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, if such class shall be Common Stock or if the holders of the Series A Fixed/Adjustable Rate Preferred Stock shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of stock of such class or classes.

The Series A Fixed/Adjustable Rate Preferred Stock shall rank prior, as to dividends and upon liquidation, dissolution or winding up, to the Common Stock and the Corporation's Series A Junior Participating Preferred Stock, and on a parity with (i) the Corporation's ESOP Convertible Preferred Stock, with a liquidation value of $35.88 per share, (ii) the Corporation's 7 3/8% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (iii) the Corporation's 7 3/4% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (iv) if issued, the Corporation's 7.82% Cumulative

131

Preferred Stock, with a liquidation value of $200.00 per share, (v) if issued, the Corporation's 7.80% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (vi) if issued, the Corporation's 9.00% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (vii) if issued, the Corporation's 8.40% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (viii) if issued, the Corporation's 8.20% Cumulative Preferred Stock, with a liquidation value of $200.00 per share and (ix) if issued, the Corporation's 8.03% Cumulative Preferred Stock, with a liquidation value of $200.00 per share.

132

B. This Certificate of Designation shall not become effective until, and shall become effective at, 12:01 a.m. on May 31, 1997.

IN WITNESS WHEREOF, Dean Witter, Discover & Co. has caused this Certificate of Designation to be signed by Christine A. Edwards, its Executive Vice President, General Counsel and Secretary, this 30th day of May, 1997.

DEAN WITTER, DISCOVER & CO.

By:     /s/ Christine A. Edwards
Name:   Christine A. Edwards
Title:  Executive Vice President,
        General Counsel & Secretary

133

CERTIFICATE OF DESIGNATION OF PREFERENCES AND RIGHTS
OF THE
8.03% CUMULATIVE PREFERRED STOCK

($200.00 Stated Value)

OF

DEAN WITTER, DISCOVER & CO.

Pursuant to Section 151 of the

General Corporation Law of the State of Delaware

The undersigned DOES HEREBY CERTIFY:

A. The following resolution was duly adopted by the Board of Directors (the "Board") of Dean Witter, Discover & Co., a Delaware corporation (hereinafter called the "Corporation"), by unanimous vote thereof at a meeting on May 28, 1997:

RESOLVED that, pursuant to authority expressly granted to and vested in the Board by provisions of the Amended and Restated Certificate of Incorporation of the Corporation (the "Certificate of Incorporation"), the issuance of a series of Preferred Stock, par value $0.01 per share (the "Preferred Stock"), which shall consist of 670,000 of the shares of Preferred Stock which the Corporation has authority to issue, is authorized, and the Board hereby fixes the powers, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, of the shares of such series (in addition to the powers, designations, preferences and relative participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, set forth in the Certificate of Incorporation which may be applicable to the Preferred Stock) as follows:

1. Designation and Amount; Fractional Shares. The designation for such series of the Preferred Stock authorized by this resolution shall be the 8.03%

134

Cumulative Preferred Stock, par value $0.01 per share, with a stated value of $200.00 per share (the "Cumulative Preferred Stock"). The stated value per share of the Cumulative Preferred Stock shall not for any purpose be considered to be a determination by the Board with respect to the capital and surplus of the Corporation. The number of shares of the Cumulative Preferred Stock shall be 670,000. The Cumulative Preferred Stock is issuable in whole shares only.

2. <u>Dividends.</u> (a) Holders of shares of the Cumulative Preferred Stock will be entitled to receive, when, as and if declared by the Board or the Committee (as hereinafter defined) out of assets of the Corporation legally available for payment cash dividends at the rate of 8.03% per annum. Dividends on the Cumulative Preferred Stock will be payable quarterly on February 28, May 30, August 30 and November 30 of each year (each a "dividend payment date"). Dividends on shares of the Cumulative Preferred Stock will be cumulative from the date of initial issuance of such shares of the Cumulative Preferred Stock. Dividends will be payable, in arrears, to holders of record as they appear on the stock books of the Corporation on such record dates, not more than 60 days nor less than 10 days preceding the payment dates thereof, as shall be fixed by the Board or the Committee. The amount of dividends payable for the initial dividend period or any period shorter than a full dividend period shall be calculated on the basis of a 360-day year of twelve 30-day months. No dividends may be declared or paid or set apart for payment on any Parity Preferred Stock (as defined in paragraph 9(b) below) with regard to the payment of dividends unless there shall also be or have been declared and paid or set apart for payment on the Cumulative Preferred Stock, like dividends for all dividend payment periods of the Cumulative Preferred Stock ending on or before the dividend payment date of such Parity Preferred Stock ratably in proportion to the respective amounts of dividends (x) accumulated and unpaid or payable on such Parity Preferred Stock, on the one hand, and (y) accumulated and unpaid through the dividend payment period or periods of the Cumulative Preferred Stock next preceding such dividend payment date, on the other hand. For the purposes of this Certificate of Designation, the "Committee" shall mean any committee of the Board to whom the Board, pursuant to Section 141(c) of the General Corporation Law of the State of Delaware, delegates authority to perform the functions of the Board set forth in this Certificate of Designation.

135

Except as set forth in the preceding sentence, unless full cumulative dividends on the Cumulative Preferred Stock have been paid, no dividends (other than in Common Stock of the Corporation) may be paid or declared and set aside for payment or other distribution made upon the Common Stock or on any other stock of the Corporation ranking junior to or on a parity with the Cumulative Preferred Stock as to dividends, nor may any Common Stock or any other stock of the Corporation ranking junior to or on a parity with the Cumulative Preferred Stock as to dividends be redeemed, purchased or otherwise acquired for any consideration (or any payment be made to or available for a sinking fund for the redemption of any shares of such stock; provided, however, that any moneys theretofore deposited in any sinking fund with respect to any Preferred Stock of the Corporation in compliance with the provisions of such sinking fund may thereafter be applied to the purchase or redemption of such Preferred Stock in accordance with the terms of such sinking fund, regardless of whether at the time of such application full cumulative dividends upon shares of the Cumulative Preferred Stock outstanding to the last dividend payment date shall have been paid or declared and set apart for payment) by the Corporation; provided that any such junior or parity Preferred Stock or Common Stock may be converted into or exchanged for stock of the Corporation ranking junior to the Cumulative Preferred Stock as to dividends.

(b) If one or more amendments to the Internal Revenue Code of 1986, as amended (the "Code"), are enacted that reduce the percentage of the dividends received deduction as specified in Section 243(a)(1) of the Code or any successor provision (the "Dividends Received Percentage") to below 70%, the amount of each dividend payable per share of the Cumulative Preferred Stock for dividend payments made on or after the date of enactment of such change, and so long as the Dividends Received Percentage remains below 70%, will be adjusted by multiplying the amount of the dividend payable determined as described above (before adjustment) by a factor, which will be the number determined in accordance with the following formula

136

(the "DRD Formula"), and rounding the result to the nearest cent:

$$\frac{1 - (.35 (1 - .70))}{1 - (.35 (1 - DRP))}$$

For the purposes of the DRD Formula, "DRP" means the Dividends Received Percentage applicable to the dividend in question. No amendment to the Code, other than a change in the percentage of the dividends received deduction set forth in Section 243(a)(1) of the Code or any successor provision, will give rise to an adjustment. Notwithstanding the foregoing provisions, in the event that, with respect to any such amendment, the Corporation will receive either an unqualified opinion of nationally recognized independent tax counsel selected by the Corporation or a private letter ruling or similar form of authorization from the Internal Revenue Service to the effect that such an amendment would not apply to dividends payable on the Cumulative Preferred Stock, then any such amendment will not result in the adjustment provided for pursuant to the DRD Formula. The opinion referenced in the previous sentence will be based upon a specific exception in the legislation amending the DRP or upon a published pronouncement of the Internal Revenue Service addressing such legislation. Unless the context otherwise requires, references to dividends in this Certificate of Designation will mean dividends as adjusted by the DRD Formula. The Corporation's calculation of the dividends payable, as so adjusted and as certified accurate as to calculation and reasonable as to method by the independent certified public accountants then regularly engaged by the Corporation, will be final and not subject to review absent manifest error.

If any amendment to the Code which reduces the Dividends Received Percentage to below 70% is enacted after a dividend payable on a dividend payment date has been declared and on or before such dividend is paid, the amount of dividend payable on such dividend payment date will not be increased. Instead, an amount, equal to the excess of (x) the product of the dividends paid by the Corporation on such dividend payment date and the DRD Formula (where the DRP used in the DRD Formula would be equal to the reduced Dividends Received Percentage) over (y) the dividends paid by the Corporation on such dividend payment date, will be payable on the next succeeding dividend payment date to holders of record on the record date for such next succeeding dividend payment in addition to any other amounts payable on such date.

137

In the event that the amount of dividends payable per share of the Cumulative Preferred Stock will be adjusted pursuant to the DRD Formula, the Corporation will cause notice of each such adjustment to be sent to the holders of record as they appear on the stock books of the Corporation on such record date, not more than 60 days nor less than 10 days preceding the payment date thereof as shall be fixed by the Board or the Committee.

In the event that the Dividends Received Percentage is reduced to 50% or less, the Corporation may, at its option, redeem the Cumulative Preferred Stock, in whole but not in part, as described in paragraph 6 hereof.

3. <u>Liquidation Preference.</u> The shares of the Cumulative Preferred Stock shall rank, as to liquidation, dissolution or winding up of the Corporation, prior to the shares of Common Stock and any other class of stock of the Corporation ranking junior to the Cumulative Preferred Stock as to rights upon liquidation, dissolution or winding up of the Corporation, so that in the event of any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the holders of the Cumulative Preferred Stock shall be entitled to receive out of the assets of the Corporation available for distribution to its stockholders, whether from capital, surplus or earnings, before any distribution is made to holders of shares of Common Stock or any other such junior stock, an amount equal to $200.00 per share (the "Liquidation Preference" of a share of the Cumulative Preferred Stock) plus an amount equal to all dividends (whether or not earned or declared) accrued and accumulated and unpaid on the shares of the Cumulative Preferred Stock to the date of final distribution. The holders of the Cumulative Preferred Stock will not be entitled to receive the Liquidation Preference until the liquidation preference of any other class of stock of the Corporation ranking senior to the Cumulative Preferred Stock as to rights upon liquidation, dissolution or winding up shall have been paid (or a sum set aside therefor sufficient to provide for payment) in full. After payment of the full amount of the Liquidation Preference and such dividends, the

138

holders of shares of the Cumulative Preferred Stock will not be entitled to any further participation in any distribution of assets by the Corporation. If, upon any liquidation, dissolution or winding up of the Corporation, the assets of the Corporation, or proceeds thereof, distributable among the holders of shares of Parity Preferred Stock shall be insufficient to pay in full the preferential amount aforesaid, then such assets, or the proceeds thereof, shall be distributable among such holders ratably in accordance with the respective amounts which would be payable on such shares if all amounts payable thereon were paid in full. For the purposes hereof, neither a consolidation or merger of the Corporation with or into any other corporation, nor a merger of any other corporation with or into the Corporation, nor a sale or transfer of all or any part of the Corporation's assets for cash or securities shall be considered a liquidation, dissolution or winding up of the Corporation.

4. <u>Conversion.</u> The Cumulative Preferred Stock is not convertible into shares of any other class or series of stock of the Corporation.

5. <u>Voting Rights.</u> The holders of shares of the Cumulative Preferred Stock shall have no voting rights whatsoever, except for any voting rights to which they may be entitled under the laws of the State of Delaware, and except as follows:

(a) Whenever, at any time or times, dividends payable on the shares of Cumulative Preferred Stock or on any Parity Preferred Stock with respect to payment of dividends, shall be in arrears for an aggregate number of days equal to six calendar quarters or more, whether or not consecutive, the holders of the outstanding shares of the Cumulative Preferred Stock shall have the right, with holders of shares of any one or more other class or series of stock upon which like voting rights have been conferred and are exercisable (voting together a class), to elect two of the authorized number of members of the Board at the Corporation's next annual meeting of stockholders and at each subsequent annual meeting of stockholders until such arrearages have been paid or set apart for payment, at which time such right shall terminate, except as herein or by law expressly provided, subject to revesting in the

139

event of each and every subsequent default of the character above mentioned. Upon any termination of the right of the holders of shares of the Cumulative Preferred Stock as a class to vote for directors as herein provided, the term of office of all directors then in office elected by the holders of shares of the Cumulative Preferred Stock shall terminate immediately.

Any director who shall have been so elected pursuant to this paragraph may be removed at any time, either with or without cause. Any vacancy thereby created may be filled only by the affirmative vote of the holders of shares of the Cumulative Preferred Stock voting separately as a class (together with the holders of shares of any other class or series of stock upon which like voting rights have been conferred and are exercisable). If the office of any director elected by the holders of shares of the Cumulative Preferred Stock voting as a class becomes vacant for any reason other than removal from office as aforesaid, the remaining director elected pursuant to this paragraph may choose a successor who shall hold office for the unexpired term in respect of which such vacancy occurred. At elections for such directors, each holder of shares of the Cumulative Preferred Stock shall be entitled to one vote for each share held (the holders of shares of any other class or series of preferred stock having like voting rights being entitled to such number of votes, if any, for each share of such stock held as may be granted to them).

(b) So long as any shares of the Cumulative Preferred Stock remain outstanding, the consent of the holders of at least two-thirds of the shares of the Cumulative Preferred Stock outstanding at the time and all other classes or series of stock upon which like voting rights have been conferred and are exercisable (voting together as a class) given in person or by proxy, either in writing or at any meeting called for the purpose, shall be necessary to permit, effect or validate any one or more of the following:

(i) the issuance or increase of the authorized amount of any class or series of shares ranking prior (as that term is defined in paragraph 9(a) hereof) to the shares of the Cumulative Preferred Stock; or

140

(ii) the amendment, alteration or repeal, whether by merger, consolidation or otherwise, of any of the provisions of the Certificate of Incorporation (including this resolution or any provision hereof) that would materially and adversely affect any power, preference, or special right of the shares of the Cumulative Preferred Stock or of the holders thereof; provided, however, that any increase in the amount of authorized Common Stock or authorized Preferred Stock or any increase or decrease in the number of shares of any series of Preferred Stock or the creation and issuance of other series of Common Stock or Preferred Stock, in each case ranking on a parity with or junior to the shares of the Cumulative Preferred Stock with respect to the payment of dividends and the distribution of assets upon liquidation, dissolution or winding up, shall not be deemed to materially and adversely affect such powers, preferences or special rights.

(c) The foregoing voting provisions shall not apply if, at or prior to the time when the act with respect to which such vote would otherwise be required shall be effected, all outstanding shares of the Cumulative Preferred Stock shall have been redeemed or called for redemption and sufficient funds shall have been deposited in trust to effect such redemption.

6. <u>Redemption.</u> The shares of the Cumulative Preferred Stock may be redeemed at the option of the Corporation, as a whole, or from time to time in part, at any time, upon not less than 30 days' prior notice mailed to the holders of the shares to be redeemed at their addresses as shown on the stock books of the Corporation; provided, however, that shares of the Cumulative Preferred Stock shall not be redeemable prior to February 28, 2007, except as stated below. Subject to the foregoing, on or after such date, shares of the Cumulative Preferred Stock are redeemable at the option of the Corporation, in whole or in part, upon not less than 30 days' notice at the redemption prices set forth below, plus accrued and accumulated but unpaid dividends to but excluding the date fixed for

redemption, if redeemed during the twelve-month period beginning on February 28 of the years indicated below:

| Year | Redemption Price Per Share |
|------|---------------------------:|
| 2007 | $ 205.354 |
| 2008 | 204.282 |
| 2009 | 203.212 |
| 2010 | 202.142 |
| 2011 | 201.070 |
| On or after 2012 | 200.000 |

If full cumulative dividends on the Cumulative Preferred Stock have not been paid, the Cumulative Preferred Stock may not be redeemed in part and the Corporation may not purchase or acquire any share of the Cumulative Preferred Stock otherwise than pursuant to a purchase or exchange offer made on the same terms to all holders of the Cumulative Preferred Stock. If fewer than all the outstanding shares of the Cumulative Preferred Stock are to be redeemed, the Corporation will select those to be redeemed by lot or a substantially equivalent method.

Notwithstanding the foregoing provisions, if the Dividends Received Percentage is equal to or less than 50% and, as a result, the amount of dividends on the Cumulative Preferred Stock payable on any dividend payment date will be or is adjusted upwards as described in paragraph 2(b) hereof, the Corporation, at its option, may redeem all, but not less than all, of the outstanding shares of the Cumulative Preferred Stock (a "Dividends Received Deduction Redemption"); provided that within sixty days of the date of the date on which an amendment to the Code is enacted which reduces the Dividends Received Percentage to 50% or less and the date on which notice of issuance of the Cumulative Preferred Stock is given, the Corporation sends notice to holders of the Cumulative Preferred Stock of such redemption. A Dividends Received Deduction Redemption, in accordance with this paragraph, will take place on the date specified in the notice, which shall be not less than thirty nor more than sixty days from the date such notice is sent to holders of the Cumulative Preferred Stock. A Dividends Received Deduction Redemption shall be at the applicable redemption price set forth in the following table, in each case plus accrued and accumulated but unpaid dividends thereon to but excluding the date fixed for redemption, including any changes in

142

dividends payable due to changes in the Dividends Received Percentage and Additional Dividends, if any:

| Redemption period | Redemption price per share |
|---|---|
| February 28, 1998 to February 27, 1999 | $ 210.000 |
| February 28, 1999 to February 27, 2000 | 208.889 |
| February 28, 2000 to February 27, 2001 | 207.778 |
| February 28, 2001 to February 27, 2002 | 206.667 |
| February 28, 2002 to February 27, 2003 | 205.556 |
| February 28, 2003 to February 27, 2004 | 204.444 |
| February 28, 2004 to February 27, 2005 | 203.333 |
| February 28, 2005 to February 27, 2006 | 202.222 |
| February 28, 2006 to February 27, 2007 | 201.111 |

If a Dividends Received Deduction Redemption occurs on or after February 28, 2007, the redemption prices shall be as set forth in the first paragraph of this paragraph 6.

If a notice of redemption has been given pursuant to this paragraph 6 and if, on or before the date fixed for redemption, the funds necessary for such redemption shall have been set aside by the Corporation, separate and apart from its other funds, in trust for the pro rata benefit of the holders of the shares of the Cumulative Preferred Stock so called for redemption, then, notwithstanding that any certificates for such shares have not been surrendered for cancellation, on the redemption date dividends shall cease to accrue on the shares to be redeemed, and at the close of business on the redemption date the holders of such shares shall cease to be stockholders with respect to such shares and shall have no interest in or claims against the Corporation by virtue thereof and shall have no voting or other rights with respect to such shares, except the right to receive the moneys payable upon surrender (and endorsement, if required by the Corporation) of their certificates, and the shares evidenced thereby shall no longer be outstanding. Subject to applicable escheat laws, any moneys so set aside by the Corporation and unclaimed at the end of two years from the redemption date shall revert to the general funds of the Corporation, after which reversion the holders of such shares so called for redemption shall look only to the general funds of the Corporation for the payment of the amounts payable upon such redemption. Any interest accrued on funds so deposited shall be paid to the Corporation from time to time.

143

7. <u>Authorization and Issuance of Other Securities.</u> No consent of the holders of the Cumulative Preferred Stock shall be required for (a) the creation of any indebtedness of any kind of the Corporation, (b) the creation, or increase or decrease in the amount, of any class or series of stock of the Corporation not ranking prior as to dividends or upon liquidation, dissolution or winding up to the Cumulative Preferred Stock or (c) any increase or decrease in the amount of authorized Common Stock or any increase, decrease or change in the par value thereof or in any other terms thereof.

8. <u>Amendment of Resolution.</u> The Board and the Committee each reserves the right by subsequent amendment of this resolution from time to time to increase or decrease the number of shares that constitute the Cumulative Preferred Stock (but not below the number of shares thereof then outstanding) and in other respects to amend this resolution within the limitations provided by law, this resolution and the Certificate of Incorporation.

9. <u>Rank.</u> For the purposes of this resolution, any stock of any class or classes of the Corporation shall be deemed to rank:

(a) prior to shares of the Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, if the holders of stock of such class or classes shall be entitled by the terms thereof to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of shares of the Cumulative Preferred Stock;

(b) on a parity with shares of the Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, whether or not the dividend rates, dividend payment dates, or redemption or liquidation prices per share thereof be different from those of the Cumulative Preferred Stock, if the holders of stock of such class or classes shall be entitled by the terms thereof to the receipt of dividends or of amounts distributed upon liquidation, dissolution or winding up, as the case may be, in proportion to their respective dividend rates or

144

liquidation prices, without preference or priority of one over the other as between the holders of such stock and the holders of shares of the Cumulative Preferred Stock (the term "Parity Preferred Stock" being used to refer to any stock on a parity with the shares of the Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, as the context may require); and

(c) junior to shares of the Cumulative Preferred Stock, either as to dividends or upon liquidation, dissolution or winding up, or both, if such class shall be Common Stock or if the holders of the Cumulative Preferred Stock shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of stock of such class or classes.

The Cumulative Preferred Stock shall rank prior, as to dividends and upon liquidation, dissolution or winding up, to the Common Stock and the Corporation's Series A Junior Participating Preferred Stock, and on a parity with (i) the Corporation's ESOP Convertible Preferred Stock, with a liquidation value of $35.88 per share, (ii) the Corporation's 7 $3/8$% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (iii) the Corporation's 7 $3/4$% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (iv) the Corporation's Series A Fixed/Adjustable Rate Preferred Stock, with a liquidation value of $200.00 per share, (v) if issued, the Corporation's 7.82% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (vi) if issued, the Corporation's 7.80% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (vii) if issued, the Corporation's 9.00% Cumulative Preferred Stock, with a liquidation value of $200.00 per share, (viii) if issued, the Corporation's 8.40% Cumulative Preferred Stock, with a liquidation value of $200.00 per share and (ix) if issued, the Corporation's 8.20% Cumulative Preferred Stock, with a liquidation value of $200.00 per share.

145

B. This Certificate of Designation shall not become effective until, and shall become effective at, 12:01 a.m. on May 31, 1997.

IN WITNESS WHEREOF, Dean Witter, Discover & Co. has caused this Certificate of Designation to be signed by Christine A. Edwards, its Executive Vice President, General Counsel and Secretary, this 30th day of May, 1997.

DEAN WITTER, DISCOVER & CO.

By:    /s/ Christine A. Edwards
Name:  Christine A. Edwards
Title:  Executive Vice President,
        General Counsel & Secretary

146

CERTIFICATE OF DESIGNATION, PREFERENCES
AND RIGHTS OF SERIES A JUNIOR
PARTICIPATING PREFERRED STOCK

of

DEAN WITTER, DISCOVER & CO.

Pursuant to Section 151 of the General Corporation Law
of the State of Delaware

The undersigned officer of Dean Witter, Discover & Co., a corporation organized and existing under the General Corporation Law of the State of Delaware, in accordance with the provisions of Section 103 thereof, DOES HEREBY CERTIFY:

That pursuant to the authority conferred upon the Board of Directors by the Amended and Restated Certificate of Incorporation of the said Corporation, the said Board of Directors on April 21, 1995 adopted the following resolution creating a series of 220,000 shares of Preferred Stock designated as Series A Junior Participating Preferred Stock:

RESOLVED, that pursuant to the authority vested in the Board of Directors of this Corporation in accordance with the provisions of its Amended and Restated Certificate of Incorporation, a series of Preferred Stock of the Corporation be and it hereby is created, and that the designation and amount thereof and the voting powers, preferences and relative, participating, optional and other special rights of the shares of such series, and the qualifications, limitations or restrictions thereof are as follows:

Section 1. <u>Designation and Amount</u>. The shares of such series shall be designated as "SERIES A JUNIOR PARTICIPATING PREFERRED STOCK" and the number of shares constituting such series shall be 220,000.

Section 2. <u>Dividends and Distributions</u>.

(A)    The holders of shares of Series A Junior Participating Preferred Stock shall be entitled to receive, when, as and if declared by the Board of

147

Directors out of funds legally available for the purposes, quarterly dividends payable in cash on the last day of March, June, September and December in each year (each such date being referred to herein as a "QUARTERLY DIVIDEND PAYMENT DATE"), commencing on the first Quarterly Dividend Payment Date after the first issuance of a share or fraction of a share of Series A Junior Participating Preferred Stock, in an amount per share (rounded to the nearest cent) equal to the greater of (a) $1.00 or (b) subject to the provision for adjustment hereinafter set forth, 1,000 times the aggregate per share amount of all cash dividends, and 1,000 times the aggregate per share amount (payable in kind) of all non-cash dividends or other distributions other than a dividend payable in shares of Common Stock or a subdivision of the outstanding shares of Common Stock (by reclassification or otherwise), declared on the Common Stock, par value $0.01 per share, of the Corporation (the "COMMON STOCK") since the immediately preceding Quarterly Dividend Payment Date, or, with respect to the first Quarterly Dividend Payment Date, since the first issuance of any share or fraction of a share of Series A Junior Participating Preferred Stock. In the event the Corporation shall at any time after April 21, 1995 (the "RIGHTS DECLARATION DATE") (i) declare any dividend on Common Stock payable in shares of Common Stock, (ii subdivide the outstanding Common Stock, or (ii combine the outstanding Common Stock into a smaller number of shares, then in each such case the amount to which holders of shares of Series A Junior Participating Preferred Stock were entitled immediately prior to such event under clause (b) of the preceding sentence shall be adjusted by multiplying such amount by a fraction the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

(B)    The Corporation shall declare a dividend or distribution on the Series A Junior Participating Preferred Stock as provided in Paragraph (A) above immediately after it declares a dividend or distribution on the Common Stock (other than a dividend payable in shares of Common Stock); provided that, in the event no dividend or distribution shall have been declared on the Common Stock during the period between any Quarterly Dividend Payment Date and the next subsequent Quarterly Dividend Payment Date, a dividend of $0.01 per share on the Series A Junior Participating Preferred Stock shall nevertheless be payable on such subsequent Quarterly Dividend Payment Date.

(C)    Dividends shall begin to accrue and be cumulative on outstanding shares of Series A Junior Participating Preferred Stock from the Quarterly Dividend Payment Date next preceding the date of issue of such shares of Series A Junior Participating Preferred Stock, unless the date of issue of such shares is prior to the record date for the first Quarterly Dividend Payment Date, in which case dividends on such shares shall begin to accrue form the date of issue of such

148

shares, or unless the date of issue is a Quarterly Dividend Payment Date or is a date after the record date for the determination of holders of shares of Series A Junior Participating Preferred Stock entitled to receive a quarterly dividend and before such Quarterly Dividend Payment Date, in either of which events such dividends shall begin to accrue and be cumulative from such Quarterly Dividend Payment Date. Accrued but unpaid dividends shall not bear interest. Dividends paid on the shares of Series A Junior Participating Preferred Stock in an amount less than the total amount of such dividends at the time accrued and payable on such shares shall be allocated pro rata on a share-by-share basis among all such shares at the time outstanding. The Board of Directors may fix a record date for the determination of holders of shares of Series A Junior Participating Preferred Stock entitled to receive payment of a dividend or distribution declared thereon, which record date shall be no more than 30 days prior to the date fixed for the payment thereof.

Section 3. <u>Voting Rights.</u> The holders of shares of Series A Junior Participating Preferred Stock shall have the following voting rights:

(A) Subject to the provision for adjustment hereinafter set forth, each share of Series A Junior Participating Preferred Stock shall entitle the holder thereof to 1,000 votes on all matters submitted to a vote of the stockholders of the Corporation. In the event the Corporation shall at any time after the Rights Declaration Date (i) declare any dividend on Common Stock payable in shares of Common Stock, (ii) subdivide the outstanding Common Stock, or (iii) combine the outstanding Common Stock into a smaller number of shares, then in each such case the number of votes per share to which holders of shares of Series A Junior Participating Preferred Stock were entitled immediately prior to such event shall be adjusted by multiplying such number by a fraction the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

(B) Except as otherwise provided herein or by law, the holders of shares of Series A Junior Participating Preferred Stock and the holders of shares of Common Stock shall vote together as one class on all matters submitted to a vote of stockholders of the Corporation.

(C) (i) If at any time dividends on any Series A Junior Participating Preferred Stock shall be in arrears in an amount equal to six (6) quarterly dividends thereon, the occurrence of such contingency shall mark the beginning of a period (herein called a "DEFAULT PERIOD") which shall extend until such time when all accrued and unpaid dividends for all previous quarterly dividend periods and for the current quarterly dividend period on all shares of Series A Junior Participating

149

Preferred Stock then outstanding shall have been declared and paid or set apart for payment. During each default period, all holders of Preferred Stock (including holders of the Series A Junior participating Preferred Stock) with dividends in arrears in an amount equal to six (6) quarterly dividends thereon, voting as a class, irrespective of series, shall have the right to elect two (2) directors.

(ii) During any default period, such voting right of the holders of Series A Junior Participating Preferred Stock may be exercised initially at a special meeting called pursuant to subparagraph (iii) of this Section 3(C) or at any annual meeting of stockholders, and thereafter at annual meetings of stockholders, provided that such voting right shall not be exercised unless the holders of ten percent (10%) in number of shares of Preferred Stock outstanding shall be present in person or by proxy. The absence of a quorum of the holders of Common Stock shall not affect the exercise by the holders of Preferred Stock of such voting right. At any meeting at which the holders of Preferred Stock shall exercise such voting right initially during an existing default period, they shall have the right, voting as a class, to elect directors to fill such vacancies, if any, in the Board of Directors as may then exist up to two (2) directors or, if such right is exercised at an annual meeting, to elect two (2) directors. If the number which may be so elected at any special meeting does not amount to the required number, the holders of the Preferred Stock shall have the right to make such increase in the number of directors as shall be necessary to permit the election by them of the required number. After the holders of the Preferred Stock shall have exercised their right to elect directors in any default period and during the continuance of such period, the number of directors shall not be increased or decreased except by vote of the holders of Preferred Stock as herein provided or pursuant to the rights of any equity securities ranking senior to or <u>pari passu</u> with the Series A Junior Participating Preferred Stock.

(iii) Unless the holders of Preferred Stock shall, during an existing default period, have previously exercised their right to elect directors, the Board of Directors may order, or any stockholder or stockholders owning in the aggregate not less than ten percent (10%) of the total number of shares of Preferred Stock outstanding, irrespective of series, may request, the calling of special meeting of the holders of Preferred Stock, which meeting shall thereupon be called by the President, a Vice-President or the Secretary of the Corporation. Notice of such meeting and of any annual meeting at which holders of Preferred Stock are entitled to vote pursuant to this Paragraph (C)(iii) shall be given to each holder of record of Preferred Stock by mailing a copy of such notice to him or her at his or her last address as the same appears on the books of the Corporation. Such

150

meeting shall be called for a time not earlier than 20 days and not later than 60 days after such order or request or in default of the calling of such meeting within 60 days after such order or request, such meeting may be called on similar notice by any stockholder or stockholders owning in the aggregate not less than ten percent (10%) of the total number of shares of Preferred Stock outstanding. Notwithstanding the provisions of this Paragraph (C)(iii), no such special meeting shall be called during the period within 60 days immediately preceding the date fixed for the next annual meeting of the stockholders.

(iv) In any default period, the holders of Common Stock, and other classes of stock of the Corporation if applicable, shall continue to be entitled to elect the whole number of directors until the holders of Preferred Stock shall have exercised their right to elect two (2) directors voting as a class, after the exercise of which right (x) the directors so elected by the holders of Preferred Stock shall continue in office until their successors shall have been elected by such holders or until the expiration of the default period, and (y) any vacancy in the Board of Directors may (except as provided in Paragraph (C)(ii) of this Section 3) be filled by vote of a majority of the remaining directors theretofore elected by the holders of the class of stock which elected the director whose office shall have become vacant. References in this Paragraph (C) to directors elected by the holders of a particular class of stock shall include directors elected by such directors to fill vacancies as provided in clause (y) of the foregoing sentence.

(v) Immediately upon the expiration of a default period, (x) the right of the holders of Preferred Stock as a class to elect directors shall cease, (y) the term of any directors elected by the holders of Preferred Stock as a class shall terminate, and (z) the number of directors shall be such number as may be provided for in the certificate of incorporation or by-laws irrespective of any increase made pursuant to the provisions of Paragraph (C)(ii) of this Section 3 (such number being subject, however, to change thereafter in any manner provided by law or in the certificate of incorporation or by-laws). Any vacancies in the Board of Directors effected by the provisions of clauses (y) and (z) in the preceding sentence may be filled by a majority of the remaining directors.

(D) Except as set forth herein, holders of Series A Junior Participating Preferred Stock shall have no special voting rights and their consent shall not be required (except to the extent they are entitled to vote with holders of Common Stock as set forth herein) for taking any corporate action.

151

Section 4. Certain Restrictions.

(A) Whenever quarterly dividends or other dividends or distributions payable on the Series A Junior Participating Preferred Stock as provided in Section 2 are in arrears, thereafter and until all accrued and unpaid dividends and distributions, whether or not declared, on shares of Series A Junior Participating Preferred Stock outstanding shall have been paid in full, the Corporation shall not

(i) declare or pay dividends on, make any other distributions on, or redeem or purchase or otherwise acquire for consideration any shares of stock ranking junior (either as to dividends or upon liquidation, dissolution or winding up) to the Series A Junior Participating Preferred Stock;

(ii) declare or pay dividends on or make any other distributions on any shares of stock ranking on a parity (either as to dividends or upon liquidation, dissolution or winding up) with the Series A Junior Participating Preferred Stock, except dividends paid ratably on the Series A Junior Participating Preferred Stock and all such parity stock on which dividends are payable or in arrears in proportion to the total amounts to which the holders of all such shares are then entitled;

(iii) redeem or purchase or otherwise acquire for consideration shares of any stock ranking on a parity (either as to dividends or upon liquidation, dissolution or winding up) with the Series A Junior Participating Preferred Stock, provided that the Corporation may at any time redeem, purchase or otherwise acquire shares of any such parity stock in exchange for shares of any stock of the Corporation ranking junior (either as to dividends or upon dissolution, liquidation or winding up) to the Series a Junior Participating Preferred Stock; or

(iv) purchase or otherwise acquire for consideration any shares of Series A Junior Participating Preferred Stock, or any shares of stock ranking on a parity with the Series A Junior Participating Preferred Stock, except in accordance with a purchase offer made in writing or by publication (as determined by the Board of Directors) to all holders of such shares upon such terms as the Board of Directors, after consideration of the respective annual dividend rates and other relative rights and preferences of the respective series and classes, shall determine in good faith will result in fair and equitable treatment among the respective series or classes.

(B) The Corporation shall not permit any subsidiary of the Corporation to purchase or otherwise acquire for consideration any shares of stock of the Corporation unless the Corporation could, under Paragraph (A) of this Section 4, purchase or otherwise acquire such shares at such time and in such manner.

152

Section 5. <u>Reacquired Shares.</u> Any shares of Series A Junior Participating Preferred Stock purchased or otherwise acquired by the Corporation in any manner whatsoever shall be retired and cancelled promptly after the acquisition thereof. All such shares shall upon their cancellation become authorized but unissued shares of Preferred Stock and may be reissued as part of a new series of Preferred Stock to be created by resolution or resolutions of the Board of Directors, subject to the conditions and restrictions on issuance set forth herein.

Section 6. <u>Liquidation, Dissolution or Winding up.</u> (A) Upon any liquidation (voluntary or otherwise), dissolution or winding up of the Corporation, no distribution shall be made to the holders of shares of stock ranking junior (either as to dividends or upon liquidation, dissolution or winding up) to the Series A Junior Participating Preferred Stock unless, prior thereto, the holders of shares of Series A Junior Participating Preferred Stock shall have received an amount equal to 1,000 times the Exercise Price, plus an amount equal to accrued and unpaid dividends and distributions thereon, whether or not declared, to the date of such payment (the "Series A Liquidation Preference"). Following the payment of the full amount of he Series A Liquidation Preference, no additional distributions shall be made to the holders of shares of Series A Junior Participating Preferred Stock unless, prior thereto, the holders of shares of Common Stock shall have received an amount per share (the "Common Adjustment") equal to the quotient obtained by dividing (i) the Series A Liquidation Preference by (ii) 1,000 (as appropriately adjusted as set forth in subparagraph (C) below to reflect such events as stock splits, stock dividends and recapitalizations with respect to the Common Stock) (such number in clause (ii), the "Adjustment Number"). following the payment of the full amount of the Series A Liquidation Preference and the Common Adjustment in respect of all outstanding shares of Series A Junior Participating Preferred Stock and Common Stock, respectively, holders of Series A Junior Participating Preferred Stock and holders of shares of Common Stock shall receive their ratable and proportionate share of the remaining assets to be distributed in the ratio of the Adjustment Number to 1 with respect to such Preferred Stock and Common Stock, on a per share basis, respectively.

(B) In the event, however, that there are not sufficient assets available to permit payment in full of the Series A Liquidation Preference and the liquidation preferences of all other series of preferred stock, if any, which rank on a parity with the Series A Junior Participating Preferred Stock, then such remaining assets shall be distributed ratably to the holders of such parity shares in proportion to their respective liquidation preferences. In the event, however, that there are not

153

sufficient assets available to permit payment in full of the Common Adjustment, then such remaining assets shall be distributed ratably to the holders of Common Stock.

(C) In the event the Corporation shall at any time after the rights Declaration Date (i) declare any dividend on Common Stock payable in shares of Common Stock, (ii) subdivide the outstanding Common Stock, or (iii) combine the outstanding Common Stock into a smaller number of shares, then in each such case the Adjustment Number in effect immediately prior to such event shall be adjusted by multiplying such Adjustment Number by a fraction the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

Section 7. Consolidation, Merger, Etc. In case the Corporation shall enter into any consolidation, merger, combination or other transaction in which the shares of Common Stock are exchanged for or changed into other stock or securities, cash and/or any other property, then in any such case the shares of Series A Junior Participating Preferred Stock shall at the same time be similarly exchanged or changed in an amount per share (subject to the provision for adjustment hereinafter set forth) equal to 1,000 times the aggregate amount of stock, securities, cash and/or any other property (payable in kind), as the case may be, into which or for which each share of Common Stock is changed or exchanged. In the event the Corporation shall at any time after the Rights Declaration Date (i) declare any dividend on Common Stock payable in shares of Common Stock, (ii) subdivide the outstanding Common Stock, or (iii) combine the outstanding Common Stock into a smaller number of shares then in each such case the amount set forth in the preceding sentence with respect to the exchange or change of shares of Series A Junior Participating Preferred Stock shall be adjusted by multiplying such amount by a fraction the numerator of which is the number of shares of Common Stock outstanding immediately after such event and the denominator of which is the number of shares of Common Stock that were outstanding immediately prior to such event.

Section 8. No Redemption. The shares of Series A Junior Participating Preferred Stock shall not be redeemable.

Section 9. Amendment. The Amended and Restated Certificate of Incorporation of the Corporation shall not be further amended in any manner which would materially alter or change the powers, preferences or special rights of the Series A Junior Participating Preferred Stock so as to affect them adversely without the affirmative vote of the holders of a majority or more of the outstanding shares of Series A Junior Participating Preferred Stock, voting separately as a class.

154

Section 10. <u>Fractional Shares</u>. Series A Junior Participating Preferred Stock may be issued in fractions of a share which shall entitle the holder, in proportion to such holders fractional shares, to exercise voting rights, receive dividends, participate in distributions and to have the benefit of all other rights of holders of Series A Junior Participating Preferred Stock.

IN WITNESS WHEREOF, we have executed and subscribed this Certificate and do affirm the foregoing as true under the penalties of perjury this 25th day of April, 1995.

DEAN WITTER, DISCOVER & CO.

/s/ Ronald T. Carman
Name:  Ronald T. Carman
Title:  Senior vice President and
           Associate General Counsel

155

CERTIFICATE OF INCREASE
OF
SERIES A JUNIOR PARTICIPATING PREFERRED STOCK
OF
DEAN WITTER, DISCOVER & CO.

Pursuant to Section 151 of the
General Corporation Law of the State of Delaware

Dean Witter, Discover & Co. (the "Corporation"), a corporation organized and existing under the General Corporation Law of the State of Delaware, in accordance with Section 103 thereof, does hereby certify:

1. Pursuant to a Certificate of Designation, Preferences and Rights of Series A Junior Participating Preferred Stock filed in the office of the Secretary of State of Delaware on April 26, 1995, the Board of Directors of the Corporation created a series of 220,000 shares of Series A Junior Participating Preferred Stock, and as of the date hereof no shares of such series have been issued.

2. The Board of Directors, on April 18, 1997, adopted the following resolution authorizing an increase in the authorized number of shares of Series A Junior Participating Preferred Stock from 220,000 to 450,000:

RESOLVED, that the number of shares constituting the series of the Corporation's Series A Junior Participating Preferred Stock be increased to 450,000.

156

3. This Certificate of Increase and the increase in the authorized number of shares of Series A Junior Participating Preferred Stock provided for herein shall not become effective until, and shall become effective at, 12:01 a.m. on May 31, 1997.

IN WITNESS WHEREOF, the undersigned has executed and subscribed this Certificate of Increase this 30th day of May, 1997.

DEAN WITTER, DISCOVER & CO.

By:      /s/ Christine A. Edwards
Name:  Christine A. Edwards
Title:   Executive Vice President,
          General Counsel & Secretary

157

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 03:00 PM 03/24/1998
981113145 - 0923632

CERTIFICATE OF AMENDMENT

TO

AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

OF

MORGAN STANLEY, DEAN WITTER, DISCOVER & CO.

Pursuant to Section 242 of the
General Corporation Law of
the State of Delaware

Morgan Stanley, Dean Witter, Discover & Co. (the "Corporation"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, does hereby certify that:

FIRST: The Board of Directors of the Corporation, by unanimous written consent pursuant to Section 141 of the General Corporation Law of the State of Delaware, duly adopted resolutions setting forth a proposed amendment to the Amended and Restated Certificate of Incorporation of the Corporation, declaring said amendment to be advisable and authorizing the officers of the Corporation to submit such amendment to the stockholders of the Corporation for approval at the Corporation's 1998 annual meeting of stockholders. The resolution setting forth the proposed amendment is as follows:

RESOLVED, that the Board of Directors declares it advisable that Article I of the Corporation's Amended and Restated Certificate of Incorporation be amended to read in its entirety as follows:

ARTICLE I

NAME

The name of the corporation (which is hereinafter referred to as the "Corporation") is:

Morgan Stanley Dean Witter & Co.

SECOND: Thereafter, pursuant to resolution of its Board of Directors, the 1998 annual meeting of stockholders of the Corporation was duly called and held, upon notice in accordance with Section 222 of the General Corporation Law of the State of Delaware, at which meeting the necessary number of shares as required by the Corporation's Amended and Restated Certificate of Incorporation were voted in favor of the amendment.

THIRD: Said amendment was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

158

FOURTH: This Certificate of Amendment shall not become effective until, and shall become effective at, 5:00 p.m. on March 24, 1998.

IN WITNESS WHEREOF, the Corporation has caused this Certificate to be signed by Ronald T. Carman, its Assistant Secretary, this 24th day of March, 1998.

MORGAN STANLEY, DEAN WITTER, DISCOVER & CO.

BY: /s/ Ronald T. Carman

Ronald T. Carman, Assistant Secretary

159

CERTIFICATE OF ELIMINATION
OF PREFERRED STOCK
OF MORGAN STANLEY DEAN WITTER & CO.
(Pursuant to Section 151(g) of the General
Corporation Law of the State of Delaware)

Morgan Stanley Dean Witter & Co., a corporation duly organized and existing under the General Corporation Law of the State of Delaware (the "Corporation"), certifies as follows:

FIRST: The Corporation's Amended and Restated Certificate of Incorporation authorizes the issuance of 1,000,000 shares of a series of Preferred Stock designated 7 3/8% Cumulative Preferred Stock, par value $0.01 per share, with a stated value of $200.00 per share (the "7 3/8% Preferred Stock").

SECOND: The Preferred Stock Financing Committee of the Board of Directors of the Corporation (the "Preferred Stock Financing Committee") redeemed and retired all issued and outstanding shares of the 7 3/8% Preferred Stock, which constituted all authorized shares of the 7 3/8% Preferred Stock.

THIRD: Pursuant to the provisions of Section 151(g) of the General Corporation Law of the State of Delaware (the "GCL"), the Preferred Stock Financing Committee adopted the following resolutions:

RESOLVED FURTHER, that upon redemption of the 7 3/8% Preferred Stock and corresponding Depositary Shares, all of the shares of 7 3/8% Preferred Stock so redeemed shall be retired; and

RESOLVED FURTHER, that upon redemption and retirement of the 7 3/8% Preferred Stock in accordance with the foregoing resolutions, none of the authorized shares of such series of Preferred Stock will be outstanding and no shares of such series thereafter will be issued; and

RESOLVED FURTHER, that any officer of the Corporation is authorized and directed to execute a Certificate of Elimination as provided by Section 151(g) of the GCL in accordance with Section 103 of the GCL, substantially in the form attached as Exhibit A, with such changes therein as the officer executing the same may approve and as are permitted by the GCL to be made by such officer, such approval to be conclusively evidenced by such officer's execution of such Certificate of Elimination, and to file the same forthwith in the Office of the Secretary of State of the State of Delaware, and when such Certificate of Elimination becomes

160

effective, all references to the 7 3/8% Preferred Stock in the Amended and Restated Certificate of Incorporation of the Corporation shall be eliminated and the shares of 7 3/8% Preferred Stock so redeemed and retired shall resume the status of authorized and unissued shares of Preferred Stock of the Corporation, without designation as to series.

FOURTH: Pursuant to the provisions of Section 151(g) of the GCL, all references to 7 3/8% Preferred Stock in the Amended and Restated Certificate of Incorporation of the Corporation hereby are eliminated, and the shares that were designated to such series hereby are returned to the status of authorized but unissued shares of the Preferred Stock of the Corporation, without designation as to series.

IN WITNESS WHEREOF, the Corporation has caused this certificate to be signed by Martin M. Cohen, its Assistant Secretary, this 21 day of October, 1998.

MORGAN STANLEY DEAN WITTER & CO.

By:    /s/ Martin M. Cohen
Title:  Assistant Secretary

161

CERTIFICATE OF ELIMINATION
OF THE
7.80% CUMULATIVE PREFERRED STOCK
($200.00 Stated Value)
OF MORGAN STANLEY DEAN WITTER & CO.

(Pursuant to Section 151(g) of the
General Corporation Law of the State of Delaware)

Morgan Stanley Dean Witter & Co., a corporation duly organized and existing under the General Corporation Law of the State of Delaware (the "Corporation"), certifies as follows:

FIRST: The Corporation's Amended and Restated Certificate of Corporation authorizes the issuance of 1,150,000 shares of a series of Preferred Stock designated 7.80% Cumulative Preferred Stock, par value $0.01 per share, with a stated value of $200.00 per share (the "7.80% Preferred Stock").

SECOND: Pursuant to the provisions of Section 151(g) of the General Corporation Law of the State of Delaware (the "DGCL"), the Preferred Stock Financing Committee of the Board of Directors of the Corporation adopted the following resolutions:

RESOLVED FURTHER, that none of the authorized shares of the 7.80% Preferred Stock are outstanding and none of the authorized shares of such series of Preferred Stock will be issued; and

RESOLVED FURTHER, that any officer of the Corporation is authorized and directed to execute a Certificate of Elimination as provided by Section 151(g) of the DGCL in accordance with Section 103 of the DGCL, substantially in the form attached as Exhibit A, with such changes therein as the officer executing the same may approve and as are permitted by the DGCL to be made by such officer, such approval to be conclusively evidenced by such officer's execution of such Certificate of Elimination, and to file the same forthwith in the Office of the Secretary of State of the State of Delaware, and when such Certificate of Elimination becomes effective, all references to the 7.80% Preferred Stock in the Amended and Restated Certificate of Incorporation of the Corporation shall be eliminated and the shares of 7.80% Preferred Stock shall resume the status of authorized and unissued shares of Preferred Stock of the Corporation, without designation as to series.

THIRD: Pursuant to the provisions of Section 151(g) of the DGCL, all references to 7.80% Preferred Stock in the Amended and Restated Certificate of Incorporation of the Corporation hereby are eliminated, and the shares that were designated to such series hereby are returned to the status of authorized but unissued shares of the Preferred Stock of the Corporation, without designation as to series.

162

IN WITNESS WHEREOF, the Corporation has caused this certificate to be signed by Martin M. Cohen, its assistant Secretary, this 2nd day of March, 1999.

MORGAN STANLEY DEAN WITTER & CO.

By      /s/ Martin M. Cohen
Name:  Martin M. Cohen
Title:   Assistant Secretary

163

CERTIFICATE OF ELIMINATION
OF THE
7.82% CUMULATIVE PREFERRED STOCK
($200.00 Stated Value)
OF MORGAN STANLEY DEAN WITTER & CO.

(Pursuant to Section 151(g) of the
General Corporation Law of the State of Delaware)

Morgan Stanley Dean Witter & Co., a corporation duly organized and existing under the General Corporation Law of the State of Delaware (the "Corporation"), certifies as follows:

FIRST: The Corporation's Amended and Restated Certificate of Corporation authorizes the issuance of 611,238 shares of a series of Preferred Stock designated 7.82% Cumulative Preferred Stock, par value $0.01 per share, with a stated value of $200.00 per share (the "7.82% Preferred Stock").

SECOND: Pursuant to the provisions of Section 151(g) of the General Corporation Law of the State of Delaware (the "DGCL"), the Preferred Stock Financing Committee of the Board of Directors of the Corporation adopted the following resolutions:

RESOLVED FURTHER, that none of the authorized shares of the 7.82% Preferred Stock are outstanding and none of the authorized shares of such series of Preferred Stock will be issued; and

RESOLVED FURTHER, that any officer of the Corporation is authorized and directed to execute a Certificate of Elimination as provided by Section 151(g) of the DGCL in accordance with Section 103 of the DGCL, substantially in the form attached as Exhibit A, with such changes therein as the officer executing the same may approve and as are permitted by the DGCL to be made by such officer, such approval to be conclusively evidenced by such officer's execution of such Certificate of Elimination, and to file the same forthwith in the Office of the Secretary of State of the State of Delaware, and when such Certificate of Elimination becomes effective, all references to the 7.82% Preferred Stock in the Amended and Restated Certificate of Incorporation of the Corporation shall be eliminated and the shares of 7.82% Preferred Stock shall resume the status of authorized and unissued shares of Preferred Stock of the Corporation, without designation as to series.

THIRD: Pursuant to the provisions of Section 151(g) of the DGCL, all references to 7.82% Preferred Stock in the Amended and Restated Certificate of Incorporation of the Corporation hereby are eliminated, and the shares that were designated to such series hereby are returned to the status of authorized but unissued shares of the Preferred Stock of the Corporation, without designation as to series.

164

IN WITNESS WHEREOF, the Corporation has caused this certificate to be signed by Martin M. Cohen, its assistant Secretary, this 2nd day of March, 1999.

MORGAN STANLEY DEAN WITTER & CO.

By      /s/ Martin M. Cohen
Name:  Martin M. Cohen
Title:   Assistant Secretary

165

Certificate of Amendment
to
Amended and Restated Certificate of Incorporation
of
Morgan Stanley Dean Witter & Co.

Pursuant to Section 242 of the
General Corporation Law of
the State of Delaware

Morgan Stanley Dean Witter & Co. (the "Company"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, does hereby certify that:

FIRST: The Board of Directors of the Company, at a duly convened telephonic meeting of the Board of Directors held on December 20, 1999, duly adopted resolutions setting forth a proposed amendment to the Amended and Restated Certificate of Incorporation of the Company, declaring said amendment to be advisable and authorizing the officers of the Company to submit such amendment to the stockholders of the Company for approval at the Company's 2000 annual meeting of stockholders. The resolution setting forth the proposed amendment is as follows:

"RESOLVED, that the Board of Directors declares it advisable that the first sentence of Article IV of the Company's Amended and Restated Certificate of Incorporation in effect on the date hereof be amended to read in its entirety as follows:

The total number of shares of stock which the Corporation shall the authority to issue is three billion five hundred thirty million (3,530,000,000), consisting of thirty million (30,000,000) shares of Preferred Stock, par value $0.01 per share (hereinafter referred to as "Preferred Stock"), and three billion five hundred million (3,500,000,000) shares of Common Stock, par value $0.01 per share (hereinafter referred to as "Common Stock")."

SECOND: Thereafter, pursuant to resolution of its Board of Directors, the 2000 annual meeting of stockholders of the Company was duly called and held, upon notice in accordance with Section 222 of the General Corporation Law of the State of Delaware, at which meeting the necessary number of shares as required by Section 242 of the General Corporation Law of the State of Delaware were voted in favor of the amendment.

THIRD: Said amendment was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

IN WITNESS WHEREOF, the Company has caused this Certificate to be signed by Ronald T. Carman, its Assistant Secretary this 11th day of April, 2000.

MORGAN STANLEY DEAN WITTER & CO.

By: /s/ Ronald T. Carman
    Ronald T. Carman, Assistant Secretary

166

**CERTIFICATE OF ELIMINATION**

**OF THE**

**9.00% CUMULATIVE PREFERRED STOCK**

($200.00 Stated Value)

**OF MORGAN STANLEY DEAN WITTER & CO.**

(Pursuant to Section 151(g) of the

**General Corporation Law of the State of Delaware)**

Morgan Stanley Dean Witter & Co., a corporation duly organized and existing under the General Corporation Law of the State of Delaware (the "Corporation"), certifies as follows:

FIRST: The Corporation's Amended and Restated Certificate of Incorporation authorizes the issuance of 720,900 shares of a series of Preferred Stock designated 9.00% Cumulative Preferred Stock, par value $0.01 per share, with a stated value of $200.00 per share (the "9.00% Preferred Stock").

SECOND: Pursuant to the provisions of Section 151(g) of the General Corporation Law of the State of Delaware (the "DGCL"), the Preferred Stock Financing Committee of the Board of Directors of the Corporation adopted the following resolutions:

RESOLVED, that none of the authorized shares of the 9.00% Preferred Stock are outstanding and none of the authorized shares of such series of Preferred Stock will be issued; and

RESOLVED FURTHER, that any officer of the Corporation is authorized and directed to execute a Certificate of Elimination as provided by Section 151(g) of the DGCL in accordance with Section 103 of the DGCL, substantially in the form attached as Exhibit A, with such changes therein as the officer executing the same may approve and as are permitted by the DGCL to be made by such officer, such approval to be conclusively evidenced by such officer's execution of such Certificate of Elimination, and to file the same forthwith in the Office of the Secretary of State of the State of Delaware, and when such Certificate of Elimination becomes effective, all references to the 9.00% Preferred Stock in the Amended and Restated Certificate of Incorporation of the Corporation shall be eliminated and the shares of 9.00% Preferred Stock shall resume the status of authorized and unissued shares of Preferred Stock of the Corporation, without designation as to series.

THIRD: Pursuant to the provisions of Section 151(g) of the DGCL, all references to 9.00% Preferred Stock in the Amended and Restated Certificate of Incorporation of the Corporation hereby are eliminated, and the shares that were designated to such series hereby are returned to the status of authorized but unissued shares of the Preferred Stock of the Corporation, without designation as to series.

167

IN WITNESS WHEREOF, the Corporation has caused this certificate to be signed by Martin M. Cohen, its Assistant Secretary, this 30th day of January, 2001.

**MORGAN STANLEY DEAN WITTER & CO.**

By      /s/ Martin M. Cohen
Name:  Martin M. Cohen
Title:   Assistant Secretary

168

## CERTIFICATE OF ELIMINATION

### OF THE

### ESOP CONVERTIBLE PREFERRED STOCK

### OF MORGAN STANLEY DEAN WITTER & CO.

(Pursuant to Section 151(g) of the

**General Corporation Law of the State of Delaware)**

Morgan Stanley Dean Witter & Co., a corporation duly organized and existing under the General Corporation Law of the State of Delaware (the "Corporation"), certifies as follows:

FIRST: The Corporation's Amended and Restated Certificate of Incorporation authorizes the issuance of 3,902,438 shares of a series of Preferred Stock designated ESOP Convertible Preferred Stock, par value $0.01 per share (the "ESOP Preferred Stock").

SECOND: Pursuant to the provisions of Section 151(g) of the General Corporation Law of the State of Delaware (the "DGCL"), the Preferred Stock Financing Committee of the Board of Directors of the Corporation adopted the following resolutions:

RESOLVED FURTHER, that none of the authorized shares of the ESOP Preferred Stock are outstanding and none of the authorized shares of such series of Preferred Stock will be issued; and

RESOLVED FURTHER, that any officer of the Corporation is authorized and directed to execute a Certificate of Elimination as provided by Section 151(g) of the DGCL in accordance with Section 103 of the DGCL, substantially in the form attached as Exhibit B, with such changes therein as the officer executing the same may approve and as are permitted by the DGCL to be made by such officer, such approval to be conclusively evidenced by such officer's execution of such Certificate of Elimination, and to file the same forthwith in the Office of the Secretary of State of the State of Delaware, and when such Certificate of Elimination becomes effective, all references to the ESOP Preferred Stock in the Amended and Restated Certificate of Incorporation of the Corporation shall be eliminated and the shares of the ESOP Preferred Stock shall resume the status of authorized and unissued shares of Preferred Stock of the Corporation, without designation as to series.

THIRD: Pursuant to the provisions of Section 151(g) of the DGCL, all references to the ESOP Preferred Stock in the Amended and Restated Certificate of Incorporation of the Corporation hereby are eliminated, and the shares that were designated to such series hereby are returned to the status of authorized but unissued shares of the Preferred Stock of the Corporation, without designation as to series.

169

IN WITNESS WHEREOF, the Corporation has caused this certificate to be signed by Martin M. Cohen, its Assistant Secretary, this 30th day of January, 2001.

**MORGAN STANLEY DEAN WITTER & CO.**

By      /s/ Martin M. Cohen
Name:  Martin M. Cohen
Title:   Assistant Secretary

170

**CERTIFICATE OF ELIMINATION**

**OF THE**

**8.20% CUMULATIVE PREFERRED STOCK**

($200.00 Stated Value)

**OF MORGAN STANLEY DEAN WITTER & CO.**

(Pursuant to Section 151(g) of the

**General Corporation Law of the State of Delaware)**

Morgan Stanley Dean Witter & Co., a corporation duly organized and existing under the General Corporation Law of the State of Delaware (the "Corporation"), certifies as follows:

FIRST: The Corporation's Amended and Restated Certificate of Incorporation authorizes the issuance of 847,500 shares of a series of Preferred Stock designated 8.20% Cumulative Preferred Stock, par value $0.01 per share, with a stated value of $200.00 per share (the "8.20% Preferred Stock").

SECOND: Pursuant to the provisions of Section 151(g) of the General Corporation Law of the State of Delaware (the "DGCL"), the Preferred Stock Financing Committee of the Board of Directors of the Corporation adopted the following resolutions:

RESOLVED FURTHER, that none of the authorized shares of the 8.20% Preferred Stock are outstanding and none of the authorized shares of such series of Preferred Stock will be issued; and

RESOLVED FURTHER, that any officer of the Corporation is authorized and directed to execute a Certificate of Elimination as provided by Section 151(g) of the DGCL in accordance with Section 103 of the DGCL, substantially in the form attached as Exhibit C, with such changes therein as the officer executing the same may approve and as are permitted by the DGCL to be made by such officer, such approval to be conclusively evidenced by such officer's execution of such Certificate of Elimination, and to file the same forthwith in the Office of the Secretary of State of the State of Delaware, and when such Certificate of Elimination becomes effective, all references to the 8.20% Preferred Stock in the Amended and Restated Certificate of Incorporation of the Corporation shall be eliminated and the shares of the 8.20% Preferred Stock shall resume the status of authorized and unissued shares of Preferred Stock of the Corporation, without designation as to series.

THIRD: Pursuant to the provisions of Section 151(g) of the DGCL, all references to the 8.20% Preferred Stock in the Amended and Restated Certificate of Incorporation of the Corporation hereby are eliminated, and the shares that were designated to such series hereby are returned to the status of authorized but unissued shares of the Preferred Stock of the Corporation, without designation as to series.

171

IN WITNESS WHEREOF, the Corporation has caused this certificate to be signed by Martin M. Cohen, its Assistant Secretary, this 30th day of January, 2001.

**MORGAN STANLEY DEAN WITTER & CO.**

By     /s/ Martin M. Cohen

Name:  Martin M. Cohen

Title:   Assistant Secretary

172

## CERTIFICATE OF ELIMINATION

### OF THE

### 8.40% CUMULATIVE PREFERRED STOCK

($200.00 Stated Value)

### OF MORGAN STANLEY DEAN WITTER & CO.

(Pursuant to Section 151(g) of the

### General Corporation Law of the State of Delaware)

Morgan Stanley Dean Witter & Co., a corporation duly organized and existing under the General Corporation Law of the State of Delaware (the "Corporation"), certifies as follows:

FIRST: The Corporation's Amended and Restated Certificate of Incorporation authorizes the issuance of 996,776 shares of a series of Preferred Stock designated 8.40% Cumulative Preferred Stock, par value $0.01 per share, with a stated value of $200.00 per share (the "8.40% Preferred Stock").

SECOND: Pursuant to the provisions of Section 151(g) of the General Corporation Law of the State of Delaware (the "DGCL"), the Preferred Stock Financing Committee of the Board of Directors of the Corporation adopted the following resolutions:

RESOLVED FURTHER, that none of the authorized shares of the 8.40% Preferred Stock are outstanding and none of the authorized shares of such series of Preferred Stock will be issued; and

RESOLVED FURTHER, that any officer of the Corporation is authorized and directed to execute a Certificate of Elimination as provided by Section 151(g) of the DGCL in accordance with Section 103 of the DGCL, substantially in the form attached as Exhibit D, with such changes therein as the officer executing the same may approve and as are permitted by the DGCL to be made by such officer, such approval to be conclusively evidenced by such officer's execution of such Certificate of Elimination, and to file the same forthwith in the Office of the Secretary of State of the State of Delaware, and when such Certificate of Elimination becomes effective, all references to the 8.40% Preferred Stock in the Amended and Restated Certificate of Incorporation of the Corporation shall be eliminated and the shares of 8.40% Preferred Stock shall resume the status of authorized and unissued shares of Preferred Stock of the Corporation, without designation as to series.

THIRD: Pursuant to the provisions of Section 151(g) of the DGCL, all references to 8.40% Preferred Stock in the Amended and Restated Certificate of Incorporation of the Corporation hereby are eliminated, and the shares that were designated to such series hereby are returned to the status of authorized but unissued shares of the Preferred Stock of the Corporation, without designation as to series.

173

IN WITNESS WHEREOF, the Corporation has caused this certificate to be signed by Martin M. Cohen, its Assistant Secretary, this 30th day of January, 2001.

**MORGAN STANLEY DEAN WITTER & CO.**

By      /s/ Martin M. Cohen

Name:  Martin M. Cohen

Title:   Assistant Secretary

174

**CERTIFICATE OF ELIMINATION**
**OF THE**
**SERIES A FIXED/ADJUSTABLE RATE CUMULATIVE PREFERRED STOCK**
($200.00 Stated Value)

**OF MORGAN STANLEY DEAN WITTER & CO.**

(Pursuant to Section 151(g) of the

General Corporation Law of the State of Delaware)

Morgan Stanley Dean Witter & Co., a corporation duly organized and existing under the General Corporation Law of the State of Delaware (the "Corporation"), certifies as follows:

FIRST: The Corporation's Amended and Restated Certificate of Incorporation authorizes the issuance of 1,725,000 shares of a series of Preferred Stock designated Series A Fixed/Adjustable Rate Cumulative Preferred Stock, without par value, with a stated value of $200 per share (the "Series A Fixed/Adjustable Rate Preferred Stock").

SECOND: Pursuant to the provisions of Section 151(g) of the General Corporation Law of the State of Delaware (the "DGCL"), the Preferred Stock Financing Committee of the Board of Directors of the Corporation adopted the following resolutions:

RESOLVED FURTHER, that none of the authorized shares of the Series A Fixed/Adjustable Rate Preferred Stock are outstanding and none of the authorized shares of such series of Preferred Stock will be issued; and

RESOLVED FURTHER, that any officer of the Corporation is authorized and directed to execute a Certificate of Elimination as provided by Section 151(g) of the DGCL in accordance with Section 103 of the DGCL, substantially in the form attached as Exhibit B, with such changes therein as the officer executing the same may approve and as are permitted by the DGCL to be made by such officer, such approval to be conclusively evidenced by such officer's execution of such Certificate of Elimination, and to file the same forthwith in the Office of the Secretary of State of the State of Delaware, and when such Certificate of Elimination becomes effective, all references to the Series A Fixed/Adjustable Rate Preferred Stock in the Amended and Restated Certificate of Incorporation of the Corporation shall be eliminated and the shares of Series A Fixed/Adjustable Rate Preferred Stock shall resume the status of authorized and unissued shares of Preferred Stock of the Corporation, without designation as to series.

THIRD: Pursuant to the provisions of Section 151(g) of the DGCL, all references to Series A Fixed/Adjustable Rate Preferred Stock in the Amended and Restated Certificate of Incorporation of the Corporation hereby are eliminated, and the shares that were designated to such series hereby are returned to the status of authorized but unissued shares of the Preferred Stock of the Corporation, without designation as to series.

175

IN WITNESS WHEREOF, the Corporation has caused this certificate to be signed by Martin M. Cohen, its Assistant Secretary, this 24th day of December, 2001.

**MORGAN STANLEY DEAN WITTER & CO.**

By      /s/ Martin M. Cohen
Name:  Martin M. Cohen
Title:   Assistant Secretary

176

**CERTIFICATE OF ELIMINATION**
**OF THE**
**7 3/4% CUMULATIVE PREFERRED STOCK**
($200.00 Stated Value)

**OF MORGAN STANLEY DEAN WITTER & CO.**

(Pursuant to Section 151(g) of the

General Corporation Law of the State of Delaware)

Morgan Stanley Dean Witter & Co., a corporation duly organized and existing under the General Corporation Law of the State of Delaware (the "Corporation"), certifies as follows:

FIRST: The Corporation's Certificate of Designation of Preferences and Rights of the 7 3/4/% Cumulative Preferred Stock, dated May 30, 1997 ("Certificate of Designation") authorizes the issuance of 1,000,000 shares of a series of Preferred Stock designated 7 3/4% Cumulative Preferred Stock, without par value, with a stated value of $200 per share (the "7 3/4% Preferred Stock").

SECOND: Pursuant to the provisions of Section 151(g) of the General Corporation Law of the State of Delaware (the "DGCL"), the Preferred Stock Financing Committee of the Board of Directors of the Corporation adopted the following resolutions:

RESOLVED FURTHER, that none of the authorized shares of the 7 3/4% Preferred Stock are outstanding and none of the authorized shares of such series of Preferred Stock will be issued; and

RESOLVED FURTHER, that any officer of the Corporation is authorized and directed to execute a Certificate of Elimination as provided by Section 151(g) of the DGCL in accordance with Section 103 of the DGCL, substantially in the form attached as Exhibit A, with such changes therein as the officer executing the same may approve and as are permitted by the DGCL to be made by such officer, such approval to be conclusively evidenced by such officer's execution of such Certificate of Elimination, and to file the same forthwith in the Office of the Secretary of State of the State of Delaware, and when such Certificate of Elimination becomes effective, all references to the 7 3/4% Preferred Stock in the Certificate of Designation of the Corporation shall be eliminated and the shares of 7 3/4% Preferred Stock shall resume the status of authorized and unissued shares of Preferred Stock of the Corporation, without designation as to series.

THIRD: Pursuant to the provisions of Section 151(g) of the DGCL, all references to 7 3/4% Preferred Stock in the Certificate of Designation of the Corporation hereby are eliminated, and the shares that were designated to such series hereby are returned to the status of authorized but unissued shares of the Preferred Stock of the Corporation, without designation as to series.

177

IN WITNESS WHEREOF, the Corporation has caused this certificate to be signed by Martin M. Cohen, its Assistant Secretary, this 24th day of December, 2001.

**MORGAN STANLEY DEAN WITTER & CO.**

By      /s/ Martin M. Cohen

Name:  Martin M. Cohen

Title:   Assistant Secretary

178

## CERTIFICATE OF OWNERSHIP AND MERGER
## MERGING
## MORGAN STANLEY NC INC.
## INTO
## MORGAN STANLEY DEAN WITTER & CO.

Morgan Stanley Dean Witter & Co., a corporation incorporated under the laws of the State of Delaware (the "Corporation"), pursuant to Section 253 of the General Corporation Law of the State of Delaware, does hereby certify that it owns all the capital stock of Morgan Stanley NC Inc., a corporation incorporated under the laws of the State of Delaware ("NC"), and that the Corporation, by resolutions of its board of directors duly adopted on June 18, 2002, determined to merge NC into itself, which resolutions provide in relevant part as follows:

WHEREAS, the Corporation owns all the outstanding stock of Morgan Stanley NC Inc., a corporation organized and existing under the laws of the State of Delaware ("NC"), and desires to merge NC into itself and to be possessed of all the estate, property, rights, privileges and franchises of said corporation.

NOW, THEREFORE, BE IT RESOLVED, effective at the time specified in the Certificate of Ownership and Merger filed in respect thereof (the "Effective Time"), that the Corporation merge NC into itself and assume all NC's liabilities and obligations; and

FURTHER RESOLVED, that it is intended that the merger of NC into the Corporation qualify as a tax-free reorganization under Section 368(a)(1)(F) of the Internal Revenue Code of 1986, as amended, and that these resolutions constitute a plan of reorganization within the meaning of Section 368; and

FURTHER RESOLVED, that, at any time prior to the Effective Time, the merger may be amended, modified, terminated or abandoned by action of the Corporation's Board of Directors; and

FURTHER RESOLVED, that, at the Effective Time, Article I of the Corporation's Amended and Restated Certificate of Incorporation be amended to read in its entirety as follows:

### Article I
### Name

The name of the Corporation (which is hereafter referred to as the "Corporation") is Morgan Stanley.

FURTHER RESOLVED, that each officer of the Corporation is authorized to make and execute a Certificate of Ownership and Merger setting forth a copy of this

179

resolution, and the date of adoption thereof, and to file the same in the office of the Secretary of State of the State of Delaware; and

FURTHER RESOLVED, that in connection with changing the Corporation's name, each officer of the Corporation is authorized, in the name and on behalf of the Corporation, to enter into any agreements with the office of the Secretary of State of the State of Delaware, and to make and execute such additional certificates and to file the same in the office of the Secretary of State of the State of Delaware, in each case as may, in his or her judgment, be required or advisable; and

FURTHER RESOLVED, that in order for the Corporation to comply with all applicable regulations and requirements of federal, state, local and foreign governmental agencies and exchanges, each officer of the Corporation is authorized, in the name and on behalf of the Corporation, to prepare, execute and file or cause to be filed all reports, statements, documents, undertakings, commitments and information with any exchange or governmental agency or agencies as may, in his or her judgment, be required or advisable in connection with the merger or the Corporation's name change; and

FURTHER RESOLVED, that, after the Certificate of Ownership and Merger shall have become effective, each officer of the Corporation is hereby authorized, in the name and on behalf of the Corporation, to apply to, and to take such steps and to execute such documents as may be necessary or desirable to, change the name in which the Corporation is qualified to do business, in such jurisdictions as it is qualified, to reflect the change in the Corporation's name; and

FURTHER RESOLVED, that, after the Certificate of Ownership and Merger shall have become effective, each officer of the Corporation is hereby authorized, in the name and on behalf of the Corporation, to apply to, and to take such steps and to execute such documents as may be necessary or desirable to, use any alternate name, fictitious name, assumed name or other name in such jurisdictions as the Corporation is qualified, if such officer determines it is necessary or desirable for the Corporation to use an alternate name, fictitious name, assumed name or other name; and

FURTHER RESOLVED, that, after the Certificate of Ownership and Merger shall have become effective, the Bylaws of the Corporation shall be and hereby are amended by deleting the name "Morgan Stanley Dean Witter & Co." from the Heading and substituting therefor the name "Morgan Stanley"; and

FURTHER RESOLVED, that, after the Certificate of Ownership and Merger shall have become effective, each officer of the Corporation is hereby authorized, in the name and on behalf of the Corporation, to prepare, execute and file a listing application or supplemental listing application, and such other documents, and to take such steps, as may be necessary or desirable, with the New York Stock Exchange and if such officers determine it required or advisable, any other exchanges on which the Corporation has listed securities, to reflect the change in the Corporation's name; and

180

FURTHER RESOLVED, that all actions to be taken or heretofore taken by any officer or agent of the Corporation in connection with any matter referred to or contemplated by any of the foregoing resolutions be, and they hereby are, approved, ratified and confirmed in all respects; and

FURTHER RESOLVED, that each officer of the Corporation is authorized to do all acts and things and to sign, seal, execute, acknowledge, file, deliver and record all papers, instruments, agreements, documents and certificates, and to pay all charges, fees, taxes and other expenses, from time to time necessary, desirable or appropriate to be done, signed, sealed, executed, acknowledged, filed, delivered, recorded or paid, under any applicable law, or otherwise, and to certify as having been adopted by this Board of Directors any form of resolution required by any law, regulation or agency, in order to effectuate the purpose of the foregoing resolutions or any of them or to carry out the transactions contemplated hereby.

This Certificate of Ownership and Merger, and the merger provided for herein, shall not become effective until, and shall become effective at, 12:01 a.m. on June 20, 2002.

IN WITNESS WHEREOF, Morgan Stanley Dean Witter & Co. has caused this certificate to be signed by its authorized officer, the 18th day of June, 2002.

MORGAN STANLEY DEAN WITTER & CO.

By: /s/   William J. O'Shaughnessy, Jr.
     William J. O'Shaughnessy, Jr.
     Assistant Secretary

181

Certificate of Amendment
to
Amendment and Restated Certificate of Incorporation
of
Morgan Stanley

Pursuant to Section 242 of the
General Corporation Law of
the State of Delaware

Morgan Stanley (the "Company"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, does hereby certify that:

FIRST: The Board of Directors of the Company, at a duly convened meeting of the Board of Directors held on December 14, 2004, duly adopted resolutions setting forth a proposed amendment to the Amended and Restated Certificate of Incorporation of the Company, declaring said amendment to be advisable and authorizing the officers of the Company to submit such amendment to the stockholders of the Company for approval at the Company's 2005 annual meeting of stockholders. The resolution setting forth the proposed amendment is as follows:

"NOW, THEREFORE, BE IT RESOLVED, that the Board of Directors declares it advisable that Article VII of the Corporation's Amended and Restated Certificate of Incorporation be amended to read in its entirely as follows:

## ARTICLE VII

### Board of Directors

Subject to the rights of the holders of any series of Preferred Stock, or any other series or class of stock as set forth in this Certificate of Incorporation, to elect additional directors under specified circumstances, the number of directors of the Corporation shall be fixed in such manner as prescribed in the Bylaws of the Corporation and may be increased or decreased from time to time in such manner as prescribed by the Bylaws.

Unless and except to the extent that the Bylaws of the Corporation shall so require, the election of directors of the Corporation need not be by written ballot.

Subject to the succeeding provisions of this paragraph, the directors, other than those who may be elected by the holders of any series of Preferred Stock or any other series or class of stock as set forth in this Certificate of Incorporation, shall be divided into three classes, initially consisting of 6, 4 and 4 directors. One class of directors initially consisting of 4 directors shall be initially elected for a term expiring at the annual meeting of stockholders to be held in 1998, another class initially consisting of 4 directors shall be initially elected for a term expiring at the annual meeting of stockholders to be held in 1999, and another class initially consisting of 6 directors shall be initially elected for a term expiring at the

182

annual meeting of stockholders to be held in 2000. Members of each class shall hold office until their successors are elected and qualified. At each annual meeting of the stockholders of the Corporation commencing with the 1998 annual meeting but prior to the 2006 annual meeting, directors elected to succeed those directors whose terms then expire shall be elected by a plurality vote of all votes cast at such meeting to hold office for a term expiring at the third succeeding annual meeting of stockholders after their election, with each director to hold office until his or her successor shall have been duly elected and qualified. At each annual meeting of the stockholders of the Corporation commencing with the 2006 annual meeting, directors elected to succeed those directors whose terms then expire shall be elected by a plurality vote of all votes cast at such meeting to hold office for a term expiring at the next annual meeting of stockholders, with each director to hold office until his or her successor shall have been duly elected and qualified. Commencing with the 2008 annual meeting of stockholders of the Corporation, the foregoing classification of the Board of Directors shall cease.

Subject to the rights of the holders of any series of Preferred Stock, or any other series or class of stock as set forth in this Certificate of Incorporation, to elect additional directors under specified circumstances, vacancies resulting from death, resignation, retirement, disqualification, removal from office or other cause, and newly created directorships resulting from any increase in the authorized number of directors, may be filled only by the affirmative vote of a majority of the remaining directors, though less than a quorum of the Board of Directors, and directors so chosen (i) prior to the 2008 annual meeting of stockholders shall hold office for a term expiring at the annual meeting of stockholders at which the term of office of the class to which they have been elected expires, or (ii) subsequent to the 2008 annual meeting of stockholders shall hold office for a term expiring at the next annual meeting of stockholders, and in each case until such director's successor shall have been duly elected and qualified. No decrease in the number of authorized directors constituting the Board of Directors shall shorten the term of any incumbent director.

Subject to the rights of the holders of any series of Preferred Stock, or any other series or class of stock as set forth in this Certificate of Incorporation, to elect additional directors under specified circumstances, any director may be removed from office at any time, but only by the affirmative vote of the holders of at least 80 percent of the voting power of the then outstanding Voting Stock, voting together as a single class, and, prior to the 2008 annual meeting of stockholders, only for cause."

SECOND: Thereafter, pursuant to resolution of its Board of Directors, the 2005 annual meeting of stockholders of the Company was duly called and held, upon notice in accordance with Section 222 of the General Corporation Law of the State of Delaware, at which meeting the necessary number of shares as required by Section 242 of the General Corporation Law of the State of Delaware and the Amended and Restated Certificate of Incorporation were voted in favor of the amendment.

183

THIRD: Said amendment was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

IN WITNESS WHEREOF, the Company has caused this Certificate to be signed by Ronald T. Carman, its Assistant Secretary, this 22nd day of March, 2005.

MORGAN STANLEY

By: /s/ Ronald T. Carman
Ronald T. Carman
Assistant Secretary

184

**CERTIFICATE OF AMENDMENT**
**TO**
**AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**
**OF**
**MORGAN STANLEY**

Morgan Stanley, a corporation duly organized and existing under the General Corporation Law of the State of Delaware (the "Corporation"), does hereby certify that:

1. Article VII of the Amended and Restated Certificate of Incorporation of the Corporation is hereby amended in its entirety to read as follows:

"ARTICLE VII

Board of Directors

Subject to the rights of the holders of any series of Preferred Stock, or any other series or class of stock as set forth in this Certificate of Incorporation, to elect additional directors under specified circumstances, the number of directors of the Corporation shall be fixed in such manner as prescribed in the Bylaws of the Corporation and may be increased or decreased from time to time in such manner as prescribed by the Bylaws.

Unless and except to the extent that the Bylaws of the Corporation shall so require, the election of directors of the Corporation need not be by written ballot.

The directors, other than those who may be elected by the holders of any series of Preferred Stock or any other series or class of stock as set forth in this Certificate of Incorporation, shall be elected annually at each annual meeting of stockholders of the Corporation to hold office for a term expiring at the next annual meeting of stockholders, with each director to hold office until his or her successor shall have been duly elected and qualified. The terms of office of each director whose term of office did not expire at the 2006 annual meeting of stockholders of the Corporation shall nonetheless expire upon the effectiveness of this Certificate of Amendment under the General Corporation Law of the State of Delaware (the "Effective Time"), such that the directors elected at the 2006 annual meeting of stockholders of the Corporation effective upon the Effective Time to succeed such directors

185

shall commence their term of office at the Effective Time, for a term expiring at the next annual meeting of stockholders, with each such director to hold office until his or her successor shall have been duly elected and qualified.

Subject to the rights of the holders of any series of Preferred Stock, or any other series or class of stock as set forth in this Certificate of Incorporation, to elect additional directors under specified circumstances, vacancies resulting from death, resignation, retirement, disqualification, removal from office or other cause, and newly created directorships resulting from any increase in the authorized number of directors, may be filled only by the affirmative vote of a majority of the remaining directors, though less than a quorum of the Board of Directors, and directors so chosen shall hold office for a term expiring at the next annual meeting of stockholders, and until such director's successor shall have been duly elected and qualified. No decrease in the number of authorized directors constituting the Board of Directors shall shorten the term of any incumbent director.

Any director may be removed from office at any time, with or without cause."

2. Article X of the Amended and Restated Certificate of Incorporation of the Corporation is hereby amended in its entirety to read as follows:

"ARTICLE X

Amendments

Except as may be expressly provided in this Certificate of Incorporation, the Corporation reserves the right at any time and from time to time to amend, alter, change or repeal any provision contained in this Certificate of Incorporation or a Preferred Stock Designation, and any other provisions authorized by the laws of the State of Delaware at the time in force may be added or inserted, in the manner now or hereafter prescribed herein or by applicable law, and all rights, preferences and privileges of whatsoever nature conferred upon stockholders, directors or any other persons whomsoever by and pursuant to this Certificate of Incorporation in its present form or as hereafter amended are granted subject to the right reserved in this Article X; provided, however, that any amendment

186

or repeal of Article VIII or Article IX of this Certificate of Incorporation shall not adversely affect any right or protection existing thereunder in respect of any act or omission occurring prior to such amendment or repeal, and provided further that no Preferred Stock Designation shall be amended after the issuance of any shares of the series of Preferred Stock created thereby, except in accordance with the terms of such Preferred Stock Designation and the requirements of applicable law.

Notwithstanding anything contained in this Certificate of Incorporation to the contrary, and in addition to approval by the Board of Directors, the affirmative vote of the holders of at least 80 percent of the voting power of the then outstanding Voting Stock, voting together as a single class, shall be required to amend, repeal or adopt any provision inconsistent with paragraph (1) of Article V or this second paragraph of this Article X. For the purposes of this Certificate of Incorporation, "Voting Stock" shall mean the outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors."

3. The foregoing amendments were duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

[Signature Page Follows]

187

IN WITNESS WHEREOF, the Corporation has caused this Certificate to be executed by its duly authorized officer on this 5th day of April, 2006.

**MORGAN STANLEY**

By: /s/ WILLIAM J. O'SHAUGHNESSY, JR.

William J. O'Shaughnessy, Jr.
Assistant Secretary

188

CERTIFICATE OF DESIGNATION OF PREFERENCES AND RIGHTS OF THE
FLOATING RATE NON-CUMULATIVE PREFERRED STOCK, SERIES A

(Liquidation Preference $25,000 per share)

OF

MORGAN STANLEY

———————

Pursuant to Section 151 of the

General Corporation Law of the State of Delaware

———————

Morgan Stanley, a Delaware corporation (hereinafter called the "Corporation"), DOES HEREBY CERTIFY that, pursuant to resolutions of the Preferred Stock Financing Committee (the "Committee") of the Board of Directors of the Corporation adopted on June 26, 2006, the creation of Floating Rate Non-Cumulative Preferred Stock, Series A, par value $0.01 per share, liquidation preference $25,000 per share ("Series A"), of the Corporation was authorized and the designation, preferences, privileges, voting rights, and other special rights and qualifications, limitations and restrictions of the Series A, in addition to those set forth in the Certificate of Incorporation and Bylaws of the Corporation, are fixed as follows:

1. *Designation.* The distinctive serial designation of such series of preferred stock is "Floating Rate Non-Cumulative Preferred Stock, Series A." Each share of Series A shall be identical in all respects to every other share of Series A, except as to the respective dates from which dividends thereon shall accrue, to the extent such dates may differ as permitted pursuant to Section 4(a) below.

2. *Number of Shares.* The authorized number of shares of Series A shall be 46,000. Shares of Series A that are redeemed, purchased or otherwise acquired by the Corporation, or converted into another series of Preferred Stock, shall be cancelled and shall revert to authorized but unissued shares of Preferred Stock; provided that this Section 2 shall not apply to any purchase or other acquisition of shares of Series A by any subsidiary of the Corporation.

3. *Definitions.* As used herein with respect to Series A:

(a) "Allowable Capital" has the meaning set forth in Section 7.

(b) "Board of Directors" means the board of directors of the Corporation.

(c) "Bylaws" means the amended and restated bylaws of the Corporation, as they may be amended from time to time.

(d) "Business Day" means a day that is a Monday, Tuesday, Wednesday, Thursday or Friday and is not a day on which banking institutions in New York City generally are authorized or obligated by law, regulation or executive order to close.

189

(e) "Calculation Agent" means, at any time, the person or entity appointed by the Corporation and serving as such agent at such time. The Corporation may terminate any such appointment and may appoint a successor agent at any time and from time to time, provided that the Corporation shall use its best efforts to ensure that there is, at all relevant times when the Series A is outstanding, a person or entity appointed and serving as such agent. The Calculation Agent may be a person or entity affiliated with the Corporation.

(f) "Capital Units" means the outstanding Capital Units of the Corporation and of Morgan Stanley Finance plc. Each Capital Unit consists of a subordinated debenture issued by Morgan Stanley Finance plc and guaranteed by the Corporation on a subordinated basis, and a related purchase contract issued by the Corporation that requires the holder to purchase one depositary share representing ownership of multiple shares of the Corporation's cumulative preferred stock.

(g) "Capital Units Cumulative Preferred Stock" means shares, if any, of the Corporation's 8.03% Cumulative Preferred Stock, par value $0.01 per share, with a stated value $200 per share, which the Corporation may issue under the terms of the outstanding Capital Units.

(h) "Certificate of Designation" means this Certificate of Designation relating to the Series A, as it may be amended or supplemented from time to time.

(i) "Certification of Incorporation" shall mean the amended and restated certificate of incorporation of the Corporation, as it may be amended from time to time, and shall include this Certificate of Designation.

(j) "Common Stock" means the common stock, par value $0.01 per share, of the Corporation.

(k) "Dividend Determination Date" means, for each Dividend Period, the second London Business Day immediately preceding the first day of such Dividend Period.

(l) "Dividend Payment Date" means January 15, April 15, July 15, and October 15 of each year.

(m) "Dividend Period" has the meaning set forth in Section 4(a).

(n) "Dividend Record Date" has the meaning set forth in Section 4(a).

(o) "Junior Stock" means any class or series of capital stock of the Corporation that ranks junior to Series A as to the payment of dividends. Junior Stock includes the Common Stock.

(p) "LIBOR" has the meaning set forth in Section 4(a).

(q) "Liquidation Preference" has the meaning set forth in Section 5(b).

(r) "London Business Day" means a day that is a Monday, Tuesday, Wednesday, Thursday or Friday and is a day on which dealings in U.S. dollars are transacted in the London interbank market.

(s) "Nonpayment" has the meaning set forth in Section 8(b).

190

(t) "Parity Stock" means any other class or series of stock of the Corporation that ranks equally with the Series A in the payment of dividends.

(u) "Preferred Stock" means any and all series of preferred stock of the Corporation, including the Series A.

(v) "Preferred Stock Directors" has the meaning set forth in Section 8(b).

(w) "Regulations" has the meaning set forth in Section 7.

(x) "Required Unrestricted Capital Provisions" has the meaning set forth in Section 7.

(y) "Tier 1 Capital Equivalent" has the meaning set forth in Section 7.

(z) "Voting Preferred Stock" means any other class or series of Preferred Stock of the Corporation ranking equally with the Series A as to the distribution of assets upon liquidation, dissolution or winding up of the Corporation and upon which like voting rights have been conferred and are exercisable. Voting Preferred Stock includes the Capital Units Cumulative Preferred Stock, if issued, and any class or series of cumulative Preferred Stock that the Corporation may issue in the future, to the extent their like voting rights are exercisable at such time. Whether a plurality, majority or other portion of the shares of Series A and any other Voting Preferred Stock have been voted in favor of any matter shall be determined by reference to the liquidation amounts of the shares voted.

4. *Dividends.*

(a) **Rate.** Holders of Series A will be entitled to receive, when, as and if declared by the Board of Directors or a duly authorized committee of the Board of Directors, out of funds legally available for the payment of dividends under Delaware law, non-cumulative cash dividends from the original issue date (in the case of the initial Dividend Period only) or the immediately preceding Dividend Payment Date, quarterly in arrears on each Dividend Payment Date, commencing on October 15, 2006. These dividends will accrue, with respect to each Dividend Period (as defined below), on the liquidation preference amount of $25,000 per share at a rate per annum equal to the greater of (1) three-month U.S. Dollar LIBOR (as defined below) on the related Dividend Determination Date plus .70% or (2) 4%. In the event that the Corporation issues additional shares of Series A after the original issue date, dividends on such shares may accrue from the original issue date or any other date specified by the Board of Directors or an authorized committee thereof at the time such additional shares are issued.

Dividends that are payable on Series A on any Dividend Payment Date will be payable to holders of record of Series A as they appear on the stock register of the Corporation on the applicable record date, which shall be the 15th calendar day before such Dividend Payment Date or such other record date fixed by the Board of Directors or a duly authorized committee of the Board of Directors that is not more than 60 nor less than 10 days prior to such Dividend Payment Date (each, a "Dividend Record Date"). Any such day that is a Dividend Record Date shall be a Dividend Record Date whether or not such day is a Business Day.

A "Dividend Period" is the period from and including a Dividend Payment Date to but excluding the next Dividend Payment Date or any earlier redemption date, except that (i) the initial Dividend Period for any share of Series A issued on the

191

original issue date will commence on and include the original issue date of the Series A and will end on and exclude the October 15, 2006 Dividend Payment Date, and (ii) for any share of Series A issued after the original issue date, the initial Dividend Period for such shares may commence on and include such other date as the Board of Directors or a duly authorized committee of the Board of Directors shall determine and publicly disclose and shall end on and exclude the next Dividend Payment Date. Dividends payable on the Series A will be computed by the Calculation Agent on the basis of a 360-day year and the actual number of days elapsed in the Dividend Period. Dividends for the initial Dividend Period will be calculated from the original issue date. If any date on which dividends would otherwise be payable is not a Business Day, then the Dividend Payment Date will be the next succeeding Business Day unless such day falls in the next calendar month, in which case the Dividend Payment Date will be the immediately preceding day that is a Business Day.

For any Dividend Period, LIBOR (the London interbank offered rate) shall be determined by the Calculation Agent on the Dividend Determination Date in the following manner:

(i) LIBOR will be the rate for deposits in U.S. dollars for a period of three months, commencing on the first day of such Dividend Period, that appears on Page 3750, or any successor page, on Moneyline Telerate Inc., or any successor service, at approximately 11:00 a.m., London time, on that Dividend Determination Date.

(ii) If no such rate appears, then the Calculation Agent will request the principal London offices of each of four major reference banks in the London interbank market, as selected by the Calculation Agent after consultation with the Corporation, to provide the Calculation Agent with its offered quotation for deposits in U.S. dollars for a period of three months, commencing on the first day of such Dividend Period, to prime banks in the London interbank market at approximately 11:00 a.m., London time, on that Dividend Determination Date and in a principal amount that is representative of a single transaction in U.S. dollars in that market at that time. If at least two quotations are provided, LIBOR determined on that Dividend Determination Date will be the arithmetic mean of those quotations. If fewer than two quotations are provided, LIBOR will be determined for the first day of such Dividend Period as the arithmetic mean of the rates quoted at approximately 11:00 a.m., New York time, on that Dividend Determination Date, by three major banks in New York City, as selected by the Calculation Agent after consultation with the Corporation, for loans in U.S. dollars to leading European banks, for a period of three months, commencing on the first day of such Dividend Period, and in a principal amount that is representative of a single transaction in U.S. dollars in that market at that time. If the banks so selected by the Calculation Agent are not quoting as set forth above, LIBOR for that Dividend Determination Date will be the same as LIBOR for the immediately preceding Dividend Period, or, if there was no Dividend Period, the dividend payable will be based on the initial dividend rate.

The Calculation Agent's determination of any dividend rate, and its calculation of the amount of dividends for any Dividend Period, will be maintained on file at the Corporation's principal offices, will be made available to any stockholder upon request and will be final and binding in the absence of manifest error.

Holders of Series A shall not be entitled to any dividends, whether payable in cash, securities or other property, other than dividends (if any) declared and payable on the Series A as specified in this Section 4 (subject to the other provisions of this Certificate of Designation).

192

Dividends on shares of the Series A will not be cumulative. Accordingly, if the Board of Directors (or a duly authorized committee thereof) does not declare a dividend on the Series A payable in respect of any Dividend Period before the related Dividend Payment Date, such dividend will not accrue and the Corporation will have no obligation to pay a dividend for that Dividend Period on the Dividend Payment Date or at any future time, whether or not dividends on the Series A are declared for any future Dividend Period.

(b) **Priority of Dividends**. The Series A will rank (i) senior to the Common Stock and any class or series of the Corporation's capital stock expressly stated to be junior to the Series A, (ii) junior to any class or series of the Corporation's capital stock expressly stated to be senior to the Series A (issued with the requisite consent of the holders of the Series A, if required) and (iii) except as described in the following sentence, at least equally with each other class or series of Preferred Stock the Corporation may issue with respect to the payment of dividends and the distribution of assets upon liquidation, dissolution or winding up of the Corporation. The Series A will rank junior as to payment of dividends, but on a parity as to amounts payable upon liquidation, dissolution or winding up of the Corporation, with any Capital Units Cumulative Preferred Stock, any other class or series of cumulative Preferred Stock that the Corporation may issue in the future and any other class or series of Preferred Stock that the Corporation may issue in the future that is expressly stated to be senior as to payment of dividends, but on a parity as to amounts payable upon our liquidation, dissolution or winding up, to the Series A.

So long as any share of Series A remains outstanding, no dividend or distribution shall be paid or declared on Junior Stock, and no Junior Stock shall be purchased, redeemed or otherwise acquired for consideration by the Corporation, directly or indirectly, during a Dividend Period, unless the full dividend for the latest completed Dividend Period on all outstanding shares of Series A has been declared and paid (or declared and a sum sufficient for the payment thereof has been set aside). The foregoing limitation shall not apply to:

• repurchases, redemptions or other acquisitions of shares of Junior Stock in connection with (1) any employment contract, benefit plan or other similar arrangement with or for the benefit of any one or more employees, officers, directors or consultants or (2) a dividend reinvestment or stockholder stock purchase plan;

• an exchange, redemption, reclassification or conversion of any class or series of Junior Stock, or any junior stock of a subsidiary of the Corporation, for any class or series of Junior Stock;

• the purchase of fractional interests in shares of Junior Stock under the conversion or exchange provisions of Junior Stock or the security being converted or exchanged;

• any declaration of a dividend in connection with any stockholders' rights plan, or the issuance of rights, stock or other property under any stockholders' rights plan, or the redemption or repurchase of rights pursuant to the plan; or

• any dividend in the form of stock, warrants, options or other rights where the dividend stock or the stock issuable upon exercise of such warrants, options or other rights is the same stock as that on which the dividend is being paid or ranks equal or junior to that stock.

193

In addition, the foregoing limitation shall not restrict the ability of Morgan Stanley & Co. Incorporated, or any other affiliate of the Corporation, to engage in any market-making transactions in Junior Stock in the ordinary course of business.

When dividends are not paid (or declared and a sum sufficient for payment thereof set aside) on any Dividend Payment Date (or, in the case of Parity Stock having dividend payment dates different from the Dividend Payment Dates, on a dividend payment date falling within a related Dividend Period) in full upon the Series A and any shares of Parity Stock, all dividends declared on the Series A and all such Parity Stock and payable on such Dividend Payment Date (or, in the case of parity stock having dividend payment dates different from the Dividend Payment Dates, on a dividend payment date falling within the related Dividend Period) shall be declared *pro rata* so that the respective amounts of such dividends shall bear the same ratio to each other as all accrued but unpaid dividends per share on the Series A and all Parity Stock payable on such Dividend Payment Date (or, in the case of Parity Stock having dividend payment dates different from the Dividend Payment Dates, on a dividend payment date falling within the related Dividend Period) bear to each other.

Subject to the foregoing, dividends (payable in cash, securities or other property) may be determined by the Board of Directors or a duly authorized committee of the Board of Directors and may be declared and paid on the Common Stock and any other stock ranking, as to dividends, equally with or junior to the Series A, from time to time out of any funds legally available for such payment, and the Series A shall not be entitled to participate in any such dividends.

5. *Liquidation Rights.*

(a) **Voluntary or Involuntary Liquidation**. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation, holders of Series A shall be entitled to receive out of the assets of the Corporation or proceeds thereof available for distribution to stockholders of the Corporation, after satisfaction of all liabilities, if any, to creditors of the Corporation, and before any distribution of such assets or proceeds is made to or set aside for the holders of Common Stock and any other classes or series of capital stock of the Corporation ranking junior to the Series A as to such distribution, a liquidating distribution in an amount equal to $25,000 per share, together with an amount equal to all dividends, if any, that have been declared but not paid prior to the date of payment of such distribution (but without any accumulation in respect of dividends that have not been declared prior to such payment date). Holders of the Series A Preferred Stock will not be entitled to any other amounts from the Corporation after they have received their full liquidation preference.

(b) **Partial Payment**. If in any distribution described in Section 5(a) above the assets of the Corporation or proceeds thereof are not sufficient to pay the Liquidation Preference (as defined below) in full to all holders of Series A and all holders of any stock of the Corporation ranking equally with the Series A as to such distribution, the amounts paid to the holders of Series A and to the holders of all such other stock shall be paid *pro rata* in accordance with the respective aggregate Liquidation Preference of the holders of Series A and the holders of all such other stock. In any such distribution, the "Liquidation Preference" of any holder of stock of the Corporation shall mean the amount otherwise payable to such holder in such distribution (assuming no limitation on the assets of the Corporation available for such distribution), including an amount equal to any declared but unpaid dividends (and, in the case of any holder of stock other than Series A and on which dividends accrue on a cumulative basis, an amount equal to any unpaid, accrued, cumulative dividends, whether or not declared, as applicable).

194

(c) **Residual Distributions**. If the Liquidation Preference has been paid in full to all holders of Series A and any other shares of the Corporation's stock ranking equally as to such liquidation distribution, the holders of other stock of the Corporation shall be entitled to receive all remaining assets of the Corporation (or proceeds thereof) according to their respective rights and preferences.

(d) **Merger, Consolidation and Sale of Assets Not Liquidation**. For purposes of this Section 5, the merger or consolidation of the Corporation with or into any other corporation or other entity, including a merger or consolidation in which the holders of Series A receive cash, securities or other property for their shares, or the sale, lease or exchange (for cash, securities or other property) of all or substantially all of the assets of the Corporation, shall not constitute a liquidation, dissolution or winding up of the Corporation.

6. *Redemption.*

(a) **Optional Redemption**. The Series A may not be redeemed by the Corporation prior to July 15, 2011. On or after July 15, 2011, subject to obtaining any then required regulatory approval, the Corporation, at its option, may redeem, in whole at any time or in part from time to time, the shares of Series A at the time outstanding, upon notice given as provided in Section 6(c) below, at a redemption price equal to $25,000 per share, together (except as otherwise provided herein below), for the purposes of the redemption price only, with an amount equal to dividends accrued but unpaid for the then current Dividend Period at the rate set forth in Section 4(a) to, but excluding, the date fixed for redemption (regardless of whether any dividends are actually declared for that Dividend Period). The redemption price for any shares of Series A shall be payable on the redemption date to the holder of such shares against surrender of the certificate(s) evidencing such shares to the Corporation or its agent. Any accrued and unpaid dividend for the then current Dividend Period payable on a redemption date that occurs subsequent to the Dividend Record Date for a Dividend Period shall not be paid to the holder entitled to receive the redemption price on the redemption date, but rather shall be paid to the holder of record of the redeemed shares on such Dividend Record Date relating to the Dividend Payment Date as provided in Section 4 above.

(b) **No Sinking Fund**. The Series A will not be subject to any mandatory redemption, sinking fund or other similar provisions. Holders of Series A will have no right to require the redemption or repurchase of any shares of Series A.

(c) **Notice of Redemption**. Notice of every redemption of shares of Series A shall be given by first class mail, postage prepaid, addressed to the holders of record of the shares to be redeemed at their respective last addresses appearing on the books of the Corporation. Such mailing shall be at least 30 days and not more than 60 days before the date fixed for redemption. Any notice mailed as provided in this Subsection shall be conclusively presumed to have been duly given, whether or not the holder receives such notice, but failure duly to give such notice by mail, or any defect in such notice or in the mailing thereof, to any holder of shares of Series A designated for redemption shall not affect the validity of the proceedings for the redemption of any other shares of Series A. Notwithstanding the foregoing, if the depositary shares representing interests in the Series A are issued in book-entry form through The Depository Trust Company or any other similar facility, notice of redemption may be given to the holders of Series A at such time and in any manner permitted by such facility. Each such notice given to a holder shall state: (1) the redemption date; (2) the number of shares of Series A to be redeemed and, if less than all the shares held by such holder are to be redeemed, the number of such shares to be redeemed from such holder; (3) the redemption price; and (4) the place or places where certificates for such shares are to be surrendered for payment of the redemption price.

195

(d) **Partial Redemption**. In case of any redemption of only part of the shares of Series A at the time outstanding, the shares to be redeemed shall be selected either *pro rata* or in such other manner as the Corporation may determine to be fair and equitable. Subject to the provisions hereof, the Corporation shall have full power and authority to prescribe the terms and conditions upon which shares of Series A shall be redeemed from time to time. If fewer than all the shares represented by any certificate are redeemed, a new certificate shall be issued representing the unredeemed shares without charge to the holder thereof.

(e) **Effectiveness of Redemption**. If notice of redemption has been duly given and if on or before the redemption date specified in the notice all funds necessary for the redemption have been set aside by the Corporation, separate and apart from its other funds, in trust for the *pro rata* benefit of the holders of any shares of Series A so called for redemption, so as to be and continue to be available therefor, then, notwithstanding that any certificate for any share so called for redemption has not been surrendered for cancellation, on and after the redemption date dividends shall cease to accrue on all shares so called for redemption, all shares so called for redemption shall no longer be deemed outstanding and all rights with respect to such shares shall forthwith on such redemption date cease and terminate, except only the right of the holders thereof to receive the amount payable on such redemption, without interest. Any funds unclaimed at the end of two years from the redemption date shall, to the extent permitted by law, be released to the Corporation, after which time the holders of the shares so called for redemption shall look only to the Corporation for payment of the redemption price of such shares.

7. *Conversion Upon Regulatory Changes.* If both (i) and (ii) below occur:

(i) after June 26, 2006, the Corporation (by election or otherwise) becomes subject to any law, rule, regulation or guidance (together, "Regulations") relating to its capital adequacy, which Regulation (x) modifies the existing requirements for treatment as Allowable Capital (as defined under the Securities and Exchange Commission rules relating to consolidated supervised entities as in effect from time to time), (y) provides for a type or level of capital characterized as "Tier 1" or its equivalent pursuant to Regulations of any governmental agency, authority or other body having regulatory jurisdiction over the Corporation (or any of its subsidiaries or consolidated affiliates) and implementing the capital standards published by the Basel Committee on Banking Supervision, the Securities and Exchange Commission, the Board of Governors of the Federal Reserve System or any other United States national governmental agency, authority or other body, or any other applicable regime based on capital standards published by the Basel Committee on Banking Supervision or its successor, or (z) provides for a type or level of capital that in the judgment of the Corporation (after consultation with legal counsel of recognized standing) is substantially equivalent to such "Tier 1" capital (such capital described in either (y) or (z) above is referred to below as "Tier 1 Capital Equivalent"), and

(ii) the Corporation affirmatively elects to qualify the Series A for treatment as Allowable Capital or Tier 1 Capital Equivalent without any sublimit or other quantitative restriction on the inclusion of the Series A in Allowable Capital or Tier 1 Capital Equivalent (other than any limitation the Corporation elects to accept and any limitation requiring that common equity or a specified form of common equity constitute the dominant form of Allowable Capital or Tier 1 Capital

196

Equivalent) under such Regulations, then, upon such affirmative election, the Series A shall be convertible at the Corporation's option into a new series of Preferred Stock having terms and provisions substantially identical to those of the Series A, except that such new series may have such additional or modified rights, preferences, privileges and voting powers, and limitations and restrictions thereof, as are necessary in the judgment of the Board of Directors or a duly authorized committee of the Board of Directors (after consultation with legal counsel of recognized standing) to comply with the Required Unrestricted Capital Provisions (as defined below), *provided* that the Corporation shall not cause any such conversion unless the Board of Directors or a duly authorized committee of the Board of Directors determines that the rights, preferences, privileges and voting powers, and the qualifications, limitations and restrictions thereof, of such new series of Preferred Stock, taken as a whole, are not materially less favorable to the holders thereof than the rights, preferences, privileges and voting powers, and the qualifications, limitations and restrictions thereof, of the Series A, taken as a whole.

As used above, the term "Required Unrestricted Capital Provisions" means such terms and provisions as are, in the judgment of the Board of Directors or a duly authorized committee of the Board of Directors (after consultation with counsel of recognized standing), required for preferred stock to be treated as Allowable Capital or Tier 1 Capital Equivalent, as applicable, without any sublimit or other quantitative restriction on the inclusion of such preferred stock in Allowable Capital or Tier 1 Capital Equivalent, as applicable (other than any limitation the Corporation elects to accept and any limitation requiring that common equity or a specified form of common equity constitute the dominant form of Allowable Capital or Tier 1 Capital Equivalent) pursuant to the applicable Regulations.

The Corporation shall provide notice to the holders of Series A of any election to qualify the Series A for Allowable Capital or Tier 1 Capital Equivalent treatment and of any determination to convert the Series A into a new series of Preferred Stock pursuant to the terms of this Section 7, promptly upon the effectiveness of any such election or determination. A copy of such notice and of the relevant Regulations shall be maintained on file at the principal offices of the Corporation and, upon request, will be made available to any stockholder of the Corporation. Any conversion of the Series A pursuant to this Section 7 shall be effected pursuant to such procedures as the Corporation may determine and publicly disclose.

Except as specified in this Section 7, holders of Series A shares shall have no right to exchange or convert such shares into any other securities.

8. *Voting Rights.*

(a) **General**. The holders of Series A shall not have any voting rights except as set forth below and as determined by the Board of Directors or an authorized committee thereof or as otherwise from to time required by law.

(b) **Right To Elect Two Directors Upon Nonpayment Events**. If and whenever dividends on any shares of the Series A, or any other Voting Preferred Stock, shall have not been declared and paid for the equivalent of six or more dividend payments, whether or not for consecutive dividend periods (a "Nonpayment"), the holders of such shares, voting together as a class with holders of any and all other series of Voting Preferred Stock then outstanding, will be entitled to vote for the election of a total of two additional members of the Board of Directors (the "Preferred Stock Directors"), *provided* that the election of any such directors shall not cause the Corporation to violate the corporate governance requirement of the New York Stock Exchange (or any other exchange on which the Corporation's securities may be listed) that listed companies must have a majority of

197

independent directors and *provided further* that the Board of Directors shall at no time include more than two Preferred Stock Directors. In that event, the number of directors on the Board of Directors shall automatically increase by two, and the new directors shall be elected at a special meeting called at the request of the holders of record of at least 20% of the Series A or of any other series of Voting Preferred Stock (unless such request is received less than 90 days before the date fixed for the next annual or special meeting of the stockholders, in which event such election shall be held at such next annual or special meeting of stockholders), and at each subsequent annual meeting. Such request to call a special meeting for the initial election of the Preferred Stock Directors after a Nonpayment shall be made by written notice, signed by the requisite holders of Series A or other Voting Preferred Stock, and delivered to the Secretary of the Corporation in such manner as provided for in Section 10 below, or as may otherwise be required by law. The voting rights will continue until dividends on the shares of the Series A and any such series of Voting Preferred Stock shall have been fully paid (or declared and a sum sufficient for the payment of such dividends shall have been set aside for such payment) for at least four regular dividend periods following the Nonpayment.

If and when dividends for at least four regular dividend periods following a Nonpayment have been fully paid (or declared and a sum sufficient for such payment shall have been set aside) on the Series A and any other class or series of Voting Preferred Stock, the holders of the Series A and all other holders of Voting Preferred Stock shall be divested of the foregoing voting rights (subject to revesting in the event of each subsequent Nonpayment), the term of office of each Preferred Stock Director so elected shall terminate and the number of directors on the Board of Directors shall automatically decrease by two. In determining whether dividends have been paid for at least four regular dividend periods following a Nonpayment, the Corporation may take account of any dividend it elects to pay for any dividend period after the regular dividend date for that period has passed. Any Preferred Stock Director may be removed at any time without cause by the holders of record of a majority of the outstanding shares of the Series A together with all series of Voting Preferred Stock then outstanding (voting together as a single class) to the extent such holders have the voting rights described above. So long as a Nonpayment shall continue, any vacancy in the office of a Preferred Stock Director (other than prior to the initial election after a Nonpayment) may be filled by the written consent of the Preferred Stock Director remaining in office, or if none remains in office, by a vote of the holders of record of a majority of the outstanding shares of Series A and all Voting Preferred Stock when they have the voting rights described above (voting together as a single class). The Preferred Stock Directors shall each be entitled to one vote per director on any matter.

(c) **Other Voting Rights**. So long as any shares of Series A are outstanding, in addition to any other vote or consent of stockholders required by law or by the Certificate of Incorporation, the vote or consent of the holders of at least two-thirds of the shares of Series A and any Voting Preferred Stock at the time outstanding and entitled to vote thereon, voting together as a single class, given in person or by proxy, either in writing without a meeting or by vote at any meeting called for the purpose, shall be necessary for effecting or validating:

(i) **Authorization of Senior Stock**. Any amendment or alteration of the provisions of the Certificate of Incorporation or this Certificate of Designation to authorize or create, or increase the authorized amount of, any shares of any class or series of stock of the Corporation ranking senior to the Series A with respect to the distribution of assets upon any liquidation, dissolution or winding up of the Corporation;

198

(ii) **Amendment of Series A**. Any amendment, alteration or repeal of any provision of the Certificate of Incorporation or this Certificate of Designation, whether by merger, consolidation or otherwise, so as to materially and adversely affect the special rights, preferences, privileges and voting powers of the Series A, taken as a whole; or

(iii) **Share Exchanges, Reclassifications, Mergers and Consolidations**. Any consummation of a binding share exchange or reclassification involving the Series A, or of a merger or consolidation of the Corporation with another entity, unless in each case (x) the shares of Series A remain outstanding or, in the case of any such merger or consolidation with respect to which the Corporation is not the surviving or resulting entity, are converted into or exchanged for preference securities of the surviving or resulting entity or its ultimate parent, and (y) such shares remaining outstanding or such preference securities, as the case may be, have such rights, preferences, privileges and voting powers, and limitations and restrictions thereof, taken as a whole, as are not materially less favorable to the holders thereof than the rights, preferences, privileges and voting powers of the Series A, taken as a whole;

*provided*, *however*, that for all purposes of this Section 8(c), any increase in the amount of the authorized or issued Series A or the creation and issuance, or an increase in the authorized or issued amount, of any other class or series of Preferred Stock ranking equally with the Series A with respect to the distribution of assets upon liquidation, dissolution or winding up of the Corporation and ranking senior to or equally with the Series A with respect to the payment of dividends will not be deemed to adversely affect the rights, preferences, privileges or voting powers of, and will not require the affirmative vote or consent of, the holders of outstanding shares of Series A. In addition, any conversion of the Series A pursuant to Section 7 above shall not be deemed to adversely affect the rights, preferences, privileges and voting powers of the Series A.

If any amendment, alteration, repeal, share exchange, reclassification, merger or consolidation specified in this Section 8(c) would adversely affect one or more but not all other series of Voting Preferred Stock (including the Series A for this purpose), then only such series of Preferred Stock as are adversely affected by and entitled to vote on the matter shall vote on the matter together as a class in lieu of all other series of Preferred Stock. If all series of a class of Preferred Stock are not equally affected by the proposed amendment, alteration, repeal, share exchange, reclassification, merger or consolidation described above, there shall be required a two-thirds approval of the class and a two-thirds approval of each series that will have a diminished status.

(d) **Changes for Clarification**. Without the consent of the holders of the Series A, so long as such action does not adversely affect the rights, preferences, privileges and voting powers, and limitations and restrictions thereof, of the Series A, the Corporation may amend, alter, supplement or repeal any terms of the Series A:

(i) to cure any ambiguity, or to cure, correct or supplement any provision contained in this Certificate of Designation that may be defective or inconsistent; or

(ii) to make any provision with respect to matters or questions arising with respect to the Series A that is not inconsistent with the provisions of this Certificate of Designation.

(e) **Changes after Provision for Redemption**. No vote or consent of the holders of Series A shall be required pursuant to Section 8(b), (c) or (d) above if, at or prior to the time when the act with respect to which any such vote or consent would otherwise be required pursuant to such Section, all outstanding shares of Series A shall have been redeemed, or shall have been called for redemption upon proper notice and sufficient funds shall have been set aside for such redemption, in each case pursuant to Section 6 above.

(f) **Procedures for Voting and Consents**. The rules and procedures for calling and conducting any meeting of the holders of Series A (including, without limitation, the fixing of a record date in connection therewith), the solicitation and use of proxies at such a meeting, the obtaining of written consents and any other aspect or matter with regard to such a meeting or such consents shall be governed by any rules the Board of Directors or a duly authorized committee of the Board of Directors, in its discretion, may adopt from time to time, which rules and procedures shall conform to the requirements of the Certificate of Incorporation, the Bylaws, applicable law and any national securities exchange or other trading facility on which the Series A is listed or traded at the time. Whether the vote or consent of the holders of a plurality, majority or other portion of the shares of Series A and any Voting Preferred Stock has been cast or given on any matter on which the holders of shares of Series A are entitled to vote shall be determined by the Corporation by reference to the specified liquidation amounts of the shares voted or covered by the consent.

9. *Record Holders.* To the fullest extent permitted by applicable law, the Corporation and the transfer agent for the Series A may deem and treat the record holder of any share of Series A as the true and lawful owner thereof for all purposes, and neither the Corporation nor such transfer agent shall be affected by any notice to the contrary.

10. *Notices.* All notices or communications in respect of Series A shall be sufficiently given if given in writing and delivered in person or by first class mail, postage prepaid, or if given in such other manner as may be permitted in this Certificate of Designation, in the Certificate of Incorporation or Bylaws or by applicable law.

11. *No Preemptive Rights.* No share of Series A shall have any rights of preemption whatsoever as to any securities of the Corporation, or any warrants, rights or options issued or granted with respect thereto, regardless of how such securities, or such warrants, rights or options, may be designated, issued or granted.

12. *Other Rights.* The shares of Series A shall not have any voting powers, preferences or relative, participating, optional or other special rights, or qualifications, limitations or restrictions thereof, other than as set forth herein or in the Certificate of Incorporation or as provided by applicable law.

200

IN WITNESS WHEREOF, Morgan Stanley has caused this certificate to be signed by Jacqueline Brody, its Assistant Treasurer, this 5th day of July, 2006.

**MORGAN STANLEY**

By    /S/ JACQUELINE T. BRODY
Name: Jacqueline Brody
Title:  Assistant Treasurer

201

**CERTIFICATE OF ELIMINATION**
**OF THE**
**8.03% CUMULATIVE PREFERRED STOCK**
**($200.00 Stated Value)**
**OF MORGAN STANLEY**

**(Pursuant to Section 151(g) of the**
**General Corporation Law of the State of Delaware)**

Morgan Stanley, a corporation duly organized and existing under the General Corporation Law of the State of Delaware (the "Corporation"), certifies as follows:

**FIRST:** Pursuant to Section 151 of the General Corporation Law of the State of Delaware (the "DGCL") and the authority granted in the Certificate of Incorporation of the Corporation, as amended, the Board of Directors of the Corporation, by resolution duly adopted, authorized the issuance of 670,000 shares of a series of Preferred Stock designated 8.03% Cumulative Preferred Stock, par value $0.01 per share, with a stated value of $200.00 per share (the "8.03% Preferred Stock"), and, on May 30 1997, filed a Certificate of Designation with respect to such 8.03% Preferred Stock (the "Certificate of Designation") in the Office of the Secretary of State of the State of Delaware.

**SECOND:** Pursuant to the provisions of Section 151(g) of DGCL, the Board of Directors of the Corporation adopted the following resolutions:

RESOLVED, that none of the authorized shares of the 8.03% Cumulative Preferred Stock, par value $0.01 per share, with a stated value of $200.00 per share (the "8.03% Preferred Stock") are outstanding and none of the authorized shares of such series of 8.03% Preferred Stock will be issued; and

RESOLVED FURTHER, that any officer of the Corporation is authorized and directed to execute a Certificate of Elimination as provided by Section 151(g) of the General Corporation Law of the State of Delaware (the "DGCL") in accordance with Section 103 of the DGCL, substantially in the form attached as Exhibit A, with such changes therein as the officer executing the same may approve and as are permitted by the DGCL to be made by such officer, such approval to be conclusively evidenced by such officer's execution of such Certificate of Elimination, and to file the same forthwith in the Office of the Secretary of State of the State of Delaware, and when such Certificate of Elimination becomes effective, all references to the 8.03% Preferred Stock in the Amended and Restated Certificate of Incorporation of the Corporation shall be eliminated and the shares of 8.03% Preferred Stock shall resume the status of authorized and unissued shares of preferred stock of the Corporation, without designation as to series.

202

**THIRD:** Pursuant to the provisions of Section 151(g) of the DGCL, all matters set forth in the Certificate of Designation with respect to such 8.03% Preferred Stock be, and hereby are, eliminated from the Certificate of Incorporation of the Corporation, as amended, and the shares that were designated to such series hereby are returned to the status of authorized but unissued shares of the Preferred Stock of the Corporation, without designation as to series.

IN WITNESS WHEREOF, the Corporation has caused this certificate to be signed by Martin M. Cohen, its Assistant Secretary, this 23rd day of March, 2007.

MORGAN STANLEY

By    /S/ MARTIN M. COHEN
Name: Martin M. Cohen
Title:  Assistant Secretary

203